Nos. 23-1475, -1533

IN THE

# United States Court of Appeals for the Federal Circuit

APPLE INC.,

*Appellant,*

LG ELECTRONICS INC., LG ELECTRONICS USA, INC.,
GOOGLE LLC,

*Appellees,*

*v.*

GESTURE TECHNOLOGY PARTNERS, LLC

*Cross-Appellant.*

On Appeal from the United States Patent & Trademark
Office, Patent Trial & Appeal Board, Nos. IPR2021-00920,
IPR2022-00091, IPR2022-00359

## OPENING BRIEF OF APPELLANT APPLE INC.

Paul R. Hart
ERISE IP, P.A.
5299 DTC Blvd.
Suite 1340
Greenwood Village, CO 80111

Adam P. Seitz
Clifford T. Brazen
ERISE IP, P.A.
7015 College Blvd.
Suite 700
Overland Park, KS 66211

Melanie L. Bostwick
Abigail Colella
Jonas Q. Wang
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street NW
Washington, DC  20005
(202) 339-8400

Elizabeth R. Moulton
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

*Counsel for Appellant Apple Inc.*

# CLAIM LANGUAGE AT ISSUE

**U.S. Patent No. 7,933,431, Claims 7, 11, 13**

**7.**  Handheld computer apparatus comprising:

a housing;

a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object;

computer means within said housing for analyzing said image to determine information concerning a position or movement of said object; and

means for controlling a function of said apparatus using said information.

**11.**  Apparatus according to claim 7, further including means for transmitting information.

**13.**  Apparatus according to claim 7, wherein said apparatus is a cellular phone.

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## AMENDED <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 23-1475, -1533 |
| **Short Case Caption** | Apple Inc. v. Gesture Technology Partners, LLC |
| **Filing Party/Entity** | Apple Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/17/2023

Signature: /s/ Melanie L. Bostwick

Name: Melanie L. Bostwick

**ii**

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Apple Inc. | None | None |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

☐   Additional pages attached

**iii**

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑   None/Not Applicable           ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)   ☐   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable           ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**iv**

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ................................................................ ii

TABLE OF AUTHORITIES .................................................................... vii

STATEMENT OF RELATED CASES ....................................................... x

INTRODUCTION .................................................................................... 1

STATEMENT OF JURISDICTION ......................................................... 3

STATEMENT OF THE ISSUES .............................................................. 4

STATEMENT OF THE CASE ................................................................. 4

   By The Late 1990s, Many Techniques Exist To Capture And
      Replicate Human Movement Using Computers .................... 4

   In 2011, Gesture Technology Obtains A Patent On
      Capturing And Replicating Human Movement Using
      Computers. ............................................................................ 10

   Gesture Technology Sues Apple For Infringement, And
      Apple Pursues Inter Partes Review .................................... 15

   The Board Holds All But Claims 11 And 13 Unpatentable As
      Obvious. ................................................................................. 21

SUMMARY OF ARGUMENT ................................................................ 25

STANDARD OF REVIEW ..................................................................... 27

ARGUMENT .......................................................................................... 28

I.    The Board Applied The Wrong Legal Standard For
      Obviousness, And Improperly Ignored Apple's
      Arguments And Evidence, In Upholding The
      Patentability Of Claims 11 And 13 .................................... 28

     A.    The Board improperly focused only on
          Numazaki's express statements, which is not the
          test for obviousness. .................................................. 30

v

B.    In misconstruing Apple's argument and ignoring much of its evidence, the Board committed procedural error. ........................................................ 39

II.    Reversal, Not Remand, Is The Appropriate Remedy. ......... 43

CONCLUSION ....................................................................... 48

ADDENDUM

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allentown Mack Sales & Serv., Inc. v. NLRB,*
    522 U.S. 359 (1998) ................................................................. 39, 40

*Belden Inc. v. Berk-Tek LLC,*
    805 F.3d 1064 (Fed. Cir. 2015) ........................................... 48

*Campbell Soup Co. v. Gamon Plus, Inc.,*
    10 F.4th 1268 (Fed. Cir. 2021) ........................................... 28

*Consolidated Edison Co. v. NLRB,*
    305 U.S. 197 (1938) ............................................................... 28

*Corning v. Fast Felt Corp.,*
    873 F.3d 896 (Fed. Cir. 2017) ............................................. 47

*E.I. DuPont de Nemours & Co. v. Synvina C.V.,*
    904 F.3d 996 (Fed. Cir. 2018) ............................................. 39

*In re Gartside,*
    203 F.3d 1305 (Fed. Cir. 2000) ........................................... 28

*In re Gleave,*
    560 F.3d 1331 (Fed. Cir. 2009) ........................................... 37

*Hotchkiss v. Greenwood,*
    52 U.S. 248 (1850) ................................................................. 30

*Graham v. John Deere Co.,*
    383 U.S. 1 (1966) ................................................................... 30

*Intel Corp. v. Qualcomm Inc.,*
    No. 20-2092, 2022 WL 880681 (Fed. Cir. Mar. 24, 2022) .................. 48

*Koninklijke Philips N.V. v. Google LLC,*
    948 F.3d 1330 (Fed. Cir. 2020) ........................................... 31

vii

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007) ..................................................................... 31

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ............................................... 45

*Power Integrations, Inc. v. Lee*,
    797 F.3d 1318 (Fed. Cir. 2015) ...................................... 40, 42

*Praxair Distrib., Inc. v. Mallinckrodt Hosp. Prods. IP Ltd.*,
    890 F.3d 1024 (Fed. Cir. 2018) ............................................... 43

*Randall Mfg. v. Rea*,
    733 F.3d 1355 (Fed. Cir. 2013) ............................ 37, 38, 39

*Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG*,
    856 F.3d 1019 (Fed. Cir. 2017) ............................................... 27

*Smith & Nephew, Inc. v. Rea*,
    721 F.3d 1371 (Fed. Cir. 2013) ............................................... 43

*In re Thrift*,
    298 F.3d 1357 (Fed. Cir. 2002) ............................................... 42

*Vicor Corp. v. SynQor, Inc.*,
    869 F.3d 1309 (Fed. Cir. 2017) ............................................... 42

**Statutes**

5 U.S.C. § 706(2) ............................................................................. 28

5 U.S.C. § 706(2)(A) ....................................................................... 39

5 U.S.C. § 706(2)(D) ....................................................................... 39

28 U.S.C. § 1295(a)(4)(A) ................................................................ 4

35 U.S.C. § 103(a) (2006) ............................................................. 30

35 U.S.C. § 141(c) .............................................................................. 4

35 U.S.C. § 142 ................................................................................... 4

35 U.S.C. § 311(a) ................................................................. 3

35 U.S.C. § 319 ..................................................................... 4

## Other Authorities

37 C.F.R. § 90.3(a)(1) ........................................................... 4

H.R. Rep. No. 1923 (1952) .................................................. 30

## STATEMENT OF RELATED CASES

No appeal in or from the same proceeding has previously been before this or any other appellate court.

This Court's decision may directly affect or be directly affected by the following cases that involve the same patent at issue in this appeal: *Gesture Tech. Partners, LLC v. Apple, Inc.* No. 4:22-cv-04806 (N.D. Cal.); *Gesture Tech. Partners, LLC v. LG Electronics, Inc. et al.,* No. 2:21-cv-19234 (D.N.J.); *Gesture Tech. Partners LLC v. Motorola Mobility LLC*, No. 1:22-cv-03535 (N.D. Il.); *Gesture Tech. Partners, LLC v. Lenovo Grp. Ltd. et al.*, No. 6:21-cv-00122 (W.D. Tex.).

The Court's decision may also directly affect or be directly affected by the following co-pending appeals involving other patents owned by Gesture Technology, which this Court has designated as companion cases to this appeal: *Gesture Tech. Partners, LLC v. Unified Patents, LLC,* No. 23-1444 (Fed. Cir.); *Apple Inc. v. Gesture Tech. Partners LLC*, No. 23-1494 (Fed. Cir.).

# INTRODUCTION

The Board in this inter partes review proceeding largely got it right—except when it fundamentally misconstrued Apple's obviousness argument and upheld two dependent claims based on a lack of express disclosure in the prior art. That aspect of the Board's decision is legally flawed and requires reversal, or at minimum a remand, as to the two claims in question.

The technology at hand is now familiar. In the late 1990s, innovators were working to improve the ways that humans could interact with computers. While a point-and-click mouse input was adequate for basic operations, it did not offer the possibility of three-dimensional interaction, nor could it replicate natural human movement on the screen. From data suits to cyber gloves, scientists were exploring the frontier of virtual reality and pushing us toward a future where video games would mimic our movements and the boundary between user and machine would blur.

Timothy Pryor, who would later found cross-appellant Gesture Technology Partners, LLC, was one of those scientists. But he was not the only one. And when he pursued a series of continuation patents all

stemming from a provisional application filed in 1999, the Patent Office did not have the benefit of a full record of what others had already accomplished by that time.

The Patent Office now has that record.  And, in the underlying inter partes review proceeding, the Patent Trial and Appeal Board found 29 of the 31 claims of Gesture Technology's patent obvious in view of the prior art and the knowledge of a skilled artisan in 1999. Before Gesture Technology filed its provisional application—and long before 2010, when it filed the continuation application containing the challenged claims—others had invented the technique of reflecting light off a target, capturing image data with cameras, and processing that data into computer commands based on the target's movement.  They had also incorporated that technique into portable handheld devices, as Gesture Technology's independent patent claims recite.  The Board properly deemed those independent claims, and nearly all of the dependent claims, unpatentable as obvious.

But the Board went astray as to two dependent claims, each of which essentially requires that the handheld device be a cellular phone. It upheld those two claims without even addressing Apple's evidence for

2

why a person of ordinary skill would have understood the primary prior-art reference to suggest a cellular phone.  The Board instead fixated on the uncontroversial fact that the reference did not expressly teach a device that it called a "cellular phone."  But that is not the test for obviousness.  An obviousness analysis instead turns on what a person of ordinary skill would understand and infer from the prior art based on their own background knowledge.  The Board legally erred by imposing a standard of disclosure that is contrary to this basic principle of patent law.  And it erred further by simply ignoring Apple's argument and evidence on obviousness, even after it had demonstrated at the oral hearing that it understood Apple's argument.

Those legal errors compel vacatur and remand, at a minimum. But because Gesture Technology failed to present any basis to discredit Apple's evidentiary showing, this Court can and should reverse the Board's ruling as to claims 11 and 13.

## STATEMENT OF JURISDICTION

The Board had jurisdiction of Apple's petition for inter partes review pursuant to 35 U.S.C. § 311(a).  The Board issued its Final Written Decision on November 30, 2022.  Appx1-38.  Apple timely filed

3

a notice of appeal from certain aspects of that decision on February 1, 2023. *See* 35 U.S.C. § 142; 37 C.F.R. § 90.3(a)(1). This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c) and 319.

## STATEMENT OF THE ISSUES

1.    Whether the Board committed legal error when it demanded that Apple show express disclosure of a limitation in the prior art, rather than considering the evidence and argument Apple presented demonstrating that a person of ordinary skill in the art would have understood the prior art to suggest the limitation.

2.    Whether reversal, rather than remand, is the appropriate outcome when the only conclusion supported by substantial record evidence is that claims 11 and 13 are obvious.

## STATEMENT OF THE CASE

### *By The Late 1990s, Many Techniques Exist To Capture And Replicate Human Movement Using Computers.*

This case involves technology allowing a computer user to provide input using not a traditional mechanism such as a mouse or a keyboard, but rather the movements of their own body. Those traditional mechanisms have many limitations, including that they are "only

4

capable of playing a role of a two-dimensional pointing device at best."
Appx759 1:18-20. And in the case of animations for video games, for
example, "it is difficult to give a natural motion to a character" using
just the rudimentary inputs from a device such as a mouse. Appx759
1:23-26.

By the second half of the 1990s, many techniques had been
developed to allow for three-dimensional inputs and, specifically, to
replicate something "close to a natural human communication" by
inputting "a gesture like a hand action or a body motion" along with
"speech input." Appx759 1:28-34. One example was the "data glove," a
wearable device embedded with optical fibers and magnetic sensors that
could track the position and movement of a user's hand to produce a
corresponding command or simulate the user's movement on a screen.
Appx759 1:67-2:16. Techniques also existed to analyze video images
and extract data (such as identifying the shape of a human hand), but
without equipment such as a green screen or an expensive range-finder,
it was difficult to isolate the target hand or body movement from the
background image. Appx759-760 2:50-3:25.

Innovators at the time were focused on finding a better solution. In 1998, for example, a team of inventors from Intel submitted a patent application describing "a powerful new paradigm for user input in a computer system." Appx822 3:36-37. Their invention disclosed a way to track human gestures using video data and replicate those gestures on a computer screen. *See generally* Appx804-831. And in 1997, a team of inventors from Toshiba submitted their own patent application disclosing a "Method and Apparatus for Generating Information Input Using Reflected Light Image of Target Object." Appx657.

This latter application ultimately issued in November 2000 as U.S. Patent No. 6,144,366, also known as the "Numazaki" reference. Appx657-803. It discloses an improved method and apparatus for detecting and using a person's gestures or movements. Appx760 4:9-40. Numazaki addresses the shortcomings of the prior art using an "information input generation apparatus," as depicted in Figure 2:

6



FIG.2

Appx659; *see* Appx761 5:11-12.

A lighting unit, depicted as element 101, emits light that can be reflected off a target object (element 106), such as a human finger. Appx764 11:11-12. Numazaki explains that near-infrared light is preferable when detecting human gestures. Appx764 12:1-6. Two photo-detection units contained within a reflected light extraction unit (element 102) detect the amount of light received from the field of view. Appx763 10:40-42. Numazaki describes how, for example, CMOS (complementary metal oxide semiconductor) sensors—tiny devices used as imaging sensors in many cameras—can be used as photo-detection units. Appx764 12:56-57; *see* Appx888-889. These units operate at

7

different times, in concert with a timing control unit (element 112) that controls whether the lighting unit is emitting light.  When the first photo-detection unit (element 109) is operating, the lighting unit will emit light.  When the second photo-detection unit (element 110) is operating, the lighting unit will not emit light.  Appx764 11:20-32.  As a result, the first photo-detection unit will capture an image of the target object illuminated by both natural light and the light from the lighting unit, whereas the second photo-detection unit will capture only the natural illumination of the target.  Appx764 11:33-39.  A difference calculation unit (element 111 in Figure 2) then determines the difference between the two images to identify the reflected light that results from the lighting unit's illumination as opposed to another source.  Appx764 11:43-56.

Numazaki describes in detail how this information, along with known properties about the target object, is used by the feature data generation unit (element 103) to extract information about, for example, gestures and other movements by the target object.  Appx763 10:57-66.  And it describes how this information can in turn be used to execute commands on a computer based on these gestures.  *See, e.g.*, Appx772

8

27:41-56 (describing detection of a finger making a pushing movement in order to execute a mouse click).

Numazaki also teaches how to achieve its gesture-detection invention in a portable device, rather than a stationary television or computer. For example, Figure 78 depicts "a compact portable information device" that is equipped with "[t]he information input generation apparatus of the present invention"—that is, the apparatus depicted in Figure 2. Appx784 52:5-7.



Appx733. The lighting unit and photo-detection units are contained behind a small window (element 712). Appx784 52:12-14. Using the inventive apparatus, "[a] position of a cursor **714** on the screen can be

9

controlled by moving a finger **713** in front of this window **712**."
Appx784 52:14-16.

The Numazaki invention can also be used to improve video
communications.  Numazaki explains that, as of 1997, "[t]he video
image compression technique has been progressing rapidly, but it is still
difficult to display the video at the portable terminal device in a
satisfactory fashion."  Appx778 39:6-8.  Using the capabilities of the
invention's feature data generation unit, however, one can "extract[]
only a specific target" from an image, allowing the device "to transmit
and display only the useful information."  Appx778 39:9, 17-20.  In this
way, it is "possible to lower the communication cost" as well as the
"power consumption and cost of the portable terminal device."  Appx778
39:10-12.  As Numazaki explains, one application for this embodiment
of the invention is in a "TV telephone," where it is "desirable to extract
and transmit only the faces of both sides."  Appx778 39:12-14.

***In 2011, Gesture Technology Obtains A Patent On Capturing And
Replicating Human Movement Using Computers.***

Around the time that Numazaki and others were exploring
improvements to movement-capture technology, Gesture Technology's

10

founder, Timothy Pryor, was doing the same. In July 1999, he filed a

provisional patent application, followed by a non-provisional application

in July 2000. Appx39. Through a series of continuation applications,

that filing led to the patent at issue in this case: U.S. Patent No.

7,933,431, which issued in April 2011 from an application filed in July

2010. Appx39.[1] The Numazaki reference was not cited or considered in

the prosecution of the '431 patent, nor were other references like the

Intel patent described above. *See* Appx1714; Appx1741. Indeed, the

'431 patent was not subject to any prior-art-based office action during

prosecution; the claims were allowed following a single rejection under

§ 112 for lack of antecedent basis in one claim, as well as a

typographical error in a second claim. *See* Appx609-613; Appx629-634.

The '431 patent describes a method and apparatus "to enable

rapid TV camera and computer based sensing in many practical

applications, including, but not limited to, handheld devices, cars, and

---

[1] For purposes of this proceeding, and without forfeiting future
challenges, Apple treats July 8, 1999, as the priority date for the '431
patent claims. *See* Appx1704-1705.

video games." Appx39 (Abstract). The specification describes a "basic embodiment[]" very similar to that of Numazaki's Figure 2:



**FIG. 1A**

Appx40; Appx63 3:23-24. Multiple cameras (elements 100, 101, and optionally 144) are mounted on a monitor (element 102), such as a television. Appx63 3:25-27, 44-46. The specification explains that these cameras may be "simple pixel addressable CMOS cameras" that were available in 1999. Appx64 5:50-53. A "window" may be used to cover the cameras along with their "light sources" (elements 110 and 111), which are "typically LEDs." Appx63 3:30-33.

The light sources illuminate targets such as "the fingers, hand, feet and head of the user, or objects such as **131** held by a user." Appx63 3:34-36. And the cameras sense the light that is reflected back

12

from the target.  Appx63 3:37-43.  The resulting imaging information is
then used by a computer (such as element 106) "to provide various
position and orientation related functions of use."  Appx67 11:57-58; *see
also* Appx62 2:20-23.

The '431 patent identifies several possible applications for this
basic arrangement.  For example, it may be used to facilitate a "Sports
Game," such as a "parasail game in which one flies over the water near
Wa[i]kiki beach."  Appx71 19:15, 41-42.  The lights and cameras sense
"position, velocity[,] acceleration, or orientation" of target points on the
player, and the computer uses this information to command the display
accordingly.  Appx71 19:43-46.  As another example, the patent posits a
"'Flirting' Game," in which a "handsome man" is depicted seated at a
restaurant on a video display, and "the goal for the girl **1510** playing
the game is to flirt with this man until he gets up and comes over to say
hello, ask her out or what ever."  Appx72 22:8, 18-23.  In this
embodiment, the cameras and computer are used to detect a player's
"facial expressions, hand or body gestures."  Appx72 22:10-12.

Like Numazaki, the '431 patent specification also contemplates
incorporating a handheld device.  It describes an embodiment in which

13

the "camera and requisite computer" are "in the handheld device, such as a cell phone or whatever." Appx67 12:59-61. The camera can be used to acquire an image of a target object or information about the object, which is then used to perform desired functions. "One function is just to acquire an image for transmission via for example the cell phone[']s own connection." Appx67 12:62-66. This embodiment is shown in Figure 8B:



**FIG. 8B**

Appx49. As depicted, "an image of object **849** [is] acquired by camera **850** of cell phone **851** held by user **852**," then "transmitted over mobile phone link **853** to a remote location and displayed, for example." Appx67-68 12:67-13:3.

The claims of the '431 patent all focus on a "[h]andheld computer apparatus" or a method of controlling a "handheld computing device."

14

Appx74.  Independent claim 7, from which the claims at issue in Apple's appeal depend, recites:

> 7.  Handheld computer apparatus comprising:
>
> a housing;
>
> a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object;
>
> computer means within said housing for analyzing said image to determine information concerning a position or movement of said object; and
>
> means for controlling a function of said apparatus using said information.

Appx74 25:61-26:5.

The two dependent claims at issue in Apple's appeal each add a single limitation to the requirements of claim 7.  Dependent claim 11 specifies that the handheld computer apparatus "further includ[es] means for transmitting information."  Appx74 26:12-13.  Dependent claim 13, meanwhile, specifies that the handheld computer apparatus "is a cellular phone."  Appx74 26:16-17.

### *Gesture Technology Sues Apple For Infringement, And Apple Pursues Inter Partes Review.*

In February 2021, Gesture Technology sued Apple (and several others) in the Western District of Texas, alleging infringement of the

15

'431 patent and other patents owned by Gesture Technology. The case against Apple was later transferred to the Northern District of California. In May 2021, meanwhile, Apple filed a petition with the Patent Trial and Appeal Board seeking inter partes review of all claims of the '431 patent. Appx132-213. LG and Google—appellees here—also filed petitions, which the Board joined with Apple's. Appx1 n.1.

Apple's petition demonstrated that most of the '431 patent claims, including claims 11 and 13, are obvious over the Numazaki reference in view of the knowledge of a person of ordinary skill. Appx145-173. And it demonstrated that the remaining claims are obvious over Numazaki in view of additional references.[2] Apple supported its petition with a detailed declaration from Dr. Benjamin Bederson, a professor of computer science at the University of Maryland and a member (and

---

[2] For those claims, Apple's obviousness showing depended on combining Numazaki with (1) the Intel patent discussed above, U.S. Patent No. 6,088,018, also known as the DeLeeuw reference (claims 5-6, 29); (2) U.S. Patent No. 6,064,354, also known as the DeLuca reference (claims 10, 23, 24, and 27); or (3) U.S. Patent No. 6,243,683, also known as the Peters reference (claims 30-31). Apple anticipates discussing these grounds further in response to Gesture Technology's cross-appeal brief.

16

former director) of the Human-Computer Interaction Lab.  Appx1818-1821.

As to independent claim 7, Apple showed that Numazaki teaches a "[h]andheld computer apparatus"—as in Figure 78, reproduced above (at 9)—with a "housing" that includes "camera means" (the CMOS photo-detection units) for "obtaining an image using reflected light of at least one object" (the user's finger) "positioned by a user operating said object."  *See* Appx159-162.  Apple also demonstrated how Numazaki teaches "analyzing said image to determine information concerning a position or movement of said object," as claim 7 requires, because it "expressly describes a process through which the system identifies a user's finger based on its characteristics and tracks lateral finger movements."  Appx162.  As Dr. Bederson explained, a person of ordinary skill would have understood that this finger-tracking function "is performed by a processor," which constitutes the "computer means" recited by claim 7.  *See* Appx162-163; Appx1858-1859.  Finally, Apple demonstrated how Numazaki teaches "means for controlling a function" of the handheld apparatus using the position and movement information, because the processor can use the finger-tracking

17

information to control the position of a cursor on the device's screen. Appx164; *see also* Appx1859-1860.

With respect to claims 11 and 13, Apple relied on the knowledge that a person of ordinary skill would bring to bear when reviewing Numazaki. As discussed above (at 10), Numazaki teaches a "TV telephone" embodiment in which images are not only captured but transmitted between devices. Appx165-166; Appx778 39:6-16. Numazaki also describes this embodiment as supporting a "conference record system"—which, as Dr. Bederson explained, "is more commonly referred to as a videoconference system in which videoconference telephones send video and audio to each other." Appx165-166; Appx778 40:16-49; Appx1861. This embodiment therefore includes the "means for transmitting information" recited by dependent claim 11. Appx165.[3]

While Numazaki does not expressly teach that this embodiment can be implemented in a "[h]andheld computer apparatus," Apple and Dr. Bederson demonstrated that a person of ordinary skill would have

---

[3] The parties and the Board all agreed that the corresponding "means" for claim 11 "includes at least a cellular transceiver." Appx145; Appx11.

been motivated to implement the transmission functionality in Numazaki's portable device embodiment (such as the one shown in Figure 78). Numazaki explains that the image-transmission embodiment, which "extracts and transmits only the faces of the participating users," is meant to reduce "communication costs and power consumption"—exactly the "difficulties involved with videoconference applications using a portable device." Appx1855 (citing Appx778 39:6-60). A skilled artisan would therefore "recognize these same benefits would apply to the portable device in *Numazaki's* eighth embodiment." Appx1855; *see also* Appx165-166; Appx156-158; Appx1861. And they would further recognize that the portable device embodiment, which uses the same two-camera structure as the image-transmission embodiment, "could easily support the image capture solution" with only "minimal modifications." Appx1856.

The same motivation to combine Numazaki's "TV telephone" embodiment with its portable device embodiment would suggest to a person of ordinary skill the "cellular phone" limitation of dependent claim 13. Apple's petition acknowledged that Numazaki "does not expressly state that its TV telephone is a cellular phone." Appx167.

19

But again, the skilled artisan in 1999 would recognize that the concerns Numazaki discusses with respect to the TV telephone were applicable to cellular phones at the time.  Appx167.  As Dr. Bederson explained, "wireless cellular data connections at the time were expensive, and *Numazaki's* image extract method would alleviate otherwise high data transfer costs."  Appx1862.

This advantage would be particularly valuable for cellular communications, as opposed to Wi-Fi or wired connections, "which do not share the same data transfer cost concerns."  Appx1862.  And while "cellular videophones were not prevalent in the marketplace" as of July 1999, a person of ordinary skill "would have known that researchers were working on the technology and that products were being introduced to customers."  Appx1862; *see* Appx1026-1032 (July 1999 New York Times article describing a "cellular videophone" debuted by Kyocera).  The solution in Numazaki's image-transmission embodiment, moreover, was exactly the sort of improvement that might "make such cellular videophones commercially viable."  Appx1863.

20

### *The Board Holds All But Claims 11 And 13 Unpatentable As Obvious.*

The Board instituted review, finding that Apple had shown "a reasonable likelihood" that it "would prevail with respect to at least one of the claims challenged." Appx311. Indeed, the Board found a reasonable likelihood of Apple prevailing with respect to all but one claim—claim 11. The Board noted Gesture Technology's objection that Apple "'fail[ed] to identify any cellular transceiver in Numazaki,'" and observed that the petition therefore did "not appear to show how the prior art teaches every limitation of claim 11." Appx301 (quoting Appx254). Neither Gesture Technology nor the Board expressed any similar concern with Apple's showing with regard to claim 13's cellular phone limitation, however. The Board instead noted that Gesture Technology "d[id] not contest" Apple's assertions regarding claim 13 "at this stage," and found that Apple had shown "a reasonable likelihood of prevailing" on its challenge to that claim. Appx302.

In its Patent Owner Response, Gesture Technology renewed its argument about the allegedly missing cellular transceiver of claim 11. *See* Appx351-352. It also raised a new argument regarding claim 13.

21

Gesture Technology now seized on Apple's acknowledgement "that Numazaki does not disclose a cellular phone." Appx354. And it argued that Numazaki could not suggest a cellular phone because the article Dr. Bederson cited in support of his testimony described an upcoming commercial Kyocera cellular videophone that would "transmit video at 'about two frames a second.'" Appx354 (quoting Appx1028). In contrast, Numazaki posits a rate of "30 frames per second." Appx778 39:65. From this, Gesture Technology concluded that "[a] POSITA would understand that cellphones at the effective filing date completely lacked the bandwidth required to transmit at the video rate specified in Numazaki." Appx355.

In reply, Apple demonstrated the flaws in Gesture Technology's arguments. With respect to the new argument on claim 13, Apple explained that Gesture Technology was "miss[ing] the point" of Apple's obviousness theory. Appx410. "Dr. Bederson's opinion did not depend on any particular commercial system supporting Numazaki's videoconference functionality." Appx410. Rather, the point of relying on the July 1999 article was to show "that artisans were working on cellular videophones at the time," consistent with Dr. Bederson's

opinion that Numazaki would suggest a cellular phone to a person of

ordinary skill.  Appx410-411.  In any event, Apple demonstrated that

Gesture Technology's technical "incompatibility" argument was

factually flawed.  Appx411; *see also* Appx1136-1137.  And, crucially,

Gesture Technology and its expert had not disputed Apple's showing

that cellular communications at the time raised exactly the same

concerns as those Numazaki identified in connection with its "TV

telephone" embodiment.  Appx410-411.  Given Numazaki's suggestion

of a cellular videophone, moreover, it would have been obvious to a

skilled artisan to use a cellular transceiver as required by claim 11.

Appx405-406; *see* Appx1135-1136.  Gesture Technology had not

suggested that a cellular phone might use anything else.  Appx405.

Following an oral hearing, the Board issued its final written

decision.  The Board determined that Apple had shown nearly all of the

'431 patent claims to be obvious.  Appx37.  As to claim 7, the Board

agreed with Apple's showing that Numazaki's Figure 78 embodiment

teaches a "handheld computer apparatus" with all the requisite

components from the basic Figure 2 embodiment, including "camera

means" (the photo-detection units) for "obtaining an image" using

reflected light and "computer means" (the feature data generation unit) for analyzing the image. Appx23-30. The Board rejected Gesture Technology's counterarguments as being based on conclusory expert testimony that was inconsistent with Numazaki itself, Appx24-25, being non-responsive to Apple's theories, Appx28, and being internally inconsistent, Appx29.

But the Board concluded that Apple had not shown dependent claims 11 and 13 to be unpatentable. Its analysis on both claims, apart from reciting the parties' arguments, spanned less than a page. Appx31-32. And most of that space was devoted to the uncontroversial fact that Numazaki does not expressly state that its portable device or TV telephone is a cellular phone or contains a cellular transceiver. Appx31. During the hearing, the Board had recognized that Apple was making an obviousness argument that relied on a skilled artisan's knowledge in combination with the express teachings of Numazaki, and it had faulted Gesture Technology for focusing only on the latter. *See* Appx517-518. But the Board's decision reflected the same narrow focus. The Board acknowledged that Dr. Bederson was explaining why a person of ordinary skill would have understood Numazaki's disclosure

24

to suggest a cellular phone, but then asserted that "this is in conflict with Petitioner's admission in the Petition that Numazaki does not 'state that its TV telephone is a cellular phone.'" Appx31-32 (quoting Appx167). The Board also faulted Dr. Bederson's reliance on the New York Times article describing Kyocera's cellular videophone because it did not "equate videoconference telephones with cellular videophones." Appx32. The Board's analysis did not address Apple's showing (and Dr. Bederson's testimony) of why a person of ordinary skill would understand the functionality of Numazaki's TV telephone to be that of a cellular videophone, or how Numazaki's stated concerns about communication costs and power consumption were particularly applicable to cellular phones.

Apple filed this appeal challenging the Board's decision as to claims 11 and 13. Gesture Technology then filed a cross-appeal challenging the Board's conclusion that the other 29 claims of the '431 patent are unpatentable as obvious.

## SUMMARY OF ARGUMENT

**I.** The Board's ruling on claims 11 and 13 failed to address Apple's theory of obviousness. Instead, the Board seized on the

25

undisputed fact that Numazaki does not expressly state that its TV telephone embodiment is a cellular phone. In doing so, the Board entirely failed to address Apple's argument and evidence for why a person of ordinary skill would nonetheless understand Numazaki to suggest a cellular phone. It had no answer to Apple's showing that the functions of the "TV telephone" were those of a cellular videophone. Nor did it address Apple's expert testimony linking the concerns that motivated Numazaki's TV telephone embodiment with the state of cellular video communication, in contrast to wired or Wi-Fi communication, at the relevant time.

In its blinkered focus on terminology, the Board committed two legal errors. First, in setting a requirement for an explicit disclosure of a cellular phone in Numazaki, the Board misapplied the standard for obviousness. Second, in misconstruing Apple's obviousness theory and failing to address Apple's actual argument while instead addressing an argument that Apple did not make, the Board failed to engage in reasoned decisionmaking, in violation of the Administrative Procedure Act.

26

**II.** These legal errors make reversal, rather than remand, particularly appropriate here. The facts are largely undisputed, and the Board's conclusion as to claims 11 and 13 was the result of analytical errors. Apple thoroughly presented the evidentiary basis for its obviousness theory, the Board made no factual findings that would undermine this showing, and Gesture Technology and its expert did not provide the Board with any basis to reject Apple's showing or reach alternative factual findings. Reversal is compelled by the substantial evidence of record, which supports only the conclusion that claims 11 and 13 are obvious based on Numazaki in view of the knowledge of a person of ordinary skill.

## STANDARD OF REVIEW

This Court "review[s] the Board's decisions under the Administrative Procedure Act (APA)." *Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG*, 856 F.3d 1019, 1024 (Fed. Cir. 2017). The Court must "hold unlawful and set aside" any findings or conclusions that are, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "without

27

observance of procedure required by law;" or "unsupported by substantial evidence."  5 U.S.C. § 706(2).

"Obviousness is a question of law based on underlying facts." *Campbell Soup Co. v. Gamon Plus, Inc.*, 10 F.4th 1268, 1275 (Fed. Cir. 2021).  The Court "review[s] the Board's legal determinations de novo and its factual findings for substantial evidence."  *Id.*  Substantial evidence "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## ARGUMENT

### I. The Board Applied The Wrong Legal Standard For Obviousness, And Improperly Ignored Apple's Arguments And Evidence, In Upholding The Patentability Of Claims 11 And 13.

The Board's ruling on claims 11 and 13 was fundamentally flawed. As set forth above (at 18-20), Apple's argument on these claims was a single-reference obviousness theory that demonstrated, with supporting evidence, how a person of ordinary skill in July 1999 would have interpreted Numazaki's disclosure of a "TV telephone" as a cellular

28

phone (with a cellular transceiver) based on the state of the art at the time.  But the Board did not address that theory.

Instead, the Board seized on the undisputed fact that Numazaki does not expressly state that its TV telephone is a cellular phone. Appx31.  And it missed the point of Dr. Bederson's reliance on the New York Times article, which was meant to show what skilled artisans would understand about the state of cellular phone technology at the relevant time—not to show that a reference to a "videoconference telephone" is equivalent to a reference to a "cellular videophone." Appx32.  Furthermore, the Board utterly failed to engage with Apple's evidence linking the transmission cost and capacity concerns that motivated Numazaki's TV telephone embodiment with the state of cellular video communication (but not wired or Wi-Fi communication) at the time.

The Board's myopic focus on the specific terminology used in the prior-art documents reflects two legal errors.  First, in demanding an explicit disclosure of a cellular phone in Numazaki, and ignoring a wealth of evidence about the knowledge of a person of ordinary skill, the Board misapplied the standard for obviousness.  *Infra* Part IA.  Second,

in addressing an argument that Apple did not make, and instead
resting its conclusion on a plain misinterpretation of Apple's
obviousness theory, the Board failed to engage in reasoned
decisionmaking in violation of the APA.  *Infra* Part IB.  For both
reasons, the Board's decision on claims 11 and 13 cannot stand.

### A.    The Board improperly focused only on Numazaki's express statements, which is not the test for obviousness.

Patent law protects not "the work of the skil[l]ful mechanic" but
"that of the inventor."  *Hotchkiss v. Greenwood*, 52 U.S. 248, 267 (1850).
Thus "[a] patent may not be obtained though the invention is not
identically disclosed or described" in a single prior-art reference, "if the
differences between the subject matter sought to be patented and the
prior art are such that the subject matter as a whole would have been
obvious at the time the invention was made to a person having ordinary
skill in the art to which said subject matter pertains."  35 U.S.C.
§ 103(a) (2006); *see* H.R. Rep. No. 1923, at 7 (1952), *quoted in Graham v.
John Deere Co.*, 383 U.S. 1, 14 (1966) ("An invention which has been
made, and which is new in the sense that the same thing has not been
made before, may still not be patentable if the difference between the

30

new thing and what was known before is not considered sufficiently great to warrant a patent.").[4]

In considering a claim of obviousness, therefore, a tribunal must assess the prior art in view of "the background knowledge possessed by a person having ordinary skill in the art." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). And the obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Id.*; *see also Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1337 (Fed. Cir. 2020) ("Regardless of the tribunal, the inquiry into whether any 'differences' between the invention and the prior art would have rendered the invention obvious to a skilled artisan necessarily depends on such artisan's knowledge.").

Apple's obviousness showing adhered to these principles. As discussed above (at 18-20, 22-23), Apple was clear throughout the proceeding that its challenge was based not on Numazaki alone but on

---

[4] Because the '431 patent application was filed before March 16, 2013, the pre-AIA version of § 103 applies. *See* Appx6 n.4.

the teachings of that reference "in view of the knowledge of a [person having ordinary skill in the art]." Appx145 (Petition); Appx1618 (Decl. of Dr. Bederson). Indeed, Apple carefully distinguished between the limitations it believed were expressly taught by Numazaki and those that depended on the inferences a skilled artisan would draw. For example, Apple explained how Numazaki "teaches the same (or at least an equivalent) camera means as that described by the '431 patent," based on its express disclosure of CCD (charge coupled device) and CMOS image sensors. Appx160. In contrast, when discussing claim 7's "computer means" limitation, Apple demonstrated why a person of ordinary skill would "have understood that *Numazaki's* finger detection and tracking functionality is performed by a processor," Appx162-163, even though Numazaki does not expressly call out such a processor in the "compact portable information device" shown in Figure 78, Appx784 52:5-19.

Apple was equally clear when it came to claims 11 and 13. Its petition walked through the motivation for a skilled artisan to "include the fifth embodiment image capture functionality" as well as its "transmission functionality" in "the portable device described in

32

*Numazaki's* eighth embodiment." Appx165-166. And it likewise showed why that skilled artisan "would have understood" Numazaki's "TV telephone" or "videoconference embodiment" to suggest a cellular phone. Appx167. Citing Dr. Bederson's testimony, Apple explained how Numazaki's "focus on lower communications costs"—the impetus for the image-extraction and transmission approach for the "TV telephone"—"is a concern applicable to cellular phones" specifically, and not to "other wireless connections" or to "wired connections." Appx167 (citing Appx1630-1631). In other words, a skilled artisan reading Numazaki in 1999 would have good reason for thinking that the "TV telephone" either was or at least could be a cellular phone.

Apple also linked this showing to contemporaneous evidence, to ward off an objection that "cellular videophones were not prevalent in the marketplace as of the '431 Patent's alleged invention date of July 8, 1999." Appx1630. The 1999 New York Times article that Dr. Bederson cited "discuss[ed] a new 'cellular videophone' introduced by Kyocera," Appx1631, which was to hit the market that month and which had been described as "the world's first video personal handyphone system," Appx1027-1028:



AP/Wide World Photos

Appx1028.  As Dr. Bederson explained, this article supported his opinion that a skilled artisan at the time "would have known that researchers were working on [cellular videophone] technology and that products were being introduced to customers."  Appx1630; *see also* Appx410-411.  Indeed, this knowledge would supply even more motivation for a person of ordinary skill to implement the improvements in Numazaki's image-transmission embodiment, because they would help "make such cellular videophones commercially viable" right at the time when they were starting to come out of development and hit the marketplace.  Appx167.

34

This is precisely the kind of showing that has been found sufficient to demonstrate obviousness.  In *Realtime Data, LLC v. Iancu*, for example, this Court upheld the Board's obviousness conclusion based on a single reference, O'Brien.  912 F.3d 1368, 1376 (Fed. Cir. 2019).  The challenged patent claims recited a data-compression method that involved "maintaining a dictionary" of code words associated with specific data block strings.  *Id.* at 1370.  The O'Brien reference, all agreed, "did not use the specific claim term 'dictionary.'"  *Id.* at 1371.  But the petitioner argued, and the Board found, that a person of ordinary skill would have understood O'Brien's disclosure of a "string compression" was in fact "'a dictionary algorithm.'"  *Id.*  As evidentiary support for the skilled artisan's inference, the petitioner had relied on a data-compression textbook published around the priority date of the O'Brien reference, which made clear the link between "O'Brien's string encoding" and "dictionary encoding."  *Id.*  That evidence, both the Board and this Court held, showed "that the claims would have been obvious in view of a single reference."  *Id.* at 1376.

Apple made the same showing here: it demonstrated that Numazaki's "TV telephone," while not expressly labeled a "cellular

phone" with a "cellular transceiver," would have been understood as such by a person of ordinary skill. And it supported that point with contemporaneous evidence of what a person of ordinary skill would have understood as of the '431 patent's priority date about the capabilities and limitations of a cellular phone with image-transmission functionality. Yet the Board held this showing insufficient.

In doing so, it plainly misapplied the standard for a single-reference obviousness analysis. To begin with, the Board gave undue weight to the specific terminology used in Namazaki. It leaned heavily on the fact that Numazaki "does not 'state that its TV telephone is a cellular phone.'" Appx31 (quoting Appx167). But Apple never argued otherwise; indeed, the Board's statement was quoting from Apple's own petition. The Board also faulted the 1999 New York Times article for not "discuss[ing] videoconference telephones" (the terminology Numazaki uses in discussing its image-transmission embodiment) or "equat[ing] videoconference telephones with cellular videophones." Appx32. But again, Apple relied on the article not to show that these two terms are equivalent but to demonstrate the substance of a skilled artisan's knowledge at the time. And Apple was not required to link the

36

terminology used in Numazaki with that of the '431 patent. Even in a stricter anticipation analysis, a prior-art "reference need not satisfy an *ipsissimis verbis* test." *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009). It certainly need not do so for purposes of obviousness.

The rest of the Board's reasoning was similarly flawed. The Board swept away much of Apple's argument and evidence by reasoning that it "appears to be implying that Numazaki necessarily teaches that its fifth embodiment is a cell phone," which "is in conflict with [Apple's] admission … that Numazaki does not 'state that its TV telephone is a cellular phone.'" Appx31-32 (quoting Appx167). That reasoning fundamentally misapprehends Apple's argument and the standard for obviousness. In *KSR*, the Supreme Court "[r]eject[ed] a blinkered focus on individual documents" and instead "required an analysis that reads the prior art in context." *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013). In assessing obviousness, therefore, it is necessary to "account for critical background information that could easily explain" the thinking and motivation of an ordinarily skilled artisan. *Id.*

To be sure, it is important for a party to supply "a factual foundation" for its "claim about what one of ordinary skill in the … art

would have known." *Id*. And that is exactly what Apple did, supplying both the testimony of Dr. Bederson—who was himself a person of ordinary skill at the relevant time, *see* Appx1588-1597, Appx1604-1605—and contemporaneous documentary evidence in the form of a news article reflecting the state of the relevant art. The Board understood Apple's argument at the hearing. *See infra* Part IB. Yet, in its Final Written Decision, the Board donned its blinkers in refusing to consider Apple's evidence for the purpose for which it was offered. The question was not whether Numazaki "necessarily teaches" that one of its embodiments "is a cell phone." Appx31. The question was whether a person of ordinary skill, in combining their own background knowledge with Numazaki's teachings about image capture, image transmission, and portable devices, would have inferred that the device in question was a cellular phone.

The Board neither asked nor answered that question. And, because of its misguided approach, it failed to properly consider the evidence that Apple put forth about what a person of ordinary skill in July 1999 would have known and what their motivations would be. This "failure to consider the knowledge of one of skill in the art

appropriately" was legal error. *Randall*, 733 F.3d at 1363; *see also, e.g.*, *E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1008-09 (Fed. Cir. 2018) (faulting the Board for applying the wrong legal standard in its obviousness analysis). In fulfilling its adjudicatory role, the Board "is subject to the requirement of reasoned decisionmaking." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). "It is hard to imagine a more violent breach of that requirement than applying a rule of primary conduct or a standard of proof which is in fact different from the rule or standard formally announced." *Id.* But that is exactly what the Board did. Its decision with respect to claims 11 and 13 cannot be upheld.

### B. In misconstruing Apple's argument and ignoring much of its evidence, the Board committed procedural error.

For the reasons discussed in Part IA, the Board's ruling on claims 11 and 13 was "not in accordance with law." 5 U.S.C. § 706(2)(A). But it should also be "set aside" because it was rendered "without observance of procedure required by law." *Id.* § 706(2)(D).

"Under the APA, the [B]oard is obligated not only to come to a sound decision, but to fully and particularly set out the bases upon

which it reached that decision." *Power Integrations, Inc. v. Lee*, 797
F.3d 1318, 1323 (Fed. Cir. 2015); *see also Allentown Mack*, 522 U.S. at
374 ("Not only must an agency's decreed result be within the scope of its
lawful authority, but the process by which it reaches that result must
be logical and rational."). As this Court has held, the Board violates
that obligation when it "fundamentally misconstrue[s]" a party's
argument and thus "fail[s] to provide a full and reasoned explanation of
its decision." *Power Integrations*, 797 F.3d at 1323-24.

The disconnect between Apple's argument and the Board's
reasoning is clear. *See supra* 31-39. But the source of that disconnect is
not. Apple's petition and reply each explained how its obviousness
theory for claims 11 and 13 worked. Appx165-167; Appx405-406;
Appx409-412. And Apple's counsel carefully walked the Board through
this theory at the oral hearing. *See* Appx511-516. Apple reiterated how
it "relied on Numazaki's 5th embodiment … as teaching a device that a
POSITA would understand as a cellular video phone." Appx511. It
explained the role of the New York Times article as "evidence that
researchers, POSITAs at the time were actively working on solving the
problems necessary to bring cellular video phones to market." Appx513.

40

Indeed, it explained that "the core" of Dr. Bederson's opinion with respect to the New York Times article was that it "evidences that th[e]se problems had been worked on for some period of time prior to 1999." Appx513. And Apple linked that work to the "specific teachings" in Numazaki that led Dr. Bederson "to conclude that this was technology that targeted portable TV telephones using cellular technology." Appx513-514.

The Board appeared to understand the theory. When Gesture Technology's counsel argued that "Numazaki certainly doesn't teach a cell phone," Judge Dougal interjected that there was not "any dispute" that Numazaki "doesn't say explicitly that the TV telephone is a cell phone." Appx517. He asked Gesture Technology's counsel instead to address whether there was "evidence against" Dr. Bederson's testimony linking "Numazaki's focus on lower communication costs" and the "data transfer cost concerns" that are "applicable to cellular phones" but not to "Wi-Fi or wired connections." Appx518. And he acknowledged that Apple was relying on the New York Times article to further support its position that "one of skill in the art would understand Numazaki to be talking about cell phones." Appx518.

41

None of this expressed understanding is reflected in the Board's actual opinion. On the contrary, as discussed above (at 25), the Board's decision on claims 11 and 13 does not even mention cost concerns or Dr. Bederson's testimony about why those concerns would lead a person of ordinary skill to interpret Numazaki's TV telephone as a cellular phone. Appx30-32. The Board instead suggested that Dr. Bederson was relying solely on a "broad assertion" about videoconference phones being equated with cellular videophones, and it deemed *that* assertion "unsupported." Appx32.

That was not the extent of Dr. Bederson's testimony, and it was not the substance of Apple's argument. In focusing on this "red herring," the Board utterly "failed to … evaluate [Apple's] primary argument." *Power Integrations*, 797 F.3d at 1325. This Court has not hesitated to overturn Board decisions that commit this same error. *See, e.g.*, *Vicor Corp. v. SynQor, Inc.*, 869 F.3d 1309, 1323-24 (Fed. Cir. 2017) (finding APA violation and vacating ruling where "the Board failed to consider two of Vicor's arguments"); *In re Thrift*, 298 F.3d 1357, 1366 (Fed. Cir. 2002) (vacating ruling where Board's decision was

42

"inadequate on its face" because it failed to address multiple arguments made by applicant).  The Court should do the same here.

## II.     Reversal, Not Remand, Is The Appropriate Remedy.

The legal errors demonstrated in Part I demand, at a minimum, a remand for the Board to consider the obviousness of claims 11 and 13 under a proper legal standard and a correct understanding of Apple's arguments and evidence.  But this Court can instead reverse that part of the Board's decision outright and hold these two claims obvious.  *See, e.g.*, *Praxair Distrib., Inc. v. Mallinckrodt Hosp. Prods. IP Ltd.*, 890 F.3d 1024, 1037 (Fed. Cir. 2018).  Reversal rather than remand is particularly appropriate where, as here, "the facts are largely undisputed" and the Board's non-obviousness conclusion was "mainly the result of the analytical errors discussed above."  *Smith & Nephew, Inc. v. Rea*, 721 F.3d 1371, 1380 (Fed. Cir. 2013).

The evidentiary basis for Apple's obviousness showing is thoroughly laid out above.  *See supra* 32-34, 40-41.  And the Board made no factual findings that would undermine this showing.  It did not, for example, conclude that cost and data concerns were inapplicable to cellular video communication as of the '431 patent's priority date.

43

Nor did it reject Apple's evidence that a person of ordinary skill at that time would have known that cellular videophones were reaching commercial viability and that improvements like Numazaki's image-extraction technique would have fostered their advancement. The Board certainly did not find any basis to conclude that the "means for transmitting information" in a cellular videophone would be anything other than a cellular transceiver.

Furthermore, Gesture Technology and its expert did not provide the Board with any basis to make such a finding or to otherwise reject Apple's evidence. Indeed, in its preliminary response, Gesture Technology did not even dispute that Numazaki rendered a cellular phone obvious. Appx302. And its post-institution arguments about claims 11 and 13 focused heavily on the irrelevant fact that Numazaki does not expressly teach a cellular phone with a cellular transceiver. *See* Appx351; Appx354; Appx429-430; Appx434. As discussed above (at 30-31, 35-37), that is not a requirement for a single-reference obviousness challenge.

Gesture Technology's remaining arguments are equally meritless and should not deter this Court from reversing. Gesture Technology

argued in its Patent Owner Response that a cellular phone "must be able to transmit voice and receive voice over a cellular network." Appx355. But Gesture Technology did not ask the Board to construe any claim language to impose that requirement. Nor did it provide any intrinsic or extrinsic support for such a construction. Gesture Technology instead relied exclusively on a single paragraph from the declaration of its expert, Mr. Occhiogrosso, which consisted of the same conclusory sentence in Gesture Technology's brief. *See* Appx1356-1357; *see also, e.g.*, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (en banc) ("[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court."). Regardless, Gesture Technology also offered no basis to find that a cellular videophone in 1999—such as the Kyocera phone discussed in the New York Times article—would *not* be able to transmit and receive voice over a cellular network. And Apple's obviousness theory, again, rested on a person of ordinary skill understanding that Numazaki's TV telephone disclosure would be implemented in such a cellular videophone.

45

Gesture Technology's only attempt to dispute that key point was meritless, as Apple demonstrated. Gesture Technology relied on a statement in the New York Times article that the Kyocera cellular videophone that became commercially available in July 1999 was able to transmit video at "about two frames a second." Appx354 (quoting Appx1028). In contrast, in the course of discussing its fifth embodiment that includes the TV telephone, Numazaki refers to a video rate of "30 frames per second." Appx778 39:65. Gesture Technology's expert, Mr. Occhiogrosso, opined that "if cellphones scheduled for release after the … filing date of the '431 Patent can only transmit video" at two frames per second, then "a POSITA would not have understood Numazaki's 'TV telephone,' which is associated with rates of 30 frames per second (fps) which is characteristic of full motion TV, as being a cellphone." Appx1356; *see also* Appx354-355.

Apple and Dr. Bederson demonstrated the flaws with this opinion on reply. As Apple explained, "Dr. Bederson's opinion did not depend on any particular commercial system supporting Numazaki's videoconference functionality," but rather showed that "artisans were working on cellular videophones at the time." Appx410-411. Moreover,

46

even accepting that frame rates might be relevant, Mr. Occhiogrosso's opinion ignored Numazaki's express teaching that its inventive method, by "extracting only the subject from captured video," Appx411, could reduce the requisite bandwidth "in an order of one tenth to one hundredth." Appx778 40:29-36. Thus, as Dr. Bederson explained, a 30 frame per second video could be reduced to require only "bandwidth sufficient to communicate 0.3 frames per second of video"—that is, "a mere 15% (i.e., 0.3/2) of the bandwidth used by the Kyocera VP-210 cellular phone." Appx1136-1138. In response, the best that Gesture Technology could muster was an argument that the Kyocera system "is of no relation to *Numazaki*," Appx435—undermining its own attempt to impose frame-rate limitations from one onto the other. Notably, the Board did not adopt Gesture Technology's frame-rate argument.

Gesture Technology failed to rebut any of the factual bases for Apple's obviousness challenge. As a result, the only conclusion that would be supported by substantial evidence is a finding that claims 11 and 13 are obvious based on Numazaki in view of the knowledge of a person of ordinary skill. In these circumstances, reversal—not remand—is the right outcome. *See, e.g.*, *Corning v. Fast Felt Corp.*, 873

47

F.3d 896, 901-02 (Fed. Cir. 2017); *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1077 (Fed. Cir. 2015); *Intel Corp. v. Qualcomm Inc.*, No. 20-2092, 2022 WL 880681, at \*4 (Fed. Cir. Mar. 24, 2022).

## CONCLUSION

For the reasons discussed above, the Court should reverse the Board's conclusion of non-obviousness as to claims 11 and 13. At a minimum, the Court should vacate this aspect of the Board's decision and remand. As Apple will explain in its response-reply brief, the Court should affirm the Board's decision in all other respects.

Respectfully submitted,

*/s/Melanie L. Bostwick*

Paul R. Hart
ERISE IP, P.A.
5299 DTC Blvd.
Suite 1340
Greenwood Village, CO 80111

Adam P. Seitz
Clifford T. Brazen
ERISE IP, P.A.
7015 College Blvd.
Suite 700
Overland Park, KS 66211

Melanie L. Bostwick
Abigail Colella
Jonas Q. Wang
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street NW
Washington, DC 20005
(202) 339-8400

Elizabeth R. Moulton
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

*Counsel for Appellant Apple Inc.*

July 17, 2023

49

# ADDENDUM

Final Written Decision,
  Paper No. 28, filed November 30, 2022 ..................................... Appx1

U.S. Patent No. 7,933,431 ............................................................ Appx39

Trials@uspto.gov                                                    Paper 28
571-272-7822                                        Date: November 30, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE, INC., LG ELECTRONICS, INC.,
LG ELECTRONICS U.S.A., INC., AND GOOGLE LLC,
Petitioner,

v.

GESTURE TECHNOLOGY PARTNERS, LLC,
Patent Owner.

_____

IPR2021-00920[1]
Patent 7,933,431 B2

_____

Before KEVIN F. TURNER, JONI Y. CHANG, and
BRENT M. DOUGAL, *Administrative Patent Judges.*

DOUGAL, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

_____

[1] IPR2022-00091 (LG Electronics, Inc. and LG Electronics U.S.A., Inc.) and
IPR2022-00359 (Google LLC) have been joined with this proceeding.

IPR2021-00920
Patent 7,933,431 B2

## I.    INTRODUCTION

### A.    Background

Applying the standard set forth in 35 U.S.C. § 314(a), we instituted an *inter partes* review challenging the patentability of claims 1–31 (the "challenged claims") of U.S. Patent No. 7,933,431 B2 (Ex. 1001, "the '431 patent"). Paper 12 ("Dec."). Apple, Inc.[2] filed the request for an *inter partes* review (Paper 1, "Petition" or "Pet."), which Patent Owner, Gesture Technology Partners, LLC, opposed (Papers 8, 10).[3]

After institution, Patent Owner filed a Response (Paper 15, "PO Resp."), Petitioner filed a Reply (Paper 19, "Reply"), and Patent Owner filed a Sur-reply (Paper 20, "Sur-reply"). An oral hearing was held on September 13, 2022, and a copy of the transcript was entered into the record. Paper 27 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Decision is a Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of the claims on which we instituted trial. Having reviewed the arguments of the parties and the supporting evidence, we determine that Petitioner has shown by a preponderance of the evidence, that claims 1–10, 12, 14–31 are unpatentable. We also determine that Petitioner has not shown that claims 11 and 13 are unpatentable.

### B.    Related Matters

The parties identify these related matters: *Gesture Technology Partners, LLC v. Huawei Device Co., Ltd.*, No. 2:21-cv-00040 (E.D. Tex.); *Gesture Technology Partners, LLC v. Samsung Electronics Co.*, No. 2:21-

---

[2] Apple, Inc., LG Electronics, Inc., LG Electronics U.S.A., Inc., and Google LLC are collectively referred to herein as "Petitioner."
[3] Petitioner also filed a Preliminary Reply. Paper 9.

IPR2021-00920
Patent 7,933,431 B2

cv-00041 (E.D. Tex.); *Gesture Technology Partners, LLC v. Apple Inc.*, No. 6:21-cv-00121 (W.D. Tex.); *Gesture Technology Partners, LLC v. Lenovo Group Ltd.*, No. 6:21-cv-00122 (W.D. Tex.); *Gesture Technology Partners, LLC v. LG Electronics, Inc.*, No. 6:21-cv-00123 (W.D. Tex.); *Gesture Technology Partners, LLC v. Motorola Mobility LLC*, No. 1:22-cv03535 (N.D. Ill.); and *Gesture Technology Partners, LLC v. Katherine K. Vidal*, No. 1:22-cv-622 (E.D. Va). Pet. 76; Paper 21, 1–3. Patent Owner identifies the following Board proceedings as related matters:  IPR2021-00917; IPR2021-00921; IPR2021-00922; and IPR2021-00923. Paper 21, 2–3. Patent Owner also identifies the following related *Ex Parte* Reexaminations: No. 90/014,900; No. 90/014,901; No. 90/014,902; and No. 90/014,903. *Id.* at 3–4.

### C.  The '431 Patent

The '431 patent "relates to simple input devices for computers, particularly, but not necessarily, intended for use with 3-D graphically intensive activities, and operating by optically sensing a human input to a display screen or other object and/or the sensing of human positions or orientations." Ex. 1001, 2:7–11. The '431 patent further states that it relates to "applications in a variety of fields such as computing, gaming, medicine, and education." *Id.* at 2:15–17. For instance, the '431 patent describes "a combination of one or more TV cameras (or other suitable electro-optical sensors) and a computer to provide various position and orientation related functions of use." *Id.* at 11:54–58.

Figure 8A, reproduced below, illustrates the control of functions via a handheld device.

IPR2021-00920
Patent 7,933,431 B2



**FIG. 8A**

Figure 8A shows a perspective view of a cellular phone (800) using a laser spot projector (801) to project a laser spot on a detector (802) in a dashboard (803). *Id.* at 12:17–20. The '431 patent discloses that, alternatively or in conjunction, round dot targets (805, 806, 807) can be sensed on the cellular phone (800), such as by a TV camera (815). *Id.* at 12:20–25.

In another example, the cellular phone (800) can be used to signal a fax unit (824) to print data from the phone by pointing the cellular phone toward the fax unit. *Id.* at 12:42–45. TV camera (815) scans images of the dot targets (805, 806, 807) and a computer (830) analyzes the target images to determine the position and/or orientation or motion of the cellular phone to thereby determine if a command is being issued with movement of the cellular phone. *Id.* at 12:45–51. The computer then commands the fax unit to print if this action is signaled by the position, orientation, or motion of the cellular phone. *Id.* at 12:51–52.

D.  *Illustrative Claim*

Petitioner challenges claims 1–31 of the '413 patent. Claims 1, 7, and 14 are independent. Claims 1 and 7 are illustrative:

IPR2021-00920
Patent 7,933,431 B2

1. A method for controlling a handheld computing device comprising the steps of:

holding said device in one hand;

moving at least one finger in space in order to signal a command to said device;

electro-optically sensing light reflected from said at least one finger using a sensing means associated with said device;

determining from said sensed light the movement of said finger, and

using said sensed finger movement information, controlling said device in accordance with said command.


7. Handheld computer apparatus comprising:

a housing;

a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object;

computer means within said housing for analyzing said image to determine information concerning a position or movement of said object; and

means for controlling a function of said apparatus using said information.

Ex. 1001, 25:39–50, 25:61–26:5.


## II. ANALYSIS

### A. *Summary of Issues*

In the below analysis, we first address the grounds of unpatentability. We then address jurisdiction over expired patents.

IPR2021-00920
Patent 7,933,431 B2

## B. Instituted Grounds

Petitioner asserts the following grounds of unpatentability (Pet. 4), supported by the declaration of Benjamin B. Bederson (Ex. 1008):

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–4, 7–9, 11–22, 25, 26, 28 | 103(a)[4] | Numazaki,[5] Knowledge of a PHOSITA[6] |
| 5, 6, 29 | 103(a) | Numazaki, DeLeeuw[7] |
| 10, 23, 24, 27 | 103(a) | Numazaki, DeLuca[8] |
| 30, 31 | 103(a) | Numazaki, Peters[9] |

### 1. Legal Standards for Unpatentability

Petitioner bears the burden to demonstrate unpatentability. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

A claim is unpatentable as obvious under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting 35 U.S.C. § 103(a)). We resolve the question of obviousness based on underlying factual determinations, including: (1) the

[4] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 285–88 (2011), revised 35 U.S.C. § 103 effective March 16, 2013. Because the challenged patent was filed before March 16, 2013, we refer to the pre-AIA versions.
[5] U.S. Patent 6,144,366, issued Nov. 7, 2000 ("Numazaki") (Ex. 1003).
[6] A person having ordinary skill in the art ("PHOSITA").
[7] U.S. Patent 6,088,018, issued July 11, 2000 ("DeLeeuw") (Ex. 1004).
[8] U.S. Patent 6,064,354, issued May 16, 2000 ("DeLuca") (Ex. 1005).
[9] U.S. Patent 6,243,683 B1, issued June 5, 2001 ("Peters") (Ex. 1006).

IPR2021-00920
Patent 7,933,431 B2

scope and content of the prior art; (2) any differences between the prior art and the claims; (3) the level of skill in the art; and (4) when in evidence, objective indicia of nonobviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

We apply these principles to the Petition's challenges.

### 2.  Level of Ordinary Skill in the Art

Petitioner asserts that "[a] person having ordinary skill in the art ('PHOSITA') at the time of the '431 Patent would have had at least a bachelor's degree in electrical engineering or equivalent with at least one year of experience in the field of human computer interaction" and that "[a]dditional education or experience might substitute for the above requirements." Pet. 3 (citing Ex. 1008 ¶¶ 30–32). Patent Owner does not dispute Petitioner's level of ordinary skill in the art. PO Resp. 6.

We are persuaded, on the present record, that Petitioner's declarant's statement is consistent with the problems and solutions in the '431 patent and prior art of record. We adopt this definition for the purposes of this Decision.

### 3.  Claim Construction

In *inter partes* review, we construe claims using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent. 37 C.F.R. § 42.100(b) (2021).

Petitioner provides a number of claim constructions. Pet. 5–12. Patent Owner does not contest Petitioner's claim constructions, and argues for a

IPR2021-00920
Patent 7,933,431 B2

few additional claim constructions. PO Resp. 6–9. We address each term construed by one of the parties below.

We determine that it is not necessary to construe any other terms. *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

 a) *The Preambles*

The preambles of claims 1 and 14 both state: "A method for controlling a handheld computing device comprising the steps of . . ." and the preamble of claim 7 states: "Handheld computer apparatus comprising . . . ." Ex. 1001, 25:40–41, 25:61, 26:18–19. The Petition does not address whether the preambles are limiting, but rather attempts to show that independent of whether they are limiting, the preambles are taught by the prior art. *See e.g.* Pet. 17 ("To the extent the preamble is limiting, *Numazaki* teaches . . ."). Patent Owner argues that the preambles should be limiting (PO Resp. 6–7) and Petitioner does not contest or address this argument (*see* Reply).

Patent Owner argues that the preambles should be limiting because they recite essential structure or steps and are "necessary to give life, meaning, and vitality" to the claims. PO Resp. 6 (quoting *Acceleration Bay, LLC v. Activision Blizzard, Inc.*, 908 F.3d 765, 770 (Fed. Cir. 2018)). Specifically, Patent Owner asserts that each claim includes one or more limitations that refer back to the preamble's "handheld computing device" or "handheld computer apparatus" for antecedent basis. *Id.* at 6–7. Patent Owner further argues that the '431 patent discloses different embodiments, with some embodiments being in the form of a computer and some

IPR2021-00920
Patent 7,933,431 B2

embodiments being in the form of a handheld device. *Id.* at 7 (citing Ex. 1001, 12:59–13:7, Fig. 10A). Patent Owner contends that the claims are directed to the latter embodiments related to a handheld device and, therefore, "the preamble is necessary to give life, meaning, and vitality to claims 1, 7, and 14, consistent with the embodiments that the inventor chose to claim." *Id.*

We agree that the preambles of claims 1, 7, and 14 are limiting. This is primarily because the body of each claim includes "said device" or "said apparatus" which refers back to the preamble and is understood with reference thereto. For example, the last clause of claim 7 states: "means for controlling a function of *said apparatus* using said information." Ex. 1001, 26:4–5 (emphasis added). "Said apparatus" derives antecedent basis from the "[h]andheld computer apparatus" recited in the preamble. Moreover, the "means for controlling a function of said apparatus" is understood because of this reference to the handheld computer apparatus. The limitations of claims 1 and 14 are similar and so this logic applies equally to these claims as well. Thus, we agree that the preamble recites essential structure and is "necessary to give life, meaning, and vitality" to claims 1, 7, and 14.

b) *Camera Means*

Petitioner asserts that, though claim 7 recites "camera means," it is not a means-plus-function limitation under §112 ¶ 6. Pet. 6. Petitioner argues that "a PHOSITA would have considered 'camera means associated with said housing' to have a sufficiently definite meaning as the name for structure." *Id.* (citing Ex. 1008 ¶ 36). Petitioner further argues that "all optical sensors obtain images by capturing light, so the claimed function is simply describing the general process that all optical sensors employ to obtain images of objects." *Id.* (citing Ex. 1008 ¶ 36).

IPR2021-00920
Patent 7,933,431 B2

"Patent Owner agrees" with Petitioner's construction PO. Resp. 7. We accept Petitioner's construction as consistent with the current record.

### c) *Computer Means*

Petitioner contends that claim 7's limitation of "computer means within said housing for analyzing said image to determine information concerning a position or movement of said object" is a means-plus-function limitation under §112 ¶ 6. Pet. 7. Petitioner argues that the limitation's function is analyzing an image "to determine positioning or movement of an object." *Id.* Petitioner argues that the corresponding structure "includes a computer/processor programmed (1) to identify either natural or artificial features on an object as described . . . or (2) to track the movement using one of the disclosed methods." *Id.* at 9; *see id.* at 8–9 (discussing the disclosure of the '431 patent) (citing Ex. 1001, 3:38–47, 3:57–62, 4:9–14, 5:2–23, 6:64–7:13, 8:40–59, 11:16–35).

Petitioner also argues that "objects" should be construed to mean "both separate objects held/controlled by the user and also part of the user's body, such as a user's finger or hand." *Id.* at 8; *see id.* at 7–8 (citing Ex. 1001, 3:39–41, 3:48–50, claims 7–8).

"Patent Owner does not contest" Petitioner's construction. PO Resp. 6. We accept Petitioner's construction as consistent with the current record.[10]

### d) *Means for Controlling a Function*

Petitioner argues that claim 7's limitation of "means for controlling a function of said apparatus using said information" is a means-plus-function

---

[10] In related IPR2021-00917 the petitioner there offered a slightly different construction. *See* IPR2021-00917, Paper 31, 11–12. The parties do not address the slight differences and we determine that the outcome here is not construction dependent.

IPR2021-00920
Patent 7,933,431 B2

limitation under §112 ¶ 6. Pet. 10. According to Petitioner, the limitation's function is "controlling a function of the apparatus using information about the object's location or movement." *Id.* Petitioner argues that the corresponding structure "is a processor programmed to perform the specific algorithms that accomplish this function" which "includes at least [the] Fig. 9 disclosure." *Id.* at 10–11.

"Patent Owner does not contest" Petitioner's construction. PO Resp. 6. However, as discussed above, we determine that "said apparatus" refers to the handheld computer apparatus in the preamble. Thus, we accept Petitioner's construction with the added requirement that the general purpose computer be a handheld computer apparatus.

    *e)*   *Means for Transmitting Information*

Petitioner asserts that claim 11's limitation of "means for transmitting information" is a means-plus-function limitation under §112 ¶ 6. Pet. 11. Petitioner argues that the '431 patent teaches the structure for performing the limitation's function of "transmitting information" is a "wireless cellular transceiver" and thus the corresponding structure required by the claim "includes at least a wireless cellular transceiver." *Id.* at 11–12 (citing Ex. 1001, 12:59–13:3).

"Patent Owner does not contest" Petitioner's construction. PO Resp. 6. We accept Petitioner's construction as consistent with the current record.[11]

---

[11] In related IPR2021-00917 consistent with the District Court, we construed the term slightly differently than what Petitioner proposes here. *See* IPR2021-00917, Paper 31,13–14; *see also* Dec. 7 (inviting the parties to address the District Court Claim Construction Memorandum and Order (Ex. 2001)). The parties do not address the slight differences and we determine that the outcome here is not construction dependent.

IPR2021-00920
Patent 7,933,431 B2

> *f)   Light Source for Illuminating*

Patent Owner asserts that "a light source for illuminating said object" in dependent claim 12 should be construed to mean "the light source of the handheld computer apparatus illuminates the object while the 'camera means' obtains an image of the object." PO Resp. 8. Petitioner opposes this construction. Reply 16–19

Patent Owner argues that claim 7, from which claim 12 depends, requires that "[a] 'camera means' obtains an image of the object 'using reflected light' from the object" and that

> a POSITA would understand claim 12 as meaning the light source of the handheld computer apparatus illuminates the object while the "camera means" obtains an image of the object. The object reflects light from the light source and it is this "reflected light" that is used by the "camera means" to obtain the image of the object. *See* Ex. 2002, ¶ 44.

PO Resp. 8. This is not required by the claims.

Claim construction starts with an analysis of the claim language itself. *Sjolund v. Musland*, 847 F.2d 1573, 1582 (Fed. Cir. 1988) ("[T]he claims define the invention."). First, claims 7 and 12 are directed to an apparatus and not a method. Thus, neither claim 7 nor 12 require any method steps such as illuminating the object while the camera means obtains an image of the object. Claim 7 uses language to describe the function of the camera, but that does not require an active method step such as requiring that the camera means obtain an image.

Second, claim 12 does not rely on claim 7 for antecedent basis of the light source. Though claim 7 refers to "reflected light" and claim 12 provides "a light source," there is nothing in the language of the claims that would require the reflected light to come from the light source. That said, the

IPR2021-00920
Patent 7,933,431 B2

light source may be the source of the reflected light, but it is not required by the language of the claims.

Thus, reading claims 7 and 12, Patent Owner's construction is not apparent or implied from the claim language.

Patent Owner also argues that the purpose for having a light source in the Specification should be read into the claims. PO Resp. 8. Patent Owner argues that "the specification of the '431 Patent . . . discloses 'cameras and their associated light sources' and operating the camera 'at the same time a . . . light is on.'" *Id.* (quoting Ex. 1001, 3:31–32, 7:5–7).

The mere fact that the Specification provides an example as to how the light source is used is not a sufficient reason for us to read a limitation into the claims from the Specification. If the specification "reveal[s] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess[,] . . . the inventor's lexicography governs." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). However, this is not the case here. Patent Owner does not identify anywhere in the Specification where "a light source for illuminating said object" is defined as "the light source of the handheld computer apparatus illuminates the object while the 'camera means' obtains an image of the object."

For these reasons, we decline to adopt Patent Owner's claim construction. We determine that the added limitation in claim 12 should be read according to its plain and ordinary meaning. In other words, "a light source for illuminating said object," simply means exactly what it says "a light source for illuminating said object."

### 4.  *Obviousness over Numazaki and Knowledge of a PHOSITA*

Petitioner argues that Numazaki in view of the knowledge of a person having ordinary skill in the art ("PHOSITA") would have rendered obvious claims 1–4, 7–9, 11–22, 25, 26, and 28. Pet. 12–40. Patent Owner contends that Numazaki does not disclose all the limitations of claims 1, 7, and 11–14. PO Resp. 9–27.

We first give an overview of Numazaki. This is followed by a discussion of Petitioner's positions and Patent Owner's arguments in response, where we conclude that Petitioner has shown by a preponderance of the evidence that some of the challenged claims are unpatentable.

### a)  *Numazaki*

Numazaki "relates to a method and an apparatus for generating information input in which input information is extracted by obtaining a reflected light image of a target object." Ex. 1003, 1:8–11. Figure 1, reproduced below, depicts a block diagram for an information input generation apparatus.



FIG.1

Figure 1 shows that an information input generation apparatus includes a lighting unit (101), a reflected light extraction unit (102), a feature data generation unit (103), and a timing signal generation unit (104). *Id.* at 10:23–

28. Numazaki describes emitting light from the light emitting unit (101) and that the intensity of the light varies in time according to a timing signal from the timing signal generation unit (104). *Id.* at 10:29–31. The light is directed onto a target object and light reflected from the target object is extracted by the reflected light extraction unit (102). *Id.* at 10:31–35. Numazaki teaches that the feature data generation unit (103) extracts feature data from the reflected light image. *Id.* at 10:57–61. Numazaki further teaches operating a computer based on information obtained from the feature data. *Id.* at 10:61–66.

Figure 2, reproduced below, shows a more detailed block diagram of an embodiment of information input generation apparatus.



In Figure 2, a timing control unit (112) is used to turn the lighting unit (101) on (i.e., illuminating the target object) when the first photo detection unit (109) is active and off when the second photo detection unit (110) is active. *Id.* at 11:20–32. The first photo detection unit captures an image of the target object illuminated by both natural light and the lighting unit and the second photo detection unit captures an image of the target object illuminated by

IPR2021-00920
Patent 7,933,431 B2

only natural light. *Id.* at 11:33–39. The difference between the two images—obtained by a difference calculation unit (111)—represents the "reflected light from the object resulting from the light emitted by the lighting unit 101." *Id.* at 11:43–51. This information is then used by the feature data generation unit (103) to determine gestures, pointing, etc. of the target object that may be converted into commands executed by a computer. *Id.* at 10:57–66.

Figure 78, reproduced below, illustrates an information input generation apparatus.

## FIG.78



Figure 78 shows "a compact portable information device" having "a size that can be held by one hand." *Id.* at 52:5–8. The device includes a window (712) for a lighting unit and a photo-detection sensor unit. *Id.* at 52:12–14. Numazaki describes controlling the position of a cursor (714) on a screen by moving a finger (713) in front of the window (712). *Id.* at 52:14–16.

IPR2021-00920
Patent 7,933,431 B2

   *b)  Independent Claim 1*

   Petitioner relies on Numazaki in view of the knowledge of a
PHOSITA for teaching or suggesting all of the elements of claim 1. Pet. 12–
21. For example, Petitioner relies on the portable computer with an
information input generation device of Figure 78 for teaching the handheld
computing device and holding the device in one hand. *Id.* at 17–19. For the
remaining method steps of claim 1, Petitioner relies on Numazaki and the
knowledge of a PHOSITA. *Id.* at 19–21. In particular, the Petition relies on
the teaching of a window (712) for "the lighting unit and the photo-detection
sensor unit" of Numazaki Figure 78 "which enables the 'position of a cursor
714 on the screen [to] be controlled by moving a finger 713 in front of this
window 712.'" *Id.* at 19 (quoting Ex. 1003, 52:5–16); *see also id.* at 20–21.
Petitioner argues that "[a] PHOSITA would have understood that controlling
a cursor on the handheld device is signaling a command." *Id.* (citing Ex.
1008 ¶¶ 46–47).

   Numazaki only provides some details about the photo-detection
sensor unit. *See generally* Ex. 1003, 50:25–54:6. However, Petitioner relies
on Numazaki's teaching that "light and camera arrangement" of Figure 2 "is
incorporated into the eighth embodiment" for more details about the photo-
detection sensor unit. Pet. 20; *see also id.* at 15–16 (citing Ex. 1008 ¶ 44)
(discussing what a PHOSITA would have understood was incorporated into
the eighth embodiment). Petitioner describes Numazaki as teaching a system
where two images are obtained of the target object by two different cameras,
one with the lighting unit on and one with it off. *Id.* at 12–14 (citing Ex.
1003, 11:20–39, Fig. 2). The images are compared to obtain certain
information. *Id.* at 14 (citing Ex. 1003, 11:43–51). Petitioner concludes that
the obtained "information is then used by feature data generation unit 103 to

17
**Appx17**

IPR2021-00920
Patent 7,933,431 B2

determine gestures, pointing, etc. of the target object that may be converted into commands executed by a computer" and that this all reads on the electro-optically sensing, determining, and using steps of claim 1. *Id.* at 20–21.

We determine that the Petition has shown by a preponderance of the evidence how Numazaki and the knowledge of a PHOSITA would have suggested all of the features of claim 1. Patent Owner argues that Numazaki does not teach or suggest aspects of the electro-optically sensing and determining steps of claim 1. PO Resp. 9–12. We address Patent Owner's arguments below.

### (1) Electro-optically Sensing

Claim 1 requires "electro-optically sensing light reflected from said at least one finger using a sensing means associated with said device." Ex. 1001, 25:44–46.

For this limitation, the Petition relies generally on the teaching of 'a window 712 [] for the lighting unit and the photo-detection sensor unit" of Numazaki Figure 78 (Pet. 20 (quoting Ex. 1003, 52:12–14)) to teach "illuminat[ing] the target object (e.g., the user's hand) in a controlled manner such that a precise image of the user's hand and hand movement can be ascertained" through the incorporation of the teachings of Figure 2 into that embodiment (*id.* (citing Ex. 1003, 11:9–23).

Petitioner argues that Numazaki teaches a reflected light extraction unit, with two photo-detection units which it calls first and second camera units which read on the sensing means. *Id.*; *see also* Reply 3.

Neither Patent Owner, nor Patent Owner's declarant, contest Petitioner's position, supported by its declarant, that Numazaki's reflected light extraction unit, with its two photo detection units in Figure 2 teach a

18
**Appx18**

IPR2021-00920
Patent 7,933,431 B2

camera, i.e. the claimed sensing means. *See* PO Resp. 9–10 (citing Pet. 12–13, 20–21) (acknowledging Petitioner's position); Ex. 2002 ¶¶ 52–53 (Patent Owner's declarant acknowledging Petitioner's position and declarant support).[12]

However, Patent Owner argues that "[n]one of embodiments 1–7 in Numazaki [(including Figure 2)] mention a 'photo-detection sensor unit,' and thus none of embodiments 1–7 teach or suggest the 'photo-detection sensor unit' in Fig. 78 is or includes the 'photo detection unit' in Fig. 2." PO Resp. 10 (citing Ex. 2002 ¶ 54). Patent Owner admits that Numazaki at Figure 2 teaches two "photo-detection units," but essentially argues that because the term "photo-detection unit" is not identical to Figure 78's "photo-detection sensor unit," one of skill in the art would not understand what a "photo-detection sensor unit" is, or how it relates to the rest of the disclosure. *Id.* at 10, 12; *see also* Sur-reply 1–4.

In support, Patent Owner relies on its declarant who testifies: "I reviewed Numazaki in its entirety and it contains no disclosure stating that the 'photo-detection sensor unit' in Fig. 78 is or includes a 'photo-detection unit' from Fig. 2" and "it is my opinion that a POSITA would understand that none of embodiments 1–7 disclose the 'photo-detection sensor unit' in Fig. 78 as being or including 'photo-detection unit' in Fig. 2." Ex. 2007 ¶ 54.

As will be understood from reviewing Numazaki, Numazaki discloses an eighth embodiment having a number of different portable form factors

---

[12] Numazaki also teaches that "CMOS sensors are used as the photo-detection means" in the eighth embodiment. Ex. 1003, 53:7–18. The '431 patent similarly teaches that "CMOS cameras" can be used to obtain images. Ex. 1001, 5:50–57.

IPR2021-00920
Patent 7,933,431 B2

shown in Figures 74–79, but sharing "a system configuration incorporating the information input generation apparatus of the present invention as described in the above embodiments," i.e. embodiments 1–7, including Figure 2. Ex. 1004, 50:19–20; *see also* Ex. 1008 ¶ 44. In addition to referring back to the prior disclosure, additional details of the information input generation apparatus including the photo-detection section are provided at 52:33–54:6. This section not only describes an information input generation apparatus that is very similar to the disclosure of Figure 2, but it again refers back to the "the photo-detection section . . ., as already described in detail above." *Id.* at 53:22–36; *see also* Dec. 15 (explaining that "details about the photo-detection sensor unit" could be found at Ex. 1004, 50:25–54:6).

Thus, the position of Patent Owner and Patent Owner's declarant is inconsistent with the express disclosure of Numazaki that makes clear that the photo-detection section of the eighth embodiment, including the "photo-detection sensor unit" of Figure 78, incorporates the disclosure of the photo-detection section of the prior embodiments, including Figure 2. Thus, we determine that one of skill in the art would have understood Numazaki to teach that the "photo-detection sensor unit" in Fig. 78 is or at least includes a camera/sensing means, just as Numazaki's reflected light extraction unit, with its two photo detection units in Figure 2, teach a camera/sensing means.

For the above reasons, Patent Owner's arguments do not identify any shortcomings in the showing by Petitioner that Numazaki teaches sensing means. We further determine that Petitioner has shown by a preponderance of the evidence that the electro-optically sensing limitation is taught by Numazaki.

IPR2021-00920
Patent 7,933,431 B2

### (2) Determining

Claim 1 also requires "determining from said sensed light the movement of said finger." Ex. 1001, 25:47–48.

Petitioner addresses this limitation together with electro-optically sensing discussed above. Pet. 20. The Petition relies generally on the teaching of 'a window 712 [] for the lighting unit and the photo-detection sensor unit" of Numazaki Figure 78 (*id.* 20 (quoting Ex. 1003, 52:12–14)) to teach "illuminat[ing] the target object (e.g., the user's hand) in a controlled manner such that a precise image of the user's hand and hand movement can be ascertained" through the incorporation of the teachings of Figure 2 into that embodiment (*id.* (citing Ex. 1003, 11:9–23). We determine that Petitioner has shown by a preponderance of the evidence that this limitation is taught by Numazaki in view of the knowledge of a PHOSITA.

Patent Owner argues that "Numazaki requires two photo-detection units to perform an analysis of a target object and control the computer, so it does not teach or suggest 'determining' finger movement from reflected light that is 'electro-optically' sensed using one 'sensor means,' as set forth in [the] claim." PO Resp. 13.

Patent Owner does not identify why the claim should be limited to one sensor means or camera. Though the claim refers to "electro-optically sensing light . . . using a sensing means" and "determining from said sensed light," this does not limit the claim to only one camera. Unless a more limited construction is indicated by the specification or prosecution history, the indefinite article "a" or "an" is construed in a claim to mean "one or more." *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000). Thus, "a sensing means," encompasses one or more cameras.

IPR2021-00920
Patent 7,933,431 B2

Patent Owner also argues that "Numazaki does not teach or suggest 'determining' finger movement absent the other hardware that Numazaki identifies as necessary, such as the lighting unit, the image-subtraction circuitry, and the associated timing circuitry." PO Resp. 13.

However, claim 1 uses the term "comprising" to create an "open ended" claim. "'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim." *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) (citing *In re Baxter*, 656 F.2d 679, 686 (CCPA 1981). Thus, the presence of a lighting unit or other hardware is not excluded from the claim. This is also consistent with the '431 patent, which teaches the use of LEDs "to illuminate [associated] targets." Ex. 1001, 3:34–35; *see also id.* at 26:13–14 (claim 12).

The claimed phrase "electro-optically sensing light . . . using a sensing means" does require "a sensing means," such as a camera, be used in the step. However, it does not prohibit other hardware from being involved. For example, the claim does not say "electro-optically sensing light . . . using only a sensing means." Thus, the fact that "Numazaki identifies as necessary . . . the image-subtraction circuitry and associated timing circuitry" does not prevent Numazaki from teaching or suggesting the limitations of open-ended claim 1.

For the above reasons, Patent Owner's arguments do not undermine the showing by Petitioner that Numazaki in view of the knowledge of a PHOSITA teaches all of the aspects of the determining movement claim element.

IPR2021-00920
Patent 7,933,431 B2

### (1) Conclusion

After review of the arguments and evidence, and further in view of the above discussion, we determine that Petitioner has shown, by a preponderance of the evidence, that claim 1 is unpatentable over Numazaki in view of the knowledge of a PHOSITA.

### c) Independent Claim 7

Independent claim 7 is directed to a handheld computer apparatus and is similar to method claim 1. *Compare* Ex. 1001, 25:61–26:5 *with id.* at 25:40–50. As such, the Petition relies on the essentially the same teachings of Numazaki discussed above with respect to claim 1 for the features of claim 7, which we agree with for the reasons explained above. *See* Pet. 26–31. Patent Owner argues that Numazaki does not teach or suggest the camera means or computer means required by claim 7. PO Resp. 13–19.

### (1) Camera Means

As discussed above, both parties agree that "camera means" in claim 7 is not a means-plus-function limitation under §112 ¶ 6 and merely requires a camera. Pet. 6. PO Resp. 7. Similar to the "sensing means" in claim 1, Petitioner argues that Numazaki teaches a reflected light extraction unit, with two photo-detection units which it calls first and second camera units, which reflected light extraction unit reads on the camera means. Pet. 27–28.

Neither Patent Owner, nor Patent Owner's declarant, contest Petitioner's position, supported by its declarant, that Numazaki's reflected light extraction unit, with its two photo detection units in Figure 2, teach a camera, i.e. the claimed camera means. *See* PO Resp. 14–15 (citing Pet. 12–13; Ex. 1008 ¶ 39) (acknowledging Petitioner's position and declarant

IPR2021-00920
Patent 7,933,431 B2

support); Ex. 2002 ¶ 65 (Patent Owner's declarant acknowledging
Petitioner's position and declarant support).[13]

Patent Owner repeats essentially the same arguments addressed above
concerning claim 1 that because the term "photo-detection unit" in Figure 2
is not identical to Figure 78's "photo-detection sensor unit," one of skill in
the art would not understand what a "photo-detection sensor unit" is, or how
it relates to the rest of the disclosure. PO Resp. 14–16.

We reject these arguments for the same reasons expressed above.
Namely, the express disclosure of Numazaki makes clear that the photo-
detection section of the eighth embodiment, including the "photo-detection
sensor unit" of Figure 78, incorporates the disclosure of the photo-detection
section of the prior embodiments, including Figure 2. Thus, we determine
that one of skill in the art would have understood Numazaki to teach that the
"photo-detection sensor unit" in Fig. 78 is or at least includes a camera
means, just as Numazaki's reflected light extraction unit, with its two photo
detection units in Figure 2, teaches a camera means.

Patent Owner also argues that "Numazaki fails to teach . . . that the
'photo-detection sensor unit' can obtain an image." PO Resp. 15. Patent
Owner relies on the testimony of its declarant for support who states that
"[e]ven though Numazaki's 'photo-detection sensor unit' is capable of
'photo-detecting on an external body,' Ex. 1003, 52:9–14, a POSITA would
not find this sufficiently specific for the 'photodetection sensor unit' to teach
or suggest a camera." Ex. 2002 ¶ 63.

---

[13] Numazaki also teaches that "CMOS sensors are used as the photo-
detection means" in the eighth embodiment. Ex. 1003, 53:7–18. The '431
patent similarly teaches that "CMOS cameras" can be used to obtain images.
Ex. 1001, 5:50–57.

IPR2021-00920
Patent 7,933,431 B2

Patent Owner's declarant does not further explain his reasoning. For example, the declarant does not discuss why the discussion of photo-detecting "does not necessarily mean that the 'photo-detection sensor unit' is or includes a camera." The disclosure of Numazaki when discussing photo-detecting is directed to taking images; and according to Patent Owner obtaining images "is what cameras do." PO Resp. 7.

For example, Numazaki describes a "photo-detecting state" in reference to when a photo-detection unit "detects the optical image." Ex. 1003, 11:20–31; *see also id.* at 11:38–52. Numazaki's eighth embodiment itself states that "the photo-detection section . . . outputs an image" and "the photo-detection section stores the charges generated by the photo-electric conversion element upon photo-detecting images of the object at a time of light emission by the lighting unit and at a time of no light emission by the lighting unit, . . . , as already described in detail above." *Id.* at 53:22–36; *see also e.g., id.* at 10:33–56 (discussing a "photo-detection section" to capture reflected light as an image), 11:9–52, 12:56–65, 15:23–51.

Thus, the testimony of Patent Owner's declarant, which is stated as being based on "Numazaki in its entirety," does not appear to be consistent with how the term "photo-detecting" is used in Numazaki. Read in context, photo-detecting an external body *does* mean that the "photo-detection sensor unit" captures an image, like a camera, because that is how Numazaki uses the term. Thus, though Patent Owner is correct that Numazaki does not explicitly say that the "photo-detection sensor unit" is a camera, it is clear from the disclosure of Numazaki that "photo-detecting" refers to obtaining an image, which is what Patent Owner asserts is the function of a camera.

The function of the photo-detection sensor unit is further taught in a number of locations in Numazaki. For example, Numazaki at 52:8–14 (cited

at Pet. 37) teaches that "a window 712 is provided for the lighting unit and the photo-detection sensor unit" to enable the function of "lighting and photo-detecting on an external body." The paragraph continues to teach that "[a] position of a cursor 714 on the screen can be controlled by moving a finger 713 in front of this window 712." Ex. 1003, 52:14–16. As discussed above, Numazaki teaches that in the eighth embodiment "the photo-detection section . . . outputs an image" and "the photo-detection section stores the charges generated by the photo-electric conversion element upon photo-detecting images of the object at a time of light emission by the lighting unit and at a time of no light emission by the lighting unit, . . . , as already described in detail above." *Id.* at 53:22–36.

Thus, the function of the photo-detection sensor unit, to obtain an image, is taught by Numazaki. Further, this description of the function of the photo-detection sensor unit is consistent with, and points to, Numazaki's more detailed earlier discussion of the reflected light extraction unit and photo-detection optics, which teaches obtaining an image. *See* Ex. 1003, 10:33–35, 11:11–15 ("an image is formed on a photo-detection plane of the reflected light extraction unit 102 by a photo-detection optics 107."), 50:21–42, 53:22–36; Pet. 37.

For the above reasons, Patent Owner's arguments do not identify any shortcomings in the showing by Petitioner that Numazaki teaches a camera means.

### (2) Computer Means

Claim 7 requires "computer means within said housing for analyzing said image to determine information concerning a position or movement of said object." Ex. 1001, 26:1–3. As discussed above, Petitioner argues that this limitation is subject to 35 U.S.C. § 112 ¶ 6, and that the relevant

IPR2021-00920
Patent 7,933,431 B2

structure "includes a computer/processor programmed (1) to identify either natural or artificial features on an object as described . . . or (2) to track the movement using one of the disclosed methods." Pet. 9. "Patent Owner does not contest" Petitioner's construction. PO Resp. 6.

Petitioner argues that "[a] PHOSITA would [] have understood that Numazaki's finger detection and tracking functionality is performed by a processor and would have considered the processes performed by Numazaki's processor the same or equivalent to the natural feature identification algorithm disclosed in the '431 Patent." Pet. 30 (citing Ex. 1008 ¶ 55). Petitioner explains:

> *Numazaki* teaches the same (or an equivalent) structure [as the '431 Patent] for detecting the position of a user's finger to permit the user to control a device using gestures. Namely, *Numazaki* expressly describes a process through which the system identifies a user's finger based on its characteristics and tracks lateral finger movements by "detecting the center of gravity" of a finger, where "finger tip movement and the center of gravity movement can be smoothly correlated" using pixel values. *Numazaki* (Ex. 1003), 19:43-20:25. To detect a finger, *Numazaki* teaches a "stick shaped object detection unit 213[, which] detects a stick shaped object extending in the vertical direction, that is, an upward extended finger (normally an index finger) of the hand of the operator." *Id*. at 18:32-35. Once the finger is detected, *Numazaki* calculates the center of gravity and tracks this center of gravity as the finger moves. *Id*. at 19:43-20:25. Using this technique, *Numazaki* teaches "the cursor on [a] screen can be controlled" so that "when the finger is moved, the cursor is also moved." *Id*. at 26:8-14, 26:23-25.

Pet. 29–30.

Patent Owner first argues that claim 7 more generally requires only a single camera obtain a single image for analysis by the computer means. PO Resp. 16–17. Patent Owner bases its argument on the claim language of "a

IPR2021-00920
Patent 7,933,431 B2

camera means . . . for obtaining an image" and "computer means . . . for analyzing said image." *Id.*

As acknowledged by Patent Owner however, claim 7 is not limited to a single camera or a single image. Sur-reply 5. Unless a more limited construction is indicated by the specification or prosecution history, the indefinite article "a" or "an" is construed in a claim to mean "one or more." *KCJ Corp.*, 223 F.3d at 1356. Thus, "a camera means" encompasses one or more cameras, and "an image" encompasses one or more images.

Patent Owner clarifies its position that claim 7 requires the image obtained by "photodetection unit 109" or the image obtained by "photo-detection unit 110" to be analyzed by the computer means without any other processing. Sur-reply 6. However, this does not reflect the position of Petitioner as to what is the camera means. Petitioner argues "that the output of Numazaki's reflected light extraction unit 102 is an image, that said image is analyzed by the [computer means]." Reply 13–14.

Petitioner's position is that Numazaki's reflected light extraction unit 102 with its two photodetection units reads on the camera means, rather than a single photodetection unit as argued by Patent Owner. *See* Pet. 28–29; Reply 14. The Petition makes clear that it is the image output from the reflected light extraction unit that is analyzed by the computer means. Pet. 28–29. As discussed in the preceding section, we determine herein that Petitioner has shown that Numazaki teaches a camera means by a preponderance of the evidence.

We find no reason to limit claim 7 to a single camera or to read camera means to exclude multiple cameras. We further find no reason to limit claim 7 such that multiple cameras could not be used to obtain an image from the individual cameras that make up the camera means. Other

28

IPR2021-00920
Patent 7,933,431 B2

than asserting their position, Patent Owner does not identify any errors in Petitioner's position, supported by a preponderance of the evidence herein, that the reflected light extraction unit reads on a camera, it obtains an image, and that image is analyzed by the computer means. *See, e.g.*, Pet. 28–29; Reply 13–14; *see also* Sur-reply 6 (acknowledging Petitioner's position).

Patent Owner also argues that the Petition does not show how Numazaki's "feature data generation unit" "correspond[s] to a computer or processor that has been 'programmed.'" PO Resp. 18. At the same time, Patent Owner acknowledges that the Petition "cites to various algorithms performed by Numazaki's 'feature data generation unit'" for teaching the determining step of claim 7.[14] *Id.* Further, Patent Owner later admits that "*Numazaki* discloses that 'it is also possible to realize this operation of the feature data generation unit in a form of software. It is obviously possible to realize a hardware configuration for carrying out this operation, and a configuration using both software and hardware is also possible.'" Sur-reply 6–7 (quoting Ex. 1003, 20:41–45); *see also* Reply 14–15; Ex. 1008 ¶ 55; Ex. 1017 ¶ 9. Thus, the evidence of record shows that Numazaki teaches that the feature data generation unit corresponds to a computer or processor that has been programmed.

Patent Owner then argues that "Numazaki's 'compact portable information device'" [of Figure 78] does not include "the corresponding structure for 'computer means' in [the] claim element." PO Resp. 18. Patent

---

[14] Patent Owner also makes an argument that "[i]f Petitioner attempts to argue that the subtraction of the images satisfies the analysis portion of claim element [7(c)], that argument also fails." PO Resp. 17. However, as summarized from the Petition above (*see* Pet. 29–30), this is not a position taken by Petitioner; and thus, this argument is not relevant to any position taken by Petitioner.

IPR2021-00920
Patent 7,933,431 B2

Owner further argues that "Numazaki does not disclose the internal hardware/circuitry of the 'compact portable information device.'" *Id.*

Patent Owner's argument is based on the same reasoning rejected above that one of ordinary skill in the art would not understand how Numazaki Figure 78 relates to the earlier disclosure in Numazaki. As previously discussed Numazaki expressly states that the eighth embodiment, including Figure 78 "incorporate[s] the information input generation apparatus of the present invention as described in the above embodiments," i.e. embodiments 1–7. Ex. 1004, 50:19–20; *see also* Ex. 1008 ¶ 44. Patent Owner does not contest that the feature data generation unit is part of the information input generation apparatus. *See* Ex. 1003, Fig. 2 (showing a feature data generation unit as part of an information input generation apparatus).

For the above reasons, Patent Owner's arguments do not undermine the showing by Petitioner that Numazaki in view of the knowledge of a PHOSITA teaches all of the aspects of the computer means claim element.

### (3)    Conclusion

After review of the arguments and evidence, and further in view of the above discussion, we determine that Petitioner has shown, by a preponderance of the evidence, that claim 7 is unpatentable over Numazaki in view of the knowledge of a PHOSITA.

### d)    Claims 11 and 13

Dependent claim 11 recites "Apparatus according to claim 7, further including means for transmitting information." Ex. 1001, 26:12–13. As noted previously, Petitioner argues that the "means for transmitting information" is subject to 35 U.S.C. § 112 ¶ 6, and that the structure corresponding to the claimed function is "at least a wireless cellular

transceiver." Pet. 11–12 (citing Ex. 1001, 12:59–13:3). "Patent Owner does not contest" Petitioner's construction. PO Resp. 6.

Dependent claim 13 recites "Apparatus according to claim 7, wherein said apparatus is a cellular phone." Ex. 1001, 26:16–17.

Petitioner argues that Numazaki's fifth embodiment teaches a "conference record system" or TV telephone and that "a PHOSITA would have been motivated to implement this transmission functionality in the portable device described in Numazaki's eighth embodiment." Pet. at 32–33 (citing Ex. 1003, 38:6–16, 40:16–49; Ex. 1008 ¶¶ 50–52, 58): *id.* at 33–34. The Petition also argues "that Numazaki's focus on lower communications costs is a concern applicable to cellular phones." *Id.* at 34.

The Petition fails to show how Numazaki teaches or suggests either of claim 11 or 13. First, Petitioner admits that Numazaki does not "state that its TV telephone is a cellular phone." *Id.* at 34. Further, the portable device described in Numazaki's eighth embodiment is also not disclosed as being a wireless cellular transceiver or a cellular phone, and the Petition makes no assertions that it is either. The Petition includes no analysis regarding whether the transmission functionality included in Numazaki's "conference record system" or TV telephone is an equivalent of "a wireless cellular transceiver" or a cell phone. *See* Pet. 32–34; *see also* PO Resp. 19–20, 22–23.

In response to Patent Owner's arguments, Petitioner argues that "Dr. Bederson explains that these 'videoconference telephones were also known as cellular videophones.'" Reply 15 (citing Ex. 1008, ¶ 58). Petitioner appears to be implying that Numazaki necessarily teaches that its fifth embodiment is a cell phone. However, this is in conflict with Petitioner's

IPR2021-00920
Patent 7,933,431 B2

admission in the Petition that Numazaki does not "state that its TV telephone is a cellular phone." Pet. 34.

Further, Dr. Bederson's supporting evidence does not support his allegation. Dr. Bederson cites to a newspaper article discussing "the global efforts preceding the launch of a market leading cellular videophone" that does not discuss videoconference telephones or equate videoconference telephones with cellular videophones. Ex. 1008, ¶ 58 (citing Ex. 1013). Thus, Dr. Bederson's broad assertion that "videoconference telephones were also known as cellular videophones" is unsupported.

For these reasons, we determine that Petitioner fails to show how Numazaki in view of the knowledge of a PHOSITA teaches or suggests all of the limitations of claims 11 or 13.

### a)    Claim 12

Dependent claim 12 recites "Apparatus according to claim 7, further including a light source for illuminating said object." Ex. 1001, 26:14–15. As noted previously, we determine that the added limitation in claim 12 should be read according to its plain and ordinary meaning. In other words, "a light source for illuminating said object," simply means exactly what it says "a light source for illuminating said object."

Petitioner argues that claim 12 is taught by Numazaki's "light and camera arrangement" in "Numazaki's handheld device." Pet. 33 (citing Ex. 1003, 11:9–23, 52:12–14).

Patent Owner does not contest Petitioner's position in the Petition, other than to argue that the combination does not teach the claim limitation under Patent Owner's construction. PO Resp. 20–21. Patent Owner further admits that Numazaki teaches a lighting unit used to illuminate an object. *Id.* at 21. As we previously rejected Patent Owner's attempt to read limitations

IPR2021-00920
Patent 7,933,431 B2

from the Specification into the claims, Patent Owner's arguments here do not apply to the requirements of claim 12.

We have reviewed Petitioner's assertions with respect to the claim 12 and the supporting evidence, and determine that Petitioner has established by a preponderance of the evidence that claim 12 is unpatentable.

### b) Independent Claim 14

Independent claim 14 is directed to a method for controlling a handheld computing device and is very similar to method claim 1. *Compare* Ex. 1001, 26:18–28 *with id.* at 25:40–50. As such, the Petition relies on the same teachings of Numazaki discussed above with respect to claim 1 for the features of claim 14, which we agree with for purposes of this Decision for the reasons explained above. *See* Pet. 35.

Similarly, Patent Owner argues that the Petition fails to teach or suggest the claim elements of claims 14 for the same reasons as claims 1 and 7, reiterating some of the same arguments discussed above. PO Resp. 23–26. Patent Owner does not provide any additional argument other than what has already been addressed with respect to claims 1 and 7 above.

We have reviewed Petitioner's assertions with respect to the claim 14 and the supporting evidence, and determine that Petitioner has established by a preponderance of the evidence that claim 14 is unpatentable.

### c) Claims 2–4, 8, 9, 12, 13, 15–22, 25, 26, 28

Petitioner argues that Numazaki in view of the knowledge of a PHOSITA renders obvious dependent claims 2–4, 8, 9, 12, 13, 15–22, 25, 26, and 28. Pet. 21–26, 31–34, 36–40. Patent Owner does not contest Petitioner's assertions regarding these claims other than to point to the independent claims. PO Resp. 13, 19, 27.

IPR2021-00920
Patent 7,933,431 B2

We have reviewed Petitioner's assertions with respect to these claims and the supporting evidence, and determine that Petitioner has established by a preponderance of the evidence that claims 2–4, 8, 9, 12, 13, 15–22, 25, 26, and 28 are unpatentable.

### 5. *Obviousness over Numazaki and DeLeeuw, Numazaki and DeLuca, and Numazaki and, Peters*

Petitioner argues that the combination of Numazaki and DeLeeuw renders obvious dependent claims 5, 6, and 29. Pet. 41–48. Petitioner argues that the combination of Numazaki and DeLuca renders obvious dependent claims 10, 23, 24, and 27. *Id.* at 48–57. Petitioner argues that the combination of Numazaki and Peters renders obvious dependent claims 30 and 31. *Id.* at 57–61. Patent Owner does not contest Petitioner's assertions regarding these claims other than to point to the independent claims. PO Resp. 28–29.

We have reviewed Petitioner's assertions with respect to these claims and the supporting evidence, and determine that Petitioner has established by a preponderance of the evidence that claims 5, 6, 10, 23, 24, 27, and 29–31 are unpatentable.

### C. *Jurisdiction over Expired Patents*

Patent Owner argues that the USPTO does not have jurisdiction over expired patents. PO Resp. 1–2. Rather, Patent Owner argues, the USPTO only has jurisdiction over patents with claims that can be amended or cancelled. *Id.* Patent Owner states that, as explained by the Supreme Court, "Congress [has] significant latitude to assign [the] adjudication of public rights to entities other than Article III courts," including for the USPTO to "reexamine—and perhaps cancel—a patent claim in an inter partes review." *Id.* (quoting *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC,*

IPR2021-00920
Patent 7,933,431 B2

138 S. Ct. 1365, 1368, 1374 (2018). However, Patent Owner argues that this authority does not extend to expired patents because the public franchise associated with an issued patent no longer exists after expiration. *Id.* at 2. Thus, it is argued, the USPTO no longer has jurisdiction, even though the patent owner "may be entitled to collect damages" for patent infringement, because "the patent owner[] no longer has the right to exclude others" and the USPTO has nothing to cancel or amend. *Id.*

Patent Owner reasons that:

Expiration removes the patent from the [US]PTO's jurisdiction and returns it to the sole jurisdiction of the Article III courts, which have exclusive authority to govern claims for damages. If this were not so, the [US]PTO would purport to have authority to retroactively modify a public franchise that no longer exists, in a setting where the expired public franchise does not enjoy any presumption of validity and in which amendment of claims is no longer permitted.

*Id.*

*Inter partes* review of patents, whether expired or not, fits within the USPTO's mandate "for the granting and issuing of patents" (35 U.S.C. § 2(a)(1)), for as the Supreme Court has stated, "[i]nter partes review is 'a second look at an earlier administrative grant of a patent'" (*Oil States Energy Servs.*, 138 S. Ct. at 1374 (quoting *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144 (2016)). Our rules have also made clear that *inter partes* review covers expired patents. 37 C.F.R. 42.100(b) (2012); *see also, e.g.*, 83 Fed. Reg. 51341 (Oct. 11, 2018) (Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board)[15] ("The claim construction standard adopted in this final

---

[15] Available at https://www.federalregister.gov/d/2018-22006/p-13.

rule also is consistent with the same standard that the Office has applied in interpreting claims of expired patents and soon-to-be expired patents. *See, e.g.*, *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1279 (Fed. Cir. 2017) (noting that '[t]he Board construes claims of an expired patent in accordance with *Phillips* . . . [and] [u]nder that standard, words of a claim are generally given their ordinary and customary meaning').").

Further, the statutes governing *inter partes* review do not limit them to non-expired patents. For example, 35 U.S.C. § 311(b), which sets forth the scope of *inter partes* review merely refers to patents, with no mention of the expiration date. Further, 35 U.S.C. § 311(c) entitled "Filing Deadline" makes no mention of the expiration date of the patent. Elsewhere, 35 U.S.C. § 315 does limit the filing of IPRs based on civil actions and the serving of complaints, but again makes no mention of the expiration date of the patent. Patent Owner does not identify any statute or legal precedent that expressly limits *inter partes* review to non-expired patents.

Patent Owner fails to adequately explain why the Patent Office's authority to take a second look at an earlier administrative grant of a patent ends when the patent term expires even though the rights granted by the patent are not yet exhausted.

For all of these reasons, we do not agree that the Board lacks jurisdiction over expired patents.

## III. CONCLUSION

For the reasons discussed above, we determine that Petitioner has proven, by a preponderance of the evidence, that some of the challenged claims are unpatentable, as summarized in the following table:

IPR2021-00920
Patent 7,933,431 B2

| Claims | 35 U.S.C. § | Reference(s) /Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–4, 7–9, 11–22, 25, 26, 28 | 103(a) | Numazaki, Knowledge of a PHOSITA | 1–4, 7–9, 12, 14–22, 25, 26, 28 | 11, 13 |
| 5, 6, 29 | 103(a) | Numazaki, DeLeeuw | 5, 6, 29 | |
| 10, 23, 24, 27 | 103(a) | Numazaki, DeLuca | 10, 23, 24, 27 | |
| 30, 31 | 103(a) | Numazaki, Peters | 30, 31 | |
| **Overall Outcome** | | | 1–10, 12, 14–31 | 11, 13 |

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–10, 12, 14–31 of U.S. Patent 7,933,431 B2 have been shown to be unpatentable;

FURTHERED ORDERED that claims 11 and 13 of U.S. Patent 7,933,431 B2 have not been shown to be unpatentable; and

FURTHERED ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2021-00920
Patent 7,933,431 B2

FOR PETITIONER:

Adam Seitz
Paul Hart
ERISE IP, P.A.
adam.seitz@eriseip.com
paul.hart@eriseip.com


FOR PATENT OWNER:

Todd Landis
John Wittenzellner
WILLIAMS SIMONS & LANDIS PLLC
tlandis@wsltrial.com
johnw@wsltrial.com

US007933431B2

(12) **United States Patent**   (10) **Patent No.:**    **US 7,933,431 B2**

Pryor   (45) **Date of Patent:**    **Apr. 26, 2011**

(54) **CAMERA BASED SENSING IN HANDHELD, MOBILE, GAMING, OR OTHER DEVICES**

(76) Inventor: **Timothy R. Pryor**, Tecumseh (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/834,281**

(22) Filed: **Jul. 12, 2010**

(65) **Prior Publication Data**

US 2010/0277412 A1    Nov. 4, 2010

**Related U.S. Application Data**

(63) Continuation of application No. 11/980,710, filed on Oct. 31, 2007, now Pat. No. 7,756,297, which is a continuation of application No. 10/893,534, filed on Jul. 19, 2004, now Pat. No. 7,401,783, which is a continuation of application No. 09/612,225, filed on Jul. 7, 2000, now Pat. No. 6,766,036.

(60) Provisional application No. 60/142,777, filed on Jul. 8, 1999.

(51) **Int. Cl.**
    *G06K 9/00*    (2006.01)

(52) **U.S. Cl.** ...................... **382/103**; 382/104; 348/207.1

(58) **Field of Classification Search** .................. 382/103, 382/104; 348/207.1
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,878,174 | A * | 3/1999 | Stewart et al. | ................. 382/293 |
| 6,342,917 | B1 * | 1/2002 | Amenta | .................... 348/207.1 |
| 6,453,180 | B1 * | 9/2002 | Endoh et al. | .................. 455/567 |
| 6,597,817 | B1 * | 7/2003 | Silverbrook | .................. 382/289 |

* cited by examiner

*Primary Examiner* — Tom Y Lu

(74) *Attorney, Agent, or Firm* — Warner Norcross & Judd LLP

(57) **ABSTRACT**

Method and apparatus are disclosed to enable rapid TV camera and computer based sensing in many practical applications, including, but not limited to, handheld devices, cars, and video games. Several unique forms of social video games are disclosed.

**31 Claims, 22 Drawing Sheets**





IPR2021-00920
Apple EX1001 Page 1



*FIG. 1A*



*FIG. 1B*

*FIG. 1C*

IPR2021-00920
Apple EX1001 Page 2



**FIG. 2A**

**FIG. 2B**

IPR2021-00920
Apple EX1001 Page 3



## FIG. 2C

IPR2021-00920
Apple EX1001 Page 4



# FIG. 2D



# FIG. 4A

IPR2021-00920
Apple EX1001 Page 5



**FIG. 3A**



**FIG. 4B**

IPR2021-00920
Apple EX1001 Page 6



**FIG. 3B**



**FIG. 3C**

IPR2021-00920
Apple EX1001 Page 7

Case: 23-1475    Document: 20    Page: 107    Filed: 07/17/2023



# FIG. 5A



# FIG. 5B

IPR2021-00920
Apple EX1001 Page 8



**FIG. 6**

IPR2021-00920
Apple EX1001 Page 9



**FIG. 7**



**FIG. 9**

IPR2021-00920
Apple EX1001 Page 10



FIG. 8A

FIG. 8B

IPR2021-00920
Apple EX1001 Page 11



*FIG. 10A*



*FIG. 10B*

IPR2021-00920
Apple EX1001 Page 13



**FIG. 11A**

IPR2021-00920
Apple EX1001 Page 14



*FIG. 11B*



*FIG. 12*



*FIG. 13*



*FIG. 14A*

IPR2021-00920
Apple EX1001 Page 18

Case: 23-1475    Document: 20    Page: 118    Filed: 07/17/2023



## FIG. 14B



## FIG. 14C

IPR2021-00920
Apple EX1001 Page 19



*FIG. 15*

IPR2021-00920
Apple EX1001 Page 20



*FIG. 16*

Case: 23-1475    Document: 20    Page: 121    Filed: 07/17/2023



FIG. 17C

FIG. 17A

IPR2021-00920
Apple EX1001 Page 22



*FIG. 17B*

IPR2021-00920
Apple EX1001 Page 23

US 7,933,431 B2

1

**CAMERA BASED SENSING IN HANDHELD, MOBILE, GAMING, OR OTHER DEVICES**

CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 11/980,710 filed Oct. 31, 2007, now U.S. Pat. No. 7,756,297; which is a continuation of application Ser. No. 10/893,534 filed Jul. 19, 2004, now U.S. Pat. No. 7,401,783; which is a continuation of application Ser. No. 09/612,225 filed Jul. 7, 2000, now U.S. Pat. No. 6,766,036; which claims the benefit of U.S. Provisional Application No. 60/142,777, filed Jul. 8, 1999.

Cross references to related co-pending US applications by the inventor having similar subject matter.

1. Touch TV and other Man Machine Interfaces: Ser. No. 09/435,854 filed Nov. 8, 1999, now U.S. Pat. No. 7,098, 891; which was a continuation of application Ser. No. 07/946,908, now U.S. Pat. No. 5,982,352;

2. More Useful Man Machine Interfaces and Applications: Ser. No. 09/433,297 filed Nov. 3, 1999, now U.S. Pat. No. 6,750,848;

3. Useful Man Machine interfaces and applications: Ser. No. 09/138,339, Pub. Appln. 2002-0036617, now abandoned;

4. Vision Target based assembly: Ser. No. 08/469,907 filed Jun. 6, 1995, now U.S. Pat. No. 6,301,783;

5. Picture Taking method and apparatus: provisional application 60/133,671, and regular application Ser. No. 09/568,552 filed May 11, 2000, now U.S. Pat. No. 7,015, 950;

6. Methods and Apparatus for Man Machine Interfaces and Related Activity: Provisional Application: provisional application 60/133,673 filed May 11, 1999; and regular application Ser. No. 09/568,554 filed May 11, 2000, now U.S. Pat. No. 6,545,670;

7. Tactile Touch Screens for Automobile Dashboards, Interiors and Other Applications: provisional application Ser. No. 60/183,807; and regular application Ser. No. 09/789,538, now U.S. Pat. No. 7,084,859; and

8. Apparel Manufacture and Distance Fashion Shopping in Both Present and Future: provisional application 60/187,397 filed Mar. 7, 2000.

The disclosures of the following U.S. patents and co-pending patent applications by the inventor, or the inventor and his colleagues, are incorporated herein by reference:

1. "Man machine Interfaces": U.S. application Ser. No. 09/435,854 and U.S. Pat. No. 5,982,352, and U.S. application Ser. No. 08/290,516, filed Aug. 15, 1994, now U.S. Pat. No. 6,008,000, the disclosure of both of which is contained in that of Ser. No. 09/435,854;

2. "Useful Man Machine Interfaces and Applications": U.S. application Ser. No. 09/138,339, now Pub. Appln. 2002-0036617;

3. "More Useful Man Machine Interfaces and Applications": U.S. application Ser. No. 09/433,297;

4. "Methods and Apparatus for Man Machine Interfaces and Related Activity": U.S. Appln. Ser. No. 60/133,673 filed as regular application Ser. No. 09/568,554 now U.S. Pat. No. 6,545,670;

5. "Tactile Touch Screens for Automobile Dashboards, Interiors and Other Applications": U.S. provisional Appln. Ser. No. 60/183,807, filed Feb. 22, 2000, now filed as reg. application Ser. No. 09/789,538; and

2

6. "Apparel Manufacture and Distance Fashion Shopping in Both Present and Future": U.S. Appln. Ser. No. 60/187,397, filed Mar. 7, 2000.

FIELD OF THE INVENTION

The invention relates to simple input devices for computers, particularly, but not necessarily, intended for use with 3-D graphically intensive activities, and operating by optically sensing a human input to a display screen or other object and/or the sensing of human positions or orientations. The invention herein is a continuation in part of several inventions of mine, listed above.

This continuation application seeks to provide further useful embodiments for improving the sensing of objects. Also disclosed are new applications in a variety of fields such as computing, gaming, medicine, and education. Further disclosed are improved systems for display and control purposes.

The invention uses single or multiple TV cameras whose output is analyzed and used as input to a computer, such as a home PC, to typically provide data concerning the location of parts of, or objects held by, a person or persons.

DESCRIPTION OF RELATED ART

The above mentioned co-pending applications incorporated by reference discuss many prior art references in various pertinent fields, which form a background for this invention. Some more specific U.S. Patent references are for example:

DeMenthon—U.S. Pat. Nos. 5,388,059; 5,297,061; 5,227, 985

Cipolla—U.S. Pat. No. 5,581,276

Pugh—U.S. Pat. No. 4,631,676

Pinckney—U.S. Pat. No. 4,219,847

DESCRIPTION OF FIGURES

FIG. 1 illustrates a basic computer terminal embodiment of the invention, similar to that disclosed in copending applications.

FIG. 2 illustrates object tracking embodiments of the invention employing a pixel addressable camera.

FIG. 3 illustrates tracking embodiments of the invention using intensity variation to identify and/or track object target datums.

FIG. 4 illustrates tracking embodiments of the invention using variation in color to identify and/or track object target datums.

FIG. 5 illustrates special camera designs for determining target position in addition to providing normal color images.

FIG. 6 identification and tracking with stereo pairs.

FIG. 7 illustrates use of an indicator or co-target.

FIG. 8 illustrates control of functions with the invention, using a handheld device which itself has functions.

FIG. 9 illustrates pointing at an object represented on a screen using a finger or laser pointer, and then manipulating the represented object using the invention.

FIG. 10 illustrates control of automobile or other functions with the invention, using detected knob, switch or slider positions.

FIG. 11 illustrates a board game embodiment of the invention.

FIG. 12 illustrates a generic game embodiment of the invention.

FIG. 13 illustrates a game embodiment of the invention, such as might be played in a bar.

IPR2021-00920
Apple EX1001 Page 24

US 7,933,431 B2

3

FIG. **14** illustrates a laser pointer or other spot designator embodiment of the invention.

FIG. **15** illustrates a gesture based flirting game embodiment of the invention.

FIG. **16** illustrates a version of the pixel addressing camera technique wherein two lines on either side of a 1000 element square array are designated as perimeter fence lines to initiate tracking or other action.

FIG. **17** illustrates a 3-D acoustic imaging embodiment of the invention.

THE INVENTION EMBODIMENTS

FIG. **1**

The invention herein and disclosed in portions of other copending applications noted above, comprehends a combination of one or more TV cameras (or other suitable electro-optical sensors) and a computer to provide various position and orientation related functions of use. It also comprehends the combination of these functions with the basic task of generating, storing and/or transmitting a TV image of the scene acquired—either in two or three dimensions.

The embodiment depicted in FIG. **1**A illustrates the basic embodiments of many of my co-pending applications above. A stereo pair of cameras **100** and **101** located on each side of the upper surface of monitor **102** (for example a rear projection TV of 60 inch diagonal screen size) with display screen **103** facing the user, are connected to PC computer **106** (integrated in this case into the monitor housing), for example a 400 Mhz Pentium II. For appearances and protection a single extensive cover window may be used to cover both cameras and their associated light sources **110** and **111**, typically LEDs.

The LEDs in this application are typically used to illuminate targets associated with any of the fingers, hand, feet and head of the user, or objects such as **131** held by a user, **135** with hands **136** and **137**, and head **138**. These targets, such as circular target **140** and band target **141** on object **131** are desirably, but not necessarily, retro-reflective, and may be constituted by the object features themselves (e.g., a finger tip, such as **145**), or by features provided on clothing worn by the user (e.g., a shirt button **147** or polka dot **148**, or by artificial targets other than retroreflectors.

Alternatively, a three camera arrangement can be used, for example using additional camera **144**, to provide added sensitivity in certain angular and positional relationships. Still more cameras can be used to further improve matters, as desired. Alternatively, and or in addition, camera **144** can be used for other purposes, such as acquire images of objects such as persons, for transmission, storage or retrieval independent of the cameras used for datum and feature location determination.

For many applications, a single camera can suffice for measurement purposes as well, such as **160** shown in FIG. **1**B for example, used for simple 2 dimensional (2D) measurements in the xy plane perpendicular to the camera axis (z axis), or 3D (xyz, roll pitch yaw) where a target grouping, for example of three targets is used such as the natural features formed by the two eyes **164**, **165** and nose **166** of a human **167**. These features are roughly at known distances from each other, the data from which can be used to calculate the approximate position and orientation of the human face. Using for example the photogrammetric technique of Pinkney described below, the full 6 degree of freedom solution of the human face location and orientation can be achieved to an accuracy limited by the ability of the camera image processing software utilized to determine the centroids

4

or other delineating geometric indicators of the position of the eyes and nose, (or some other facial feature such as the mouth), and the accuracy of the initial imputing of the spacing of the eyes and their respective spacing to the nose. Clearly if a standard human value is used (say for adult, or for a child or even by age) some lessening of precision results, since these spacings are used in the calculation of distance and orientation of the face of human **167** from the camera **160**.

In another generally more photogrammetrically accurate case, one might choose to use four special targets (e.g., glass bead retro-reflectors, or orange dots) **180**-**183** on the object **185** having known positional relationships relative to each other on the object surface, such as one inch centers. This is shown in FIG. **1**C, and may be used in conjunction with a pixel addressable camera such as described in FIG. **2** below, which allows one to rapidly determine the object position and orientation and track its movements in up to 6 degrees of freedom as disclosed by Pinkney U.S. Pat. No. **4,219,847** and technical papers referenced therein. For example, the system described above for FIGS. **1** and **2** involving the photogrammetric resolution of the relative position of three or more known target points as viewed by a camera is known and is described in a paper entitled "A Single Camera Method for the 6-Degree of Freedom Sprung Mass Response of Vehicles Redirected by Cable Barriers" presented by M. C. van Wijk and H. F. L. Pinkney to The Society of Photo-optical Instrumentation Engineers.

The stereo pair of cameras can also acquire a two view stereo image of the scene as well, which can be displayed in 3D using stereoscopic or auto-stereoscopic means, as well as transmitted or recorded as desired.

In many applications of the foregoing invention it is desirable not just to use a large screen but in fact one capable of displaying life size images. This particularly relates to human scaled images, giving a life-like presence to the data on the screen. In this way the natural response of the user with motions of hands, head, arms, etc., is scaled in "real" proportion to the data being presented.

FIG. **2**

This embodiment and others discloses special types of cameras useful with the invention. In the first case, that of FIG. **2**A, a pixel addressable camera such as the MAPP2200 made by IVP corporation of Sweden is used, which allows one to do many things useful for rapidly determining location of objects, their orientation and their motion.

For example, as shown in FIG. **2**A, an approximately circular image **201** of a target datum such as **180** on object **185** of FIG. **1**C may be acquired by scanning the pixel elements on a matrix array **205** on which the image is formed. Such an array in the future will have for example 1000×1000 pixels, or more (today the largest IVP makes is 512×512. The IVP also is not believed to be completely randomly addressable, which some future arrays will be).

As an illustration, computer **220** determines, after the array **205** has been interrogated, that the centroid "x, y" of the pixel elements on which the target image lies is at pixel x=500, y=300 (including a sub-fraction thereof in many cases). The centroid location can be determined for example by the moment method disclosed in the Pinkney patent, referenced above.

The target in this case is defined as a contrasting point on the object, and such contrast can be in color as well as, or instead of, intensity. Or with some added preprocessing, it can be a distinctive pattern on the object, such as a checkerboard or herringbone.

IPR2021-00920
Apple EX1001 Page 25

US 7,933,431 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

Subsequent Tracking

To subsequently track the movement of this target image, it is now only necessary to look in a small pixel window composed of a small number of pixels around the target. For example the square **230** shown, as the new position x'y' of the target image cannot be further distant within a short period of time elapsed from the first scan, and in consideration of the small required time to scan the window.

For example, if the window is 100×100 pixels, this can be scanned in 1 millisecond or less with such a pixel addressing camera, by interrogating only those pixels in the window, while still communicating with the camera over a relatively slow USB serial link of 12 mb transmission rate (representing 12,000 pixel gray level values in one millisecond).

One thus avoids the necessity to scan the whole field, once the starting target image position is identified. This can be known by an initial scan as mentioned, or can be known by having the user move an object with a target against a known location with respect to the camera such as a mechanical stop, and then indicate that tracking should start either by verbally saying so with voice recognition, or by actuating a control key such as **238** or whatever.

It is noted that if the tracking window is made large enough, then it can encompass a whole group of datums, such as **180-183** on an object.

FIG. 2B Reduction in Acquisition Time

Another application of such a pixel addressing camera is shown in FIG. 2B. One can look at the whole field, x y of the camera, **240**, but only address say every 10th pixel such as **250**, **251** and **252**, in each direction, i.e., for a total 10,000 pixels in a field of 1 million (1000×1000, say).

In this case computer **220** simply queries this fraction of the pixels in the image, knowing apriori that the target image such as **260** will have an image size larger than 10×10 pixels, and must be detectable, if of sufficient contrast, by one of the queried pixels. (For smaller or larger target images, the number and spacing of queried pixels can be adjusted accordingly). This for example, allows one to find approximate location of targets with only $\frac{1}{100}$ the pixel interrogation time otherwise needed, for example, plus any gain obtained as disclosed above, by knowing in what region of the image to look (for example during tracking, or given some apriori knowledge of approximate location due to a particular aspect of the physical arrangement or the program in question).

Once a target has been approximately found as just described, the addressing can be optimized for that region of the image only, as disclosed in subsequent tracking section above.

Given the invention, the potential for target acquisition in a millisecond or two thus is achievable with simple pixel addressable CMOS cameras coming on stream now (today costing under $50), assuming the target points are easily identifiable from at least one of brightness (over a value), contrast (with respect to surroundings), color, color contrast, and more difficult, shape or pattern (e.g., a plaid, or herringbone portion of a shirt). This has major ramifications for the robustness of control systems built on such camera based acquisition, be they for controlling displays, or machines or whatever.

It's noted that with new 2000×2000 cameras coming on stream, it may only be necessary to look at every 15th or 20th pixel in each direction to get an adequate feel for target location. This means every 200th to 400th pixel, not enough to cause image rendition difficulties even if totally dark grey (as it might be in a normal white light image if set up for IR wavelengths only).

FIG. 2C

Another method for finding the target in the first place with limited pixel interrogation is to look at pixels near a home point where a person for example indicates that the target is. This could be for example, placing ones fingernail such as **270**, whose natural or artificial (e.g., reflective nail polish) features are meant to be seen by the camera **275** and determined to be in the right corner of a pad **271** in FIG. 2C which approximately covers the field of view **274** of the camera **275**. The computer **220** analyzes the pixels in the right corner **278** of the image field **279** representing the pad portion **271** with the camera **275**, either continuously, or only when the finger for example hits a switch such as **280** at the edge of the pad, or on command (e.g., by the user pushing a button or key, or a voice message inputted via microphone **285** for example). After such acquisition, the target is then tracked to other locations in xy space of the pad, for example as described above. Its noted that it helps to provide a beep or other sound or indication when acquisition has been made.

Pick Windows in Real Time

Another aspect of the invention is that one can also pick the area of the image to interrogate at any desired moment. This can be done by creating a window of pixels with in the field to generate information, for example as discussed relative to a specific car dashboard application of FIG. 10.

FIG. 2D—Scan Pattern

A pixel addressing camera also allows a computer such as **220** to cause scans to be generated which are not typical raster scans. For example circular or radial, or even odd shapes as desired. This can be done by providing from the computer the sequential addresses of the successive pixels on the camera chip whose detected voltages are to be queried.

A circular scan of pixels addressed at high speed can be used to identify when and where a target enters a field enclosed by the circular pixel scan. This is highly useful, and after that, the approximate location of the target can be determined by further scans of pixels in the target region.

For example consider addressing the pixels c1 c2 c3 . . . cn representing a circle **282** at the outer perimeter of the array, **285**, of 1000×1000 elements such as discussed above. The number of pixels in a full circle is approximately 1000 pi, which can be scanned even with USB (universal serial bus) limits at 300 times per second or better. For targets of $\frac{1}{100}$ field in width, this means that a target image entering the field (which is shown intersecting element cm and its neighbors) would have to travel $\frac{1}{100}$ the field width in 0.0033 seconds to be totally missed in a worst case. If the image field corresponds to 20 inches in object field width this is 0.2 inches×300/sec or 60 inches/second, very fast for human movement, and not likely to be exceeded even where smaller targets are used.

Alternative shapes to circular "trip wire" perimeters may be used, such as squares, zig-zag, or other layouts of pixels to determine target presence. Once determined, a group of pixels such as group **292** can be interrogated to get a better determination of target location.

FIG. 3

Since many applications of the invention concern, or at least have present a human caused motion, or motion of a part of a human, or an object moved by a human, the identification and tracking problem can be simplified if the features of interest, either natural or artificial of the object provide some kind of change in appearance during such motion.

FIG. 3 illustrates tracking embodiments of the invention using intensity variation to identify and/or track object target datums. In a simple case, a subtraction of successive images can aid in identifying zones in an image having movement of

IPR2021-00920
Apple EX1001 Page 26

US 7,933,431 B2

7

features as is well known. It is also useful to add pixel intensities of successive images in computer 220 for example. This is particular true with bright targets (with respect to their usual surroundings) such as LEDs or retro-reflectors. If the pixels in use by the camera are able to gather light preferentially at the same time a special illumination light is on, this will accentuate the target with respect to background. And if successive frames are taken in this way, not only will a stationary image of the special target build up, but if movement takes place the target image then will blur in a particular direction which itself can become identify-able. And the blur direction indicates direction of motion as well, at least in the 2-D plane of the pixel array used.

Another form of movement can take place artificially, where the target is purposely moved to provide an indication of its presence. This movement can be done by a human easily by just dithering ones finger for example (if a portion of the finger such as the tip is the target in question), or by vibrating an object having target features of interest on it, for example by moving the object up and down with ones hand.

For example consider FIG. 3A, where a human 301 moves his finger 302 in a rapid up and down motion, creating different image positions sequentially in time of bright target ring 320, 320' on his finger, as seen by camera 325. If the camera can read quickly enough each of these positions such as 326 and 327 in image field 328 can be resolved, other wise a blur image such as 330 is registered on the camera and recorded in the computer 335.

Instead of using ones finger, it is also possible to create movement of a target for example with a tuning fork or other mechanism mechanically energizing the target movement, on what otherwise might be a static object say. And it is possible for the human, or a computer controlling the movement in question to create it in such a manner that it aids identification. For example, a certain number of moves of ones finger (e.g., 4), or 2 moves/sec of ones finger, or horizontal moves of ones finger etc., any or all of these could indicate to the computer upon analysis of the camera image, that a target was present.

The invention comprehends this as a method for acquiring the datum to be tracked in the first place, and has provided a camera mechanism for tracking fast enough not to lose the data, assuming a sufficiently distinct feature. For example, it is desirable to not require sophisticated image processing routines and the like if possible, to avoid the time it takes to execute same with affordable equipment. And yet in many scenes, finding a target cant be done easily today without some aid, either a high contrast target (contrasting brightness or color or both, for example). Or the aid can be movement as noted, which allows the search for the target to be at least localized to a small region of the field of view, and thence take much less time to run, even if a sophisticated algorithm is employed.

FIG. 3B illustrates an embodiment wherein a target which blinks optically is used. The simplest case is a modulated LED target such 340 on object 341 shown. Successive frames taken with camera 345 looking at pixel window 346 at 300 scans of the pixels within the window per second where the image 347 of the LED target is located, can determine, using computer 349 (which may be separate from, or incorporated with the image sensor), 5 complete blinks of target 340, if blinked at a 60 hz rate. Both blink frequency, blink spacing, blink pulse length can all be determined if the scan rate is sufficiently faster than the blink rate, or pulse time.

It should be noted that if the target 340 is a retro-reflector as in FIG. 1, with an illumination source such as 355 near the

8

axis of the camera, then the LEDs (or other sources) of the illuminator can be modulated, causing the same effect on the target.

Somewhat more sophisticated is the situation shown in FIG. 3C where a target 380 (on object 360) illuminated by a light source 365 provides a time variant intensity change in the camera image 368 obtained by camera 370 as the target moves its position and that of the image. This can be achieved naturally by certain patterns of material such as herringbone, or by multifaceted reflectors such as cut diamonds (genuine or glass), which "twinkle" as the object moves. A relative high frequency "twinkle" in the image indicates then the presence of the target in that area of the image in which it is found.

When analog sensors such as PSD (position sensing diode) sensor 369 described in a copending application is used in addition to, or instead of a matrix array in camera 370, the variation in light intensity or twinkle can be obtained directly from the detected output voltage from the signal conditioning of the sensor as shown in trace 375 corresponding to the movement of diamond target 380 a distance in the camera field. From the PSD one can also determine the position of the detected target image, theoretically at least independent of the intensity fluctuation.

For digital array detectors, the intensity variation can also be detected by subtracting images and observing the difference due to such variation. Such images need to be taken frequently if the twinkle frequency is high, and this can cause problems unless high speed camera scanning is possible. For example, in a twinkle mode, a pixel addressable camera using the invention herein could scan every 5th pixel in both x and y. This would allow a 1000 frame per second operation of a camera which would normally go 40 frames per second. Such a rate should be able to capture most twinkle effects with the assumption that the light field changes on more than 25 pixels. If less, then scan density would need to be increased to every 3rd pixel say, with a corresponding reduction in twinkle frequency detection obtainable.

FIG. 4

FIG. 4A illustrates identification and tracking embodiments of the invention using color and color change in a manner similar in some aspects to the intensity variation from object datums described above.

Color can be used as has been noted previously to identify a target, as can a change in color with time. For example, a target can change its color in order to identify itself to successive interrogations of pixels in a color TV camera. This can be accomplished by having a retro-reflector which is illuminated in succession by light from different colored LEDs for example, in the arrangement of FIG. 1. For example red led 401 illuminates retro reflector target 405 on object 406 during frame 1 (or partial frame, if not all pixels addressed) taken by camera 410. Then yellow led 402 illuminates target 405 on the next frame, and so forth. For any reading of successive frames, one point in the image will appear to distinctly change color, while all other points will be more or less the same due to the room lighting overwhelming the led source illumination and the natural color rendition of the objects themselves.

To return color variation when moved, one can employ a target which changes color naturally as it moves, even with illumination of constant color. Such a target can contain a diffractive, refractive, or interference based element, for example, a reflective diffraction grating for example, which splits white light illumination into colors, which are seen differently as the target moves and changes angle with respect to the observer and/or illumination source.

IPR2021-00920
Apple EX1001 Page 27

US 7,933,431 B2

9

For example, consider FIG. 4B showing reflective grating **440** on object **445** at initial position P. When illuminated by white light for example from lamp **450**, it reflects the spectrum such that when the object has moved to a new position P' the color (or colors, depending on the grating type, and angles involved) returning to camera **460** is changed. Such gratings can be purchased from Edmund Scientific company, and are typically made as replicas of ruled or holographic gratings.

Some types of natural features which change color are forms of jewelry which have different colored facets pointing in different directions. Also some clothes look different under illumination from different angles. This could be called then "color twinkle".

FIG. 5

FIG. **5** illustrates special camera designs for determining target position in addition to providing normal color images. As was pointed out in a co-pending application, it may be desirable to have two cameras looking at an object or area one for producing images of a person or scene, the other for feature location and tracking. These may be bore-sighted together using beam splitters or the like to look at the same field, or they may just have largely overlapping image fields. The reason this is desirable is to allow one to obtain images of activity in the field of view (e.g., a human playing a game) while at the same time ideally determine information concerning position or other aspects of features on the human or objects associated with him.

It is now of interest to consider a matrix array chip equipped with a special color filter on its face which passes a special wavelength in certain pixel regions, in addition to providing normal color rendition via RGB or other filtering techniques in the remaining regions. The chip could be pixel addressable, but does not have to be.

Version FIG. 5A

One version would have one special pixel filter such as **505**, for each square group of 4 pixels in an array **500** (one special pixel filter **505**, and 3 pixels, **510**-**512** filtered for RGB (red green blue) or similar, as is commonly used now for example. In one functional example, the special pixel **505** is purposely not read during creation of the normal image of a scene, but rather read only on alternate frames (or as desired) to determine target locations. If the array can be addressed pixel wise, the actual time lost doing this can be low. Since 25% of the pixels are effectively used in forming the image in this example, and assuming all pixels are of equal area (not necessarily required), then 25% of the image needs to be filled in. This can be done advantageously in the image displayed, by making the color and intensity of this pixel the same as the resultant color and average intensity value of the other 3 in the cluster.

Version FIG. 5B

In this version, related to FIG. **2** above, and shown in FIG. **5**b, isolated pixels such as **530** (exaggerated in size for clarity) on array **531** or clusters of pixels such as **540**-**543**, are used to rapidly find a target with low resolution, such as round dot target image **550**. These pixels can ideally have special filters on their face, for example having near IR bandpass filters (of a wavelength which can still be seen by the camera, typically up to 1 um wavelength max). If takes only a few pixels to see the rough presence of a target, then in an image field of 1000×1000 pixels there could be one or more target images occupying 10×10 pixels or more. Thus in any group of 10×10, you could have 5 near IR filtered receptive pixels say, i.e., only 5% of the total pixel count but sufficient to see the IR targets location to a modest accuracy. Once found, one can also use the "normal" pixels on which the target image also

10

falls to aid in more precise determination of its location, for example using pixel group **555** composed of numerous pixels.

In short by having a camera with certain pixels responsive to selected wavelengths and/or scanned separately one can very rapidly scan for target features, then when found, take a regular picture if desired. Or just take regular pictures, until the necessity arises to determine target location.

Similarly the special filtered pixels such as **505** or **530** could be laser wavelength bandpass filtered for this purpose, used by the array for preferentially detecting laser light projected on an object (while ignoring other wavelengths). In a normal image, such a pixel would be nearly black as little white light passes (except that centered on the laser wavelength). To provide a normal picture using such a camera, the special IR or laser wavelengths pixels readings would be filled in with values and colors of light from the surrounding regions.

Such a laser wavelength filter can be extremely effective, even if a relatively weak laser is used to illuminate a large area, especially where retro-reflectors are used, and the light returned is concentrated by 1000 times or more.

FIG. 6

The embodiments above have dealt with finding just one target, and generally with just one camera, even though two or more cameras may be used for stereo imaging. Where stereo pairs of cameras are used, clearly each camera must see the target, if range via image disparity (the shift in location of a feature in the image in two camera views separated by a baseline) is to be determined.

Using the invention, one camera can be considered a master, the other a slave. The master camera determines target location by any of the means described above. Then the slave need only look at the expected pixel location of the target assuming some a priori knowledge of range which can come from previous target readings, or known range zones where the target has to lie in a given application.

Consider cameras **600** (master) with lens **603** and **601** (slave) having lens **604**, the axes of the two cameras separated by baseline **602** and with interfaced to computer **605**. The image of target **610** on object **615** is formed at position **620** on array **630** of camera **600**, and at position **621** on array **631** of camera **601**. The difference in position x in the direction of the baseline, in this simple situation is directly proportional to range z. The knowledge then of target image position **620** found by interrogating some or all of the pixels of camera **600** can as mentioned be used to more rapidly find image **621** in the image field of the "slave" camera **601**, and thus the z location of the target **610**.

For example if range is known to be an approximate value of z, one can look in the image field of the camera **601** along a line of points at a calculated value x away from the edge of the field, assuming **620** has been found to lie as shown near the corresponding edge of the field of camera **600**.

Two or more cameras may be used for stereo image analysis including object range and orientation data as discussed in FIGS. **1** and **6**. Range can also be determined via triangulation with a single camera and one target if projected on to the object in question at an angle to the camera axis from a laser say, or by using a single camera and 3 or more points on an object whose relative relationship is known (including the case of a line of points and an external point).

FIG. 7

As stated above, the TV camera of the invention can be used to see either natural or artificial features of objects. The former are just the object features, not those provided on the object especially for the purpose of enhancing the ability to

IPR2021-00920
Apple EX1001 Page 28

US 7,933,431 B2

**11**

determine the object location or other variable using computer analysis of TV camera images. Such natural features, as has been pointed out in many of the co-pending referenced applications, can be holes, corners, edges, indentations, protrusions, and the like of fingers, heads, objects held in the hand, or whatever.

But using simple inexpensive equipment it is often hard to determine the presence or location of such features in a rapid reliable enough manner to insure function of the application in question. In this case, one can employ one or more artificial features, provided on the object by attaching an artificial target onto the object, or manufacturing the object with such a target.

At least three types of artificial features can be employed.
1. The first is to provide special features required for object location, or orientation determination. Such a special feature can be of an optically contrasting material at the wavelength used to that of the object, for example a bright color, or a retroreflector;
2. The second is to provide one artificial feature (typically capable of more easily being found in an image than natural features of the object), and by finding it, localize to the region of that target environs the problem of finding any other features needed nearby; and
3. The third is to find an artificial feature on an object that actually by its shape, location, or coded features, provides a guide to the location of natural or other artificial features which are to be sensed in order to determine position or orientation of the same or related objects. This has been dubbed by me a co-target in co-pending applications incorporated by reference.

As shown in FIG. **7**, object **700** has co-target **701** at one end, visible to camera **705**. The co-target in this particular instance is a diamond shape, and is of high contrast for easy acquisition. For example it could be a yellow plastic retroreflector formed of molded corner cubes similar to those used on cars for taillights and other safety purposes.

The diamond shape in this case is significant for two reasons. First it is unusual relative to the object or background when used in the context intended, and makes the target still more identifiable (that is novel color, shape and brightness are all present). In addition, in this particular instance it has been chosen that a diamond shape, should indicate that the corners of the object are to be used for 6 axis position and orientation determination and that the choice of color for example, signifies that the object corners are within some predetermined distance from the target. If desired the target location on the object can also point to the corners. For example, in the drawing, the four corners of the diamond, **720-723**, point in the general direction of the four corners **730-733** of the rectangular object **700**.
FIG. **8**

The invention herein and disclosed in portions of other copending applications noted above, comprehends a combination of one or more TV cameras (or other suitable electro-optical sensors) and a computer to provide various position and orientation related functions of use. It also comprehends the combination of these functions with the basic task of generating, storing and/or transmitting a TV image of the scene acquired either in two or three dimensions.

FIG. **8A** illustrates control of functions with the invention, using a handheld device which itself has functions (for example, a cell phone). The purpose is to add functionality to the device, without complicating its base function, and/or alternatively add a method to interact with the device to achieve other purposes.

**12**

The basic idea here is that a device which one holds in ones hand for use in its own right, can also be used with the invention herein to perform a control function by determining its position, orientation, pointing direction or other variable with respect to one or more external objects, using an optical sensing apparatus such as a TV camera located externally to sense the handheld device, or with a camera located in the handheld device, to sense datums or other information external for example to the device.

This can have important safety and convenience aspects to it, particularly when the device is used while driving a car or operating other machinery. To date voice recognition has been the only alternative to keying data in to small handheld devices, and voice is limited in many cases very limited if some physical movement is desired of the thing being communicated with.

A cellular phone **800** held in the hand of a user can be used to also signal functions in a car using a projected laser spot from built in laser spot projector **801** as in FIG. **14**, in this case detected by detector **802** on the dashboard **803**. Alternatively and or in conjunction, one may use features such as round dot targets **805-807** on the cell phone which are sensed, for example, by a TV camera **815** located in the car headliner **816** or alternatively for example in the dashboard (in this case the targets would be on the opposite end of the cell phone). More than one set of targets can be used, indeed for most generality, they would be an all sides which point in any direction where a camera could be located to look at them.

Remote control units and dictating units are also everyday examples of some devices of this type which can serve control purposes according to the invention. One of the advantages here is that it keeps the number of switches etc on the device proper to a minimum, while allowing a multitude of added functions, also in noisy environments where voice recognition could be difficult or undesirable for other reasons.

Use of specialized target datums or natural features of devices held in the hand, or used with cameras on such devices, allows photogrammetric techniques such as described in FIG. **1** to be used to determine the location in 6 degrees of freedom of the device with respect to external objects.

As one illustrative example, to signal a fax unit **824** in the car to print data coming through on the phone, the user just points (as illustrated in position **2**) the cell phone toward the fax, and the TV camera **815** scans the images of targets **805-807** on the face toward the camera, and the computer **830** connected to the camera analyzes the target images (including successive images if motion in a direction for example is used as an indicator, rather than pointing angle for example), determines the cell phone position and/or orientation or motion and commands the fax to print if such is signaled by the cell phone position orientation or motion chosen. The knowledge in space of the cell phone location and its pointing direction (and motion as pointed out above) provides information as to the fact that the fax was the intended target of the effort. Such data can be taught to the system, after the fact even if the fax or any other item desired to be controlled is added later.

Another version has a camera and requisite computer (and or transmission capability to an external computer) in the handheld device, such as a cell phone or whatever. When pointed at an object, the camera can acquire the image of the object and/or any natural features or special datums on the object which are needed to perform the function desired.

One function is just to acquire an image for transmission via for example the cell phones own connection. This is illustrated in FIG. **8B**, where an image of object **849** acquired

IPR2021-00920
Apple EX1001 Page 29

US 7,933,431 B2

13

by camera **850** of cell phone **851** held by user **852** is transmitted over mobile phone link **853** to a remote location and displayed, for example. While this image can be of the user, or someone or something of interest, for example a house, if a real estate agent is making the call, it is also possible to acquire features of an object and use it to determine something.

For example, one purpose is recognition, for example one can point at the object, and let the computer recognize what it is from its TV image. Or point around in space taking multiple TV frames aiming in different directions, and when computer recognition of a desired object in one of the images takes place, transmit certain data to the object. Or it can be used to acquire and transmit to remote locations, only that data from recognized objects.

Thus the invention can provided on a hand held object for a variety of purposes,

To take images of things;

To determine datums on things; and

To automatically read things.

The combination of any or all of these functions in addition with other object functions such as hand held cell phones, dictation units, telephones, wearable computer devices and the like.

An alternative, shown with phantom lines in FIG. **8A**, to the some aspects of the above described operation of the embodiment is to use a laser pointer **801** in for example a cell phone to designate say the fax machine as shown. Then the TV camera **815** simply detects the presence of the laser pointer projected spot **820** on the fax, and via computer memory it is known that this is a device to be energized or connected in connection with the cell phone.

The camera located in a handheld device can also be used to point at a TV screen, such as that on the dashboard of a car, and to utilize data presented there for some purpose. For example, if pointed at a screen saying email message number 5, the camera of the device can be used to obtain this image, recognize it through known character recognition techniques, and process it for transmission if desired. Or it might just say the message to the user of the phone through the speaker of the cell phone. Such a technique is not required if means exist to directly transmit the incoming information to the cell phone, but this may not be possible.

FIG. **9**

FIG. **9** illustrates pointing at a displayed image of an object represented on a screen using a finger or laser pointer, and then manipulating the represented object or a portion thereof using the invention. For example, consider user **901** pointing a laser pointer **905** at an image generated by computer **910** on display **912**, typically a large screen display (e.g., 5 feet diagonal or more) where control features here disclosed are of most value.

The user with the pointer, can point to an image or portion of the displayed image to be controlled, and then using the action of the pointer move the controlling portion of the image, for example a "virtual" slider control **930** projected on the screen whose lever **935** can be moved from left to right, to allow computer **910** sensing the image (for example by virtue of TV camera **940** looking at the screen as disclosed in the copending applications) to make the appropriate change, for example in the heat in a room.

Alternatively one can also point at the object using ones fingers and using other aspects of the invention sense the motions of ones fingers with respect to the virtually displayed images on the screen, such as turning of a knob, moving of a slider, throwing a switch etc.

14

Such controls are not totally physical, as you don't feel the knob, so to speak. But they are not totally virtual either, as you turn it or other wise actuate the control just as if it was physical. For maximum effect, the computer should update the display as you make the move, so that you at least get visual feedback of the knob turning. You could also get an appropriate sound if desired, for example from speaker **950**, like an increase in pitch of the sound as the knob is "moved" clockwise.

FIG. **10**

The above control aspects can in some forms be used in a car as well even with a small display, or in some cases without the display.

Or it can be a real knob which is sensed, for example by determining position of a target on a steering wheel or the fingers turning it tracked (as disclosed in co-pending application references).

For example, consider car steering wheel rim **1000** in FIG. **10A**. In particular, consider hinged targeted switch, **1010** (likely in a cluster of several switches) on or near the top of the wheel, when the car is pointed straight ahead, and actuated by the thumb of the driver **1011**. A camera **1020** located in the headliner **1025**, and read out by microcomputer **1025** senses representative target **1030** on switch **1010**, when the switch is moved to an up position exposing the target to the camera (or one could cover the target with ones fingers, and when you take a finger off, it is exposed, or conversely one can cover the target to actuate the action).

The camera senses that target **1010** is desired to be signaled and accordingly computer **1025** assures this function, such as turning on the radio. As long as the switch stays in the position, the radio is on. However other forms of control can be used where the switch and target snap back to an original position, and the next actuation, turns the radio off. And too, the time the switch is actuated can indicate a function, such as increasing the volume of the radio until one lets off the switch, and the target is sensed to have swung back to its original position and the increase in volume thus terminated.

In operating the invention in this manner, one can see position, velocity, orientation, excursion, or any other attribute of actuation desired. Because of the very low cost involved in incremental additions of functions, all kinds of things not normally sensed can be economically provided. For example the position of a datum **1040** on manually or alternatively automatically movable plastic air outlet **1041** in the dashboard **1042** can be sensed, indicative of the direction of airflow. The computer **1025** can combine this with other data concerning driver or passenger wishes, other outlets, air temperature and the like, to perfect control of the ambiance of the car interior.

It is also noted that the same TV camera used to sense switch positions, wheel position, duct position, seat position (for example using datum **1045**), head rest position (for example using datum **1046**), and a variety of other aspects of physical positions or motions of both the car controls and the driver or passengers. And it can do this without wires or other complicating devices such as rotary encoders which otherwise add to the service complexity and cost.

When the camera is located as shown, it can also see other things of interest on the dashboard and indeed the human driver himself, for example his head **1048**. This latter aspect has significance in that it can be used to determine numerous aspects such as:

1. The identity of the driver. For example, if a certain band of height isn't reached, such as point P on the drivers head, the ignition can be interlocked. Much simpler than face recog-

IPR2021-00920
Apple EX1001 Page 30

US 7,933,431 B2

15

nition, but effective if properly interlocked to prevent repeated retries in a short time period.

2. The position of the head of the driver in case of an accident. As detailed in reference **4**, a camera or cameras can be used to determine head location, and indeed location of the upper torso if the field of view is large enough. This information can be used to control airbag deployment, or head rest position prior to or during an accident (noting too that headrest position can also be monitored without adding any hardware). Particularly of interest is that the pixel addressing camera of the invention can have the frequency response to be useful in a crash, sensing the movement of the person (particularly severe if unrestrained) within a millisecond or two, and providing a measure of the position for airbag deployment. Additional cameras may also be used to aid the determination, by providing other views or observing other features, for example.

Using a pixel addressing camera for camera **1020** confers additional advantages. For example consider the image of the car interior produced by the camera lens **1021**, on matrix of pixels **1061**, whose addressing and processing is controlled by computer **1025**. In the first instance one can confine the window of view of a certain group of pixels of the total matrix **1061** to be only in the region of the steering wheel, as in window **1065** shown. This allows much faster readout of the more limited number of pixels, and thus of the steering wheel switches, at the expense of not seeing anywhere else in that particular reading. But this may be desirable in some cases, since it may only be required to scan for heater controls or seat positions, every 10 seconds say, while scanning for other more immediate items a hundred times per second or more. A good example are safety related functions. 5 per second might suffice for seeing where the turn signal or windshield washer control was, as an example. Window 1066 dotted lines is illustrative of a window specialized for head, headrest and seat positions, say.

Scans in certain areas of the image can also depend on information obtained. For example one may initiate a scan of a control position, based on the increasing or decreasing frequency of an event occurrence. For example if the persons head is in a different location for a significant number of scans made at 15 second intervals for example, then in case of a crash, this data could be considered unreliable. Thus the camera window corresponding to pixels in the zone of the head location **1048** could be scanned more frequently henceforward, either until the car stopped, or until such action settled down for example. Such action is often the case of a person listening to rock music, for example.

Similarly, if someone is detected operating the heater controls, a scan of predominately heater function controls and related zones like air outlets can be initiated. Thus while normal polling of heater controls might be every 2 seconds say, once action is detected, polling can increase in the window(s) in question to 40 times per second for example. The detection of action can be made first via the camera, or via input from some other input device such as a convention heater knob and electric circuit operable therewith.

Scans in certain areas of the image can also depend on information obtained in other areas of scan, or be initiated by other control actions or by voice. For example, if hard deceleration is detected by an accelerometer, but before a crash occurred, the camera could immediately be commanded to begin scanning as fast as possible in the region of the image occupied by the driver and/or any other humans in its field of view. This would be for the purpose of monitoring movements in a crash, if a crash came, in order to deploy an airbag for example.

16

One might utilize the invention to actuate a function, based on positions of people or other objects in the vehicle. As one example, suppose the drivers hand is resting on a console mounted gear lever. By scanning the image of this region, one can determine from the image the position of the console shift lever, and use the image thereof to control gear change via computer **1025**. However if the driver rests his hands on the windshield wiper stalk, it could in the same manner, become a column mounted gear lever so to speak. Or just be used for up down gear changes, like a paddle shifter on a racing car. In fact in the latter sense, the camera could be instructed to detect ones finger or hand movement to do this function for example, wherever one desired to rest ones hand (within the camera field of view at least). This function is also useful for physically disabled persons wishing to drive the car. And it can be different for different persons as well, via programming of the control functions associated with any given hand, switch or other position or movement.

FIG. **10**B illustrates alternative types of control mechanisms which can be used with the invention, in this case illustrated on the steering wheel of a car, although as can be appreciated, any suitable function or location may be used or created. And too, combinations of functions can be used. The invention is generic to car steering wheel controls, dishwashers, audio systems in ones home, heating and air conditioning elements and virtually all other forms of human related control functions. The key is that the camera computer combination makes a very inexpensive way to share a wide variety of functions with one or just a few basic systems and over a large population base.

As shown in FIG. **10**B, the steering wheel **1070** has two additional types of controls visible to camera **1020** and able to be sensed and generate the appropriate control function via computer. These are rotating device **1072** built to rotate around the steering wheel rim circular cross section, and expose a continuously variable, or digital or step wise increment component to the camera. For example, three bars are shown, short **1075**, medium **1076**, and long **1077**. The computer senses which of the three is visible by comparing the length to pre-stored values (or taught values, see below), and causes the desired action to occur.

The second control **1080** is a sliding device **1081** which can be slid clockwise, or counterclockwise along a circumferential section of the steering wheel at the top, sides or wherever. As before, Its position is determined by camera **1020** again providing more data than just a switch up or down as shown before.

While illustrated on the steering wheel where it is readily at hand, it can be appreciated that the position of either the slider **1081** or the rotary device **1072**, or other similar devices for the purpose at hand could be elsewhere than the wheel, for example on stalk or on a piece of the dash, or other interior component indeed wherever a camera of the invention can view them without excessive obscuration by persons or things in the car. It need not be on a car either, controls of this type can be in the home or elsewhere. Indeed a viewable control datum can even be on a portable component such as ones key chain, phone, or article of clothing apparel, or whatever. Similarly the camera **1020** can view these items for other purposes as well.

The teach-ability of the invention is achieved by showing the camera the code marker in question (e.g., a short bar located on the wheel), and in the computer recording this data along with what it is supposed to signify as a control function for example, turn rear wiper on to first setting. This added functionality of being easily changed after manufacture is an

IPR2021-00920
Apple EX1001 Page 31

US 7,933,431 B2

17                                                                          18

important advantage in some cases, as for example, today after-market addition of wired in accessories is difficult.

Games Using the Invention

The co-pending referenced applications have described games which can be played with target sensing and touch screen based devices, typically but not necessarily, electro-optically based (e.g., TV camera). The cameras of the invention can be used to, for example: Sense the player or players in the game or portions thereof; sense objects held or manipulated by the players (e.g., a ball, a pistol); sense physical tokens used in the game, such as monopoly game tokens; and sense game accessories such as checkerboards, croquet wickets; compare positions of objects with respect to other objects or players.

In addition, the cameras can be used to take images which can be displayed also a major feature given the ability to create life size displays. And the computer of the invention can be used to control the presentation of background image data from stored images, or even images downloaded from the internet for example.

Some or all of these aspects will now be illustrated in some representative game illustrations (again noting that some more are in the co-pending applications).

FIG. 11 Board Game

Even today, popular board games such as Monopoly and the like are being provided in computer playable form, with the "board" represented on the screen of the computer monitor. The invention here builds on this by providing various added features which allow a physical nature of the game just as the real game, but with new aspects and providing physical game play which can be transmitted over the internet to others. These features also can be turned off or on at as desired.

In one version shown in FIG. **11**A, the player tokens such as **1101** and **1102** are observed by camera of the invention **1110** placed directly overhead of the play board **1115**, which can for example be a traditional monopoly board (chess board, checker board, etc). points on the board such as corners **1130**, **1131**, **1132**, and **1133** can also be observed to establish a reference coordinate system for the computer **1140** to track the moves of the markers, either from their natural features, or from specialized datums thereon (e.g., retro-reflective hat top **1141** on marker **1101**). For example a train shape **1102** of a marker can be called from memory, or taught to the computer by showing it to the camera. Rotation invariant image analysis programs such as the PATMAX program from Cognex company can be used to identify the marker in any normal orientation, together with its location on the board (the board itself can be taught to the computer using the camera, but is preferably called up from memory).

The board position and relative scale in the field of view is determined easily by knowing the spacing of the corner points **1130-1133** and using this to calibrate the camera (to provide extra contrast, the corners can have retro-reflective glass bead edging or beading as shown). For example if the points are spaced 20 inch on corners of the board, and the camera is positioned so that 20 inches occupies 80% of its field of view, then the field of view is 25 inches square (for a square matrix of camera pixels), and each pixel of 1000 pixels square, occupies 0.025 inches in the object field.

The play of both players (and others as desired) can be displayed on the monitor **1150**, along with an image of the board (which also can be called from computer memory). But other displays can be provided as well. For example to lend more realism to the game, the display (and if desired sound from speaker **1155** connected to computer **1140**) can also be programmed to show an image or sound that corresponds to the game. For example, when the camera image has provided information that one player has landed on "Boardwalk" (the most valuable property) a big building could be caused to be shown on the screen, corresponding to it also suitable sounds like wow or something provided).

The camera can be used to see monopoly money (or other game accessories) as well, and to provide input so the computer can count it or do whatever.

A large, wall sized for example, screen can add added realism, by allowing one to actually get the feeling of being inside the property purchased, for example.

One of the exciting aspects of this game is that it can be used to turn an existing board game into something different. For example, in the original monopoly the streets are named after those in Atlantic City. By using the computer, and say a DVD disc such as **1160** stored images of any city desired can be displayed, together with sounds. For example, one could land on the Gritti Palace Hotel in Venice, instead of Boardwalk. As shown in FIG. **11**B, the TV camera senses the image of train marker **1101**, and conveys this information to computer **1140**, which causes the display **1150** and speaker of the invention to display the information desired by the program in use.

Making the game in software in this way, allows one to bring it home to any city desired. This is true of a pure (virtual) computer game as well, where the board only exists on the computer screen.

For added fun, for example in a small town context, local stores and properties could be used, together with local images, local personages appearing on the screen hawking them, and the like. A local bank could be displayed to take your money, (even with sounds of the local banker, or their jingle from the radio) etc. This makes the game much more local and interesting for many people. Given the ease of creating such local imagery and sounds with cameras such as digital camcorder **1151** used as an input of display imagery (e.g., from local celebrity **1158**) to the game program, one can make any monopoly experience more interesting and fun at low cost.

The same holds true with other well known games, such as Clue, where local homes could be the mystery solving location, for example. One can also create games to order, by laying out ones own board. If one of the persons is remote, their move can be displayed on the screen **1150**.

In the above, the display has been treated as sort of backdrop or illustration related. However, one can also create a whole new class of games in which the display and/or computer and the board are intertwined. For example as one takes a trip around the monopoly board, several chance related drawings opportunities occur during play. In this new game, such could be internet addresses one draws, which, via modem **1152**, send the board game computer **1140** to any of a large number of potential internet sites where new experiences await, and are displayed in sight and sound on the display.

It should also be noted that the board can be displayed on the screen as well, or alternatively projected on a wall or table (from overhead). A particularly neat mixture of new and old is shown in FIG. **11**B, where the board is displayed on a screen pointed vertically upward just as it would be on a table, and indeed in this case physically resident on a table **1165**. The board is displayed (from software images or cad models of the board in computer **1166**) on a high resolution table top HDTV LCD screen **1167** with a suitable protective plastic shield (not shown for clarity). Play can proceed just as before using physical tokens such as **1101** and **1102**. In this case the

IPR2021-00920
Apple EX1001 Page 32

US 7,933,431 B2

19

display used to augment the game can actually be shown on the same screen as the board, if desired.

The TV camera **1110** in this context is used to see the tokens and any other objects of the game, the people as desired, and the play, as desired. The camera can be used to see the display screen, but the data concerning the board configuration displayed may be best imputed to the computer program from direct data used to create the display.

A beauty of the invention is that it allows the interaction of both computer generated images and simulations, with the play using normal objects, such as one might be accustomed to for example, or which give a "real" feel, or experience to the game.

FIG. **12** Sports Game

FIG. **12** illustrates a generic physical game of the invention using points such as **1201-1205** on the human (or humans) **1210** sensed by a TV camera such as stereo camera pair **1215** and transmitted to the computer of the invention **1220**. While points can be sensed in 2D, this illustration uses a stereo camera pair located on large screen display **1225** as shown to provide a unitary package built into the screen display (pointed out in other co-pending applications). In this particular instance a 3D display is illustrated, though this isn't necessary to obtain value and a good gaming experience. The human optionally wears red and green filter glasses **1235** such that red images on the screen are transmitted to one eye, green to another, so as to provide a 3D effect. Similarly crossed polarized filter glasses (with appropriate display), and any other sort of stereoscopic, or autostereoscopic method can also be used, but the one illustrated is simple, requires no connecting wires to the human, and can be viewed by multiple uses, say in a gym aerobics room.

The game is generic, in that it totally depends on the program of the computer. For example, it can be an exercise game, in which one walks on a treadmill **1250**, but the image displayed on screen **1225** and sound from speakers **1255** and **1266** carry one through a Bavarian forest or the streets of New York as one walks, for example.

Or it can be a parasail game in which one flies over the water near Wakiki beach, with suitable images and sounds. In any case action determined by sensing position, velocity acceleration, or orientation of points **1201-1206** on the player, **1210** is converted by computer **1220** into commands for the display and sound system. Note in the figure this player is shown viewing the same screen as the treadmill walker. This has been shown for illustration purposes, and it is unlikely the same game could be applied to both, but it is possible.

It is noted that fast sensing, such as provided by the pixel addressing camera method disclosed above is highly desirable to allow realistic responses to be generated. This is especially true where velocities or accelerations need to be calculated from the point position data present in the image (and in comparison to previous images).

For example, consider points **1201** and **1202** on player **1210**. If point **1201** moves to **1201**_a_, and **1202** moves to **1202**_a_ indicative of a quick jerk movement to turn the displayed parasail, this movement could occur in a 0.1 second. But the individual point movements to trace the action would have to be sensed in 0.01 second or quicker for example to even approximately determine the acceleration and thus force exerted on the glider, to cause it to move.

It is important to note that the invention is not only generic in so far as the variety of these games are concerned, but it also achieves the above with virtually no mechanical devices requiring maintenance and creating reliability problems

20

which can eliminate profits from arcade type businesses especially with ever more sophistication required of the games themselves.

FIG. 13 Bar Game

FIG. **13** illustrates a game which is in a class of gesture based games, in which the flirting game of FIG. **15** is also an example. In such games one senses the position, velocity or acceleration of a part of a person, or an object associated with the person. This can also include a sequence of positions, itself constituting the gesture. The detected data is then related to some goal of the contest. Consider FIG. **13**, wherein the object in ones hand is monitored using the invention, and a score or other result is determined based on the position, velocity, orientation or other variable of the object determined. For example, in a bar one can monitor the position, orientation, and rate of change thereof of drinking glasses.

A two person game is illustrated, but any reasonable number can play as long as the targets can all be tracked sufficiently for the game (in one test over 200 targets were acquired, but as can be appreciated this uses most of the field of view of the camera, and thus speed improvements made possible by pixel addressing become more difficult.

As shown, a single camera **1301** observes one or more targets such as **1305** on glass **1310** held by contestant **1315**, and target **1320** on glass **1325** of contestant **1330**. On a signal, each drinks, and a score is calculated by program resident in computer **1350** based on the time taken to raise the glass, and place it back empty on table **1355**. A display of the score, and an image desired, for example of the winner (taken with camera **1301** or another camera), or a funny image called from computer memory, is displayed on monitor display **1370**.

If the glass features are sufficiently distinct for reliable and rapid acquisition and tracking, for example as might be provided by an orange color, or a distinct shape, then specialized target features are not required.

Alternatively the velocity, path of movement of the glass (or other object), acceleration, or any other variable from which target data is sufficient to calculate, can be used to determine a score or other information to be presented or used.

FIG. **14**

The referenced co-pending applications have described a game where by laser pointers can be used to designate images on a TV screen. In this case of FIG. **14**A, the TV camera of the invention such as **1410** is used in a two player game to see laser pointers spots such as **1420** and **1421** projected by players **1430** and **1431** respectively, using laser pointers **1440** and **1441** respectively. When one player's spot hits the other, the event is recorded in memory of computer **1450** for further analysis and display.

In a somewhat different context, a person can use a laser pointer to point at an object to designate it for some purpose, for example for action. For example consider FIG. **14**B, in which housewife **1460** who points with laser pointer **1462** so as to provide a laser spot **1465** on dishwasher **1470**. TV camera of the invention **1475** in corner of the kitchen **1480** picks up all laser spots in an image of the room (made easier to process in terms of signal to background imagery if one locates a laser wavelength band-pass interference filter **1481** in front of the TV camera as shown) and compares via computer **1483**, the location of the spot detected in the image to stored memory locations of objects such as the dishwasher **1470** or fridge **1485** in the camera field of view, so as to identify the object needing action. In this case too, housewife may signal via a spatially variant laser pointer projection image (see copending referenced applications for further

IPR2021-00920
Apple EX1001 Page 33

US 7,933,431 B2

21                                          22

examples in other applications), or a series of spots in time, what action is desired, for example to turn the washer on. In this case the computer **1483** can cause a command to do so to be sent to the washer.

Any one with a simple laser pointer can make these commands effective. No learning is needed just point at the item desired, with the TV camera and computer of the invention acquiring the data and interpreting it. This is much simpler than remote controls of today, and a major advantage for those who have difficulty or inclination to learn complex electronic devices and procedures. It should be noted that these pointing procedures can easily be combined with voice recognition to further define the desired control activity for example inputting the housewife's voice in this example by virtue of microphone **1476**.

The stored locations can be taught. For example in a setup mode, one can point a laser pointer at the dishwasher, and indicate to the computer that that spot is the dishwasher. The indication can be provided by keyboard, voice recognition or any other means that is satisfactory.

Clearly other items can be monitored or controlled in this manner. The camera can also detect optical indications provided by other means, for example lights in the appliance itself. And one can detect whether light have been left on at night (or not left on) and cause them to be turned off or on as desired.

Such a camera if it is responsive to normal illumination as well as that of the laser wavelength, can also be used to see movements and locations of people. For example, it can look at the top of the stove, and assure that no movement is near the stove **1486**, or objects on it if programmed to do so, thus sounding an alarm if an infant should get near the stove, for example.

The housewife in the kitchen can also point at a board on which preprogrammed actions are represented. For example consider board **1490**, shown in greater detail in FIG. **14**C, in which 3 squares **1491-1493** are to represent different functions. Thus if **1491** is programmed (via keyboard, voice or whatever) to represent turning on the clothes dryer in the laundry, when the TV camera sees, and via the computer, identifies spot **1496** projected by the user on square **1491**, it causes the dryer to turn on. Operated in this manner, the board **1490**, in combination with a TV camera of the invention (such as **1475** or a more dedicated one for the board alone) and computer such as **1483** can be considered a form of touch screen, where the user, in this case in the kitchen can point at a portion of the board with a finger, or a laser pointer, and register a choice, much like touching an icon on a conventional computer touch screen.

Similarly, squares or other zones representing choices or the like can be on the item itself. For example, a stove can have four areas on its front, which can be pointed at individually for control purposes, what ever they are (e.g., representing heat settings, burner locations or the like). For security, it could be that only a coded sequence of laser pulses would be seen, or as pointed out in co-pending reference Ser. No. 60/133,673, a spatial code, for example representing the user such as an initial could be projected, and sensed on the object by the TV camera.

The laser pointer can be held in the hand of the user, or, like **1497** attached for example to a finger, such as forefinger **1498**. Or it can be on or in another object, desirably one which is often hand held in the normal course of work, such as a TV remote control, a large spoon, or the like. Or using other aspects of the invention, the finger of the user can be observed to point directly, and the object being pointed at determined. For example if finger **1498** is moved 4 times, it could indicate

to the TV camera and thence computer that channel four was desired on a TV display not shown.

If a special pointer is used, it can be any workable optical device, not necessarily a laser. The camera and computer of the invention can also be used to observe the user pointing directly, and compute the pointing vector, as has been described in my co-pending applications.

FIG. **15** A "Flirting" Game

Another game type is where the camera looks at the human, and the humans expressions are used in the game. In this case it is facial expressions, hand or body gestures that are the thing most used.

For example, one idea is to have a scene in a restaurant displayed on a display screen **1500**, preferably a large HDTV screen or wall projection to be as lifelike as possible, and preferably life size as well which lends extra realism to some games, such as this one due to the human element involved.

Let us consider that seated at the table in the restaurant displayed on the screen is a handsome man **1501** whose picture (likely a 3D rendered animation, or alternatively photo-imagery called from memory), and the goal for the girl **1510** playing the game is to flirt with this man until he gets up and comes over to say hello, ask her out or what ever (what he does, could be a function of the score obtained, even!).

Player **1510** seated at table **1511** (for authenticity, for example) is observed by TV camera **1515** (or stereo pair as desired, depending whether 3D information is thought required) and computer of the invention **1520**, which through software determines the position of eyebrows, lips, hands, fingers and any other features needed for the game. If necessary, specialized targets can be used as disclosed herein and elsewhere to augment this discrimination, for example such as optically contrasting nail polish, lipstick, eyeliner or other. Contrast can be in a color sense, or in a reflectivity sense such as even retro-reflective materials such as Scotchlite 7615 by 3M company. Even special targets can be used to enhance expressions if desired.

This can be a fun type game, as the response of the displayed person can be all kinds of things even contrary to the actual gestures if desired. Sounds, such as from speaker **1530** can also be added. And voice recognition of players words sensed by microphone **1550** can also be used, if verbal as well as expressive flirting is used.

While the game here has been illustrated in a popular flirting context, it is more generally described as a gesture based game. It can also be done with another contestant acting as the other player. And For example, the contestants can be spaced by the communication medium of the internet. The displayed characters on the screen (of the other player) can be real, or representations whose expressions and movements change due to sensed data from the player, transmitted in vector or other form to minimize communication bandwidth if desired.

Other games of interest might be:

"Down on the Farm" in which a farmer with live animals is displayed on a life size screen, and the children playing the game are to help the farmer by calling the animals to come over to them. This would use recognition of voice and gesture to make the animal images move and make sounds.

A player can find someone in a display and point at him, like the "Whereas Waldo" puzzle game. Then the subject moves, child runs to peek at him, and to find him, say running down a street whose image is displayed on the screen.

One can also use the camera of the invention to monitor the progress made by a child building blocks, and show an Video

IPR2021-00920
Apple EX1001 Page 34

US 7,933,431 B2

23                                          24

displayed image of a real skyscraper progressing as he builds his little version. Note the benefit of group activity like a board game and children's play with each other.
FIG. **16**

FIG. **16** illustrates a version of the pixel addressing camera technique wherein two lines on either side of a 1000 element square array are designated as perimeter fence lines to initiate tracking or other action.

Some "pixel addressing" cameras such as the IVP MAPP 2500 512×512 element camera, are smart, that is can process on the same chip. However, in some cases the control of such a camera may not allow one to actually read just one pixel, say, but rather one must read the whole line on which the pixel rests. Now some processing can be in parallel such that no speed is lost, at least in many instances.

If however, one does have to read a whole line serially into a computer portion, then to fully see a 10×10 pixel round target say, one would have to read at least 10 lines.

If two targets both were located on the same lines, the time involved to read would be the same.

In the same vein, if lines of data must be scanned, then the approach of **2***b* wherein every 20th pixel say is interrogated can be specialized to having such pixels fall on scan lines wherever possible. And where one is restricted to reading all pixels on a scan line and where a target entry zone is anticipated, one can have a scan line oriented to be crossed by such entry. For example in FIG. **16**, the two lines **1601** (line of pixels **3**) and **1602** (line of pixels **997**) of a 1000×1000 element pixel array **1610** are designated as perimeter fence lines, to trigger a target tracking or other function on the entry of a target image on to the array, such as **1615** from either the right or left side in the drawing. This is often the case where entry from top or bottom is precluded by constraints of the application, such as a table top at the bottom, or the height of a person at the top. Or in a stereo example such as FIG. **6**, the baseline defines the direction of excursion of a target as z is varied again calling for crossing of scan lines out of the plane of the paper at some point.

The invention herein has provided an exciting method by which common board games can become more fun. The invention provides a link with that past, as well as all of the benefits of the video and computer revolution, also via the internet.

It is envisioned that the same approach may be applied to many card games as well. It is also thought that the invention will find use in creating ones own games, or in downloading from the internet others creations. For example, common everyday objects can become the tokens of the games, and taught to the game computer by presenting them to the video camera. Similarly, the people playing the game can be taught, including their names and interests.
FIG. **17**

FIG. **17** illustrates a 3D acoustic imaging embodiment of the invention which at low cost may generate accurate 3D images of the insides of objects, when used in conjunction with ultrasonic transducers and particularly a matrix array of ultrasonic transducers.

As shown in FIG. **17**A, the position in xyz of the ultrasonic imaging head **1700** on wand **1701** held in a users hand **1702** is monitored electro-optically as taught in FIG. **1**, using a single camera **1710** and a simple four dot target set **1715** on the head **1700** at the end of the transducer wand **1701** in contact with the object to be examined **1720**. Alternatively, as also taught in FIG. **1**, a stereo pair for example providing higher resolution in angle can be employed.

Computer **1725** combines ultrasonic ranging data from the ultrasound transducer head **1700** and from the sensor of trans-

ducer location (in this case performed optically by camera **1710** using the optically visible targets on the transducer head) in order to create a range image of the internal body of the object **1720** which is thus referenced accurately in space to the external coordinate system in the is case represented by the camera co-ordinates xy in the plane of the TV camera scan, and z in the optical axis of the camera.

In many cases it is also desirable to know the pointing angles of the transducer. One instance is where it is not possible to see the transducer itself due to obscuration, in which case the target may alternately be located at the end **1704** of the wand for example. Here the position and orientation of the wand is determined from the target data, and the known length of the wand to the tip is used, with the determined pointing angle in pitch and yaw (obtained from the foreshortening of the target spacings in the camera image field) to calculate the tip position in space.

This pitch and yaw determination also has another use however, and that is to determine any adjustments that need to be made in the ultrasonic transduction parameters or to the data obtained, realizing that the direction of ultrasound propagation from the transducer is also in the pointing direction. And that the variation in ultrasound response may be very dependent on the relation of this direction **1730** with respect to the normal **1735** of the surface **1736** of the object (the normal vector is shown for clarity pointing inward to the object).

The difference in direction can be calculated by using the TV camera (which could be a stereo pair for greater angular resolution) as well to determine the surface normal direction. This can, for example, be done by placing a target set such as **1740** on the surface in the field of the camera as shown. This can be dynamically or statically accomplished using the photogrammetric method described in the Pinkney references.

Differences in direction between the surface normal and the transducer pointing direction are then utilized by software in the computer **1725** of the invention in analysis of the ultrasound signals detected. The pointing angle and the position of the transducer on the surface of the object are used by the computer in predicting the location of various returns from internal points within the object, using a suitable coordinate transformation to relate them to the external coordinate reference of the TV camera.

All data, including transducer signals and wand location is fed to computer **1725** which then allows the 3D image of the inside of the body to be determined as the wand is moved around, by a human, or by a robot. This is really neat as all the images sequentially obtained in this manner can be combined in the computer to give an accurate 3D picture **1745** displayed on monitor **1750**.

In one preferred embodiment as shown in FIG. **17**C, the transducer head **1700** is comprised of a matrix **1755** of 72 individual transducer elements which send and receive ultrasound data at for example, 5 MHZ. This allows an expanded scan capability, since the sensor can be held steady at each discrete location xyz on the object surface, and a 3D image obtained with out movement of the transducer head, by analyzing the outputs of each of the transducers. Some earlier examples are described in articles such as: Richard E. Davidsen, 1996 IEEE Ultrasonics Symposium, A Multiplexed Two-Dimensional Array For Real Time Volumetric and B-Mode; Stephen W. Smith, 1995 IEEE Ultrasonics Symposium, Update On 2-D Array Transducers For Medical Ultrasound, 1995.

If the wand is now moved in space, fine scan resolution is obtained, due to the operation of the individual elements so positioned with out the need to move the wand in a fine pitch

IPR2021-00920
Apple EX1001 Page 35

US 7,933,431 B2

25

26

manner to all points needed for spatial resolution of this order. This eases the operators task, if manually performed, and makes robotization of such examination much easier from a control point of view.

Consider FIG. 17B which illustrates a transducer as just described, also with automatic compensation at each point for pointing angle, robotically positioned by object, **1785** with respect to object **1764**. In this case a projection technique such as described in U.S. Pat. No. 5,854,491 is used to optically determine the attitude of the object surface, and the surface normal direction **1760** from the position of target set **1765** projected on the surface by diode laser set **1770**, and observed by TV Camera **1775** located typically near the working end of the robot. Differences between the normal direction and the transducer propagation direction (typically parallel to the housing of the transducer) is then used by computer **1777** to correct the data of the ultrasonic sensor **1780** whose pointing direction in space is known through the joint angle encoders and associated control system **1782** of robot **1785** holding the sensor. Alternatively the pointing direction of this sensor can be monitored by an external camera such as **1710** of FIG. **17A**.

It should be noted that the data obtained by TV camera **1775** concerning the normal to the surface and the surface range from the robot/ultrasonic sensor, can be used advantageously by the control system **1782** to position the robot and sensor with respect to the surface, in order to provide a fully automatic inspection of object **1764**. Indeed the camera sensor operating in triangulation can be used to establish the coordinates of the exterior surface of object **1764** as taught for example in U.S. Pat. No. 5,854,491, while at the same time, the acoustic sensor can determine the range to interior points which can be differentiated by their return signal time or other means. In this manner, a complete 3D map of the total object, interior and exterior, can be obtained relative to the coordinate system of the Robot, which can then be transformed to any coordinate system desired.

The invention has a myriad of applications beyond those specifically described herein. The games possible with the invention in particular are limited only by the imagination.

What is claimed is:

**1**. A method for controlling a handheld computing device comprising the steps of:

holding said device in one hand;

moving at least one finger in space in order to signal a command to said device;

electro-optically sensing light reflected from said at least one finger using a sensing means associated with said device;

determining from said sensed light the movement of said finger, and

using said sensed finger movement information, controlling said device in accordance with said command.

**2**. A method according to claim **1**, wherein at least one camera is utilized to effect said electro-optical sensing.

**3**. A method according to claim **1**, including the further step of acquiring an image of at least a portion of the user of the device.

**4**. A method according to claim **1**, wherein said movement is sensed in 3 dimensions.

**5**. A method according to claim **1**, wherein movement of one finger relative to another finger is sensed.

**6**. A method according to claim **1**, wherein movement of two fingers is sensed.

**7**. Handheld computer apparatus comprising:

a housing;

a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object;

computer means within said housing for analyzing said image to determine information concerning a position or movement of said object; and

means for controlling a function of said apparatus using said information.

**8**. Apparatus according to claim **7**, wherein said object is a finger.

**9**. Apparatus according to claim **7**, further including a display function which is controlled.

**10**. Apparatus according to claim **9**, wherein said display is 3D display.

**11**. Apparatus according to claim **7**, further including means for transmitting information.

**12**. Apparatus according to claim **7**, further including a light source for illuminating said object.

**13**. Apparatus according to claim **7**, wherein said apparatus is a cellular phone.

**14**. A method for controlling a handheld computing device comprising the steps of:

providing a computer within said device;

associating a camera with said device, said camera viewing at least a portion of the body of a user operating said device or an object held by said user, in order provide image data concerning said portion or object;

using said computer, analyzing said image data to determine information concerning a user input command; and

from said determined information, controlling a function of said device.

**15**. A method according to claim **14**, wherein reflected light from said body portion or object is imaged by said camera.

**16**. A method according to claim **14**, wherein said information includes the position of the portion or object.

**17**. A method according to claim **14**, wherein said information includes the change in position of the portion or object.

**18**. A method according to claim **14**, wherein said information includes the velocity or path of the portion or object.

**19**. A method according to claim **14**, wherein said information is obtained in 3 dimensions.

**20**. A method according to claim **14**, wherein said information includes the pointing direction of the portion or object.

**21**. A method according to claim **14**, wherein a display is controlled.

**22**. A method according to claim **21**, wherein a virtual image on said display is moved or changed.

**23**. A method according to claim **21**, wherein said display is a 3D display.

**24**. A method according to claim **23**, wherein said display is a stereoscopic display.

**25**. A method according to claim **14**, including the further step of transmitting data to a further device.

**26**. A method according to claim **14**, wherein said camera operates at 30 frames per second or greater.

**27**. A method according to claim **14**, wherein said controlled function relates to a game.

**28**. A method according to claim **14**, including the further step of acquiring a picture of the user of the handheld device.

**29**. A method according to claim **14**, wherein two fingers of the user are sensed and a pinching action determined.

**30**. A method according to claim **14**, wherein said body portion indicates an expression of said user.

**31**. A method according to claim **14**, wherein said information provides an aid to speech recognition.

\* \* \* \* \*

IPR2021-00920
Apple EX1001 Page 36

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. Cir. R. 32(b)(1) because this brief contains 8518 words, excluding the parts of the brief exempted by Fed. Cir. R. 23(b)(2) and Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Melanie L. Bostwick*
Melanie L. Bostwick
*Counsel for Appellant Apple Inc.*