VOLUME I of II (PAGES APPX1-1631)
Nos. 23-1475, -1533

IN THE

# United States Court of Appeals for the Federal Circuit

APPLE INC.,

*Appellant,*

LG ELECTRONICS INC., LG ELECTRONICS USA, INC.,
GOOGLE LLC,

*Appellees,*

*v.*

GESTURE TECHNOLOGY PARTNERS, LLC

*Cross-Appellant.*

On Appeal from the United States Patent & Trademark
Office, Patent Trial & Appeal Board, Nos. IPR2021-00920,
IPR2022-00091, IPR2022-00359

## JOINT APPENDIX

Fred I. Williams
WILLIAMS SIMONS & LANDIS PLLC
601 Congress Avenue, Suite 600
Austin, TX 78701
(512) 543-1354

*Counsel for Cross-Appellant
Gesture Technology Partners, LLC*

Daniel Cooley
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
Suite 800
1875 Explorer Street
Reston, VA 20190

*Counsel for Appellee Google
LLC*

Melanie L. Bostwick
Abigail Colella
Jonas Q. Wang
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street NW
Washington, DC 20005
(202) 339-8400

*Counsel for Appellant Apple Inc.*

Stanley J. Panikowski
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, CA 92121

*Counsel for Appellees LG
Electronics Inc. and LG Electronics
USA Inc.*

*Additional Counsel on Inside Cover*

John Wittenzellner
WILLIAMS SIMONS &
   LANDIS PLLC
1735 Market Street
Suite 125 No. 453
Philadelphia, PA 19103

*Counsel for Cross-Appellant
Gesture Technology Partners,
LLC*

Elizabeth R. Moulton
Orrick, Herrington &
   Sutcliffe LLP
405 Howard Street
San Francisco, CA 94105

Paul R. Hart
ERISE IP, P.A.
5299 DTC Blvd.
Suite 1340
Greenwood Village, CO 80111

Adam P. Seitz
Clifford T. Brazen
ERISE IP, P.A.
7015 College Blvd.
Suite 700
Overland Park, KS 66211

*Counsel for Appellant Apple Inc.*

Matthew D. Satchwell
DLA PIPER LLP (US)
Suite 900
444 West Lake Street
Chicago, IL  60606

*Counsel for Appellees LG
Electronics Inc. and LG
Electronics USA Inc.*

Erika Arner
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001

*Counsel for Appellee Google LLC*

# TABLE OF CONTENTS

## VOLUME I

### IPR2021-00920

Final Written Decision,
Paper No. 28, filed November 30, 2022....................................Appx1-38

Ex. 1001, U.S. Patent No. 7,933,431, filed April 26, 2011........Appx39-74

Certified List of the Prosecution History of IPR2021-00920,
IPR2022-00091 and IPR2022-00359.........................................Appx78-82

Petition for Inter Partes Review,
Paper No. 1, filed May 21, 2021 .......................................Appx132-213

Patent Owner's Preliminary Response,
Paper No. 8, filed September 7, 2021................................Appx235-269

Patent Owner's Sur-Reply,
Paper No. 10, filed October 1, 2021...................................Appx275-280

Decision Granting Institution of Inter Partes Review,
Paper No. 12, filed December 6, 2021 ..............................Appx 282-312

Patent Owner's Response,
Paper No. 15, filed February 28, 2022 ..............................Appx328-363

Petitioner's Reply,
Paper No. 19, filed May 23, 2022 .....................................Appx389-417

Patent Owner's Sur-Reply to Petitioner's Reply,
Paper No. 19, filed July 6, 2022 .......................................Appx418-438

Oral Hearing Transcript,
Paper No. 27, September 13, 2022 ...................................Appx469-529

EX1002, Prosecution History for the 7,933,431 Patent
(excerpts) ...........................................................Appx609-613, 629-634

EX1003, U.S. Patent No. 6,144,366 to Numazaki et al.,
filed November 7, 2000 ........................................................... Appx657-803

EX1004, U.S. Patent No. 6,088,018 to DeLeeuw et al.,
    filed July 11, 2000 .............................................................. Appx804-831

EX1008, Declaration of Dr. Benjamin B. Bederson,
    dated May 20, 2021
    (excerpts) ........ Appx863, 888-889, 891-893, 899-901, 903-904, 906-908

EX1013, Sheryl WuDunn, *Next Stage of the Cellular Tour:*
    *Forced to Compete, Japan Becomes a Global Power*,
    N.Y. Times, July 27, 1999.............................................. Appx1026-1032

EX1017, Supplemental Declaration of Dr. Benjamin B. Bederson,
    dated May 23, 2022
    (excerpts) ....................................................Appx1128-1130, 1133-1138

EX2002, Declaration of Benedict Occhiogrosso, in Support of
    Gesture Technology Partners, LLC's Patent Owner Response,
    dated February 28, 2022
    (excerpts) .........................Appx1324, 1340-1341, 1351-1352, 1356-1357

**IPR2022-00091**

Patent Owner's Preliminary Response to the Petition
    for Inter Partes Review of U.S. Patent No. 7,933,431
    Pursuant to 37 C.F.R. § 42.120, Paper 7,
    dated February 18, 2022................................................ Appx1528-1571

EX1008, Declaration of Dr. Benjamin B. Bederson,
    dated May 21, 2021
    (excerpts) ..............Appx1586, 1588-1597, 1604-1605, 1607-1608, 1618,
                                                                                  1630-1631

## VOLUME II

### IPR2022-00359

Petition for Inter Partes Review of U.S. Patent No. 7,933,431,
Paper 1, dated January 6, 2022
(excerpts) .......................................... Appx1696, 1704-1705, 1714, 1741

EX1008, Declaration of Dr. Benjamin B. Bederson,
dated May 21, 2021
(excerpts) ...................................Appx1818-1821, 1855-1856, 1858-1863

Petition for Inter Partes Review of U.S. Patent 7,933,431,
IPR2021-00917, Paper 1, dated May 14, 2021 .............. Appx2026-2088

Petitioner's Authorized Reply to Patent Owner's Preliminary
Response, IPR2021-00917, Paper 7,
dated September 22, 2021 ............................................. Appx2089-2090

Final Written Decision, IPR2021-00917,
Paper 31, dated November 21, 2022
(excerpt)....................................................................... Appx2101, 2145

Original Complaint for Patent Infringement filed in W.D. Tex.
Case No. 6:21-cv-00121, filed February 4, 2021............ Appx2147-2166

Unified Patents, LLC FAQ................................................ Appx2167-2171

Unified Patents, LLC Success at Challenging Bad Patents
(excerpt)....................................................................... Appx2172-2176

Exhibit 1020, Declaration of Kevin Jakel, IPR2021-00917,
dated May 11, 2021....................................................... Appx2178-2184

Final Decision on Remand Terminating Institution,
IPR2015-01751, -1752, filed October 2, 2020
(excerpts) .................................................. Appx2185, 2210, 2217, 2221

Patent Trial and Appeal Board Consolidated Trial Practice
Guide, dated November 2019 (excerpts).............. Appx2226, 2243-2244

Order Identifying Real Party in Interest, IPR2021-01413,
    Paper 56, filed March 8, 2023 (excerpt) ........................ Appx2362, 2395

Decision Granting Director Review, Vacating-in-part the Final Written
    Decision and Vacating Board Order, IPR2021-01413,
    Paper 76, filed May 22,2023 (excerpt) ................. Appx2397, 2400-2401

Trials@uspto.gov                                                      Paper 28
571-272-7822                                        Date: November 30, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE, INC., LG ELECTRONICS, INC.,
LG ELECTRONICS U.S.A., INC., AND GOOGLE LLC,
Petitioner,

v.

GESTURE TECHNOLOGY PARTNERS, LLC,
Patent Owner.

———————————

IPR2021-00920[1]
Patent 7,933,431 B2

———————————

Before KEVIN F. TURNER, JONI Y. CHANG, and
BRENT M. DOUGAL, *Administrative Patent Judges.*

DOUGAL, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

———————————

[1] IPR2022-00091 (LG Electronics, Inc. and LG Electronics U.S.A., Inc.) and
IPR2022-00359 (Google LLC) have been joined with this proceeding.

IPR2021-00920
Patent 7,933,431 B2

# I.    INTRODUCTION

## A.    Background

Applying the standard set forth in 35 U.S.C. § 314(a), we instituted an *inter partes* review challenging the patentability of claims 1–31 (the "challenged claims") of U.S. Patent No. 7,933,431 B2 (Ex. 1001, "the '431 patent"). Paper 12 ("Dec."). Apple, Inc.[2] filed the request for an *inter partes* review (Paper 1, "Petition" or "Pet."), which Patent Owner, Gesture Technology Partners, LLC, opposed (Papers 8, 10).[3]

After institution, Patent Owner filed a Response (Paper 15, "PO Resp."), Petitioner filed a Reply (Paper 19, "Reply"), and Patent Owner filed a Sur-reply (Paper 20, "Sur-reply"). An oral hearing was held on September 13, 2022, and a copy of the transcript was entered into the record. Paper 27 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Decision is a Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of the claims on which we instituted trial. Having reviewed the arguments of the parties and the supporting evidence, we determine that Petitioner has shown by a preponderance of the evidence, that claims 1–10, 12, 14–31 are unpatentable. We also determine that Petitioner has not shown that claims 11 and 13 are unpatentable.

## B.    Related Matters

The parties identify these related matters: *Gesture Technology Partners, LLC v. Huawei Device Co., Ltd.*, No. 2:21-cv-00040 (E.D. Tex.); *Gesture Technology Partners, LLC v. Samsung Electronics Co.*, No. 2:21-

---

[2] Apple, Inc., LG Electronics, Inc., LG Electronics U.S.A., Inc., and Google LLC are collectively referred to herein as "Petitioner."
[3] Petitioner also filed a Preliminary Reply. Paper 9.

IPR2021-00920
Patent 7,933,431 B2

cv-00041 (E.D. Tex.); *Gesture Technology Partners, LLC v. Apple Inc.*, No. 6:21-cv-00121 (W.D. Tex.); *Gesture Technology Partners, LLC v. Lenovo Group Ltd.*, No. 6:21-cv-00122 (W.D. Tex.); *Gesture Technology Partners, LLC v. LG Electronics, Inc.*, No. 6:21-cv-00123 (W.D. Tex.); *Gesture Technology Partners, LLC v. Motorola Mobility LLC*, No. 1:22-cv03535 (N.D. Ill.); and *Gesture Technology Partners, LLC v. Katherine K. Vidal*, No. 1:22-cv-622 (E.D. Va). Pet. 76; Paper 21, 1–3. Patent Owner identifies the following Board proceedings as related matters:  IPR2021-00917; IPR2021-00921; IPR2021-00922; and IPR2021-00923. Paper 21, 2–3. Patent Owner also identifies the following related *Ex Parte* Reexaminations: No. 90/014,900; No. 90/014,901; No. 90/014,902; and No. 90/014,903. *Id.* at 3–4.

   *C.  The '431 Patent*

   The '431 patent "relates to simple input devices for computers, particularly, but not necessarily, intended for use with 3-D graphically intensive activities, and operating by optically sensing a human input to a display screen or other object and/or the sensing of human positions or orientations." Ex. 1001, 2:7–11. The '431 patent further states that it relates to "applications in a variety of fields such as computing, gaming, medicine, and education." *Id.* at 2:15–17. For instance, the '431 patent describes "a combination of one or more TV cameras (or other suitable electro-optical sensors) and a computer to provide various position and orientation related functions of use." *Id.* at 11:54–58.

   Figure 8A, reproduced below, illustrates the control of functions via a handheld device.

IPR2021-00920
Patent 7,933,431 B2



*FIG. 8A*

Figure 8A shows a perspective view of a cellular phone (800) using a laser spot projector (801) to project a laser spot on a detector (802) in a dashboard (803). *Id.* at 12:17–20. The '431 patent discloses that, alternatively or in conjunction, round dot targets (805, 806, 807) can be sensed on the cellular phone (800), such as by a TV camera (815). *Id.* at 12:20–25.

In another example, the cellular phone (800) can be used to signal a fax unit (824) to print data from the phone by pointing the cellular phone toward the fax unit. *Id.* at 12:42–45. TV camera (815) scans images of the dot targets (805, 806, 807) and a computer (830) analyzes the target images to determine the position and/or orientation or motion of the cellular phone to thereby determine if a command is being issued with movement of the cellular phone. *Id.* at 12:45–51. The computer then commands the fax unit to print if this action is signaled by the position, orientation, or motion of the cellular phone. *Id.* at 12:51–52.

### D. *Illustrative Claim*

Petitioner challenges claims 1–31 of the '413 patent. Claims 1, 7, and 14 are independent. Claims 1 and 7 are illustrative:

4

IPR2021-00920
Patent 7,933,431 B2

1. A method for controlling a handheld computing device comprising the steps of:

holding said device in one hand;

moving at least one finger in space in order to signal a command to said device;

electro-optically sensing light reflected from said at least one finger using a sensing means associated with said device;

determining from said sensed light the movement of said finger, and

using said sensed finger movement information, controlling said device in accordance with said command.

7. Handheld computer apparatus comprising:

a housing;

a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object;

computer means within said housing for analyzing said image to determine information concerning a position or movement of said object; and

means for controlling a function of said apparatus using said information.

Ex. 1001, 25:39–50, 25:61–26:5.

## II.   ANALYSIS

### A.   *Summary of Issues*

In the below analysis, we first address the grounds of unpatentability.

We then address jurisdiction over expired patents.

IPR2021-00920
Patent 7,933,431 B2

### B. Instituted Grounds

Petitioner asserts the following grounds of unpatentability (Pet. 4), supported by the declaration of Benjamin B. Bederson (Ex. 1008):

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–4, 7–9, 11–22, 25, 26, 28 | 103(a)[4] | Numazaki,[5] Knowledge of a PHOSITA[6] |
| 5, 6, 29 | 103(a) | Numazaki, DeLeeuw[7] |
| 10, 23, 24, 27 | 103(a) | Numazaki, DeLuca[8] |
| 30, 31 | 103(a) | Numazaki, Peters[9] |

### 1. Legal Standards for Unpatentability

Petitioner bears the burden to demonstrate unpatentability. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

A claim is unpatentable as obvious under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting 35 U.S.C. § 103(a)). We resolve the question of obviousness based on underlying factual determinations, including: (1) the

---

[4] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 285–88 (2011), revised 35 U.S.C. § 103 effective March 16, 2013. Because the challenged patent was filed before March 16, 2013, we refer to the pre-AIA versions.
[5] U.S. Patent 6,144,366, issued Nov. 7, 2000 ("Numazaki") (Ex. 1003).
[6] A person having ordinary skill in the art ("PHOSITA").
[7] U.S. Patent 6,088,018, issued July 11, 2000 ("DeLeeuw") (Ex. 1004).
[8] U.S. Patent 6,064,354, issued May 16, 2000 ("DeLuca") (Ex. 1005).
[9] U.S. Patent 6,243,683 B1, issued June 5, 2001 ("Peters") (Ex. 1006).

IPR2021-00920
Patent 7,933,431 B2

scope and content of the prior art; (2) any differences between the prior art and the claims; (3) the level of skill in the art; and (4) when in evidence, objective indicia of nonobviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

    We apply these principles to the Petition's challenges.

    *2.   Level of Ordinary Skill in the Art*

    Petitioner asserts that "[a] person having ordinary skill in the art ('PHOSITA') at the time of the '431 Patent would have had at least a bachelor's degree in electrical engineering or equivalent with at least one year of experience in the field of human computer interaction" and that "[a]dditional education or experience might substitute for the above requirements." Pet. 3 (citing Ex. 1008 ¶¶ 30–32). Patent Owner does not dispute Petitioner's level of ordinary skill in the art. PO Resp. 6.

    We are persuaded, on the present record, that Petitioner's declarant's statement is consistent with the problems and solutions in the '431 patent and prior art of record. We adopt this definition for the purposes of this Decision.

    *3.   Claim Construction*

    In *inter partes* review, we construe claims using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent. 37 C.F.R. § 42.100(b) (2021).

    Petitioner provides a number of claim constructions. Pet. 5–12. Patent Owner does not contest Petitioner's claim constructions, and argues for a

IPR2021-00920
Patent 7,933,431 B2

few additional claim constructions. PO Resp. 6–9. We address each term construed by one of the parties below.

We determine that it is not necessary to construe any other terms. *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

### a)  The Preambles

The preambles of claims 1 and 14 both state: "A method for controlling a handheld computing device comprising the steps of . . ." and the preamble of claim 7 states: "Handheld computer apparatus comprising . . . ." Ex. 1001, 25:40–41, 25:61, 26:18–19. The Petition does not address whether the preambles are limiting, but rather attempts to show that independent of whether they are limiting, the preambles are taught by the prior art. *See e.g.* Pet. 17 ("To the extent the preamble is limiting, *Numazaki* teaches . . ."). Patent Owner argues that the preambles should be limiting (PO Resp. 6–7) and Petitioner does not contest or address this argument (*see* Reply).

Patent Owner argues that the preambles should be limiting because they recite essential structure or steps and are "necessary to give life, meaning, and vitality" to the claims. PO Resp. 6 (quoting *Acceleration Bay, LLC v. Activision Blizzard, Inc.*, 908 F.3d 765, 770 (Fed. Cir. 2018)). Specifically, Patent Owner asserts that each claim includes one or more limitations that refer back to the preamble's "handheld computing device" or "handheld computer apparatus" for antecedent basis. *Id.* at 6–7. Patent Owner further argues that the '431 patent discloses different embodiments, with some embodiments being in the form of a computer and some

embodiments being in the form of a handheld device. *Id.* at 7 (citing Ex. 1001, 12:59–13:7, Fig. 10A). Patent Owner contends that the claims are directed to the latter embodiments related to a handheld device and, therefore, "the preamble is necessary to give life, meaning, and vitality to claims 1, 7, and 14, consistent with the embodiments that the inventor chose to claim." *Id.*

We agree that the preambles of claims 1, 7, and 14 are limiting. This is primarily because the body of each claim includes "said device" or "said apparatus" which refers back to the preamble and is understood with reference thereto. For example, the last clause of claim 7 states: "means for controlling a function of *said apparatus* using said information." Ex. 1001, 26:4–5 (emphasis added). "Said apparatus" derives antecedent basis from the "[h]andheld computer apparatus" recited in the preamble. Moreover, the "means for controlling a function of said apparatus" is understood because of this reference to the handheld computer apparatus. The limitations of claims 1 and 14 are similar and so this logic applies equally to these claims as well. Thus, we agree that the preamble recites essential structure and is "necessary to give life, meaning, and vitality" to claims 1, 7, and 14.

  *b)  Camera Means*

Petitioner asserts that, though claim 7 recites "camera means," it is not a means-plus-function limitation under §112 ¶ 6. Pet. 6. Petitioner argues that "a PHOSITA would have considered 'camera means associated with said housing' to have a sufficiently definite meaning as the name for structure." *Id.* (citing Ex. 1008 ¶ 36). Petitioner further argues that "all optical sensors obtain images by capturing light, so the claimed function is simply describing the general process that all optical sensors employ to obtain images of objects." *Id.* (citing Ex. 1008 ¶ 36).

IPR2021-00920
Patent 7,933,431 B2

"Patent Owner agrees" with Petitioner's construction PO. Resp. 7. We accept Petitioner's construction as consistent with the current record.

### c) Computer Means

Petitioner contends that claim 7's limitation of "computer means within said housing for analyzing said image to determine information concerning a position or movement of said object" is a means-plus-function limitation under §112 ¶ 6. Pet. 7. Petitioner argues that the limitation's function is analyzing an image "to determine positioning or movement of an object." *Id.* Petitioner argues that the corresponding structure "includes a computer/processor programmed (1) to identify either natural or artificial features on an object as described . . . or (2) to track the movement using one of the disclosed methods." *Id.* at 9; *see id.* at 8–9 (discussing the disclosure of the '431 patent) (citing Ex. 1001, 3:38–47, 3:57–62, 4:9–14, 5:2–23, 6:64–7:13, 8:40–59, 11:16–35).

Petitioner also argues that "objects" should be construed to mean "both separate objects held/controlled by the user and also part of the user's body, such as a user's finger or hand." *Id.* at 8; *see id.* at 7–8 (citing Ex. 1001, 3:39–41, 3:48–50, claims 7–8).

"Patent Owner does not contest" Petitioner's construction. PO Resp. 6. We accept Petitioner's construction as consistent with the current record.[10]

### d) Means for Controlling a Function

Petitioner argues that claim 7's limitation of "means for controlling a function of said apparatus using said information" is a means-plus-function

---

[10] In related IPR2021-00917 the petitioner there offered a slightly different construction. *See* IPR2021-00917, Paper 31, 11–12. The parties do not address the slight differences and we determine that the outcome here is not construction dependent.

IPR2021-00920
Patent 7,933,431 B2

limitation under §112 ¶ 6. Pet. 10. According to Petitioner, the limitation's function is "controlling a function of the apparatus using information about the object's location or movement." *Id.* Petitioner argues that the corresponding structure "is a processor programmed to perform the specific algorithms that accomplish this function" which "includes at least [the] Fig. 9 disclosure." *Id.* at 10–11.

"Patent Owner does not contest" Petitioner's construction. PO Resp. 6. However, as discussed above, we determine that "said apparatus" refers to the handheld computer apparatus in the preamble. Thus, we accept Petitioner's construction with the added requirement that the general purpose computer be a handheld computer apparatus.

### e) *Means for Transmitting Information*

Petitioner asserts that claim 11's limitation of "means for transmitting information" is a means-plus-function limitation under §112 ¶ 6. Pet. 11. Petitioner argues that the '431 patent teaches the structure for performing the limitation's function of "transmitting information" is a "wireless cellular transceiver" and thus the corresponding structure required by the claim "includes at least a wireless cellular transceiver." *Id.* at 11–12 (citing Ex. 1001, 12:59–13:3).

"Patent Owner does not contest" Petitioner's construction. PO Resp. 6. We accept Petitioner's construction as consistent with the current record.[11]

---

[11] In related IPR2021-00917 consistent with the District Court, we construed the term slightly differently than what Petitioner proposes here. *See* IPR2021-00917, Paper 31,13–14; *see also* Dec. 7 (inviting the parties to address the District Court Claim Construction Memorandum and Order (Ex. 2001)). The parties do not address the slight differences and we determine that the outcome here is not construction dependent.

IPR2021-00920
Patent 7,933,431 B2

*f)   Light Source for Illuminating*

Patent Owner asserts that "a light source for illuminating said object" in dependent claim 12 should be construed to mean "the light source of the handheld computer apparatus illuminates the object while the 'camera means' obtains an image of the object." PO Resp. 8. Petitioner opposes this construction. Reply 16–19

Patent Owner argues that claim 7, from which claim 12 depends, requires that "[a] 'camera means' obtains an image of the object 'using reflected light' from the object" and that

> a POSITA would understand claim 12 as meaning the light source of the handheld computer apparatus illuminates the object while the "camera means" obtains an image of the object. The object reflects light from the light source and it is this "reflected light" that is used by the "camera means" to obtain the image of the object. *See* Ex. 2002, ¶ 44.

PO Resp. 8. This is not required by the claims.

Claim construction starts with an analysis of the claim language itself. *Sjolund v. Musland*, 847 F.2d 1573, 1582 (Fed. Cir. 1988) ("[T]he claims define the invention."). First, claims 7 and 12 are directed to an apparatus and not a method. Thus, neither claim 7 nor 12 require any method steps such as illuminating the object while the camera means obtains an image of the object. Claim 7 uses language to describe the function of the camera, but that does not require an active method step such as requiring that the camera means obtain an image.

Second, claim 12 does not rely on claim 7 for antecedent basis of the light source. Though claim 7 refers to "reflected light" and claim 12 provides "a light source," there is nothing in the language of the claims that would require the reflected light to come from the light source. That said, the

IPR2021-00920
Patent 7,933,431 B2

light source may be the source of the reflected light, but it is not required by the language of the claims.

Thus, reading claims 7 and 12, Patent Owner's construction is not apparent or implied from the claim language.

Patent Owner also argues that the purpose for having a light source in the Specification should be read into the claims. PO Resp. 8. Patent Owner argues that "the specification of the '431 Patent . . . discloses 'cameras and their associated light sources' and operating the camera 'at the same time a . . . light is on.'" *Id.* (quoting Ex. 1001, 3:31–32, 7:5–7).

The mere fact that the Specification provides an example as to how the light source is used is not a sufficient reason for us to read a limitation into the claims from the Specification. If the specification "reveal[s] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess[,] . . . the inventor's lexicography governs." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). However, this is not the case here. Patent Owner does not identify anywhere in the Specification where "a light source for illuminating said object" is defined as "the light source of the handheld computer apparatus illuminates the object while the 'camera means' obtains an image of the object."

For these reasons, we decline to adopt Patent Owner's claim construction. We determine that the added limitation in claim 12 should be read according to its plain and ordinary meaning. In other words, "a light source for illuminating said object," simply means exactly what it says "a light source for illuminating said object."

IPR2021-00920
Patent 7,933,431 B2

### 4. *Obviousness over Numazaki and Knowledge of a PHOSITA*

Petitioner argues that Numazaki in view of the knowledge of a person having ordinary skill in the art ("PHOSITA") would have rendered obvious claims 1–4, 7–9, 11–22, 25, 26, and 28. Pet. 12–40. Patent Owner contends that Numazaki does not disclose all the limitations of claims 1, 7, and 11–14. PO Resp. 9–27.

We first give an overview of Numazaki. This is followed by a discussion of Petitioner's positions and Patent Owner's arguments in response, where we conclude that Petitioner has shown by a preponderance of the evidence that some of the challenged claims are unpatentable.

### a) *Numazaki*

Numazaki "relates to a method and an apparatus for generating information input in which input information is extracted by obtaining a reflected light image of a target object." Ex. 1003, 1:8–11. Figure 1, reproduced below, depicts a block diagram for an information input generation apparatus.



FIG.1

Figure 1 shows that an information input generation apparatus includes a lighting unit (101), a reflected light extraction unit (102), a feature data generation unit (103), and a timing signal generation unit (104). *Id.* at 10:23–

IPR2021-00920
Patent 7,933,431 B2

28. Numazaki describes emitting light from the light emitting unit (101) and that the intensity of the light varies in time according to a timing signal from the timing signal generation unit (104). *Id.* at 10:29–31. The light is directed onto a target object and light reflected from the target object is extracted by the reflected light extraction unit (102). *Id.* at 10:31–35. Numazaki teaches that the feature data generation unit (103) extracts feature data from the reflected light image. *Id.* at 10:57–61. Numazaki further teaches operating a computer based on information obtained from the feature data. *Id.* at 10:61–66.

Figure 2, reproduced below, shows a more detailed block diagram of an embodiment of information input generation apparatus.



In Figure 2, a timing control unit (112) is used to turn the lighting unit (101) on (i.e., illuminating the target object) when the first photo detection unit (109) is active and off when the second photo detection unit (110) is active. *Id.* at 11:20–32. The first photo detection unit captures an image of the target object illuminated by both natural light and the lighting unit and the second photo detection unit captures an image of the target object illuminated by

only natural light. *Id.* at 11:33–39. The difference between the two images—obtained by a difference calculation unit (111)—represents the "reflected light from the object resulting from the light emitted by the lighting unit 101." *Id.* at 11:43–51. This information is then used by the feature data generation unit (103) to determine gestures, pointing, etc. of the target object that may be converted into commands executed by a computer. *Id.* at 10:57–66.

Figure 78, reproduced below, illustrates an information input generation apparatus.

## FIG.78



Figure 78 shows "a compact portable information device" having "a size that can be held by one hand." *Id.* at 52:5–8. The device includes a window (712) for a lighting unit and a photo-detection sensor unit. *Id.* at 52:12–14. Numazaki describes controlling the position of a cursor (714) on a screen by moving a finger (713) in front of the window (712). *Id.* at 52:14–16.

*b)   Independent Claim 1*

Petitioner relies on Numazaki in view of the knowledge of a PHOSITA for teaching or suggesting all of the elements of claim 1. Pet. 12–21. For example, Petitioner relies on the portable computer with an information input generation device of Figure 78 for teaching the handheld computing device and holding the device in one hand. *Id.* at 17–19. For the remaining method steps of claim 1, Petitioner relies on Numazaki and the knowledge of a PHOSITA. *Id.* at 19–21. In particular, the Petition relies on the teaching of a window (712) for "the lighting unit and the photo-detection sensor unit" of Numazaki Figure 78 "which enables the 'position of a cursor 714 on the screen [to] be controlled by moving a finger 713 in front of this window 712.'" *Id.* at 19 (quoting Ex. 1003, 52:5–16); *see also id.* at 20–21. Petitioner argues that "[a] PHOSITA would have understood that controlling a cursor on the handheld device is signaling a command." *Id.* (citing Ex. 1008 ¶¶ 46–47).

Numazaki only provides some details about the photo-detection sensor unit. *See generally* Ex. 1003, 50:25–54:6. However, Petitioner relies on Numazaki's teaching that "light and camera arrangement" of Figure 2 "is incorporated into the eighth embodiment" for more details about the photo-detection sensor unit. Pet. 20; *see also id.* at 15–16 (citing Ex. 1008 ¶ 44) (discussing what a PHOSITA would have understood was incorporated into the eighth embodiment). Petitioner describes Numazaki as teaching a system where two images are obtained of the target object by two different cameras, one with the lighting unit on and one with it off. *Id.* at 12–14 (citing Ex. 1003, 11:20–39, Fig. 2). The images are compared to obtain certain information. *Id.* at 14 (citing Ex. 1003, 11:43–51). Petitioner concludes that the obtained "information is then used by feature data generation unit 103 to

IPR2021-00920
Patent 7,933,431 B2

determine gestures, pointing, etc. of the target object that may be converted into commands executed by a computer" and that this all reads on the electro-optically sensing, determining, and using steps of claim 1. *Id.* at 20–21.

We determine that the Petition has shown by a preponderance of the evidence how Numazaki and the knowledge of a PHOSITA would have suggested all of the features of claim 1. Patent Owner argues that Numazaki does not teach or suggest aspects of the electro-optically sensing and determining steps of claim 1. PO Resp. 9–12. We address Patent Owner's arguments below.

*(1) Electro-optically Sensing*

Claim 1 requires "electro-optically sensing light reflected from said at least one finger using a sensing means associated with said device." Ex. 1001, 25:44–46.

For this limitation, the Petition relies generally on the teaching of 'a window 712 [] for the lighting unit and the photo-detection sensor unit" of Numazaki Figure 78 (Pet. 20 (quoting Ex. 1003, 52:12–14)) to teach "illuminat[ing] the target object (e.g., the user's hand) in a controlled manner such that a precise image of the user's hand and hand movement can be ascertained" through the incorporation of the teachings of Figure 2 into that embodiment (*id.* (citing Ex. 1003, 11:9–23).

Petitioner argues that Numazaki teaches a reflected light extraction unit, with two photo-detection units which it calls first and second camera units which read on the sensing means. *Id.*; *see also* Reply 3.

Neither Patent Owner, nor Patent Owner's declarant, contest Petitioner's position, supported by its declarant, that Numazaki's reflected light extraction unit, with its two photo detection units in Figure 2 teach a

camera, i.e. the claimed sensing means. *See* PO Resp. 9–10 (citing Pet. 12–13, 20–21) (acknowledging Petitioner's position); Ex. 2002 ¶¶ 52–53 (Patent Owner's declarant acknowledging Petitioner's position and declarant support).[12]

However, Patent Owner argues that "[n]one of embodiments 1–7 in Numazaki [(including Figure 2)] mention a 'photo-detection sensor unit,' and thus none of embodiments 1–7 teach or suggest the 'photo-detection sensor unit' in Fig. 78 is or includes the 'photo detection unit' in Fig. 2." PO Resp. 10 (citing Ex. 2002 ¶ 54). Patent Owner admits that Numazaki at Figure 2 teaches two "photo-detection units," but essentially argues that because the term "photo-detection unit" is not identical to Figure 78's "photo-detection sensor unit," one of skill in the art would not understand what a "photo-detection sensor unit" is, or how it relates to the rest of the disclosure. *Id.* at 10, 12; *see also* Sur-reply 1–4.

In support, Patent Owner relies on its declarant who testifies: "I reviewed Numazaki in its entirety and it contains no disclosure stating that the 'photo-detection sensor unit' in Fig. 78 is or includes a 'photo-detection unit' from Fig. 2" and "it is my opinion that a POSITA would understand that none of embodiments 1–7 disclose the 'photo-detection sensor unit' in Fig. 78 as being or including 'photo-detection unit' in Fig. 2." Ex. 2007 ¶ 54.

As will be understood from reviewing Numazaki, Numazaki discloses an eighth embodiment having a number of different portable form factors

---

[12] Numazaki also teaches that "CMOS sensors are used as the photo-detection means" in the eighth embodiment. Ex. 1003, 53:7–18. The '431 patent similarly teaches that "CMOS cameras" can be used to obtain images. Ex. 1001, 5:50–57.

IPR2021-00920
Patent 7,933,431 B2

shown in Figures 74–79, but sharing "a system configuration incorporating the information input generation apparatus of the present invention as described in the above embodiments," i.e. embodiments 1–7, including Figure 2. Ex. 1004, 50:19–20; *see also* Ex. 1008 ¶ 44. In addition to referring back to the prior disclosure, additional details of the information input generation apparatus including the photo-detection section are provided at 52:33–54:6. This section not only describes an information input generation apparatus that is very similar to the disclosure of Figure 2, but it again refers back to the "the photo-detection section . . ., as already described in detail above." *Id.* at 53:22–36; *see also* Dec. 15 (explaining that "details about the photo-detection sensor unit" could be found at Ex. 1004, 50:25–54:6).

Thus, the position of Patent Owner and Patent Owner's declarant is inconsistent with the express disclosure of Numazaki that makes clear that the photo-detection section of the eighth embodiment, including the "photo-detection sensor unit" of Figure 78, incorporates the disclosure of the photo-detection section of the prior embodiments, including Figure 2. Thus, we determine that one of skill in the art would have understood Numazaki to teach that the "photo-detection sensor unit" in Fig. 78 is or at least includes a camera/sensing means, just as Numazaki's reflected light extraction unit, with its two photo detection units in Figure 2, teach a camera/sensing means.

For the above reasons, Patent Owner's arguments do not identify any shortcomings in the showing by Petitioner that Numazaki teaches sensing means. We further determine that Petitioner has shown by a preponderance of the evidence that the electro-optically sensing limitation is taught by Numazaki.

IPR2021-00920
Patent 7,933,431 B2

> (2) *Determining*

Claim 1 also requires "determining from said sensed light the movement of said finger." Ex. 1001, 25:47–48.

Petitioner addresses this limitation together with electro-optically sensing discussed above. Pet. 20. The Petition relies generally on the teaching of 'a window 712 [] for the lighting unit and the photo-detection sensor unit" of Numazaki Figure 78 (*id.* 20 (quoting Ex. 1003, 52:12–14)) to teach "illuminat[ing] the target object (e.g., the user's hand) in a controlled manner such that a precise image of the user's hand and hand movement can be ascertained" through the incorporation of the teachings of Figure 2 into that embodiment (*id.* (citing Ex. 1003, 11:9–23). We determine that Petitioner has shown by a preponderance of the evidence that this limitation is taught by Numazaki in view of the knowledge of a PHOSITA.

Patent Owner argues that "Numazaki requires <u>two</u> photo-detection units to perform an analysis of a target object and control the computer, so it does not teach or suggest 'determining' finger movement from reflected light that is 'electro-optically' sensed using one 'sensor means,' as set forth in [the] claim." PO Resp. 13.

Patent Owner does not identify why the claim should be limited to one sensor means or camera. Though the claim refers to "electro-optically sensing light . . . using a sensing means" and "determining from said sensed light," this does not limit the claim to only one camera. Unless a more limited construction is indicated by the specification or prosecution history, the indefinite article "a" or "an" is construed in a claim to mean "one or more." *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000). Thus, "a sensing means," encompasses one or more cameras.

IPR2021-00920
Patent 7,933,431 B2

Patent Owner also argues that "Numazaki does not teach or suggest 'determining' finger movement absent the other hardware that Numazaki identifies as necessary, such as the lighting unit, the image-subtraction circuitry, and the associated timing circuitry." PO Resp. 13.

However, claim 1 uses the term "comprising" to create an "open ended" claim. "'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim." *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) (citing *In re Baxter*, 656 F.2d 679, 686 (CCPA 1981). Thus, the presence of a lighting unit or other hardware is not excluded from the claim. This is also consistent with the '431 patent, which teaches the use of LEDs "to illuminate [associated] targets." Ex. 1001, 3:34–35; *see also id.* at 26:13–14 (claim 12).

The claimed phrase "electro-optically sensing light . . . using a sensing means" does require "a sensing means," such as a camera, be used in the step. However, it does not prohibit other hardware from being involved. For example, the claim does not say "electro-optically sensing light . . . using only a sensing means." Thus, the fact that "Numazaki identifies as necessary . . . the image-subtraction circuitry and associated timing circuitry" does not prevent Numazaki from teaching or suggesting the limitations of open-ended claim 1.

For the above reasons, Patent Owner's arguments do not undermine the showing by Petitioner that Numazaki in view of the knowledge of a PHOSITA teaches all of the aspects of the determining movement claim element.

IPR2021-00920
Patent 7,933,431 B2

### (1) Conclusion

After review of the arguments and evidence, and further in view of the above discussion, we determine that Petitioner has shown, by a preponderance of the evidence, that claim 1 is unpatentable over Numazaki in view of the knowledge of a PHOSITA.

### c) Independent Claim 7

Independent claim 7 is directed to a handheld computer apparatus and is similar to method claim 1. *Compare* Ex. 1001, 25:61–26:5 *with id.* at 25:40–50. As such, the Petition relies on the essentially the same teachings of Numazaki discussed above with respect to claim 1 for the features of claim 7, which we agree with for the reasons explained above. *See* Pet. 26–31. Patent Owner argues that Numazaki does not teach or suggest the camera means or computer means required by claim 7. PO Resp. 13–19.

### (1) Camera Means

As discussed above, both parties agree that "camera means" in claim 7 is not a means-plus-function limitation under §112 ¶ 6 and merely requires a camera. Pet. 6. PO Resp. 7. Similar to the "sensing means" in claim 1, Petitioner argues that Numazaki teaches a reflected light extraction unit, with two photo-detection units which it calls first and second camera units, which reflected light extraction unit reads on the camera means. Pet. 27–28.

Neither Patent Owner, nor Patent Owner's declarant, contest Petitioner's position, supported by its declarant, that Numazaki's reflected light extraction unit, with its two photo detection units in Figure 2, teach a camera, i.e. the claimed camera means. *See* PO Resp. 14–15 (citing Pet. 12–13; Ex. 1008 ¶ 39) (acknowledging Petitioner's position and declarant

IPR2021-00920
Patent 7,933,431 B2

support); Ex. 2002 ¶ 65 (Patent Owner's declarant acknowledging Petitioner's position and declarant support).[13]

Patent Owner repeats essentially the same arguments addressed above concerning claim 1 that because the term "photo-detection unit" in Figure 2 is not identical to Figure 78's "photo-detection sensor unit," one of skill in the art would not understand what a "photo-detection sensor unit" is, or how it relates to the rest of the disclosure. PO Resp. 14–16.

We reject these arguments for the same reasons expressed above. Namely, the express disclosure of Numazaki makes clear that the photo-detection section of the eighth embodiment, including the "photo-detection sensor unit" of Figure 78, incorporates the disclosure of the photo-detection section of the prior embodiments, including Figure 2. Thus, we determine that one of skill in the art would have understood Numazaki to teach that the "photo-detection sensor unit" in Fig. 78 is or at least includes a camera means, just as Numazaki's reflected light extraction unit, with its two photo detection units in Figure 2, teaches a camera means.

Patent Owner also argues that "Numazaki fails to teach . . . that the 'photo-detection sensor unit' can obtain an image." PO Resp. 15. Patent Owner relies on the testimony of its declarant for support who states that "[e]ven though Numazaki's 'photo-detection sensor unit' is capable of 'photo-detecting on an external body,' Ex. 1003, 52:9–14, a POSITA would not find this sufficiently specific for the 'photodetection sensor unit' to teach or suggest a camera." Ex. 2002 ¶ 63.

---

[13] Numazaki also teaches that "CMOS sensors are used as the photo-detection means" in the eighth embodiment. Ex. 1003, 53:7–18. The '431 patent similarly teaches that "CMOS cameras" can be used to obtain images. Ex. 1001, 5:50–57.

IPR2021-00920
Patent 7,933,431 B2

Patent Owner's declarant does not further explain his reasoning. For example, the declarant does not discuss why the discussion of photo-detecting "does not necessarily mean that the 'photo-detection sensor unit' is or includes a camera." The disclosure of Numazaki when discussing photo-detecting is directed to taking images; and according to Patent Owner obtaining images "is what cameras do." PO Resp. 7.

For example, Numazaki describes a "photo-detecting state" in reference to when a photo-detection unit "detects the optical image." Ex. 1003, 11:20–31; *see also id.* at 11:38–52. Numazaki's eighth embodiment itself states that "the photo-detection section . . . outputs an image" and "the photo-detection section stores the charges generated by the photo-electric conversion element upon photo-detecting images of the object at a time of light emission by the lighting unit and at a time of no light emission by the lighting unit, . . . , as already described in detail above." *Id.* at 53:22–36; *see also e.g., id.* at 10:33–56 (discussing a "photo-detection section" to capture reflected light as an image), 11:9–52, 12:56–65, 15:23–51.

Thus, the testimony of Patent Owner's declarant, which is stated as being based on "Numazaki in its entirety," does not appear to be consistent with how the term "photo-detecting" is used in Numazaki. Read in context, photo-detecting an external body *does* mean that the "photo-detection sensor unit" captures an image, like a camera, because that is how Numazaki uses the term. Thus, though Patent Owner is correct that Numazaki does not explicitly say that the "photo-detection sensor unit" is a camera, it is clear from the disclosure of Numazaki that "photo-detecting" refers to obtaining an image, which is what Patent Owner asserts is the function of a camera.

The function of the photo-detection sensor unit is further taught in a number of locations in Numazaki. For example, Numazaki at 52:8–14 (cited

IPR2021-00920
Patent 7,933,431 B2

at Pet. 37) teaches that "a window 712 is provided for the lighting unit and the photo-detection sensor unit" to enable the function of "lighting and photo-detecting on an external body." The paragraph continues to teach that "[a] position of a cursor 714 on the screen can be controlled by moving a finger 713 in front of this window 712." Ex. 1003, 52:14–16. As discussed above, Numazaki teaches that in the eighth embodiment "the photo-detection section . . . outputs an image" and "the photo-detection section stores the charges generated by the photo-electric conversion element upon photo-detecting images of the object at a time of light emission by the lighting unit and at a time of no light emission by the lighting unit, . . . , as already described in detail above." *Id.* at 53:22–36.

Thus, the function of the photo-detection sensor unit, to obtain an image, is taught by Numazaki. Further, this description of the function of the photo-detection sensor unit is consistent with, and points to, Numazaki's more detailed earlier discussion of the reflected light extraction unit and photo-detection optics, which teaches obtaining an image. *See* Ex. 1003, 10:33–35, 11:11–15 ("an image is formed on a photo-detection plane of the reflected light extraction unit 102 by a photo-detection optics 107."), 50:21–42, 53:22–36; Pet. 37.

For the above reasons, Patent Owner's arguments do not identify any shortcomings in the showing by Petitioner that Numazaki teaches a camera means.

### (2)  Computer Means

Claim 7 requires "computer means within said housing for analyzing said image to determine information concerning a position or movement of said object." Ex. 1001, 26:1–3. As discussed above, Petitioner argues that this limitation is subject to 35 U.S.C. § 112 ¶ 6, and that the relevant

IPR2021-00920
Patent 7,933,431 B2

structure "includes a computer/processor programmed (1) to identify either natural or artificial features on an object as described . . . or (2) to track the movement using one of the disclosed methods." Pet. 9. "Patent Owner does not contest" Petitioner's construction. PO Resp. 6.

Petitioner argues that "[a] PHOSITA would [] have understood that Numazaki's finger detection and tracking functionality is performed by a processor and would have considered the processes performed by Numazaki's processor the same or equivalent to the natural feature identification algorithm disclosed in the '431 Patent." Pet. 30 (citing Ex. 1008 ¶ 55). Petitioner explains:

> *Numazaki* teaches the same (or an equivalent) structure [as the '431 Patent] for detecting the position of a user's finger to permit the user to control a device using gestures. Namely, *Numazaki* expressly describes a process through which the system identifies a user's finger based on its characteristics and tracks lateral finger movements by "detecting the center of gravity" of a finger, where "finger tip movement and the center of gravity movement can be smoothly correlated" using pixel values. *Numazaki* (Ex. 1003), 19:43-20:25. To detect a finger, *Numazaki* teaches a "stick shaped object detection unit 213[, which] detects a stick shaped object extending in the vertical direction, that is, an upward extended finger (normally an index finger) of the hand of the operator." *Id*. at 18:32-35. Once the finger is detected, *Numazaki* calculates the center of gravity and tracks this center of gravity as the finger moves. *Id*. at 19:43-20:25. Using this technique, *Numazaki* teaches "the cursor on [a] screen can be controlled" so that "when the finger is moved, the cursor is also moved." *Id.* at 26:8-14, 26:23-25.

Pet. 29–30.

Patent Owner first argues that claim 7 more generally requires only a single camera obtain a single image for analysis by the computer means. PO Resp. 16–17. Patent Owner bases its argument on the claim language of "a

IPR2021-00920
Patent 7,933,431 B2

camera means . . . for obtaining an image" and "computer means . . . for analyzing said image." *Id.*

As acknowledged by Patent Owner however, claim 7 is not limited to a single camera or a single image. Sur-reply 5. Unless a more limited construction is indicated by the specification or prosecution history, the indefinite article "a" or "an" is construed in a claim to mean "one or more." *KCJ Corp.*, 223 F.3d at 1356. Thus, "a camera means" encompasses one or more cameras, and "an image" encompasses one or more images.

Patent Owner clarifies its position that claim 7 requires the image obtained by "photodetection unit 109" or the image obtained by "photo-detection unit 110" to be analyzed by the computer means without any other processing. Sur-reply 6. However, this does not reflect the position of Petitioner as to what is the camera means. Petitioner argues "that the output of Numazaki's reflected light extraction unit 102 is an image, that said image is analyzed by the [computer means]." Reply 13–14.

Petitioner's position is that Numazaki's reflected light extraction unit 102 with its two photodetection units reads on the camera means, rather than a single photodetection unit as argued by Patent Owner. *See* Pet. 28–29; Reply 14. The Petition makes clear that it is the image output from the reflected light extraction unit that is analyzed by the computer means. Pet. 28–29. As discussed in the preceding section, we determine herein that Petitioner has shown that Numazaki teaches a camera means by a preponderance of the evidence.

We find no reason to limit claim 7 to a single camera or to read camera means to exclude multiple cameras. We further find no reason to limit claim 7 such that multiple cameras could not be used to obtain an image from the individual cameras that make up the camera means. Other

IPR2021-00920
Patent 7,933,431 B2

than asserting their position, Patent Owner does not identify any errors in Petitioner's position, supported by a preponderance of the evidence herein, that the reflected light extraction unit reads on a camera, it obtains an image, and that image is analyzed by the computer means. *See, e.g.*, Pet. 28–29; Reply 13–14; *see also* Sur-reply 6 (acknowledging Petitioner's position).

Patent Owner also argues that the Petition does not show how Numazaki's "feature data generation unit" "correspond[s] to a computer or processor that has been 'programmed.'" PO Resp. 18. At the same time, Patent Owner acknowledges that the Petition "cites to various algorithms performed by Numazaki's 'feature data generation unit'" for teaching the determining step of claim 7.[14] *Id.* Further, Patent Owner later admits that "*Numazaki* discloses that 'it is also possible to realize this operation of the feature data generation unit in a form of software. It is obviously possible to realize a hardware configuration for carrying out this operation, and a configuration using both software and hardware is also possible.'" Sur-reply 6–7 (quoting Ex. 1003, 20:41–45); *see also* Reply 14–15; Ex. 1008 ¶ 55; Ex. 1017 ¶ 9. Thus, the evidence of record shows that Numazaki teaches that the feature data generation unit corresponds to a computer or processor that has been programmed.

Patent Owner then argues that "Numazaki's 'compact portable information device'" [of Figure 78] does not include "the corresponding structure for 'computer means' in [the] claim element." PO Resp. 18. Patent

---

[14] Patent Owner also makes an argument that "[i]f Petitioner attempts to argue that the subtraction of the images satisfies the analysis portion of claim element [7(c)], that argument also fails." PO Resp. 17. However, as summarized from the Petition above (*see* Pet. 29–30), this is not a position taken by Petitioner; and thus, this argument is not relevant to any position taken by Petitioner.

IPR2021-00920
Patent 7,933,431 B2

Owner further argues that "Numazaki does not disclose the internal hardware/circuitry of the 'compact portable information device.'" *Id.*

Patent Owner's argument is based on the same reasoning rejected above that one of ordinary skill in the art would not understand how Numazaki Figure 78 relates to the earlier disclosure in Numazaki. As previously discussed Numazaki expressly states that the eighth embodiment, including Figure 78 "incorporate[s] the information input generation apparatus of the present invention as described in the above embodiments," i.e. embodiments 1–7. Ex. 1004, 50:19–20; *see also* Ex. 1008 ¶ 44. Patent Owner does not contest that the feature data generation unit is part of the information input generation apparatus. *See* Ex. 1003, Fig. 2 (showing a feature data generation unit as part of an information input generation apparatus).

For the above reasons, Patent Owner's arguments do not undermine the showing by Petitioner that Numazaki in view of the knowledge of a PHOSITA teaches all of the aspects of the computer means claim element.

### (3)   Conclusion

After review of the arguments and evidence, and further in view of the above discussion, we determine that Petitioner has shown, by a preponderance of the evidence, that claim 7 is unpatentable over Numazaki in view of the knowledge of a PHOSITA.

### d)   Claims 11 and 13

Dependent claim 11 recites "Apparatus according to claim 7, further including means for transmitting information." Ex. 1001, 26:12–13. As noted previously, Petitioner argues that the "means for transmitting information" is subject to 35 U.S.C. § 112 ¶ 6, and that the structure corresponding to the claimed function is "at least a wireless cellular

transceiver." Pet. 11–12 (citing Ex. 1001, 12:59–13:3). "Patent Owner does not contest" Petitioner's construction. PO Resp. 6.

Dependent claim 13 recites "Apparatus according to claim 7, wherein said apparatus is a cellular phone." Ex. 1001, 26:16–17.

Petitioner argues that Numazaki's fifth embodiment teaches a "conference record system" or TV telephone and that "a PHOSITA would have been motivated to implement this transmission functionality in the portable device described in Numazaki's eighth embodiment." Pet. at 32–33 (citing Ex. 1003, 38:6–16, 40:16–49; Ex. 1008 ¶¶ 50–52, 58): *id.* at 33–34. The Petition also argues "that Numazaki's focus on lower communications costs is a concern applicable to cellular phones." *Id.* at 34.

The Petition fails to show how Numazaki teaches or suggests either of claim 11 or 13. First, Petitioner admits that Numazaki does not "state that its TV telephone is a cellular phone." *Id.* at 34. Further, the portable device described in Numazaki's eighth embodiment is also not disclosed as being a wireless cellular transceiver or a cellular phone, and the Petition makes no assertions that it is either. The Petition includes no analysis regarding whether the transmission functionality included in Numazaki's "conference record system" or TV telephone is an equivalent of "a wireless cellular transceiver" or a cell phone. *See* Pet. 32–34; *see also* PO Resp. 19–20, 22–23.

In response to Patent Owner's arguments, Petitioner argues that "Dr. Bederson explains that these 'videoconference telephones were also known as cellular videophones.'" Reply 15 (citing Ex. 1008, ¶ 58). Petitioner appears to be implying that Numazaki necessarily teaches that its fifth embodiment is a cell phone. However, this is in conflict with Petitioner's

IPR2021-00920
Patent 7,933,431 B2

admission in the Petition that Numazaki does not "state that its TV telephone is a cellular phone." Pet. 34.

Further, Dr. Bederson's supporting evidence does not support his allegation. Dr. Bederson cites to a newspaper article discussing "the global efforts preceding the launch of a market leading cellular videophone" that does not discuss videoconference telephones or equate videoconference telephones with cellular videophones. Ex. 1008, ¶ 58 (citing Ex. 1013). Thus, Dr. Bederson's broad assertion that "videoconference telephones were also known as cellular videophones" is unsupported.

For these reasons, we determine that Petitioner fails to show how Numazaki in view of the knowledge of a PHOSITA teaches or suggests all of the limitations of claims 11 or 13.

### a) Claim 12

Dependent claim 12 recites "Apparatus according to claim 7, further including a light source for illuminating said object." Ex. 1001, 26:14–15. As noted previously, we determine that the added limitation in claim 12 should be read according to its plain and ordinary meaning. In other words, "a light source for illuminating said object," simply means exactly what it says "a light source for illuminating said object."

Petitioner argues that claim 12 is taught by Numazaki's "light and camera arrangement" in "Numazaki's handheld device." Pet. 33 (citing Ex. 1003, 11:9–23, 52:12–14).

Patent Owner does not contest Petitioner's position in the Petition, other than to argue that the combination does not teach the claim limitation under Patent Owner's construction. PO Resp. 20–21. Patent Owner further admits that Numazaki teaches a lighting unit used to illuminate an object. *Id.* at 21. As we previously rejected Patent Owner's attempt to read limitations

IPR2021-00920
Patent 7,933,431 B2

from the Specification into the claims, Patent Owner's arguments here do not apply to the requirements of claim 12.

We have reviewed Petitioner's assertions with respect to the claim 12 and the supporting evidence, and determine that Petitioner has established by a preponderance of the evidence that claim 12 is unpatentable.

### b) Independent Claim 14

Independent claim 14 is directed to a method for controlling a handheld computing device and is very similar to method claim 1. *Compare* Ex. 1001, 26:18–28 *with id.* at 25:40–50. As such, the Petition relies on the same teachings of Numazaki discussed above with respect to claim 1 for the features of claim 14, which we agree with for purposes of this Decision for the reasons explained above. *See* Pet. 35.

Similarly, Patent Owner argues that the Petition fails to teach or suggest the claim elements of claims 14 for the same reasons as claims 1 and 7, reiterating some of the same arguments discussed above. PO Resp. 23–26. Patent Owner does not provide any additional argument other than what has already been addressed with respect to claims 1 and 7 above.

We have reviewed Petitioner's assertions with respect to the claim 14 and the supporting evidence, and determine that Petitioner has established by a preponderance of the evidence that claim 14 is unpatentable.

### c) Claims 2–4, 8, 9, 12, 13, 15–22, 25, 26, 28

Petitioner argues that Numazaki in view of the knowledge of a PHOSITA renders obvious dependent claims 2–4, 8, 9, 12, 13, 15–22, 25, 26, and 28. Pet. 21–26, 31–34, 36–40. Patent Owner does not contest Petitioner's assertions regarding these claims other than to point to the independent claims. PO Resp. 13, 19, 27.

IPR2021-00920
Patent 7,933,431 B2

We have reviewed Petitioner's assertions with respect to these claims and the supporting evidence, and determine that Petitioner has established by a preponderance of the evidence that claims 2–4, 8, 9, 12, 13, 15–22, 25, 26, and 28 are unpatentable.

>    5.  *Obviousness over Numazaki and DeLeeuw, Numazaki and DeLuca, and Numazaki and, Peters*

Petitioner argues that the combination of Numazaki and DeLeeuw renders obvious dependent claims 5, 6, and 29. Pet. 41–48. Petitioner argues that the combination of Numazaki and DeLuca renders obvious dependent claims 10, 23, 24, and 27. *Id.* at 48–57. Petitioner argues that the combination of Numazaki and Peters renders obvious dependent claims 30 and 31. *Id.* at 57–61. Patent Owner does not contest Petitioner's assertions regarding these claims other than to point to the independent claims. PO Resp. 28–29.

We have reviewed Petitioner's assertions with respect to these claims and the supporting evidence, and determine that Petitioner has established by a preponderance of the evidence that claims 5, 6, 10, 23, 24, 27, and 29–31 are unpatentable.

>   C.  *Jurisdiction over Expired Patents*

Patent Owner argues that the USPTO does not have jurisdiction over expired patents. PO Resp. 1–2. Rather, Patent Owner argues, the USPTO only has jurisdiction over patents with claims that can be amended or cancelled. *Id.* Patent Owner states that, as explained by the Supreme Court, "Congress [has] significant latitude to assign [the] adjudication of public rights to entities other than Article III courts," including for the USPTO to "reexamine—and perhaps cancel—a patent claim in an inter partes review." *Id.* (quoting *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC,*

IPR2021-00920
Patent 7,933,431 B2

138 S. Ct. 1365, 1368, 1374 (2018). However, Patent Owner argues that this authority does not extend to expired patents because the public franchise associated with an issued patent no longer exists after expiration. *Id.* at 2. Thus, it is argued, the USPTO no longer has jurisdiction, even though the patent owner "may be entitled to collect damages" for patent infringement, because "the patent owner[] no longer has the right to exclude others" and the USPTO has nothing to cancel or amend. *Id.*

> Patent Owner reasons that:

> Expiration removes the patent from the [US]PTO's jurisdiction and returns it to the sole jurisdiction of the Article III courts, which have exclusive authority to govern claims for damages. If this were not so, the [US]PTO would purport to have authority to retroactively modify a public franchise that no longer exists, in a setting where the expired public franchise does not enjoy any presumption of validity and in which amendment of claims is no longer permitted.

*Id.*

> *Inter partes* review of patents, whether expired or not, fits within the USPTO's mandate "for the granting and issuing of patents" (35 U.S.C. § 2(a)(1)), for as the Supreme Court has stated, "[i]nter partes review is 'a second look at an earlier administrative grant of a patent'" (*Oil States Energy Servs.*, 138 S. Ct. at 1374 (quoting *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144 (2016)). Our rules have also made clear that *inter partes* review covers expired patents. 37 C.F.R. 42.100(b) (2012); *see also, e.g.*, 83 Fed. Reg. 51341 (Oct. 11, 2018) (Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board)[15] ("The claim construction standard adopted in this final

---

[15] Available at https://www.federalregister.gov/d/2018-22006/p-13.

IPR2021-00920
Patent 7,933,431 B2

rule also is consistent with the same standard that the Office has applied in interpreting claims of expired patents and soon-to-be expired patents. *See, e.g.*, *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1279 (Fed. Cir. 2017) (noting that '[t]he Board construes claims of an expired patent in accordance with *Phillips* . . . [and] [u]nder that standard, words of a claim are generally given their ordinary and customary meaning').").

Further, the statutes governing *inter partes* review do not limit them to non-expired patents. For example, 35 U.S.C. § 311(b), which sets forth the scope of *inter partes* review merely refers to patents, with no mention of the expiration date. Further, 35 U.S.C. § 311(c) entitled "Filing Deadline" makes no mention of the expiration date of the patent. Elsewhere, 35 U.S.C. § 315 does limit the filing of IPRs based on civil actions and the serving of complaints, but again makes no mention of the expiration date of the patent. Patent Owner does not identify any statute or legal precedent that expressly limits *inter partes* review to non-expired patents.

Patent Owner fails to adequately explain why the Patent Office's authority to take a second look at an earlier administrative grant of a patent ends when the patent term expires even though the rights granted by the patent are not yet exhausted.

For all of these reasons, we do not agree that the Board lacks jurisdiction over expired patents.


III. CONCLUSION

For the reasons discussed above, we determine that Petitioner has proven, by a preponderance of the evidence, that some of the challenged claims are unpatentable, as summarized in the following table:

IPR2021-00920
Patent 7,933,431 B2

| Claims | 35 U.S.C. § | Reference(s) /Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–4, 7–9, 11–22, 25, 26, 28 | 103(a) | Numazaki, Knowledge of a PHOSITA | 1–4, 7–9, 12, 14–22, 25, 26, 28 | 11, 13 |
| 5, 6, 29 | 103(a) | Numazaki, DeLeeuw | 5, 6, 29 | |
| 10, 23, 24, 27 | 103(a) | Numazaki, DeLuca | 10, 23, 24, 27 | |
| 30, 31 | 103(a) | Numazaki, Peters | 30, 31 | |
| **Overall Outcome** | | | 1–10, 12, 14–31 | 11, 13 |

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–10, 12, 14–31 of U.S. Patent 7,933,431 B2 have been shown to be unpatentable;

FURTHERED ORDERED that claims 11 and 13 of U.S. Patent 7,933,431 B2 have not been shown to be unpatentable; and

FURTHERED ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2021-00920
Patent 7,933,431 B2

FOR PETITIONER:

Adam Seitz
Paul Hart
ERISE IP, P.A.
adam.seitz@eriseip.com
paul.hart@eriseip.com


FOR PATENT OWNER:

Todd Landis
John Wittenzellner
WILLIAMS SIMONS & LANDIS PLLC
tlandis@wsltrial.com
johnw@wsltrial.com



US007933431B2

## (12) United States Patent
Pryor

(10) Patent No.: **US 7,933,431 B2**
(45) Date of Patent: **Apr. 26, 2011**

(54) **CAMERA BASED SENSING IN HANDHELD, MOBILE, GAMING, OR OTHER DEVICES**

(76) Inventor: **Timothy R. Pryor**, Tecumseh (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/834,281**

(22) Filed: **Jul. 12, 2010**

(65) **Prior Publication Data**

US 2010/0277412 A1    Nov. 4, 2010

**Related U.S. Application Data**

(63) Continuation of application No. 11/980,710, filed on Oct. 31, 2007, now Pat. No. 7,756,297, which is a continuation of application No. 10/893,534, filed on Jul. 19, 2004, now Pat. No. 7,401,783, which is a continuation of application No. 09/612,225, filed on Jul. 7, 2000, now Pat. No. 6,766,036.

(60) Provisional application No. 60/142,777, filed on Jul. 8, 1999.

(51) **Int. Cl.**
*G06K 9/00* (2006.01)

(52) **U.S. Cl.** ...................... 382/103; 382/104; 348/207.1

(58) **Field of Classification Search** .................. 382/103, 382/104; 348/207.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,878,174 A * | 3/1999 | Stewart et al. | ................ | 382/293 |
| 6,342,917 B1 * | 1/2002 | Amenta | .................... | 348/207.1 |
| 6,453,180 B1 * | 9/2002 | Endoh et al. | ................... | 455/567 |
| 6,597,817 B1 * | 7/2003 | Silverbrook | ................. | 382/289 |

* cited by examiner

*Primary Examiner* — Tom Y Lu
(74) *Attorney, Agent, or Firm* — Warner Norcross & Judd LLP

(57) **ABSTRACT**

Method and apparatus are disclosed to enable rapid TV camera and computer based sensing in many practical applications, including, but not limited to, handheld devices, cars, and video games. Several unique forms of social video games are disclosed.

**31 Claims, 22 Drawing Sheets**







**FIG. 1A**



**FIG. 1B**



**FIG. 1C**

IPR2021-00920
Apple EX1001 Page 2



**FIG. 2A**

**FIG. 2B**

IPR2021-00920
Apple EX1001 Page 3



*FIG. 2C*

IPR2021-00920
Apple EX1001 Page 4



**FIG. 2D**



**FIG. 4A**

IPR2021-00920
Apple EX1001 Page 5



**FIG. 3A**



**FIG. 4B**

IPR2021-00920
Apple EX1001 Page 6



*FIG. 3B*



*FIG. 3C*

IPR2021-00920
Apple EX1001 Page 7



# FIG. 5A



# FIG. 5B

IPR2021-00920
Apple EX1001 Page 8



**FIG. 6**



**FIG. 7**



**FIG. 9**

IPR2021-00920
Apple EX1001 Page 10



**FIG. 8A**

**FIG. 8B**

IPR2021-00920
Apple EX1001 Page 11



FIG. 10A

IPR2021-00920
Apple EX1001 Page 12



*FIG. 10B*

IPR2021-00920
Apple EX1001 Page 13



**FIG. 11A**

IPR2021-00920
Apple EX1001 Page 14



*FIG. 11B*

IPR2021-00920
Apple EX1001 Page 15



FIG. 12



FIG. 13



FIG. 14A

IPR2021-00920
Apple EX1001 Page 18



## FIG. 14B



## FIG. 14C



*FIG. 15*

IPR2021-00920
Apple EX1001 Page 20



*FIG. 16*



*FIG. 17C*



*FIG. 17A*

IPR2021-00920
Apple EX1001 Page 22



*FIG. 17B*

IPR2021-00920
Apple EX1001 Page 23

US 7,933,431 B2

1

# CAMERA BASED SENSING IN HANDHELD, MOBILE, GAMING, OR OTHER DEVICES

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 11/980,710 filed Oct. 31, 2007, now U.S. Pat. No. 7,756,297; which is a continuation of application Ser. No. 10/893,534 filed Jul. 19, 2004, now U.S. Pat. No. 7,401,783; which is a continuation of application Ser. No. 09/612,225 filed Jul. 7, 2000, now U.S. Pat. No. 6,766,036; which claims the benefit of U.S. Provisional Application No. 60/142,777, filed Jul. 8, 1999.

Cross references to related co-pending US applications by the inventor having similar subject matter.

1. Touch TV and other Man Machine Interfaces: Ser. No. 09/435,854 filed Nov. 8, 1999, now U.S. Pat. No. 7,098, 891; which was a continuation of application Ser. No. 07/946,908, now U.S. Pat. No. 5,982,352;

2. More Useful Man Machine Interfaces and Applications: Ser. No. 09/433,297 filed Nov. 3, 1999, now U.S. Pat. No. 6,750,848;

3. Useful Man Machine interfaces and applications: Ser. No. 09/138,339, Pub. Appln. 2002-0036617, now abandoned;

4. Vision Target based assembly: Ser. No. 08/469,907 filed Jun. 6, 1995, now U.S. Pat. No. 6,301,783;

5. Picture Taking method and apparatus: provisional application 60/133,671, and regular application Ser. No. 09/568,552 filed May 11, 2000, now U.S. Pat. No. 7,015, 950;

6. Methods and Apparatus for Man Machine Interfaces and Related Activity: Provisional Application: provisional application 60/133,673 filed May 11, 1999; and regular application Ser. No. 09/568,554 filed May 11, 2000, now U.S. Pat. No. 6,545,670;

7. Tactile Touch Screens for Automobile Dashboards, Interiors and Other Applications: provisional application Ser. No. 60/183,807; and regular application Ser. No. 09/789,538, now U.S. Pat. No. 7,084,859; and

8. Apparel Manufacture and Distance Fashion Shopping in Both Present and Future: provisional application 60/187,397 filed Mar. 7, 2000.

The disclosures of the following U.S. patents and co-pending patent applications by the inventor, or the inventor and his colleagues, are incorporated herein by reference:

1. "Man machine Interfaces": U.S. application Ser. No. 09/435,854 and U.S. Pat. No. 5,982,352, and U.S. application Ser. No. 08/290,516, filed Aug. 15, 1994, now U.S. Pat. No. 6,008,000, the disclosure of both of which is contained in that of Ser. No. 09/435,854;

2. "Useful Man Machine Interfaces and Applications": U.S. application Ser. No. 09/138,339, now Pub. Appln. 2002-0036617;

3. "More Useful Man Machine Interfaces and Applications": U.S. application Ser. No. 09/433,297;

4. "Methods and Apparatus for Man Machine Interfaces and Related Activity": U.S. Appln. Ser. No. 60/133,673 filed as regular application Ser. No. 09/568,554, now U.S. Pat. No. 6,545,670;

5. "Tactile Touch Screens for Automobile Dashboards, Interiors and Other Applications": U.S. provisional Appln. Ser. No. 60/183,807, filed Feb. 22, 2000, now filed as reg. application Ser. No. 09/789,538; and

2

6. "Apparel Manufacture and Distance Fashion Shopping in Both Present and Future": U.S. Appln. Ser. No. 60/187,397, filed Mar. 7, 2000.

## FIELD OF THE INVENTION

The invention relates to simple input devices for computers, particularly, but not necessarily, intended for use with 3-D graphically intensive activities, and operating by optically sensing a human input to a display screen or other object and/or the sensing of human positions or orientations. The invention herein is a continuation in part of several inventions of mine, listed above.

This continuation application seeks to provide further useful embodiments for improving the sensing of objects. Also disclosed are new applications in a variety of fields such as computing, gaming, medicine, and education. Further disclosed are improved systems for display and control purposes.

The invention uses single or multiple TV cameras whose output is analyzed and used as input to a computer, such as a home PC, to typically provide data concerning the location of parts of, or objects held by, a person or persons.

## DESCRIPTION OF RELATED ART

The above mentioned co-pending applications incorporated by reference discuss many prior art references in various pertinent fields, which form a background for this invention. Some more specific U.S. Patent references are for example:

DeMenthon—U.S. Pat. Nos. 5,388,059; 5,297,061; 5,227, 985

Cipolla—U.S. Pat. No. 5,581,276

Pugh—U.S. Pat. No. 4,631,676

Pinckney—U.S. Pat. No. 4,219,847

## DESCRIPTION OF FIGURES

FIG. 1 illustrates a basic computer terminal embodiment of the invention, similar to that disclosed in copending applications.

FIG. 2 illustrates object tracking embodiments of the invention employing a pixel addressable camera.

FIG. 3 illustrates tracking embodiments of the invention using intensity variation to identify and/or track object target datums.

FIG. 4 illustrates tracking embodiments of the invention using variation in color to identify and/or track object target datums.

FIG. 5 illustrates special camera designs for determining target position in addition to providing normal color images.

FIG. 6 identification and tracking with stereo pairs.

FIG. 7 illustrates use of an indicator or co-target.

FIG. 8 illustrates control of functions with the invention, using a handheld device which itself has functions.

FIG. 9 illustrates pointing at an object represented on a screen using a finger or laser pointer, and then manipulating the represented object using the invention.

FIG. 10 illustrates control of automobile or other functions with the invention, using detected knob, switch or slider positions.

FIG. 11 illustrates a board game embodiment of the invention.

FIG. 12 illustrates a generic game embodiment of the invention.

FIG. 13 illustrates a game embodiment of the invention, such as might be played in a bar.

IPR2021-00920
Apple EX1001 Page 24

US 7,933,431 B2

3

FIG. **14** illustrates a laser pointer or other spot designator embodiment of the invention.

FIG. **15** illustrates a gesture based flirting game embodiment of the invention.

FIG. **16** illustrates a version of the pixel addressing camera technique wherein two lines on either side of a 1000 element square array are designated as perimeter fence lines to initiate tracking or other action.

FIG. **17** illustrates a 3-D acoustic imaging embodiment of the invention.

THE INVENTION EMBODIMENTS

FIG. **1**

The invention herein and disclosed in portions of other copending applications noted above, comprehends a combination of one or more TV cameras (or other suitable electro-optical sensors) and a computer to provide various position and orientation related functions of use. It also comprehends the combination of these functions with the basic task of generating, storing and/or transmitting a TV image of the scene acquired—either in two or three dimensions.

The embodiment depicted in FIG. **1**A illustrates the basic embodiments of many of my co-pending applications above. A stereo pair of cameras **100** and **101** located on each side of the upper surface of monitor **102** (for example a rear projection TV of 60 inch diagonal screen size) with display screen **103** facing the user, are connected to PC computer **106** (integrated in this case into the monitor housing), for example a 400 Mhz Pentium II. For appearances and protection a single extensive cover window may be used to cover both cameras and their associated light sources **110** and **111**, typically LEDs.

The LEDs in this application are typically used to illuminate targets associated with any of the fingers, hand, feet and head of the user, or objects such as **131** held by a user, **135** with hands **136** and **137**, and head **138**. These targets, such as circular target **140** and band target **141** on object **131** are desirably, but not necessarily, retro-reflective, and may be constituted by the object features themselves (e.g., a finger tip, such as **145**), or by features provided on clothing worn by the user (e.g., a shirt button **147** or polka dot **148**, or by artificial targets other than retroreflectors.

Alternatively, a three camera arrangement can be used, for example using additional camera **144**, to provide added sensitivity in certain angular and positional relationships. Still more cameras can be used to further improve matters, as desired. Alternatively, and or in addition, camera **144** can be used for other purposes, such as acquire images of objects such as persons, for transmission, storage or retrieval independent of the cameras used for datum and feature location determination.

For many applications, a single camera can suffice for measurement purposes as well, such as **160** shown in FIG. **1**B for example, used for simple 2 dimensional (2D) measurements in the xy plane perpendicular to the camera axis (z axis), or 3D (xyz, roll pitch yaw) where a target grouping, for example of three targets is used such as the natural features formed by the two eyes **164**, **165** and nose **166** of a human **167**. These features are roughly at known distances from each other, the data from which can be used to calculate the approximate position and orientation of the human face. Using for example the photogrammetric technique of Pinkney described below, the full 6 degree of freedom solution of the human face location and orientation can be achieved to an accuracy limited by the ability of the camera image processing software utilized to determine the centroids

4

or other delineating geometric indicators of the position of the eyes and nose, (or some other facial feature such as the mouth), and the accuracy of the initial imputing of the spacing of the eyes and their respective spacing to the nose. Clearly if a standard human value is used (say for adult, or for a child or even by age) some lessening of precision results, since these spacings are used in the calculation of distance and orientation of the face of human **167** from the camera **160**.

In another generally more photogrammetrically accurate case, one might choose to use four special targets (e.g., glass bead retro-reflectors, or orange dots) **180**-**183** on the object **185** having known positional relationships relative to each other on the object surface, such as one inch centers. This is shown in FIG. **1**C, and may be used in conjunction with a pixel addressable camera such as described in FIG. **2** below, which allows one to rapidly determine the object position and orientation and track its movements in up to 6 degrees of freedom as disclosed by Pinkney U.S. Pat. No. **4,219,847** and technical papers referenced therein. For example, the system described above for FIGS. **1** and **2** involving the photogrammetric resolution of the relative position of three or more known target points as viewed by a camera is known and is described in a paper entitled "A Single Camera Method for the 6-Degree of Freedom Sprung Mass Response of Vehicles Redirected by Cable Barriers" presented by M. C. van Wijk and H. F. L. Pinkney to The Society of Photo-optical Instrumentation Engineers.

The stereo pair of cameras can also acquire a two view stereo image of the scene as well, which can be displayed in 3D using stereoscopic or auto-stereoscopic means, as well as transmitted or recorded as desired.

In many applications of the foregoing invention it is desirable not just to use a large screen but in fact one capable of displaying life size images. This particularly relates to human scaled images, giving a life-like presence to the data on the screen. In this way the natural response of the user with motions of hands, head, arms, etc., is scaled in "real" proportion to the data being presented.

FIG. **2**

This embodiment and others discloses special types of cameras useful with the invention. In the first case, that of FIG. **2**A, a pixel addressable camera such as the MAPP2200 made by IVP corporation of Sweden is used, which allows one to do many things useful for rapidly determining location of objects, their orientation and their motion.

For example, as shown in FIG. **2**A, an approximately circular image **201** of a target datum such as **180** on object **185** of FIG. **1**C may be acquired by scanning the pixel elements on a matrix array **205** on which the image is formed. Such an array in the future will have for example 1000×1000 pixels, or more (today the largest IVP makes is 512×512. The IVP also is not believed to be completely randomly addressable, which some future arrays will be).

As an illustration, computer **220** determines, after the array **205** has been interrogated, that the centroid "x, y" of the pixel elements on which the target image lies is at pixel x=500, y=300 (including a sub-fraction thereof in many cases). The centroid location can be determined for example by the moment method disclosed in the Pinkney patent, referenced above.

The target in this case is defined as a contrasting point on the object, and such contrast can be in color as well as, or instead of, intensity. Or with some added preprocessing, it can be a distinctive pattern on the object, such as a checkerboard or herringbone.

IPR2021-00920
Apple EX1001 Page 25

5

6

Subsequent Tracking

To subsequently track the movement of this target image, it is now only necessary to look in a small pixel window composed of a small number of pixels around the target. For example the square **230** shown, as the new position x'y' of the target image cannot be further distant within a short period of time elapsed from the first scan, and in consideration of the small required time to scan the window.

For example, if the window is 100×100 pixels, this can be scanned in 1 millisecond or less with such a pixel addressing camera, by interrogating only those pixels in the window, while still communicating with the camera over a relatively slow USB serial link of 12 mb transmission rate (representing 12,000 pixel gray level values in one millisecond).

One thus avoids the necessity to scan the whole field, once the starting target image position is identified. This can be known by an initial scan as mentioned, or can be known by having the user move an object with a target against a known location with respect to the camera such as a mechanical stop, and then indicate that tracking should start either by verbally saying so with voice recognition, or by actuating a control key such as **238** or whatever.

It is noted that if the tracking window is made large enough, then it can encompass a whole group of datums, such as **180-183** on an object.

FIG. **2**B Reduction in Acquisition Time

Another application of such a pixel addressing camera is shown in FIG. **2**B. One can look at the whole field, x y of the camera, **240**, but only address say every 10th pixel such as **250**, **251** and **252**, in each direction, i.e., for a total 10,000 pixels in a field of 1 million (1000×1000, say).

In this case computer **220** simply queries this fraction of the pixels in the image, knowing apriori that the target image such as **260** will have an image size larger than 10×10 pixels, and must be detectable, if of sufficient contrast, by one of the queried pixels. (For smaller or larger target images, the number and spacing of queried pixels can be adjusted accordingly). This for example, allows one to find approximate location of targets with only $\frac{1}{100}$ the pixel interrogation time otherwise needed, for example, plus any gain obtained as disclosed above, by knowing in what region of the image to look (for example during tracking, or given some apriori knowledge of approximate location due to a particular aspect of the physical arrangement or the program in question).

Once a target has been approximately found as just described, the addressing can be optimized for that region of the image only, as disclosed in subsequent tracking section above.

Given the invention, the potential for target acquisition in a millisecond or two thus is achievable with simple pixel addressable CMOS cameras coming on stream now (today costing under $50), assuming the target points are easily identifiable from at least one of brightness (over a value), contrast (with respect to surroundings), color, color contrast, and more difficult, shape or pattern (e.g., a plaid, or herring-bone portion of a shirt). This has major ramifications for the robustness of control systems built on such camera based acquisition, be they for controlling displays, or machines or whatever.

It's noted that with new 2000×2000 cameras coming on stream, it may only be necessary to look at every 15th or 20th pixel in each direction to get an adequate feel for target location. This means every 200th to 400th pixel, not enough to cause image rendition difficulties even if totally dark grey (as it might be in a normal white light image if set up for IR wavelengths only).

FIG. **2**C

Another method for finding the target in the first place with limited pixel interrogation is to look at pixels near a home point where a person for example indicates that the target is. This could be for example, placing ones fingernail such as **270**, whose natural or artificial (e.g., reflective nail polish) features are readily seen by the camera **275** and determined to be in the right corner of a pad **271** in FIG. **2**C which approximately covers the field of view **274** of the camera **275**. The computer **220** analyzes the pixels in the right corner **278** of the image field **279** representing the pad portion **271** with the camera **275**, either continuously, or only when the finger for example hits a switch such as **280** at the edge of the pad, or on command (e.g., by the user pushing a button or key, or a voice message inputted via microphone **285** for example). After such acquisition, the target is then tracked to other locations in xy space of the pad, for example as described above. Its noted that it helps to provide a beep or other sound or indication when acquisition has been made.

Pick Windows in Real Time

Another aspect of the invention is that one can also pick the area of the image to interrogate at any desired moment. This can be done by creating a window of pixels with in the field to generate information, for example as discussed relative to a specific car dashboard application of FIG. **10**.

FIG. **2**D—Scan Pattern

A pixel addressing camera also allows a computer such as **220** to cause scans to be generated which are not typical raster scans. For example circular or radial, or even odd shapes as desired. This can be done by providing from the computer the sequential addresses of the successive pixels on the camera chip whose detected voltages are to be queried.

A circular scan of pixels addressed at high speed can be used to identify when and where a target enters a field enclosed by the circular pixel scan. This is highly useful, and after that, the approximate location of the target can be determined by further scans of pixels in the target region.

For example consider addressing the pixels c1 c2 c3 . . . cn representing a circle **282** at the outer perimeter of the array, **285**, of 1000×1000 elements such as discussed above. The number of pixels in a full circle is approximately 1000 pi, which can be scanned even with USB (universal serial bus) limits at 300 times per second or better. For targets of $\frac{1}{100}$ field in width, this means that a target image entering the field such as circular target image **289** (which is shown intersecting element cm and its neighbors) would have to travel $\frac{1}{100}$ the field width in 0.0033 seconds to be totally missed in a worst case. If the image field corresponds to 20 inches in object field width this is 0.2 inches×300/sec or 60 inches/second, very fast for human movement, and not likely to be exceeded even where smaller targets are used.

Alternative shapes to circular "trip wire" perimeters may be used, such as squares, zig-zag, or other layouts of pixels to determine target presence. Once determined, a group of pixels such as group **292** can be interrogated to get a better determination of target location.

FIG. **3**

Since many applications of the invention concern, or at least have present a human caused motion, or motion of a part of a human, or an object moved by a human, the identification and tracking problem can be simplified if the features of interest, either natural or artificial of the object provide some kind of change in appearance during such motion.

FIG. **3** illustrates tracking embodiments of the invention using intensity variation to identify and/or track object target datums. In a simple case, a subtraction of successive images can aid in identifying zones in an image having movement of

IPR2021-00920
Apple EX1001 Page 26

US 7,933,431 B2

7

features as is well known. It is also useful to add pixel intensities of successive images in computer 220 for example. This is particular true with bright targets (with respect to their usual surroundings) such as LEDs or retro-reflectors. If the pixels in use by the camera are able to gather light preferentially at the same time a special illumination light is on, this will accentuate the target with respect to background. And if successive frames are taken in this way, not only will a stationary image of the special target build up, but if movement takes place the target image then will blur in a particular direction which itself can become identify-able. And the blur direction indicates direction of motion as well, at least in the 2-D plane of the pixel array used.

Another form of movement can take place artificially, where the target is purposely moved to provide an indication of its presence. This movement can be done by a human easily by just dithering ones finger for example (if a portion of the finger such as the tip is the target in question), or by vibrating an object having target features of interest on it, for example by moving the object up and down with ones hand.

For example consider FIG. 3A, where a human 301 moves his finger 302 in a rapid up and down motion, creating different image positions sequentially in time of bright target ring 320, 320' on his finger, as seen by camera 325. If the camera can read quickly enough each of these positions such as 326 and 327 in image field 328 can be resolved, other wise a blur image such as 330 is registered on the camera and recorded in the computer 335.

Instead of using ones finger, it is also possible to create movement of a target for example with a tuning fork or other mechanism mechanically energizing the target movement, on what otherwise might be a static object say. And it is possible for the human, or a computer controlling the movement in question to create it in such a manner that it aids identification. For example, a certain number of moves of ones finger (e.g., 4), or 2 moves/sec of ones finger, or horizontal moves of ones finger etc., any or all of these could indicate to the computer upon analysis of the camera image, that a target was present.

The invention comprehends this as a method for acquiring the datum to be tracked in the first place, and has provided a camera mechanism for tracking fast enough not to lose the data, assuming a sufficiently distinct feature. For example, it is desirable to not require sophisticated image processing routines and the like if possible, to avoid the time it takes to execute same with affordable equipment. And yet in many scenes, finding a target cant be done easily today without some aid, either a high contrast target (contrasting brightness or color or both, for example). Or the aid can be movement as noted, which allows the search for the target to be at least localized to a small region of the field of view, and thence take much less time to run, even if a sophisticated algorithm is employed.

FIG. 3B illustrates an embodiment wherein a target which blinks optically is used. The simplest case is a modulated LED target such 340 on object 341 shown. Successive frames taken with camera 345 looking at pixel window 346 at 300 scans of the pixels within the window per second where the image 347 of the LED target is located, can determine, using computer 349 (which may be separate from, or incorporated with the image sensor), 5 complete blinks of target 340, if blinked at a 60 hz rate. Both blink frequency, blink spacing, blink pulse length can all be determined if the scan rate is sufficiently faster than the blink rate, or pulse time.

It should be noted that if the target 340 is a retro-reflector as in FIG. 1, with an illumination source such as 355 near the

8

axis of the camera, then the LEDs (or other sources) of the illuminator can be modulated, causing the same effect on the target.

Somewhat more sophisticated is the situation shown in FIG. 3C where a target 380 (on object 360) illuminated by a light source 365 provides a time variant intensity change in the camera image 368 obtained by camera 370 as the target moves its position and that of the image. This can be achieved naturally by certain patterns of material such as herringbone, or by multifaceted reflectors such as cut diamonds (genuine or glass), which "twinkle" as the object moves. A relative high frequency "twinkle" in the image indicates then the presence of the target in that area of the image in which it is found.

When analog sensors such as PSD (position sensing diode) sensor 369 described in a copending application is used in addition to, or instead of a matrix array in camera 370, the variation in light intensity or twinkle can be obtained directly from the detected output voltage from the signal conditioning of the sensor as shown in trace 375 corresponding to the movement of diamond target 380 a distance in the camera field. From the PSD one can also determine the position of the detected target image, theoretically at least independent of the intensity fluctuation.

For digital array detectors, the intensity variation can also be detected by subtracting images and observing the difference due to such variation. Such images need to be taken frequently if the twinkle frequency is high, and this can cause problems unless high speed camera scanning is possible. For example, in a twinkle mode, a pixel addressable camera using the invention herein could scan every 5th pixel in both x and y. This would allow a 1000 frame per second operation of a camera which would normally go 40 frames per second. Such a rate should be able to capture most twinkle effects with the assumption that the light field changes on more than 25 pixels. If less, then scan density would need to be increased to every 3rd pixel say, with a corresponding reduction in twinkle frequency detection obtainable.

FIG. 4

FIG. 4A illustrates identification and tracking embodiments of the invention using color and color change in a manner similar in some aspects to the intensity variation from object datums described above.

Color can be used as has been noted previously to identify a target, as can a change in color with time. For example, a target can change its color in order to identify itself to successive interrogations of pixels on a color TV camera. This can be accomplished by having a retro-reflector which is illuminated in succession by light from different colored LEDs for example, in the arrangement of FIG. 1. For example red led 401 illuminates retro reflector target 405 on object 406 during frame 1 (or partial frame, if not all pixels addressed) taken by camera 410. Then yellow led 402 illuminates target 405 on the next frame, and so forth. For any reading of successive frames, one point in the image will appear to distinctly change color, while all other points will be more or less the same due to the room lighting overwhelming the led source illumination and the natural color rendition of the objects themselves.

To return color variation when moved, one can employ a target which changes color naturally as it moves, even with illumination of constant color. Such a target can contain a diffractive, refractive, or interference based element, for example, a reflective diffraction grating for example, which splits white light illumination into colors, which are seen differently as the target moves and changes angle with respect to the observer and/or illumination source.

IPR2021-00920
Apple EX1001 Page 27

US 7,933,431 B2

9                                          10

For example, consider FIG. **4**B showing reflective grating **440** on object **445** at initial position P. When illuminated by white light for example from lamp **450**, it reflects the spectrum such that when the object has moved to a new position P' the color (or colors, depending on the grating type, and angles involved) returning to camera **460** is changed. Such gratings can be purchased from Edmund Scientific company, and are typically made as replicas of ruled or holographic gratings.

Some types of natural features which change color are forms of jewelry which have different colored facets pointing in different directions. Also some clothes look different under illumination from different angles. This could be called then "color twinkle".

FIG. **5**

FIG. **5** illustrates special camera designs for determining target position in addition to providing normal color images. As was pointed out in a co-pending application, it may be desirable to have two cameras looking at an object or area one for producing images of a person or scene, the other for feature location and tracking. These may be bore-sighted together using beam splitters or the like to look at the same field, or they may just have largely overlapping image fields. The reason this is desirable is to allow one to obtain images of activity in the field of view (e.g., a human playing a game) while at the same time ideally determine information concerning position or other aspects of features on the human or objects associated with him.

It is now of interest to consider a matrix array chip equipped with a special color filter on its face which passes a special wavelength in certain pixel regions, in addition to providing normal color rendition via RGB or other filtering techniques in the remaining regions. The chip could be pixel addressable, but does not have to be.

Version FIG. **5**A

One version would have one special pixel filter such as **505**, for each square group of 4 pixels in an array **500** (one special pixel filter **505**, and 3 pixels, **510**-**512** filtered for RGB (red green blue) or similar, as is commonly used now for example. In one functional example, the special pixel **505** is purposely not read during creation of the normal image of a scene, but rather read only on alternate frames (or as desired) to determine target locations. If the array can be addressed pixel wise, the actual time lost doing this can be low. Since 25% of the pixels are effectively dead in forming the image in this example, and assuming all pixels are of equal area (not necessarily required), then 25% of the image needs to be filled in. This can be done advantageously in the image displayed, by making the color and intensity of this pixel the same as the resultant color and average intensity value of the other 3 in the cluster.

Version FIG. **5**B

In this version, related to FIG. **2** above, and shown in FIG. **5**b, isolated pixels such as **530** (exaggerated in size for clarity) on array **531** or clusters of pixels such as **540**-**543**, are used to rapidly find a target with low resolution, such as round dot target image **550**. These pixels can ideally have special filters on their face, for example having near IR bandpass filters (of a wavelength which can still be seen by the camera, typically up to 1 um wavelength max). If takes only a few pixels to see the rough presence of a target, then in an image field of 1000×1000 pixels there could be one or more target images occupying 10×10 pixels or more. Thus in any group of 10×10, you could have 5 near IR filtered receptive pixels say, i.e., only 5% of the total pixel count but sufficient to see the IR targets location to a modest accuracy. Once found, one can also use the "normal" pixels on which the target image also

falls to aid in more precise determination of its location, for example using pixel group **555** composed of numerous pixels.

In short by having a camera with certain pixels responsive to selected wavelengths and/or scanned separately one can very rapidly scan for target features, then when found, take a regular picture if desired. Or just take regular pictures, until the necessity arises to determine target location.

Similarly the special filtered pixels such as **505** or **530** could be laser wavelength bandpass filtered for this purpose, used by the array for preferentially detecting laser light projected on an object (while ignoring other wavelengths). In a normal image, such a pixel would be nearly black as little white light passes (except that centered on the laser wavelength). To provide a normal picture using such a camera, the special IR or laser wavelengths pixels readings would be filled in with values and colors of light from the surrounding regions.

Such a laser wavelength filter can be extremely effective, even if a relatively weak laser is used to illuminate a large area, especially where retro-reflectors are used, and the light returned is concentrated by 1000 times or more.

FIG. **6**

The embodiments above have dealt with finding just one target, and generally with just one camera, even though two or more cameras may be used for stereo imaging. Where stereo pairs of cameras are used, clearly each camera must see the target, if range via image disparity (the shift in location of a feature in the image in two camera views separated by a baseline) is to be determined.

Using the invention, one camera can be considered a master, the other a slave. The master camera determines target location by any of the means described above. Then the slave need only look at the expected pixel location of the target assuming some a priori knowledge of range which can come from previous target readings, or known range zones where the target has to lie in a given application.

Consider cameras **600** (master) with lens **603** and **601** (slave) having lens **604**, the axes of the two cameras separated by baseline **602** and with interfaced to computer **605**. The image of target **610** on object **615** is formed at position **620** on array **630** of camera **600**, and at position **621** on array **631** of camera **601**. The difference in position x in the direction of the baseline, in this simple situation is directly proportional to range z. The knowledge then of target image position **620** found by interrogating some or all of the pixels of camera **600** can as mentioned be used to more rapidly find image **621** in the image field of the "slave" camera **601**, and thus the z location of the target **610**.

For example if range is known to be an approximate value of z, one can look in the image field of the camera **601** along a line of points at a calculated value x away from the edge of the field, assuming **620** has been found to lie as shown near the corresponding edge of the field of camera **600**.

Two or more cameras may be used for stereo image analysis including object range and orientation data as discussed in FIGS. **1** and **6**. Range can also be determined via triangulation with a single camera and one target if projected on to the object in question at an angle to the camera axis from a laser say, or by using a single camera and 3 or more points on an object whose relative relationship is known (including the case of a line of points and an external point).

FIG. **7**

As stated above, the TV camera of the invention can be used to see either natural or artificial features of objects. The former are just the object features, not those provided on the object especially for the purpose of enhancing the ability to

IPR2021-00920
Apple EX1001 Page 28

US 7,933,431 B2

11

determine the object location or other variable using computer analysis of TV camera images. Such natural features, as has been pointed out in many of the co-pending referenced applications, can be holes, corners, edges, indentations, protrusions, and the like of fingers, heads, objects held in the hand, or whatever.

But using simple inexpensive equipment it is often hard to determine the presence or location of such features in a rapid reliable enough manner to insure function of the application in question. In this case, one can employ one or more artificial features, provided on the object by attaching an artificial target onto the object, or manufacturing the object with such a target.

At least three types of artificial features can be employed.
1. The first is to provide special features required for object location, or orientation determination. Such a special feature can be of an optically contrasting material at the wavelength used to that of the object, for example a bright color, or a retroreflector;
2. The second is to provide one artificial feature (typically capable of more easily being found in an image than natural features of the object), and by finding it, localize to the region of that target environs the problem of finding any other features needed nearby; and
3. The third is to find an artificial feature on an object that actually by its shape, location, or coded features, provides a guide to the location of natural or other artificial features which are to be sensed in order to determine position or orientation of the same or related objects. This has been dubbed by me a co-target in co-pending applications incorporated by reference.

As shown in FIG. 7, object 700 has co-target 701 at one end, visible to camera 705. The co-target in this particular instance is a diamond shape, and is of high contrast for easy acquisition. For example it could be a yellow plastic retro-reflector formed of molded corner cubes similar to those used on cars for taillights and other safety purposes.

The diamond shape in this case is significant for two reasons. First it is unusual relative to the object or background when used in the context intended, and makes the target still more identifiable (that is novel color, shape and brightness are all present). In addition, in this particular instance it has been chosen that a diamond shape, should indicate that the corners of the object are to be used for 6 axis position and orientation determination and that the choice of color for example, signifies that the object corners are within some predetermined distance from the target. If desired the target location on the object can also point to the corners. For example, in the drawing, the four corners of the diamond, 720-723, point in the general direction of the four corners 730-733 of the rectangular object 700.
FIG. 8

The invention herein and disclosed in portions of other copending applications noted above, comprehends a combination of one or more TV cameras (or other suitable electro-optical sensors) and a computer to provide various position and orientation related functions of use. It also comprehends the combination of these functions with the basic task of generating, storing and/or transmitting a TV image of the scene acquired either in two or three dimensions.

FIG. 8A illustrates control of functions with the invention, using a handheld device which itself has functions (for example, a cell phone). The purpose is to add functionality to the device, without complicating its base function, and/or alternatively add a method to interact with the device to achieve other purposes.

12

The basic idea here is that a device which one holds in ones hand for use in its own right, can also be used with the invention herein to perform a control function by determining its position, orientation, pointing direction or other variable with respect to one or more external objects, using an optical sensing apparatus such as a TV camera located externally to sense the handheld device, or with a camera located in the handheld device, to sense datums or other information external for example to the device.

This can have important safety and convenience aspects to it, particularly when the device is used while driving a car or operating other machinery. To date voice recognition has been the only alternative to keying data in to small handheld devices, and voice is limited in many cases very limited if some physical movement is desired of the thing being communicated with.

A cellular phone 800 held in the hand of a user can be used to also signal functions in a car using a projected laser spot from built in laser spot projector 801 as in FIG. 14, in this case detected by detector 802 on the dashboard 803. Alternatively and or in conjunction, one may use features such as round dot targets 805-807 on the cell phone which are sensed, for example, by a TV camera 815 located in the car headliner 816 or alternatively for example in the dashboard (in this case the targets would be on the opposite end of the cell phone). More than one set of targets can be used, indeed for most generality, they would be an all sides which point in any direction where a camera could be located to look at them.

Remote control units and dictating units are also everyday examples of some devices of this type which can serve control purposes according to the invention. One of the advantages here is that it keeps the number of switches etc on the device proper to a minimum, while allowing a multitude of added functions, also in noisy environments where voice recognition could be difficult or undesirable for other reasons.

Use of specialized target datums or natural features of devices held in the hand, or used with cameras on such devices, allows photogrammetric techniques such as described in FIG. 1 to be used to determine the location in 6 degrees of freedom of the device with respect to external objects.

As one illustrative example, to signal a fax unit 824 in the car to print data coming through on the phone, the user just points (as illustrated in position 2) the cell phone toward the fax, and the TV camera 815 scans the images of targets 805-807 on the face toward the camera, and the computer 830 connected to the camera analyzes the target images (including successive images if motion in a direction for example is used as an indicator, rather than pointing angle for example), determines the cell phone position and/or orientation or motion and commands the fax to print if such is signaled by the cell phone position orientation or motion chosen. The knowledge in space of the cell phone location and its pointing direction (and motion as pointed just above) provides information as to the fact that the fax was the intended target of the effort. Such data can be taught to the system, after the fact even if the fax or any other item desired to be controlled is added later.

Another version has a camera and requisite computer (and or transmission capability to an external computer) in the handheld device, such as a cell phone or whatever. When pointed at an object, the camera can acquire the image of the object and/or any natural features or special datums on the object which are needed to perform the function desired.

One function is just to acquire an image for transmission via for example the cell phones own connection. This is illustrated in FIG. 8B, where an image of object 849 acquired

IPR2021-00920
Apple EX1001 Page 29

US 7,933,431 B2

13                                                     14

by camera **850** of cell phone **851** held by user **852** is transmitted over mobile phone link **853** to a remote location and displayed, for example. While this image can be of the user, or someone or something of interest, for example a house, if a real estate agent is making the call, it is also possible to acquire features of an object and use it to determine something.

For example, one purpose is recognition, for example one can point at the object, and let the computer recognize what it is from its TV image. Or point around in space taking multiple TV frames aiming in different directions, and when computer recognition of a desired object in one of the images takes place, transmit certain data to the object. Or it can be used to acquire and transmit to remote locations, only that data from recognized objects.

Thus the invention can provided on a hand held object for a variety of purposes,

To take images of things;

To determine datums on things; and

To automatically read things.

The combination of any or all of these functions in addition with other object functions such as hand held cell phones, dictation units, telephones, wearable computer devices and the like.

An alternative, shown with phantom lines in FIG. **8A**, to the some aspects of the above described operation of the embodiment is to use a laser pointer **801** in for example a cell phone to designate say the fax machine as shown. Then the TV camera **815** simply detects the presence of the laser pointer projected spot **820** on the fax, and via computer memory it is known that this is a device to be energized or connected in connection with the cell phone.

The camera located in a handheld device can also be used to point at a TV screen, such as that on the dashboard of a car, and to utilize data presented there for some purpose. For example, if pointed at a screen saying email message number 5, the camera of the device can be used to obtain this image, recognize it through known character recognition techniques, and process it for transmission if desired. Or it might just say the message to the user of the phone through the speaker of the cell phone. Such a technique is not required if means exist to directly transmit the incoming information to the cell phone, but this may not be possible.

FIG. **9**

FIG. **9** illustrates pointing at a displayed image of an object represented on a screen using a finger or laser pointer, and then manipulating the represented object or a portion thereof using the invention. For example, consider user **901** pointing a laser pointer **905** at an image generated by computer **910** on display **912**, typically a large screen display (e.g., 5 feet diagonal or more) where control features here disclosed are of most value.

The user with the pointer, can point to an image or portion of the displayed image to be controlled, and then using the action of the pointer move the controlling portion of the image, for example a "virtual" slider control **930** projected on the screen whose lever **935** can be moved from left to right, to allow computer **910** sensing the image (for example by virtue of TV camera **940** looking at the screen as disclosed in copending applications) to make the appropriate change, for example in the heat in a room.

Alternatively one can also point at the object using ones fingers and using other aspects of the invention sense the motions of ones fingers with respect to the virtually displayed images on the screen, such as turning of a knob, moving of a slider, throwing a switch etc.

Such controls are not totally physical, as you don't feel the knob, so to speak. But they are not totally virtual either, as you turn it or other wise actuate the control just as if it was physical. For maximum effect, the computer should update the display as you make the move, so that you at least get visual feedback of the knob turning. You could also get an appropriate sound if desired, for example from speaker **950**, like an increase in pitch of the sound as the knob is "moved" clockwise.

FIG. **10**

The above control aspects can in some forms be used in a car as well even with a small display, or in some cases without the display.

Or it can be a real knob which is sensed, for example by determining position of a target on a steering wheel and the fingers turning it tracked (as disclosed in co-pending application references).

For example, consider car steering wheel rim **1000** in FIG. **10A**. In particular, consider hinged targeted switch, **1010** (likely in a cluster of several switches) on or near the top of the wheel, when the car is pointed straight ahead, and actuated by the thumb of the driver **1011**. A camera **1020** located in the headliner **1025**, and read out by microcomputer **1025** senses representative target **1030** on switch **1010**, when the switch is moved to an up position exposing the target to the camera (or one could cover the target with ones fingers, and when you take a finger off, it is exposed, or conversely one can cover the target to actuate the action).

The camera senses that target **1010** is desired to be signaled and accordingly computer **1025** assures this function, such as turning on the radio. As long as the switch stays in this position, the radio is on. However other forms of control can be used where the switch and target snap back to an original position, and the next actuation, turns the radio off. And too, the time the switch is actuated can indicate a function, such as increasing the volume of the radio until one lets off the switch, and the target is sensed to have swung back to its original position and the increase in volume thus terminated.

In operating the invention in this manner, one can see position, velocity, orientation, excursion, or any other attribute of actuation desired. Because of the very low cost involved in incremental additions of functions, all kinds of things not normally sensed can be economically provided. For example the position of a datum **1040** on manually or alternatively automatically movable plastic air outlet **1041** in the dashboard **1042** can be sensed, indicative of the direction of airflow. The computer **1025** can combine this with other data concerning driver or passenger wishes, other outlets, air temperature and the like, to perfect control of the ambiance of the car interior.

It is also noted that the same TV camera used to sense switch positions, wheel position, duct position, seat position (for example using datum **1045**), head rest position (for example using datum **1046**), and a variety of other aspects of physical positions or motions of both the car controls and the driver or passengers. And it can do this without wires or other complicating devices such as rotary encoders which otherwise add to the service complexity and cost.

When the camera is located as shown, it can also see other things of interest on the dashboard and indeed the human driver himself, for example his head **1048**. This latter aspect has significance in that it can be used to determine numerous aspects such as:

1. The identity of the driver. For example, if a certain band of height isn't reached, such as point P on the drivers head, the ignition can be interlocked. Much simpler than face recog-

IPR2021-00920
Apple EX1001 Page 30

US 7,933,431 B2

15

nition, but effective if properly interlocked to prevent repeated retries in a short time period.

2. The position of the head of the driver in case of an accident. As detailed in reference **4**, a camera or cameras can be used to determine head location, and indeed location of the upper torso if the field of view is large enough. This information can be used to control airbag deployment, or head rest position prior to or during an accident (noting too that headrest position can also be monitored without adding any hardware). Particularly of interest is that the pixel addressing camera of the invention can have the frequency response to be useful in a crash, sensing the movement of the person (particularly severe if unrestrained) within a millisecond or two, and providing a measure of the position for airbag deployment. Additional cameras may also be used to aid the determination, by providing other views or observing other features, for example.

Using a pixel addressing camera for camera **1020** confers additional advantages. For example consider the image of the car interior produced by the camera lens **1021**, on matrix of pixels **1061**, whose addressing and processing is controlled by computer **1025**. In the first instance one can confine the window of view of a certain group of pixels of the total matrix **1061** to be only in the region of the steering wheel, as in window **1065** shown. This allows much faster readout of the more limited number of pixels, and thus of the steering wheel switches, at the expense of not seeing anywhere else in that particular reading. But this may be desirable in some cases, since it may only be required to scan for heater controls or seat positions, every 10 seconds say, while scanning for other more immediate items a hundred times per second or more. A good example are safety related functions. 5 per second might suffice for seeing where the turn signal or windshield washer control was, as an example. Window 1066 dotted lines is illustrative of a window specialized for head, headrest and seat positions, say.

Scans in certain areas of the image can also depend on information obtained. For example one may initiate a scan of a control position, based on the increasing or decreasing frequency of an event occurrence. For example if the persons head is in a different location for a significant number of scans made at 15 second intervals for example, then in case of a crash, this data could be considered unreliable. Thus the camera window corresponding to pixels in the zone of the head location **1048** could be scanned more frequently henceforward, either until the car stopped, or until such action settled down for example. Such action is often the case of a person listening to rock music, for example.

Similarly, if someone is detected operating the heater controls, a scan of predominately heater function controls and related zones like air outlets can be initiated. Thus while normal polling of heater controls might be every 2 seconds say, once action is detected, polling can increase in the window(s) in question to 40 times per second for example. The detection of action can be made first via the camera, or via input from some other input device such as a convention heater knob and electric circuit operable therewith.

Scans in certain areas of the image can also depend on information obtained in other areas of scan, or be initiated by other control actions or by voice. For example, if hard deceleration was detected by an accelerometer, but before a crash occurred, the camera could immediately be commanded to begin scanning as fast as possible in the region of the image occupied by the driver and/or any other humans in its field of view. This would be for the purpose of monitoring movements in a crash, if a crash came, in order to deploy an airbag for example.

16

One might utilize the invention to actuate a function, based on positions of people or other objects in the vehicle. As one example, suppose the drivers hand is resting on a console mounted gear lever. By scanning the image of this region, one can determine from the image the position of the console shift lever, and use the image thereof to control gear change via computer **1025**. However if the driver rests his hands on the windshield wiper stalk, it could in the same manner, become a column mounted gear lever so to speak. Or just be used for up down gear changes, like a paddle shifter on a racing car. In fact in the latter sense, the camera could be instructed to detect ones finger or hand movement to do this function for example, wherever one desired to rest ones hand (within the camera field of view at least). This function is also useful for physically disabled persons wishing to drive the car. And it can be different for different persons as well, via programming of the control functions associated with any given hand, switch or other position or movement.

FIG. **10**B illustrates alternative types of control mechanisms which can be used with the invention, in this case illustrated on the steering wheel of a car, although as can be appreciated, any suitable function or location may be used or created. And too, combinations of functions can be used. The invention is generic to car steering wheel controls, dishwashers, audio systems in ones home, heating and air conditioning elements and virtually all other forms of human related control functions. The key is that the camera computer combination makes a very inexpensive way to share a wide variety of functions with one or just a few basic systems and over a large population base.

As shown in FIG. **10**B, the steering wheel **1070** has two additional types of controls visible to camera **1020** and able to be sensed and generate the appropriate control function via computer. These are rotating device **1072** built to rotate around the steering wheel rim circular cross section, and expose a continuously variable, or digital or step wise increment component to the camera. For example, three bars are shown, short **1075**, medium **1076**, and long **1077**. The computer senses which of the three is visible by comparing the length to pre-stored values (or taught values, see below), and causes the desired action to occur.

The second control **1080** is a sliding device **1081** which can be slid clockwise, or counterclockwise along a circumferential section of the steering wheel at the top, sides or whereever. As before, Its position is determined by camera **1020** again providing more data than just a switch up or down as shown before.

While illustrated on the steering wheel where it is readily at hand, it can be appreciated that the position of either the slider **1081** or the rotary device **1072**, or other similar devices for the purpose at hand could be elsewhere than the wheel, for example on stalk or on a piece of the dash, or other interior component indeed wherever a camera of the invention can view them without excessive obscuration by persons or things in the car. It need not be on a car either, controls of this type can be in the home or elsewhere. Indeed a viewable control datum can even be on a portable component such as ones key chain, phone, or article of clothing apparel, or whatever. Similarly the camera **1020** can view these items for other purposes as well.

The teach-ability of the invention is achieved by showing the camera the code marker in question (e.g., a short bar located on the wheel), and in the computer recording this data along with what it is supposed to signify as a control function for example, turn rear wiper on to first setting. This added functionality of being easily changed after manufacture is an

IPR2021-00920
Apple EX1001 Page 31

US 7,933,431 B2

17

important advantage in some cases, as for example, today after-market addition of wired in accessories is difficult.

Games Using the Invention

The co-pending referenced applications have described games which can be played with target sensing and touch screen based devices, typically but not necessarily, electro-optically based (e.g., TV camera). The cameras of the invention can be used to, for example: Sense the player or players in the game or portions thereof; sense objects held or manipulated by the players (e.g., a ball, a pistol); sense physical tokens used in the game, such as monopoly game tokens; and sense game accessories such as checkerboards, croquet wickets; compare positions of objects with respect to other objects or players.

In addition, the cameras can be used to take images which can be displayed also a major feature given the ability to create life size displays. And the computer of the invention can be used to control the presentation of background image data from stored images, or even images downloaded from the internet for example.

Some or all of these aspects will now be illustrated in some representative game illustrations (again noting that some more are in the co-pending applications).

FIG. 11 Board Game

Even today, popular board games such as Monopoly and the like are being provided in computer playable form, with the "board" represented on the screen of the computer monitor. The invention here builds on this by providing various added features which allow a physical nature of the game just as the real game, but with new aspects and providing physical game play which can be transmitted over the internet to others. These features also can be turned off or on at as desired.

In one version shown in FIG. 11A, the player tokens such as 1101 and 1102 are observed by camera of the invention 1110 placed directly overhead of the play board 1115, which can for example be a traditional monopoly board (chess board, checker board, etc). points on the board such as corners 1130, 1131, 1132, and 1133 can also be observed to establish a reference coordinate system for the computer 1140 to track the moves of the markers, either from their natural features, or from specialized datums thereon (e.g., retro-reflective hat top 1141 on marker 1101). For example a train shape 1102 of a marker can be called from memory, or taught to the computer by showing it to the camera. Rotation invariant image analysis programs such as the PATMAX program from Cognex company can be used to identify the marker in any normal orientation, together with its location on the board (the board itself can be taught to the computer using the camera, but is preferably called up from memory).

The board position and relative scale in the field of view is determined easily by knowing the spacing of the corner points 1130-1133 and using this to calibrate the camera (to provide extra contrast, the corners can have retro-reflective glass bead edging or beading as shown). For example if the points are spaced 20 inch on corners of the board, and the camera is positioned so that 20 inches occupies 80% of its field of view, then the field of view is 25 inches square (for a square matrix of camera pixels), and each pixel of 1000 pixels square, occupies 0.025 inches in the object field.

The play of both players (and others as desired) can be displayed on the monitor 1150, along with an image of the board (which also can be called from computer memory). But other displays can be provided as well. For example to lend more realism to the game, the display (and if desired sound from speaker 1155 connected to computer 1140) can also be programmed to show an image or sound that corresponds to

18

the game. For example, when the camera image has provided information that one player has landed on "Boardwalk" (the most valuable property) a big building could be caused to be shown on the screen, corresponding to it also suitable sounds like wow or something provided).

The camera can be used to see monopoly money (or other game accessories) as well, and to provide input so the computer can count it or do whatever.

A large, wall sized for example, screen can add added realism, by allowing one to actually get the feeling of being inside the property purchased, for example.

One of the exciting aspects of this game is that it can be used to turn an existing board game into something different. For example, in the original monopoly the streets are named after those in Atlantic City. By using the computer, and say a DVD disc such as 1160 stored images of any city desired can be displayed, together with sounds. For example, one could land on the Gritti Palace Hotel in Venice, instead of Board-walk. As shown in FIG. 11B, the TV camera senses the image of train marker 1101, and conveys this information to computer 1140, which causes the display 1150 and speaker of the invention to display the information desired by the program in use.

Making the game in software in this way, allows one to bring it home to any city desired. This is true of a pure (virtual) computer game as well, where the board only exists on the computer screen.

For added fun, for example in a small town context, local stores and properties could be used, together with local images, local personages appearing on the screen hawking them, and the like. A local bank could be displayed to take your money, (even with sounds of the local banker, or their jingle from the radio) etc. This makes the game much more local and interesting for many people. Given the ease of creating such local imagery and sounds with cameras such as digital camcorder 1151 used as an input of display imagery (e.g., from local celebrity 1158) to the game program, one can make any monopoly experience more interesting and fun at low cost.

The same holds true with other well known games, such as Clue, where local homes could be the mystery solving location, for example. One can also create games to order, by laying out ones own board. If one of the persons is remote, their move can be displayed on the screen 1150.

In the above, the display has been treated as sort of back-drop or illustration related. However, one can also create a whole new class of games in which the display and/or computer and the board are intertwined. For example as one takes a trip around the monopoly board, several chance related drawings opportunities occur during play. In this new game, such could be internet addresses one draws, which, via modem 1152, send the board game computer 1140 to any of a large number of potential internet sites where new experiences await, and are displayed in sight and sound on the display.

It should also be noted that the board can be displayed on the screen as well, or alternatively projected on a wall or table (from overhead). A particularly neat mixture of new and old is shown in FIG. 11B, where the board is displayed on a screen pointed vertically upward just as it would be on a table, and indeed in this case physically resident on a table 1165. The board is displayed (from software images or cad models of the board in computer 1166) on a high resolution table top HDTV LCD screen 1167 with a suitable protective plastic shield (not shown for clarity). Play can proceed just as before using physical tokens such as 1101 and 1102. In this case the

IPR2021-00920
Apple EX1001 Page 32

US 7,933,431 B2

19

display used to augment the game can actually be shown on the same screen as the board, if desired.

The TV camera **1110** in this context is used to see the tokens and any other objects of the game, the people as desired, and the play, as desired. The camera can be used to see the display screen, but the data concerning the board configuration displayed may be best imputed to the computer program from direct data used to create the display.

A beauty of the invention is that it allows the interaction of both computer generated images and simulations, with the play using normal objects, such as one might be accustomed to for example, or which give a "real" feel, or experience to the game.

FIG. **12** Sports Game

FIG. **12** illustrates a generic physical game of the invention using points such as **1201-1205** on the human (or humans) **1210** sensed by a TV camera such as stereo camera pair **1215** and transmitted to the computer of the invention **1220**. While points can be sensed in 2D, this illustration uses as stereo camera pair located on large screen display **1225** as shown to provide a unitary package built into the screen display (pointed out in other co-pending applications). In this particular instance a 3D display is illustrated, though this isn't necessary to obtain value and a good gaming experience. The human optionally wears red and green filter glasses **1235** such that red images on the screen are transmitted to one eye, green to another, so as to provide a 3D effect. Similarly crossed polarized filter glasses (with appropriate display), and any other sort of stereoscopic, or autostereoscopic method can also be used, but the one illustrated is simple, requires no connecting wires to the human, and can be viewed by multiple uses, say in a gym aerobics room.

The game is generic, in that it totally depends on the program of the computer. For example, it can be an exercise game, in which one walks on a treadmill **1250**, but the image displayed on screen **1225** and sound from speakers **1255** and **1266** carry one through a Bavarian forest or the streets of New York as one walks, for example.

Or it can be a parasail game in which one flies over the water near Wakiki beach, with suitable images and sounds. In any case action determined by sensing position, velocity acceleration, or orientation of points **1201-1206** on the player, **1210** is converted by computer **1220** into commands for the display and sound system. Note in the figure this player is shown viewing the same screen as the treadmill walker. This has been shown for illustration purposes, and it is unlikely the same game could be applied to both, but it is possible.

It is noted that fast sensing, such as provided by the pixel addressing camera method disclosed above is highly desirable to allow realistic responses to be generated. This is especially true where velocities or accelerations need to be calculated from the point position data present in the image (and in comparison to previous images).

For example, consider points **1201** and **1202** on player **1210**. If point **1201** moves to **1201**a, and **1202** moves to **1202**a indicative of a quick jerk movement to turn the displayed parasail, this movement could occur in a 0.1 second. But the individual point movements to trace the action would have to be sensed in 0.01 second or quicker for example to even approximately determine the acceleration and thus force exerted on the glider, to cause it to move.

It is important to note that the invention is not only generic in so far as the variety of these games are concerned, but it also achieves the above with virtually no mechanical devices requiring maintenance and creating reliability problems

20

which can eliminate profits from arcade type businesses especially with ever more sophistication required of the games themselves.

FIG. **13** Bar Game

FIG. **13** illustrates a game which is in a class of gesture based games, in which the flirting game of FIG. **15** is also an example. In such games one senses the position, velocity or acceleration of a part of a person, or an object associated with the person. This can also include a sequence of positions, itself constituting the gesture. The detected data is then related to some goal of the contest. Consider FIG. **13**, wherein the object in ones hand is monitored using the invention, and a score or other result is determined based on the position, velocity, orientation or other variable of the object determined. For example, in a bar one can monitor the position, orientation, and rate of change thereof of drinking glasses.

A two person game is illustrated, but any reasonable number can play as long as the targets can all be tracked sufficiently for the game (in one test over 200 targets were acquired, but as can be appreciated this uses most of the field of view of the camera, and thus speed improvements made possible by pixel addressing become more difficult.

As shown, a single camera **1301** observes one or more targets such as **1305** on glass **1310** held by contestant **1315**, and target **1320** on glass **1325** of contestant **1330**. On a signal, each drinks, and a score is calculated by program resident in computer **1350** based on the time taken to raise the glass, and place it back empty on table **1355**. A display of the score, and an image desired, for example of the winner (taken with camera **1301** or another camera), or a funny image called from computer memory, is displayed on monitor display **1370**.

If the glass features are sufficiently distinct for reliable and rapid acquisition and tracking, for example as might be provided by an orange color, or a distinct shape, then specialized target features are not required.

Alternatively the velocity, path of movement of the glass (or other object), acceleration, or any other variable from which target data is sufficient to calculate, can be used to determine a score or other information to be presented or used.

FIG. **14**

The referenced co-pending applications have described a game where by laser pointers can be used to designate images on a TV screen. In this case of FIG. **14**A, the TV camera of the invention such as **1410** is used in a two player game to see laser pointer spots such as **1420** and **1421** projected by players **1430** and **1431** respectively, using laser pointers **1440** and **1441** respectively. When one player's spot hits the other, the event is recorded in memory of computer **1450** for further analysis and display.

In a somewhat different context, a person can use a laser pointer to point at an object to designate it for some purpose, for example for action. For example consider FIG. **14**B, in which housewife **1460** who points with laser pointer **1462** so as to provide a laser spot **1465** on dishwasher **1470**. TV camera of the invention **1475** in corner of the kitchen **1480** picks up all laser spots in an image of the room (made easier to process in terms of signal to background imagery if one locates a laser wavelength band-pass interference filter **1481** in front of the TV camera as shown) and compares via computer **1483**, the location of the spot detected in the image to stored memory locations of objects such as the dishwasher **1470** or fridge **1485** in the camera field of view, so as to identify the object needing action. In this case too, housewife may signal via a spatially variant laser pointer projection image (see copending referenced applications for further

IPR2021-00920
Apple EX1001 Page 33

US 7,933,431 B2

21                                           22

examples in other applications), or a series of spots in time, what action is desired, for example to turn the washer on. In this case the computer **1483** can cause a command to do so to be sent to the washer.

Any one with a simple laser pointer can make these commands effective. No learning is needed just point at the item desired, with the TV camera and computer of the invention acquiring the data and interpreting it. This is much simpler than remote controls of today, and a major advantage for those who have difficulty or inclination to learn complex electronic devices and procedures. It should be noted that these pointing procedures can easily be combined with voice recognition to further define the desired control activity for example inputting the housewife's voice in this example by virtue of microphone **1476**.

The stored locations can be taught. For example in a setup mode, one can point a laser pointer at the dishwasher, and indicate to the computer that that spot is the dishwasher. The indication can be provided by keyboard, voice recognition or any other means that is satisfactory.

Clearly other items can be monitored or controlled in this manner. The camera can also detect optical indications provided by other means, for example lights in the appliance itself. And one can detect whether light have been left on at night (or not left on) and cause them to be turned off or on as desired.

Such a camera if it is responsive to normal illumination as well as that of the laser wavelength, can also be used to see movements and locations of people. For example, it can look at the top of the stove, and assure that no movement is near the stove **1486**, or objects on it if programmed to do so, thus sounding an alarm if an infant should get near the stove, for example.

The housewife in the kitchen can also point at a board on which preprogrammed actions are represented. For example consider board **1490**, shown in greater detail in FIG. 14C, in which 3 squares **1491-1493** are to represent different functions. Thus if **1491** is programmed (via keyboard, voice or whatever) to represent turning on the clothes dryer in the laundry, when the TV camera sees, and via the computer, identifies spot **1496** projected by the user on square **1491**, it causes the dryer to turn on. Operated in this manner, the board **1490**, in combination with a TV camera of the invention (such as **1475** or a more dedicated one for the board alone) and computer such as **1483** can be considered a form of touch screen, where the user, in this case in the kitchen can point at a portion of the board with a finger, or a laser pointer, and register a choice, much like touching an icon on a conventional computer touch screen.

Similarly, squares or other zones representing choices or the like can be on the item itself. For example, a stove can have four areas on its front, which can be pointed at individually for control purposes, what ever they are (e.g., representing heat settings, burner locations or the like). For security, it could be that only a coded sequence of laser pulses would be seen, or as pointed out in co-pending reference Ser. No. 60/133,673, a spatial code, for example representing the user such as an initial could be projected, and sensed on the object by the TV camera.

The laser pointer can be held in the hand of the user, or, like **1497** attached for example to a finger, such as forefinger **1498**. Or it can be on or in another object, desirably one which is often hand held in the normal course of work, such as a TV remote control, a large spoon, or the like. Or using other aspects of the invention, the finger of the user can be observed to point directly, and the object being pointed at determined. For example if finger **1498** is moved 4 times, it could indicate

to the TV camera and thence computer that channel four was desired on a TV display not shown.

If a special pointer is used, it can be any workable optical device, not necessarily a laser. The camera and computer of the invention can also be used to observe the user pointing directly, and compute the pointing vector, as has been described in my co-pending applications.

FIG. **15** A "Flirting" Game

Another game type is where the camera looks at the human, and the humans expressions are used in the game. In this case it is facial expressions, hand or body gestures that are the thing most used.

For example, one idea is to have a scene in a restaurant displayed on a display screen **1500**, preferably a large HDTV screen or wall projection to be as lifelike as possible, and preferably life size as well which lends extra realism to some games, such as this one due to the human element involved.

Let us consider that seated at the table in the restaurant displayed on the screen is a handsome man **1501** whose picture (likely a 3D rendered animation, or alternatively photo-imagery called from memory), and the goal for the girl **1510** playing the game is to flirt with this man until he gets up and comes over to say hello, ask her out or what ever (what he does, could be a function of the score obtained, even!).

Player **1510** seated at table **1511** (for authenticity, for example) is observed by TV camera **1515** (or stereo pair as desired, depending whether 3D information is thought required) and computer of the invention **1520**, which through software determines the position of eyebrows, lips, hands, fingers and any other features needed for the game. If necessary, specialized targets can be used as disclosed herein and elsewhere to augment this discrimination, for example such as optically contrasting nail polish, lipstick, eyeliner or other. Contrast can be in a color sense, or in a reflectivity sense such as even retro-reflective materials such as Scotchlite 7615 by 3M company. Even special targets can be used to enhance expressions if desired.

This can be a fun type game, as the response of the displayed person can be all kinds of things even contrary to the actual gestures if desired. Sounds, such as from speaker **1530** can also be added. And voice recognition of players words sensed by microphone **1550** can also be used, if verbal as well as expressive flirting is used.

While the game here has been illustrated in a popular flirting context, it is more generally described as a gesture based game. It can also be done with another contestant acting as the other player. And For example, the contestants can be spaced by the communication medium of the internet. The displayed characters on the screen (of the other player) can be real, or representations whose expressions and movements change due to sensed data from the player, transmitted in vector or other form to minimize communication bandwidth if desired.

Other games of interest might be:

"Down on the Farm" in which a farmer with live animals is displayed on a life size screen, and the children playing the game are to help the farmer by calling the animals to come over to them. This would use recognition of voice and gesture to make the animal images move and make sounds.

A player can find someone in a display and point at him, like the "Whereas Waldo" puzzle game. Then the subject moves, child runs to peek at him, and to find him, say running down a street whose image is displayed on the screen.

One can also use the camera of the invention to monitor the progress made by a child building blocks, and show an Video

IPR2021-00920
Apple EX1001 Page 34

US 7,933,431 B2

23

displayed image of a real skyscraper progressing as he builds his little version. Note the benefit of group activity like a board game and children's play with each other.

FIG. **16**

FIG. **16** illustrates a version of the pixel addressing camera technique wherein two lines on either side of a 1000 element square array are designated as perimeter fence lines to initiate tracking or other action.

Some "pixel addressing" cameras such as the IVP MAPP 2500 512×512 element camera, are smart, that is can process on the same chip. However, in some cases the control of such a camera may not allow one to actually read just one pixel, say, but rather one must read the whole line on which the pixel rests. Now some processing can be in parallel such that no speed is lost, at least in many instances.

If however, one does have to read a whole line serially into a computer portion, then to fully see a 10×10 pixel round target say, one would have to read at least 10 lines.

If two targets both were located on the same lines, the time involved to read would be the same.

In the same vein, if lines of data must be scanned, then the approach of **2b** wherein every 20th pixel say is interrogated can be specialized to having such pixels fall on scan lines wherever possible. And where one is restricted to reading all pixels on a scan line and where a target entry zone is anticipated, one can have a scan line oriented to be crossed by such entry. For example in FIG. **16**, the two lines **1601** (line of pixels **3**) and **1602** (line of pixels **997**) of a 1000×1000 element pixel array **1610** are designated as perimeter fence lines, to trigger a target tracking or other function on the entry of a target image on to the array, such as **1615** from either the right or left side in the drawing. This is often the case where entry from top or bottom is precluded by constraints of the application, such as a table top at the bottom, or the height of a person at the top. Or in a stereo example such as FIG. **6**, the baseline defines the direction of excursion of a target as z is varied again calling for crossing of scan lines out of the plane of the paper at some point.

The invention herein has provided an exciting method by which common board games can become more fun. The invention provides a link with that past, as well as all of the benefits of the video and computer revolution, also via the internet.

It is envisioned that the same approach may be applied to many card games as well. It is also thought that the invention will find use in creating ones own games, or in downloading from the internet others creations. For example, common everyday objects can become the tokens of the games, and taught to the game computer by presenting them to the video camera. Similarly, the people playing the game can be taught, including their names and interests.

FIG. **17**

FIG. **17** illustrates a 3D acoustic imaging embodiment of the invention which at low cost may generate accurate 3D images of the insides of objects, when used in conjunction with ultrasonic transducers and particularly a matrix array of ultrasonic transducers.

As shown in FIG. **17**A, the position in xyz of the ultrasonic imaging head **1700** on wand **1701** held in a users hand **1702** is monitored electro-optically as taught in FIG. **1**, using a single camera **1710** and a simple four dot target set **1715** on the head **1700** at the end of the transducer wand **1701** in contact with the object to be examined **1720**. Alternatively, as also taught in FIG. **1**, a stereo pair for example providing higher resolution in angle can be employed.

Computer **1725** combines ultrasonic ranging data from the ultrasound transducer head **1700** and from the sensor of trans-

24

ducer location (in this case performed optically by camera **1710** using the optically visible targets on the transducer head) in order to create a range image of the internal body of the object **1720** which is thus referenced accurately in space to the external coordinate system in the is case represented by the camera co-ordinates xy in the plane of the TV camera scan, and z in the optical axis of the camera.

In many cases it is also desirable to know the pointing angles of the transducer. One instance is where it is not possible to see the transducer itself due to obscuration, in which case the target may alternately be located at the end **1704** of the wand for example. Here the position and orientation of the wand is determined from the target data, and the known length of the wand to the tip is used, with the determined pointing angle in pitch and yaw (obtained from the foreshortening of the target spacings in the camera image field) to calculate the tip position in space.

This pitch and yaw determination also has another use however, and that is to determine any adjustments that need to be made in the ultrasonic transduction parameters or to the data obtained, realizing that the direction of ultrasound propagation from the transducer is also in the pointing direction. And that the variation in ultrasound response may be very dependent on the relation of this direction **1730** with respect to the normal **1735** of the surface **1736** of the object (the normal vector is shown for clarity pointing inward to the object).

The difference in direction can be calculated by using the TV camera (which could be a stereo pair for greater angular resolution) as well to determine the surface normal direction. This can, for example, be done by placing a target set such as **1740** on the surface in the field of the camera as shown. This can be dynamically or statically accomplished using the photogrammetric method described in the Pinkney references.

Differences in direction between the surface normal and the transducer pointing direction are then utilized by software in the computer **1725** of the invention in analysis of the ultrasound signals detected. The pointing angle and the position of the transducer on the surface of the object are used by the computer in predicting the location of various returns from internal points within the object, using a suitable coordinate transformation to relate them to the external coordinate reference of the TV camera.

All data, including transducer signals and wand location is fed to computer **1725** which then allows the 3D image of the inside of the body to be determined as the wand is moved around, by a human, or by a robot. This is really neat as all the images sequentially obtained in this manner can be combined in the computer to give an accurate 3D picture **1745** displayed on monitor **1750**.

In one preferred embodiment as shown in FIG. **17**C, the transducer head **1700** is comprised of a matrix **1755** of 72 individual transducer elements which send and receive ultrasound data at for example, 5 MHZ. This allows an expanded scan capability, since the sensor can be held steady at each discrete location xyz on the object surface, and a 3D image obtained with out movement of the transducer head, by analyzing the outputs of each of the transducers. Some earlier examples are described in articles such as: Richard E. Davidsen, 1996 IEEE Ultrasonics Symposium, A Multiplexed Two-Dimensional Array For Real Time Volumetric and B-Mode; Stephen W. Smith, 1995 IEEE Ultrasonics Symposium, Update On 2-D Array Transducers For Medical Ultrasound, 1995.

If the wand is now moved in space, fine scan resolution is obtained, due to the operation of the individual elements so positioned with out the need to move the wand in a fine pitch

IPR2021-00920
Apple EX1001 Page 35

US 7,933,431 B2

25

manner to all points needed for spatial resolution of this order. This eases the operators task, if manually performed, and makes robotization of such examination much easier from a control point of view.

Consider FIG. 17B which illustrates a transducer as just described, also with automatic compensation at each point for pointing angle, robotically positioned by robot, **1785** with respect to object **1764**. In this case a projection technique such as described in U.S. Pat. No. 5,854,491 is used to optically determine the attitude of the object surface, and the surface normal direction **1760** from the position of target set **1765** projected on the surface by diode laser set **1770**, and observed by TV Camera **1775** located typically near the working end of the robot. Differences between the normal direction and the transducer propagation direction (typically parallel to the housing of the transducer) is then used by computer **1777** to correct the data of the ultrasonic sensor **1780** whose pointing direction in space is known through the joint angle encoders and associated control system **1782** of robot **1785** holding the sensor. Alternatively the pointing direction of this sensor can be monitored by an external camera such as **1710** of FIG. **17A**.

It should be noted that the data obtained by TV camera **1775** concerning the normal to the surface and the surface range from the robot/ultrasonic sensor, can be used advantageously by the control system **1782** to position the robot and sensor with respect to the surface, in order to provide a fully automatic inspection of object **1764**. Indeed the camera sensor operating in triangulation can be used to establish the coordinates of the exterior surface of object **1764** as taught for example in U.S. Pat. No. 5,854,491, while at the same time, the acoustic sensor can determine the range to interior points which can be differentiated by their return signal time or other means. In this manner, a complete 3D map of the total object, interior and exterior, can be obtained relative to the coordinate system of the Robot, which can then be transformed to any coordinate system desired.

The invention has a myriad of applications beyond those specifically described herein. The games possible with the invention in particular are limited only by the imagination.

What is claimed is:

1. A method for controlling a handheld computing device comprising the steps of:
 holding said device in one hand;
 moving at least one finger in space in order to signal a command to said device;
 electro-optically sensing light reflected from said at least one finger using a sensing means associated with said device;
 determining from said sensed light the movement of said finger, and
 using said sensed finger movement information, controlling said device in accordance with said command.

2. A method according to claim **1**, wherein at least one camera is utilized to effect said electro-optical sensing.

3. A method according to claim **1**, including the further step of acquiring an image of at least a portion of the user of the device.

4. A method according to claim **1**, wherein said movement is sensed in 3 dimensions.

5. A method according to claim **1**, wherein movement of one finger relative to another finger is sensed.

6. A method according to claim **1**, wherein movement of two fingers is sensed.

7. Handheld computer apparatus comprising:
 a housing;
 a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object;

26

computer means within said housing for analyzing said image to determine information concerning a position or movement of said object; and
 means for controlling a function of said apparatus using said information.

8. Apparatus according to claim **7**, wherein said object is a finger.

9. Apparatus according to claim **7**, further including a display function which is controlled.

10. Apparatus according to claim **9**, wherein said display is 3D display.

11. Apparatus according to claim **7**, further including means for transmitting information.

12. Apparatus according to claim **7**, further including a light source for illuminating said object.

13. Apparatus according to claim **7**, wherein said apparatus is a cellular phone.

14. A method for controlling a handheld computing device comprising the steps of:
 providing a computer within said device;
 associating a camera with said device, said camera viewing at least a portion of the body of a user operating said device or an object held by said user, in order provide image data concerning said portion or object;
 using said computer, analyzing said image data to determine information concerning a user input command; and
 from said determined information, controlling a function of said device.

15. A method according to claim **14**, wherein reflected light from said body portion or object is imaged by said camera.

16. A method according to claim **14**, wherein said information includes the position of the portion or object.

17. A method according to claim **14**, wherein said information includes the change in position of the portion or object.

18. A method according to claim **14**, wherein said information includes the velocity or path of the portion or object.

19. A method according to claim **14**, wherein said information is obtained in 3 dimensions.

20. A method according to claim **14**, wherein said information includes the pointing direction of the portion or object.

21. A method according to claim **14**, wherein a display is controlled.

22. A method according to claim **21**, wherein a virtual image on said display is moved or changed.

23. A method according to claim **21**, wherein said display is a 3D display.

24. A method according to claim **23**, wherein said display is a stereoscopic display.

25. A method according to claim **14**, including the further step of transmitting data to a further device.

26. A method according to claim **14**, wherein said camera operates at 30 frames per second or greater.

27. A method according to claim **14**, wherein said controlled function relates to a game.

28. A method according to claim **14**, including the further step of acquiring a picture of the user of the handheld device.

29. A method according to claim **14**, wherein two fingers of the user are sensed and a pinching action determined.

30. A method according to claim **14**, wherein said body portion indicates an expression of said user.

31. A method according to claim **14**, wherein said information provides an aid to speech recognition.

\* \* \* \* \*

IPR2021-00920
Apple EX1001 Page 36

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

March 20, 2023
-----------------

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**APPLE, INC., LG ELECTRONICS, INC.,**
**LG ELECTRONICS U.S.A., INC., AND GOOGLE LLC,**
**Petitioner,**

**v.**

**GESTURE TECHNOLOGY PARTNERS, LLC,**
**Patent Owner.**

**Case: IPR2021-00920**[1]
**Patent No. 7,933,431 B2**

By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

*/s/ Michael W. Domenico*
--------------------------
Certifying Officer



---

[1] *Inter Partes* Review Nos. IPR2022-00091 and IPR2022-00359 were joined with *Inter Partes* Review No. IPR2021-00920.

## Prosecution History for IPR2021-00920

| Date | Document |
|---|---|
| 05/21/2021 | Petition for *Inter Partes* Review |
| 05/21/2021 | Petitioner's Power of Attorney for *Inter Partes* Review |
| 06/07/2021 | Notice of Accord Filing Date |
| 06/08/2021 | Patent Owner's Mandatory Notices |
| 06/08/2021 | Patent Owner's Power of Attorney |
| 06/08/2021 | Patent Owner's Mandatory Notices |
| 06/08/2021 | Patent Owner's Power of Attorney |
| 09/07/2021 | Patent Owner's Response to The Petition for *Inter Partes* Review |
| 09/27/2021 | Petitioner's Authorized Preliminary Reply |
| 10/01/2021 | Patent Owner's Authorized Preliminary Sur-Reply |
| 11/03/2021 | Certificate of Service |
| 12/06/2021 | Institution Decision:  Grant |
| 12/06/2021 | Order:  Scheduling Order |
| 02/17/2022 | Panel Change Order |
| 02/28/2022 | Patent Owner's Response to The Petition for *Inter Partes* Review |
| 03/17/2022 | Institution decision and grant of joinder, IPR2022-00091 |
| 04/19/2022 | Notice of Deposition of B. Occhiogrosso |
| 05/06/2022 | Institution decision and grant of joinder, IPR2022-00359 |
| 05/23/2022 | Petitioner's Reply to Patent Owner's Response |
| 07/06/2022 | Patent Owner's Sur-Reply to Petitioner's Reply in the *Inter Partes* Review |
| 07/18/2022 | Patent Owner's Mandatory Notices |
| 07/25/2022 | Petitioners Request for Oral Argument |

| Date | Document |
|------|----------|
| 07/25/2022 | Patent Owner's Request for Oral Argument |
| 07/26/2022 | ORDER Setting Oral Argument |
| 09/08/2022 | Petitioner's Updated Exhibit List |
| 09/08/2022 | Patent Owner's Updated Exhibit List |
| 11/28/2022 | Other:  Hearing transcript |
| 11/30/2022 | Final Written Decision:  original |

## Prosecution History for IPR2022-00091

| Date | Document |
|---|---|
| 11/05/2021 | Petition for *Inter Partes* Review |
| 11/05/2021 | Power of Attorney |
| 11/05/2021 | Motion for Joinder |
| 11/19/2021 | Notice:  Notice filing date accorded |
| 11/26/2021 | PATENT OWNER'S MANDATORY NOTICES |
| 11/26/2021 | Patent Owner's Power of Attorney |
| 02/18/2022 | Patent Owner's Preliminary Response to the Petition for *Inter Partes* Review |
| 03/17/2022 | DECISION Granting Institution of *Inter Partes* Review; Granting Motion for Joinder |

3

Prosecution History for IPR2022-00359

| Date | Document |
|---|---|
| 01/06/2022 | Petition for *Inter Partes* Review |
| 01/06/2022 | Petitioner's Power of Attorney and Designation of Lead and Backup Counsel |
| 01/06/2022 | Motion for Joinder to *Inter Partes* Review IPR2021-00920 |
| 01/12/2022 | Notice:  Notice filing date accorded |
| 01/18/2022 | Patent Owner's Mandatory Notices |
| 01/18/2022 | Patent Owner's Power of Attorney |
| 05/06/2022 | DECISION Granting Institution of *Inter Partes* Review; Granting Motion for Joinder |

4

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.
Petitioner

v.

GESTURE TECHNOLOGY PARTNERS LLC
Patent Owner

———————

Case No. IPR2021-00920
U.S. Patent No. 7,933,431

———————

**PETITION FOR *INTER PARTES* REVIEW
OF U.S. PATENT NO. 7,933,431**

## TABLE OF CONTENTS

I. INTRODUCTION ............................................................... 1

II. SUMMARY OF THE '431 PATENT ............................................. 1

A. THE '431 PATENT'S ALLEGED INVENTION ................................... 1
B. THE '431 PATENT'S PROSECUTION .......................................... 2
C. A PERSON HAVING ORDINARY SKILL IN THE ART ........................... 3

III. REQUIREMENTS FOR IPR UNDER 37 C.F.R. § 42.104 .................. 3

A. STANDING UNDER 37 C.F.R. § 42.104(A) ..................................... 3
B. CHALLENGE UNDER 37 C.F.R. § 42.104(B) AND RELIEF REQUESTED ............ 4
C. CLAIM CONSTRUCTION UNDER 37 C.F.R. § 42.104(B)(3) ............................. 5

IV. THE CHALLENGED CLAIMS ARE UNPATENTABLE ............... 12

A. GROUND 1: CLAIMS 1-4, 7-9, 11-22, 25, 26, AND 28 ARE OBVIOUS UNDER PRE-AIA 35 U.S.C. § 103 OVER NUMAZAKI IN VIEW OF THE KNOWLEDGE OF A PHOSITA ......................................... 12
B. GROUND 2: CLAIMS 5-6 AND 29 ARE OBVIOUS UNDER PRE-AIA 35 U.S.C. § 103 OVER NUMAZAKI IN VIEW OF DELEEUW .................................... 41
C. GROUND 3: CLAIMS 10, 23, 24, AND 27 ARE OBVIOUS UNDER PRE-AIA 35 U.S.C. § 103 OVER NUMAZAKI IN VIEW OF DELUCA ....................... 48
D. GROUND 4: CLAIMS 30 AND 31 ARE OBVIOUS UNDER PRE-AIA 35 U.S.C. § 103 OVER NUMAZAKI IN VIEW OF PETERS ........................... 57

V. DISCRETIONARY CONSIDERATIONS ........................................ 61

A. THE GENERAL PLASTICS FACTORS FAVOR INSTITUTION ................................. 61
B. THE FINTIV FACTORS FAVOR INSTITUTION .................................... 66

VI. CONCLUSION ............................................................... 75

VII. MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(A)(1) ............. 76

A. REAL PARTY-IN-INTEREST ................................................... 76
B. RELATED MATTERS ......................................................... 76
C. LEAD AND BACK-UP COUNSEL ............................................... 76

i

## I. INTRODUCTION

Petitioner Apple Inc. ("Petitioner") requests an *Inter Partes* Review ("IPR") of claims 1–31 (the "Challenged Claims") of U.S. Patent No. 7,933,431 ("the '431 Patent").

## II. SUMMARY OF THE '431 PATENT

### A. The '431 Patent's Alleged Invention

The '431 Patent describes computer devices that "optically sens[e] human input" using one or more cameras, contemplating applications in a "variety of fields such as computing, gaming, medicine, and education." *'431 Patent* (Ex. 1001), 2:7–17. A number of scenarios are described in which a user and or object held by a user are imaged in order to control a computer function, including multiple cameras mounted in a fixed display as depicted in Fig. 1A below:



*Id.* at Fig. 1A, 3:23-52 (describing cameras 100, 101, and 144).

1

The Challenged Claims, however, are limited to handheld devices that process

imaging of a person (or an object held by a person) to control a function of the

handheld device. *Id*. at 25:40-26:62. Fig. 8B below is the sole figure from the '431

Patent that depicts such a handheld device:



*FIG. 8B*

*Id*. at Fig. 8B, 12:59-13:25 (describing a handheld device with a camera that captures

images of objects, including people). With this handheld device, the '431 Patent

explains that "it is [] possible to acquire features of an object and use it to determine

something." *Id*. at 13:5-7. For example, the device can be used for object recognition

or to automatically read text printed on the object. *Id*. at 13:8-21.

**B.    The '431 Patent's Prosecution**

The Application that resulted in the '431 Patent was filed on July 12, 2010.

The Application claims priority to provisional patent application No. 60/142,777,

filed July 8, 1999. *Id*. at (22), (60). For purposes of this petition and without waiving

2

its right to challenge priority in this or any other proceeding, Petitioner adopts July 8, 1999 as the invention date for the Challenged Claims.

The Challenged Claims were not subject to any prior art-based office actions. *'431 File History* (Ex. 1002), 80-83.

### C.    A Person Having Ordinary Skill in the Art

A person having ordinary skill in the art ("PHOSITA") at the time of the '431 Patent would have had at least a bachelor's degree in electrical engineering or equivalent with at least one year of experience in the field of human computer interaction. Additional education or experience might substitute for the above requirements. *Bederson Dec.* (Ex. 1008), ¶¶ 30-32.

## III.    REQUIREMENTS FOR IPR UNDER 37 C.F.R. § 42.104

### A.    Standing Under 37 C.F.R. § 42.104(A)

Petitioner certifies that the '431 Patent is available for IPR and that Petitioner is not barred or estopped from requesting an IPR challenging the claims of the '431 Patent. Specifically, (1) Petitioner is <u>not</u> the owner of the '431 Patent, (2) Petitioner has <u>not</u> filed a civil action challenging the validity of any claim of the '431 Patent, and (3) this Petition is filed less than one year after the Petitioner was served with a complaint alleging infringement of the '431 Patent.

## B.    Challenge Under 37 C.F.R. § 42.104(B) and Relief Requested

In view of the prior art and evidence presented, claims 1–31 of the '431 Patent are unpatentable and should be cancelled. 37 C.F.R. § 42.104(b)(1). Further, based on the prior art references identified below, IPR of the Challenged Claims should be granted. 37 C.F.R. § 42.104(b)(2).

| Proposed Ground of Unpatentability | Exhibits |
|---|---|
| **Ground 1:** Claims 1-4, 7-9, 11-22, 25, 26, and 28 are obvious under pre-AIA 35 U.S.C. § 103 over U.S. Patent 6,144,366 to Numazaki, et al. ("*Numazaki*") in view of the knowledge of a PHOSITA | Ex. 1003 |
| **Ground 2:** Claims 5-6 and 29 are obvious under pre-AIA 35 U.S.C. § 103 over *Numazaki* in view of U.S. Patent No. 6,088,018 to De Leeuw, et al. ("*DeLeeuw*") | Ex. 1003, Ex. 1004, |
| **Ground 2:** Claims 10, 23, 24, and 27 are obvious under pre-AIA 35 U.S.C. § 103 over *Numazaki* in view of U.S. Patent No. 6,064,354 to DeLuca (*"DeLuca"*) | Ex. 1003, Ex. 1005, |
| **Ground 4:** Claims 30 and 31 are obvious under pre-AIA 35 U.S.C. § 103 over *Numazaki* in view of U.S. Patent No. 6,243,683 to Peters ("*Peters*") | Ex. 1003, Ex. 1006, |

Section IV identifies where each element of the Challenged Claims is found in the prior art. 37 C.F.R. § 42.104(b)(4). The exhibit numbers of the evidence relied upon to support the challenges are provided above and the relevance of the evidence to the challenges raised is provided in Section IV. 37 C.F.R. § 42.104(b)(5). **Exhibits 1001-1016** are also attached.

## C.    Claim Construction Under 37 C.F.R. § 42.104(B)(3)

In this proceeding, claims are interpreted under the same standard applied by Article III courts (i.e., the *Phillips* standard). *See* 37 C.F.R § 42.100(b); *see also* 83 Fed. Reg. 197 (Oct. 11, 2018); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*). Under this standard, words in a claim are given their plain meaning which is the meaning understood by a person of ordinary skill in the art in view of the patent and file history. *Phillips*, 415 F.3d 1303, 1212–13.

### a.  35 U.S.C. § 112(f) Limitations

Claims 7 and 11 include limitations that invoke 35 U.S.C. §112(f) ("112(f)"). 35 U.S.C. § 112(f) (limitations "may be expressed as a means . . . for performing a specified function *without the recital of structure, material, or acts in support thereof,* and such [limitation] shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."). "In making the assessment of whether the limitation in question is a means-plus-function term . . . [,] the essential inquiry is . . . whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015).

5

Corresponding structure for the means-plus-function limitation is identified below. Unless expressly discussed below, Petitioner proposes that the claimed functions (underlined in the headings below) require no construction beyond their express terms.

1. *Claim 7: a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object*

Although this limitation in Claim 7 recites "means," which raises a rebuttal presumption that 112(f) applies, a PHOSITA would have considered "camera means associated with said housing" to have a sufficiently definite meaning as the name for structure. *Bederson Dec.* (Ex. 1008), ¶ 36 (explaining that a PHOSITA would have understood that a camera means in the context of this claim conveys the class of optical image sensors—the component that obtains an image of an object). Indeed, all optical sensors obtain images by capturing light, so the claimed function is simply describing the general process that all optical sensors employ to obtain images of objects. *Id.* (explaining that the claimed function is describing the generic process common to all imaging). Because the limitation recites structure for performing the claimed function, it need not be construed pursuant to 112(f). *Williamson*, 792 F.3d at 1348-49.

6

In the event the Board disagrees and concludes that 112(f) does apply, Petitioner has shown in Proposed Ground 1 below that *Numazaki* utilizes a camera means that is the same or an equivalent of that disclosed in the '431 Patent.

   2. *Claim 7: computer means within said housing for <u>analyzing said image to determine information concerning a position or movement of said object</u>*

Where a limitation recites a specific function performed by a generic computer/processor, the Federal Circuit has repeatedly held that 112(f) applies and that the corresponding "structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm." *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999); *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1249 (Fed. Cir. 2005). Although light on details as to how specifically images are analyzed to determine positioning or movement of an object, the '431 Patent does disclose some details that inform how a general purpose computer is transformed into a special purpose computer for performing the claimed function.

Before addressing the structure, however, a brief clarifying point on the function is required. Claim 7 recites an "object positioned by a user operating said object" and "determin[ing] information concerning a position or movement of said object." Although the plain language suggests the "object" is separate from the user,

7

the function should be construed to capture both separate objects held/controlled by the user and also part of the user's body, such as a user's finger or hand. Dependent Claim 8 confirms this interpretation, additionally requiring "said object is a finger." *'431 Patent* (Ex. 1001), Claim 8. Consistent with this interpretation, the '431 Patent repeatedly teaches that objects can be a part of or a whole person. *See, e.g., id*. at 3:39-41 (discussing "object features" such as "a finger tip"), 3:48-50 (noting the system can capture "images of objects such as persons").

Turning to the structure, the '431 Patent generally teaches two techniques for analyzing images of objects to determine information concerning the object's position or movement. First, an artificial target may be placed on the object such that the system can identify the target to ascertain information about its location or movement. *See, e.g., id*. at 3:38-47 (describing circular and band targets on the object that may be "retro-reflective" and "features provided on clothing worn by the user (e.g., a shirt button 147 or polka dot 148)[.]"), 4:9-14 (describing "four special targets (e.g., glass bead retro-reflectors, or orange dots) 180-183 on the object 185 having known positional relationships relative to each other on the object surface, such as one inch centers"), 11:16-35 (describing different types of artificial features that may be used as targets). Second, features of the object itself may be used as a "target" with which the system can ascertain information about the object's location

8

or movement. *See, e.g.*, *id*. at 3:40-41 (noting the target "may be constituted by the object features themselves (e.g., a finger tip[)]"); 3:57-62 ("[W]here a target grouping, for example of three targets is used such as the natural features formed by the two eyes 164, 165 and nose 166 of a human 167. These features are roughly at known distances from each other, the data from which can be used to calculate the approximate position and orientation of the human face.").

With the target identified, the '431 Patent describes "tracking" the identified target in order to ascertain information about the object's movement. *Id*. at 5:2-23. Additional specific techniques are discussed for tracking movement. *See, e.g., id*. at 6:64-7:13 (describing subtracting sequential images to obtain the target image and a "blur" indicating a direction of target's movement), 8:40-59 (describing an embodiment in which changing target colors are used to track the object).

In sum, the corresponding structure for "computer means within said housing for analyzing said image to determine information concerning a position or movement of said object" includes a computer/processor programmed (1) to identify either natural or artificial features on an object as described in the excerpts discussed above or (2) to track the movement using one of the disclosed methods discussed in the preceding paragraph.

9

3. *Claim 7: means for <u>controlling a function of said apparatus
using said information</u>*

Because the limitation recites only "means" and no other terms that may

connote specific structure, 112(f) applies. As with the proceeding limitation, a

PHOSITA would have understood that controlling a function of the apparatus using

information about the object's location or movement is performed by a processor.

*Bederson Dec.* (Ex. 1008), ¶ 37. Accordingly, like the preceding limitation, the

corresponding structure for "means for controlling . . ." is a processor programmed

to perform the specific algorithms that accomplish this function. *WMS Gaming,* 184

F.3d at 1349.

There is limited disclosure in the '431 Patent that aligns with Claim 7's

handheld device associated with a camera that determines information concerning

position or movement of an object and controls an internal function with that

information. In fact, only the disclosure corresponding to Fig. 8B describes a

handheld device with an internal camera, but none of the functions described with

respect to this embodiment are performed based on the position or movement of an

imaged object. *'431 Patent* (Ex. 1001), 12:59-13:44 (describing an embodiment in

which the "camera and requisite computer . . . [are] in the handheld device" and

listing functions based on identifying an object, recognizing "datums on things," and

recognizing and reading text on things); *Bederson Dec.* (Ex. 1008), ¶ 37 (discussing

10

the same and concluding that none of the described functions related to the Fig. 8B handheld device are performed based on the position or movement of an imaged object).

There are, however, other disclosures of controlling functions based on the output of the camera means. For example, the '431 Patent describes controlling functions on a display by utilizing a laser pointer or by moving one's fingers, the movement and positioning of which is captured by a camera. '431 Patent (Ex. 1001), 13:46-67; *Bederson Dec.* (Ex. 1008), ¶ 37 (explaining that a PHOSITA would have understood the TV camera would capture the user's fingers to determine where they are pointing).

For purposes of the below Challenged Claims, the Petition assumes that corresponding structure for this limitation includes at least this Fig. 9 disclosure.

4. *Claim 11: means for <u>transmitting information</u>*

Because the limitation recites only "means" and no other terms that may connote specific structure, 112(f) applies. The '431 Patent describes a handheld device with a wireless cellular transceiver capable of transmitting information to a remote location:

> Another version has a camera and requisite computer (and or transmission capability to an external computer) in the handheld device, such as a cell phone or whatever. . . .

11

One function is just to acquire an image for transmission via for example the cell phones own connection. This is illustrated in FIG. 8B, where an image of object 849 acquired by camera 850 of cell phone 851 held by user 852 is transmitted over mobile phone link 853 to a remote location and displayed, for example.

*'431 Patent* (Ex. 1001), 12:59-13:3. Accordingly, the corresponding structure for this limitation includes at least a cellular transceiver.

## IV.    THE CHALLENGED CLAIMS ARE UNPATENTABLE

### A.    Ground 1: Claims 1-4, 7-9, 11-22, 25, 26, and 28 are obvious under pre-AIA 35 U.S.C. § 103 over *Numazaki* in view of the knowledge of a PHOSITA

*Overview of Numazaki*

U.S. Patent No. 6,144,366 to Numazaki et al. (*"Numazaki"*) (Ex. 1003) was filed on October 17, 1997 and is prior art to the '431 Patent under at least 35 U.S.C. § 102(e) (pre-AIA). *Numazaki* was not cited or considered during prosecution of the '431 Patent. *'431 Patent* (Ex. 1001).

*Numazaki* is generally directed to a method for detecting a gesture or the movement of a user's hand. *Numazaki* (Ex. 1003), Abstract, 4:9-40. *Numazaki* purports to have improved upon prior methods by using a controlled light source to illuminate the target object (e.g., the user's hand), a first camera unit (referred to by

12

*Numazaki* as a "photo-detection unit"),[1] and a second camera unit. *Id*. at 11:9-23.

This arrangement is illustrated in Fig. 2 below:



*Id*. at Fig. 2. A timing control unit is used to turn lighting unit 101 on (i.e., illuminating the target object) when the first camera unit is active and off when the second camera unit is active. *Id*. at 11:20-32. The result of this light control is the first camera unit captures an image of the target object illuminated by both natural light and the lighting unit 101 and the second camera unit captures an image of the

---

[1] A PHOSITA would have considered *Numazaki's* photo-detection units to be camera units. *Bederson Dec*. (Ex. 1008), ¶ 40 (explaining that *Numazaki* describes using CMOS or CCD sensor units at 15:24-16:19, which were two of the more common optical sensors used in camera units at the time).

13

target object illuminated by only natural light. *Id*. at 11:33-39. The difference between the two images—obtained by difference calculation unit 111—represents the "reflected light from the object resulting from the light emitted by the lighting unit 101." *Id*. at 11:43-51. This information is then used by feature data generation unit 103 to determine gestures, pointing, etc. of the target object that may be converted into commands executed by a computer. *Id*. at 10:57-66.

In an eighth embodiment, *Numazaki* describes implementing this structure in a handheld device such that "[a] position of a cursor 714 on the screen can be controlled by moving a finger 713 in front of this window 712." *Id.* at 52:5-16. This arrangement is illustrated in Fig. 79 below:

14



*Id.* at Fig. 79.

*Numazaki's* eighth embodiment incorporates "the information input generation apparatus of the present invention as described in the above embodiments." *Id*. at 50:21-24. A PHOSITA would have understood that the referenced information input generation apparatus is that illustrated in Fig. 2 and described in the corresponding disclosure. *Bederson Dec*. (Ex. 1008), ¶ 44 (explaining that *Numazaki* describes its controlled light and camera configuration as key to its invention and noting that *Numazaki* at 53:22-36 teaches that the eighth

15

embodiment uses the precise image difference calculation taught by Fig. 2 and its corresponding disclosure).

Because *Numazaki*, like the '431 Patent, discloses a camera system that may be controlled by human gesture input, *Numazaki* is in the same field of endeavor as the '431 Patent. *Compare Numazaki* (Ex. 1003), 10:8-13, 10:61-66, 52:20-32 (describing an "information input scheme in which . . . light is irradiated onto a target object from a light source, and [that] reflected light . . . is captured as an image, so that information on this target object such as its shape, motion, distance, etc. can be obtained," where the target object is a hand and the information obtained is a "gesture or a pointing according to the feature data extracted from the reflected light image of the hand" to "operate a computer" in a wrist watch embodiment) *with '431 Patent* (Ex 1001), Abstract (describing a "method and apparatus . . . to enable rapid TV camera and computer based sensing in . . . handheld devices"), 2:7-23 (describing the field of invention as "simple input devices for computers" that operate by "optically sensing a human input" such that the output of a "single or multiple TV cameras . . . is analyzed and used as input to a computer"). *Numazaki* is therefore analogous art to the '431 Patent. *Bederson Dec.* (Ex. 1008), ¶¶ 38-45.

16

*i.*    **Claim 1**

***[1(P)] A method for controlling a handheld computing device comprising the steps of:***

To the extent the preamble is limiting, *Numazaki* teaches a computer implemented method. In particular, *Numazaki* teaches a "method . . . for generating information input . . . capable of realizing a direct command type information input scheme by which the gesture or the motion can be inputted easily." *Numazaki* (Ex. 1003), 4:9-13.

*Numazaki's* eighth embodiment teaches "a compact portable information device equipped with the information input generation apparatus of the present invention, which is in a size that can be held by one hand" such that the "position of a cursor 714 on the screen can be controlled by moving a finger 713 in front of this window 712." *Id*. at 52:5-16. This arrangement is illustrated in Fig. 78 below:

17



*Id.* at Fig. 78.

**[1(a)] holding said device in one hand;**

As depicted in Fig. 78 below, *Numazaki's* handheld device is designed to be held in a hand:

18



*Id.* at Fig. 78.

**[1(b)] *moving at least one finger in space in order to signal a command to said device;***

In *Numazaki's* "compact portable information device," "a window 712 is provided for the lighting unit and the photo-detection sensor unit," which enables the "position of a cursor 714 on the screen [to] be controlled by moving a finger 713 in front of this window 712." *Id*. at 52:5-16. A PHOSITA would have understood that controlling a cursor on the handheld device is signaling a command. *Bederson Dec.* (Ex. 1008), ¶¶ 46-47 (noting that "command" is not precisely defined in the '431 Patent, discussing the Fig. 9 embodiment in which a user may control an

19

application by moving her fingers, and concluding that such control is "signaling a

command" within the meaning of this limitation).

***[1(c)] electro-optically sensing light reflected from said at least one finger using a
sensing means associated with said device; determining from said sensed light the
movement of said finger, and***

*Numazaki's* handheld device includes "a window 712 [] for the lighting unit

and the photo-detection sensor unit." *Numazaki* (Ex. 1003), 52:12-14. As described

with reference to Fig. 2, which is incorporated into the eighth embodiment as noted

above, *Numazaki* uses this light and camera arrangement to illuminate the target

object (e.g., the user's hand) in a controlled manner such that a precise image of the

user's hand and hand movement can be ascertained. *Id*. at 11:9-23. Specifically, a

timing control unit is used to turn lighting unit 101 on (i.e., illuminating the target

object) when the first camera unit is active and off when the second camera unit is

active. *Id*. at 11:20-32. The result of this light control is the first camera unit captures

an image of the target object illuminated by both natural light and the lighting unit

101 and the second camera unit captures an image of the target object illuminated

by only natural light. *Id*. at 11:33-39. The difference between the two images—

obtained by difference calculation unit 111—represents the "reflected light from the

object resulting from the light emitted by the lighting unit 101." *Id*. at 11:43-51. This

information is then used by feature data generation unit 103 to determine gestures,

20

pointing, etc. of the target object that may be converted into commands executed by a computer. *Id*. at 10:57-66.

**[1(d)] *using said sensed finger movement information, controlling said device in accordance with said command.***

As discussed above, *Numazaki's* "compact portable information device" allows the "position of a cursor 714 on the screen [to] be controlled by moving a finger 713 in front of [] window 712." *Id*. at 52:5-16.

### ii.    Claim 2

***A method according to claim 1, wherein at least one camera is utilized to effect said electro-optical sensing.***

As discussed above, a PHOSITA would have considered *Numazaki's* photo-detection units to be camera units. *Bederson Dec.* (Ex. 1008), ¶ 40 (explaining that *Numazaki* describes using CMOS or CCD sensor units at 15:24-16:19, which were two of the more common optical sensors used in camera units at the time). Indeed, with reference to its third embodiment, *Numazaki* expressly refers to its image sensing and gesture recognition technology as a "gesture camera." *Numazaki* (Ex. 1003), 29:4-8.

*Numazaki's* eighth embodiment incorporates "the information input generation apparatus of the present invention as described in the above embodiments." *Id*. at 50:21-24. A PHOSITA would have understood that the

21

referenced information input generation apparatus is that illustrated in Fig. 2 and described in the corresponding disclosure. *Bederson Dec*. (Ex. 1008), ¶¶ 48-49. The Fig. 2 apparatus includes "features data generation unit 103," (*Numazaki* (Ex. 1003), Fig. 2) and *Numazaki* explains that its third embodiment "gesture camera" is an "exemplary case of the feature data generation unit of the first embodiment." *Numazaki* (Ex. 1003), 29:4-6. Accordingly, a PHOSITA would have understood that *Numazaki's* third embodiment "gesture camera" one embodiment of the information input generation apparatus that *Numazaki* expressly incorporates into its eighth embodiment. *Bederson Dec*. (Ex. 1008), ¶¶ 48-49. Further, a PHOSITA would have been motivated to ensure the gesture camera described in the third embodiment is implemented in the eighth embodiment's handheld device. *Id*. Indeed, the primary function described with respect to the eighth embodiment is recognizing a user's finger-based gestures to control an application running on the handheld device. *Id*. The third embodiment's gesture camera is directed to accurately capturing a user's gestures and converting those into commands. *Id*. (discussing *Numazaki* at 29:1-30:5). Accordingly, a PHOSITA would have recognized that the third embodiment's gesture camera is well-suited to the gesture recognition and device control contemplated by the eighth embodiment. *Id*.

22

### iii.    Claim 3

**A method according to claim 1, including the further step of acquiring an image of at least a portion of the user of the device**

*Numazaki* explains that an image of the object is acquired as part of the gesture recognition process. *Numazaki* (Ex. 1003), 10:8-13 (teaching "the reflected light from this target object is captured as an image, so that information on this target object such as its shape, motion, distance, etc., can be obtained"); *see also id*. at 10:33-39 (explaining that the first embodiment's information input generation apparatus "extracts the reflected light from the target object . . . as an image").

In the event that Patent Owner argues this limitation should be construed to require capturing an image separate from the finger-based gesture input addressed in independent claim 1, *Numazaki* also discloses an embodiment in which the user's image is captured separate from any gesture-based control. Namely, *Numazaki's* fifth embodiment is directed to lowering the communication costs for videoconference applications on a portable device. *Id*. at 39:6-16 (noting goals of "lower[ing] the communication cost, and the power consumption and cost of the portable terminal device"). To accomplish these goals, *Numazaki* teaches that all image information other than the subject should be deleted from the image information before transmitting. *Id*. at 39:17-60 (describing a mask process through which an "extracted image" containing only the subject is "stored in the extracted

23

image memory unit 354"). A PHOSITA would have been motivated to include such image capture functionality in the portable eighth embodiment's portable device for a number of reasons. First, *Numazaki* expressly suggests its fifth embodiment image capture technology should be incorporated into a portable device. *Bederson Dec*. (Ex. 1008), ¶¶ 50-52 (discussing *Numazaki* at 39:6-16 and concluding that one purpose of the fifth embodiment is to accommodate limited bandwidth and power with portable devices). Second, a PHOSITA would have recognized the portable device in *Numazaki's* eighth embodiment could easily support the image capture solution described with respect to the fifth embodiment. Namely, as described with respect to Fig. 46, the fifth embodiment image capture technology uses two separate cameras—one for reflected light and one for natural light—to identify the subject and extract only the subject from the image information. *Id*. (discussing *Numazaki* at 39:21-60). The eighth embodiment already includes this two camera structure described with respect to the first embodiment. *Bederson Dec*. (Ex. 1008), ¶¶ 50-52 (explaining that *Numazaki* describes its controlled light and camera configuration as key to its invention and noting that *Numazaki* at 53:22-36 teaches that the eighth embodiment uses the two-camera image difference calculation taught by Fig. 2 and its corresponding disclosure). Accordingly, minimal modifications would be

24

required to implement the fifth embodiment image capture functionality in the eighth embodiment's handheld device. *Id*.

### iv.    Claim 4

***A method according to claim 1, wherein said movement is sensed in 3 dimensions.***

*Numazaki* teaches that finger movement in three dimensions can be detected and used in the context of controlling a computer:

> The feature data generation unit 103 extracts various feature data from the reflected light image. Many different types of the feature data and their extraction methods can be used in the present invention, as will be described in detail in the later embodiments. **When the target object is a hand**, **it becomes possible to obtain the information regarding a gesture or a pointing** according to the feature data extracted from the reflected light image of the hand, for example, **and it becomes possible to operate a computer by using this obtained information**. **It is also possible to extract the 3D information on the target object for further utilization**.

*Numazaki* (Ex. 1003), 10:57-67 (emphasis added). *Numazaki* also teaches that, although precise measurements in three dimensions may not be practical, it is "possible to detect 'approaching' or 'moving away' in the relative sense, so that it is possible to combine this information with the feedback by the display so as to realize the input of the three-dimensional position information." *Id*. at 27:57-62. A PHOSITA would have been motivated to incorporate this three dimensional gesture

25

sensing into the eighth embodiment portable device at least because it would increase the options for a user to control the device with gestures. *Bederson Dec.* (Ex. 1008), ¶¶ 53-54 (explaining that allowing a user to indicate commands using finger movements, including approaching or moving away, would improve usability by allowing the user to issue commands in many additional and intuitive ways). For example, the eighth embodiment contemplates allowing users to "click and drag . . . icons on the screen" and proposes that a button can be used to indicate the intent to perform such an action. *Numazaki* (Ex. 1003), 50:45-47. Were three-dimensional information incorporated in this function, the user could indicate an intent to click an icon by moving her finger toward the screen and an intent to release the icon by moving her finger away from the screen. *Bederson Dec.* (Ex. 1008), ¶¶ 53-54 (concluding that such a solution would be more intuitive and improve the user experience).

### v.    *Claim 7*

### [7(P)] *Handheld computer apparatus comprising:*

> *See* Claim [1(P)], *supra.*

### [7(a)] *a housing;*

> As depicted in Fig. 78 below, *Numazaki's* handheld device comprises a housing designed to be held in a hand:

26



*Id.* at Fig. 78.

**[7(b)] a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object;**

As discussed in Section III.C.a.1, this limitation includes language that connotes specific structure and need not be construed pursuant to 112(f). But, if the Board were to disagree, *Numazaki* teaches the same (or at least an equivalent) camera means as that described by the '431 Patent). For example, the '431 Patent describes using "CMOS cameras." *'431 Patent* (Ex. 1001), 5:50-57. Similarly, *Numazaki* teaches that either CCD or CMOS image sensors may be used, but notes

27

that using "CMOS sensors is advantageous in view of both the performance and the cost." *Numazaki* (Ex. 1003), 15:23-27.

As discussed in Section III.C.a.2, "object positioned by a user operating said object" should be construed to capture both separate objects held/controlled by the user and also part of the user's body, such as a user's finger or hand. *Numazaki* teaches using its image sensors to obtain an image using reflected light of at least a user's finger. Namely, *Numazaki's* handheld device includes "a window 712 [] for the lighting unit and the photo-detection sensor unit." *Numazaki* (Ex. 1003), 52:12-14. As described with reference to Fig. 2, which is incorporated into the eighth embodiment as noted above, *Numazaki* uses this light and camera arrangement to illuminate the target object (e.g., the user's hand) in a controlled manner such that a precise image of the user's hand and hand movement can be ascertained. *Id*. at 11:9-23. Specifically, a timing control unit is used to turn lighting unit 101 on (i.e., illuminating the target object) when the first camera unit is active and off when the second camera unit is active. *Id*. at 11:20-32. The result of this light control is the first camera unit captures an image of the target object illuminated by both natural light and the lighting unit 101 and the second camera unit captures an image of the target object illuminated by only natural light. *Id*. at 11:33-39. The difference between the two images—obtained by difference calculation unit 111—represents

28

the "reflected light from the object resulting from the light emitted by the lighting unit 101." *Id*. at 11:43-51. This information is then used by feature data generation unit 103 to determine gestures, pointing, etc. of the target object that may be converted into commands executed by a computer. *Id*. at 10:57-66.

### *[7(c)] computer means within said housing for analyzing said image to determine information concerning a position or movement of said object; and*

*Numazaki's* "compact portable information device" allows the "position of a cursor 714 on the screen [to] be controlled by moving a finger 713 in front of [] window 712." *Id*. at 52:5-16.

As discussed in Section III.C.a.2, the corresponding structure for "computer means within said housing for analyzing said image to determine information concerning a position or movement of said object" includes a computer/processor programmed to identify natural features on an object so as to determine the object's position. *See, e.g., '431 Patent* (Ex. 1001), 3:39-41(noting features such as a finger tip can be used as a "target"), 13:46-67 (describing a user pointing and using the motion of her fingers to control objects within an application). *Numazaki* teaches the same (or an equivalent) structure for detecting the position of a user's finger to permit the user to control a device using gestures. Namely, *Numazaki* expressly describes a process through which the system identifies a user's finger based on its characteristics and tracks lateral finger movements by "detecting the center of

29

gravity" of a finger, where "finger tip movement and the center of gravity movement can be smoothly correlated" using pixel values. *Numazaki* (Ex. 1003), 19:43-20:25. To detect a finger, *Numazaki* teaches a "stick shaped object detection unit 213[, which] detects a stick shaped object extending in the vertical direction, that is, an upward extended finger (normally an index finger) of the hand of the operator." *Id.* at 18:32-35. Once the finger is detected, *Numazaki* calculates the center of gravity and tracks this center of gravity as the finger moves. *Id.* at 19:43-20:25. Using this technique, *Numazaki* teaches "the cursor on [a] screen can be controlled" so that "when the finger is moved, the cursor is also moved." *Id.* at 26:8-14, 26:23-25. A PHOSITA would have understood that processing such cursor control is similar to processing the "click and drag" functionality described with reference to the eighth embodiment and would have been motivated to implement the eighth embodiment to use the same processing functionality from the second embodiment. *Bederson Dec.* (Ex. 1008), ¶ 55. A PHOSITA would further have understood that *Numazaki's* finger detection and tracking functionality is performed by a processor and would have considered the processes performed by *Numazaki's* processor the same or equivalent to the natural feature identification algorithm disclosed in the '431 Patent. *Id.*

30

***[7(d)] means for controlling a function of said apparatus using said information.***

As discussed in Section III.C.a.3, the corresponding structure for this limitation includes at least the disclosure with reference to Fig. 9 by which a user can control a cursor on a display by moving her fingers (captured by a camera). *Numazaki* teaches the same (or an equivalent) structure for controlling cursor 714 on the screen based on a user's finger movements. Namely, *Numazaki's* "compact portable information device" allows the "position of a cursor 714 on the screen [to] be controlled by moving a finger 713 in front of [] window 712." *Numazaki* (Ex. 1003), 52:5-16. As discussed above with respect to limitation [7(c)], the finger movement is captured by a pair of image sensors and the position and movement is determined by a processor. A PHOSITA would have understood that converting a user's finger movements into cursor control is a function performed by a processor and would have considered the processes performed by *Numazaki's* processor the same or equivalent to the cursor control algorithm disclosed in the '431 Patent. *Bederson Dec.* (Ex. 1008), ¶ 56.

### vi.    *Claim 8*

***Apparatus according to claim 7, wherein said object is a finger.***

*See* limitations [7(c)-7(d)], *supra*.

31

### vii.    Claim 9

***Apparatus according to claim 7, further including a display function which is controlled.***

As set forth above with respect to limitations [7(c)-7(d)], *Numazaki* teaches controlling cursor 714 on the display of the handheld device depicted in Fig. 78. A PHOSITA would have understood that the user moving the cursor is reflected on the device's display, providing feedback to the user. *Bederson Dec.* (Ex. 1008), ¶ 57. Accordingly, *Numazaki's* cursor control is a display function. *Id.*

### viii.    Claim 11

***Apparatus according to claim 7, further including means for transmitting information.***

As set forth above with respect to Claim 3, a PHOSITA would have been motivated to include the fifth embodiment image capture functionality in *Numazaki's* eighth embodiment portable device. All arguments and evidence are hereby incorporated by reference. The fifth embodiment not only captures images, but also transmits those images to another device in support of a "conference record system." *Numazaki* (Ex. 1003), 39:6-16 (referring to the functionality as a "TV telephone"), 40:16-49 (explaining that the fifth embodiment allows the system to extract image information of only the speaker and transmit that extracted information to another device in support of a "conference record system"); *see also*

32

*Bederson Dec.* (Ex. 1008), ¶ 58 (explaining that a PHOSITA would have understood the described "conference record system" is more commonly referred to as a videoconference system in which videoconference telephones send video and audio to each other). For the same reasons described above with respect to the image capture functionality, a PHOSITA would have been motivated to implement this transmission functionality in the portable device described in *Numazaki's* eighth embodiment. *Id.* at ¶¶ 50-52.

### ix.    Claim 12

**Apparatus according to claim 7, further including a light source for illuminating said object.**

*Numazaki's* handheld device includes "a window 712 [] for the lighting unit and the photo-detection sensor unit." *Numazaki* (Ex. 1003), 52:12-14. As described with reference to Fig. 2, which is incorporated into the eighth embodiment as noted above, *Numazaki* uses this light and camera arrangement to illuminate the target object (e.g., the user's hand) in a controlled manner such that a precise image of the user's hand and hand movement can be ascertained. *Id*. at 11:9-23.

### x.    Claim 13

**Apparatus according to claim 7, wherein said apparatus is a cellular phone.**

As discussed with respect to Claim 11, a PHOSITA would have been motivated to implement *Numazaki's* fifth embodiment functionality into the eighth

33

embodiment's handheld device, including the video conference functionality in which handheld device extracts image information of only the speaker and transmits it to a further device. All arguments and evidence from this discussion are incorporated by reference.

*Numazaki* refers to this videoconference embodiment as a "TV telephone" and stresses that its goals are to "lower the communication cost[] and the power consumption." *Numazaki* (Ex. 1003), 39:6-16. Although *Numazaki* does not expressly state that its TV telephone is a cellular phone, a PHOSITA would have understood that *Numazaki's* focus on lower communications costs is a concern applicable to cellular phones. *Bederson Dec.* (Ex. 1008), ¶¶ 59-60 (explaining that wireless cellular data connections at the time were expensive and concluding that *Numazaki's* subject extraction process would be less applicable/valuable to other wireless connections such as WiFi or wired connections). Although cellular videophones were not prevalent in the marketplace at the time, a PHOSITA would have known that researchers were working on the technology and would have understood that *Numazaki's* fifth embodiment is directed to improvements to make such cellular videophones commercially viable. *Id.* (discussing a commercial cellular videophone hitting the market in 1999).

34

### xi.    Claim 14

**[14(P)] A method for controlling a handheld computing device comprising the steps of:**

*See* limitation [1(P)], *supra*.

**[14(a)] providing a computer within said device;**

As discussed above with reference to limitations [7(c)-7(d)], *Numazaki's* eighth embodiment handheld device performs its function using an internal processor. A PHOSITA would have understood that processor-based systems are "computer" systems and would have considered *Numazaki's* handheld device to include a computer within the meaning of this limitation. *Bederson Dec.* (Ex. 1008), ¶ 61 (explaining that the term "computer" as used in this limitation means processor-based systems able to execute functionality in software).

**[14(b)] associating a camera with said device, said camera viewing at least a portion of the body of a user operating said device or an object held by said user, in order provide image data concerning said portion or object;**

*See* limitations [1(b)-1(c)], *supra*.

**[14(c)] using said computer, analyzing said image data to determine information concerning a user input command; and**

*See* limitations [1(c)-1(d)], *supra*.

**[14(d)] from said determined information, controlling a function of said device.**

*See* limitation [1(d)], *supra*.

35

*xii.*    **Claim 15**

***A method according to claim 14, wherein reflected light from said body portion or object is imaged by said camera.***

*Numazaki* explains that an image of the object is acquired as part of the gesture recognition process. *Numazaki* (Ex. 1003), 10:8-13 (teaching "reflected light from this target object is captured as an image, so that information on this target object such as its shape, motion, distance, etc., can be obtained"); *see also id*. at 10:33-39 (explaining that the first embodiment's information input generation apparatus "extracts the reflected light from the target object . . . as an image").

*xiii.*    **Claim 16**

***A method according to claim 14, wherein said information includes the position of the portion or object.***

As set forth above with respect to limitation [7(c)], *Numazaki* determines the position of a user's finger and tracks its movement. All arguments and evidence from this discussion are hereby incorporated by reference.

*xiv.*    **Claim 17**

***A method according to claim 14, wherein said information includes the change in position of the portion or object.***

As set forth above with respect to limitation [7(c)], *Numazaki* determines the position of a user's finger and tracks its movement (e.g., as the user moves her finger

36

to control the cursor). All arguments and evidence from this discussion are hereby

incorporated by reference.

### xv.     Claim 18

**A method according to claim 14, wherein said information includes the velocity
or path of the portion or object.**

As depicted in Fig. 20 below, *Numazaki* uses a center of gravity calculation

to track the path of a finger as it moves:



*Id.* at Fig. 20, 24:54-26:18 (describing the same and noting the tracking enables a

user to control a cursor on the screen by moving her finger). A PHOSITA would

have understood that tracking the movement of a user's finger as part of *Numazaki's*

computer control process necessarily obtains information about the path of the

finger. *Bederson Dec.* (Ex. 1008), ¶ 62 (explaining that tracking the movement of a

finger in order to control the movement of a cursor on the display necessarily tracks

37

the "path" of the finger and noting the path of the user's finger will correspond with

the path the cursor takes on the display).

### xvi.     Claim 19

**A method according to claim 14, wherein said information is obtained in 3 dimensions.**

> *See* Claim 4, *supra*.

### xvii.    Claim 20

**A method according to claim 14, wherein said information includes the pointing direction of the portion or object.**

> *Numazaki* teaches that the pointing direction of a user's finger is determined

as part of the gesture-based cursor control process:

> [O]nly the tip end portion is extracted from **the image of the finger tip and its center of gravity is obtained**. By means of this, **it is possible to realize the two-dimensional pointing such as the pointing on the computer screen**. . . .
>
> For example, when the motion of "approaching a little and then moving back" is detected, it is possible to generate a signal corresponding to the mouse click. **By means of this, it becomes possible to move the cursor by the finger and make a selection from the menu by making an action of "pushing".**

*Numazaki* (Ex. 1003), 27:41-56 (emphasis added).

38

### xviii.  Claim 21

**A method according to claim 14, wherein a display is controlled.**

*See* Claim 9, *supra.*

### xix.  Claim 22

**A method according to claim 21, wherein a virtual image on said display is moved or changed.**

The '431 Patent describes "virtually displayed images" such a knob, slider, or switch can be manipulated by a user through gestures. '431 Patent (Ex. 1001), 13:54-67. As discussed with respect to limitation [1(b)], *Numazaki's* handheld device allows a user to move a virtual cursor on a display through finger-based gestures. All arguments and evidence from this discussion are incorporated by reference. A PHOSITA would consider a movable cursor within an application a "virtual image" within the meaning of this limitation. *Bederson Dec.* (Ex. 1008), ¶¶ 63-64 (explaining that *Numazaki's* cursor is analogous to the virtual controls described by the '431 Patent at 13:46-67).

### xx.  Claim 25

**A method according to claim 14, including the further step of transmitting data to a further device.**

As discussed with respect to Claim 11, a PHOSITA would have been motivated to implement *Numazaki's* fifth embodiment functionality into the eighth

embodiment's handheld device, including the video conference functionality in which handheld device extracts image information of only the speaker and transmits it to a further device. All arguments and evidence from this discussion are incorporated by reference.

### *xxi.* Claim 26

***A method according to claim 14, wherein said camera operates at 30 frames per second or greater.***

As set forth above with respect to Claims 3 and 11, a PHOSITA would have been motivated to implement the fifth embodiment's videoconference functionality in the eighth embodiment's portable device. All arguments and evidence from this discussion are hereby incorporated by reference. *Numazaki* expressly teaches that its video capture functionality for this videoconference functionality operates at 30 frames per second. *Numazaki* (Ex. 1003), 39:61-6 (noting the "frame rate of the usual video is 30 frames per second" and concluding "it is possible to update the extracted image 30 times per second").

### *xxii.* Claim 28

***A method according to claim 14, including the further step of acquiring a picture of the user of the handheld device.***

*See* Claim 3, *supra.*

**B.    Ground 2: Claims 5-6 and 29 are obvious under pre-AIA 35 U.S.C. § 103 over *Numazaki* in view of *DeLeeuw***

*Overview of DeLeeuw*

U.S. Patent No. 6,088,018 to DeLeeuw, et al. (*"DeLeeuw"*) (Ex. 1004) was filed on June 11, 1998 and is prior art to the '431 Patent under at least 35 U.S.C. § 102(e) (pre-AIA). *DeLeeuw* was not cited or considered during prosecution of the '431 Patent. *'431 Patent* (Ex. 1001).

*DeLeeuw* discloses a "method of providing input signals to a system having a display" by capturing an object via video. *Id.* at 1:37-45. In a typical setup, the "video camera is pointed toward the user," whom "may see a reflected image of himself or herself on the computer screen" yet still "see and interact with other display elements such as desktop icons or application program displays" because the reflected image is displayed transparently. *Id.* at 2:55-60. The result appears in Figure 1:

41



**FIG. 1**

*Id.* at Fig. 1 (annotated to show pinching gesture). Using this "video reflection," the user may interact with a computer system's graphical user interface by "physically moving real objects (such as the user's hands and fingers, for example) that are in the field of view of the video camera." *Id.* at 3:6-11.

One embodiment uses pixel colors in the video data to "track the movement of real objects such as a user's hands" to "be recognized as input event generators" where a cursor can be moved when "the user 'pinches' his or her index finger and thumb" to input a "mouse down event," the release of which creates a "mouse up event." *Id.* at 3:54-4:7.

42

Because *DeLeeuw,* like the '431 Patent, discloses a camera system that may be controlled by human gesture input, *DeLeeuw* is in the same field of endeavor as the '431 Patent. *Compare DeLeeuw* (Ex. 1004), 3:65-4:4 (describing how "video data signals" capture the "movement of a user's index finger and thumb" together and display it as a "reflected image") *with '431 Patent* (Ex 1001), Abstract (describing a "method and apparatus . . . to enable rapid TV camera and computer based sensing in . . . handheld devices"), 2:7-23 (describing the field of invention as "simple input devices for computers" that operate by "optically sensing a human input" such that the output of a "single or multiple TV cameras [is] analyzed and used as input to a computer"). *DeLeeuw* is therefore analogous art to the '431 Patent. *Bederson Dec*. (Ex. 1008), ¶¶ 65-66.

**Motivation to Modify Numazaki in view of DeLeeuw**

In an eighth embodiment, *Numazaki* detects pointing gestures within a "range of illumination" cast by a lighting unit 701 and captured by a camera 702 to select and move icons on a screen. *Numazaki* (Ex. 1003), 50:25-48. *Numazaki* describes one implementation in which this functionality is implemented in a handheld portable device as depicted in Fig. 78 below:

43



*Id.* at Fig. 78, 52:5-19 (describing the same). Although *Numazaki* detects "pointing or gesture input" and expressly contemplates "operations such as click and drag for selecting and moving icons," the eighth embodiment does not explicitly disclose detecting a pinching gesture for icon manipulation. *Id.* at 50:38-48. A PHOSITA would, however, have been motivated to implement *Numazaki's* eighth embodiment such that a user could manipulate icons using a pinch gesture as disclosed in *DeLeeuw. Bederson Dec.* (Ex. 1008), ¶¶ 67-68. First, allowing users to perform a pinch gesture in order to manipulate icons is one of a finite number of identified and predictable solutions for icon manipulation. *Id.* (noting that *DeLeeuw* expressly

44

teaches pinch gestures in the context of icon manipulation and concluding that such a gesture is an intuitive means of allowing users to select and move an item within an application); *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). Second, a PHOSITA would have anticipated success in modifying *Numazaki* in this manner given that *Numazaki* already includes the technical hardware and programming necessary to detect gestures comprising multiple fingers. *Bederson Dec.* (Ex. 1008), ¶ 68 (discussing *Numazaki* at 38:43-49, which discloses identifying hand gestures, including a state of two extended fingers similar to that necessary to implement a pinch, and concluding that a PHOSITA would be able to easily incorporate *DeLeeuw's* pinch gesture into *Numazaki's* eighth embodiment with minimal changes to the existing programming); *see also KSR*, 550 U.S. at 416 (obvious to combine prior art elements according to known methods to yield predictable results).

### i.    Claim 5

**A method according to claim 1, wherein movement of one finger relative to another finger is sensed.**

As described above regarding the motivation to combine *Numazaki* and *DeLeeuw, DeLeeuw* teaches a computer gesture-detection system that uses a camera like that in *Numazaki* to expressly detect a pinching gesture. *DeLeeuw's* system captures video images using a "video camera coupled to a PC" subsequently

45

"rendered to the entire screen of the PC's display." *DeLeeuw* (Ex. 1004), 2:46-50.

The "video camera is pointed toward the user," whom "may see a reflected image of himself or herself on the computer screen" yet still "see and interact with other display elements such as desktop icons or application program displays" because the reflected image is displayed transparently. *Id.* at 2:55-61. The result appears in Figure 1:



**FIG. 1**

*Id.* at Fig. 1 (annotate to show pinching gesture). This "video reflection" allows a user to interact with a computer system's graphical user interface by "physically moving real objects (such as the user's hands and fingers, for example) that are in

46

the field of view of the video camera." *Id.* at 3:6-11. Specifically, a cursor can be moved when "the user 'pinches' his or her index finger and thumb" to input a "mouse down event," the release of which creates a "mouse up event." *Id.* at 3:54-4:7. *DeLeeuw* teaches that such pinch gesture involves detecting "the movement of a user's index finger and thumb." *Id*. at 3:65-67. A PHOSITA would have understood detecting such a "pinch" gesture based on the movement of an index finger and thumb involves sensing the movement of the index finger and thumb relative to each other. *Bederson Dec*. (Ex. 1008), ¶ 65 (explaining that detecting a pinch gesture as described in *DeLeeuw* would involve both detecting that the index finger and thumb are positioned opposite one another and also that the user moves them toward each other in a "pinch" motion).

### ii.    Claim 6

**A method according to claim 1, wherein movement of two fingers is sensed.**

As discussed with respect to the preceding limitation, the proposed combination of *Namazaki* and *DeLeeuw* detects a pinch gesture, which involves sensing the movement of an index finger and thumb. All arguments and evidence are hereby incorporated.

### iii.   Claim 29

**A method according to claim 14, wherein two fingers of the user are sensed and a pinching action determined.**

As discussed with respect to the preceding limitation, the proposed combination of *Namazaki* and *DeLeeuw* detects a pinch gesture, which involves sensing the movement of an index finger and thumb. All arguments and evidence are hereby incorporated.

### C.   Ground 3: Claims 10, 23, 24, and 27 are obvious under pre-AIA 35 U.S.C. § 103 over *Numazaki* in view of *DeLuca*

*Overview of DeLuca*

U.S. Patent No. 6,064,354 to DeLuca (*"DeLuca"*) (Ex. 1005) was filed on July 1, 1998 and is prior art to the '431 Patent under at least 35 U.S.C. § 102(e) (pre-AIA). *DeLuca* was not cited or considered during prosecution of the '431 Patent. *'431 Patent* (Ex. 1001).

*DeLuca* discloses a "computer system" that "stereoscopically projects a three dimensional object having an interface image in a space observable by a user" where the "user controls the movement of a physical object within the space" while observing both the projected and physical object. *DeLuca* (Ex. 1005), Abstract. In one example, a user can activate a "word processing program . . . when the user's

48

finger moves within the [3D] space to touch the projected icon" that is a "W"

representing the word processing program. *Id.*

Figures 1 and 5 depicts a physical object, such as fingertip 400, used to touch

an icon 250, which is part of the stereoscopically projected object 245. *Id.* at 2:44-

51; 4:9-10. Cameras 310 and 320 determine the position and orientation of the

fingertip. *Id.* at 5:22-25, 5:39-43.



*Id.* at Fig. 1.



**FIG. 5**

*Id.* at Fig. 5.

Because *DeLuca,* like the '431 Patent, discloses a camera system that may be controlled by human gesture input, *DeLuca* is in the same field of endeavor as the '431 Patent. *Compare DeLuca* (Ex. 1005), Fig. 1, 1:63-66, Abstract (describing "a three dimensional display system capable of determining an intersection of a physical object with a three dimensionally displayed object in a space," such as a "word processing program . . . activated when the user's finger moves within the space to touch the projected icon") w*ith '431 Patent* (Ex. 1001), Abstract (describing a "method and apparatus . . . to enable rapid TV camera and computer based sensing in . . . handheld devices"), 2:7-23 (describing the field of invention as "simple input devices for computers" that operate by "optically sensing a human input" such that

50

the output of a "single or multiple TV cameras [is] analyzed and used as input to a computer"). *DeLuca* is therefore analogous art to the '431 Patent. *Bederson Dec.* (Ex. 1008), ¶¶ 69-71.

***Motivation to Modify Numazaki in view of DeLuca***

In an eighth embodiment depicted in Figure 74, *Numazaki* detects a pointing gesture within a "range of illumination" by using light source 701 and camera 702, then using that detection as an input to select and move icons on a screen. *Numazaki* (Ex. 1003), 50:25-47.



51

*Id.* at Fig. 74 (annotated to illustrate capturing a pointing gesture within a portable

computer's range of illumination to select an icon). This portable embodiment is also

implemented in a handheld device as depicted in Fig. 78 below:



*Id*. at Fig. 78.

Although *Numazaki* describes a three-dimensional workspace within which a

user can point or gesture within the three-dimensional space over the keyboard to

interact with an application, it does not explicitly teach projecting the application

into three-dimensional space. For a number of reasons, however, a PHOSITA would

have been motivated to implement *Numazaki's* Fig. 78 embodiment with a projected

52

three-dimensional display pursuant to *DeLuca*. First, a PHOSITA would have understood that modifying *Numazaki* in this manner would have improved the user experience in the same way *DeLuca's* system allows a user to more intuitively interact with a program by projecting the application into a three-dimensional space. *Bederson Dec.* (Ex. 1008), ¶¶ 72-73 (discussing the improvements over two-dimensional displays outlined by *DeLuca* (Ex. 1005), 1:11-2:5, and concluding that the three-dimensional gesturing and pointing contemplated by *Numazaki's* eighth embodiment would have been more intuitive if implemented in a three-dimensional projection of the application as described in *DeLuca*); *see also KSR*, 550 U.S. at 417 (obvious to use known techniques to improve similar devices in the same way). Second, a PHOSITA would have anticipated success in modifying *Numazaki* in this manner based at least on the similarities in functionality and structure between *Numazaki* and *DeLuca*. *Bederson Dec*. (Ex. 1008), ¶ 74 (describing the similarities between *Numazaki* and *DeLuca* and concluding the described modification would have been well within the skill set of a PHOSITA); *see also KSR*, 550 U.S. at 416 (obvious to combine prior art elements according to known methods to yield predictable results). Indeed, *Numazaki* already contemplates detecting a user's hand in three dimensions. *Numazaki* (Ex. 1003, 16:39-44 (noting that "it is possible to extract a 3D shape of . . . [a] hand," that "it is possible to detect an inclination of the

53

palm of the hand, which appears as a partially different distances[,]" and that "when the hand is moved, the change of the pixel values can be regarded as a change of the distance"). So much of the modification would simply be incorporating the three-dimensional projection technology from *DeLuca* into the laptop arrangement described in *Numazaki's* eighth embodiment. *Bederson Dec.* (Ex. 1008), ¶ 74.

### iv.    Claim 10

***Apparatus according to claim 9, wherein said display is 3D display.***

In Figures 1 and 5, *DeLuca* teaches a physical object, such as fingertip 400, may be used to touch an icon 250, which is part of stereoscopically projected object 245. *DeLuca* (Ex. 1005), 2:44-51; 4:9-10. Cameras 310 and 320 determine the position and orientation of the fingertip. *Id.* at 5:22-25, 5:39-43.

54

IPR2021-00920
U.S. Patent No. 7,933,431



*Id.* at Fig. 1.



*Id.* at Fig. 5. By example, this enables a user to activate a "word processing program

. . . when the user's finger moves within the [3D] space to touch the projected icon"

that is a "W" representing the word processing program. *Id.*at Abstract.

### v.  Claim 23

**A method according to claim 21, wherein said display is a 3D display.**

> *See* Claim 10, *supra.*

### vi.  Claim 24

**A method according to claim 23, wherein said display is a stereoscopic display.**

> *See* Claim 10, *supra.*

### vii.  Claim 27

**A method according to claim 14, wherein said controlled function relates to a game.**

*DeLuca* teaches that its stereoscopic methods can be employed in a game such

that a user can interact with virtual game elements. *DeLuca* (Ex. 1005), 5:58-64

(describing a "game application"). A PHOSITA would have been motivated to

implement such a gaming application in *Numazaki's* handheld device as modified

pursuant to *DeLuca's* stereoscopic display teachings. *Bederson Dec.* (Ex. 1008), ¶

75. Indeed, having implemented *DeLuca's* stereoscopic display, a PHOSITA would

have been motivated to assess *DeLuca's* described applications to determine whether

56

they would additionally add value to *Numazaki's* portable device. *Id*. Given the popularity of handheld gaming devices at the time, a PHOSITA would have recognized the benefit of incorporating *DeLuca's* gaming application into *Numazaki's* handheld device. *Id*. (discussing the well-established popularity of handheld gaming devices).

### D. Ground 4: Claims 30 and 31 are obvious under pre-AIA 35 U.S.C. § 103 over *Numazaki* in view of *Peters*

*Overview of Peters*

U.S. Patent 6,243,683 to Geoffrey Peters ("*Peters*") (Ex. 1006) was filed on December 29, 1998, published on June 5, 2001, and is prior art to the '431 Patent under at least 35 U.S.C. § 102(e) (pre-AIA). *Peters* was not cited or considered during prosecution of the '431 Patent. *'431 Patent* (Ex. 1001).

*Peters* teaches a camera-based speech recognition system that uses "gestures of a user . . . detected from a video input . . . to turn a speech recognition unit on and off." *Peters* (Ex. 1006), Abstract. *Peters* runs a "face tracking algorithm" to "identify the user of interest in the field, and to detect when the user is looking at the camera," *i.e.,* to "determine when the user's eyes are directed straight at the camera 108." *Id.* at 3:27-41. Alternatively, the system can be activated by detecting "one or more specific body movements, such as a waving of the hand or the user pointing at the

57

camera." *Id*. at 3:40-43. Further still, "two or more gestures may be required to activate the speech recognition system. For example, a user may be required to both point and look directly at the camera [] in order to activate speech recognition." *Id*. at 3:47-51. The structure in Fig. 6 below is used to accomplish all these variations:



**FIG. 6**

*Id*. at Fig. 6 (annotated to illustrate face-tracking and finger gesture detection elements), 4:40-48 (describing the same).

Because *Peters*, like the '431 Patent, discloses a camera system that may be controlled by human gesture input, *Peters* is in the same field of endeavor as the '431 Patent. *Compare Peters* (Ex. 1006), 3:17-20, 3:48-51, 4:49-55 (describing

receipt of "one or more frames of a video image of a user" from a camera and analyzing them "to determine if the user had made one or more gestures" such as both "point[ing] and look[ing] directly at [a] camera") w*ith '431 Patent* (Ex 1001), Abstract (describing a "method and apparatus . . . to enable rapid TV camera and computer based sensing in . . . handheld devices"), 2:7-23 (describing the field of invention as "simple input devices for computers" that operate by "optically sensing a human input" such that the output of a "single or multiple TV cameras [is] analyzed and used as input to a computer").

*Peters* is therefore analogous art to the '431 Patent. *Bederson Dec.* (Ex. 1008)*, ¶¶* 76-77.

### *Motivation to Modify Numazaki in view of Peters*

For a number of reasons, a PHOSITA would have been motivated to implement *Peters's* functionality in *Numazaki's* Fig. 78 embodiment. First, *Numazaki* provides express motivation to combine its gesture-based input techniques with speech input. Namely, *Numazaki* notes that its gesture recognition technology should serve "as a complement to the input information given by the input means such as speech input." *Numazaki* (Ex. 1003), 1:28-34. Based on this express teaching, a PHOSITA would have been motivated to incorporate speech input teachings such as *Peters's* into *Numazaki's* system. *Bederson Dec.* (Ex. 1008),

59

¶ 78. Second, a PHOSITA would have anticipated success in modifying *Numazaki* in this manner based at least on the similarities in functionality and structure between *Numazaki* and *Peters*. *Id.* at ¶ 79 (describing the similarities between *Numazaki* and *Peters*, including that both describe a two-camera structure and that both detect gestures performed by a user and concluding the described modification would have been well within the skill set of a PHOSITA); *see also KSR*, 550 U.S. at 416 (obvious to combine prior art elements according to known methods to yield predictable results). Because *Numazaki* already includes multiple cameras and functionality with which a user's gestures can be detected, much of the modification would simply be incorporating *Peters's* speech recognition functionality into *Numazaki's* eighth embodiment. *Bederson Dec.* (Ex. 1008), ¶ 79.

### i.    Claim 30

**A method according to claim 14, wherein said body portion indicates an expression of said user.**

As discussed above, *Peters* teaches a camera-based speech recognition system that uses "gestures of a user . . . detected from a video input . . . to turn a speech recognition unit on and off." *Peters* (Ex. 1006), Abstract. In one example, *Peters* runs a "face tracking algorithm" to "identify the user of interest in the field, and to detect when the user is looking at the camera," *i.e.,* to "determine when the user's eyes are directed straight at the camera 108." *Id.* at 3:27-41. A PHOSITA would

60

have understood that looking directly into the camera with intention is "an expression of [the] user" as required by this limitation. *Bederson Dec.* (Ex. 1008), ¶ 80.

### ii.    Claim 31

***A method according to claim 14, wherein said information provides an aid to speech recognition.***

*Peters* teaches a camera-based speech recognition system that uses "gestures of a user . . . detected from a video input . . . to turn a speech recognition unit on and off." *Peters* (Ex. 1006), Abstract. In this way, the gesture information captured by the camera "provides an aid to speech recognition."

## V.    DISCRETIONARY CONSIDERATIONS

### A.    The *General Plastics* Factors Favor Institution

To ensure a Patent Owner is not subjected to "abuse of the review process by repeated attacks on patents," the Board has set forth seven factors that it considers in determining whether to exercise its discretion to deny a petition under § 314(a). *General Plastic Industrial Co., Ltd. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19 at 15-19 (September 6, 2017) (precedential). Here, these factors weigh heavily in favor of institution.

61

IPR2021-00920
U.S. Patent No. 7,933,431

In recently filed IPR2021-00917, Unified Patents, LLC challenged claims 7-13 from the '431 Patent (referred to herein as the "Unified IPR"). *Unified IPR* at 4. The Unified IPR presents four separate grounds, including three base references (*Doi*, *Numazaki*, and *Rhoads*) and two secondary references (*Cousins* and *Parulski*). Of these five references, only *Numazaki* is relied upon in the instant Petition. Petitioner has not substantively modified the grounds presented herein responsive to the Unified IPR. In fact, when Petitioner became aware of the Unified IPR, the instant petition was near final and Petitioner was preparing to file a separate Petition (IPR2021-00922, which challenges U.S. Patent No. 8,552,079) that relies on *Numazaki* in a nearly identical manner to the instant petition. The petition in IPR2021-00922 was filed just two business days after the Unified IPR and, like the instant petition, it was not substantively changed in any way responsive to the Unified IPR.

As set forth below, at least because the instant petition challenges significantly more claims than the Unified IPR and did not strategically benefit from the Unified IPR, the Board should decline to exercise its discretion under § 314(a).

### *Factor 1—Whether the same petitioner previously filed a petition directed to the same claims of the same patent*

That Petitioner is not a party to the Unified IPR and that this is Petitioner's first challenge to the '431 Patent "weigh[] especially heavily against a discretionary

IPR2021-00920
U.S. Patent No. 7,933,431

denial." *Unified Patents, Inc. v. Certified Measurement, LLC*, IPR2018-00548, Paper No. 7 at 7-8 (Sep. 5, 2018). To be sure, "application of the *General Plastic* factors is not limited solely to instances when multiple petitions are filed by the same petitioner." *Valve Corp. v. Electronic Scripting Products, Inc.*, IPR2019-00062, Paper No. 13 at 2 (Apr. 2, 2019). In *Valve*, however, the Board found that the petitioner (Valve) had a "significant relationship" with the previous petitioner (HTC) and filed its petition only after HTC's petition had been denied by the Board. *Id.* at 9-10, 12-13. Petitioner neither had nor has any such "significant relationship" with Unified Patents, LLC.

In IPR2020-00319, after concluding the petitioner and prior petitioners did not have a "significant relationship," the Board assessed whether Factor 1 favored denying institution due to a significant overlap in challenged claims. IPR2020-00319, Paper 15 at 5-8. There, the petition challenged only a single additional claim that had not been previously challenged. *Id.* at 7-8. Despite this overlap, the Board concluded that Factor 1 "weighs against exercising our discretion to deny institution" because "there is not complete overlap of asserted claims." *Id.* at 8. Here, the Petition challenges Claims 1-31. The Unified IPR challenged only Claims 7-13, which means there are 24 additional claims challenged in the instant Petition that are

63

unaddressed by the Unified IPR. Accordingly, Factor 1 weighs heavily against

denying institution.

***Factor 2—Whether at the time of filing of the first petition the petitioner knew of the prior art asserted in the second petition or should have known of it***

***Factor 3—Whether at the time of filing of the second petition the petitioner already received the patent owner's preliminary response to the first petition or received the Board's decision on whether to institute review in the first petition***

***Factor 4—The length of time that elapsed between the time the petitioner learned of the prior art asserted in the second petition and the filing of the second petition***

***Factor 5—Whether the petitioner provides adequate explanation for the time elapsed between the filings of multiple petitions directed to the same claims of the same patent***

The second to fifth factors "bear little relevance" here because Petitioner has

never before challenged the '431 Patent. *Unified Patents*, at 7-8 ("Once resolution

of factor 1 indicates that Petitioner had not previously filed a petition against the

same patent, factors 2-5 bear little relevance unless there is evidence in the record of

extenuating circumstances such as a showing that there was a previous petitioner

who challenged the same patent and that the previous petitioner and the current

petitioner planned the staggered petitions.") (internal citation omitted). No such

extenuating circumstances are present here.

***Factor 6—The finite resources of the Board***

64

"The sixth and seventh factors are efficiency considerations." *Valve*, IPR2019-00062, Paper 11 at 15. To be sure, there is a minimal amount of overlap between the instant Petition and the Unified IPR. The latter asserts that *Numazaki* anticipates Claims 7-9 and 11-12, while the instant petition relies on *Numazaki* across four separate grounds to demonstrate that all 31 claims are obvious. But the distinctions between the two petitions far outweigh the similarities. Indeed, there is no common theory at all—the instant petition does not advance any grounds of anticipation. And, although both petitions rely on similar content from *Numazaki* for the five commonly-challenged claims (7-9 and 11-12), this overlap is minor compared to the differences between the petitions. For example, the Unified IPR does not challenge Claims 1-6 or 14-31 at all. Similarly, the instant Petition does not rely on four of the five references cited in the Unified IPR. In sum, while Petitioner makes every effort to respect the finite resources of the Board, to ensure Petitioner is able to challenge all claims for which it may be subject to allegations of infringement,[2] the small amount of overlap on five of the 31 Challenged Claims is unavoidable. In IPR2020-00319, the Board found that Factor 6 weighed only

_____

[2] The litigation is in its infancy, and Patent Owner has not yet served infringement contentions.

65

"slightly for denying the Petition" where the two petitions "challenge[d] substantially similar sets of claims based on overlapping prior art." Here, there is significantly less overlap. Accordingly, to the extent this factor favors denying institution at all, it cannot outweigh the other factors that strongly favor institution.

### *Factor 7—The requirement under 35 U.S.C. § 316(a)(11) to issue a final determination not later than 1 year after the date on which the Director notices institution of review*

There is no readily identifiable roadblock for the Board to issue a final determination within the statutory one-year limit.

Accordingly, the Board should reach the merits of this petition, and institute review of all challenged claims.

### B.    The *Fintiv* Factors Favor Institution

Under the "*Fintiv* factors," the Board has asserted that it may consider parallel litigation, including an early trial date, in determining whether to institute under 35 U.S.C. § 314(a). *NHK Spring Co., Ltd., v. Intri-Plex Technologies, Inc.*, IPR2018-00752, Paper 8 at 19–20 (PTAB Sept. 12, 2018) (precedential); *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 at 2–3, 6 (PTAB Mar. 20, 2020) (enumerating six factors that "relate to whether efficiency, fairness, and the merits support the exercise of authority to deny institution in view of an earlier trial date in [a] parallel proceeding") (precedential). Those factors favor institution here.

66

a. The *Fintiv* factors strongly favor institution

1. Whether the court granted a stay or evidence exists that one may be granted if a proceeding is instituted.

The litigation in the Western District of Texas has just begun. Neither party has requested a stay yet, though Petitioner intends to do so if institution is granted. Petitioner has acted expeditiously in filing this Petition since the district court litigation began. Accordingly, this factor should favor institution. At worst, this factor is neutral because the Board "will not attempt to predict" how the district court will proceed. *Sand Revolution II, LLC v. Continental Intermodal Group-Trucking LLC*, IPR2019-01393, Paper 24 at 7 (PTAB June 16, 2020) (informative).

2. Proximity of the court's trial date to the Board's projected statutory deadline for a final written decision.

Although no trial date has been set, the projected trial date in the Texas Litigation should be scheduled in early 2023 or later.[3] The trial therefore occurs *at*

---

[3] A recent Order Governing Proceedings in patent cases issued by Judge Alan D. Albright proposes a *Markman* hearing 23 weeks after the Case Management Conference ("CMC") and trial 52 weeks after *Markman*. *Ex. 1007* at 8, 10. Here, no CMC has been scheduled, and Petitioner does not anticipate a CMC in the coming months.

67

*least* [complete at filing] months *after* the expected final written decision (FWD).

"This factor looks at the proximity of the trial date to the date of [FWD] to assess the weight to be accorded a trial date set earlier than the expected [FWD] date." IPR2020-00944, Paper 20, 61. As recognized by the Board, where "there is at least some persuasive evidence that delays are possible," trial dates upward of six months before the FWD are insufficient to deny institution. *Id.* Here, the law and facts support the same conclusion.

As the Federal Circuit explained in *In re Apple*, "a court's general ability to set a fast-paced schedule is not particularly relevant," especially where "the forum [i.e., W.D. Tex.] itself has not historically resolved cases so quickly." *In re Apple Inc.*, No 20-135, slip op. at 16 (Fed. Cir. Nov. 9, 2020) (Ex. 1009); *see* IPR2020-01280, Paper 17, 13-16. Indeed, the Federal Circuit found error in reliance on the case's scheduled trial date. *In re Apple Inc.*, No 20-135, slip op. at 15. Similarly, adhering to the Federal Circuit's guidance, it would be error for the Board to rely upon the current schedule. And, if the Board instead projects the trial date using the WDTX's average time to trial—which itself leaves the Board to error-prone speculation as to the timing of this particular trial—that speculated trial date is (at best) concurrent with the timing of the final written decision. Id.

68

Notably, here, concerns over speculation transcend the legal error noted by the Federal Circuit, as averages are inherently unreliable in resolving trial dates. This is evident from statistics concerning strikingly frequent trial slippage in WDTX. "70% of [WDTX] trial dates initially relied upon by the PTAB to deny petitions have slid," as of July 2020. District Court Trial Dates Tend to Slip After PTAB Discretionary Denials (Ex. 1010). Such delays even impacted the seminal *NHK* and *Fintiv* cases, where, after the Board denied institution, associated trial dates were delayed to after the expected FWD dates by the courts—the same WDTX court in *Fintiv* as is handling the Texas Litigation. *See* IPR2018-01680, Paper 22 at 17, n. 6 (PTAB Apr. 3, 2019) ("In the district court case running parallel to *NHK Spring*, the court ultimately moved the trial date back six months, illustrating the uncertainty associated with litigation schedules."); Order Resetting *Fintiv* Jury Trial (Ex. 1011) (resetting *Fintiv* trial to October 4, 2021, nearly five months after the FWD would have been due in the associated IPR). In contrast, despite the pandemic, the Board has adhered to the one-year statutory deadline for FWDs prescribed by 35 U.S.C. § 316(a)(11).

3. Investment in the parallel proceeding by the court and the parties.

The parties have invested little in the parallel proceeding. No infringement or invalidity contentions have been exchanged, no claim construction positions have

69

been taken, and no discovery has been conducted. This factor weighs in favor of institution.

4. Overlap between issues raised in the petition and in the parallel proceeding.

No invalidity contentions have been served in the district court litigation, so there is presently no overlap. This factor weights in favor of institution.

5. *Whether* the petitioner and the defendant in the parallel proceeding are the same party.

The parties are the same in the district court litigation. However, members of the Board have noted that *Fintiv* addresses only the scenario in which the petitioner is unrelated to a defendant in a parallel proceeding, finding this should weigh against denying institution, but that *Fintiv* "says nothing about situations in which the petitioner is the same as, or is related to, the district court defendant." *Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, IPR2020-00122, Paper 15, at *10 (PTAB May 15, 2020) (APJ Crumbley, dissenting) (noting that disfavoring a "defendant in the district court" is "contrary to the goal of providing district court litigants an alternative venue to resolve questions of patentability").

6. Other circumstances that impact the Board's exercise of discretion, including the merits.

As set forth above, the strength of the proposed grounds weighs strongly in favor of institution.

Additionally, the *Fintiv* factors require the Board to take "a holistic view of whether efficiency and integrity of the system are best served by denying or instituting review." *Fintiv*, Paper 11 at 6. Denying institution here is both inefficient and would raise significant concerns about the patent system's integrity. Were the Board to deny institution, years of district court litigation would be required just to obtain a finding of invalidity. Such a scenario runs directly counter to *Fintiv's* goals of preserving efficiency and the system's integrity.

In sum, denying institution here creates vast inefficiencies, forcing the parties to litigate for potentially years in the district court and harms system integrity by rejecting the PTAB as the "lead agency" in assessing patentability. The Board should decline to exercise its discretion for these additional reasons.

### b. The *Fintiv* Framework Should Be Overturned

Apart from Petitioner's showing that the *Fintiv* factors favor institution, the *Fintiv* framework should be overturned because it is both legally invalid and unwise policy. Specifically, the framework (1) exceeds the Director's authority, (2) is arbitrary and capricious, (3) and was adopted without notice-and-comment rulemaking.

71

1. The *Fintiv* framework exceeds the Director's authority

Under the America Invents Act ("AIA"), the Director has no authority to deny IPR petitions based on parallel infringement litigation if the IPR petition was timely under § 315(b). Section 314(a) permits the Director to determine whether "there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged." That phrasing is not an invitation to create grounds for denying institution that conflict with other aspects of the statute. Accordingly, even assuming § 314(a) gives the Director a degree of discretion to deny institution, he cannot exercise that discretion in a manner that violates or exceeds his authority under the AIA. And the AIA's text, structure, and purpose show that Congress withheld the authority to deny institution based on parallel infringement litigation.

For example, § 315(b) makes clear that IPR is permissible when parallel litigation is pending if the petition is timely. Because statutorily defined time limitations inherently "take[] account of delay," other "case-specific circumstances"—like the *Fintiv* factors—"cannot be invoked to preclude adjudication of a claim … brought within the [statutory] window." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 667, 677-680, 685 (2014).

The AIA's structure confirms that the Director lacks authority to adopt and apply the *Fintiv* framework. Various provisions specify how the Director may or

72

must handle parallel proceedings, showing that Congress carefully considered how to promote both efficiency and the purposes of IPR in the face of parallel proceedings and intended for IPR to be available even when parallel infringement litigation is pending if the IPR petition is timely. *See, e.g.*, §§ 315(a), (d), 325(d). But none of those provisions grants the Director discretion to reject IPR because there is a parallel lawsuit. Thus, Congress "knew how to draft the kind of statutory language that [the Director] seeks to read into" the AIA. *State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*, 137 S. Ct. 436, 443-444 (2016). "[H]ad Congress intended to" grant the Director the discretion he has asserted in the *NHK-Fintiv* framework, Congress "would have said so." *Id.*

Finally, by treating overlap as a reason to deny institution, the *Fintiv* framework contravenes a central purpose of IPR, namely, providing a more efficient additional pathway for resolving the same issues that the challenger could otherwise have brought only in litigation. *See* H.R. Rep. No. 98, at 48, 112th Cong., 1st Sess. (2011); *Thryv, Inc. v. Click-To-Call Techs., LP*, 140 S. Ct. 1367, 1374-1375 (2020).

### 2. The *Fintiv* framework is arbitrary and capricious

The *Fintiv* framework is arbitrary and capricious, and therefore unlawful, in several respects. First, the framework requires the Board to make decisions based on speculation about the course of parallel litigation, producing irrational outcomes and

73

disparities between similarly situated IPR petitioners. *See, e.g.*, *Horsehead Resource Dev. Co. v. Browner*, 16 F.3d 1246, 1269 (D.C. Cir. 1994) ("agency actions based upon speculation are arbitrary and capricious"). Second, the *NHK-Fintiv* factors are so vague and malleable that they lead the Board to "treat similar situations differently without reasoned explanation"—a hallmark of arbitrary and capricious agency action. *Port of Seattle v. FERC*, 499 F.3d 1016, 1034 (9th Cir. 2007). And third, the *NHK-Fintiv* framework is not rationally connected to its ostensible purpose of promoting efficiency. On the contrary, the rule undermines that goal by, for example, pressuring infringement defendants to file premature IPR petitions and allowing infringement plaintiffs to block IPR entirely through forum shopping.

> 3. The *Fintiv* framework was impermissibly adopted without notice-and-comment rulemaking

The *Fintiv* framework is also invalid because it is a rule that was impermissibly adopted without notice-and-comment rulemaking. Through the Director's designation of *NHK* and *Fintiv* as precedential, those decisions' framework became "binding" on the Board "in subsequent matters involving similar facts or issues," Patent Trial and Appeal Board, Standard Operating Procedure 2 (Rev. 10) ("SOP-2"), at 11 (Sept. 20, 2018)—that is, they became a "rule" as defined in the Administrative Procedure Act ("APA"), *see* 5 U.S.C. § 551(4) (defining "rule"). But that designation process did not entail public notice and an opportunity or public comment, *see* SOP-2 at 1-4, 8-12;

74

*Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1331-1332 (Fed. Cir. 2017) (Moore, J.,

concurring), contrary to the requirements of both the APA and the AIA. *See Kisor v.

Wilkie*, 139 S. Ct. 2400, 2420 (2019); §§ 2(b)(2), 316(a).

## VI.    CONCLUSION

For the forgoing reasons, Petitioner respectfully requests *inter partes* review

of claims 1–31 of the '431 Patent.

Respectfully submitted,

By: /s/ Adam P. Seitz
Adam P. Seitz, Reg. No. 52,206
Paul R. Hart, Reg. No. 59,646

*COUNSEL FOR PETITIONER*

75

## VII. MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(A)(1)

### A. Real Party-In-Interest

Petitioner is the real party-in-interest. 37 C.F.R. § 42.8(b)(1).

### B. Related Matters

Pursuant to 37 C.F.R. § 42.8(b)(2), Petitioner is aware of the following matters involving the '431 Patent: *Gesture Technology Partners, LLC v. Apple Inc.,* No. 6:21-cv-00121 (W.D. Tex.); *Gesture Technology Partners, LLC v. Lenovo Group Ltd. et al.,* No. 6:21-cv-00122 (W.D. Tex.); *Gesture Technology Partners, LLC v. LG Electronics, Inc. et al.,* No. 6:21-cv-00123 (W.D. Tex.). IPR2021-00917, filed on May 14, 2021, challenged claims 7-13 from the '431 Patent.

### C. Lead and Back-Up Counsel

Petitioner provides the following designation and service information for lead and back-up counsel. 37 C.F.R. § 42.8(b)(3) and (b)(4).

| Lead Counsel | Back-Up Counsel |
|---|---|
| | |

76

| Adam P. Seitz (Reg. No. 52,206) | Paul R. Hart (Reg. No. 59,646) |
|---|---|
| Adam.Seitz@eriseip.com | Paul.Hart@eriseip.com |
| | |
| Postal and Hand-Delivery Address: | Postal and Hand-Delivery Address: |
| Erise IP, P.A. | Erise IP, P.A. |
| 7015 College Blvd., Ste. 700 | 5299 DTC Blvd., Ste. 1340 |
| Overland Park, Kansas 66211 | Greenwood Village, Colorado 80111 |
| Telephone: (913) 777-5600 | Telephone: (913) 777-5600 |
| Fax: (913) 777-5601 | Fax: (913) 777-5601 |

## APPENDIX OF EXHIBITS

| | |
|---|---|
| **Exhibit 1001** | U.S. Patent No. 7,933,431("'431 Patent") |
| **Exhibit 1002** | Prosecution History for the '431 Patent ("'431 File History") |
| **Exhibit 1003** | U.S. Patent No. 6,144,366 ("Numazaki") |
| **Exhibit 1004** | U.S. Patent No. 6,088,018 to De Leeuw, et al. (*DeLeeuw*) |
| **Exhibit 1005** | U.S. Patent No. 6,064,354 to DeLuca (*"DeLuca"*) |
| **Exhibit 1006** | U.S. Patent No. 6,243,683 to Peters ("*Peters*") |
| **Exhibit 1007** | Order Governing Proceedings in patent cases issued by Judge Alan D. Albright |
| **Exhibit 1008** | Bederson Declaration ("Bederson Dec.") |
| **Exhibit 1009** | *In re Apple Inc.*, No 20-135, slip op. at 16 (Fed. Cir. Nov. 9, 2020) |
| **Exhibit 1010** | District Court Trial Dates Tend to Slip After PTAB Discretionary Denials |
| **Exhibit 1011** | Order Resetting *Fintiv* Jury Trial |
| **Exhibit 1012** | "CCD and CMOS Imaging Array Technologies," Stuart Taylor, Xerox Research Centre Europe, 1998 |
| **Exhibit 1013** | Sheryl WuDunn's article on cellular videophone technology |
| **Exhibit 1014** | A Brief History of Handheld Video Games |
| **Exhibit 1015** | "A Miniature Space-Variant Active Vision System: Cortex-I," Ph.D. Thesis, NYU, 1992 |
| **Exhibit 1016** | In Conference Companion on Human Factors in Computing Systems (CHI '95), I. Katz, R. Mack, and L. Marks (Eds.). ACM, New York, NY, USA, 210-211. DOI=http://dx.doi.org/10.1145/223355.223526 |

IPR2021-00920
U.S. Patent No. 7,933,431

## CERTIFICATION OF WORD COUNT

The undersigned certifies pursuant to 37 C.F.R. §42.24 that the foregoing

Petition for *Inter Partes* Review, excluding any table of contents, mandatory notices

under 37 C.F.R. §42.8, certificates of service or word count, or appendix of exhibits,

contains 13,834 words according to the word-processing program used to prepare

this document (Microsoft Word).

Dated: May 21, 2021


BY: /s/ Adam P. Seitz
Adam P. Seitz, Reg. No. 52,206

COUNSEL FOR PETITIONER

79

## CERTIFICATE OF SERVICE ON PATENT OWNER
## UNDER 37 C.F.R. § 42.105

Pursuant to 37 C.F.R. §§ 42.6(e) and 42.105, the undersigned certifies that on May 21, 2021, a complete and entire copy of this Petition for *Inter Partes* Review including exhibits was provided via Federal Express to the Patent Owner by serving the correspondence address of record for the '431 Patent as listed on PAIR:

Warner Norcross + Judd LLP
Intellectual Property Group
150 Ottawa Ave. NW, Suite 1500
Grand Rapids, MI 49503

Further, a courtesy copy of this Petition for *Inter Partes* Review was sent via email to Patent Owner's litigation counsel:

Fred I. Williams (fwilliams@wsltrial.com)
Michael Simons (msimons@wsltrial.com)
Jonathan L. Hardt (jhardt@wsltrial.com)
Chad Ennis (cennis@wsltrial.com)
Todd E. Landis (tlandis@wsltrial.com)
John Wittenzellner (johnw@wsltrial.com)

BY: /s/ Adam P. Seitz
Adam P. Seitz, Reg. No. 52,206

COUNSEL FOR PETITIONER

80

IPR2021-00920
Patent 7,933,431

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.

Petitioner,

v.

GESTURE TECHNOLOGY PARTNERS, LLC

Patent Owner

_____

***Inter Partes* Review No. IPR2021-00920**

**Patent No. 7,933,431**

**PATENT OWNER'S RESPONSE TO THE PETITION
FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 7,933,431
PURSUANT TO 37 C.F.R. § 42.120**

Filed on behalf of Patent Owner by:

Todd E. Landis (Reg. No. 44,200)
2633 McKinney Ave., Suite 130
Dallas, TX 75204

John Wittenzellner (Reg. No. 61,662)
1735 Market Street, Suite A #453
Philadelphia, PA 19103

Adam B. Livingston (Reg. No. 79,173)
327 Congress Avenue, Suite 490
Austin, TX 78701

**WILLIAMS SIMONS & LANDIS PLLC**

IPR2021-00920
Patent 7,933,431

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

II.   STATEMENT OF THE PRECISE RELIEF REQUESTED ........................3

III.  THE PETITION SHOULD BE DENIED BECAUSE IT DOES NOT ESTABLISH A REASONABLE LIKELIHOOD OF SUCCESS ON ANY CHALLENEGED CLAIM ........................................................3

    A.    The '431 Patent .............................................................................3

    B.    Level of Ordinary Skill in the Art .................................................5

    C.    Claim Construction.......................................................................5

        1.    The preambles of independent claims 1, 7, and 14 should be construed as limitations.......................................................5

    D.    Ground 1 – Numazaki Does Not Render Obvious Claims 1-4, 7-9, 11-22, 25, 26, and 28 ............................................................9

        1.    Independent Claim 1 ...........................................................9

            i.    [1(c)] electro-optically sensing light reflected from said at least one finger using a sensing means associated with said device; determining from said sensed light the movement of said finger ........................9

        2.    Dependent Claim 2................................................................12

        3.    Dependent Claim 3................................................................12

        4.    Dependent Claim 4................................................................12

        5.    Independent Claim 7 .............................................................13

            i.    [7(b)] a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object................................................................13

            ii.   [7(c)] computer means within said housing for analyzing said image to determine information concerning a position or movement of said object.........14

6.    Dependent Claim 8.................................................15

7.    Dependent Claim 9.................................................15

8.    Dependent Claim 11 ..............................................16

9.    Dependent Claim 12 ..............................................17

10.   Dependent Claim 13 ..............................................17

11.   Independent Claim 14 ...........................................17

     i.    [14(b)] associating a camera with said device, said camera viewing at least a portion of the body of a user operating said device or an object held by said user, in order provide image data concerning said portion or object..............................................17

     ii.   [14(c)] using said computer, analyzing said image data to determine information concerning a user input command ...................................................18

12.   Dependent Claim 15 ..............................................20

13.   Dependent Claim 16 ..............................................20

14.   Dependent Claim 17 ..............................................20

15.   Dependent Claim 18 ..............................................21

16.   Dependent Claim 19 ..............................................21

17.   Dependent Claim 20 ..............................................21

18.   Dependent Claim 21 ..............................................22

19.   Dependent Claim 22 ..............................................22

20.   Dependent Claim 25 ..............................................22

21.   Dependent Claim 26 ..............................................22

22.   Dependent Claim 28 ..............................................23

E.  Ground 2 – The Combination of Numazaki and DeLeeuw Does Not Render Obvious Claims 5, 6, and 29 ..................................................23

F.  Ground 3 – The Combination of Numazaki and DeLuca Does Not Render Obvious Claims 10, 23, 24, and 27 ........................................23

G.  Ground 4 – The Combination of Numazaki and Peters Does Not Render Obvious Claims 30 and 31 ......................................................24

IV.  THE PETITION SHOULD BE DENIED FOR FAILURE TO COMPLY WITH 37 C.F.R. § 42.104(b)(3)-(4) ............................................................24

V.  THE PETITION SHOULD BE DENIED UNDER 35 U.S.C. § 314(a).......25

VI.  THE PETITION SHOULD BE DENIED BECAUSE THE BOARD DOES NOT HAVE JURISDICTION OVER EXPIRED PATENTS...........28

VII.  CONCLUSION.............................................................................................29

## I.    INTRODUCTION

Gesture Technology Partners, LLC ("GTP" or "Patent Owner") respectfully submits this Preliminary Response (the "Response") to Apple Inc.'s ("Apple" or "Petitioner") Petition for *Inter Partes* Review ("IPR") No. IPR2021-00920 (the "Petition" or "Pet.") of U.S. Patent No. 7,933,431 (the "'431 Patent").

Institution should be denied because the Petition fails to demonstrate a reasonable likelihood that any challenged claim of the '431 Patent is unpatentable. As detailed herein, the reference (Numazaki) applied by the Petition against all independent claims of the '431 Patent has numerous glaring deficiencies, including failing to teach to suggest at least the following limitations:

- [1(c)][1] electro-optically sensing light reflected from said at least one finger using a sensing means associated with said device; determining from said sensed light the movement of said finger;

- [7(b)] a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object;

---

[1] For convenience of reference only, this Preliminary Response adopts the claim element numbering presented in the Petition.

- [7(c)] computer means within said housing for analyzing said image to determine information concerning a position or movement of said object;

- [14(b)] associating a camera with said device, said camera viewing at least a portion of the body of a user operating said device or an object held by said user, in order provide image data concerning said portion or object; and

- [14(c)] using said computer, analyzing said image data to determine information concerning a user input command.

The Board should also deny institution because the Petition fails to comply with 37 C.F.R. § 42.104(b)(3)-(4). Institution should be denied for the additional reason that the Board should exercise its discretionary power to deny institution under 35 U.S.C. § 314(a). Unified Patents filed a petition for *inter partes* review (IPR2021-00917) before Petitioner Apple, which relies on the same prior art. Both Unified Patents and Apple declined to identify whether Apple is a Unified Member, thereby denying the Board and Patent Owner a full and fair opportunity to address why the Board should deny institution under *General Plastic Industrial Co., Ltd. v. Canon Kabushiki Kaisha* ("*General Plastic*"), IPR2016-01357, Paper 19 at 15-19 (September 6, 2017) (precedential).

Finally, the Petition should be denied because the Board does not have jurisdiction over expired patents.

For these reasons, institution should be denied.

## II.    STATEMENT OF THE PRECISE RELIEF REQUESTED

Patent Owner requests that the Board deny institution of the Petition with respect to all challenged claims and all asserted grounds.  A full statement of the reasons for the relief requested is set forth in Sections III-V of this Response.

## III.    THE PETITION SHOULD BE DENIED BECAUSE IT DOES NOT ESTABLISH A REASONABLE LIKELIHOOD OF SUCCESS ON ANY CHALLENEGED CLAIM

As shown below, the Petition fails to demonstrate a reasonable likelihood that Petitioner would prevail with respect to any claim of the '431 Patent.  The Petition challenges claims 1-31 of the '431 Patent (the "Challenged Claims").  Pet., p. 1.  As detailed herein, each proposed Ground fails to disclose key limitations of each Challenged Claim.  Trial should not be instituted.

### A.    The '431 Patent

The '431 Patent, which is entitled "Camera Based Sensing in Handheld, Mobile, Gaming or Other Devices," claims priority to U.S. Provisional Application No. 60/142,777 filed on July 8, 1999.  *See* Ex. 1001.  The '431 Patent is directed towards methods and apparatuses "to enable rapid TV camera and computer-based sensing in many practical applications, including, but not limited to, handheld devices, cars, and video games."  *Id.*, Abstract.  In some embodiments, the patent describes the use of computer devices and one or more cameras that "optically

sens[e] human input" with applications in a "variety of fields such as computing, gaming, medicine, and education." *Id*., 2:7-17.

In some embodiments, the '431 Patent discloses a handheld device, such as a cell phone, that processes imaging from a person or object to control functions on the handheld device. *Id*., 11:62:-67. Figure 8A, which is reproduced below, depicts some embodiments in which a handheld device includes the functionality of the invention.



*FIG. 8A*

Ex. 1001, Fig. 8A.

The '431 Patent describes that the handheld device can "perform a control function by determining [] position, orientation, pointing direction or other variable

with respect to one or more external objects, using an optical sensing apparatus . . . or with a camera located in the handheld device, to sense datums or other information external for example to the device." *Id.*, 12:1-9. The '431 Patent describes that the device is able to "acquire features of an object and use it to determine something" such as object recognition. *Id.* at 13:5-21. The '431 Patent states that the purpose of some handheld embodiments is "to add functionality to the device, without complicating its base function, and/or alternatively [to] add a method to interact with the device to achieve other purposes." *Id.* at 11:64-67.

## B.    Level of Ordinary Skill in the Art

For the purposes of this Response only, Patent Owner does not dispute the level of skill of a person of ordinary skill in the art ("POSITA") identified in the Petition.

## C.    Claim Construction

Except for the claim term discussed below, Patent Owner does not contest the constructions proposed in the Petition for the purpose of this response. *See* Pet., p. 7. Patent Owner reserves the right to address claim construction of any term in the Challenged Claims if the Board institutes *inter partes* proceedings.

### 1.    The preambles of independent claims 1, 7, and 14 should be construed as limitations.

The preambles of claims 1, 7, and 14 should be construed as limitations. "A preamble limits the invention if it recites essential structure or steps, or is 'necessary

to give life, meaning, and vitality' to the claim." *Acceleration Bay, LLC v. Activision Blizzard, Inc.*, 908 F.3d 765, 770 (Fed. Cir. Nov. 6, 2018) (quoting *Catalina Mktg.Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002)). The preambles of claims 1, 7, and 14 do both. Independent claims 1, 7, and 14 are reproduced below.

> 1. A method for controlling a <u>handheld computing device</u> comprising the steps of:
>
> holding said <u>device</u> in one hand;
>
> moving at least one finger in space in order to signal a command to said <u>device</u>;
>
> electro-optically sensing light reflected from said at least one finger using a sensing means associated with said <u>device</u>;
>
> determining from said sensed light the movement of said finger, and
>
> using said sensed finger movement information, controlling said <u>device</u> in accordance with said command.

Ex. 1001, 25:40-50 (emphasis added).

> 7. <u>Handheld computer apparatus</u> comprising:
>
> a housing;

a camera means associated with said housing for obtaining an image

using reflected light of at least one object positioned by a user

operating said object;

computer means within said housing for analyzing said image to

determine information concerning a position or movement of

said object; and

means for controlling a function of said <u>apparatus</u> using said

information.

Ex. 1001, 25:61-26:5 (emphasis added).

14. A method for controlling a <u>handheld computing device</u> comprising the

steps of:

providing a computer within said <u>device</u>;

associating a camera with said <u>device</u>, said camera viewing at least a

portion of the body of a user operating said <u>device</u> or an object

held by said user, in order provide image data concerning said

portion or object;

using said computer, analyzing said image data to determine

information concerning a user input command; and

from said determined information, controlling a function of said <u>device</u>.

Ex. 1001, 26:18-28 (emphasis added).

7

The preamble of claim 1 recites: "a handheld computing device." As shown, multiple limitations within claim 1 refer back to the same handheld computing device for antecedent basis. Moreover, claim 1 explicitly requires "holding said device in one hand," which only reinforces that "the device" must be the "handheld computing device," as set forth in the preamble of claim 1. Similarly, the preamble of claim 7 recites "handheld computer apparatus." The final limitation of claim 7 refers back to the same handheld computer apparatus for antecedent basis. And, finally, the preamble of claim 14 recites: "handheld computing device." As shown, multiple limitations within claim 14 refer back to the same handheld computing device for antecedent basis. So the preambles recite essential structure for claims 1, 7, and 14.

The preambles are also necessary to give life, meaning, and vitality to claims 1, 7, and 14. The '431 Patent discloses different embodiments of Dr. Pryor's inventions. In some embodiments, the invention is provided in the form of a computer. *See, e.g.,* Ex. 1001, Fig. 1A. In some other embodiments, the invention is provided in a handheld device, such as a cell phone. *See id.*, 12:59-13:7. Claims 1, 7, and 14 purposely recite a "handheld computing device" or "handheld computing apparatus" to claim the handheld-device embodiments disclosed in the specification. Thus, the preamble is necessary to give life, meaning, and vitality to claims 1, 7, and 14, consistent with the embodiments that the inventor chose to claim.

### D.  Ground 1 – Numazaki Does Not Render Obvious Claims 1-4, 7-9, 11-22, 25, 26, and 28

Numazaki does not render obvious claims 1-4, 7-9, 11-22, 25, 26, and 28.

#### 1.  Independent Claim 1

Numazaki does not render independent claim 1 obvious because it does not teach or suggest at least the following elements of independent claim 1.

> ##### i.  [1(c)] electro-optically sensing light reflected from said at least one finger using a sensing means associated with said device; determining from said sensed light the movement of said finger

Claim element [1(c)] recites "electro-optically sensing light reflected from said at least one finger using a sensing means associated with said device; determining from said sensed light the movement of said finger." Claim element [1(c)] requires "determining" finger movement from reflected light that is "electro-optically" sensed using one "sensor means." The Petition contends that Numazaki teaches or suggests claim element [1(c)]. Pet., pp. 20-21. It does not.

The Petition fails to provide any construction for the term "sensing means." *See id.* The Petition also fails to expressly identify which components in Numazaki correspond to the claimed "sensing means." *See id.* For purposes of this response, Patent Owner assumes that Petitioner has identified the "camera units" as corresponding to the "sensing means" term.

It is worth noting, however, that Numzaki does not use the term "camera unit." Instead, the Petition uses the term "camera units" to refer to what Numazaki describes as "photo-detection units." *Compare* Pet., p. 13 ("when the first camera unit is active and off when the second camera unit is active.") (citing Ex. 1003, 11:20-32) *with* Ex. 1003, 11:28-32 ("such that the lighting unit 101 emits the light when the first photo-detection unit 109 is in a photo-detecting state, whereas the lighting unit 101 does not emit the light when the second photo-detection unit 110 is in a photodetecting state."). This response will use the term "photo-detection unit" (i.e., the term used in Numazaki) to refer to what the Petition identifies as "camera units" to be consistent with the disclosure of Numazaki.

Numazaki requires <u>two</u> photo-detection units to perform an analysis of a target object and control a computer. Numazaki discloses a "reflected light extraction unit 102" with a "first photo-detection unit 109," a "second photo-detection unit 110," and a "difference calculation unit 111." Ex. 1003, 10:57-66; 11:20-51; Fig. 2. The first photo-detection unit 109 requires that a lighting unit 101 emit light during detection. *Id*. at 11:26-30, Fig. 2. Later, at a different time, when first photo-detection unit 109 is not active, the second photo-detection unit 110 detects while lighting unit 101 is not active. *Id*., 11:30-32, Fig. 2. Those two images—the image from first photo-detection unit 109 and the image from the second photo-detection unit 110—are then subtracted from each other before the information is used in the

remainder of the system to analyze the target object and control a computer. *See id.*, 10:57-66; 11:43-56. Thus, Numazaki's first embodiment requires: (1) two, not one, photo-detection units; (2) a lighting unit for illumination; (3) timing circuitry that selectively activates the lighting unit based on which photo-detection unit is active; and (4) circuitry for subtracting one image from another. Petitioner agrees that Numazaki requires two photo-detection units to perform an analysis of a target object and control a computer. *See* Pet., pp. 13-15, 20-21.

Numazaki requires <u>two</u> photo-detection units to perform an analysis of a target object and control the computer, so it does not teach or suggest "determining" finger movement from reflected light that is "electro-optically" sensed using one "sensor means," as set forth in claim element [1(c)]. Similarly, Numazaki does not teach or suggest "determining" finger movement absent the other hardware that Numazaki identifies as necessary, such as the lighting unit, the image-subtraction circuitry, and the associated timing circuitry. The Petition does not recognize this deficiency in Numazaki. *See* Pet., pp. 13-15 and 20-21. Nor does it argue that it would have been obvious to modify Numazaki to meet this claim element. *See id.*

For at least these reasons, Numazaki fails to teach or suggest claim element [1(c)]. Accordingly, Numazaki fails to render independent claim 1 unpatentable.

## 2.    Dependent Claim 2

Dependent claim 2 recites "A method according to claim 1, wherein at least one camera is utilized to effect said electro-optical sensing." Claim 2 depends from and adds limitations to claim 1. Numazaki fails to render claim 1 unpatentable, therefore, Numazaki fails to render dependent claim 2 unpatentable for at least the same reasons.

## 3.    Dependent Claim 3

Dependent claim 3 recites "A method according to claim 1, including the further step of acquiring an image of at least a portion of the user of the device." Claim 3 depends from and adds limitations to claim 1. Numazaki fails to render claim 1 unpatentable, therefore, Numazaki fails to render dependent claim 3 unpatentable for at least the same reasons.

## 4.    Dependent Claim 4

Dependent claim 4 recites "A method according to claim 1, wherein said movement is sensed in 3 dimensions." Claim 4 depends from and adds limitations to claim 1. Numazaki fails to render claim 1 unpatentable, therefore, Numazaki fails to render dependent claim 4 unpatentable for at least the same reasons.

### 5.    Independent Claim 7

Numazaki does not render independent claim 7 obvious because it does not teach or suggest the following elements of independent claim 7:

> **i.    [7(b)] a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object**

Claim element [7(b)] recites "a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object."  The Petition contends that Numazaki teaches or suggests this limitation.  Pet., pp. 27-29.  It does not.

Under Petitioner's proposed construction, the "camera means" term is an "optical image sensor."  Pet., p. 6.  Numazaki does not teach or suggest one optical image sensor (i.e., one camera means) to obtain an image.  As discussed above, Numazaki requires two photo-detection units.  *See* claim 1, *supra*.  The Petition even concedes that Numazaki requires two photo-detection units.  Pet., pp. 13, 14, 20, 28.  The Petition does not address this deficiency in Numazaki, nor does it assert that it would have been obvious to a skilled artisan to modify Numazaki such that it meets this claim element.  *See* Pet., pp. 27-29.  For at least these reasons, Numzaki fails to teach or suggest claim element [7(b)].

ii.   **[7(c)] computer means within said housing for analyzing said image to determine information concerning a position or movement of said object**

Claim element [7(c)] recites "computer means within said housing for analyzing said image to determine information concerning a position or movement of said object." Claim element [7(c)] requires, in part, that the "computer means" be capable of analyzing an image from one camera means to determine position or movement information of the object. *Compare* claim element [7(c)] *with* claim element [7(b)]. The Petition contends that Numazaki teaches or suggests this limitation. Pet., 29-30. It does not.

As discussed above, to perform an analysis (e.g., tracking) of a target object, Numazaki requires: (1) two, not one, images from different photo-detection units; (2) a lighting unit for illumination; (3) timing circuitry that selectively activates the lighting unit based on which photo-detection unit is active; and (4) circuitry for subtracting one image from another. *See* claim 1, *supra*. *See also* Ex. 1003, 10:57-66; 11:20-56; Fig. 2.

Under Petitioner's proposed construction, the "camera means" term is an "optical image sensor." Pet., p. 6. Claim element 7 requires that the optical image sensor obtain an image. Ex. 1001, 25:63-65. Under Petitioner's proposed construction of the "computer means . . ." term, the corresponding structure must be capable of analyzing a target object captured by one camera means (i.e., one "optical

14

image sensor"). The alleged "computer means" taught by Numazaki cannot analyze a target object captured by one optical image sensor. Similarly, alleged "computer means" taught by Numazaki cannot analyze a target object absent the other hardware that Numazaki identifies as necessary, such as the lighting unit, the image-subtraction circuitry, and the associated timing circuitry. The Petition does not recognize this deficiency in Numazaki. *See* Pet., pp. 13-15 and 27-30. Nor does it argue that it would have been obvious to modify Numazaki to meet this claim element. *See id.* Accordingly, Numazaki does not teach or suggest the corresponding structure for performing the recited function of claim element [7(c)].

For at least these reasons, Numazaki fails to render independent claim 7 unpatentable.

### 6.    Dependent Claim 8

Dependent claim 8 recites "Apparatus according to claim 7, wherein said object is a finger." Claim 8 depends from and adds limitations to claim 7. Numazaki fails to render claim 7 unpatentable, therefore, Numazaki fails to render dependent claim 8 unpatentable for at least the same reasons.

### 7.    Dependent Claim 9

Dependent claim 9 recites "Apparatus according to claim 7, further including a display function which is controlled." Claim 9 depends from and adds limitations

to claim 7.  Numazaki fails to render claim 7 unpatentable, therefore, Numazaki fails to render dependent claim 9 unpatentable for at least the same reasons.

### 8.     Dependent Claim 11

Dependent claim 11 recites "Apparatus according to claim 7, further including means for transmitting information."  Claim 11 depends from and adds limitations to claim 7.  Numazaki fails to render claim 7 unpatentable, therefore, Numazaki fails to render dependent claim 11 unpatentable for at least the same reasons.

Moreover, the Petition fails to provide any analysis regarding whether Numazaki discloses this limitation under Petitioner's proposed construction of the term "means for transmitting information."  *See* Pet., pp. 24-25.  The Petition asserts that the corresponding structure for this limitation is "at least a cellular transceiver." *See id.*, pp. 11-12.

The Petition fails to identify any cellular transceiver in Numazaki.  *See* Pet., pp. 32-33.  Instead, the Petition relies on the so-called fifth embodiment of Numazaki, which is part of a "conference record system."  *See id.*  The Petition fails to identify the transmitter in that embodiment, let alone provide any analysis regarding whether the transmitter allegedly disclosed in Numazaki is an equivalent of the "cellular transceiver" proposed by Petitioner.  *See id.*

### 9. Dependent Claim 12

Dependent claim 12 recites "Apparatus according to claim 7, further including a light source for illuminating said object." Claim 12 depends from and adds limitations to claim 7. Numazaki fails to render claim 7 unpatentable, therefore, Numazaki fails to render dependent claim 12 unpatentable for at least the same reasons.

### 10. Dependent Claim 13

Dependent claim 13 recites "Apparatus according to claim 7, wherein said apparatus is a cellular phone." Claim 13 depends from and adds limitations to claim 7. Numazaki fails to render claim 7 unpatentable, therefore, Numazaki fails to render dependent claim 13 unpatentable for at least the same reasons.

### 11. Independent Claim 14

Numazaki does not render independent claim 14 obvious because it does not teach or suggest the following elements of independent claim 14:

> **i.    [14(b)] associating a camera with said device, said camera viewing at least a portion of the body of a user operating said device or an object held by said user, in order provide image data concerning said portion or object**

Claim element [14(b)] recites "associating a camera with said device, said camera viewing at least a portion of the body of a user operating said device or an object held by said user, in order provide image data concerning said portion or

object." Claim element [14(b)] requires, in part, one camera viewing a body portion or an object to provide image data. The Petition contends that Numazaki teaches or suggests this limitation. Pet., p. 35. It does not.

As discussed above, Numazaki requires <u>two</u> photo-detection units. *See* claim 1, *supra*. The Petition even concedes that Numazaki requires two photo-detection units. Pet., pp. 13, 14, 20, and 28. Accordingly, Numazaki does not teach or suggest one camera viewing a body portion or an object to provide image data. The Petition does not address this deficiency in Numazaki, nor does it assert that it would have been obvious to a skilled artisan to modify Numazaki such that it meets this claim element. *See* Pet., pp. 27-29 and 35. For at least these reasons, Numzaki fails to teach or suggest claim element [14(b)].

### ii.     [14(c)] using said computer, analyzing said image data to determine information concerning a user input command

Claim element [14(c)] recites "using said computer, analyzing said image data to determine information concerning a user input command." Claim element [14(c)] requires, in part, "analyzing" the "image data" from the one camera to "determine information concerning a user input command." *Compare* claim element [14(c)] *with* claim element [14(b)]. The Petition contends that Numazaki teaches or suggests this limitation. Pet., 29-30. It does not.

IPR2021-00920
Patent 7,933,431

As discussed above, to perform an analysis (e.g., tracking) of a target object and control a computer, Numazaki requires: (1) two, not one, images from different photo-detection units; (2) a lighting unit for illumination; (3) timing circuitry that selectively activates the lighting unit based on which photo-detection unit is active; and (4) circuitry for subtracting one image from another. *See* claim 1, *supra*. *See also* Ex. 1003, 10:57-66; 11:20-56; Fig. 2.

Numazaki requires two images from different photo-detection units to perform an analysis of a target object and control the computer, so it does not teach or suggest "analyzing" the "image data" from the one camera to "determine information concerning a user input command," as set forth in claim element [14(c)]. Similarly, Numazaki does not teach or suggest "analyzing" image data absent the other hardware that Numazaki identifies as necessary, such as the lighting unit, the image-subtraction circuitry, and the associated timing circuitry. The Petition does not recognize this deficiency in Numazaki. *See* Pet., pp. 13-15, 20, 21, and 35. Nor does it argue that it would have been obvious to modify Numazaki to meet this claim element. *See id.* Accordingly, Numazaki does not teach or suggest the corresponding structure for performing the recited function of claim element [14(c)].

For at least these reasons, Numazaki fails to render independent claim 14 unpatentable.

### 12. Dependent Claim 15

Dependent claim 15 recites "A method according to claim 14, wherein reflected light from said body portion or object is imaged by said camera." Claim 15 depends from and adds limitations to claim 14. Numazaki fails to render claim 14 unpatentable, therefore, Numazaki fails to render dependent claim 15 unpatentable for at least the same reasons.

### 13. Dependent Claim 16

Dependent claim 16 recites "A method according to claim 14, wherein said information includes the position of the portion or object." Claim 16 depends from and adds limitations to claim 14. Numazaki fails to render claim 14 unpatentable, therefore, Numazaki fails to render dependent claim 16 unpatentable for at least the same reasons.

### 14. Dependent Claim 17

Dependent claim 17 recites "A method according to claim 14, wherein said information includes the change in position of the portion or object." Claim 17 depends from and adds limitations to claim 14. Numazaki fails to render claim 14 unpatentable, therefore, Numazaki fails to render dependent claim 17 unpatentable for at least the same reasons.

### 15.    Dependent Claim 18

Dependent claim 18 recites "A method according to claim 14, wherein said information includes the velocity or path of the portion or object." Claim 18 depends from and adds limitations to claim 14.  Numazaki fails to render claim 14 unpatentable, therefore, Numazaki fails to render dependent claim 18 unpatentable for at least the same reasons.

### 16.    Dependent Claim 19

Dependent claim 19 recites "A method according to claim 14, wherein said information is obtained in 3 dimensions."  Claim 19 depends from and adds limitations to claim 14.  Numazaki fails to render claim 14 unpatentable, therefore, Numazaki fails to render dependent claim 19 unpatentable for at least the same reasons.

### 17.    Dependent Claim 20

Dependent claim 20 recites "A method according to claim 14, wherein said information includes the pointing direction of the portion or object."  Claim 20 depends from and adds limitations to claim 14.  Numazaki fails to render claim 14 unpatentable, therefore, Numazaki fails to render dependent claim 20 unpatentable for at least the same reasons.

### 18. Dependent Claim 21

Dependent claim 21 recites "A method according to claim 14, wherein a display is controlled." Claim 21 depends from and adds limitations to claim 14. Numazaki fails to render claim 14 unpatentable, therefore, Numazaki fails to render dependent claim 21 unpatentable for at least the same reasons.

### 19. Dependent Claim 22

Dependent claim 22 recites "A method according to claim 21, wherein a virtual image on said display is moved or changed." Claim 22 depends from and adds limitations to claim 21. Numazaki fails to render claim 21 unpatentable, therefore, Numazaki fails to render dependent claim 22 unpatentable for at least the same reasons.

### 20. Dependent Claim 25

Dependent claim 25 recites "A method according to claim 14, including the further step of transmitting data to a further device." Claim 25 depends from and adds limitations to claim 14. Numazaki fails to render claim 14 unpatentable, therefore, Numazaki fails to render dependent claim 25 unpatentable for at least the same reasons.

### 21. Dependent Claim 26

Dependent claim 26 recites "A method according to claim 14, wherein said camera operates at 30 frames per second or greater." Claim 26 depends from and

adds limitations to claim 14. Numazaki fails to render claim 14 unpatentable, therefore, Numazaki fails to render dependent claim 26 unpatentable for at least the same reasons.

### 22.    Dependent Claim 28

Dependent claim 28 recites "A method according to claim 14, including the further step of acquiring a picture of the user of the handheld device." Claim 28 depends from and adds limitations to claim 14. Numazaki fails to render claim 14 unpatentable, therefore, Numazaki fails to render dependent claim 28 unpatentable for at least the same reasons.

### E.    Ground 2 – The Combination of Numazaki and DeLeeuw Does Not Render Obvious Claims 5, 6, and 29

Dependent claims 5, 6, and 29 depend from and add limitations to claim 1 or claim 14. For at least the reasons discussed above with respect to Ground 1, Numazaki does not teach or suggest one or more limitations of claim 1 and claim 14. DeLeeuw does not remedy those deficiencies, and the Petition does not so assert. *See* Pet., pp. 45-48. Therefore, the combination of Numazaki and DeLeeuw fails to render dependent claims 5, 6, and 29 unpatentable.

### F.    Ground 3 – The Combination of Numazaki and DeLuca Does Not Render Obvious Claims 10, 23, 24, and 27

Dependent claims 10, 23, 24, and 27 depend indirectly from and add limitations to claim 7 or claim 14. For at least the reasons discussed above with

respect to Ground 1, Numazaki does not teach or suggest one or more limitations of claim 7 and claim 14. DeLuca does not remedy those deficiencies, and the Petition does not so assert. *See* Pet., pp. 48-57. Therefore, the combination of Numazaki and DeLuca fails to render dependent claims 10, 23, 24, and 27 unpatentable.

### G. Ground 4 – The Combination of Numazaki and Peters Does Not Render Obvious Claims 30 and 31

Dependent claims 30 and 31 depend from and add limitations to claim 14. For at least the reasons discussed above with respect to Ground 1, Numazaki does not teach or suggest one or more limitations of claim 14. Peters does not remedy those deficiencies, and the Petition does not so assert. *See* Pet., pp. 57-61. Therefore, the combination of Numazaki and Peters fails to render dependent claims 30 and 31 unpatentable.

## IV. THE PETITION SHOULD BE DENIED FOR FAILURE TO COMPLY WITH 37 C.F.R. § 42.104(b)(3)-(4)

The Petition must identify how each challenged claim is to be construed. *See* 37 C.F.R. § 42.104(b). For means-plus-function terms, the Petition "must identify the specific portions of the specification that describe the structure, material, or acts corresponding to each claimed function." *See* 37 C.F.R. § 42.104(b)(3). The Petition fails to construe the term "sensing means," which is recited in independent claim 1. *See* Ex. 1001, 25:44-46. The term includes the word "means," but Petitioner fails to identify whether the term requires construction under 35 U.S.C. §

112(f).[2] By contrast, the Petition provides a construction for the "camera means" limitation recited in claim 7, even though Petitioner contends that the term does not require construction pursuant to 35 U.S.C. § 112(f). *See* Pet., pp. 6-7. By failing to show how independent claim 1 (and dependent claims 2-6) is to be construed in accordance with 37 C.F.R. § 42.104(b)(3), Petitioner also fails to show how, as so construed, challenged claim 1 is unpatentable under the statutory grounds identified in the Petition, and thus trial should not be instituted. *See* 37 C.F.R. § 42.104(b)(4).

## V.     THE PETITION SHOULD BE DENIED UNDER 35 U.S.C. § 314(a)

The Board has discretion as to whether to institute *inter partes* review. *See* 35 U.S.C. §314(a); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2140 (2016) ("[T]he agency's decision to deny a petition is a matter committed to the Patent Office's discretion."). In *General Plastic*, the Board recognized "the potential for abuse of the review process by repeated attacks on patents." *General Plastic*, Paper 19 at 17. In an attempt to mitigate such abuse, the Board identified seven factors that it considers in determining whether to institute decision of a subsequent petition. *Id.* at 16. The correct identification of the Petitioner is necessary for five of the seven General Plastic factors:

---

[2] Patent Owner does not contend that the term "sensing means" requires construction under 35 U.S.C. § 112(f).

1.    whether the same <u>petitioner</u> previously filed a petition directed to the same claims of the same patent;

2.    whether at the time of filing of the first petition the <u>petitioner</u> knew of the prior art asserted in the second petition or should have known of it;

3.    whether at the time of filing of the second petition the <u>petitioner</u> already received the patent owner's preliminary response to the first petition or received the Board's decision on whether to institute review in the first petition;

4.    the length of time that elapsed between the time the <u>petitioner</u> learned of the prior art asserted in the second petition and the filing of the second petition;

5.    whether the <u>petitioner</u> provides adequate explanation for the time elapsed between the filings of multiple petitions directed to the same claims of the same patent;

6.    the finite resources of the Board; and

7.    the requirement under 35 U.S.C. § 316(a)(11) to issue a final determination not later than 1 year after the date on which the Director notices institution of review.

*General Plastic*, Paper 19 at 16 (emphasis added).

There is no dispute that Unified Patents filed a petition for *inter partes* review of the '431 Patent (IPR2021-00917) before Apple filed this Petition. *See* Paper 1, p. 62. Both petitions rely on the same primary reference for the challenged claims (i.e., Numazaki). *Compare* Paper 1, p. 4 *with Unified Patents, LLC v. Gesture Technology Partners, LLC* ("*Unified IPR*"), No. IPR2021-00917, Paper 1, p. 5 (PTAB May 14, 2021). Both petitions also withhold key information—whether Petitioner Apple is a "Member" of Unified Patents (i.e., the correct identification of the Petitioner). *See* Paper 1, pp. 61-66; *Unified IPR*, Paper 1, pp. 52-55; *Unified IPR*, Ex. 1020. Apple could have identified whether it is a Unified Patents Member, but chose not to.

Whether Apple is a Unified Patents Member is material because Unified's Members pay it a yearly subscription fee to, *inter alia*, file petitions for *inter partes* review in response to patent lawsuits. *See Unified IPR*, Ex. 1020, ¶2. Patent Owner filed five lawsuits, asserting the '431 Patent and other patents, in the United States District Courts for the Eastern and Western Districts of Texas. Petitioner is a defendant in one of those lawsuits: *Gesture Technology Partners, LLC v. Apple Inc.*, No. 6:21-cv-00121 (W.D. Tex.). Unified Patents then filed a petition for *inter partes* review of the '431 Patent (IPR2021-00917).

Petitioner should not be permitted to file an additional petition for *inter partes* review of the '431 Patent after Unified Patents filed a petition based on the same prior art (i.e., Numazaki). Accordingly, the Board should exercise its discretion and

27

deny institution of the Petition.  In the alternative, Patent Owner requests that the

Board compel Petitioner to disclose whether it is a Unified Member to provide the

Board and Patent Owner a full and fair opportunity to address the *General Plastic*

factors.

## VI.    THE PETITION SHOULD BE DENIED BECAUSE THE BOARD DOES NOT HAVE JURISDICTION OVER EXPIRED PATENTS

35 U.S.C. § 2(a)(1) states that United States Patent and Trademark Office

"shall be responsible for the granting and issuing of patents. . . ."  The Patent Trial

Appeal Board is required to "conduct inter partes reviews and post-grant reviews

pursuant to chapters 31 and 32." 35 U.S.C. § 6(b)(4).  The burden of proof required

to find a claim unpatentable is the preponderance of evidence, which is a lower

burden of proof than the clear and convincing standard applied in district courts.  35

U.S.C. § 316(a)(9) requires that the Director prescribe regulations "setting forth

standards and procedures for allowing the patent owner to move to amend the patent

under subsection(d)."  This is due, in part, to the fact that there is a lower burden of

proof required before the Board.

The '431 Patent has expired, so the opportunity to amend the '431 Patent is

not available to Patent Owner.  As a result, determinations regarding the validity of

this expired patent should be reserved for Article III courts under the clear and

convincing standard.

## VII.   CONCLUSION

The Petition should be denied.  Petitioner has not established that the cited references render unpatentable any claim of the '431 Patent.  Alternatively, the Board should exercise its discretion under 35 U.S.C. § 314(a) to deny institution.

## CERTIFICATE OF COMPLIANCE

Pursuant to 37 C.F.R. § 42.24(d), I hereby certify that the foregoing Patent Owner's Preliminary Response contains 5,815 words as measured by the word processing software used to prepare the document, excluding the cover page, signature block, and portions exempted under 37 C.F.R. § 42.24(a) or (b).

DATED:  September 7, 2021                    Respectfully submitted,

By: /Todd E. Landis/
Todd E. Landis
Registration No. 44,200
Counsel for Patent Owner

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. § 42.6, the undersigned certifies that on September 7, 2021, the foregoing document was served on counsel of record for Petitioner by filing this document through the End-to-End System, as well as via electronic mail to counsel of record for Petitioner at the following address:  Adam P. Seitz (Adam.Seitz@eriseip.com); Paul R. Hart (Paul.Hart@eriseip.com).

Respectfully submitted,

By: /Todd E. Landis/
Todd E. Landis
Registration No. 44,200
Counsel for Patent Owner

IPR2021-00920
Patent 7,933,431

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.

Petitioner,

v.

GESTURE TECHNOLOGY PARTNERS, LLC

Patent Owner

_____

*Inter Partes* Review No. IPR2021-00920

**Patent No. 7,933,431**

**PATENT OWNER'S AUTHORIZED PRELIMINARY SUR-REPLY**

Filed on behalf of Patent Owner by:

Todd E. Landis (Reg. No. 44,200)
2633 McKinney Ave., Suite 130
Dallas, TX 75204

John Wittenzellner (Reg. No. 61,662)
1735 Market Street, Suite A #453
Philadelphia, PA 19103

Adam B. Livingston (Reg. No. 79,173)
327 Congress Avenue, Suite 490
Austin, TX 78701

**WILLIAMS SIMONS & LANDIS PLLC**

Gesture Technology Partners, LLC ("GTP" or "Patent Owner") respectfully submits this sur-reply in support of its response to the Petition, as authorized by the Board on September 20, 2021. Petitioner Apple Inc.'s ("Apple" or "Petitioner") evasiveness regarding whether it is a Unified Patents Member is suspect. *See* Paper 1, pp. 61-71; Paper 9. Fortunately, Unified Patents confirmed that Apple is a Unified Patents Member in the related *inter partes* proceeding filed by Unified. *Unified Patents, LLC v. Gesture Technology Partners* ("*Unified IPR*"), *LLC*, IPR2021-00917, Paper 7, p. 1, n. 2 (PTAB Sept. 22, 2021).

Neither Apple nor Unified Patents (two entities with a significant relationship[1]) can deny that they filed two petitions for *inter partes* review of the '431 Patent. Nor can they deny that both petitions rely on the same primary reference for the challenged claims (i.e., Numazaki). *Compare* Paper 1, p. 4 *with Unified IPR*, No. IPR2021-00917, Paper 1, p. 5 (PTAB May 14, 2021). This is the same abusive conduct identified by the Board in *General Plastics*. *See General Plastic Industrial Co., Ltd. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19 at 17 (September 6, 2017) (precedential) ("we also recognize the potential for abuse

---

[1] Unified Members, such as Apple, "pay a yearly subscription fee. . . ." *Unified IPR*, Ex. 1020, ¶2. In return for those fees, Unified performs various services for Apple, including filing petitions for *inter partes* review. *See id.*, ¶3.

of the review process by repeated attacks on patents"). The question, then, is how to ameliorate the harm from the two petitions filed by Unified and Apple.

Denial of the petition filed by Unified Patents (IPR2021-00917) is the best way to ameliorate that harm—the relief that Patent Owner seeks in that proceeding. Indeed all of the *Fintiv* factors weigh strongly in favor of denying the petition filed by Unified Patents, save one, which is neutral. *See Unified IPR*, Paper 8 (PTAB Sep. 28, 2021). Alternatively, Petitioner respectfully submits that the Board should deny the Petition in this proceeding if the Board institutes the Unified proceedings (IPR2021-00917).

Apple's reply would mislead the reader to conclude that Unified membership is irrelevant to the *General Plastics* analysis. *See* Paper 9. But the Board's "application of the *General Plastic* factors is not limited solely to instances when multiple petitions are filed by the same petitioner." *Valve Corp. v. Electronic Scripting Products, Inc.*, IPR2019-00062, -00063, -00084, Paper 11, p. 9 (PTAB Apr. 2, 2019). Instead, the Board "consider[s] any relationship between those petitioners when weighing the General Plastic factors." *See id.* Here, Apple pays Unified to file petitions for *inter partes* review. *See Unified IPR*, Ex. 1020, ¶¶2-3.

Apple's analysis of the *Mercedes-Benz* decision omits critical details and misquotes the decision. *See* Paper 9 at 2. Indeed the petitioner in those proceedings, Mercedes Benz, was <u>not</u> a Unified Member. *See* IPR2019-01404, Paper 12, pp. 11-

12 (PTAB Jan. 22, 2020).  That is why Apple misleadingly replaced "Daimler AG's and Daimler North American Corp.'s" with "petitioner's" when quoting the decision in its reply.  *Compare id.* at 12 *with* Paper 9 at 2.  Moreover, the Board limited that decision to "the particular circumstances of this case," not a blanket decision on Unified membership.  *See id.*

In another sleight of hand, Apple's analysis of *Netflix, Inc. and Hulu, LLC* neglects to mention that the Board found that only one of the two petitioners in that proceeding—Netflix—was a member of the Unified "micro-pool" that might have resulted in Unified filing that petition for *inter partes* review.  IPR2020-00052, Paper 42, pp. 11-12 (PTAB May 14, 2020).  Moreover, the record before the Board in that proceeding indicated that Netflix's membership in Unified might not have been coextensive with the subject matter of the patent at issue.  *See id.* at 11.

At bottom, there is a significant relationship between Apple and Unified, the parties that filed two petitions for *inter partes* review of the same patent and based on the same prior art.  Petitioner respectfully submits that the most compelling case for discretionary denial, between the two petitions, is the petition filed by Unified Patents (IPR2021-00917).  Alternatively, Petitioner respectfully submits that the Board should deny the Petition in this proceeding under *General Plastics* to avoid the abuse to Patent Owner and waste of the Board's resources that would result from allowing both petitions to proceed.

DATED:  October 1, 2021                Respectfully submitted,


By: /Todd E. Landis/
Todd E. Landis
Registration No. 44,200
Counsel for Patent Owner

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. § 42.6, the undersigned certifies that on October 1, 2021, the foregoing document was served on counsel of record for Petitioner by filing this document through the End-to-End System, as well as via electronic mail to counsel of record for Petitioner at the following address:   Adam P. Seitz (Adam.Seitz@eriseip.com); Paul R. Hart (Paul.Hart@eriseip.com).

Respectfully submitted,

By: /Todd E. Landis/
Todd E. Landis
Registration No. 44,200
Counsel for Patent Owner

Trials@uspto.gov                                          Paper 12
571-272-7822                                   Date: December 6, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

APPLE, INC.,
Petitioner,

v.

GESTURE TECHNOLOGY PARTNERS, LLC,
Patent Owner.

————————————

IPR2021-00920
Patent 7,933,431 B2

————————————

Before JONI Y. CHANG, KRISTI L. R. SAWERT, and
BRENT M. DOUGAL, *Administrative Patent Judges.*

DOUGAL, *Administrative Patent Judge.*

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314, 37 C.F.R. § 42.4*

IPR2021-00920
Patent 7,933,431 B2

# I. INTRODUCTION

## A. Background and Summary

Petitioner, Apple Inc., requests that we institute an *inter partes* review to challenge the patentability of claims 1–31 (the "challenged claims") of U.S. Patent 7,933,431 B2 (Ex. 1001, "the '431 patent"). Paper 1 ("Petition" or "Pet."). Patent Owner, Gesture Technology Partners, LLC, argues that Petitioner's request is deficient and should not be granted. Paper 8 ("Preliminary Response" or "Prelim. Resp."). With our authorization, Petitioner filed a Reply to Patent Owner's Preliminary Response (Paper 9, "Reply") and Patent Owner filed a Sur-reply (Paper 10, "Sur-reply").

Applying the standard set forth in 35 U.S.C. § 314(a), which requires demonstration of a reasonable likelihood that Petitioner would prevail with respect to at least one challenged claim, we institute an *inter partes* review.[1]

## B. Related Matters

The parties identify these related matters: *Gesture Technology Partners, LLC v. Huawei Device Co., Ltd.*, No. 2:21-cv-00040 (E.D. Tex.); *Gesture Technology Partners, LLC v. Samsung Electronics Co.*, No. 2:21-cv-00041 (E.D. Tex.); *Gesture Technology Partners, LLC v. Apple Inc.*, No. 6:21-cv-00121 (W.D. Tex.); *Gesture Technology Partners, LLC v. Lenovo Group Ltd.*, No. 6:21-cv-00122 (W.D. Tex.); and *Gesture Technology Partners, LLC v. LG Electronics, Inc.*, No. 6:21-cv-00123 (W.D. Tex.). Pet. 76; Paper 6, 1–2. Patent Owner identifies these related Board proceedings: IPR2021-00917; IPR2021-00922; and IPR2021-00923. Paper 6, 2.

---

[1] Our findings and conclusions at this stage are preliminary, and thus, no final determinations are made.

IPR2021-00920
Patent 7,933,431 B2

### C.  The '431 Patent

The '431 patent "relates to simple input devices for computers, particularly, but not necessarily, intended for use with 3-D graphically intensive activities, and operating by optically sensing a human input to a display screen or other object and/or the sensing of human positions or orientations." Ex. 1001, 2:7–11. The '431 patent further states that it relates to "applications in a variety of fields such as computing, gaming, medicine, and education." *Id.* at 2:15–17. For instance, the '431 patent describes "a combination of one or more TV cameras (or other suitable electro-optical sensors) and a computer to provide various position and orientation related functions of use." *Id.* at 11:54–58.

Figure 8A, reproduced below, illustrates the control of functions via a handheld device.



**FIG. 8A**

Figure 8A shows a perspective view of a cellular phone (800) using a laser spot projector (801) to project a laser spot on a detector (802) in a dashboard (803). *Id.* at 12:17–20. The '431 patent discloses that, alternatively or in conjunction, round dot targets (805, 806, 807) can be sensed on the cellular phone (800), such as by a TV camera (815). *Id.* at 12:20–25.

3

IPR2021-00920
Patent 7,933,431 B2

In another example, the cellular phone (800) can be used to signal a fax unit (824) to print data from the phone by pointing the cellular phone toward the fax unit. *Id.* at 12:42–45. TV camera (815) scans images of the dot targets (805, 806, 807) and a computer (830) analyzes the target images to determine the position and/or orientation or motion of the cellular phone to thereby determine if a command is being issued with movement of the cellular phone. *Id.* at 12:45–51. The computer then commands the fax unit to print if this action is signaled by the position, orientation, or motion of the cellular phone. *Id.* at 12:51–52.

### D.  Illustrative Claim

Petitioner challenges claims 1–31 of the '413 patent. Claims 1, 7, and 14 are independent. Claims 1 and 7 are illustrative:

> 1. A method for controlling a handheld computing device comprising the steps of:
>
>> holding said device in one hand;
>>
>> moving at least one finger in space in order to signal a command to said device;
>>
>> electro-optically sensing light reflected from said at least one finger using a sensing means associated with said device;
>>
>> determining from said sensed light the movement of said finger, and
>>
>> using said sensed finger movement information, controlling said device in accordance with said command.

> 7. Handheld computer apparatus comprising:
>
>> a housing;
>>
>> a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object;

IPR2021-00920
Patent 7,933,431 B2

> computer means within said housing for analyzing said
> image to determine information concerning a position or
> movement of said object; and

> means for controlling a function of said apparatus using
> said information.

Ex. 1001, 25:39–50, 25:61–26:5.

## II.  ANALYSIS

### A.  Summary of Issues

In the below analysis, we first address the grounds of unpatentability.

We then address Patent Owner's discretionary denial and jurisdiction

arguments.

### B.  Grounds of Unpatentability

Petitioner asserts the following grounds of unpatentability (Pet. 5),

supported by the declaration of Benjamin B. Bederson (Ex. 1008):

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–4, 7–9, 11–22, 25, 26, 28 | 103(a)[2] | Numazaki,[3] Knowledge of a PHOSITA[4] |
| 5, 6, 29 | 103(a) | Numazaki, DeLeeuw[5] |
| 10, 23, 24, 27 | 103(a) | Numazaki, DeLuca[6] |
| 30, 31 | 103(a) | Numazaki, Peters[7] |

---

[2]  The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 285–88 (2011), revised 35 U.S.C. § 103 effective March 16, 2013. Because the challenged patent was filed before March 16, 2013, we refer to the pre-AIA versions.

[3]  U.S. Patent 6,144,366, issued Nov. 7, 2000 ("Numazaki") (Ex. 1003).

[4]  A person having ordinary skill in the art ("PHOSITA").

[5]  U.S. Patent 6,088,018, issued July 11, 2000 ("DeLeeuw") (Ex. 1004).

[6]  U.S. Patent 6,064,354, issued May 16, 2000 ("DeLuca") (Ex. 1005).

[7]  U.S. Patent 6,243,683 B1, issued June 5, 2001 ("Peters") (Ex. 1006).

IPR2021-00920
Patent 7,933,431 B2

*1. Legal Standards for Unpatentability*

Petitioner bears the burden to demonstrate unpatentability. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). At this preliminary stage, we determine whether the information presented in the Petition shows a reasonable likelihood that Petitioner would prevail in establishing that at least one of the challenged claims would have been unpatentable. *See* 35 U.S.C. § 314(a).

A claim is unpatentable as obvious under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting 35 U.S.C. § 103(a)). We resolve the question of obviousness based on underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the prior art and the claims; (3) the level of skill in the art; and (4) when in evidence, objective indicia of nonobviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

We apply these principles to the Petition's challenges.

*2. Level of Ordinary Skill in the Art*

Petitioner asserts that "[a] person having ordinary skill in the art ('PHOSITA') at the time of the '431 Patent would have had at least a bachelor's degree in electrical engineering or equivalent with at least one year of experience in the field of human computer interaction" and that "[a]dditional education or experience might substitute for the above requirements." Pet. 3 (citing Ex. 1008 ¶¶ 30–32). Patent Owner does not dispute Petitioner's level of ordinary skill in the art. Prelim. Resp. 5.

6

IPR2021-00920
Patent 7,933,431 B2

We are persuaded, on the present record, that Petitioner's declarant's statement is consistent with the problems and solutions in the '431 patent and prior art of record. We adopt this definition for the purposes of this Decision.

### 3. Claim Construction

In *inter partes* review, we construe claims using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent. 37 C.F.R. § 42.100(b) (2020).

Petitioner provides a number of claim constructions. Pet. 5–12. Patent Owner does not contest Petitioner's claim constructions, but does argue that the preambles of claims 1, 7, and 14 should be limiting. Prelim. Resp. 5–8. Patent Owner further argues that the Petition should have provided a construction for a term in claim 1. We first address each term that is construed by one of the parties and then address Patent Owner's argument concerning the lack of a construction in the Petition. [8]

### a) The Preambles

The preambles of claims 1 and 14 both state: "A method for controlling a handheld computing device comprising the steps of . . ." and the preamble of claim 7 states: "Handheld computer apparatus comprising

---

[8] As noted below, for the purposes of institution, we accept all of Petitioner's proposed constructions, as well as Patent Owner's argument that the preamble are limiting. However, we invite the parties to address how these preliminary constructions are impacted by the District Court Claim Construction Memorandum and Order (Ex. 2001) which was issued after the pre-institution briefing was submitted.

. . . ." Ex. 1001, 25:40–41, 25:61, 26:18–19. Petitioner does not address whether the preambles are limiting, but rather attempts to show that independent of whether they are limiting, the preambles are taught by the prior art. *See e.g.* Pet. 17 ("To the extent the preamble is limiting, *Numazaki* teaches . . .").

Patent Owner argues that the preambles should be limiting because they recite essential structure or steps and are "necessary to give life, meaning, and vitality" to the claims. Prelim. Resp. 5–6 (quoting *Acceleration Bay, LLC v. Activision Blizzard, Inc.*, 908 F.3d 765, 770 (Fed. Cir. Nov. 6, 2018)). Specifically, Patent Owner asserts that each claim includes one or more limitations that refer back to the preamble's "handheld computing device" or "handheld computer apparatus" for antecedent basis. *Id.* at 6–8. Patent Owner further argues that the '413 patent discloses different embodiments, with some embodiments being in the form of a computer and some embodiments being in the form of a handheld device. *Id.* at 8 (citing Ex. 1001, 12:59–13:7, Fig. 1A). Patent Owner contends that the claims are directed to the latter embodiments related to a handheld device and, therefore, "the preamble is necessary to give life, meaning, and vitality to claims 1, 7, and 14, consistent with the embodiments that the inventor chose to claim." *Id.* at 8.

We agree that the preambles of claims 1, 7, and 14 are limiting. This is primarily because in the body of each claim includes "said device" or "said apparatus" which refers back to the preamble and is understood with reference thereto. For example, the last clause of claim 7 states: "means for controlling a function of *said apparatus* using said information." Ex. 1001, 26:4–5 (emphasis added). "Said apparatus" derives antecedent basis from the "[h]andheld computer apparatus" recited in the preamble. Moreover, the

IPR2021-00920
Patent 7,933,431 B2

"means for controlling a function of said apparatus" is understood because of this reference to the handheld computer apparatus. The limitations of claims 1 and 14 are similar and so this logic applies equally to these claims as well. Thus, we agree that the preamble recites essential structure and is "necessary to give life, meaning, and vitality" to claims 1, 7, and 14.

> b)    *"camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object"*

Petitioner asserts that, though claim 7 recites "camera means," it is not a means-plus-function limitation under §112 ¶ 6. Pet. 6. Petitioner argues that "a PHOSITA would have considered 'camera means associated with said housing' to have a sufficiently definite meaning as the name for structure." *Id.* (citing Ex. 1008 ¶ 36). Petitioner further argues that "all optical sensors obtain images by capturing light, so the claimed function is simply describing the general process that all optical sensors employ to obtain images of objects." *Id.* (citing Ex. 1008 ¶ 36).

As noted above, Patent Owner does not contest Petitioner's constructions. Prelim. Resp. 5. For the purposes of institution, we accept Petitioner's construction as consistent with the current record.

> c)    *"computer means within said housing for analyzing said image to determine information concerning a position or movement of said object"*

Petitioner contends that claim 7's limitation of "computer means within said housing for analyzing said image to determine information concerning a position or movement of said object" is a means-plus-function limitation under §112 ¶ 6. Pet. 7. Petitioner argues that the limitation's function is analyzing an image "to determine positioning or movement of an object." *Id.* Petitioner argues that the corresponding structure "includes a

IPR2021-00920
Patent 7,933,431 B2

computer/processor programmed (1) to identify either natural or artificial features on an object as described . . . or (2) to track the movement using one of the disclosed methods." *Id.* at 9; *see id.* at 8–9 (discussing the disclosure of the '431 patent) (citing Ex. 1001, 3:38–47, 3:57–62, 4:9–14, 5:2–23, 6:64–7:13, 8:40–59, 11:16–35).

Petitioner also argues that "objects" should be construed to mean "both separate objects held/controlled by the user and also part of the user's body, such as a user's finger or hand." *Id.* at 8; *see id.* at 7–8 (citing Ex. 1001, 3:39–41, 3:48–50, claims 7–8).

As noted above, Patent Owner does not contest Petitioner's constructions. Prelim. Resp. 5. For the purposes of institution, we accept Petitioner's constructions as consistent with the current record.

> d) *"means for controlling a function of said apparatus using said information"*

Petitioner argues that claim 7's limitation of "means for controlling a function of said apparatus using said information" is a means-plus-function limitation under §112 ¶ 6. Pet. 10. According to Petitioner, the limitation's function is "controlling a function of the apparatus using information about the object's location or movement." *Id.* Petitioner argues that the corresponding structure "is a processor programmed to perform the specific algorithms that accomplish this function" which "includes at least [the] Fig. 9 disclosure." *Id.* at 10–11.

As noted above, Patent Owner does not contest Petitioner's constructions. Prelim. Resp. 5. However, as discussed above, we determine that "said apparatus" refers to the handheld computer apparatus in the preamble. Thus, for the purposes of institution, we accept Petitioner's

IPR2021-00920
Patent 7,933,431 B2

construction with the added requirement that the general purpose computer be a handheld computer apparatus.

      *e)   "means for transmitting information"*

Petitioner asserts that claim 11's limitation of "means for transmitting information" is a means-plus-function limitation under §112 ¶ 6. Pet. 11. Petitioner argues that the '431 patent teaches that the structure for performing the limitation's function of "transmitting information" is a "wireless cellular transceiver" and thus the corresponding structure required by the claim "includes at least a wireless cellular transceiver." *Id.* at 11–12 (citing Ex. 1001, 12:59–13:3).

As noted above, Patent Owner does not contest Petitioner's constructions. Prelim. Resp. 5. For the purposes of institution, we accept Petitioner's construction as consistent with the current record.

      *f)   "electro-optically sensing light reflected from said at least one finger using a sensing means associated with said device"*

Patent Owner argues that the Petition should have construed "sensing means" in claim 1 and that the Petition should be denied because of this failure. *Id.* at 24–25. Patent Owner argues that "[t]he Petition must identify how each challenged claim is to be construed" and that there are specific requirements "[f]or means-plus-function terms" that are not satisfied by the Petition for the term "sensing means." *Id.* at 24 (citing 37 C.F.R. § 42.104(b)). Patent Owner further argues that "term includes the word 'means,' but Petitioner fails to identify whether the term requires construction under 35 U.S.C. § 112(f)." *Id.* at 24–25.

However, at the same time, Patent Owner states that it "does not contend that the term "sensing means" requires construction under 35 U.S.C. § 112(f)" (*id.* at 25 n.2) and that the Petition implies that "'camera units' . . .

IPR2021-00920
Patent 7,933,431 B2

correspond[] to the 'sensing means'" (*id.* at 9).[9] We further note that according to the Claim Construction Memorandum and Order in one of the related District Court litigations, Patent Owner expressly argued that "sensing means" is not a means-plus-function limitation subject to 35 U.S.C. § 112(f), and the District Court agreed. Ex. 2001, 26, 28.

As neither Petitioner nor Patent Owner argues that "sensing means" is a means-plus-function limitation under §112 ¶ 6, we decline to deny institution on the basis that Petitioner failed to satisfy the requirements of 37 C.F.R. § 42.104(b)(3).

### 4. *Obviousness over Numazaki and Knowledge of a PHOSITA*

Petitioner argues that Numazaki in view of the knowledge of a person having ordinary skill in the art ("PHOSITA") would have rendered obvious claims 1–4, 7–9, 11–22, 25, 26, and 28. Pet. 12–40. Patent Owner contends that Numazaki does not disclose all the limitations of claims 1, 7, 11, and 14. Prelim. Resp. 9–24.

We first give an overview of the asserted prior art, Numazaki. This is followed by a discussion of Petitioner's positions and Patent Owner's arguments in response where we conclude that Petitioner has demonstrated a reasonable likelihood of prevailing with respect to at least one claim.

### a) *Numazaki*

Numazaki "relates to a method and an apparatus for generating information input in which input information is extracted by obtaining a reflected light image of a target object." Ex. 1003, 1:8–11.

---

[9] Claim 2 also requires that "at least one camera is utilized to effect said electro-optical sensing" implying that the sensing means is at least one camera. Ex. 1001, 25:51–52.

IPR2021-00920
Patent 7,933,431 B2

Figure 1, reproduced below, depicts a block diagram for an information input generation apparatus.

FIG.1



Figure 1 shows that an information input generation apparatus includes a lighting unit (101), a reflected light extraction unit (102), a feature data generation unit (103), and a timing signal generation unit (104). *Id.* at 10:23–28. Numazaki describes emitting light from the light emitting unit (101) and that the intensity of the light varies in time according to a timing signal from the timing signal generation unit (104). *Id.* at 10:29–31. The light is directed onto a target object and light reflected from the target object is extracted by the reflected light extraction unit (102). *Id.* at 10:31–35. Numazaki teaches that the feature data generation unit (103) extracts feature data from the reflected light image. *Id.* at 10:57–61. Numazaki further teaches operating a computer based on information obtained from the feature data. *Id.* at 10:61–66.

Figure 78, reproduced below, illustrates an information input generation apparatus.

IPR2021-00920
Patent 7,933,431 B2

FIG.78



Figure 78 shows "a compact portable information device" having "a size that can be held by one hand." *Id.* at 52:5–8. The device includes a window (712) for a lighting unit and a photo-detection sensor unit. *Id.* at 52:12–14. Numazaki describes controlling the position of a cursor (714) on a screen by moving a finger (713) in front of the window (712). *Id.* at 52:14–16.

 *b)  Claim 1*

  Petitioner relies on Numazaki in view of the knowledge of a PHOSITA for teaching or suggesting all of the elements of claim 1. Pet. 12–21. For example, Petitioner relies on the portable computer with an information input generation device of Figure 78 for teaching the handheld computing device and holding the device in one hand. *Id.* at 17–19. For the remaining method steps of claim 1, Petitioner relies on Numazaki and the knowledge of a PHOSITA. *Id.* at 19–21. In particular, the Petition relies on the teaching of a window (712) for "the lighting unit and the photo-detection

IPR2021-00920
Patent 7,933,431 B2

sensor unit" of Numazaki Figure 78 "which enables the 'position of a cursor 714 on the screen [to] be controlled by moving a finger 713 in front of this window 712.'" *Id.* at 19 (quoting Ex. 1003, 52:5–16); *see also id.* at 20–21. Petitioner argues that "[a] PHOSITA would have understood that controlling a cursor on the handheld device is signaling a command." *Id.* (citing Ex. 1008 ¶¶ 46–47).

Numazaki only provides some details about the photo-detection sensor unit. *See generally* Ex. 1003, 50:25–54:6. However, Petitioner relies on Numazaki's teaching that "light and camera arrangement" of Figure 2 "is incorporated into the eighth embodiment" for more details about the photo-detection sensor unit. Pet. 20; *see also id.* at 15–16 (citing Ex. 1008 ¶ 44) (discussing what a PHOSITA would have understood was incorporated into the eighth embodiment). Petitioner describes Numazaki as teaching a system where two images are obtained of the target object by two different cameras, one with the lighting unit on and one with it off. *Id.* at 12–14 (citing Ex. 1003, 11:20–39, Fig. 2). The images are compared to obtain certain information. *Id.* at 14 (citing Ex. 1003, 11:43–51). Petitioner concludes that the obtained "information is then used by feature data generation unit 103 to determine gestures, pointing, etc. of the target object that may be converted into commands executed by a computer" and that this all reads on the electro-optically sensing, determining, and using steps of claim 1. *Id.* at 20–21.

We determine that the Petition has sufficiently shown at this stage how Numazaki and the knowledge of a PHOSITA would have suggested all of the features of claim 1. Patent Owner argues that Numazaki does not teach or suggest aspects of the electro-optically sensing and determining

IPR2021-00920
Patent 7,933,431 B2

steps of claim 1. Prelim. Resp. 9–11. We address Patent Owner's argument below.

### (1) Electro-optically sensing and determining

Claim 1 requires "electro-optically sensing light reflected from said at least one finger using a sensing means associated with said device; determining from said sensed light the movement of said finger." Ex. 1001, 25:44–48.

Patent Owner argues that "Numazaki requires <u>two</u> photo-detection units to perform an analysis of a target object and control the computer, so it does not teach or suggest 'determining' finger movement from reflected light that is 'electro-optically' sensed using one 'sensor means,' as set forth in [the] claim." Prelim. Resp. 11.

Patent Owner does not identify why the claim should be limited to one sensor means or camera. Though the claim refers to "electro-optically sensing light . . . using a sensing means" and "determining from said sensed light," this does not limit the claim, at least on this record, to only one camera. Unless a more limited construction is indicated by the specification or prosecution history, the indefinite article "a" or "an" is construed in a claim to mean "one or more." *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. Aug. 18, 2000). Thus, "a sensing means," based on the current record, appears to encompass one or more cameras.

Patent Owner also argues that "Numazaki does not teach or suggest 'determining' finger movement absent the other hardware that Numazaki identifies as necessary, such as the lighting unit, the image-subtraction circuitry, and the associated timing circuitry." Prelim. Resp. 11.

However, claim 1 uses the term "comprising" to create an "open ended" claim. "'Comprising' is a term of art used in claim language which

16

IPR2021-00920
Patent 7,933,431 B2

means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim." *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997). Thus, the presence of a lighting unit or other hardware is not excluded from the claim. Rather, the '431 patent teaches the use of LEDs "to illuminate [associated] targets." Ex. 1001, 3:34–35.

The claimed phrase "electro-optically sensing light . . . using a sensing means" does require "a sensing means," such as a camera, be used in the step. However, it does not prohibit other hardware from being involved. For example, the claim does not say "electro-optically sensing light . . . using only a sensing means." Thus, the fact that "Numazaki identifies as necessary . . . the image-subtraction circuitry and associated timing circuitry" does not prevent Numazaki from teaching or suggesting the limitations of open-ended claim 1.

For the above reasons, Patent Owner's arguments do not undermine the showing by Petitioner that Numazaki and the knowledge of a PHOSITA teaches all of the aspects of claim 1 for purposes of this Decision.

    *c)*   *Claim 7*

Independent claim 7 is directed to a handheld computer apparatus and is similar to method claim 1. *Compare* Ex. 1001, 25:61–26:5 *with id.* at 25:40–50. As such, the Petition relies on the essentially the same teachings of Numazaki discussed above with respect to claim 1 for the features of claim 7, which we agree with for purposes of this Decision for the reasons explained above. *See* Pet. 26–31.

Patent Owner argues that "Numazaki does not teach or suggest one optical image sensor (i.e., one camera means) to obtain an image" as required by claim 7. *Id.* at 13. However, Patent Owner does not identify why

claim 7 should be limited to one optical image sensor. As noted above,
Petitioner construes "camera means" as an optical sensor (Pet. 6), which
Patent Owner does not contest (Prelim. Resp. 5). Though the claim refers to
"a camera means . . . for obtaining an image," this does not limit the claim,
at least on this record, to only one optical sensor. Unless a more limited
construction is indicated by the specification or prosecution history, the
indefinite article "a" or "an" is construed in a claim to mean "one or more."
*KCJ Corp.*, 223 F.3d at 1356. Thus, "a camera means," based on the current
record, appears to encompass one or more optical sensors.

Patent Owner also argues that the computer means of claim 7 should
be limited to analyzing a single image taken by a single camera and that the
two camera and two image system of Numazaki does not satisfy this
limitation. Prelim. Resp. 13–15. Based on the current record, we determine
that the claim is not so limited.

As noted above, we determine that "a camera means," based on the
current record, appears to encompass one or more optical sensors. Similarly,
the limitation "an image" appears to encompass one or more images for the
same reason. We see no limitations in claim 7 which would require the
camera means or image obtained by the camera means to be limited to a
single camera means or a single image.

Patent Owner also argues that the "alleged 'computer means' taught
by Numazaki cannot analyze a target object absent the other hardware that
Numazaki identifies as necessary, such as the lighting unit, the image
subtraction circuitry, and the associated timing circuitry." *Id.* at 15.

Concerning the lighting unit, claim 7 uses the term "comprising" to
create an "open ended" claim. "'Comprising' is a term of art used in claim
language which means that the named elements are essential, but other

IPR2021-00920
Patent 7,933,431 B2

elements may be added and still form a construct within the scope of the claim." *Genentech,* 112 F.3d at 501. Thus, the presence of a lighting unit is not excluded from the claim. Rather, the '431 patent teaches the use of LEDs "to illuminate [associated] targets" and claim 12, which depends from claim 7, expressly requires "a light source for illuminating said object." Ex. 1001, 3:34–35, 26:14–15.

Concerning the image subtraction circuitry, and the timing circuitry, it is not clear why this is not within the meaning of the claimed computer means. The Petition construes the corresponding structure for the computer means as "a computer/processor programmed to identify natural features on an object so as to determine the object's position." Pet. 29; *id.* at 7–9. The Petition then identifies how the system of Numazaki teaches a similar structure. *Id.* at 29–30. We agree, based on the current record, that Numazaki teaches a computer/processor programmed to identify natural features on an object so as to determine the object's position. Thus, without more, Patent Owner's broad assertion, that Numazaki's structure is insufficient or that the structure requires only a single camera or a single image, does not undermine the showing in the Petition at this stage.

Thus, we determine that the Petition has established a reasonable likelihood of success with respect to claim 7.

> d) *Claim 11*

Dependent claim 11 recites "Apparatus according to claim 7, further including means for transmitting information." Ex. 1001, 26:12–13. As noted previously, Petitioner argues that the "means for transmitting information" is subject to 35 U.S.C. § 112 ¶ 6, and that the structure corresponding to the claimed function is "at least a wireless cellular transceiver." Pet. 11–12 (citing Ex. 1001, 12:59–13:3).

Petitioner argues that Numazaki's fifth embodiment teaches a "conference record system" or TV telephone and that "a PHOSITA would have been motivated to implement this transmission functionality in the portable device described in Numazaki's eighth embodiment." *Id.* at 32–33 (citing Ex. 1003, 38:6–16, 40:16–49; Ex. 1008 ¶¶ 50–52, 58).

Patent Owner correctly notes that "[t]he Petition fails to identify any cellular transceiver in Numazaki." Prelim. Resp. 16. Patent Owner also correctly states that though the Petition relies on the "conference record system" in Numazaki's fifth embodiment, "[t]he Petition fails to identify the transmitter in that embodiment, let alone provide any analysis regarding whether the transmitter allegedly disclosed in Numazaki is an equivalent of the 'cellular transceiver' proposed by Petitioner."[10] *Id.*

For this reason, the Petition does not appear to show how the prior art teaches every limitation of claim 11.

Nevertheless, we do not need to determine whether Petitioner's showing for claim 11 is sufficient in light of our determination regarding at least claim 1. Therefore, pursuant to USPTO policy implementing the decision in *SAS Inst., Inc. v. Iancu,* 138 S. Ct. 1348 (2018) ("*SAS*"), we institute as to all claims challenged in the petition and on all grounds in the petition. *See* PTAB Consolidated Trial Practice Guide (Nov. 2019) ("Consolidated Guide"),[11] 5–6, 64.

### e)  Claim 14

Independent claim 14 is directed to a method for controlling a handheld computing device and is very similar to method claim 1. *Compare*

---

[10] Though the Petition discusses a cellular telephone with respect to claim 13, it also does not discuss a cellular transceiver. *See* Pet. 33–34.

[11] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

IPR2021-00920
Patent 7,933,431 B2

Ex. 1001, 26:18–28 *with id.* at 25:40–50. As such, the Petition relies on the same teachings of Numazaki discussed above with respect to claim 1 for the features of claim 14, which we agree with for purposes of this Decision for the reasons explained above. *See* Pet. 35.

Similarly, Patent Owner argues that the Petition fails to teach or suggest the claim elements of claims 14 for the same reasons with respect to claim 1. Prelim. Resp. 18–19. Patent Owner reiterates some of the same arguments discussed above, for example, arguing that the claimed "a camera" requires a single camera, instead of two cameras, that "image data" is one image, not two, and that Numazaki identifies additional hardware. *Id.* Patent Owner does not provide any additional argument other than what has already been addressed with respect to claim 1 above.

Thus, we determine that the Petition has established a reasonable likelihood of success with respect to claim 14.

       *f)*   *Claims 2–4, 8, 9, 12, 13, 15–22, 25, 26, 28*

Petitioner argues that Numazaki in view of the knowledge of a PHOSITA renders obvious dependent claims 2–4, 8, 9, 12, 13, 15–22, 25, 26, and 28. Pet. 21–26, 31–34, 36–40. Patent Owner does not contest Petitioner's assertions regarding these claims at this stage. *See generally* Prelim. Resp. We have reviewed Petitioner's assertions and the supporting evidence, and determine that Petitioner has established a reasonable likelihood of prevailing.

     *5.*   *Obviousness over Numazaki and DeLeeuw, Numazaki and*
           *DeLuca, and Numazaki and, Peters*

Petitioner argues that the combination of Numazaki and DeLeeuw renders obvious dependent claims 5, 6, and 29. Pet. 41–48. Petitioner argues that the combination of Numazaki and DeLuca renders obvious dependent

IPR2021-00920
Patent 7,933,431 B2

claims 10, 23, 24, and 27. *Id.* at 48–57. Petitioner argues that the combination of Numazaki and Peters renders obvious dependent claims 30 and 31. *Id.* at 57–61. Patent Owner does not separately address these grounds. *See generally* Prelim. Resp.

We have reviewed Petitioner's assertions with respect to these claims and the supporting evidence, and determine that Petitioner has established a reasonable likelihood of prevailing.

### C.  Discretionary Denial

Patent Owner argues that the Petition should be denied based on the earlier filing of IPR2021-00917 ("IPR-917") for *inter partes* review of the '431 patent under 35 U.S.C. § 314(a). Prelim. Resp. 25. IPR-917 was filed by Unified Patents, LLC ("Unified") on May 14, 2021. IPR2021-00917, Paper 3, 1. IPR-917 challenges the patentability of claims 7–13 of the '431 patent. IPR2021-00917, Paper 1, 5. This includes one ground challenging claims 7–9, 11, and 12 over Numazaki. *Id.* The present *inter partes* review was filed by Petitioner, Apple Inc., on May 21, 2021. Paper 3, 1. As noted previously, Petitioner challenges claims 1–31 of the '431 patent and all of the grounds involve Numazaki. Pet. 4.

In the context of follow-on petitions, our exercise of discretion under § 314(a) is guided by a set of non-exclusive factors:

> 1. whether the same petitioner previously filed a petition directed to the same claims of the same patent;
>
> 2. whether at the time of filing of the first petition the petitioner knew of the prior art asserted in the second petition or should have known of it;
>
> 3. whether at the time of filing of the second petition the petitioner already received the patent owner's preliminary response to the first petition or received the Board's decision on whether to institute review in the first petition;

IPR2021-00920
Patent 7,933,431 B2

4. the length of time that elapsed between the time the petitioner learned of the prior art asserted in the second petition and the filing of the second petition;

5. whether the petitioner provides adequate explanation for the time elapsed between the filings of multiple petitions directed to the same claims of the same patent;

6. the finite resources of the Board; and

7. the requirement under 35 U.S.C. § 316(a)(11) to issue a final determination not later than 1 year after the date on which the Director notices institution of review.

*General Plastic Indus. Co., Ltd. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19, 16 (PTAB Sept. 6, 2017) (precedential as to § II.B.4.i) ("the *General Plastic* factors"). For the reasons discussed below, we do not exercise discretion under § 314(a) to deny institution of trial in this case.

*1. Whether the same petitioner previously filed a petition directed to the same claims of the same patent*

As noted above, IPR-917 was filed by a Unified, a petitioner different from the present Petitioner. *See* Pet. 63–64. However, as both parties acknowledge, that is not the end of the inquiry. Pet. 63; Reply 1; Sur-reply 2.

The precedential *Valve* decision held that "[w]hen different petitioners challenge the same claims of the same patent, we also consider the nature of any relationship between those petitioners when weighing the General Plastic factors." *Valve Corp. v. Elec. Scripting Prods., Inc.*, IPR2019-00062, -00063, -00084, Paper 11 at 10 (PTAB Apr. 2, 2019) (precedential). In *Valve*, the Board found that the first *General Plastic* factor favored denying institution based on the same claims being challenged and the significant relationship between the first and second petitioners:

IPR2021-00920
Patent 7,933,431 B2

>We determine that the first *General Plastic* factor weighs against institution. As discussed above, the petitions in these cases challenge the same claims of the '934 patent as the previous petition in the 1031 IPR. As also discussed above, Valve and HTC were co-defendants in the District Court litigation and were accused of infringing the '934 patent based on HTC's VIVE devices that incorporate technology licensed from Valve. Thus, there is a significant relationship between Valve and HTC with respect to Patent Owner's assertion of the '934 patent. *The complete overlap in the challenged claims and the significant relationship between Valve and HTC favor denying institution.*

*Id.* at 10 (emphasis added). Thus, *Valve* instructs us to consider the relationship between the petitioners and the overlap in the challenged claims, as between this case and the earlier-filed IPR-917. We address each of these points in turn.

>a) *Relationship between Petitioner and Unified Patents*

While both parties explicitly or implicitly acknowledge that Petitioner is a member of Unified, neither party provides a full analysis as to why we should or should not determine that membership in Unified establishes a significant relationship between Petitioner and Unified. *See generally* Reply; Sur-reply. Petitioner initially fails to mention or discuss its Unified membership (*see* Pet. 61–66) and then discusses other cases and the present case at only a high level (*see generally* Reply). Patent Owner argues that there are shortcomings in Petitioner's analysis of these cases, but does not explain why membership in Unified alone is sufficient to establish a significant relationship between Apple and Unified under *Valve*.

Patent Owner does argue that "Unified's Members pay it a yearly subscription fee to, *inter alia*, file petitions for *inter partes* review in response to patent lawsuits. *See Unified IPR*, Ex. 1020, ¶2." Prelim. Resp. 27. Petitioner does not deny that this is the case, nor does it address why this

IPR2021-00920
Patent 7,933,431 B2

is insufficient to establish a significant relationship between Petitioner and Unified. We further note that none of the specific details of Petitioner's membership in Unified are of record.

Taking the facts as presented by Patent Owner and not contested by Petitioner, we agree that Petitioner and Unified have a relationship. Further, even if Unified was under no obligation to file an *inter partes* review of the '431 patent, such as based on the litigation between Patent Owner and Petitioner, Unified chose to involve itself in a manner that is presumably for the benefit of its members including Petitioner. At the same time, there is no evidence that Unified and Petitioner are the same, have the same interests, or are working jointly in their *inter partes* review cases. *See e.g.*, Pet. 62; Reply 1.

Thus, based on the current record, these facts are neutral.

### b) Overlapping Claims

Next we consider the overlap between the claims challenged in this proceeding and the challenged claims in IPR-917. The Petition seeks *inter partes* review of claims 1–31. Pet. 4. The Petition in IPR-917 challenges the patentability of claims 7–13. IPR2021-00917, Paper 1, 5. Thus, there are twenty-four claims at issue in this proceeding that are not at issue in IPR-917. As there is not complete overlap of challenged claims, this weighs against exercising our discretion to deny institution.

### c) Factor One Conclusion

Accordingly, though Unified and Petitioner have a relationship, that relationship is not clearly defined on the record. There is a significantly greater number of claims challenged in this Petition versus the petition in IPR-917. Thus, we find that the first *General Plastic* factor weighs against exercising our discretion to deny institution.

IPR2021-00920
Patent 7,933,431 B2

   *2. Whether at the time of filing of the first petition the petitioner*
   *knew of the prior art asserted in the second petition or should*
   *have known of it*

Because we do not find that Petitioner and Unified have a significant

relationship, this factor does not apply to Petitioner because Petitioner could

not have raised the present challenges in a petition filed by another. Thus,

this factor does not weigh in favor of exercising our discretion to deny

institution under § 314(a).

   *3. Whether at the time of filing of the second petition the petitioner*
   *already received the patent owner's preliminary response to the*
   *first petition or received the Board's decision on whether to*
   *institute review in the first petition*

Petitioner filed the present Petition seven days after the filing of IPR-

917. Thus, the Patent Owner Preliminary Response in IPR-917 had not yet

been filed and the institution decision had not yet issued.

   Petitioner further argues that:

   Petitioner has not substantively modified the grounds presented
   herein responsive to the Unified IPR [aka, IPR-917]. In fact,
   when Petitioner became aware of the Unified IPR, the instant
   petition was near final and Petitioner was preparing to file a
   separate Petition (IPR2021-00922, which challenges U.S. Patent
   No. 8,552,079) that relies on *Numazaki* in a nearly identical
   manner to the instant petition. The petition in IPR2021-00922
   was filed just two business days after the Unified IPR and, like
   the instant petition, it was not substantively changed in any way
   responsive to the Unified IPR.

Pet. 62.

   Accordingly, this factor does not weigh in favor of exercising our

discretion to deny institution under § 314(a).

IPR2021-00920
Patent 7,933,431 B2

> 4. *The length of time that elapsed between the time the petitioner learned of the prior art asserted in the second petition and the filing of the second petition*

Petitioner filed its petition only seven days after the filing of IPR-917 and did not wait until a Patent Owner Preliminary Response or institution decision in that case. Thus, this factor does not weigh in favor of exercising our discretion to deny institution under § 314(a).

> 5. *Whether the petitioner provides adequate explanation for the time elapsed between the filings of multiple petitions directed to the same claims of the same patent*

Petitioner filed the present Petition seven days after the filing of IPR-917. Petitioner argues that "Petitioner learned of the Unified IPR only upon its filing" (Reply 1) and that "Petitioner has not substantively modified the grounds presented herein responsive to the Unified IPR [aka, IPR-917]" (Pet. 62). Given the short timeframe between the filings of the two petitions, by two different petitioners, and Petitioner's assertion that they were not previously aware of IPR-917, we accept this explanation as adequate. Thus, this factor does not weigh in favor of exercising our discretion to deny institution under § 314(a).

> 6. *The finite resources of the Board*

"The sixth and seventh factors are efficiency considerations." *Valve*, IPR2019-00062, Paper 11 at 15. "In general, having multiple petitions challenging the same patent, especially when not filed at or around the same time as in this case, is inefficient and tends to waste resources." *Id.*

As noted repeatedly above, Petitioner filed the present Petition seven days after the filing of IPR-917. Thus, these two petitions challenging the '431 patent were filed at around the same time and will be subject to very

IPR2021-00920
Patent 7,933,431 B2

similar timelines. Accordingly, this factor weighs against exercising our discretion to deny institution under § 314(a).

7.  *The requirement under 35 U.S.C. § 316(a)(11) to issue a final determination not later than 1 year after the date on which the Director notices institution of review*

Any trial in the present proceeding could be resolved within the one-year statutory timeframe. Accordingly, this factor weighs against exercising our discretion to deny institution under § 314(a).

8.  *Conclusion*

As all the *General Plastic* factors weigh against exercising our discretion to deny institution under § 314(a), we conclude that we should not exercise discretion under § 314(a) and deny institution of trial.

D.  *Jurisdiction over Expired Patents*

Patent Owner argues that the Board does not have jurisdiction over expired patents. Prelim. Resp. 28. Patent Owner argues:

> 35 U.S.C. § 2(a)(1) states that the United States Patent and Trademark Office "shall be responsible for the granting and issuing of patents. . . ." The Patent Trial Appeal Board is required to "conduct inter partes reviews and post-grant reviews pursuant to chapters 31 and 32." 35 U.S.C. § 6(b)(4). The burden of proof required to find a claim unpatentable is the preponderance of evidence, which is a lower burden of proof than the clear and convincing standard applied in district courts. 35 U.S.C. § 316(a)(9) requires that the Director prescribe regulations "setting forth standards and procedures for allowing the patent owner to move to amend the patent under subsection(d)." This is due, in part, to the fact that there is a lower burden of proof required before the Board.

*Id.*

Patent Owner appears to be arguing that, because 35 U.S.C. § 316(a)(9) requires the Director to establish procedures to allow for

IPR2021-00920
Patent 7,933,431 B2

amendments of patents and that as expired patents cannot be amended, we do not have jurisdiction over expired patents in *inter partes* review. *Id.* Patent Owner concludes that as "[t]he '431 Patent has expired, . . . the opportunity to amend the '431 Patent is not available to Patent Owner" and therefore "determinations regarding the validity of this expired patent should be reserved for Article III courts under the clear and convincing standard." *Id.*

*Inter partes* review of patents, whether expired or not, fits within the USPTO's mandate "for the granting and issuing of patents" (35 U.S.C. § 2(a)(1)), for as the Supreme Court has stated, "[i]nter partes review is 'a second look at an earlier administrative grant of a patent'" (*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1374 (2018) (quoting *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144 (2016)). Our rules have also made clear *inter partes* review covers expired patents. 37 C.F.R. 42.100(b) (2012); *see also, e.g.*, 83 FR 51341 (Oct. 11, 2018) (Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board)[12] ("The claim construction standard adopted in this final rule also is consistent with the same standard that the Office has applied in interpreting claims of expired patents and soon-to-be expired patents. *See, e.g., Wasica Fin. GmbH* v. *Cont'l Auto. Sys., Inc.,* 853 F.3d 1272, 1279 (Fed. Cir. 2017) (noting that "[t]he Board construes claims of an expired patent in accordance with *Phillips* . . . [and] [u]nder that standard, words of a claim are generally given their ordinary and customary meaning").").

---

[12] Available at https://www.federalregister.gov/d/2018-22006/p-13.

Further, the statutes governing *inter partes* review do not limit them to non-expired patents. For example, 35 U.S.C. § 311(b), which sets forth the scope of *inter partes* review, merely refers to patents with no mention of the expiration date. Further, 35 U.S.C. § 311(c) entitled "Filing Deadline" makes no mention of the expiration date of the patent. Elsewhere, 35 U.S.C. § 315 does limit the filing of IPRs based on civil actions and the serving of complaints, but again makes no mention of the expiration date of the patent. Patent Owner does not identify any statute that expressly limits *inter partes* review to non-expired patents.

Patent Owner fails to adequately explain why the requirement to establish procedures to allow for amendments to a patent means that expired patents are not subject to *inter partes* review. For example, the statute does not mandate that amendments to the patent be allowed in all cases.

For all of these reasons, we do not agree that the Board lacks jurisdiction over expired patents.

## III. CONCLUSION

For the foregoing reasons, we have determined that there is a reasonable likelihood that the Petitioner would prevail with respect to at least one of the claims challenged in the Petition. We therefore institute trial as to all challenged claims on all grounds stated in the Petition.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, *inter partes* review of claims 7–13 of U.S. Patent 7,933,431 B2 is instituted on all grounds in the Petition;

IPR2021-00920
Patent 7,933,431 B2

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(c) and

37 C.F.R. § 42.4, notice is hereby given of the institution of a trial; the trial

will commence on the entry date of this decision.

FOR PETITIONER:

Adam Seitz
Paul Hart
ERISE IP, P.A.
Adam.seitz@eriseip.com
Paul.hart@eriseip.com

FOR PATENT OWNER:

Todd Landis
John Wittenzellner
WILLIAMS SIMONS & LANDIS PLLC
tlandis@wsltrial.com
johnw@wsltrial.com

IPR2021-00920
Patent 7,933,431

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.

Petitioner,

v.

GESTURE TECHNOLOGY PARTNERS, LLC

Patent Owner

_____

***Inter Partes* Review No. IPR2021-00920**

**Patent No. 7,933,431**

**PATENT OWNER'S RESPONSE TO THE PETITION
FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 7,933,431**

Filed on behalf of Patent Owner by:

Todd E. Landis (Reg. No. 44,200)
2633 McKinney Ave., Suite 130
Dallas, TX 75204

John Wittenzellner (Reg. No. 61,662)
1735 Market Street, Suite A #453
Philadelphia, PA 19103

Adam B. Livingston (Reg. No. 79,173)
601 Congress Avenue, Suite 601
Austin, TX 78701

**WILLIAMS SIMONS & LANDIS PLLC**

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................1

II.     THE BOARD DOES NOT HAVE JURISDICTION OVER EXPIRED
        PATENTS ....................................................................................................1

III.    PETITIONER'S ASSERTED GROUNDS OF UNPATENTABILITY ........3

IV.     PROCEDURAL HISTORY ..........................................................................3

V.      THE '431 PATENT ......................................................................................3

        A.    The Technology of the '431 Patent ....................................................3

        B.    Prosecution History of the '431 Patent...............................................5

        C.    Level of Ordinary Skill in the Art ......................................................6

        D.    Claim Construction..............................................................................6

              1.    The preambles of independent claims 1, 7, and 14 should
                    limit the scopes of those claims. ...............................................6

              2.    "camera means" .........................................................................7

              3.    "a light source for illuminating said object"..............................8

VI.     RESPONSE TO ISSUES RAISED IN THE PETITION ...............................9

        A.    Ground 1 – Numazaki Does Not Render Obvious Claims 1-4, 7-9, 11-
              22, 25, 26, and 28 ..............................................................................9

              1.    Numazaki does not render independent claim 1 obvious
                    because it does not teach or suggest claim element [1(c)]..........9

              2.    Dependent Claims 2-4....................................................13

              3.    Numazaki does not render independent claim 7 obvious
                    because it does not teach or suggest claim element [7(b)] .......13

              4.    Numazaki does not render independent claim 7 obvious
                    because it does not teach or suggest claim element [7(c)]........16

              5.    Dependent Claims 8 and 9 ....................................................19

              6.    Dependent Claim 11 ...............................................................19

              7.    Dependent Claim 12 ...............................................................20

8.      Dependent Claim 13 ..................................................22

9.      Numazaki does not render independent claim 14 obvious because it does not teach or suggest claim element [14(b)] .....23

10.     Numazaki does not render independent claim 14 obvious because it does not teach or suggest claim element [14(c)]......26

11.     Dependents Claim 15-22, 25, 26, and 28.................................27

B.    Ground 2 – The Combination of Numazaki and DeLeeuw Does Not Render Obvious Claims 5, 6, and 29 ....................................................28

C.    Ground 3 – The Combination of Numazaki and DeLuca Does Not Render Obvious Claims 10, 23, 24, and 27.........................................28

D.    Ground 4 – The Combination of Numazaki and Peters Does Not Render Obvious Claims 30 and 31 .....................................................28

VII.    CONCLUSION...............................................................29

# TABLE OF AUTHORITIES

**Cases**

*Acceleration Bay, LLC v. Activision Blizzard, Inc.*,
  908 F.3d 765 (Fed. Cir. Nov. 6, 2018) ....................................................6

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
  289 F.3d 80 (Fed. Cir. 2002) ..................................................................6

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
  138 S. Ct. 1365 (2018) ............................................................................1

IPR2021-00920
Patent 7,933,431

## EXHIBIT LIST

| Exhibit | Description |
|---------|-------------|
| 2001 | Claim Construction Memorandum and Order |
| 2002 | Declaration of Benedict Occhiogrosso, in Support of Gesture Technology Partners, LLC's Patent Owner Response |

## I.     INTRODUCTION

Gesture Technology Partners, LLC ("Patent Owner") respectfully submits this Response to Apple Inc.'s ("Petitioner") Petition for *Inter Partes* Review ("IPR") No. IPR2021-00920 (the "Petition" or "Pet.") of U.S. Patent No. 7,933,431 (the "'431 Patent").

The Board does not have jurisdiction over the '431 Patent because it has expired and thus this IPR should be terminated. Further, Petitioner fails to show unpatentability of claims 1-31 of the '431 Patent (the "Challenged Claim(s)") because Petitioner's Grounds fail to teach or suggest one or more elements of each Challenged Claim.

## II.     THE BOARD DOES NOT HAVE JURISDICTION OVER EXPIRED PATENTS

In *Oil States*, the Supreme Court explained that the "decision to *grant* a patent is a matter involving public rights—specifically, the grant of a public franchise." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018). "Specifically, patents are public franchises that the Government grants to the inventors of new and useful improvements." *Id.* (internal quotation marks omitted). The Court explained that "Congress [has] significant latitude to assign [the] adjudication of public rights to entities other than Article III courts." *Id.* at 1368. In exercising its "significant latitude," Congress grants public franchises "subject to the qualification that the PTO has the authority to reexamine—and

perhaps cancel—a patent claim in an inter partes review." *Id*. at 1368, 1374 (internal quotation marks omitted). Accordingly, so long as the public franchise exists, the PTO may have jurisdiction to amend and cancel the claims of the patent (e.g., via *inter partes* review).

When a patent expires, however, the public franchise ceases to exist and the franchisee (e.g., the patent owner) no longer has the right to exclude others. At most, the franchisee may be entitled to collect damages from the public franchise that formerly existed through an infringement action in district court. But because the public franchise no longer exists, the PTO has nothing in its authority to cancel or amend. Expiration removes the patent from the PTO's jurisdiction and returns it to the sole jurisdiction of the Article III courts, which have exclusive authority to govern claims for damages. If this were not so, the PTO would purport to have authority to retroactively modify a public franchise that no longer exists, in a setting where the expired public franchise does not enjoy any presumption of validity and in which amendment of claims is no longer permitted.

The '431 Patent issued in April 2011 and expired in July 2020, long before the Petition was filed on May 21, 2021. With the expiration of the patent in July 2020, the Board ceased to have jurisdiction over the '431 Patent, and this IPR should be terminated as a result.

## III.    PETITIONER'S ASSERTED GROUNDS OF UNPATENTABILITY

| Prior Art | Basis | Challenged Claims |
|---|---|---|
| Numazaki | § 103 (Obviousness) | 1-4, 7-9, 11-22, 25, 26, and 28 |
| Numazaki and DeLeeuw | § 103 (Obviousness) | 5, 6, and 29 |
| Numazaki and DeLuca | § 103 (Obviousness) | 10, 23, 24, and 27 |
| Numazaki and Peters | § 103 (Obviousness) | 30 and 31 |

## IV.    PROCEDURAL HISTORY

Petitioner filed this Petition for *Inter Partes* Review of the '431 Patent on May 21, 2021. Patent Owner submitted a Preliminary Response to the Petition on September 7, 2021. The Board instituted *inter partes* review as to the Challenged Claims on the Grounds raised in the Petition.

## V.    THE '431 PATENT

### A.    The Technology of the '431 Patent

The '431 Patent is entitled "Camera Based Sensing in Handheld, Mobile, Gaming or Other Devices." *See* Ex. 1001, Title. The '431 Patent is directed towards methods and apparatuses "to enable rapid TV camera and computer-based sensing in many practical applications, including, but not limited to, handheld devices, cars, and video games." *Id.*, Abstract. In some embodiments, the patent describes the use

IPR2021-00920
Patent 7,933,431

of computer devices and one or more cameras that "optically sens[e] human input" with applications in a "variety of fields such as computing, gaming, medicine, and education." *Id*., 2:7-17.

In some embodiments, the '431 Patent discloses a handheld device, such as a cell phone, that processes imaging from a person or object to control functions on the handheld device. *Id*., 11:62:-67. Figure 8A, which is reproduced below, depicts some embodiments in which a handheld device includes the functionality of the invention.



Ex. 1001, Fig. 8A.

The '431 Patent describes that the handheld device can "perform a control function by determining [] position, orientation, pointing direction or other variable with respect to one or more external objects, using an optical sensing apparatus . . . or with a camera located in the handheld device, to sense datums or other information external for example to the device." *Id.*, 12:1-9. The '431 Patent describes that the device is able to "acquire features of an object and use it to determine something" such as object recognition. *Id.* at 13:5-21. The '431 Patent states that the purpose of some handheld embodiments is "to add functionality to the device, without complicating its base function, and/or alternatively [to] add a method to interact with the device to achieve other purposes." *Id.* at 11:64-67.

### B.    Prosecution History of the '431 Patent

The '431 patent issued from U.S. Patent Application Serial No. 12/834,281 (the "'281 application"), which filed on July 12, 2010. The '281 application is a continuation of U.S. Patent Application Serial No. 11/980,710 (the "'710 application"), which filed on October 31, 2007. The '710 application is a continuation of U.S. Patent Application Serial No. 10/893,534 (the "'534 application"), which filed on July 19, 2004. The '534 application is a continuation of U.S. Patent Application Serial No. 09/612,225 (the "'225 application"), which filed on July 7, 2000. The '225 application claims priority to U.S. Provisional Application Serial No. 60/142,777, which filed on July 8, 1999.

## C.    Level of Ordinary Skill in the Art

For the purposes of this Response only, Patent Owner does not dispute the level of skill of a person of ordinary skill in the art ("POSITA") identified in the Petition.

## D.    Claim Construction

Except for the claim term discussed below, Patent Owner does not contest the constructions proposed in the Petition for the purpose of this Response. *See* Pet., p. 7.

### 1.    The preambles of independent claims 1, 7, and 14 should limit the scopes of those claims.

The preambles of claims 1, 7, and 14 should be limiting.  The Board agreed in the Institution Decision.  Paper 12, p. 8 ("We agree that the preambles of claims 1, 7, and 14 are limiting.").   To the extent Petitioner disagrees, the preamble of each independent claim both (1) recites essential structure or steps and (2) is necessary to give life, meaning, and vitality to the claim, and thus limits the scope of the claim. *See Acceleration Bay, LLC v. Activision Blizzard, Inc.*, 908 F.3d 765, 770 (Fed. Cir. Nov. 6, 2018) (quoting *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002)) ("A preamble limits the invention if it recites essential structure or steps, or is 'necessary to give life, meaning, and vitality' to the claim.").

Independent claims 1, 7, and 14 each claim "said device" or "said apparatus." The antecedent basis for "said device" or "said apparatus" in these claims is

"handheld computing device" or "handheld computer apparatus" in their respective preambles. Thus, the preambles of independent claims 1, 7, and 14 recite essential structure and limit the scope of those claims. *See* Ex. 2002, ¶ 41.

The preambles are also necessary to give life, meaning, and vitality to claims 1, 7, and 14. The '431 Patent discloses different embodiments of Dr. Pryor's invention. In some embodiments, the invention is provided in the form of a non-handheld device (e.g., computer within an automobile). *See, e.g.,* Ex. 1001, Fig. 10A. In some other embodiments, the invention is provided in a handheld device, such as a cell phone. *See id.*, 12:59-13:7. Claims 1, 7, and 14 purposely recite a "handheld computing device" or "handheld computing apparatus" to claim the handheld-device embodiments disclosed in the specification. Thus, the preamble is necessary to give life, meaning, and vitality to claims 1, 7, and 14, consistent with the embodiments that the inventor chose to claim. *See* Ex. 2002, ¶ 42.

## 2.    "camera means"

Independent claim 7 recites "a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object." Petitioner argues that "camera means" does *not* invoke 35 U.S.C. § 112, ¶ 6. Pet., 6. Patent Owner agrees. Patent Owner asserts that "camera means" is properly construed as "a camera." To the extent Petitioner disagrees, "obtaining an image . . . of at least one object," is what cameras do. *See* Ex. 2002, ¶

43.  They obtain images.  *See id.*  A camera is a well-known device to a POSITA and placing "means" after the word "camera" does not change its meaning to a POSITA.  *See id.*  Thus, "a camera means" is properly construed as "a camera."

### 3.    "a light source for illuminating said object"

Dependent claim 12 recites "Apparatus according to claim 7, further including a light source for illuminating said object."  A "camera means" obtains an image of the object "using reflected light" from the object.  *Compare* claim 12 *with* claim element [7(b)].  Accordingly, a POSITA would understand claim 12 as meaning the light source of the handheld computer apparatus illuminates the object while the "camera means" obtains an image of the object.  The object reflects light from the light source and it is this "reflected light" that is used by the "camera means" to obtain the image of the object.  *See* Ex. 2002, ¶ 44.

This is consistent with the specification of the '431 Patent, which discloses "cameras and their associated light sources" and operating the camera "at the same time a . . . light is on."  Ex. 1001, 3:31-32, 7:5-7.  *See also id*., 8:4-8 ("object 360 [] illuminated by a light source 365 provides a time variant intensity change in the camera image 368 obtained by camera."), 9:2-6 ("reflective grating 440 on object 445 . . . [w]hen illuminated by white light for example from lamp 450, it reflects the spectrum such that when the object has moved . . . [the light] returning to camera 460 is changed.").  *See* Ex. 2002, ¶ 45.

Accordingly, claim 12 is properly construed to mean the light source of the handheld computer apparatus illuminates the object while the "camera means" obtains an image of the object. *See* Ex. 2002, ¶ 46.

## VI.    RESPONSE TO ISSUES RAISED IN THE PETITION

### A.    Ground 1 – Numazaki Does Not Render Obvious Claims 1-4, 7-9, 11-22, 25, 26, and 28

Numazaki (the "Ground 1 Reference") does not render obvious claims 1-4, 7-9, 11-22, 25, 26, and 28.

#### 1.    Numazaki does not render independent claim 1 obvious because it does not teach or suggest claim element [1(c)]

Claim element [1(c)] recites "electro-optically sensing light reflected from said at least one finger using a sensing means associated with said device; determining from said sensed light the movement of said finger." Claim element [1(c)] requires "determining" finger movement from reflected light that is "electro-optically" sensed using one "sensing means." The Petition contends that Numazaki teaches or suggests claim element [1(c)]. Pet., pp. 20-21. It does not.

As a threshold matter, the Petition uses the term "camera units" to refer to what Numazaki describes as "photo-detection units." Pet., pp. 12-13 ("a first camera unit (referred to by Numazaki as a 'photo-detection unit').").  This Response will use "photo-detection units" (i.e., the term used in Numazaki) to refer to what the

Petition identifies as "camera units" to be consistent with the disclosure of Numazaki.

Further, the Petition fails to provide any construction for the term "sensing means." *See* Pet., pp. 20-21. The Petition also fails to expressly identify which components in Numazaki correspond to the claimed "sensing means." *See id.* For purposes of this Response, Patent Owner assumes that Petitioner has identified a "photo-detection unit" as corresponding to the "sensing means" term. *See* Ex. 2002, ¶ 53.

The Petition's contentions require that Numazaki's "photo-detection sensor unit" in Fig. 78 is or includes a "photo-detection unit" from Fig. 2 (i.e., the alleged "sensing means"). *See* Pet., p. 20. Numazaki, however, is silent regarding the "photo-detection sensor unit" in Fig. 78 being or including a "photo-detection unit" from Fig. 2. *See* Ex. 2002., ¶ 54. Numazaki's "photo-detection sensor unit" appears for the first time in Numazaki's eighth embodiment. Numazaki generically teaches the "eighth embodiment is directed to a system configuration incorporating the information input generation apparatus of the present invention as described in [embodiments 1-7]." Ex. 1003, 50:21-24. None of embodiments 1-7 in Numazaki mention a "photo-detection sensor unit," and thus none of embodiments 1-7 teach or suggest the "photo-detection sensor unit" in Fig. 78 is or includes the "photo-detection unit" in Fig. 2. *See* Ex. 2002, ¶ 54.

IPR2021-00920
Patent 7,933,431

For example, an information input generation apparatus of Numazaki's first embodiment is reproduced below:



Ex. 1003, 5:5-11, Fig. 2. As shown, Fig. 2 is devoid of a "photo-detection sensor unit" and Numazaki does not identify any component (or grouping of components) in Fig. 2 as being the "photo-detection sensor unit." *See* Ex. 2002, ¶ 55.

Moreover, the Petition does not explain why a POSITA would understand the "photo-detection sensor unit" in Fig. 78 to be a "photo-detection unit" from Fig. 2. *See* Ex. 2002, ¶ 56. The mere fact that Numazaki's eighth embodiment may "incorporate the information input generation apparatus" of Numazaki's first embodiment, Ex. 1003, 50:21-24, does not mean to a POSITA that the "photo-detection sensor unit" in Fig. 78 is or includes a "photo-detection unit" from Fig. 2

(i.e., the alleged "sensing means"). *See* Ex. 2002, ¶ 56. Thus, the Petition fails to satisfy its own requirements for claim element [1(c)], and Numazaki does not teach or suggest claim element [1(c)]. *See* Ex. 2002, ¶ 56.

Further, even assuming *arguendo* that Numazaki's "photo-detection sensor unit" in Fig. 78 includes a "photo-detection unit" from Fig. 2, and that Numazaki's "photo-detection unit" in Fig. 2 is a "sensing means," Numazaki requires <u>two</u> photo-detection units. Numazaki discloses a "reflected light extraction unit 102" with a "first photo-detection unit 109," a "second photo-detection unit 110," and a "difference calculation unit 111." Ex. 1003, 10:57-66; 11:20-51; Fig. 2. The first photo-detection unit 109 requires that a lighting unit 101 emit light during detection. *Id*. at 11:26-30, Fig. 2. Later, at a different time, when the first photo-detection unit 109 is not active, the second photo-detection unit 110 detects while lighting unit 101 is not active. *Id*., 11:30-32, Fig. 2. Those two images—the image from the first photo-detection unit 109 and the image from the second photo-detection unit 110—are then subtracted from each other and it is this difference image ("reflected light image") that is analyzed. *See id.*, 10:57-66; 11:43-56. Thus, Numazaki's first embodiment requires: (1) two, not one, photo-detection units; (2) a lighting unit for illumination; (3) timing circuitry that selectively activates the lighting unit based on which photo-detection unit is active; and (4) circuitry for subtracting one image from

another. Petitioner agrees that Numazaki requires two photo-detection units. *See* Pet., pp. 13-15, 20-21. *See* Ex. 2002, ¶ 57.

Because Numazaki requires <u>two</u> photo-detection units, Numazaki does not teach or suggest "determining" finger movement from reflected light that is "electro-optically" sensed using one "sensing means," as set forth in claim element [1(c)]. Similarly, Numazaki does not teach or suggest "determining" finger movement absent the other hardware that Numazaki identifies as necessary, such as the lighting unit, the image-subtraction circuitry, and the associated timing circuitry. The Petition does not recognize this deficiency in Numazaki. *See* Pet., pp. 13-15 and 20-21. Nor does it argue that it would have been obvious to modify Numazaki to meet this claim element. *See id. See also* Ex. 2002, ¶ 58.

For at least these reasons, Numazaki fails to teach or suggest claim element [1(c)]. Accordingly, Numazaki fails to render independent claim 1 unpatentable.

### 2.    Dependent Claims 2-4

Claims 2-4 depend from and add limitations to claim 1. Numazaki fails to render claim 1 unpatentable, therefore, Numazaki fails to render dependent claims 2-4 unpatentable for at least the same reasons.

### 3.    Numazaki does not render independent claim 7 obvious because it does not teach or suggest claim element [7(b)]

Claim element [7(b)] recites "a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a

user operating said object." The Petition contends that Numazaki's "photo-detection sensor unit" teaches or suggests this limitation. Pet., pp. 27-29. It does not.

As discussed above in Section V(D)(2), "a camera means" is properly construed as "a camera." Numazaki is silent regarding the "photo-detection sensor unit" in Fig. 78 as being or including a camera. The mere fact that Numazaki's "photo-detection sensor unit" is capable of "photo-detecting on an external body," Ex. 1003, 52:9-14, is not sufficiently specific for the "photo-detection sensor unit" to teach or suggest a camera, as required by claim element [7(b)]. *See* Ex. 2002, ¶ 63.

As discussed above in reference to claim element [1(c)], Numazaki's "photo-detection sensor unit" appears for the first time in Numazaki's eighth embodiment. None of embodiments 1-7 in Numazaki mention a "photo-detection sensor unit," and thus none of embodiments 1-7 teach or suggest the "photo-detection sensor unit" in Fig. 78 as being or including a camera, as required by claim element [7(b)]. *See* Ex. 2002, ¶ 64.

The Petition contends that each of Numazaki's "photo-detection units" in Fig. 2 (e.g., photo-detection unit 109, photo-detection unit 110) is a camera. Pet., pp. 12-13 ("a first camera unit (referred to by Numazaki as a 'photo-detection unit').");. Bederson Declaration (Ex. 1008), ¶ 39. Even assuming *arguendo* this is true, Numazaki still fails to teach that the "photo-detection sensor unit" in Fig. 78 is or

includes a "photo-detection unit" from Fig. 2. Moreover, the Petition does not explain why a POSITA would understand the "photo-detection sensor unit" in Fig. 78 to be a "photo-detection unit" from Fig. 2. *See* Ex. 2002, ¶ 65. The mere fact that Numazaki's eighth embodiment may "incorporate the information input generation apparatus" of Numazaki's first embodiment, Ex. 1003, 50:21-24, does not mean to a POSITA that the "photo-detection sensor unit" in Fig. 78 is a "photo-detection unit" from Fig. 2, and thus does not mean that the "photo-detection sensor unit" is a camera. *See* Ex. 2002, ¶ 65.

To the extent that Petitioner is attempting to equate the combination of the "photo-detection units" and the "difference calculation unit 111" from Numazaki's first embodiment in Fig. 2 with the "photo-detection sensor unit" in Fig. 78, *see* Pet., pp. 27-29, Numazaki makes no such equating between these components. Again, the mere fact that Numazaki's eighth embodiment may "incorporate the information input generation apparatus" of Numazaki's first embodiment, Ex. 1003, 50:21-24, does not mean to a POSITA that the "photo-detection sensor unit" in Fig. 78 is the combination of the "photo-detection units" and "difference calculation unit 111" from Fig. 2. *See* Ex. 2002, ¶ 66.

In summary, Numazaki fails to teach any of the following:

- that the "photo-detection sensor unit" is a camera;

- that the "photo-detection sensor unit" can obtain an image;

15

- that the "photo-detection sensor unit" is a "photo-detection unit" from Fig. 2; or

- that the "photo-detection sensor unit" is a combination of the "photo-detection units" and the "difference calculation unit 111" from Fig. 2

*See* Ex. 2002, ¶ 67.

For at least these reasons, Numzaki fails to teach or suggest claim element [7(b)].

### 4.    Numazaki does not render independent claim 7 obvious because it does not teach or suggest claim element [7(c)]

Claim element [7(c)] recites "computer means within said housing for analyzing said image to determine information concerning a position or movement of said object." The Petition contends that Numazaki teaches or suggests this limitation. Pet., 29-30. It does not.

The claim requires that the "computer means," whatever it is, analyze "said image to determine information concerning a position or movement of said object." The "said image" refers to the image obtained by the "camera means." According to the Petition, the "camera means" is "photo-detection sensor unit" (not described in Numazaki) which Petitioner attempts to equate with the "photo-detection units" of Fig. 2. Pet., pp. 27-29. Assuming the "photo-detection units" are cameras, claim element [7(c)] would require that one of those "photo-detection units" obtain an

image and that the obtained image be analyzed by the "computer means" to "determine information concerning a position or movement of said object." Numazaki does not teach that the image signals captured by the "photo-detection units" in Fig. 2 are ever analyzed for any purpose. *See* Ex. 2002, ¶ 70. Rather, those images are simply subtracted from each other to obtain another image that Numazaki refers to as the "reflected light image." The "reflected light image" is not obtained by a camera but rather is determined through the subtraction of the two images captured by the "photo-detection units." Numazaki does not teach analyzing either of the images obtained by the "photo-detection units." *See* Ex. 2002, ¶ 70.

If Petitioner attempts to argue that the subtraction of the images satisfies the analysis portion of claim element [7(c)], that argument also fails. First, the claim requires analysis of the image obtained by the camera. The subtraction involves two images. Second, the analysis must be done "to determine information concerning position or movement of said object." The subtraction process makes no such determination. At bottom, Numazaki fails to teach a "computer means" that performs the "analyzing" portion of claim element [7(c)]. *See* Ex. 2002, ¶ 71.

The Petition contends that the corresponding structure for "computer means" in claim element [7(c)] "includes a computer/processor programmed to identify natural features on an object so as to determine the object's position." Pet., p. 29. Without acquiescing to the propriety of Petitioner's construction for this claim

element, the Petition fails to identify in Numazaki a computer or processor "programmed" as required by Petitioner's claim construction. Instead, the Petition cites to various algorithms performed by Numazaki's "feature data generation unit." Pet., pp. 29-30. Ex. 1003, 17:13-17 ("Referring now to FIG. 6 to FIG. 22, the second embodiment of the present invention will be described in detail. The second embodiment is directed to . . . the *feature data generation unit*.") (emphasis added). Numazaki discloses various implementations of the "feature data generation unit." *E.g.*, Ex. 1003, Fig. 21, Fig. 22, Fig. 23, and Fig, 35. Each of these "feature data generation unit" implementations consists of numerous specialized units. *See Id*. *See also* Ex. 2002, ¶¶ 72-73. Petitioner has not provided any explanation as to how these specialized units correspond to a computer or processor that has been "programmed." Pet., pp. 29-30. Further, Numazaki does not state that the "feature data generation unit" is or can be implemented as a "programmed" computer or processor. *See* Ex. 2002, ¶¶ 72-73.

The Bederson Declaration (Ex. 1008) also cites to Numazaki's "compact portable information device" to meet the corresponding structure for "computer means" in claim element [7(c)]. Ex. 1008, ¶ 55. But Numazaki does not disclose the internal hardware/circuitry of the "compact portable information device," Ex. 1003, 52:5-19, and thus Petitioner has not met their burden in showing Numazaki discloses the corresponding structure for "computer means" in claim element [7(c)].

*See* Ex. 2002, ¶ 74.

For at least these reasons, Numazaki fails to render independent claim 7 unpatentable.

### 5.    Dependent Claims 8 and 9

Dependent claims 8 and 9 depend, either directly or indirectly, from and add limitations to claim 7.  Numazaki fails to render claim 7 unpatentable, therefore, Numazaki fails to render dependent claims 8 and 9 unpatentable for at least the same reasons.  *See* Ex. 2002, ¶ 76.

### 6.    Dependent Claim 11

Dependent claim 11 recites "Apparatus according to claim 7, further including means for transmitting information."  Claim 11 depends from and adds limitations to claim 7.  Numazaki fails to render claim 7 unpatentable, therefore, Numazaki fails to render dependent claim 11 unpatentable for at least the same reasons.

Moreover, the Petition fails to provide any analysis regarding whether Numazaki discloses this limitation under Petitioner's proposed construction of the term "means for transmitting information."  *See* Pet., pp. 24-25.  The Petition asserts that the corresponding structure for this limitation is "at least a cellular transceiver."  *See id.*, pp. 11-12.  *See* Ex. 2002, ¶¶ 78-79.

The Petition fails to identify any cellular transceiver in Numazaki.  *See* Pet., pp. 32-33.  The Board agreed in the Institution Decision.  Paper 12, p. 20 ("Patent

Owner correctly notes that '[t]he Petition fails to identify any cellular transceiver in Numazaki.'"). Instead, the Petition relies on the so-called fifth embodiment of Numazaki, which is part of a "conference record system." *See* Pet., pp. 32-33. The Petition fails to identify the transmitter in that embodiment, let alone provide any analysis regarding whether the transmitter allegedly disclosed in Numazaki is an equivalent of the "cellular transceiver" proposed by Petitioner. *See id.* Again, the Board agreed in the Institution Decision. Paper 12, p. 20 ("Patent Owner also correctly states that though the Petition relies on the 'conference record system' in Numazaki's fifth embodiment, '[t]he Petition fails to identify the transmitter in that embodiment, let alone provide any analysis regarding whether the transmitter allegedly disclosed in Numazaki is an equivalent of the 'cellular transceiver' proposed by Petitioner' . . . For this reason, the Petition does not appear to show how the prior art teaches every limitation of claim 11.") *See also* Ex. 2002, ¶¶ 78-79.

### 7.    Dependent Claim 12

Claim 12 depends from and adds limitations to claim 7. Numazaki fails to render claim 7 unpatentable, therefore, Numazaki fails to render dependent claim 12 unpatentable for at least the same reasons.

Moreover, dependent claim 12 recites "Apparatus according to claim 7, further including a light source for illuminating said object." As discussed above in Section V(D)(3), a POSITA would understand that claim 12 requires the light source

of the handheld computer apparatus illuminate the object while the "camera means" obtains an image of the object. *See* Ex. 2002, ¶ 82.

If "a camera means" in claim element [7(b)] is interpreted to mean "multiple cameras" (e.g., two cameras), Numazaki still fails to teach or suggest claim 12. Claim element 12 requires the object be illuminated by the light source of the handheld computer apparatus when any of the cameras is obtaining an image of the object. But as discussed above, Numazaki requires two photo-detection units (i.e., two cameras) and Numazaki's lighting unit (i.e., light source) is *not* active when one of the photo-detection units is capturing an image of the object. This is contrary to what is required by claim 12. *See* Ex. 2002, ¶¶ 83-84. And if Petitioner argues that one of the photo-detection units in Numazaki obtains an image when the lighting unit is active, then that image must be analyzed by the computer means in claim element [7(c)]. No such analysis occurs in Numazaki. The Petition does not address this deficiency in Numazaki, nor does it assert that it would have obvious to a POSITA to modify Numazaki such that it meets this claim element. *See* Ex. 2002, ¶¶ 83-84.

Numazaki fails to render dependent claim 12 unpatentable for at least these reasons.

### 8.    Dependent Claim 13

Claim 13 depends from and adds limitations to claim 7.  Numazaki fails to render claim 7 unpatentable, therefore, Numazaki fails to render dependent claim 13 unpatentable for at least the same reasons.

Moreover, dependent claim 13 recites "Apparatus according to claim 7, wherein said apparatus is a cellular phone."  Petitioner concedes that Numazaki does not disclose a cellular phone.  Pet., p. 34.  Instead, Petitioner references the so-called fifth embodiment of Numazaki, which discloses a "TV telephone," and then attempts to argue that a POSITA would have understood the "TV telephone" disclosure as teaching or suggesting a cellular phone.  *Id*.  Patent Owner disagrees.

Numazaki's fifth embodiment, which includes the "TV telephone," discloses a video frame rate of 30 frames per second.  Ex. 1003, 39:61-66.  In discussing the knowledge of a POSITA, the Bederson Declaration (Ex. 1008) cites to a July 1999 New York Times article ("NYT article") (Ex. 1013) describing cellphone technology.  Ex. 1008, ¶ 60.  The NYT article, which is dated *after* the effective filing date of the '431 Patent, states that an *upcoming* cellular videophone (Kyocera's VP-210) will be able to transmit video at "about two frames a second." Ex. 1013, p. 3.  If cellphones scheduled for release after the effective filing date of the '431 Patent can only transmit video at "about two frames a second," a POSITA would not have understood Numazaki's "TV telephone," which is associated with

rates of 30 frames per second, as being a cellphone. *See* Ex. 2002, ¶¶ 88-90. A POSITA would understand that cellphones at the effective filing date completely lacked the bandwidth required to transmit at the video rate specified in Numazaki. *See* Ex. 2002, ¶¶ 88-90.

Numazaki also does not teach that any of its devices can receive a cellular voice signal. At a minimum, to be a cellular phone, such a device must be able to make cellular phone calls. This means that the device must be able to transmit voice and receive voice over a cellular network. Numazaki teaches no such devices. *See* Ex. 2002, ¶¶ 88-90. Accordingly, Numazaki does not teach or suggest a cellular phone, as recited by claim 13.

> **9.    Numazaki does not render independent claim 14 obvious because it does not teach or suggest claim element [14(b)]**

Claim element [14(b)] recites "associating a camera with said device, said camera viewing at least a portion of the body of a user operating said device or an object held by said user, in order [to] provide image data concerning said portion or object." The Petition contends that Numazaki's "photo-detection sensor unit" is "a camera" that "provide[s] image data" and thus Numazaki teaches or suggests this limitation. *See* Pet., p. 35 (citing the Petition's arguments for claim elements [1(b)] and [1(c)]). It does not.

As discussed above in reference to claim element [7(b)], Numazaki is silent regarding the "photo-detection sensor unit" in Fig. 78 as being or including a camera. The mere fact that Numazaki's "photo-detection sensor unit" is capable of "photo-detecting on an external body," Ex. 1003, 52:9-14, is not sufficiently specific for the "photo-detection sensor unit" to teach or suggest "a camera" that "provide[s] image data," as required by claim element [14(b)]. *See* Ex. 2002, ¶ 94.

As discussed above in reference to claim element [1(c)], Numazaki's "photo-detection sensor unit" appears for the first time in Numazaki's eighth embodiment. None of embodiments 1-7 in Numazaki mention a "photo-detection sensor unit," and thus none of embodiments 1-7 teach or suggest the "photo-detection sensor unit" in Fig. 78 as being or including "a camera" that "provide[s] image data," as required by claim element [14(b)]. *See* Ex. 2002, ¶ 95.

The Petition contends that each of Numazaki's "photo-detection units" in Fig. 2 (e.g., photo-detection unit 109, photo-detection unit 110) is a camera. Pet., pp. 12-13 ("a first camera unit (referred to by Numazaki as a 'photo-detection unit')."); Bederson Declaration (Ex. 1008), ¶ 39. Even assuming *arguendo* this is true, Numazaki still fails to teach that the "photo-detection sensor unit" in Fig. 78 is or includes a "photo-detection unit" from Fig. 2. Moreover, the Petition does not explain why a POSITA would understand the "photo-detection sensor unit" in Fig. 78 to be a "photo-detection unit" from Fig. 2. *See* Ex. 2002, ¶¶ 96-97. The mere

fact that Numazaki's eighth embodiment may "incorporate the information input generation apparatus" of Numazaki's first embodiment, Ex. 1003, 50:21-24, does not mean to a POSITA that the "photo-detection sensor unit" in Fig. 78 is a "photo-detection unit" from Fig. 2, and thus does not mean that the "photo-detection sensor unit" is "a camera" that "provide[s] image data." *See* Ex. 2002, ¶¶ 96-97.

To the extent that Petitioner is attempting to equate the combination of the "photo-detection units" and the "difference calculation unit 111" from Numazaki's first embodiment in Fig. 2 with the "photo-detection sensor unit" in Fig. 78, Numazaki makes no such equating between these components. Again, the mere fact that Numazaki's eighth embodiment may "incorporate the information input generation apparatus" of Numazaki's first embodiment, Ex. 1003, 50:21-24, does not mean to a POSITA that the "photo-detection sensor unit" in Fig. 78 is the combination of the "photo-detection units" and "difference calculation unit 111" from Fig. 2. *See* Ex. 2002, ¶ 98.

In summary, Numazaki fails to teach any of the following:

- that the "photo-detection sensor unit" is a camera;

- that the "photo-detection sensor unit" can "provide image data";

- that the "photo-detection sensor unit" is a "photo-detection unit" from Fig. 2; or

- that the "photo-detection sensor unit" is a combination of the "photo-detection units" and the "difference calculation unit 111" from Fig. 2.

*See* Ex. 2002, ¶ 99.

For at least these reasons, Numzaki fails to teach or suggest claim element [14(b)].

### 10.    Numazaki does not render independent claim 14 obvious because it does not teach or suggest claim element [14(c)]

Claim element [14(c)] recites "using said computer, analyzing said image data to determine information concerning a user input command." Claim element [14(c)] requires, in part, "analyzing" the "image data" from the one camera to "determine information concerning a user input command." *Compare* claim element [14(c)] *with* claim element [14(b)]. The Petition contends that Numazaki teaches or suggests this limitation. Pet., 29-30. Numazaki does not teach such analyzing for all the reasons given above for claim element [7(c)]. *See* Ex. 2002, ¶ 101.

As discussed above, to perform an analysis (e.g., tracking) of a target object and control a computer, Numazaki requires: (1) two, not one, images from different photo-detection units; (2) a lighting unit for illumination; (3) timing circuitry that selectively activates the lighting unit based on which photo-detection unit is active; and (4) circuitry for subtracting one image from another. *See* claim 1, *supra*. *See also* Ex. 1003, 10:57-66; 11:20-56; Fig. 2. *See* Ex. 2002, ¶ 102.

IPR2021-00920
Patent 7,933,431

Because Numazaki requires <u>two</u> images from different photo-detection units to perform an analysis of a target object and control the computer, it does not teach or suggest "analyzing" the "image data" from the one camera to "determine information concerning a user input command," as set forth in claim element [14(c)]. Similarly, Numazaki does not teach or suggest "analyzing" image data absent the other hardware that Numazaki identifies as necessary, such as the lighting unit, the image-subtraction circuitry, and the associated timing circuitry.  The Petition does not recognize this deficiency in Numazaki.  *See* Pet., pp. 13-15, 20, 21, and 35.  Nor does it argue that it would have been obvious to modify Numazaki to meet this claim element.  *See id.*  *See also* Ex. 2002, ¶ 103.  Accordingly, Numazaki does not teach or suggest claim element [14(c)].

For at least these reasons, Numazaki fails to render independent claim 14 unpatentable.

### 11.     Dependents Claim 15-22, 25, 26, and 28

Claims 15-22, 25, 26, and 28 depend from and add limitations to claim 14. Numazaki fails to render claim 14 unpatentable, therefore, Numazaki fails to render claims 15-22, 25, 26, and 28 unpatentable for at least the same reasons. *See* Ex. 2002, ¶ 105.

**B.    Ground 2 – The Combination of Numazaki and DeLeeuw Does Not Render Obvious Claims 5, 6, and 29**

Dependent claims 5, 6, and 29 depend from and add limitations to claim 1 or claim 14.  For at least the reasons discussed above with respect to Ground 1, Numazaki does not teach or suggest one or more limitations of claim 1 and claim 14.  DeLeeuw does not remedy those deficiencies, and the Petition does not so assert.  *See* Pet., pp. 45-48.  Therefore, the combination of Numazaki and DeLeeuw fails to render dependent claims 5, 6, and 29 unpatentable.  *See* Ex. 2002, ¶ 106.

**C.    Ground 3 – The Combination of Numazaki and DeLuca Does Not Render Obvious Claims 10, 23, 24, and 27**

Dependent claims 10, 23, 24, and 27 depend indirectly from and add limitations to claim 7 or claim 14.  For at least the reasons discussed above with respect to Ground 1, Numazaki does not teach or suggest one or more limitations of claim 7 and claim 14.  DeLuca does not remedy those deficiencies, and the Petition does not so assert.  *See* Pet., pp. 48-57.  Therefore, the combination of Numazaki and DeLuca fails to render dependent claims 10, 23, 24, and 27 unpatentable.  *See* Ex. 2002, ¶ 107.

**D.    Ground 4 – The Combination of Numazaki and Peters Does Not Render Obvious Claims 30 and 31**

Dependent claims 30 and 31 depend from and add limitations to claim 14.  For at least the reasons discussed above with respect to Ground 1, Numazaki does not teach or suggest one or more limitations of claim 14.  Peters does not remedy those

deficiencies, and the Petition does not so assert.  *See* Pet., pp. 57-61.  Therefore, the combination of Numazaki and Peters fails to render dependent claims 30 and 31 unpatentable.  *See* Ex. 2002, ¶ 108.

## VII.   CONCLUSION

For the foregoing reasons, Petitioner has not established that the cited references render any of the Challenged Claims unpatentable.

## CERTIFICATE OF COMPLIANCE

Pursuant to 37 C.F.R. § 42.24(d), I hereby certify that the foregoing Patent Owner's Response contains 6,192 words as measured by the word processing software used to prepare the document, excluding the cover page, signature block, and portions exempted under 37 C.F.R. § 42.24(a) or (b).

DATED:  February 28, 2022          Respectfully submitted,

By: /Todd E. Landis/
Todd E. Landis
Registration No. 44,200
Counsel for Patent Owner

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. § 42.6, the undersigned certifies that on February 28, 2022, the foregoing document was served on counsel of record for Petitioner by filing this document through the End-to-End System, as well as via electronic mail to counsel of record for Petitioner at the following addresses:

Adam P. Seitz (Adam.Seitz@eriseip.com)
Paul R. Hart (Paul.Hart@eriseip.com).

Respectfully submitted,


By: /Todd E. Landis/
Todd E. Landis
Registration No. 44,200
Counsel for Patent Owner

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.
Petitioner

v.

GESTURE TECHNOLOGY PARTNERS LLC
Patent Owner

_____

Case No. IPR2021-00920
U.S. Patent No. 7,933,431

_____

**PETITIONER'S REPLY TO PATENT OWNER'S RESPONSE**

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................ 1

II.  ARGUMENT ............................................................................ 3

    A.  PATENT OWNER'S ARGUMENTS REGARDING LIMITATION [1(C)] MISCONSTRUE THE CLAIM LANGUAGE AND THE PROPOSED GROUND ........................................................................ 3

        1.  *Patent Owner ignores Numazaki's express teaching that its eighth embodiment implements the image difference calculation taught by its first embodiment* ................................. 6

        2.  *Patent Owner's terminology argument conflicts with Numazaki's substantive teachings* ........................................... 7

        3.  *The claims should not be construed to exclude multi-camera systems* .................................................................. 10

    B.  NUMAZAKI TEACHES THE "CAMERA MEANS" IN LIMITATION [7(B)] ..... 11

    C.  NUMAZAKI RENDERS OBVIOUS THE "COMPUTER MEANS" OF CLAIM [7(C)] ........................................................................ 13

    D.  NUMAZAKI RENDERS OBVIOUS THE "TRANSMITTING INFORMATION" OF CLAIM 11 ................................................ 15

    E.  PATENT OWNER'S CONSTRUCTION OF CLAIM 12 IS INCORRECT, AND NUMAZAKI RENDERS OBVIOUS THE "LIGHT SOURCE FOR ILLUMINATING SAID OBJECT" ........................................ 16

    F.  NUMAZAKI RENDERS OBVIOUS THE "CELLULAR PHONE" OF CLAIM 13 ........................................................................ 19

III.  THE BOARD HAS JURISDICTION TO REVIEW EXPIRED PATENTS ........................................................................ 22

IV.  CONCLUSION ...................................................................... 24

## I.     INTRODUCTION

The Challenged Claims focus on detecting hand-based gestures with a camera where the gesture is illuminated by a light source and converting those gestures into commands, allowing the user to control the device with finger movements.

The Petition is based primarily on Numazaki (Ex. 1004), which provides extensive disclosure and numerous examples of an information input scheme that captures images of an illuminated object and processes those images to detect gestures. Ex. 1004, 10:8-13. Among its many embodiments, Numazaki's eighth embodiment teaches "a compact portable information device equipped with the information input generation apparatus of the present invention, which is in a size that can be held by one hand" such that the "position of a cursor 714 on the screen can be controlled by moving a finger 713 in front of this window 712." Ex. 1003, 52:5-16. This arrangement is illustrated in Fig. 78 below:



1

*Id*. at Fig. 78. Numazaki teaches an improved method of gesture detection that uses multiple cameras to remove image information illuminated only by ambient light, resulting in a more precise image of the illuminated gestures.

Patent Owner's Response ("POR" or "Paper 15") does not dispute that Numazaki's goals, applications, and implementations are nearly identical to that described in the '431 Patent. Given the substantial overlap, the POR attempts to manufacture distinctions between the claim language and Numazaki's disclosures—most based on the more advanced two-camera process Numazaki describes. None of these distinctions distinguish the prior art when the claims are properly construed.

First, Patent Owner advances numerous attacks on the specific camera arrangement employed by Numazaki's gesture detecting unit, all of which mischaracterize Numazaki, misconstrue the claims, or both. Many of these arguments were advanced in Patent Owner's Preliminary Response and rejected by the Board at institution. As set forth below, the POR provides no justification for the Board to modify its preliminary conclusions on these points. Second, regarding "computer means" of Claim [7(c)], the POR argues that Numazaki fails to disclose that its "feature data generation unit" can be implemented as a programmed computer or processor. In fact, Numazaki teaches exactly this, expressly contemplating an embodiment in which "th[e] operation of the feature data generation unit [is realized] in a form of software." Ex. 1003, 20:41-47. Finally, the

2

POR advances two arguments regarding Numazaki's cellular videophone that misconstrue Numazaki's teachings and mischaracterize the petition.

## II.    ARGUMENT

### A.    Patent Owner's arguments regarding limitation [1(c)] misconstrue the claim language and the proposed ground

Limitation [1(c)] recites, "electro-optically sensing light reflected from said at least one finger using a sensing means[1] associated with said device." This is Numazaki's entire focus. Its "invention is basically directed to an information input scheme in which the light is irradiated onto a target object from a light source, and the reflected light from this target object is captured as an image, so that information on this target object such as its shape, motion, distance, etc., can be obtained from this reflected light image." Ex. 1003, 10:8-13; *see also id*. at 10:61-66 ("When the target object is a hand, it becomes possible to obtain the information regarding a gesture or a pointing according to the feature data extracted from the reflected light image of the hand, for example, and it becomes possible to operate a computer by using this obtained information.").

---

[1] At institution, the Board recognized that neither party contends "sensing means" invokes § 112, ¶ 6, and that the district court agreed. Paper 12, 11-12 (further noting that Claim 2 implies "sensing means is at least one camera"). The POR does not appear to dispute that sensing means is satisfied by a camera.

3

For limitation [1(c)], the petition relies on the input generation apparatus illustrated in Fig. 2 below, which includes reflected light extraction unit 102—a fundamental feature of Numazaki's invention used across many of its embodiments:



Ex. 1003, Fig. 2, 11:9-11 (noting Fig. 2 illustrates an "information input generation apparatus"). As explained in the Petition at 13-14, a timing control unit is used to turn lighting unit 101 on (i.e., illuminating the target object) when the first camera unit is active and off when the second camera unit is active. *Id.* at 11:20-32. The result of this light control is the first camera unit captures an image of the target object illuminated by both natural light and the lighting unit 101 and the second camera unit captures an image of the target object illuminated by only natural light. *Id.* at 11:33-39. The difference between the two images—obtained by difference calculation unit 111—represents the "reflected light from the object resulting from the light emitted by the lighting unit 101." *Id.* at 11:43-51. In the context of a

4

gesturing hand, unit 102 produces an image that precisely captures only the portions of the hand that are illuminated by lighting unit 101, excluding other image information that is illuminated only by ambient light. Ex. 1017, ¶¶ 7-8 (explaining that Numazaki's two-sensor structure improves upon a single sensor structure by ensuring that the produced image captures the illuminated gesture while excluding extraneous image information). This information is then used by feature data generation unit 103 to determine gestures, pointing, etc. of the target object that may be converted into commands executed by a computer. Ex. 1003, 10:57-66.

As set forth in the Petition at 14-15, Numazaki's eighth embodiment incorporates the first embodiment's gesture detection unit into a handheld device such that "[a] position of a cursor 714 on the screen can be controlled by moving a finger 713 in front of this window 712." *Id*. at 52:5-16. This arrangement is illustrated in Fig. 78 below:



5

*Id.* at Fig. 78.

Numazaki expressly teaches that its eighth embodiment incorporates "the information input generation apparatus of the present invention as described in the above embodiments." *Id.* at 50:21-24. As explained in the Petition at 15-16, a POSITA would have understood that the eighth embodiment uses the information input generation apparatus illustrated in Fig. 2 at least because Numazaki at 53:22-36 expressly teaches that the eighth embodiment uses the precise image difference calculation taught by Fig. 2 and its corresponding disclosure. Ex. 1008, ¶ 44.

> 1. *Patent Owner ignores Numazaki's express teaching that its eighth embodiment implements the image difference calculation taught by its first embodiment*

Patent Owner contends that Numazaki lacks the claimed "sensing means" due to a number of superficial arguments regarding the Petition's conclusion that Numazaki's eighth embodiment implements the information input generation apparatus from its first embodiment. Tellingly, neither Patent Owner nor its expert ever addresses the critical fact that Numazaki expressly teaches its eighth embodiment implements the same image difference calculation that is the focus of its first embodiment. Accordingly, this key teaching on which the proposed grounds turn is undisputed.

### 2. *Patent Owner's terminology argument conflicts with Numazaki's substantive teachings*

Patent Owner argues that the "photo detection unit" is different from the "photo detection *sensor* unit," and that the latter is not a "sensing means" as claimed. Paper 15, 10-12. Patent Owner concedes that Numazaki's eighth embodiment incorporates the information input generation apparatus described in the preceding embodiments, but takes issue with an alleged terminology discrepancy. Namely, noting that Numazaki's first embodiment uses the phrase "photo-detection unit" and its eighth embodiment uses "photo-detection sensor unit," Patent Owner argues that "the Petition does not explain why a POSITA would understand the 'photo-detection sensor unit' in Fig. 74 to be a 'photo-detection unit' from Fig. 2." Paper 15, 10-12.

As an initial matter, Patent Owner's terminology argument mischaracterizes the proposed ground. The Petition does not argue that Numazaki's "photo-detection sensor unit" is one of the photo-detection units from Fig. 2. Instead, the Petition makes clear that the entire Fig. 2 structure is incorporated into the eighth embodiment, including the reflected light extraction unit 102's two separate photo-detection units 109 and 110. Paper 1, 15-16, 20-21.

Second, contrary to Patent Owner's suggestion, Numazaki's terminology is both internally consistent and supports Petitioner's proposed grounds. It uses the term "photo-detection *sensor* unit" to describe a unit that includes two photo-detection *sensors*. As illustrated below, the first embodiment's information input

7

generation apparatus includes lighting unit 101 (green) and reflected light extraction unit 102 (orange):



Ex. 1003, Fig. 2 (annotated). Numazaki's Fig. 78 device includes "a window 712 [] for the lighting unit and the photo-detection sensor unit." *Id*. at 52:12-14. This is illustrated below:



*Id.* at Fig. 78 (annotated). As Dr. Bederson explained in support of the Petition, "Numazaki's eighth embodiment portable devices incorporate the controlled lighting and two-camera sensor structure described with respect to the first embodiment." Ex. 1008, ¶ 44 (discussing the individual components of reflected light extraction unit 102, including both photo-detection units). Accordingly, Numazaki's "photo-detection sensor unit" includes both photo-detection units 109 and 110.

There is no dispute that Numazaki's photo-detection units 109 and 110 are sensors. Patent Owner's expert conceded this point on cross examination:

> Q. [Do] [y]ou agree that Numazaki's unit 102 includes two separate electro-optical sensors?
> A. Yes, Numazaki's unit 102 includes two auto-detecting units which are regarded as electro-optical sensors.

9

Ex. 1018, 19:16-20. Petitioner's expert, Dr. Bederson, agrees. Ex. 1017, ¶ 5 (agreeing that both photo-detection units 109 and 110 are electro-optical sensors).

Dr. Bederson further explains that a POSITA would have understood Numazaki's terminology (1) is internally consistent and (2) supports a conclusion that the eighth embodiment's "photo-detection sensor unit" 702 comprises reflected light extraction unit 102, including two electro-optical *sensors*. *Id*. at ¶¶ 3-6 (explaining that "photo-detection sensor unit" accurately describes Fig. 2's photo detection unit that includes photo-detecting sensors).

Numazaki thus teaches photo-detection units (including sensors) for capturing images. As a result, Numazaki teaches the claimed "sensing means."

### 3. The claims should not be construed to exclude multi-camera systems

The POR next raises an argument that the Board soundly rejected at institution—that "sensing means" in limitation [1(c)] excludes systems with multiple cameras. Paper 15, 12-13. At institution, the Board rejected this argument, finding "'a sensing means,' based on the current record, "appears to encompass one or more cameras." Paper 12, 16. The POR provides no new reasons for the Board modify this preliminary determination. Accordingly, the Board should make this determination final.

The Board also rejected Patent Owner's argument that the claims exclude Numazaki's system because Numazaki includes other hardware necessary to detect

gestures. *Id*. at 17 (noting the claim is open ended and concluding that it "does not prohibit other hardware from being involved"). As with the question of claim construction, the POR provides the Board no new evidence or arguments that would demand a different conclusion. *Compare* Paper 15, 12-13, *with* Paper 8, 10-11. It simply recycles the same arguments from the POPR. Accordingly, the Board should finally conclude that Numazaki teaches the claimed sensing means."

### B.    Numazaki teaches the "camera means" in limitation [7(b)]

At 13-16, the POR argues that Numazaki does not teach or suggest the "camera means" limitation in Claim 7.[2] Most of these arguments appear identical to the arguments Patent Owner advanced against the petition's limitation [1(c)] mapping. They should be rejected when applied to limitation [7(b)] for all the reasons set forth above.

The POR does appear to advance one argument unique to limitation [7(b)]. It suggests that Numazaki's "photo-detection sensor unit" is not a camera at all. Paper 15, 13-16 (arguing "Numazaki fails to teach . . . "that the 'photo-detection sensor unit' is a camera" or that it "can obtain an image"). It is not clear from the POR that Patent Owner takes a materially different view of "camera means" than the Petition. The POR argues "camera means" is "a camera" and notes that the function of a camera is to obtain images.  Paper 15, 7-8. The Petition similarly proposed "camera

---

[2] The POR advances these same arguments for limitation [14(b)] at 23-26.

means" requires an optical sensor to capture images. Paper 1, 6-7. Satisfying both constructions, Numazaki's "photo-detection sensor unit" obtains images. As set forth in the Petition at 27-29, Numazaki teaches the same CMOS camera technology as the '431 Patent and the whole purpose of Numazaki's photo-detection technology is to obtain a precise image of an object (e.g., a user's hand) to determine gestures, pointing, etc. of the target object that may be converted into commands executed by a computer.

To the extent Patent Owner attempts to rely on a different definition of "camera,"[3] its own expert's testimony demonstrates that even a narrower definition is still satisfied by Numazaki. Mr. Occhiogrosso testified that a "camera" consists of a lens, electro-optical sensor, and storage (e.g., film or memory). Ex. 1018, 13:14-23. He conceded that photo-detection units 109 and 110 are electro-optical sensors. *Id*. at 15:18-16:3. He also conceded that the output of an electro-optical sensor must necessarily be stored (even if temporarily) to be processed. *Id*. at 28:12-29:14. And, as illustrated in Fig. 2, the structure uses a lens (photo-detection optics 107) to focus

---

[3] As noted by the Board at institution, Patent Owner did not contest Petitioner's construction in its Preliminary Reply. Paper 12, 9. As noted above, Patent Owner also does not appear to have contested that construction in its POR. Having failed twice to advocate a narrower construction, the Board should not permit Patent Owner to do so for the first time in its Sur-Reply. *Promos Techs., Inc. v. Samsung Elecs. Co.*, 809 F. App'x 825, 835 (Fed. Cir. 2020) (agreeing with PTAB that claim construction "argument, raised for the first time in Patent Owner's Sur-Reply, will not be considered.").

the light on sensors 109 and 110. Ex. 1003, 11:9-19 (explaining that an image is formed by photo-detection optics 107). Accordingly, Numazaki's Fig. 2 structure includes a lens, electro-optical sensors, and storage, satisfying the narrowest definition of "camera" discussed in this proceeding.

### C.    Numazaki renders obvious the "computer means" of Claim [7(c)]

Limitation [7(c)] recites a "computer means within said housing for analyzing said image to determine information concerning a position or movement of said object." Patent Owner first argues that the claims exclude Numazaki's process because it analyzes the difference between images captured by two cameras. Paper 15, 16-17. Next, it argues that Numazaki doesn't teach the "feature data generation unit" is or can be implemented as a programmed computer or processor. *Id.* at 17-18.[4] Neither is correct.

Regarding Numazaki's two-camera structure that improves the accuracy of gesture detection, the Board correctly concluded at institution that "no limitations in claim 7 . . . would require the camera means or image obtained by the camera means to be limited to a single camera means or a single image." Paper 12, 18 (rejecting Patent Owner's argument "that the computer means of claim 7 should be limited to analyzing a single image taken by a single camera and that the two camera and two image system of Numazaki does not satisfy this limitation."). Because the POR

---

[4] The POR advances the same arguments against limitation [14(c)] at 26-27.

13

simply advances the same numerical argument the Board rejected at institution—
that the claim requires analyzing the output of only one photo-detection units—the
Board's preliminary finding that rejected these arguments should be made final.
Indeed, there is no dispute that the output of Numazaki's reflected light extraction
unit 102 is an image, that said image is analyzed by the feature data generation unit
to determine position and movement, and that said image is the product of images
captured by the optical sensors within unit 102. Patent Owner's position that the
analyzed image must be the direct product of only one sensor finds no support in the
claim language or intrinsic record and should again be rejected.

Patent Owner's argument that Numazaki fails to teach the "feature data
generation unit" is or can be implemented as a programmed computer or processor
is similarly without merit. Neither Patent Owner nor its expert denies that
Numazaki's "feature generation unit" is a programmed computer/processor. Instead,
both assert that "Numazaki does not state that the 'feature data generation unit' is or
can be implemented as a 'programmed' computer or processor." Paper 15, 18; Ex.
2002, ¶ 73. They are wrong. Discussing the same gesture recognition cited in the
Petition at 20-30, Numazaki expressly teaches "it is [] possible to realize th[e]
operation of the feature data generation unit in a form of software." Ex. 1003, 20:41-
47 (further noting that "[i]t is obviously possible to realize a hardware configuration
for carrying out this operation, and a configuration using both software and hardware

14

is also possible"). Dr. Bederson confirmed in his original declaration that a POSITA would have understood that the gesture detection features in Numazaki are "the same (or equivalent) to" the programmed computer/processor disclosed in the '431 Patent. Paper 1, 30 (citing Ex. 1008, ¶ 55). In response to the POR, Dr. Bederson confirms that Numazaki's feature data generation unit would have been most efficiently implemented as software and that a POSITA would have been motivated to implement this expressly contemplated embodiment of the unit. Ex. 1017, ¶ 9.

**D.    Numazaki renders obvious the "transmitting information" of Claim 11**

Claim 11 recites a "means for transmitting information," which the petition construed pursuant to § 112, ¶ 6 to be "at least a cellular transceiver." The petition cites Dr. Bederson's explanation that a POSITA would have understood Numazaki's fifth embodiment "TV telephone" relied on by the petition is a videoconference telephone that uses the telephone's transmission functionality to communicate information. Paper 1, 32-33 (citing Ex. 1008, ¶ 58). In ¶ 58, Dr. Bederson explains that these "videoconference telephones were also known as cellular videophones." Ex. 1008, ¶ 58. Patent Owner's expert did not opine on, much less refute, that a cellular phone might use something other than a cellular transceiver. Indeed, on cross examination, Mr. Occhiogrosso admitted that cellular telephones do in fact communicate using cellular transceivers. Ex. 1018, 30:8-25 (stating the use of the word "cellular" implies using a cellular network), 33:19-34:2 (stating a cellular

15

transceiver is required for use in a cellular network). Dr. Bederson confirms that a POSITA would have understood the cellular videophone described in Numazaki's fifth embodiment would necessarily have transmitted information using a cellular transceiver. Ex. 1017, ¶ 10-11.

### E.    Patent Owner's construction of Claim 12 is incorrect, and Numazaki renders obvious the "light source for illuminating said object"

Claim 12 further requires the claim 7 apparatus include "a light source for illuminating said object." Citing its expert in support, the Patent Owner argues that "a POSITA would understand claim 12 as meaning the light source of the handheld computer apparatus illuminates the object while the 'camera means' obtains an image of the object." Paper 15, 8.  Purporting to apply this construction, the Patent Owner argues, "[i]f 'a camera means' in claim element [7(b)] is interpreted to mean 'multiple cameras' (e.g., two cameras), Numazaki [] fails" because one of its cameras captures images of the gesture without illumination and claim 12. *Id*. at 21. To reach this conclusion, Patent Owner's rephrases/narrows its proposed construction, requiring of Claim 12 that "the object be illuminated by the light source of the handheld computer apparatus <u>when any of the cameras is obtaining an image</u> of the object." *Id*. (emphasis added). Patent Owner's proposed claim construction and its attempt to exclude Numazaki on this basis should be rejected.

First, Patent Owner presents a false choice on claim construction. The "camera means" need not mean "only one camera" or "multiple cameras." Instead, as the Board concluded at institution, it should be construed to "encompass one or more optical sensors." Paper 12, 18. Accordingly, the claims do not outright exclude systems/methods that include multiple cameras, nor do they require every camera in a system/method satisfy every limitation. Properly construed, the claims are satisfied if a single camera in a multi-camera system/method satisfies the limitations. Patent Owner does not dispute that one of Numazaki's cameras images the gesture when the lighting unit is illuminated. Nor could it. Patent Owner's expert, Mr. Occhiogrosso, expressly recognizes that Numazaki's "first photo-detection unit 109 is active when lighting unit 101 emits light." Ex. 2002, ¶ 57; *see also* Paper 1, 13-14 (explaining how the output of unit 109 is used to determine gestures). Accordingly, when properly construed, Numazaki's teaches a camera that obtains an image of the object when illuminated.

Second, Patent Owner has failed to support (or even adequately explain) its position that the claim requires illuminating the gesture "when any of the cameras is capturing an image of the gesture." In support, the POR cites only Mr. Occhiogrosso's declaration at ¶¶ 44-46. Paper 15, 8-9. The cited portion of Mr. Occhiogrosso's declaration notes that "the specification of the '431 Patent . . . discloses 'cameras and their associated light sources' and operating the camera 'at

17

the same time a . . . light is on.'" Ex. 2002, ¶ 45. He goes on to conclude that "[a] POSITA would understand claim 12 to mean that the light source of the handheld computer apparatus illuminates the object while the 'camera means' obtains an image of the object." *Id*. at ¶ 46. Petitioner does not dispute that the '431 Patent teaches and claims imaging an illuminated gesture/object. As noted in the preceding paragraph, Numazaki teaches precisely this at least with respect to photo-detection unit 109, which always images the gesture while illuminated. But there is no support for Patent Owner's attempt to exclude Numazaki on the basis that Numazaki's second camera (photo-detection unit 110) images the gesture when not illuminated. None of the cited teachings of the '431 Patent say anything about ensuring that the light source is active any time any camera captures an image. Instead, like Numazaki, these citations simply stress the benefit of obtaining an illuminated image of the gesture. Numazaki's two-camera structure is specifically designed to do this. It ensures that the system captures an accurate image of the illuminated gesture. As set forth above, camera 109 captures an image of the target object illuminated by both natural light and the lighting unit 101 and the second camera unit captures an image of the target object illuminated by only natural light. Ex. 1003, 11:33-39. The difference between the two images represents the "reflected light from the object resulting from the light emitted by the lighting unit 101." *Id*. at 11:43-51. Numazaki's two-sensor structure thus improves upon a single sensor structure by

18

ensuring that resulting image reflects only the illuminated gesture, excluding extraneous image information. Ex. 1017, ¶¶ 7-8. This outcome is precisely the goal of the '431 Patent's invention—recognizing gestures by obtaining an illuminated image of the gesture. Patent Owner's attempt to interpret the claims in a way that excludes Numazaki's more sophisticated manner of accomplishing this goal is without support in the claims or specification and should be rejected.

### F.     Numazaki renders obvious the "cellular phone" of Claim 13

Claim 13 further limits the apparatus of claim 7 to "a cellular phone." Relying on Dr. Bederson, the petition established that a POSITA would have understood the "TV telephone" in Numazaki's fifth embodiment is a cellular phone. Paper 1, 33-34 (citing Ex. 1008, ¶¶ 59-60). In support of this conclusion, Dr. Bederson explained that the goal of Numazaki's fifth embodiment—reduced communication costs and reduced power—directly targets issues associated with cellular phones/communications. Ex. 1008, ¶ 60. Dr. Bederson admitted that cellular videophones were not prevalent in the market as of mid-1999 *Id*. However, he cited evidence that video cellular phones were being released to the public in Japan later that same year, demonstrating that practitioners would have been working on technology to enable functional cellular videophones at the time. *Id*.

Patent Owner first argues that the Japanese video cellular phone was too bandwidth limited to support Numazaki's TV telephone functionality. Paper 15, 22-

23 (noting the Japanese system transmitted "about two frames per second" and claiming that Numazaki operates at "rates of 30 frames per second"). It then argues that, because the Japanese system was later in time than Numazaki with bandwidth restrictions that could not support Numazaki's functionalities, a POSITA would not have understood Numazaki's TV telephone to be a cellular phone. *Id.* Patent Owner next argues that unrecited functionalities, including the ability to receive cellular voice calls, should be imported into Claim 13. Neither is correct.

Patent Owner's bandwidth restriction argument is wrong for a number of reasons. First, it ignores the entire point of Dr. Bederson pointing to the Japanese system. Dr. Bederson explained that the goals of Numzaki's fifth embodiment— lower communication costs and power consumption—directly target known issues with cellular communications. Ex. 1008, ¶ 60. Mr. Occhiogrosso does not dispute this broader point. Then, Dr. Bederson points to an upcoming commercial cellular videophone as evidence that "a PHOSITA would have known that researchers were working on the technology and that products were being introduced to customers." *Id.* Mr. Occhiogrosso also does not directly rebut this point. Instead, he argues that the specific commercial system identified by Dr. Bederson was too bandwidth limited to support Numazaki's videoconference functionality. That misses the point. Dr. Bederson's opinion did not depend on any particular commercial system supporting Numazaki's videoconference functionality. Instead, it evidenced that

20

artisans were working on cellular videophones at the time, which supported his conclusion that Numazaki describes a cellular videophone invention. Second, Mr. Occhiogrosso is wrong about the incompatibility between the commercial system and Numazaki's invention. One key premise of Dr. Bederson's opinion is that a goal of Numazaki's system is to lower communication costs—a known issue with cellular communications. Indeed, Numazaki's fifth embodiment is specifically designed to "reduce considerably" the bandwidth required for video transmissions. Ex. 1003, 40:41-45. Numazaki expressly teaches that its fifth embodiment method of extracting only the subject from captured video can reduce the video by "an order of one tenth to one hundredth." *Id*. at 40:29-36. As Dr. Bederson explains, even accepting Mr. Occhiogrosso's premise that cellular networks at the time were bandwidth limited to two frames per second, Numazaki's fifth embodiment reduces the amount of information sent such that a 30 frame per second video feed would be easily supported. Ex. 1017, ¶¶ 12-13. He explains that Numazaki's contemplated one hundredth reduction would convert a 30 frame per second video feed into the equivalent of a 0.3 frame per second video feed, just 15% of the bandwidth required for the Japanese system's two frames per second. *Id.* Accordingly, contrary to Mr. Occhiogrosso's argument, Numazaki's videoconference functionality would in fact have worked even with the bandwidth limited commercial Japanese system.

Patent Owner's final argument fares no better. It argues that the claims should be construed to require the ability to "receive a cellular voice signal," to "make cellular phone calls," and "to transmit voice and receive voice over a cellular network." Paper 15, 23. Patent Owner does not cite to any intrinsic support for its position. Instead, it cites only to Mr. Occhiogrosso's declaration, which is a near verbatim copy of the short POR argument, similarly without support from the intrinsic record. Patent Owner's silence is telling. In fact, there is no discussion in the '431 Patent about placing or receiving voice calls. Accordingly, Patent Owner is asking the Board to import functionality that is not required by the claim language and that is not even disclosed in the '431 Patent. The Board should decline to do so.

## III. THE BOARD HAS JURISDICTION TO REVIEW EXPIRED PATENTS

In its Preliminary Response, Patent Owner argued that the PTAB lacks authority to review expired patents because expired patents cannot be amended. Paper 8, 28. At institution, the Board rejected this argument, pointing out that Patent Owner failed to support this argument and establishing that reviewing expired patents is well within the PTAB's authority. Paper 12, 28-30. Patent Owner advances the same argument in its POR, but again fails to provide any authority supporting the proposition that the PTAB lacks authority to review expired patents. Patent Owner reframes its argument to focus on noncontroversial fact that patents are public franchises, which Congress grants the PTO significant latitude to adjudicate. Paper

22

15, 1-2. Patent Owner argues that the PTO's authority ends when the public franchise ends—at the patent's expiration. *Id*. Patent Owner does not cite any rules, statutes, or other legal authority, creating from whole cloth this novel limitation on the permitted scope of PTAB review.

Patent Owner is wrong. As the board set forth in detail at institution, there is no such limit on the PTAB's authority to review expired patents. Indeed, the Federal Circuit recently reviewed a Final Written Decision cancelling claims in an expired patent, ultimately reversing an issue of claim construction and remanding to the PTAB for further consideration of obviousness in light of the new claim construction. *Sony Corp. v. Iancu*, 924 F.3d 1235, 1239-41 (Fed. Cir. 2019). The court also concluded that a case or controversy existed despite the patent's expiration and the fact that the underlying litigation had settled, acknowledging the importance of the Board's (and the Federal Circuit's) review of expired patents given that even expired patents can be asserted for past infringement. *Id*. at 1238 n.1 ("It is well-established that our decision (and the Board's decision on remand) would have a consequence on any infringement that occurred during the life of the [] patent."). Accordingly, in addition to the reasons set forth by the Board at institution, the Federal Circuit has also confirmed the PTAB's authority to review expired patents.

IPR2021-00920
U.S. Patent No. 7,933,431

## IV.    CONCLUSION

For all of the reasons articulated in the Petition and the foregoing Reply, Petitioners respectfully request the Board find all Challenged Claims unpatentable.

Respectfully submitted,

ERISE IP, P.A.

BY:    */s/Adam P. Seitz*
Adam P. Seitz, Reg. No. 52,206
7015 College Blvd., Suite 700
Overland Park, KS 66211
P: (913) 777-5600
F: (913) 777-5601
adam.seitz@eriseip.com

Paul R. Hart, Reg. No. 59,646
5299 DTC Blvd., Ste. 1340
Greenwood Village, CO 80111
P: (913) 777-5600
F: (913) 777-5601
paul.hart@eriseip.com

ATTORNEYS FOR PETITIONER
APPLE INC.

24

IPR2021-00920
U.S. Patent No. 7,933,431

## APPENDIX OF EXHIBITS

| | |
|---|---|
| **Exhibit 1001** | U.S. Patent No. 7,933,431("'431 Patent") |
| **Exhibit 1002** | Prosecution History for the '431 Patent ("'431 File History") |
| **Exhibit 1003** | U.S. Patent No. 6,144,366 ("Numazaki") |
| **Exhibit 1004** | U.S. Patent No. 6,088,018 to De Leeuw, et al. ("DeLeeuw") |
| **Exhibit 1005** | U.S. Patent No. 6,064,354 to DeLuca ("DeLuca") |
| **Exhibit 1006** | U.S. Patent No. 6,243,683 to Peters ("Peters") |
| **Exhibit 1007** | Order Governing Proceedings in patent cases issued by Judge Alan D. Albright |
| **Exhibit 1008** | Bederson Declaration ("Bederson Dec.") |
| **Exhibit 1009** | *In re Apple Inc.*, No 20-135, slip op. at 16 (Fed. Cir. Nov. 9, 2020) |
| **Exhibit 1010** | District Court Trial Dates Tend to Slip After PTAB Discretionary Denials |
| **Exhibit 1011** | Order Resetting *Fintiv* Jury Trial |
| **Exhibit 1012** | "CCD and CMOS Imaging Array Technologies," Stuart Taylor, Xerox Research Centre Europe, 1998 |
| **Exhibit 1013** | Sheryl WuDunn's article on cellular videophone technology |
| **Exhibit 1014** | A Brief History of Handheld Video Games |
| **Exhibit 1015** | "A Miniature Space-Variant Active Vision System: Cortex-I," Ph.D. Thesis, NYU, 1992 |
| **Exhibit 1016** | In Conference Companion on Human Factors in Computing Systems (CHI '95), I. Katz, R. Mack, and L. Marks (Eds.). ACM, New York, NY, USA, 210-211. DOI=http://dx.doi.org/10.1145/223355.223526 |
| **Exhibit 1017** | Supplemental Declaration of Benjamin Bederson ("Bederson Supp. Dec.") |
| **Exhibit 1018** | Deposition Transcript of Benedict Occhiogrosso ("Occhiogrosso Trans.") |

25

## **CERTIFICATION OF COMPLIANCE WITH 37 C.F.R. 42.24**

Pursuant to 37 C.F.R. § 42.24(c)(1), the undersigned certifies that the foregoing *Petitioner's Reply to Patent Owner's Response* contains 4,913 words, exclusive of the table of contents, certificate of service, certificate of word count, and appendix of exhibits.

*/s/ Adam P. Seitz*
Adam P. Seitz, Reg. No. 52,206

*ATTORNEY FOR PETITIONER*

26

## CERTIFICATE OF SERVICE ON PATENT OWNER
## <u>UNDER 37 C.F.R. § 42.6</u>

Pursuant to 37 C.F.R. § 42.6(e), the undersigned certifies that on May 23, 2022, the foregoing *Petitioner's Reply to Patent Owner's Response* was served via electronic filing with the Board and via Electronic Mail on the following practitioners of record for Patent Owner:

Todd E. Landis (tlandis@wsltrial.com)
John Wittenzellner (johnw@wsltrial.com)
IPRGTPWSL@wsltrial.com

                                        */s/ Adam P. Seitz*
                                        Adam P. Seitz, Reg. No. 52,206

                                        *ATTORNEY FOR PETITIONER*

27

IPR2021-00920
Patent No. 7,933,431

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE, INC., LG ELECTRONICS, INC.,
LG ELECTRONICS U.S.A., INC., and GOOGLE LLC

Petitioner,

v.

GESTURE TECHNOLOGY PARTNERS, LLC

Patent Owner

———————————

*Inter Partes* Review No. IPR2021-00920[1]

**PATENT OWNER'S SUR-REPLY TO PETITONER'S REPLY IN THE
*INTER PARTES* REVIEW OF U.S. PATENT NO. 7,933,431**

Filed on behalf of Patent Owner by:

Todd E. Landis (Reg. No. 44,200)
2633 McKinney Ave., Suite 130
Dallas, TX 75204

John Wittenzellner (Reg. No. 61,662)
1735 Market Street, Suite A #453
Philadelphia, PA 19103

**WILLIAMS SIMONS & LANDIS PLLC**

———————————

[1]IPR2022-00091 (LG Electronics, Inc. and LG Electronics U.S.A., Inc.) and IPR2022-00359 (Google LLC) have been joined with this proceeding.

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................1

II.     GROUND 1:  *NUMAZAKI* DOES NOT RENDER OBVIOUS CLAIMS
        1-4, 7-9, 11-22, 25, 26, AND 28.....................................................1

        A.      *Numazaki* does not teach or suggest claim element [1(c)]. ...................1

        B.      *Numazaki* does not teach or suggest claim elements [7(b)] and
                [14(b)]. ................................................................................4

        C.      *Numazaki* does not teach or suggest claim element [7(c)] or claim
                element [14(c)]. .....................................................................5

        D.      *Numazaki* does not render obvious dependent claim 11.......................8

        E.      *Numazaki* fails to render obvious dependent claim 12. ......................11

        F.      *Numazaki* fails to render obvious dependent claim 13. .......................13

III.    CONCLUSION..............................................................................16

i

# TABLE OF AUTHORITIES

**Cases**

*In re Buchner*,
   929 F.2d 660 (Fed. Cir. 1991) ...............................................................14

ii

## I.     INTRODUCTION

Gesture Technology Partners, LLC ("Patent Owner") respectfully submits this Sur-Reply to Petitioner's Reply ("Reply") in *Inter Partes* Review No. IPR2021-00920 of U.S. Patent No. 7,933,431 (the "'431 Patent").

## II.     GROUND 1:  *NUMAZAKI* DOES NOT RENDER OBVIOUS CLAIMS 1-4, 7-9, 11-22, 25, 26, AND 28

### A.     *Numazaki* does not teach or suggest claim element [1(c)].

Claim element [1(c)] recites "electro-optically sensing light reflected from said at least one finger using a sensing means associated with said device; determining from said sensed light the movement of said finger."  In the Reply, Petitioner alleges that "neither Patent Owner nor its expert ever addresses the critical fact that Numazaki expressly teaches its eighth embodiment implements the same image difference calculation that is the focus of its first embodiment."  Reply at 6. This is not true.  Patent Owner has previously acknowledged that "Numazaki generically teaches the 'eighth embodiment is directed to a system configuration incorporating the information input generation apparatus of the present invention as described in [embodiments 1-7].'"  Paper 15, p. 10 (citing Ex. 1003, 50:21-24).  But this generic teaching in *Numazaki* does not mean that *Numazaki's* "photo-detection sensor unit" in Figure 78 is or includes the "difference calculation unit 111" from

Figure 2.  *See* Ex. 2002, ¶¶ 65-67.  Further, this generic teaching in *Numazaki* does not mean that the "photo-detection sensor unit" in Figure 78 is or includes a "photo-detection unit" (e.g., "photo-detection unit 109," "photo-detection unit 110") from Figure 2 (i.e., Petitioner's identified "sensing means" in claim element [1(c)]).  *See* Ex. 2002, ¶¶ 54-56, 65-67.

Petitioner's continual word games cannot avoid the fact that the text of *Numazaki* does not support the asserted grounds.  In the Reply, Petitioner claims that "Numazaki's terminology is both internally consistent and supports Petitioner's proposed grounds.  It uses the term 'photo-detection *sensor* unit' to describe a unit that includes two photo-detection *sensors*."  Reply at 7 (emphasis in original).  This is not correct.  The "reflected light extraction unit 102" includes both "photo-detection unit 109" and "photo-detection unit 110."  Ex. 1003, Fig. 2.  Based on Petitioner's reasoning, *Numazaki* should have used the term "photo-detection sensor unit" to refer to "reflected light extraction unit 102."  But never, in over 80 columns of specification, does *Numazaki* ever describe the "reflected light extraction unit 102" as a "photo-detection sensor unit."  Further, Petitioner fails to explain why *Numazaki* would describe a component (102) as a "reflected light extraction unit" in seven embodiments and then allegedly have the same component in other embodiments described as a "photo-detection sensor unit."  Only one conclusion can exist—Petitioner needs to rewrite the reference in hindsight to support its arguments.

2

The simple truth is that *Numazaki's* "photo-detection sensor unit" in Figure 78 is <u>not</u> the "reflected light extraction unit 102," and thus *Numazaki's* "photo-detection sensor unit" does <u>not</u> include either "photo-detection unit" from Figure 2.  That is why *Numazaki* uses different terms for "reflected light extraction unit" and "photo-detection sensor unit."

The supplemental declaration of Dr. Bederson is equally convoluted.[2] Specifically, Dr. Bederson argues "Numazaki uses the phrase 'photo-detection *sensor* unit' to describe a photo-detection unit that includes *sensors*."  Ex. 1017, ¶ 6 (emphasis in original).  First, Dr. Bederson's definition implies there are photo-detection units that <u>do not include</u> sensors.  *See* Ex. 1017, ¶¶ 3-6.  Dr. Bederson fails to explain how this is even possible.  *See id*.  Second, Dr. Bederson admits that "Numazaki's photo-detection unit 109, 110 are imaging sensors."  Ex. 1017, ¶ 3. Based on Dr. Bederson's reasoning, "photo-detection unit 109" and "photo-detection unit 110" should each be referred to as a "photo-detection sensor unit" because each is a "photo-detection unit that includes sensors."  *See* Ex. 1017, ¶ 6 ("Numazaki uses the phrase 'photo-detection *sensor* unit' to describe a photo-detection unit that includes *sensors*.") (emphasis in original).  But *Numazaki* never

---

[2] Petitioner's attempt to rewrite *Numazaki* through its expert, Dr. Bederson, is improper.  The language of *Numazaki* itself controls, not the hindsight of Petitioner's expert.

uses that terminology to describe "photo-detection unit 109" or "photo-detection unit 110." Thus, even with Dr. Bederson's spin on *Numazaki's* terminology, there is still no basis to conclude that *Numazaki's* "photo-detection sensor unit" in Figure 78 includes either *Numazaki's* "photo-detection unit 109" or "photo-detection unit 110" from Figure 2.

*Numazaki* fails to teach or suggest at least claim element [1(c)], and thus fails to render obvious independent claim 1.

## B.     *Numazaki* does not teach or suggest claim elements [7(b)] and [14(b)].

In the Reply, Petitioner argues "Numazaki's 'photo-detection sensor unit' obtains images." Reply at 12. Again, *Numazaki* does not actually disclose that the "photo-detection sensor unit" in Figure 78 obtains any image. *Numazaki* only discloses the "photo-detection sensor unit" in Figure 78 is capable of "photo-detecting on an external body." Ex. 1003, 52:9-14. This does not mean that the "photo-detection sensor unit" is a "camera means . . . for obtaining an image," as required by claim element [7(b)]. *See* Ex. 2002, ¶ 63. This also does not mean that the "photo-detection sensor unit" is "a camera . . . [that] provide[s] image data," as required by claim element [14(b)]. *See* Ex. 2002, ¶ 94.

The Petition contends that each of *Numazaki's* "photo-detection units" in Figure 2 (i.e., photo-detection unit 109, photo-detection unit 110) is a camera. Paper

1, pp. 12-13. But as discussed above in Section II(A), *Numazaki's* "photo-detection sensor unit" in Figure 78 is <u>not</u> the "reflected light extraction unit 102," and thus *Numazaki's* "photo-detection sensor unit" does <u>not</u> include either of the "photo-detection units" from the "reflected light extraction unit 102." Accordingly, *Numazaki's* "photo-detection sensor unit" in Figure 78 does not include a camera, as required by claim element [7(b)] and claim element [14(b)].

*Numazaki* fails to teach or suggest at least claim element [7(b)] and claim element [14(b)], and thus fails to render obvious independent claims 7 and 14.

### C.    *Numazaki* does not teach or suggest claim element [7(c)] or claim element [14(c)].

Claim element [7(c)] recites "computer means within said housing for analyzing <u>said image</u> to determine information concerning a position or movement of said object." The term "said image" in claim element [7(c)] refers to the image obtained by the "camera means" recited in claim element [7(b)]. Claim element [14(c)] has similar language—"said image data" that is analyzed using the "computer" is the "image data" from the "camera" recited in claim element [14(b)].

Petitioner argues that it is "Patent Owner's position that the analyzed image must be the direct product of only one sensor. . . ." Reply at 14. That is not and has never been Patent Owner's position. Patent Owner's position is based on the claim language and the fact that the claims require that "said image" (claim element [7(c)])

or "said image data" (claim element [14(c)]) be analyzed to "determine information

concerning a position . . . of said object" (claim element [7(c)]) or "determine

information concerning a user input command" (claim element [14(c)]). But that

does not occur in *Numazaki*. As Petitioner concedes, "there is no dispute that the

output of Numazaki's reflected light extraction unit 102 is an image, that said image

is analyzed by the feature data generation unit to determine position and movement,

and that said image is the product of images captured by the optical sensors within

unit 102." Reply at 12. But that image is not captured by what Petitioner identified

as the alleged cameras: photo-detection units 109 and 110. *Id.* at 10 (citing Ex.

1017, ¶ 5). Thus, Petitioner admits that <u>neither</u> the image captured by "photo-

detection unit 109" <u>nor</u> the image captured by "photo-detection unit 110" is the same

image that is later analyzed. This is contrary to the requirements of claim elements

[7(c)] and [14(c)].

Next, Petitioner argues that *Numazaki's* "feature data generation unit"

implemented as software[3] meets the "computer means" of claim element [7(c)].

Reply at 14-15. *Numazaki* discloses that "it is also possible to realize this operation

of the feature data generation unit in a form of software. It is obviously possible to

---

[3] Petitioner's new argument regarding a software implementation is improper
because the Petition does not reference any such implementation. *See generally*
Paper 1.

realize a hardware configuration for carrying out this operation, and a configuration using both software and hardware is also possible." Ex. 1003, 20:41-45. But *Numazaki* is silent on how the "compact portable information device" in Figure 78 (i.e., Petitioner's identified "handheld computer apparatus" in the preamble of claim 7) implements the "feature data generation unit." *See* Ex. 1003, 52:5-19. Accordingly, *Numazaki* does not actually disclose that the "compact portable information device" in Figure 78 implements the "feature data generation unit" in software.

In an attempt to bolster the shortcomings of *Numazaki*, Petitioner argues that "Dr. Bederson confirms that Numazaki's feature data generation unit would have been most efficiently implemented as software and that a POSITA would have been motivated to implement this expressly contemplated embodiment of the unit." Reply at 15 (citing Ex. 1017, ¶ 9). But Dr. Bederson is silent regarding any metric for efficiency and does not actually explain why one implementation of the "feature data generation unit" would be more efficient than another implementation for *Numazaki's* "compact portable information device" in Figure 78. *See* Ex. 1017, ¶9. Dr. Bederson also opines that "Numazaki identifies an additional benefit unique to the software implementation—the feature data generation unit can be recorded in a recording medium such as floppy disk and distributed amongst other laptops to likewise run Numazaki's gesture-recognition technology." Ex. 1017, ¶9 (internal

7

quotations omitted). But *Numazaki* is silent regarding the "compact portable information device" in Figure 78 having a floppy disk drive (or any drive to read a medium) and/or being a laptop. *See* Ex. 1003, 52:5-19. So Petitioner fails to explain how this "additional benefit" is motivation for the "compact portable information device" in Figure 78 to have a software implementation of the "feature data generation unit." In short, Petitioner provides no evidence that *Numazaki's* "compact portable information device" has a software implementation of the "feature data generation unit." Dr. Bederson's naked opinions cannot be used to supplant the actual disclosure in *Numazaki*.

*Numazaki* fails to teach or suggest at least claim element [7(c)] and claim element [14(c)], and thus fails to render obvious independent claims 7 and 14.

### D.    *Numazaki* does not render obvious dependent claim 11.

In the petition, Petitioner argued that the corresponding structure for the term "means for transmitting information" is "at least a cellular transceiver." Paper 1 at 12; *see also* Reply at 15. The Board adopted that construction in the institution decision. *See* Paper 12 at 11. The institution decision also recognized that the Petition failed to identify a cellular transceiver in *Numazaki*:

> Patent Owner correctly notes that "[t]he Petition fails to identify any cellular transceiver in Numazaki." Prelim. Resp. 16. Patent Owner also correctly states that though the Petition relies on the "conference record system" in Numazaki's fifth embodiment, "[t]he Petition fails to identify the transmitter in that embodiment, let alone provide any analysis regarding whether the transmitter allegedly disclosed in Numazaki is an equivalent of the 'cellular transceiver' proposed by Petitioner."[10] *Id.*
>
> For this reason, the Petition does not appear to show how the prior art teaches every limitation of claim 11.

Paper 12 at 20. The Reply is the first time Petitioner has attempted to identify a cellular transceiver in *Numazaki*. Petitioner's improper attempt to correct a deficiency in its petition should be disregarded.

Petitioner now argues in reply that "a POSITA would have understood Numazaki's fifth embodiment 'TV telephone' relied on by the petition is a videoconference telephone" and that "videoconference telephones were also known as cellular videophones." Reply at 15 (citing Ex. 1008, ¶ 58). It is telling that the institution decision found that "Patent Owner correctly notes that '[t]he Petition fails to identify any cellular transceiver in Numazaki'" (Paper 12 at 20), yet Petitioner could not muster any citations to *Numazaki* to support its position that a "TV telephone" is a cellular transceiver. *See* Reply at 15-16.

Petitioner concedes that "*Numazaki* does not expressly state that its TV telephone is a cellular phone." Paper at 1 at 34. Faced with the fact that *Numazaki* contains no support for Petitioner's argument, Petitioner turns to Dr. Bederson in yet another improper attempt to rewrite *Numazaki*. *See* Reply at 15-16 (citing Ex. 1008, ¶ 58; Ex. 1017, ¶¶ 10-11). Like Petitioner, Dr. Bederson could not identify <u>any</u> disclosure of a cellular transceiver in *Numazaki*. *See* Ex. 1008, ¶58; Ex. 1017, ¶ 10-11. He instead opines that the term "TV telephone" in *Numazaki* means "a videoconference telephone," <u>without any support</u>. *See* Ex. 1008, ¶ 58; Ex. 1017, ¶ 10. From that unsupported opinion, he goes further, opining that "videoconference telephones were also known as cellular videophones." *See* Ex. 1008, ¶ 58; *see also* Ex. 1017, ¶ 10. His only alleged support is a New York Times article entitled "Next Stage of the Cellular Tour: Forced to Compete, Japan Becomes a Global Power." Ex. 1008, ¶58 (citing Ex. 1013). It is not surprising that Dr. Bederson did not provide any specific citations to the article to support his opinions—the terms "TV telephone" and "video conference telephone" are not used in the article. *See* Ex. 1013. Dr. Bederson's opinion is wholly without support.

Dr. Bederson's opinion is also contrary to the express disclosure of *Numazaki*, which he ignored. *Numazaki's* fifth embodiment, which includes the "TV telephone" relied on by Petitioner, discloses a video frame rate of "<u>30 frames per second</u>" (fps). Ex. 1003, 39:61-66 (emphasis added). By contrast, the article that

Dr. Bederson's relied on to show that cellular videophones existed specifically states that "the world's first video personal handyphone system . . . can transmit <u>about two frames per second</u>." *See* Ex. 1013 at 3 (emphasis added).  Even if that article shows that cellular videophones existed at the time of *Numazaki*, that disclosure demonstrates that the "TV telephone" disclosed in *Numazaki* is <u>not</u> cellular because its frame rate exceeds the capability of then-existing cellular transmitters by 15 times.

Putting all of that aside, whether cellular videophones existed is not relevant. Petitioner argued that the "means for transmitting information" is disclosed by *Numazaki*'s fifth embodiment.  *See* Paper 1 at 32-33.  Accordingly, Petitioner must show that *Numazaki*'s fifth embodiment discloses "at least a cellular transceiver," not that cellular transceivers may have existed.  Petitioner has wholly failed do so, therefore, *Numazaki* fails to render obvious dependent claim 11.

### E.   *Numazaki* fails to render obvious dependent claim 12.

Claim 12 depends directly from claim 7.  Patent Owner agrees with Petitioner that the term "camera means," as recited in claim element [7(b)], should be construed to encompass one or more cameras.  Reply at 17.  Patent Owner also agrees with Petitioner's statement regarding the impact of this term on the claims: "[a]ccordingly, the claims do not outright exclude systems/methods that include multiple cameras, nor do they require every camera in a system/method satisfy every

limitation.  <u>Properly construed, the claims are satisfied if a single camera in a multi-camera system/method satisfies the limitations</u>."  Reply at 17 (emphasis added).

*Numazaki* fails to disclose a single camera that meets the requirements of claim 12 under any of Petitioner's ever-evolving interpretations of *Numazaki*.  Claim 12, when properly read in light of claim 7, requires (1) "a camera means . . . for obtaining an image" of an object while the object is illuminated by a "light source" of the "handheld computer apparatus," and (2) the image obtained by the "camera means" be analyzed "to determine information concerning a position or movement of said object."  Petitioner alleges that *Numazaki* discloses two "cameras:"  photo-detection unit 109 and photo-detection unit 110.  Paper 1, pp. 12-14.  There is no dispute that photo-detection unit 110 <u>does not</u> obtain an image of the object illuminated by lighting unit 101—lighting unit 101 is off when photo-detection unit 110 is active.  Reply at 18 ("As set forth above, camera 109 captures an image of the target object illuminated by both natural light and the lighting unit 101 and the second camera unit captures an image of the target object illuminated by only natural light."); Ex. 1003, 11:29-40, Fig. 2.  Accordingly, photo-detection unit 110 is not the claimed "camera means" because, at the very least, it does not obtain an image of the object while the object is illuminated by a light source of the handheld computer apparatus.

12

Photo-detection unit 109 fares no better.  Photo-detection unit 109 is active

when lighting unit 101 is on.  Reply at 18 ("As set forth above, camera 109 captures

an image of the target object illuminated by both natural light and the lighting unit

101"); Ex. 1003, 11:26-30, Fig. 2.  But the image obtained by photo-detection unit

109 is not analyzed "to determine information concerning a position or movement

of said object."  *See* Ex. 1003, 10:57-66, 11:43-56.  Rather, the image obtained by

photo-detection unit 109 is used in "difference calculation unit 111," along with

other inputs, to create a new image.  Ex. 1003, 11:43-56.  That new image is then

further processed in the system of *Numazaki*.  *See* Ex. 1003, 10:57-66.  Accordingly,

photo-detection unit 109 is not the claimed "camera means" because its output image

is not analyzed "to determine information concerning a position or movement of said

object," as required by claim 12.

Accordingly, *Numazaki* fails to render obvious dependent claim 12.

**F.     *Numazaki* fails to render obvious dependent claim 13.**

Dependent claim 13 requires that the apparatus of claim 7 be a "cellular

phone."  Patent Owner's response to the petition contained what should be a non-

controversial position:

> At a minimum, to be a cellular phone, such a device must be able to make cellular phone calls. This means that the device must be able to transmit voice and receive voice over a cellular network.

Paper 15 at 23. In reply, Petitioner takes the remarkable position that a "cellular phone" does not need to make cellular phone calls. *See* Reply at 22. Petitioner claims that "Patent Owner does not cite to any intrinsic support for its position." *Id.* But the plain language of the claim is intrinsic support—"cellular" modifies the word "phone" in the term "cellular phone." It is not surprising that the '431 Patent does not describe cellphones being capable of placing or receiving cellular voice calls because any layperson would have that understanding. Moreover, "[t]he specification need not disclose what is well-known in the art." *In re Buchner*, 929 F.2d 660, 661 (Fed. Cir. 1991).

Petitioner's incredulous argument was driven by the indisputable fact that, in Petitioner's own words, "Numazaki does not expressly state that its TV telephone is a cellular phone." Paper at 1 at 34. The remainder of Petitioner's argument in reply is yet another attempt to improperly rewrite *Numazaki* through the opinions of Dr. Bederson. *See* Reply at 19-22. Petitioner argues that "Numazaki's fifth embodiment reduces the amount of information sent such that a 30 frame per second video feed would be easily supported. . . [Petitioner's Expert] explains that Numazaki's

14

contemplated one hundredth reduction would convert a 30 frame per second video feed into the equivalent of a 0.3 frame per second video feed, just 15% of the bandwidth required for the Japanese system's two frames per second." Reply at 21 (citing Ex. 1017, ¶¶ 12-13). This is misleading. *Numazaki* discloses reducing the size of individual frames, <u>not</u> reducing the frame rate. *See* Ex. 1003, 40:29-49. Further, Petitioner fails to explain how frame size factors into the required bandwidth calculation and fails to identify how the frame size in the Japanese system (which is of no relation to *Numazaki*) relates to the frame size in *Numazaki*. Again, cellphones of the time lacked the bandwidth required to transmit at the video rate (30 fps) specified in *Numazaki*. *See* Ex. 2002, ¶ 89. Thus, *Numazaki's* "TV telephone" is not indicative of a cellular phone, as required by claim 13.

Petitioner also argued that Dr. Bederson's opinion "evidenced that artisans were working on cellular videophones at the time, which supported his conclusion that Numazaki describes a cellular videophone invention." Reply at 20-21. That opinion is of no relevance. Petitioner argued in the Petition that "a PHOSITA would have been motivated to implement Numazaki's fifth embodiment functionality into the eighth embodiment's handheld device." Paper 1 at 33-34. Petitioner <u>did not</u> argue that it would have been obvious to modify *Numazaki* based on general developments on cellular phones. *See id.* Moreover, *Numazaki* discloses 14 embodiments over 80 columns of specification and 105 figures but never once

15

discloses a cellphone, a cellular transceiver, or a cellular connection. Thus, *Numazaki* never discloses the "compact portable information device" in Figure 78 (i.e., Petitioner's identified "handheld computer apparatus" of claim 7) is a cellular phone. But now having the benefit of the claims of the '431 Patent, the Petitioner improperly attempts to rewrite *Numazaki*.

Accordingly, *Numazaki* fails to render obvious dependent claim 13.

## III.  CONCLUSION

For the foregoing reasons, Petitioner has not established that the cited references render any of the Challenged Claims unpatentable.

16

## CERTIFICATE OF COMPLIANCE

Pursuant to 37 C.F.R. § 42.24(d), I hereby certify that the foregoing Patent Owner's Sur-Reply contains 3,360 words as measured by the word processing software used to prepare the document, excluding the cover page, signature block, and portions exempted under 37 C.F.R. § 42.24(a) or (b).

DATED:    July 6, 2022                        Respectfully Submitted,

                                             By: /Todd E. Landis/
                                             Todd E. Landis
                                             Registration No. 44,200
                                             Counsel for Patent Owner

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. § 42.6, the undersigned certifies that on July 6, 2022, the foregoing document was served on counsel of record for Petitioner by filing this document through the End-to-End System, as well as via electronic mail to counsel of record for Petitioner (and jointed Petitioners) at the following addresses:

Adam P. Seitz (Adam.Seitz@eriseip.com)

Paul R. Hart (Paul.Hart@eriseip.com)

Matthew D. Satchwell (Matthew.satchwell@dlapiper.com)

Gianni Minutoli (gianni.minutoli@us.dlapiper.com)

Paul R. Steadman (Paul.steadman@dlapiper.com)

Erika H. Arner (erika.arner@finnegan.com)

Daniel C. Cooley (daniel.cooley@finnegan.com)

Mingji Jin (mingji.jin@finnegan.com)

Respectfully Submitted,

By: /Todd E. Landis/
Todd E. Landis
Registration No. 44,200
Counsel for Patent Owner

Trials@uspto.gov                                                        Paper # 27
571-272-7822                                              Entered: November 28, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE, INC., LG ELECTRONICS, INC.,
LG ELECTRONICS U.S.A., INC., and
GOOGLE, LLC,

Petitioner,
v.

GESTURE TECHNOLOGY PARTNERS, LLC,

Patent Owner.
_____

IPR 2021-00920
Patent 7,933,431 B2
IPR 2021-00922
Patent 8,553,079 B2

_____

Record of Oral Hearing
Held:  September 13, 2022

_____

Before, KEVIN F. TURNER, JONI Y. CHANG, and
BRENT M. DOUGAL, *Administrative Patent Judges.*

IPR      2021-00920        2021-00922
Patent   7,933,431 B2      8,553,079 B2


APPEARANCES:


ON BEHALF OF THE PETITIONER:

    PAUL HART, ESQUIRE
    Erise IP, P.A.
    7015 College Blvd.
    # 700
    Overland Park, KS  66211

ON BEHALF OF PATENT OWNER:

    TODD LANDIS, ESQUIRE
    Williams Simons & Landis, PLLC
    The Littlefield Building
    601 Congress Avenue
    Suite 600
    Austin, TX  78701


    The above-entitled matter came on for hearing on Tuesday,
September 13, 2022, commencing at 1:00 p.m., EDT, at the U.S. Patent and
Trademark Office, by video, before Chris Hofer, Notary Public.


2

IPR      2021-00920      2021-00922
Patent  7,933,431 B2    8,553,079 B2

P R O C E E D I N G S

1                              - - - - -

2          JUDGE DOUGAL:  Thank you, and welcome to this morning or

3   afternoon depending on where you're located, for our hearing today.  So this

4   is the oral hearing for IPR 2021-00920 which will be followed directly after

5   by the hearing for IPR 2021-00922 [To clarify the record, Petitioner

6   reversed the order in their argument and we proceeded in that manner.  Thus,

7   the first hearing dealt with IPR 2021-00922 and the second hearing dealt

8   with IPR 2021-00920].  Also so the parties are aware to help decrease the

9   need to repeat issues, there are some overlap or at least there are some

10  similarities, we are going to be putting the transcript of both hearings in both

11  case files.  So I know you have your slides separately but if there are issues

12  that we can address in essentially one hearing for both cases, the transcript

13  will be available in both cases so that shouldn't be an issue or problem.

14         So, at the outset a few items of business.  First of all, I'm Judge

15  Dougal.  I have with me Judges Joni Chang and Kevin Turner.  We thank

16  you all for being here today.  As you know with these virtual hearings our

17  primary goal is your right to be heard so if at any time during the proceeding

18  if you encounter technical or other difficulties that you feel undermines your

19  ability to adequately represent your client please let us know immediately,

20  please reach out to us such as by contacting the team member who provided

21  you with the contact information for today's hearing.

22         Second of all, when you're not speaking please mute yourself.  Please

23  identify yourself each time that you speak and this will help the court

24  reporter to accurately prepare a transcript and then fourth, as you know we

3

IPR      2021-00920      2021-00922
Patent  7,933,431 B2    8,553,079 B2

1  have the entire record including your demonstratives. We can refer to them

2  on our own screen or if you would like to share your demonstratives that is

3  also acceptable. When you are referring to a document in the record please

4  identify clearly what that document is, for example, the demonstratives

5  papers or exhibits. Also, it is very helpful if you pause for a moment, let us

6  find your document where you're at and especially if you're going to refer to

7  a paper in the record or exhibit and then we can better follow along with

8  your arguments.

9        Finally, please be aware that there is a public line and there may be

10  members of the public who are listening in to our hearing today. So with

11  that, we will start off with Petitioner. You will let us know how who's on

12  the line, who's on the call today and who will be presenting.

13      MR. HART: Yes. Thank you, Your Honor. My name's Paul Hart. I

14  will be presenting for Petitioner today. Also on the line is Adam Seitz, lead

15  counsel for Petitioner Apple.

16      JUDGE DOUGAL: Great. Thank you. And I believe we have 60

17  minutes of argument time. Would you like to reserve any of that for

18  rebuttal?

19      MR. HART: Yes, Your Honor. I'll reserve 20 minutes for rebuttal.

20      JUDGE DOUGAL: Okay. Thank you. And who do we have

21  presenting today for Patent Owner?

22      MR. LANDIS: Good morning, Your Honor. This is Todd Landis.

23  Along with me is John Wittenzellner on behalf of Patent Owner. I will be

24  doing the presentations today and I'll reserve whatever time I have left after

25  my argument, the initial argument, for rebuttal if I have any left.

4

1    JUDGE DOUGAL:  Okay.  Thank you.  Okay.  Before we proceed to

2    arguments, are there any questions?  Petitioner?

3    MR. HART:  No, Your Honor.

4    JUDGE DOUGAL:  Patent Owner?

5    MR. LANDIS:  No, Your Honor.

6    JUDGE DOUGAL:  Actually before we start, Patent Owner, similar

7    to our hearing we had a few weeks ago would you mind giving us an update

8    on anything that is going on with the District Court cases that relate to or I

9    should say the District Court, Eastern District of Virginia in particular

10    dealing with these cases.

11    MR. LANDIS:  Yes, Your Honor.  So all the briefing is complete.  As

12    I updated the panel last time the Court had set a hearing off calendar and

13    notified the parties that the Court would decide the issue on the papers so we

14    are awaiting that ruling which has not occurred yet.

15    JUDGE DOUGAL:  Okay.  Thank you.  All right.  With that,

16    Petitioner, Mr. Hart, please proceed.

17    MR. HART:  Thanks very much, Your Honor.  The '079 patent is

18    generally directed to controlling a computing device using hand gestures.

19    DX-2 in Petitioner's demonstratives provides an overview of those grounds

20    in this proceeding, all of which rely on Numazaki, a reference that provides

21    extensive detail of gesture-based device control that is remarkably similar to

22    the '079 patent.  Given these similarities, the remaining disputes do not turn

23    on broad distinctions between the prior art and the challenged claims here

24    but instead involves minor quibbles about specific details in Numazaki's

25    disclosure.

5

1    Turning to DX-3 I provide a short overview of the remaining disputes

2    between the parties.  Regarding the independent claims --

3    JUDGE DOUGAL:  Counsel, sorry just for the sake of the record I'm

4    going to say the DX refers to in your demonstratives; correct?  Your slide

5    number?

6    MR. HART:  Yes, Your Honor.  There is a footnote on each page of

7    Petitioner's demonstratives DX-1 through DX-20 and I will be referring to

8    those footnotes to indicate which slide I'm discussing today.

9    JUDGE DOUGAL:  Thank you.

10   MR. HART:  Thank you.  On DX-3 a summary of the remaining

11   disputes.  First, regarding the independent claims the primary dispute

12   concerns Numazaki's 8th embodiment.  Petitioner has established on its

13   papers that Numazaki's 8th embodiment laptop uses the imaging structure

14   from Numazaki's figure 2.  Patent Owner disputes this but entirely ignores

15   key evidence in support of Petitioner's case.

16   Patent Owner next argues that even if the 8th embodiment does

17   include the figure 2 structure, it fails to satisfy the claims because

18   Numazaki's figure 2 uses two cameras instead of one.  The Board correctly

19   rejected this argument at Institution and Patent Owner provides no reason to

20   depart from that preliminary finding here.

21   The next two disputes between the parties concern dependent claims.

22   First dependent claim 7 requires a target mounted on the user to detect the

23   user's hand-based gestures.  Numazaki explains that it was well known in

24   the prior art to use targets such as colored rings to improve gesture detection

25   but it acknowledges that targets had downsides such as inconvenience or

1  durability issues.  Petitioner's expert assessed the trade-off identified by

2  Numazaki and concluded that some users would be willing to accept the

3  inconvenience of wearing a ring in exchange for improved accuracy.

4        Patent Owner and its expert have refused to assess that trade-off in

5  this proceeding.  They insist that because Numazaki acknowledged

6  downsides with targets that ends the matter and obviousness is defeated.

7  Patent Owner is wrong on the law in its refusal to accept the trade-off

8  identified by Numazaki provides the Board no basis on which to side with

9  Patent Owner on dependent claim 7.

10        Finally, dependent claim 3 requires a lighting unit with a plurality of

11  LEDs.  Now our prior art, another Numazaki reference, Numazaki 863

12  teaches an LED array where the LEDs are sequentially illuminated in order

13  to improve the accuracy of gesture detection.  To exclude our prior art,

14  which sequentially illuminates its LEDs, Patent Owner asks the Board to

15  import into claim 3 a requirement that all LEDs are illuminated

16  simultaneously.  Now there's no support for this construction.  The patent

17  says nothing about simultaneous versus sequentially illuminating those

18  LEDs.  Accordingly the claims must be construed to capture both.

19        The final point on DX-3 relates to the PTAB's jurisdiction to review

20  its prior patents.  Patent Owner did not address this in its surreply.  I

21  understand that is the issue being addressed in the Eastern District of

22  Virginia litigation so I will address that in my final slide on rebuttal only if

23  necessary.

24        Turning to DX-4.  This is the disputed claim language on which the

25  parties' independent claim dispute centered.  Claim 1(b) requires using a

7

1   camera to determine a gesture that is illuminated by a light source.

2          If we turn to DX-5 we see that Numazaki's 8th embodiment teaches

3   precisely that which is claimed.  It describes a laptop as depicted in figure 74

4   that includes a light source 701 and a photodetection sensor unit 702.  The

5   user's hand is illuminated by the light source allowing the user to control

6   applications through hand gestures which are captured by the photo

7   detection sensor unit 702.  Now, Patent Owner in this proceeding does not

8   dispute that general operation of Numazaki's 8th embodiment.  Instead it

9   insists that we have insufficient detail on the record about how exactly

10  Numazaki's 8th embodiment works.

11         As we'll see in the next few slides, Patent Owner is wrong about this.

12  We have an extensive record establishing that Numazaki's 8th embodiment

13  uses the imaging structure from figure 2 in Numazaki.

14         Turning to DX-6.  The first support for this conclusion, Numazaki

15  teaches that its 8th embodiment incorporates the input information

16  generation apparatus as described in earlier embodiments and as we see in

17  the quote from column 11, lines 9 through 11 from Numazaki, figure 2 is the

18  information input generation apparatus of the first embodiment.  Now,

19  Patent Owner admits in its papers that figure 2's structure is repeatedly

20  referenced throughout Numazaki's many embodiments.  It is a foundational

21  component in the reference that we see referenced over and over throughout

22  Numazaki's many embodiments.

23         Turning to DX-7.  We see some commonalities between Numazaki's

24  8th embodiment in figure 2 that support the conclusion that figure 2 is what

25  Numazaki intended to be implemented in its 8th embodiment portable

8

1  devices.  Both figure 74 from the 8th embodiment in figure 2 include

2  lighting units.  The lighting unit in figure 2 is designated 101 and the

3  lighting unit in figure 74 701.  So common digits to connect those units.

4  They both include imaging units.  Unit 1 of 2 in figure 2 and 702 in figure

5  74, so there's commonalities between the images used for Numazaki's 8th

6  embodiment in its figure 2 imaging structure.

7        Turning to DX-8, we see what I consider to be the most concrete tie in

8  Numazaki that connects its 8th embodiment to the figure 2 imaging

9  functionality.  In this excerpt in DX-8 Numazaki teaches that its 8th

10  embodiment includes a photodetection section that captures a first image

11  when the lighting image is on and a second image when the lighting unit is

12  off.  It then takes the difference between these images to produce an image

13  that solely reflects the illuminated object, so the user's illuminated hand

14  removing all of the background information that was captured when the light

15  unit was on.  This improves fidelity and improves the accuracy of gesture

16  detection.  This excerpt concludes by noting that this functionality is as

17  already described in detail above.

18        Now, as the petition lays out and as Dr. Bederson explains in detail,

19  this differencing process described in this 8th embodiment excerpt is figure

20  2.  I have reproduced figure 2 in DX-9 and as we see in figure 2 on DX-9

21  this dual camera differencing process is exactly what figure 2 does.  That is

22  the whole purpose of figure 2.  The first photo detection unit 109 in figure 2

23  takes an image when the light is on.  The second photo detection unit 110

24  takes an image when it's off and difference calculation unit 111 takes the

25  difference between those two images to produce an image that solely reflects

9

1   the illuminated gesture, the user's hand as reflected by that light source.

2   Critically, neither Patent Owner nor its expert have addressed this

3   fact, that Numazaki expressly teaches this functionality as part of its 8th

4   embodiment.  This is the most concrete discussion in Numazaki itself that

5   connects figure 2 in the 8th embodiment and they have repeatedly ignored it

6   in the papers in this proceeding.

7   So what is Patent Owner's argument on the 8th embodiment?  Well, if

8   we turn to DX-10 we see that Patent Owner's primary argument centers on

9   terminology.  They point out that Numazaki in its 8th embodiment

10   introduces a new phrase, photo detection sensor unit.  Because that phrase

11   was not used to describe figure 2, Patent Owner argues that they cannot be

12   the same and that the Board should conclude figure 2 is not part of the 8th

13   embodiment.

14   Now, it is certainly true that Numazaki introduced that new phrase for

15   its 8th embodiment specifically for unit 702 but that phrase photo detection

16   sensor unit is entirely consistent with and descriptive of figure 2.  Patent

17   Owner does not dispute that unit 102 from figure 2 includes two photo

18   detection units.  It also does not dispute that each of those is a sensor.  So

19   referring to the structure in figure 2 as a photo detection sensor unit is

20   entirely consistent and descriptive.

21   Now there are two important points to make regarding Patent Owner's

22   terminology argument here.  The first, neither Patent Owner nor its expert

23   suggests what the photo detection sensor unit 702 might be, if not unit 102

24   from figures.  So the only evidence in the record on this point comes from

25   Petitioner and Petitioner's expert Dr. Bederson.

10

1    The second point, just to reiterate as I've mentioned before, neither

2    Patent Owner nor its expert addresses Numazaki's express teaching that its

3    8th embodiment includes the differencing process implemented by figure 2.

4    That is critical.  It is, as I said, the most concrete discussion in Numazaki

5    that connects figure 2 to the 8th embodiment and Patent Owner has entirely

6    ignored it in this proceeding.

7    DX-11 through DX-13 address a related dispute concerning the

8    independent claims here.  Patent Owner argues that even if we assume the

9    8th embodiment does include the figure 2 structure, that that structure falls

10   outside the claims.  This relates to the multiple sensors timing unit in

11   differencing process of figure 2.  In DX-11 I've pasted that same claim

12   language, claim 1(b) from the independent claim here.  Again, it recites a

13   camera that observes a gesture performing the work volume and determines

14   using the camera, that gesture illuminated by the light source.

15   Patent Owner argues that because figure 2 creates a difference image

16   it falls outside the claims.  In other words, Patent Owner insists that the

17   output of one and only one imaging sensor must be directly used to

18   determine the gesture with no intermediate or intervening process.  Patent

19   Owner is wrong.  We saw this same argument in the preliminary response

20   and the Board correctly rejected this narrow view of the claims at Institution.

21   In DX-12 I have the Board's analysis from the Institution decision at

22   pages 12 through 13 where the Board correctly held that the claims are open

23   ended and do not exclude processing such as that described by Numazaki.

24   On the papers Patent Owner provides the Board no reason to deviate from

25   this preliminary (indiscernible).

11

1     In sum, DX-13, again, I have the language.  The language is

2     straightforward.  It is using a camera to determine the gesture.  Numazaki's

3     system uses a first camera to capture the gesture while illuminated.  Uses a

4     second camera to capture background information.  Subtracts one from the

5     other to improve fidelity and then uses the result to determine a gesture.  It is

6     irrelevant to the challenged claims that second camera's image is subtracted

7     from the first.  Both cameras, including the first camera, still use to

8     determine the gesture and that is all that's required of the challenged claims.

9     DX-14 through DX-16 address the next substantive dispute which

10     relates to dependent claim 7's requirement for a target positioned on a user.

11     So this is something else other than the user itself that is used to detect user-

12     based gestures.  In DX-14 summarizing the theory that was presented in the

13     petition, Numazaki explains that it was well known to use targets such as

14     colored rings to improve gesture detection.  But Numazaki did acknowledge

15     --

16     JUDGE DOUGAL:  Mr. Hart?

17     MR. HART:  Yes, go ahead.

18     JUDGE DOUGAL:  This is Judge Dougal.  I want to go back to the

19     previous slide, DX-13.  So I read Patent Owner's argument on this issue to

20     be about this question of whether the analysis is based off of the same image

21     that comes from one of the photo detection units 109 or 110 and I guess I'd

22     like some clarification on your position as far as the camera means goes, and

23     is it your position that Numazaki can be read to the camera is either 109, 110

24     or the entire reflected extraction unit 102 can also be considered the camera.

25     Is it your position that the image that you're saying that Numazaki makes

12

1  analysis on is the image from first detection unit 109 or is it the image that

2  comes from the reflected unit, extraction unit, the final image that has the

3  background things subtracted from it?  You know, what -- is it your position

4  that either of these satisfy them, only one satisfies them, you know, I'd just

5  like a little more clarification on your position in that regard?

6      MR. HART:  Absolutely, Your Honor.  Yes, it was our position in the

7  petition that unit 102 with both sensors and the full process that it

8  implements to improve the fidelity satisfies the claimed camera.  Now, it is a

9  camera it includes in its image sensors.  It does take images of the object

10  while it's gesturing.  That gesture is illuminated by a light source when unit

11  102 does capture those images and processes them to determine the gesture.

12  But as the proceeding has progressed and these issues about the multiple

13  sensors in unit 102 have been raised by Patent Owner, it's clear that in fact

14  all of the above satisfy the claim.

15      Unit 109, the sensor that captures an image while the image is

16  illuminated also satisfies the claim.  It is used, it is a camera that is used to

17  determine the gesture performed in the work volume and illuminated by the

18  light source.  Again, 109 is the image sensor that takes a picture while the

19  light's on and so that is used in the process of determining the gesture.

20      In fact, sensor 110 also satisfies this claim language.  It is also a

21  camera.  It is an image sensor and although it captures images when the light

22  is off, it is used in the overall process to determine the gesture that was

23  performed in the work volume when the gesture was illuminated by the light

24  source.  So it is part of the process of capturing images of a gesture

25  performed in a work volume illuminated by a light source.  All of the above,

13

1  before unit 102 with those sensors and its differencing process as well as

2  individually sensor 109 and sensors 110 all satisfy the claimed camera,

3  determining using the camera, the gesture performed in a work volume and

4  illuminated by the light source.

5        Thank you for the question, Your Honor.  I will turn back to DX-14 to

6  the issue that I had started running into before the question.  Again, this is

7  related to claim 7, dependent claim 7's requirement for target position on the

8  user.  As I explained, Numazaki teaches that it was known in the prior art to

9  use such targets such as a color ring to improve detection.  It also

10 acknowledged that there are downsides with such targets, inconvenience,

11 durability issues.  Dr. Bederson, Petitioner's expert, explained that many

12 users would accept the trade-off identified by Numazaki and would accept

13 the inconvenience of wearing a ring for improved detection, improved

14 accuracy in the gesture detection of the system camera 4.  The rationale is

15 that many users wear rings on a daily basis with no ill effect and so for

16 specifically the ring embodiment identified by Numazaki there really isn't

17 much of a downside in that on balance improved detection outweighs the

18 inconvenience of wearing a ring for many users.

19       Now turning to DX-15, the Federal Circuit has explained for example

20 in Winner Intern. Royalty Corp. v. Wang, that where a proposed course of

21 action has expressed benefits and detriments, those must be weighed against

22 one another in assessing obviousness.  This has been repeatedly stressed by

23 the Federal Circuit since Winner including in Medichem, S.A. v. Rolabo,

24 S.A. in 2006 and Allied Erecting and Dismantling Co v. Genesis

25 Attachments in 2016 that we see on DX-15.  In Allied Erecting the Federal

14

1   Circuit noted a given course of action often has simultaneous advantages and

2   disadvantages.  This does not necessarily obviate motivation to combine.

3          We turn to DX-16.

4          JUDGE DOUGAL:  Counsel?

5          MR. HART:  Yes, Your Honor.

6          JUDGE DOUGAL:  Sorry to pause you here.  So jumping into claim

7   7 for the target, if I'm not mistaken I believe that's actually the '922 case,

8   not the '920; right?  We started off with the '920 discussion?  I'm a little

9   confused.

10         MR. HART:  Sorry, Your Honor.  I have been focusing on the '079

11   patent, the 922 case.  That might have been inserted into our docketing

12   system incorrectly and if so, my sincere apologies.  We didn't catch it until

13   now because as you noted earlier the issues are so common.  What is your

14   preference on the most efficient way to proceed given what appears to be my

15   embarrassing mistake here?  I'm happy to proceed on the '079, the 922, or I

16   can switch over and try to kind of synthesize what was common between the

17   two and pick it up where we left off on the '431 patent.

18         JUDGE DOUGAL:  Mr. Landis, do you have a preference if it

19   continues on with the second case versus the first one?

20         MR. LANDIS:  I've been following along on the second case so I'm

21   happy to just proceed as we're going and I'll be ready to argue that one first

22   and then other one after that.

23         JUDGE DOUGAL:  Okay.  So I'll just make it clear on the record.

24   We'll need to sort some things out on the transcript.  This is actually the

25   beginning of case IPR 2021-00922 and then we'll be dealing with the 920

15

IPR      2021-00920      2021-00922
Patent  7,933,431 B2    8,553,079 B2

1    case after this proceeding.  No problem at all, Mr. Hart.

2        MR. HART:  Apologies again and thanks very much everybody for

3    accommodating this.  So as Your Honor correctly points out, this is '079

4    dependent claim 7 target position on a user and the main issue here is the

5    trade-off.  Numazaki recognizes benefits of using targets and also

6    acknowledges using downsides of using targets.  Our expert, Dr. Bederson,

7    assessed that trade-off and concluded that many users would accept the

8    inconvenience of wearing a ring for the improved accuracy of gesture

9    detection.

10       And I was just talking about in DX-15 and DX-16, the Federal Circuit

11   is clear that where there is a trade-off, where there are identified benefits and

12   detriments, that those benefits and detriments must be weighed against one

13   another to assess obviousness.  The Court has repeatedly affirmed that rule

14   of law over and over over the years.

15       In DX-16 we see in the Winner International case, that's precisely

16   what happened.  The Federal Circuit noted that the District Court found that

17   one of skill in the art would not have reasonably elected trading the benefit

18   of security for that of convenience.  The Board there, I'm sorry, the Court

19   there ruled in favor of Patent Owner but it acknowledged that that trade-off

20   was an important part of the overall analysis.  Faced with a trade-off, you

21   must consider both the benefits and the detriments, weigh them against one

22   another to assess obviousness.  Here, Patent Owner has refused to assess that

23   trade-off.  Its expert did not consider the benefit of targets and instead

24   focused solely on the downsides identified by Numazaki.  Accordingly, the

25   sole analysis on this record that properly accounts for the trade-off identified

16

IPR      2021-00920      2021-00922
Patent  7,933,431 B2      8,553,079 B2

1  by Numazaki is from Petitioner and its expert, Dr. Bederson.

2       DX-17 through DX-19 address the final substantive dispute between

3  the parties in 922 proceeding involving the '079 patent.  Dependent claim 3

4  recites the light source includes a plurality of LEDs.  Now as we see on DX-

5  17 the petition proposed modifying Numazaki with another Numazaki

6  reference, Numazaki 863 which teaches an LED array for improved

7  accuracy.  Numazaki 863 sequentially illuminates each one of those LEDs in

8  its array in order to obtain distance information of the gesturing hand which

9  improves the accuracy of gesture detection.  Now that operation of

10  Numazaki 863 is not disputed in this proceeding.  The question is simply

11  one of claim construction.

12       As we see in DX-18 Patent Owner's argument as it laid out in its

13  response at page 7 asked the Board to construe claim 3 to require all LEDs

14  emit light simultaneously.  Now Patent Owner cites a single sentence from

15  the '079 patent in support.  That sentence that is on, at the bottom of DX-18

16  states,

17       "Light from below such as provided by single central light 122 can be

18  used to illuminate the finger that typically looks bright under such

19  illumination."

20       That sentence is simply stating that light makes a gesturing finger

21  look bright.  It says nothing about simultaneously emitting light from

22  multiple LEDs or sequentially emitting light from multiple LEDs.  In fact, it

23  is expressly concerning a single central light 122.

24       From that basic teaching, that general teaching that we saw in DX-18

25  we turn to DX-19.  From that general teaching Patent Owner argues that two

17

1  LEDs are brighter than one, that brighter light increases accuracy and that

2  simultaneous illumination should be read into the claims to capture that

3  benefit.  Now it's black letter law that limitations are not read from the

4  specification into the claims.  But even if that were legally proper, there's

5  nothing to read in from the '079 patent.  The patent has no discussion

6  whatsoever regarding illuminating simultaneously versus sequentially.

7  Accordingly, the claims must be construed broadly enough to capture both

8  approaches.

9      If there are no further questions from the Board, I will reserve the rest

10  of my time for rebuttal.

11      JUDGE DOUGAL:  All right.  Thank you, Mr. Hart.  Mr. Landis, go

12  ahead.

13      MR. LANDIS:  Good afternoon.  Todd Landis for Patent Owner.  I'm

14  going to start on my slide 8, Patent Owner's slide 8, and I will also be

15  referring to some of Petitioner's slides and I'll try to do my best to refer to

16  them as DX and the number so the record is clear.

17      There's a lot to unpackage from the arguments that we just heard.  If

18  we look at Patent Owner's slide 8 the first issue that I'd like to address is

19  this teaching or whether Numazaki teaches limitation 1(b) and this actually

20  follows with other limitations in the claims 11(b) and also in claim 21 has

21  similar limitations on the independent claims.

22      But the first thing that Petitioner says is that Numazaki discloses that

23  figure 2 is incorporated into embodiment 8 and they cite in their slides to, if

24  we look at DX-8 -- I'll give Your Honors a moment to get there -- they cite

25  to a quote from Numazaki at column 53, lines 20 through 36.  But that

18

1  column is following a discussion of figure 79, the wristwatch embodiment,

2  not the 8th embodiment. It's actually the 9th embodiment. It's not the

3  embodiment they're talking about. That paragraph doesn't say it even

4  applies to that embodiment. It is in a discussion of figure 79 and so there is

5  no teaching in Numazaki that somehow the entirety of figure 2 is in the 8th

6  embodiment.

7      The fact is Numazaki has specific language when it talks about the 8th

8  embodiment. It says there's a light source and a photo detection sensor unit.

9  It doesn't say that the entirety of figure 2 is incorporated into it. It doesn't

10  make any statement like that. There is the general statement that the

11  information input generation apparatus is included in all the embodiments

12  that precede it but it doesn't say that the entirety of it is, it doesn't say what

13  of that is included or how much of that is included and the fact is Numazaki

14  makes a specific reference to a photo detection sensor unit and that's it.

15      Petitioner would like to put the burden on Patent Owner. In fact, in

16  their slide -- if I can find it here real quick -- on slide DX-10 they say,

17      "Patent Owner does not suggest what 'photo detection unit 702' might

18  be, if not unit 102."

19      It's not Patent Owner's burden to suggest that. It's Petitioner's

20  burden to show, to prove by a preponderance of the evidence that photo

21  detection sensor unit 702 is unit 102.

22      What's interesting about the arguments that you heard is that at times

23  Petitioner says that the camera is the entirety of 102 and Your Honor asked

24  them about this, but at times they say it's just the photo detection units.

25  They need to make this variable argument because the teachings of

19

IPR       2021-00920       2021-00922
Patent    7,933,431 B2     8,553,079 B2

1  Numazaki do not meet the claims.

2      Going back to Patent Owner's slides.  I'm on slide 9 now.  It is

3  without dispute that Numazaki has two photo detection units in its figure 2,

4  one which captures an image when the light's on, one when that captures an

5  image when the light is off.  It is also or should be also without dispute that

6  neither of those images by themselves are used for any purpose within

7  Numazaki except to be subtracted from one another.  There is no other

8  purpose they are used for in Numazaki other than that.

9      Moving to slide 10.  In the petition Petitioner emphasized this word

10  "unit" when talking about sensors and saying that a unit is the same as

11  sensor, yet Numazaki doesn't say that.  Numazaki specifically calls one

12  thing a photo detection unit and then another a photo detection sensor unit

13  and never gives an explanation that those things are the same.  Petitioner

14  simply wants their expert to be able to fill in the blanks without any

15  explanation as to why those two things should be seen as the same thing.

16  That explanation is just pure conjecture on behalf of Petitioner's expert.

17      Moving to slide 11.  I didn't hear Petitioner in their argument say that

18  Numazaki actually discloses a camera.  They talk about electro-optical

19  sensors.  They talk about photo detection units.  But the claim is a camera

20  and I didn't hear him say what the camera was.  What is the camera?  That's

21  what needs to capture images here.  The entirety of the reflected light

22  extraction unit 102 doesn't actually capture an image, it creates an image.

23  That's different.  It doesn't observe anything.  It creates something.  It's

24  different.

25      Moving to slide 12.  The entirety of the support from my reading of

20

1  the petition for Numazaki obtaining an image is column 50, lines 25 through

2  43.  That's what they cited to but I don't see anywhere where Numazaki says

3  there's a camera that obtains an image.

4      Moving to slide 13.  Looking at elements 1(b), 11(b) and 21(c) which

5  are all very similar to one another and I'm referring to 11(b) here.  Here the

6  camera has to be oriented to observe a gesture.  Again, what is the camera?

7  Because the photo detection units 109, 110 they're oriented to observe some

8  sort of image but not a gesture because you can't even figure out if there is a

9  gesture until you subtract the two images from one another and create a third

10  image.  Without that, Numazaki can't function, can't even figure it out.

11  Those cameras aren't observing a gesture, they're just observing something

12  happening in front of them.  They need to then figure out through the

13  subtraction process and then through a comparison process whether a

14  gesture actually happens.  It's a completely different image and when you

15  look at claim 11, for example --

16      JUDGE DOUGAL:  Counsel, I'm confused a little bit on this

17  argument.  Claim 11 talks about a camera, right, oriented to observe a

18  gesture and a processor adapted to determine the gesture, isn't -- I'm not

19  understanding what's different between their sensors or, as they assert,

20  cameras to observe something and then determining a gesture versus the

21  claim but also it just seems to follow the same steps.

22      MR. LANDIS:  Yes, Your Honor.  Good question because that's the

23  exact point I was about to get to.  So when you look at the processor part of

24  claim 11 it's not just that you have a processor determining a gesture based

25  on anything, it's got to be based on the camera output and so that's the

21

1   important point.  What is the camera and what is that output because the

2   camera has to be oriented to observe a gesture.  Well, the entirety of the

3   reflected light extraction unit doesn't observe a gesture, it creates an image.

4   The photo detection units 109 and 110, while they may capture images, their

5   output is not used by the processor to do anything.  It's not used.  You have

6   to create a separate image in order to get to that process and that's really our

7   point about Numazaki.  They're trying to take Numazaki and muddle it all

8   up and try to create a camera from all of these different components when

9   the only thing that could really be a camera, if anything at all, would be

10  those photo units and those outputs aren't used by a processor to determine a

11  gesture.  They're not -- it's not based on those outputs.  It's based on a

12  subtraction and a new image, a completely different thing.

13          Moving to slide 14.  Well, actually I'm going to skip slide 14 because

14  I just did that and I'll move to slide 16.  This is talking about photo detection

15  unit 110 and what's important here is that 110 can't be the camera because it

16  doesn't do anything when the light source is on, when something's being

17  illuminated.  It's actual function is when it's off.  Nothing's being

18  illuminated.  So how can that be part of the system?  How can that be the

19  claimed invention?  It's not part of it, it's when it's off.

20          JUDGE DOUGAL:  Counsel, for this case in particular, the 922, what

21  language in the claim requires the light to be on while the image is taken

22  because doesn't it just say providing a light source?  A light source has to be

23  able to light up the work volume.  There doesn't seem to be anything that

24  requires lighting of, you know, there's no sentence that says lighting an

25  object while the image is taken of the object or anything like that, so --

22

1    MR. LANDIS:  Well --

2    JUDGE DOUGAL:  -- what language are you referring to that

3    requires this?

4    MR. LANDIS:  I'll refer to claim 11 because it's the one I most

5    recently had up on slide 14 and when you look at the last element, a

6    processor, it says a processor adapted to determine the gesture performed in

7    the work volume and illuminated by the light source and so I think when you

8    take that in combination with the claim it's saying that you need to have a

9    camera that's observing an image that's been illuminated by the light source

10   because that's what the processor is going to process and much of that is

11   based on just the antecedent basis language that you have in the claims,

12   based on the camera output, illuminated by a light source, based on the

13   camera output.  I think when you follow the antecedent through there, you

14   can see that what needs to be observed is a gesture that's been illuminated

15   by the light source.  Did that answer Your Honor's question?

16   JUDGE DOUGAL:  Yes.  I guess it raises additional questions for

17   claim 11, you know, like does the processor have to have some special

18   programming so that it can tell that it's illuminated versus not?  I mean, this

19   is an apparatus claim.  This one seems harder than some of your method

20   claims but, yes.

21   MR. LANDIS:  Yes, and I can go back to the method claims if Your

22   Honor would like if you could give me one second to get there.

23   JUDGE DOUGAL:  It's okay.  You can proceed (indiscernible).

24   MR. LANDIS:  Well, I would just say that the method claims have the

25   same language, it's just in a method way, not in the apparatus way obviously

23

1    with a processor doing something.  It's just determining the same thing

2    based on an illumination, you know, an image that's been illuminated by the

3    light source.  Claim 1 has that I think in the determining step for example.

4         If I could I'd just like to quickly go to slide 18 and this is dealing with

5    -- well, actually I'm going to skip slide 18 just for the sake of time and I'd

6    just like to turn to some of Petitioner's slides for a second just to address

7    some issues.

8         So here I'd like to just go to DX-5 for a second because if I heard

9    Petitioner right one of their arguments is you should know that figure 2 is

10   incorporated in figure 74 because the numerals 1 and 2 are the same, but the

11   components should be the same.  But this is just normal numbering in a

12   patent.  It's how you address the patent.  When you get to a new figure you

13   start with a new numbering system and it usually starts at, you know, either

14   a hundred or seven hundred and then goes one, two, three, four after that.

15   It's just a normal configuration of a patent application.

16        But the other interesting part about DX-5 is now they're saying that

17   the camera is the photo detection sensor unit.  So is it the photo detection

18   unit that's the camera or is it the entirety of the thing, the reflective light

19   extraction unit, going back to Your Honor's question to Petitioner.

20        If we look at quickly, Petitioner also made this argument that

21   somehow, you know, that because Numazaki mentions targets, that

22   somehow it would be allowable for you to take a person of skill in the art's

23   knowledge and modify Numazaki even though Numazaki teaches away from

24   using targets.  What's important about Numazaki is it doesn't have any

25   embodiments with targets.  There are no embodiments in Numazaki that use

24

IPR     2021-00920     2021-00922
Patent  7,933,431 B2   8,553,079 B2

1  targets.  None.  It doesn't teach that at all.  It doesn't teach that's even

2  possible.  It actually teaches away from it and that cuts against having an

3  obviousness combination, especially when you're not combining it with

4  another reference.  Each of the cases referenced by Petitioner is when you're

5  combining two references together.  We don't have that here.  This is just

6  their expert saying, well, somebody probably wouldn't mind wearing a

7  target, but he has no evidence to that effect.  It's just him saying it.  It's just

8  a bare allegation and nothing more.

9      Unless Your Honors have any further questions for me, that's all I

10  have for now on the '079.

11      JUDGE DOUGAL:  Okay.  Thank you, counsel.  Mr. Hart, your go.

12      MR. HART:  Thanks very much, Your Honor.  Just three quick points

13  in response to Patent Owner's arguments there.  The first is a correction.

14  Patent Owner pointed to DX-8 from our presentation which includes the

15  excerpt from Numazaki at column 53 describing the image differencing that

16  is incorporated in the 8th embodiment.  He characterized that as not

17  describing the 8th embodiment at all but applying to the 9th embodiment in

18  a watch embodiment specifically.  He's wrong about that.  The 9th

19  embodiment is not discussed in Numazaki until column 54.  On the next

20  column the excerpt that we discuss in our petition that Dr. Bederson

21  analyzed and that we included in DX-8 is in fact part of the 8th embodiment

22  of Numazaki and I could quickly walk through how the 8th embodiment is

23  structured.

24      So when the 8th embodiment starts, column 50, line 19 it explains that

25  the 8th embodiment is directed to an information input generation apparatus

25

1  as described in the above embodiments and I believe I have that quote in

2  DX-7 in our presentation.  The subsequent paragraphs walk through

3  different devices within which that information input generation apparatus is

4  incorporated.  There are laptops, PDAs, watches, many portable devices in

5  which the 8th embodiment's information input generation apparatus is

6  incorporated.

7        In column 53 the excerpt that we've been discussing at length,

8  Numazaki does not limit that to any of those particular devices but is broadly

9  describing the information input generation apparatus of the 8th embodiment

10  as a whole when it describes that the 8th embodiment implements the image

11  differencing process that takes a first image when the light's on, a second

12  when the light's off to improve fidelity.  So Patent Owner is simply wrong

13  that that is inapplicable to the petition's theory.  It's certainly wrong that that

14  is part of the 9th embodiment.

15        The second point I wanted to raise.  Patent Owner inserted an

16  argument about create versus capture to attempt to distinguish Numazaki's

17  camera teachings.  I've not seen that argument in this proceeding.  Neither of

18  the experts as far as I'm aware have addressed the distinction between

19  creating versus capturing.  But the claim language doesn't support such a

20  distinction, you know.  Responding to it on the fly the claims simply recite a

21  camera that observes.  There's no language that supports a distinction

22  between a camera that observes creating an image by some additional

23  processing versus one that outputs a raw representation of what was

24  observed.  Again, both those concepts creating and capturing by the camera

25  are captured by these claims.  Nothing in this record supports narrowly

26

1  interpreting the claims to exclude any camera that does any sort of

2  processing.

3        The final point I want to make.  Patent Owner spent most of its time

4  arguing that the detected gesture must be determined by the output of one

5  and only one unprocessed image sensor.  The claim language, as I walked

6  through in my opening arguments, provides no support for that.  Claims 1

7  and 21 simply recite using the camera to determine the gesture.  Claim 11

8  recites determining the gesture based on the camera output.  Nothing in these

9  claims support interpreting them so narrowly that they exclude the multi-

10 sensor structure described in Numazaki.  As the Board correctly found at

11 Institution these claims are open ended.  They can capture one or more

12 image sensors and they do not exclude the fidelity improvement process that

13 is implemented by Numazaki's figure 2.

14       And if Your Honors have any questions I'm happy to answer them,

15 otherwise Petitioner has nothing further on the '079 proceeding.

16       JUDGE DOUGAL:  Mr. Hart, I'd like to hear your thoughts a little bit

17 on the claim 7 arguments.  As I read the papers it seemed like, you know,

18 Patent Owner focused on teaching away and then Petitioner, you focused on

19 trade-offs.  I didn't see a lot of overlap in the discussion or really addressing

20 head on, you know, teaching away.  As I read Numazaki, I mean Numazaki

21 uses some pretty strong language, right, which you acknowledge in your

22 papers, you know.  It says it's not realistic, not practical for use, it's a

23 demerit, right, and Numazaki itself definitely as Patent Owner argued can be

24 viewed as this is what the prior art was and we improved that and that's no

25 longer necessary with our new system.

27

1      So it's not clear to me exactly how this argument about, oh, these are

2  just trade-offs even though Numazaki disparages it exceedingly, I'm not sure

3  how it is just saying this is just trade-offs and that outweighs the fact that

4  Numazaki clearly does not seem to favor using a ring or a target or that it's

5  Numazaki that is saying these are just merely trade-offs that you're dealing

6  with rather than just I guess your position of your expert.  So maybe you

7  could respond to that and provide a little more response to Patent Owner on

8  their teaching away arguments.

9      MR. HART:  Sure.  No, and I think that's an absolutely fair

10  observation about Numazaki.  I do think it's fair to say Numazaki was

11  proposing an alternative to the improved gesture detection of using targets so

12  it acknowledges that targets, because they're much easier to see than beige

13  hands -- the detail of, you know, a gesturing beige hands -- the color

14  including rings or painting a hand or wearing a glove, that those things have

15  historically been used to provide the accuracy that you need for gesture-

16  based control.

17      As you can imagine, you know, using an application moving objects

18  in an application require some level of precision in these types of inventions

19  that are described in Numazaki.  It's saying that historically targets were

20  used but they're downsized for these.  Numazaki is saying, you know, some

21  of what we're teaching here can obviate the need for these targets.  We can

22  get improved detection by doing the image differencing by the lighting unit,

23  the timing units, essentially all of the components that we've been talking

24  about with respect to figure 2, and so there's no question that Numazaki to

25  set up its own improvement in the art, you know, took a slight at targets and

IPR      2021-00920      2021-00922
Patent  7,933,431 B2    8,553,079 B2

1  the historical use of targets in the art.  That does not necessarily lead one to

2  conclude that Numazaki's disparagement that their discussion of the

3  downsides of targets obviates our case, right, and that's why the trade-off

4  discussion is important.

5        So in a high precision application like controlling objects in a laptop

6  environment such as is depicted in Numazaki in the 8th embodiment Dr.

7  Bederson analyzed the benefits of maybe adding a ring to improve detection.

8  So you can get the benefit of Numazaki's image differencing, the precision

9  that it gains from that in addition to the target use, in addition to the

10  precision bump that was known in the art from the use of targets and

11  because wearing a ring is a minor inconvenience and in fact many of us wear

12  rings every day -- I don't think about mine unless my toddler's wanting to

13  play with it -- he concluded that many users would agree to accept that

14  minor inconvenience wearing a ring while doing the gesture control in

15  exchange for that improved detection.

16        So, you know, in sum yes, it has strong words about the downsides of

17  targets and those strong words were to set up its own improvement of the art.

18  But as we see in the case law, for example, Galderma Laboratories, L.P. v.

19  Tolmar, Inc., that is cited by Patent Owner in its papers, 737 F.3d 731.

20  Galderma, the Federal Circuit explained that a reference does not teach away

21  if it merely expresses a general preference for an alternative invention but

22  does not criticize, discredit or otherwise discourage investigation into the

23  invention claimed.

24        So it's a spectrum.  There is so much disparagement that the Board

25  could conclude that one of skill in the art would not have reasonably

29

1  considered implementing something like targets to improve accuracy.

2  However, in Galderma they discuss the prior art at issue there. There was a

3  1991 article and a 1996 article that both discussed increased side effects

4  associated with doing what the claimed invention did and they said there is -

5  - they recognized that there were increased side effects, this was a medical

6  case or a pharmaceutical case, they recognized that the prior art

7  acknowledged these increased side effects but they said that neither of these

8  articles indicated in anyway that the side effects would be serious enough to

9  dissuade the development of the claimed invention.

10        So you can have prior art that recognizes down sides, that recognizes

11  detriments and that does not necessarily lead to a teaching away. As the

12  Federal Circuit concluded in Galderma, there was no teaching away even

13  though there was an express acknowledgement of down sides in the prior

14  art's teaching that was lined up with the claimed invention and I think that's

15  exactly what we have here. Yes, there's strong language about down sides

16  of targets but as Dr. Bederson explained, some down sides apply to some

17  targets, some down sides apply to other specifically with the ring example

18  that is identified by Numazaki, the down sides are minimal in the improved

19  accuracy is potentially significant and for users who have a need for that

20  improved accuracy depending on what their use is, many of them would be

21  willing to accept the inconvenience of a ring for that improved detection.

22        JUDGE DOUGAL: So I have two follow-up questions. One, do we

23  have any evidence that the system in Numazaki, would -- the accuracy be

24  improved with the ring and two, Numazaki has a hundred figures and I don't

25  recall are all embodiments in Numazaki a close-up situation where the

30

IPR      2021-00920        2021-00922
Patent  7,933,431 B2        8,553,079 B2

1    embodiments you're relying on here in figure 8 are laptops and palm tops

2    and they all seem to show a, you know, a gesture that's fairly close to the

3    device which kind of makes sense because it's taking, you know, a picture

4    which has to be illuminated to do this difference.

5        Does Numazaki also teach, you know, a farther away situation where

6    maybe a ring would provide more detail?  I guess I'm just trying to

7    determine if there's some support for this position other than just the

8    declarant saying rings were known to improve accuracy, you know, would

9    they improve accuracy – would they make any difference in Numazaki

10   based on the evidence?

11       MR. HART:  So there were no other embodiments that were further

12   distanced away from the camera that were analyzed by Petitioner or Dr.

13   Bederson.  So I think for purposes of this record, it's safe to assume that the

14   theory that was presented by Petitioner in this case is limited to those up

15   close and personal examples like Numazaki's 8th embodiment laptop.

16       Now, the question of whether a ring would provide benefit that is

17   what Dr. Bederson analyzed.  Not in excruciating detail but again we're

18   talking about gestures where a user is, for example, pressing a space bar to

19   grab an object on the screen and moving that object using hand gesture by

20   specific amounts.  These are applications that Numazaki describes where

21   you're making precise movements of objects on the display and based on Dr.

22   Bederson's explanation, you know, that ring gives you a precise point at

23   which you can tell how much the user's hand has moved.

24       So I do think it's fair to conclude from this record that even in those

25   up close examples of a user moving objects in an application using on a

31

IPR       2021-00920       2021-00922
Patent   7,933,431 B2       8,553,079 B2

1   laptop, that ring because it gives you a precise point on the user's hand you

2   can tell the difference, you can tell how much of that's moved with more

3   precision than just the general outline of the user's hand.  That's essentially

4   the premise of the combination here and so I take your point that there may

5   be greater benefit if the user is further removed from the camera because it

6   gives the camera something that really sticks out that might help the camera

7   figure out what the gesture is, but I do think it's based on this record there is

8   also benefit to be gained in this up close embodiment such as the laptop.

9         JUDGE DOUGAL:  Okay.  And do you recall -- I don't recall the

10   same paragraphs and stuff -- but to your understanding, so your declarant

11   Dr. Bederson spoke to that point in his declaration?

12         MR. HART:  He described --

13         JUDGE DOUGAL:  Or are you saying -- this is your understanding

14   probably thought of when he made the statement that it would improve

15   accuracy?

16         MR. HART:  I think it's fair to say that I would like there to be more

17   detail in paragraph 49 of the declaration for purposes of this discussion.  He

18   did accept Numazaki's characterization of targets such as rings as improving

19   gesture detection and kind of took that as a given.  I think practically when

20   we're thinking about the types of gestures that are contemplated, specifically

21   in our proposed combination here, that it's fair to say on this record that

22   there would be benefit but, you know, to be transparent I think there's not a

23   lot of elaboration on that specific point, you know, that was made.  The

24   difference between point A and point B was me interpreting Dr. Bederson's

25   opinion here.

1    JUDGE DOUGAL:  Okay.  Thank you.

2    MR. HART:  And again, I think I said this before but I have nothing

3  further in rebuttal so unless the APJs have further questions, Petitioner rests

4  on this proceeding.

5    JUDGE DOUGAL:  Great.  Thank you, Mr. Hart.  Mr. Landis.

6    MR. LANDIS:  Yes, Your Honor.  A few points.  Again, Todd Landis

7  for Patent Owner.  I'd like to start with the last point that was just being

8  discussed and I was happy to hear counsel say that Dr. Bederson doesn't

9  have any explanation because paragraph 49 has none.  It's just conjecture on

10  his part.  There's no support, no proof that targets improve anything, that

11  someone wouldn't mind wearing them and as Your Honor pointed out,

12  Numazaki is pretty clear about Numazaki's feelings about targets.  He didn't

13  hide that fact.  He disparaged them throughout and the case law is pretty

14  clear about what that means when it comes to obviousness, when a reference

15  disparages the use of something.

16    You even heard it in counsel's comments when he read the case, and I

17  apologize for not remembering that case right now, but he read it and that

18  case specifically talks about if the art is disparaging.  Talks down about, you

19  know, says it's bad to do something, you know, you go away from it and it

20  shouldn't be used for an obviousness combination and if we look at Patent

21  Owner's slide 25 there is the Galderma Labs case.

22    "A reference may be said to teach away when a person of ordinary

23  skill, upon reading the reference, would be discouraged from following the

24  path set out in the reference, or be led in a direction divergent from the path

25  that was taken by the applicant."

33

1    That is exactly what we have in Numazaki. It is teaching away from

2  using targets. This is nothing but conjecture on the part of an expert without

3  any proof, without any evidence. It certainly doesn't meet their burden.

4    The second thing I'd like to discuss is this paragraph in column 53.

5  Column 53 of the patent follows column 52 and column 52 starting at line

6  20 is discussing figure 79. Nothing in Numazaki says that the paragraph on

7  page 53 is referring to all the other embodiments that came before it because

8  figure 79 is discussing an information input generation apparatus in a wrist

9  watch. This again is just conjecture on the part of counsel for the Petitioner

10 but we're not supposed to decide this on conjecture. Nothing in Numazaki

11 says that paragraph applies to the 8th embodiment. Absolutely nothing and

12 it's following on to figure 79 which is a different embodiment.

13    And the final point I'd like to address is the one or more image

14 sensors and I think this is going to come up in the next case too. While it is

15 true that comprising with "a" means one or more, the Federal Circuit in In re

16 Varma has explained that that does not mean that you can have two things

17 doing two separate things. The example they gave in that case was a dog

18 that rolls over and fetches sticks and the Federal Circuit explained that while

19 you can have one or more dogs, it does not mean that one dog can roll over

20 and another dog can fetch sticks and you meet the claim. What it means is

21 both dogs have to be able to roll over and fetch sticks.

22    That is the simple example the Federal Circuit used to explain

23 comprising an "a" and so when you're looking at these claims and the claims

24 we're about to look at, yes, it's a camera but it's a camera that does

25 something and that something has to be used to do something. So you can't

34

IPR     2021-00920     2021-00922
Patent  7,933,431 B2   8,553,079 B2

1  have one camera doing one thing and another camera doing another thing.

2  That's not the way this works and that's not the way the Federal Circuit

3  interprets those claims.

4      Unless Your Honors have any further questions for me, that's all I

5  have.

6      JUDGE DOUGAL:  All right.  Thank you both.  This concludes the

7  hearing for IPR 2021-00922.  So now pausing the record, so to keep it since

8  it's fresh in our minds will the court reporter chime in if there's anything

9  that he needs clarification on.

10      (The reporter and counsel confer.)

11      (Break.)

12      JUDGE DOUGAL:  We're back on.  So this is the hearing for

13  IPR 2021-00920.  As we mentioned in the prior hearing, this transcript will -

14  - the transcript for the 920 and 922 cases will be filed in both cases so those

15  discussions that we had already to this point that are applicable now to this

16  920 case will be on record in both cases and it's not completely necessary to

17  go over those points again.

18      I will state, for example, in the beginning of the prior hearing I asked

19  some questions relating to the different cameras and images and Petitioner's

20  understanding or their position as to what met those limitations.  Those

21  discussions and arguments apply to this case as well.  For example, claim 7

22  talks about the camera means for obtaining an image and then refers to that

23  image being analyzed by the computer means.

24      We're going to pause for just one moment.

25      (Pause.)

35

1      JUDGE DOUGAL:  Okay.  As both, well, even with both cases being

2   in the record I think we'll start off with appearances again just for

3   completeness.  So I'm Judge Dougal.  I have with me Judges Turner and

4   Chang.  So, Petitioner we'll start with you.

5      MR. HART:  Thank you, Your Honor.  Paul Hart for Petitioner Apple.

6   With me today is Adam Seitz, lead counsel for Petitioner Apple.

7      JUDGE DOUGAL:  And would you like to reserve any time for

8   rebuttal?

9      MR. HART:  Yes, Your Honor.  I'll do 20 minutes again.

10      JUDGE DOUGAL:  Okay.  Thank you.  And for Patent Owner?

11      MR. LANDIS:  For Patent Owner is Todd Landis and John

12   Wittenzellner.  I will be doing the argument -- Todd Landis will be doing the

13   argument for Patent Owner and I'll reserve whatever time I have left after

14   my argument.

15      JUDGE DOUGAL:  Okay.  Thank you.  So to reiterate just briefly

16   some prior points.  Our main concern is that everyone have the opportunity

17   to be heard and if any point you feel that you are not being heard, if you've

18   lost the connection, please reach out immediately and let us know so that we

19   can pause the hearing and get those issues resolved.  Please be sure to refer

20   to any documents in the record by either the slide number, exhibit or paper

21   number and pause and give us a moment to find it before proceeding.

22      With that, any questions before we begin the second hearing,

23   Petitioner?

24      MR. HART:  No, Your Honor.

25      JUDGE DOUGAL:  Patent Owner?

<div align="center">36</div>

1          MR. LANDIS:  No, Your Honor.

2          JUDGE DOUGAL:  All right.  Thank you.  With that, Petitioner,

3     please proceed.

4          MR. HART:  Thanks very much, Your Honor.  As with the '079

5     patent that we just discussed, the '431 patent is also directed to controlling a

6     computing device using hand gestures and as with the '079 the grounds in

7     this proceeding all turn on Numazaki.  We have discussed Numazaki at some

8     length already so I will attempt to isolate just the unique issues that are

9     implicated by the prior proceeding involving the '431 patent so as not to

10    retread ground that we just covered on the '079 proceeding.

11         DX-3 summarizes the disputes in this proceeding.  The first two relate

12    to Numazaki's 8th embodiment whether it incorporate figure 2 and whether

13    figure 2 satisfies the claim language.  I'll briefly cover a few points on the

14    specific claim language but largely those are the same issues we covered

15    with the prior proceeding involving the '079 patent.

16         A unique issue in the '431 proceeding is claim 7's computer means.

17    Numazaki expressly teaches a software implementation that performs the

18    claimed function using nearly identical algorithms to those of the '431

19    patent.  As with many of the other disputes, the issue here is really Patent

20    Owner and its expert ignoring key evidence on this issue which I'll get into

21    in detail in a few slides.

22         The next unique issue in this proceeding involves cellular phones.

23    Claim 11 recites a means for transmitting which has been construed as at

24    least a cellular transceiver and claim 13 recites a cellular phone.  Petitioner's

25    expert explained that for a number of reasons Numazaki's 5th embodiment

37

1  portable TV telephone would have been understood by a POSITA to be a

2  cellular video phone.  Patent Owner and its expert ignore key components of

3  that analysis and assorted (phonetic) others.  In a final related argument

4  Patent Owner asked the Board to import voice call functionality into the

5  claims.  Patent Owner admits that the '431 patent is completely silent on

6  voice call functionality but nonetheless demands express teachings of voice

7  call functionality from the prior art.  The final point in DX-3 is the

8  jurisdiction question.  As with the other proceeding I assume that has been

9  tabled by Patent Owner to be focused on in the Eastern District of Virginia

10  litigation.

11       The claim language in the disputed independent claims in the '431

12  patent is reproduced in DX-4.  As we see on DX-4, claims 1, 7 and 14 each

13  recite some form of imaging that captures movement of an object such as a

14  user's finger so that the user can perform device control through hand

15  gestures and as we saw in the '079 proceeding, we are relying on

16  Numazaki's 8th embodiment to satisfy those limitations.

17       DX-5.  Numazaki's 8th embodiment, as I mentioned in the prior

18  proceeding, has a number of different devices that implement the

19  information input generation apparatus that is the focus on the 8th

20  embodiment.  In the '431 proceeding specifically we're relying on figure 78,

21  the PDA-like portable device based on the fact that the claims in the '431

22  specifically require handheld devices.  Beyond the distinction and a laptop

23  and this handheld device, within Numazaki's 8th embodiment there are no

24  material differences.  Figure 78's handheld PDA includes a lighting unit just

25  like the laptop did and a photo detection sensor unit just like the laptop did.

38

1  So many of the arguments that we have been through with respect to the

2  '079 proceeding will apply here.

3      Scrolling down to DX-11.  This is the first slide where we get into the

4  claim language.  Again, as we went through in detail before Numazaki

5  teaches unit 102 that has two different optical sensors in it, each one of them

6  images a gesturing hand and the output of that unit 102 is used to determine

7  gestures, movement, position of that hand.

8      Claim 1(c) that I have pasted into DX-11 recites electro-optically

9  sensing light reflected from said at least one figure and determining from

10 said sensed light the movement of said finger.  Again, it is both unit 102 as a

11 whole and specifically sensor 109 within unit 102 that satisfies the claim

12 language.  In each case, you have electro-optical sensors that sense light

13 reflected from a gesturing hand and the output of the sensors, or

14 combinations of sensors is used to determine movement of said finger.

15     Patent Owner argued, as it did today, in its Patent Owner preliminary

16 response here that because Numazaki implements multiple sensors, the

17 timing and difference in functionalities that that falls outside of the claims.

18 The Board correctly rejected that narrow view of the claims at Institution, ID

19 page 17 as I note here in DX-11.

20     Now, I was not able to find any substantive critiques of Numazaki's

21 differencing with respect to claim 1(c) in Patent Owner's surreply.  It would

22 appear they are no longer advancing that argument that attempts to

23 distinguish Numazaki's figure 2 from at least claim 1.

24     Turning to DX-12.  Patent Owner does still dispute that the claim

25 language in claims 7 and 14, the other two independent claims as satisfied

39

1  by Numazaki's figure 2.  Again, these recite very similar claim languages 1.

2  Claim 7 recites a camera means for obtaining an image using reflective light

3  of at least one object and then analyzing said image to determine

4  information concerning a position or movement of said object.  14 is similar.

5  Camera viewing at least a portion of the body to provide image data

6  analyzing said image data to determine information concerning a user input

7  command.

8    As we discussed in the prior proceeding, it is Patent Owner's position

9  that these claims require the unaltered unprocessed output of one and only

10  one image sensor to detect gestures and to convert gestures into input

11  commands.  In its surreply at 5 it argued that it is not.  It has never been

12  Patent Owner's position that the analyzed image must be the direct product

13  of only one sensor but we see on the very next page, surreply at 6, Patent

14  Owner argues that claims 7 and 14 and not met because neither the image

15  from 109 nor the image from 110 is the same image that is later analyzed.  It

16  all boils down to whether the claims require the direct unaltered,

17  unprocessed output of one and only one sensor be directly analyzed to

18  determine a gesture.  They do not.

19    As the Board, turning to DX-13, as the Board correctly held at

20  Institution these claims are open ended.  A camera means based on the

21  current record encompasses one or more optical sensors.  An image in the

22  claims encompasses one or more images for the same reason.  Claim 7 uses

23  comprising to create an open ended claim and concerning the image

24  subtraction circuitry, the timing circuitry, it is not clear why this is not

25  within the meaning of the claimed computer means.  The Board got it

40

IPR      2021-00920      2021-00922
Patent   7,933,431 B2    8,553,079 B2

1  exactly right at Institution and Patent Owner provides no reason to depart

2  from that correct preliminary determination on whether Numazaki's unit 102

3  satisfies these imaging limitations.

4       On a related note, DX-14 Patent Owner is advancing the same

5  argument from claim 12 that it is advancing for the independent claims.

6  Claim 12 depends on 7 and adds in a light source for illuminating said

7  object. Patent Owner's argument is the same. It argues that because there is

8  no one optical sensor whose direct unaltered output is processed to

9  determine a gesture, claim 12 is also not satisfied.

10      Without rehashing too much ground, DX-15 summarizes Numazaki's

11 teaching. Numazaki's the camera captures an illuminated gesture, a second

12 camera to capture background information, differences them to improve the

13 fidelity of the image and then uses that result to determine a gesture. The

14 first camera is used to determine the gesture as is the second camera and an

15 image that is the product of both cameras is processed to detect gestures. All

16 of these features, functionalities, fidelity improvement features that are a

17 part of Numazaki's figure 2 are well within the scope of all independent

18 claims in the '431 patent.

19      Turning to the first truly unique issue in the '431 proceeding. DX-11,

20 I'm sorry, DX-16 through DX-18 address claim 7's computer means. On

21 DX-16 I summarize the petition's case. The petition established that

22 Numazaki's featured data generation unit implements an algorithm that is

23 nearly identical to that described in the '431 patent and associated with the

24 claim function. Dr. Bederson compared the disclosed algorithms and

25 concluded that Numazaki's processor implements the same or at least an

41

1  equivalent algorithm to that in the '431 patent.

2      Now, Patent Owner's response did not dispute the similarities

3  between those algorithms.  Instead it argues that Numazaki exclusively

4  teaches that feature data generation unit is individual specialized units and

5  does not teach that it can be implemented as a program computer processor.

6  Yet, Patent Owner is just wrong about Numazaki's teachings.

7      As we see on DX-16 Numazaki expressly states it is possible to

8  realize the operation of the feature data generation unit in a form of

9  software.  It has an express teaching that the specific unit relied upon by the

10  petition can be implemented in software.

11      Turning to DX-17.  Dr. Bederson elaborated on the theory in his

12  supplemental declaration.  He explained that Numazaki discloses a software

13  implementation, a hardware implementation and a combination of hardware

14  and software and he explained that a POSITA would have been motivated to

15  implement the software version for a few reasons.

16      No. 1, the functionality performed by that unit is particularly well

17  suited to a software implementation.  No. 2, flow charts in Numazaki's

18  figure 13, 14 and 15 guide the software implementation and there is no

19  similar guidance for how to implement the hardware implementation and

20  finally, Numazaki expressly teaches that software implementations have an

21  additional benefit of being easily distributed across devices.

22      So three reasons why Dr. Bederson concludes the software

23  implementation is the right implementation for this particular unit and why a

24  POSITA would have been implemented to implement the software version.

25      In DX-18 Patent Owner's surreply again ignores key evidence here.

1   Patent Owner failed to even acknowledge Dr. Bederson's discussion of

2   Numazaki's flow charts that guide the software implementation.

3   Accordingly, that opinion is undisputed on this record.  Patent Owner does

4   address Dr. Bederson's point regarding the ease of distribution with software

5   but Patent Owner focuses entirely on whether Numazaki's figure 78 PDA

6   has a floppy drive or not.  It did not engage on the main point that software

7   implementations are easier to distribute across devices regardless of the

8   means with which that software is distributed.  Because Patent Owner did

9   not engage that broader point it should also be considered undisputed.

10       DX-19 through 27, now that sounds like a lot, address the final

11  substantive dispute between the parties related to claims 11 and 13 and their

12  limitations directed to cellular phones.

13       DX-20, the petition relied on Numazaki's 5th embodiment as teaching

14  a cellular video phone that a POSITA would understand, I'm sorry, as

15  teaching a device that a POSITA would understand as a cellular video

16  phone.  The 5th embodiment in Numazaki describes a portable TV

17  telephone.  The goal of the 5th embodiment is to support video conferencing

18  functionality on such a device by significantly reducing the overall

19  bandwidth required for the video stream.

20       The next few slides walk through Dr. Bederson's analysis of that 5th

21  embodiment and why he concludes that a POSITA would understand the 5th

22  embodiment portable TV telephone is in fact a cellular video phone.

23       In DX-21 Dr. Bederson introduces this concept and explains that a

24  POSITA would understand Numazaki's video conference telephone was a

25  cellular phone citing extrinsic evidence from the New York Times

43

1  establishing that there were commercial cellular video phones entering the

2  market at the time.

3       In support, Dr. Bederson in DX-22, this is from his original

4  declaration paragraph 60, explained that the goal of lowering bandwidth in

5  Numazaki's 5th embodiment was a concern specifically applicable to

6  cellular phones which at the time were plagued by expensive and bandwidth

7  limited wireless connections.

8       In DX-23, Dr. Bederson elaborated in that same paragraph 60 in his

9  original declaration.  He admitted that cellular video phones were not

10 prevalent in 1999 but he noted that a POSITA would have known

11 researchers were actively working on such devices.  In support he cited that

12 New York Times article from 1999 which discussed upcoming cellular

13 video phones from Kyocera.

14      From two key facts Dr. Bederson concluded that Numazaki's 5th

15 embodiment was describing a cellular video phone.  First, the New York

16 Times article evidenced that researchers were actively working on bringing

17 cellular video phones to market and second, that Numazaki's portable TV

18 telephones specifically sought to solve then existing problems with cellular

19 phone communications, namely limited bandwidth and expense.  From those

20 two points Dr. Bederson concluded that a POSITA would have understood

21 Numazaki's portable TV telephone was in fact a cellular phone.

22      Turning to DX-24 –

23      JUDGE DOUGAL:  So counsel.

24      MR. HART:  Yes, Your Honor.

25      JUDGE DOUGAL:  This is Judge Dougal.  So a couple of questions

44

IPR      2021-00920      2021-00922
Patent  7,933,431 B2    8,553,079 B2

1   on that.  So Patent Owner agued I believe that this article came out after the

2   priority date of the patent, the '431 patent which, you know -- so Numazaki

3   was filed in '97 so I guess I'm not totally sure how this document, you

4   know, that's not prior art to the patent but obviously still evidence is that,

5   yes, your point about people had to be have been researching, right, cell

6   phones or video phones, you know, at least at that time that the article came

7   out.  I guess I'm not sure how that supports your position that one of skill in

8   the art would understand that Numazaki's TV phone was the cell phone.

9   You're muted, sorry.

10      MR. HART:  Thank you.  I'll get used to this new Zoom world we're

11  living in someday.  Yes, you're correct that Numazaki's disclosure predated

12  the New York Times article by a couple of years.  But as Dr. Bederson

13  explained, the New York Times article -- and as you recognized -- the New

14  York Times article is not being relied on to combine its commercial cellular

15  video phone system with Numazaki in any way.  It's just evidence that

16  researchers, POSITAs at the time were actively working on solving the

17  problems necessary to bring cellular video phones to market and the fact that

18  the New York Times article shows there was a soon to be released cellular

19  video phone from Kyocera evidences that those problems had been worked

20  on for some period of time prior to 1999 and that is really the core of Dr.

21  Bederson's argument with respect to the New York Times article.  The New

22  York Times tells us researchers were researching leading up to 1999 in order

23  to solve the problems necessary to bring cellular video phones to market.

24      The second point is Numazaki's specific teachings.  He recognized

25  that cellular networks at the time were particularly plagued with low

45

IPR      2021-00920      2021-00922
Patent  7,933,431 B2    8,553,079 B2

1    bandwidth and high cost.  The fact that Numazaki's portable TV telephone

2    embodiment was specifically trying to solve those problems by reducing the

3    bandwidth required for a video conference by up to 100 times led him to

4    conclude that this was technology that targeted portable TV telephones using

5    cellular technology.

6          Now there is no alternative theory here on what the portable TV

7    telephone would have used other than cellular technology.  Dr. Bederson's

8    analysis of the existing record stands alone.  He is the only one that has set

9    forth the theory as to what specific wireless technology was contemplated by

10   Numazaki in its 5th embodiment portable TV telephone.  Does that

11   generally answer your question, Your Honor?

12         JUDGE DOUGAL:  Yes.  Thank you.

13         MR. HART:  Sure.  In DX-24 we see Patent Owner's primary

14   response to this case that the petition has set forth.  They don't dispute that

15   Numazaki teaches a portable TV telephone.  They don't dispute that the 5th

16   embodiment seeks to lower communication costs for that device.  They

17   don't dispute that lower communication costs was a particular concern for

18   cellular communications at the time or that researchers were actively

19   working to bring video cellular phones to the market as evidenced by the

20   New York Times article.  Instead, Patent Owner and its expert argue that the

21   specific cellular video phone in Kyocera discussed in the New York Times

22   article was too slow to support Numazaki's video conferencing

23   functionality.  They point out that Numazaki itself identifies a video screen

24   that is 30 frames per second and Kyocera's phone discussed in the New

25   York Times article can only support 2 frames per second.

46

IPR     2021-00920     2021-00922
Patent  7,933,431 B2   8,553,079 B2

1    As I just kind of walk through in response to Your Honor's question,

2    that's really beside the point. Dr. Bederson did not argue that Numazaki's

3    system could have been supported by any specific commercial system

4    including Kyocera's. Instead he identified that Kyocera's commercial

5    system as evidence that researchers were working to make cellular video

6    phones commercially viable. They were solving the problems leading up to

7    1999 to arrive at a situation in 1999 where these phones were being released

8    to consumers. Second, on the speed, the 30 frames per second versus 2

9    frames per second Patent Owner and its expert are just wrong.

10    Turning to DX-25. Dr. Bederson explained in his supplemental

11    declaration that Numazaki's bandwidth reduction process sought to reduce

12    the video by up to 100 times to make the video screen smaller by 100 X.

13    Applying that video frame reduction to Numazaki's video stream it was like

14    these 30 frames per second would have required only 15 percent of the

15    bandwidth offered by Kyocera's commercial system.

16    Now turning to DX-26. Patent Owner did not say much on this point

17    in its surreply and elected not to depose Dr. Bederson in response to his

18    supplemental declaration. Instead it advanced unsupported attorney

19    argument that Numazaki's video reduction process may not actually reduce

20    the overall bandwidth but there's no facts to support this. Patent Owner's

21    expert did not address it. Patent Owner did not elaborate on how reducing

22    video frames to one hundredth the original size would have no impact on the

23    overall bandwidth and that's simply a technically illogical conclusion to

24    reach.

25    In DX-27 I address Patent Owner's last attempt to exclude

47

IPR      2021-00920      2021-00922
Patent   7,933,431 B2    8,553,079 B2

1   Numazaki's teachings for the cellular phone limitations.  Patent Owner

2   asked the Board to import voice call capabilities into these claims.  Patent

3   Owner then argues that because Numazaki fails to expressly describe

4   placing or receiving voice calls, it cannot satisfy the claimed cellular phone

5   but Patent Owner concedes that there is no discussion whatsoever of voice

6   calls in the '431 patent.  The '431 patent focuses entirely on data

7   communications like Numazaki.  Accordingly, Patent Owner demands more

8   of the prior art that its own patent.  It argues that such voice call

9   functionality should be considered inherent in the '431 patent's

10  identification of the software but if voice call functionality is inherent in the

11  '431's disclosure of a phone, it's also inherent in the prior art's disclosure of

12  the phone and Numazaki's portable TV telephone should satisfy any voice

13  call requirements for the same reasons that the '431 requires.  Given the

14  patent's silence on voice calls and the logical inconsistency in Patent

15  Owner's argument, the Board should decline to import voice call limitations

16  into these claims.

17      Unless Your Honors have any questions I will reserve the rest of my

18  time for rebuttal.

19      JUDGE DOUGAL:  Okay.  Thank you, Mr. Hart.  Mr. Landis, we'll

20  turn the time over to you.

21      MR. LANDIS:  Thank you, Your Honor.  Todd Landis again for

22  Patent Owner.  I'd like to start on Patent Owner's slide 8 and begin by

23  addressing claims 11 and 13 which is some of the last points that Petitioner

24  just argued to the Board dealing with means for transmitting and cellular

25  phone and I'd like to address first this issue of the timing of support for the

48

IPR     2021-00920     2021-00922
Patent  7,933,431 B2   8,553,079 B2

1   entirety of their position.

2       The entirety of their position is that one of skill in the art would have

3   read Numazaki and understood that the TV telephone was a cellular TV

4   telephone.  The entirety of their support for that position is the New York

5   Times article but you must judge Numazaki not in 1999 but 1997 and

6   perhaps 1996 when it was filed foreignly (phonetic).  You do not get to go

7   forward with what people learned in 1999 and then apply it backwards to

8   Numazaki.  That is hindsight and the Federal Circuit has said time and time

9   again that is not allowed.  When you are looking at prior art you can't use

10  hindsight to put things into the prior art and that is exactly what Dr.

11  Bederson and Petitioners are doing.

12      If we look at Patent Owner's slide 9, Petitioner concedes that

13  Numazaki does not expressly state that the TV telephone is a cellular phone.

14  In fact, Numazaki doesn't mention the word cellular at all, not once.  I heard

15  Petitioner's counsel say Numazaki recognized something about cellular and

16  he may have been misstating that and really wanted to mention Dr. Bederson

17  but Numazaki doesn't mention cellular.  They concede that.

18      Turning to slide 10.  Nothing in Numazaki teaches or suggests a

19  cellular transceiver or a cell phone or a cellular TV telephone.  There is

20  simply nothing in the disclosure that would do that and Numazaki certainly

21  doesn't teach a cell phone which is required by claim 13.  Doesn't teach it

22  anywhere.

23      JUDGE DOUGAL:  So counsel, I don't think there's any dispute,

24  right, that Numazaki doesn't say explicitly that the TV telephone is a cell

25  phone.  So Petitioner relies on their expert and I'd like to hear what you have

49

1   to say, you know, as far as whether you have evidence to disagree with this

2   or what your thoughts are on this.  Their expert, Dr. Bederson, says that --

3   and this is paragraph 60 of his declaration which is Exhibit 1008.  He says,

4   he admits Numazaki does not expressly state that its TV telephone is a

5   cellular phone.  He says a person of skill in the art would have understood

6   that Numazaki's focus on lower communication costs is a concern

7   applicable to cellular phones indeed, and then he goes on and talks about the

8   costs and concerns that Numazaki has and says that these were more

9   applicable to cell phones and would be less -- his statement is would be less

10   valuable to other wireless connections such as Wi-Fi or wired connections

11   which do not share the same data transfer cost concerns.  So it seems like

12   that's Petitioner's main support I guess in addition to maybe that article for

13   why one of skill in the art would understand Numazaki to be talking about

14   cell phones.  So what is your response to essentially evidence against this

15   testimony?

16         MR. LANDIS:  Well, my first response, Your Honor, is if you look at

17   the entirety of what you just read it is nothing but their expert saying this is

18   what would have been known at the time of Numazaki without any support.

19   He has no support for that.  The only support he has is that New York Times

20   article from 1999 and it doesn't say anything.  It's seven pages long and it

21   doesn't say anything about what was occurring in 1997 or that Wi-Fi didn't

22   have the same bandwidth problems in 1997 or that wire transmissions didn't

23   have the same bandwidth problems in 1997.  It is silent on this issue and Dr.

24   Bederson has no further support and so these are just, again, just like the last

25   case naked conjecture on his part without any evidence and it's their burden,

1   it's not our burden, it's their burden to show that in 1997 the teachings of

2   Numazaki would have led one to understand that a TV telephone being

3   referenced there was using cellular connections.  He has no support for that

4   at all.

5           And, again, if I heard your question correctly there are other wireless

6   ways to do it that also have bandwidth concerns.  So why is the TV

7   telephone here necessarily cellular or even including cellular?  Wi-Fi would

8   have had bandwidth concerns at the same time the same way so there's lots

9   of things and we have no evidence in this record that in 1997 there was

10  something that would have made a person understand TV telephone to be a

11  cellular phone and I think in the paragraph you read, paragraph 60, Dr.

12  Bederson even concedes that Wi-Fi had bandwidth issues.

13          So why is it cellular?  This is an expert taking hindsight, taking an

14  article from 1999 and inserting it into a reference.  That is what's happening

15  here because there is no other evidence that Numazaki was referencing

16  anything cellular.  Nothing but this 1999 article.  That's it, and it's

17  completely hindsight.

18          If we look at Patent Owner's slide 17 this is the article itself.  Again,

19  dated July 27, 1999, and interestingly enough neither Dr. Bederson nor

20  Petitioner cites to anything specific within this article, they just reference the

21  article.  Nothing specific in it because there is nothing specific from the

22  1997 timeframe, the time of Numazaki which is where you have to judge

23  Numazaki.  You don't get to judge it in 1999 and all the things that may

24  have been learned in the three years since Numazaki, you have to judge it in

25  1997.

51

1       If we look at slide 18 I think this point is a major point here about

2   what was being taught in that article and what was being taught in

3   Numazaki.  Numazaki is talking about having 30 frames per second, 30

4   times per second, 30 frames per second.  The article, even if you give is

5   consideration, is admitting that video phones in 1999 could only do two

6   frames per second and I heard them discuss the bandwidth but I don't see

7   anything in Numazaki that says getting the 30 frames per second wasn't

8   their bandwidth reduction.  What they're trying to do is to say, well, they

9   have 33 frames per second and bandwidth reduction, but Numazaki doesn't

10   teach that you're reducing the 30 frames per second.  That's not taught.

11   Again, that's just attorney argument, something that's not in Numazaki and

12   the only evidence on the record actually shows that Numazaki wasn't

13   teaching a cellular video phone because even cellular video phones of three

14   years later couldn't do what Numazaki is talking about.

15       There simply isn't any evidence in this record, Your Honor.  Dr.

16   Bederson is just -- it's just naked allegations and our expert, and I don't have

17   the specific citations, but our expert did counter these points in his

18   declaration, did counter why Numazaki doesn't teach a cellular phone or a

19   cellular transceiver for Petitioner's construction and I'll try to get those

20   citations for Your Honor while I'm making my argument.

21       And so for claims 11 and 13, and especially 13 where it's a cell hone,

22   there shouldn't be any dispute that those claims are allowable and are not

23   rendered obvious by Numazaki and Dr. Bederson.  There simply isn't any

24   teaching of the means for transmitting or a cell phone as those terms have

25   been construed by either of the parties.

52

IPR        2021-00920        2021-00922
Patent   7,933,431 B2     8,553,079 B2

1        Moving on to slide 19.  Unless Your Honor -- before I move on, do

2    Your Honors have any further questions about claims 11 and 13?  Moving

3    on to slide 19.  I'll start discussing independent claims 1, 7 and 14 which all

4    are very similar to each other.  I'm going to try to skip through some of this

5    because we've talked a lot about it and go to slide 23.

6        So in slide 23 we have claim 7 which has a camera means associated

7    with said housing for obtaining an image using reflected light of at least one

8    object positioned by the user operating said object.  So here the camera has

9    to actually obtain something, it has to obtain it.

10        The -- and I know I've addressed this point but I just need to

11    emphasize it here -- the image that gets analyzed in Numazaki isn't obtained

12    by a camera, it's created and I heard counsel in the last hearing argue about

13    the difference between capture and created and maybe we're going to hear

14    that same argument about obtained and created, but there is a difference

15    between obtaining something and creating something and the image that's

16    analyzed in Numazaki is created.  It is not captured by a camera, whatever

17    they want to call the camera.  It's not.

18        On slide 24 the support in the petition for this position is seen here,

19    column 52, lines 8 through 4.  But here again what's being talked about in

20    here is a photo detection sensor unit and I still haven't heard Petitioner

21    explain what that photo detection sensor unit is and what's interesting about

22    the terminology that's used here is it doesn't say photo detection sensor units

23    and figure 2 has two photo detection units.  It says photo detection sensor

24    units.

25        So what is it?  Because the other thing has two and if the window only

53

1 allows for one how is it the entirety of figure 2? What is it? I still haven't

2 heard an explanation for the Board of what that is because Numazaki doesn't

3 tell us. You have to speculate. That's the only way you get to Petitioner's

4 conclusion is through pure speculation.

5      If we look at slide 25 this again is talking about the analysis and it is

6 the computer means that has to do this analysis of an image that is captured,

7 that is obtained by the camera. It's a set image; right? A set image, the

8 image obtained by the camera. Again, there's no analysis of any image that

9 comes off either of the photo detection units. That's the only images that are

10 obtained in Numazaki, the only thing that ever gets analyzed is a created

11 image and in fact Numazaki refers to that created image as a separate thing.

12 Gives it a separate name. It doesn't try to say it's the other images. It gives

13 it an entirely separate name to discuss what's going to happen to it later on.

14      I'm trying not to rehash, Your Honors, so I'm just skipping through

15 some of my slides in the interest of time. What I'd like to do is address

16 some of the points from Petitioner's slides real quick and the first slide I'd

17 like to look at is DX-15, and I'd just like to point out on DX-15 which is the

18 lower set of bullet points is they make this statement the first camera is used

19 to determine a gesture. Well, that's not in these claims, the used part. You

20 have to obtain an image and analyze the image. That's what's in the claims.

21 What they're trying to do is gloss over the claim language and make it into

22 something it's not. It's not just used, it's obtained and analyzed/

23      And if we could look at DX-22. Again, this is just going back to Dr.

24 Bederson and the goals. This lower communication costs, there's no

25 evidence in the record that that was actually something that was going on at

54

IPR      2021-00920      2021-00922
Patent  7,933,431 B2    8,553,079 B2

1   the time.  There's no evidence in the record of that.

2         Unless Your Honors have any further questions, that's all I have.

3         JUDGE DOUGAL:  Okay.  Thank you, Mr. Landis.  Mr. Hart, your

4   rebuttal.

5         MR. HART:  Thanks very much, Your Honor.  Just a few quick

6   points.  The first relates to the cellular phone issue.  Your Honor asked a

7   pointed question what evidence has Patent Owner presented in this case that

8   rebuts Dr. Bederson's analysis of Numazaki's 5th embodiment and its

9   conclusion that the portable TV telephone is in fact a cell phone.  Patent

10  Owner has identified nothing.  Patent Owner did not identify any evidence in

11  the record of an alternative wireless technology that Numazaki may have

12  been contemplating for its portable TV telephone.  Mr. Occhiogrosso, as I

13  mentioned earlier, did not engage the issue and did not opine that Numazaki

14  was describing any specific technology other than cellular.  On this record

15  Dr. Bederson is the only expert who has analyzed the full record and who

16  has opined as to the specific technology Numazaki was contemplating with

17  its 5th embodiment.  That is cellular technology.  Portable TV telephone

18  according to Dr. Bederson is a cellular phone based on all the evidence

19  we've hashed through in today's hearing.

20        Patent Owner made a second argument regarding the cellular phone

21  issue, specifically the bandwidth reduction.  He accused us of relying on

22  solely attorney argument for the point that Numazaki's bandwidth reduction

23  would have resulted in a system that could be used on Kyocera's

24  commercial cell phone.  That is not attorney argument.  As I walked through

25  in DX-25 citing paragraph 13 of Dr. Bederson's supplemental declaration

55

IPR      2021-00920      2021-00922
Patent  7,933,431 B2     8,553,079 B2

1    Exhibit 1017, Dr. Bederson walked through a full analysis that explained

2    how Numazaki's 5th embodiment bandwidth reduction process would have

3    taken its 30 frames per second video feed and decreased it down to a size

4    that would have been supported with only a small portion of Kyocera's

5    cellular video phone network.

6          The final point relates to the camera, to the imaging and specifically

7    Numazaki's unit 102.  We covered a lot of this in the first proceeding today.

8    Today Patent Owner in the second proceeding just a few moments ago,

9    Patent Owner put a slightly different spin on the argument.  He said the

10   camera has to obtain something and the image that gets analyzed by

11   Numazaki isn't obtained, it's created.  Again, Patent Owner has not set forth

12   this argument in its papers in this proceeding prior to today.  No expert has

13   opined on the distinction between creating and obtaining.  It strikes me that

14   Patent Owner's argument seeks to exclude any sort of processing within a

15   camera.

16         Just as a refresher, unit 102 uses sensor 110 to capture unilluminated

17   background information so that background information can be subtracted

18   from the image captured by the sensor 109.  Yes, there is processing

19   involved but the resulting image that comes out of the differencing

20   component 111 captures all of the illuminated gesture information that was

21   obtained by sensor 109.  The fact that the unit 102 performs processing to

22   remove information it does not need from the image captured by sensor 109

23   does not mean that that image is not still the result of the electro-optical

24   sensor 109.

25         That is how this works.  You're removing extraneous information

56

1   from one image to produce a more refined better image that still reflects

2   what sensor 109 captured.  Under Patent Owner's argument, any sort of

3   processing of the light that is captured through a camera lens would kick that

4   technology outside the scope of these claims because any processing

5   necessarily turns into a creating process and according to Patent Owner

6   creating an image is different than obtaining.  The claims only cover the

7   latter, not the former.  I don't think that's actually what Patent Owner is

8   arguing here.  Certainly it has not argued that in its papers that any

9   processing whatsoever within a digital camera is excluded by the claims but

10  I think that is the logical conclusion of Patent Owner's argument that we're

11  hearing today.

12      If there are no questions from Your Honors, I have nothing further in

13  this proceeding.

14      JUDGE DOUGAL:  All right.  Thank you, Mr. Hart, and Mr. Landis.

15      MR. LANDIS:  A few points, Your Honor.  First of all, just so the

16  record is clear.  Our expert, Mr. Occhiogrosso, at paragraphs 77 through 80

17  and 86 through 91 discusses the cellular phone issues at length and why

18  Numazaki does not teach them.  So we have it on the record.  There is

19  evidence on the record from our expert as to why his opinions are it doesn't

20  teach that and so what you have in the record is an expert who says it

21  doesn't teach it for these various reasons and an expert who says it does

22  teach it, but only one party has the burden here and that's Petitioner, not

23  Patent Owner.  They have the burden to prove that it is and other than the

24  naked opinions of their expert which are countered by the opinions of our

25  expert, they have no evidence that in 1997 anyone would have thought that a

1   TV telephone was a cellular video phone.  They have nothing and it's their

2   burden.

3       I keep hearing Petitioner throughout the day, both the proceedings,

4   say we didn't come forth with an alternative.  We didn't do this.  We don't

5   have a burden.  Patent Owner doesn't have a burden here.  It's Petitioner's

6   burden to show it and they simply have no evidence.  You have two experts

7   with battling opinions about what would have been known to one of skill at

8   the time of Numazaki and that's important, at the time of Numazaki what

9   one of skill would have understood TV telephone to mean and other than

10  that, Petitioner has given you nothing else except for an article from three

11  years later which is how their expert gets to this conclusion, through

12  completely hindsight bias -- I need it, I found something, therefore I found it

13  -- that's what's going on.  Hindsight bias.

14      The other thing I wanted to address is this notion of processing.  There

15  is a difference between taking an image that's obtained by a camera and

16  doing something to that image in terms of the image itself.  There is a

17  difference between that and creating an entirely new image.  That is what

18  Numazaki does.  There can't be a dispute about that.  Numazaki explicitly

19  calls it a new image.  It's an entirely new image and that's what is being

20  analyzed.  It's a created image.  Numazaki never says how much of one

21  image or the other image is being used or what is being cut out or anything

22  along those lines.  It's an entirely new image.

23      And one part that I forgot to address earlier.  I wanted to give Your

24  Honors the cite for In re Varma.  So for the record it is 816 F.3d 1352 and

25  Varma applies here as well.  I heard counsel talk about the camera and,

58

1  while yes, here again you have a camera, there's functionality that goes with

2  that camera so even if you have two cameras each of those cameras still has

3  to do what's described in the claims in order to be a camera of the claim.

4  That's what In re Varma stands for.

5      Unless Your Honors have any questions for me, that's all I have for

6  this proceeding.

7      JUDGE DOUGAL:  All right.  Thank you.  We appreciate your work

8  in preparing for these hearings and for your explanations that you have given

9  us today.  We'll take all of that under advisement and with that, this

10  concludes our hearings for today.

11      MR. LANDIS:  Your Honor, before we go off the record may I just

12  add one point real quick?  I know that we have had the transcript carried

13  through both proceedings today and counsel for Petitioner can chime in on

14  this as well, but I think tomorrow's proceedings are going to cover a lot of

15  the same ground and I'm wondering whether it makes sense for the Board

16  and for us to have these carried through to those proceedings as well just

17  because I think we're going to be rehashing a lot of things again tomorrow.

18      JUDGE DOUGAL;  I think, yes, I totally understand your point.  At

19  the same time the difficulty is although I am on those panels, we have a

20  different panel with two other judges and so we can simply put these, but I

21  think it would be to your benefit to rehash these with the entire panel.

22      MR. LANDIS:  It's a fair point, Your Honor.  Thank you.

23      JUDGE DOUGAL:  Okay.  Any other questions or issues?

24      JUDGE TURNER:  This is Judge Turner.  Just let me make one point

25  about the hearing tomorrow.  I think we certainly, the Board could enter

59

IPR     2021-00920     2021-00922
Patent  7,933,431 B2     8,553,079 B2

1   these in as 3001 exhibits in the related cases if need be if that's something

2   that's desired so that it's, you know, we want to refer to them in that way but

3   I agree, I think the change in panel makes it a little hard to -- that everything

4   is going to be sympatico.

5         JUDGE DOUGAL:  And with that, we can, you know, you can hold

6   off on making that decision if either party would like us to enter those in the

7   other cases, you know, after those hearings you can make that known or

8   make that request at that time, that'd be fine.

9         MR. LANDIS:  I think what might be best is that I'll confer with

10   Petitioner's counsel and that we can get back to the Board on that.

11         JUDGE DOUGAL:  Perfect.  Thank you.  Okay.  So that concludes

12   the hearing.

13         (Whereupon, at 3:17 p.m., the oral hearing was concluded.)

60

| IPR | 2021-00920 | 2021-00922 |
|-----|------------|------------|
| Patent | 7,933,431 B2 | 8,553,079 B2 |

PETITIONER:

Adam P. Seitz
Paul R. Hart
ERISE IP, P.A.
adam.seitz@eriseip.com
paul.hart@eriseip.com

PATENT OWNER:

Todd E. Landis
John Wittenzellner
WILLIAMS SIMONS & LANDIS PLLC
tlandis@wsltrial.com
johnw@wsltrial.com

61



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/834,281 | 07/12/2010 | Timothy R. Pryor | P06410US06/DEJ | 8202 |

881          7590          11/16/2010
STITES & HARBISON PLLC
1199 NORTH FAIRFAX STREET
SUITE 900
ALEXANDRIA, VA 22314

| EXAMINER |
|---|
| LU, TOM Y |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2624 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 11/16/2010 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

iplaw@stites.com

| | Application No. | Applicant(s) |
|---|---|---|
| **Office Action Summary** | 12/834,281 | PRYOR, TIMOTHY R. |
| | Examiner | Art Unit | |
| | Tom Y. Lu | 2624 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☐ Responsive to communication(s) filed on _____.

2a)☐ This action is **FINAL**.    2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) <u>1-31</u> is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☒ Claim(s) <u>1-6 and 14-31</u> is/are allowed.

6)☒ Claim(s) <u>7-13</u> is/are rejected.

7)☒ Claim(s) <u>14</u> is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☒ The drawing(s) filed on <u>12 July 2010</u> is/are:  a)☒ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All   b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____.

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☐ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date _____.

4)☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .

5)☐ Notice of Informal Patent Application

6)☐ Other: _____.

Application/Control Number: 12/834,281                                             Page 2
Art Unit: 2624

## DETAILED ACTION

### *Claim Rejections - 35 USC § 112*

The following is a quotation of the second paragraph of 35 U.S.C. 112:

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the
subject matter which the applicant regards as his invention.

Claim 7 recites the limitation "said device" in line 4. There is insufficient antecedent

basis for this limitation in the claim.

Claims 8-13 are rejected as being dependent upon claim 7.

### *Claim Objections*

Claim 14 is objected to because of the following informalities: line 7, typographical error

is found: "a users input command" should be "a user input command". Appropriate correction is

required.

### *Allowable Subject Matter*

Claims 1-6 and 14-31 are allowed.

Claim 7 would be allowable if rewritten or amended to overcome the rejection(s) under

35 U.S.C. 112, 2nd paragraph, set forth in this Office action.

Claims 8-13 would be allowable if rewritten to overcome the rejection(s) under 35

U.S.C. 112, 2nd paragraph, set forth in this Office action and to include all of the limitations of

the base claim and any intervening claims.

### *Conclusion*

The prior art made of record and not relied upon is considered pertinent to applicant's

disclosure.

U.S.P.N. 6,453,180 B1, see whole document.

Application/Control Number: 12/834,281                                    Page 3
Art Unit: 2624

Any inquiry concerning this communication or earlier communications from the
examiner should be directed to Tom Y. Lu whose telephone number is (571) 272-7393.  The
examiner can normally be reached on 9AM -5PM.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's
supervisor, Matthew Bella can be reached on (571) 272-7778.  The fax phone number for the
organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent
Application Information Retrieval (PAIR) system.  Status information for published applications
may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished
applications is available through Private PAIR only.  For more information about the PAIR
system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR
system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would
like assistance from a USPTO Customer Service Representative or access to the automated
information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/Tom Y Lu/
Primary Examiner, Art Unit 2624

| | | | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|---|
| ***Notice of References Cited*** | | | 12/834,281 | PRYOR, TIMOTHY R. |
| | | | Examiner | Art Unit | Page 1 of 1 |
| | | | Tom Y. Lu | 2624 | |

**U.S. PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-6,453,180 | 09-2002 | Endoh et al. | 455/567 |
| * | B | US-6,597,817 | 07-2003 | Silverbrook, Kia | 382/289 |
| * | C | US-6,342,917 | 01-2002 | Amenta, Annamaria B. | 348/207.1 |
| * | D | US-5,878,174 | 03-1999 | Stewart et al. | 382/293 |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN  PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                     **Notice of References Cited**                     Part of Paper No. 20101107



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

881        7590        12/22/2010

STITES & HARBISON PLLC
1199 NORTH FAIRFAX STREET
SUITE 900
ALEXANDRIA, VA 22314

| EXAMINER |
| --- |
| LU, TOM Y |

| ART UNIT | PAPER NUMBER |
| --- | --- |
| 2624 | |

DATE MAILED: 12/22/2010

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
| --- | --- | --- | --- | --- |
| 12/834,281 | 07/12/2010 | Timothy R. Pryor | P06410US06/DEJ | 8202 |

TITLE OF INVENTION: CAMERA BASED SENSING IN HANDHELD, MOBILE, GAMING, OR OTHER DEVICES

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
| --- | --- | --- | --- | --- | --- | --- |
| nonprovisional | YES | $755 | $300 | $0 | $1055 | 03/22/2011 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED.** SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.

**HOW TO REPLY TO THIS NOTICE:**

I. Review the SMALL ENTITY status shown above.

If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

A. If the status is the same, pay the TOTAL FEE(S) DUE shown above.

B. If the status above is to be removed, check box 5b on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and twice the amount of the ISSUE FEE shown above, or

If the SMALL ENTITY is shown as NO:

A. Pay TOTAL FEE(S) DUE shown above, or

B. If applicant claimed SMALL ENTITY status before, or is now claiming SMALL ENTITY status, check box 5a on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and 1/2 the ISSUE FEE shown above.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

PTOL-85  (Rev. 08/07) Approved for use through 08/31/2010.

IPR2021-00920
Apple EX1002 Page 100

# PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to:** <u>Mail</u>    Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450
**or <u>Fax</u>    (571)-273-2885**

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

881        7590        12/22/2010

STITES & HARBISON PLLC
1199 NORTH FAIRFAX STREET
SUITE 900
ALEXANDRIA, VA 22314

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**

I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/834,281 | 07/12/2010 | Timothy R. Pryor | P06410US06/DEJ | 8202 |

TITLE OF INVENTION: CAMERA BASED SENSING IN HANDHELD, MOBILE, GAMING, OR OTHER DEVICES

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | YES | $755 | $300 | $0 | $1055 | 03/22/2011 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| LU, TOM Y | 2624 | 382-103000 |

**1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).**

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

**2. For printing on the patent front page, list**

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

**3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT** (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE        (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) :   ☐ Individual   ☐ Corporation or other private group entity   ☐ Government

**4a. The following fee(s) are submitted:**

☐ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

**4b. Payment of Fee(s): (Please first reapply any previously paid issue fee shown above)**

☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

**5. Change in Entity Status** (from status indicated above)

☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.      ☐ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _____        Date _____

Typed or printed name _____        Registration No. _____

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85  (Rev. 08/07) Approved for use through 08/31/2010.        OMB 0651-0033        U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/834,281 | 07/12/2010 | Timothy R. Pryor | P06410US06/DEJ | 8202 |

881        7590        12/22/2010

STITES & HARBISON PLLC
1199 NORTH FAIRFAX STREET
SUITE 900
ALEXANDRIA, VA 22314

| EXAMINER |
|---|
| LU, TOM Y |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2624 | |

DATE MAILED: 12/22/2010

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment to date is 0 day(s). If the issue fee is paid on the date that is three months after the mailing date of this notice and the patent issues on the Tuesday before the date that is 28 weeks (six and a half months) after the mailing date of this notice, the Patent Term Adjustment will be 0 day(s).

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85  (Rev. 08/07) Approved for use through 08/31/2010.

IPR2021-00920
Apple EX1002 Page 102

| ***Notice of Allowability*** | **Application No.** | **Applicant(s)** |
|---|---|---|
| | 12/834,281 | PRYOR, TIMOTHY R. |
| | **Examiner** | **Art Unit** | |
| | Tom Y. Lu | 2624 | |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--**

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *reply filed 12/03/2010.*

2. ☒ The allowed claim(s) is/are *1-31.*

3. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All   b) ☐ Some*   c) ☐ None  of the:

       1. ☐ Certified copies of the priority documents have been received.

       2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

       3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

4. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached

       1) ☐ hereto or 2) ☐ to Paper No./Mail Date _____.

    (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)

2. ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3. ☐ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____

4. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

5. ☐ Notice of Informal Patent Application

6. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .

7. ☐ Examiner's Amendment/Comment

8. ☒ Examiner's Statement of Reasons for Allowance

9. ☐ Other _____.

/Tom Y Lu/
Primary Examiner, Art Unit 2624

IPR2021-00920
Apple EX1002 Page 103

Application/Control Number: 12/834,281                                          Page 2
Art Unit: 2624

## DETAILED ACTION

### Response to Amendment

The amendment and written response filed 12/03/2010 have been entered and considered.

Claims 7 and 14 have been amended.

Claims 1-31 are pending.

### Response to Arguments

Upon entry of the amendment, the rejection of claim 7 under 35 U.S.C. 112, 2nd paragraph has been withdrawn.

Upon entry of the amendment, the objection of claim 14 has been withdrawn.

### Allowable Subject Matter

Claims 1-31 are allowed.

The following is an examiner's statement of reasons for allowance:

Prior art of record, taken alone or in combination, fails to teach all the features in independent claims 1, 7 and 14.

Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee. Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

### Conclusion

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Tom Y. Lu whose telephone number is (571) 272-7393. The examiner can normally be reached on 9AM -5PM.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Matthew Bella can be reached on (571) 272-7778.  The fax phone number for the

organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent

Application Information Retrieval (PAIR) system.  Status information for published applications

may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished

applications is available through Private PAIR only.  For more information about the PAIR

system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR

system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would

like assistance from a USPTO Customer Service Representative or access to the automated

information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/Tom Y Lu/
Primary Examiner, Art Unit 2624

US006144366A

# United States Patent [19]

**Numazaki et al.**

[11] **Patent Number:** 6,144,366

[45] **Date of Patent:** Nov. 7, 2000

[54] **METHOD AND APPARATUS FOR GENERATING INFORMATION INPUT USING REFLECTED LIGHT IMAGE OF TARGET OBJECT**

[75] Inventors: **Shunichi Numazaki; Miwako Doi,** both of Kanagawa; **Akira Morishita,** Tokyo; **Naoko Umeki; Hiroki Miura,** both of Kanagawa, all of Japan

[73] Assignee: **Kabushiki Kaisha Toshiba,** Kawasaki, Japan

[21] Appl. No.: **08/953,667**

[22] Filed: **Oct. 17, 1997**

[30] **Foreign Application Priority Data**

Oct. 18, 1996 [JP] Japan ...................................... 8-275949
Jan. 31, 1997 [JP] Japan ...................................... 9-019397
Feb. 12, 1997 [JP] Japan ...................................... 9-027752

[51] Int. Cl.$^7$ .................................................. **G09G 5/08**
[52] U.S. Cl. .......................... **345/156;** 345/157; 345/158
[58] Field of Search ...................................... 345/158, 157, 345/156, 419, 425; 463/31, 32, 33, 36, 37; 250/200, 206.1, 208.1, 214 R

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,320,292 | 3/1982 | Oikawa et al. | 250/227 |
| 4,516,020 | 5/1985 | Simpson et al. | 250/214 L |
| 4,839,685 | 6/1989 | Ishiguro et al. | 354/403 |
| 4,841,349 | 6/1989 | Nakano | 357/30 |
| 4,956,794 | 9/1990 | Zeevi et al. | 364/559 |
| 5,243,182 | 9/1993 | Murata et al. | 250/222.1 |
| 5,297,061 | 3/1994 | Dementhon et al. | 364/559 |
| 5,323,174 | 6/1994 | Klapman et al. | 345/156 |
| 5,353,042 | 10/1994 | Klapman et al. | 345/156 |
| 5,423,554 | 6/1995 | Davis | 273/437 |
| 5,481,622 | 1/1996 | Gerhardt et al. | 382/103 |
| 5,627,565 | 5/1997 | Morishita | 345/158 |
| 5,686,942 | 11/1997 | Ball | 345/158 |
| 5,703,356 | 12/1997 | Bidiville et al. | 250/221 |
| 5,729,475 | 3/1998 | Romanik, Jr. | 364/559 |
| 5,801,704 | 9/1998 | Oohara et al. | 345/358 |
| 5,819,206 | 10/1998 | Horton et al. | 702/150 |
| 5,900,863 | 5/1999 | Numazaki | 345/158 |

*Primary Examiner*—William A. Cuchlinski, Jr.
*Assistant Examiner*—Marthe Y. Marc-Coleman
*Attorney, Agent, or Firm*—Oblon, Spivak, McClelland, Maier & Neustadt, P.C.

[57] **ABSTRACT**

A method and an apparatus for generating information input which are capable of realizing a direct command type information input scheme by which the gesture or the motion can be inputted easily. The apparatus has a timing signal generation unit for generating a timing signal; a lighting unit for emitting a light whose intensity vary in time, according to the timing signal generated by the timing signal generation unit; and a reflected light extraction unit having a sensor array for detecting a reflected light from a target object resulting from the light emitted by the lighting unit, in synchronization with the timing signal generated by the timing signal generation unit, so as to obtain a spatial intensity distribution of the reflected light in a form of a reflected light image indicative of an information input related to the target object, in separation from an external light that is illuminating the target object.

**96 Claims, 101 Drawing Sheets**



# FIG.1

U.S. Patent

Nov. 7, 2000

Sheet 2 of 101

6,144,366

FIG.2



PHOTO-DETECTION OPTICS

REFLECTED LIGHT EXTRACTION UNIT

102

107

106

1ST PHOTO-DETECTION UNIT — 109

111

DIFFERENCE CALCULATION UNIT

2ND PHOTO-DETECTION UNIT — 110

AMPLIFIER 113

A/D 114

MEMORY 115

FEATURE DATA GENERATION UNIT 103

LIGHTING UNIT

101

TIMING CONTROL UNIT — 112

Appx659

IPR2021-00920
Apple EX1003 Page 3



FIG.3



FIG.4

RESET

LIGHT

118

TRANSFER

SAMPLE 1

SAMPLE 2

121

124

122

123

119

120

ADDRESS LINE 127

125

VERTICAL
SIGNAL LINE
126

IPR2021-00920
Apple EX1003 Page 5

# FIG.5





# FIG.7



# FIG.8



**U.S. Patent**     Nov. 7, 2000     Sheet 9 of 101     **6,144,366**

# FIG.9





FIG.10

# FIG.11A



(a)                                                                (b)

# FIG.11B



(c)                                                                (d)

IPR2021-00920
Apple EX1003 Page 12

# FIG.12



CALCULATED
X-COORDINATE OF
CENTER OF GRAVITY
DOES NOT CHANGE

FINGER TIP
MOVEMENT

IPR2021-00920
Apple EX1003 Page 13



FIG.13

220 — PREPARE SEVERAL STRUCTURE ELEMENTS FOR STORING STICK SHAPED OBJECT CANDIDATES infoStick[n]

221 — ANY PIXEL SEQUENCE HAVING NO MORE THAN c CONSECUTIVE PIXELS WITH PIXEL VALUES ABOVE p FOUND BY HORIZONTAL LINE SCAN ?

NO (ONE LINE FINISHED)

222 — DELETE STICK SHAPED OBJECT CANDIDATE NOT UPDATED BY THIS ONE LINE infoStick[n].status→NOSTICK

223 — GO TO NEXT LINE

224 — IS IT CONNECTED WITH ANY OF STICK SHAPED OBJECT CANDIDATES UP TO PREVIOUS LINE?

YES

226 — UPDATE DATA OF THAT CANDIDATE infoStick[n].xstart[i] →X-COORDINATE OF START OF PIXEL SEQUENCE infoStick[n].xend[i] →X-COORDINATE OF END OF PIXEL SEQUENCE infoStick[n].length→+1 infoStick[n].status→EXTENDED

NO

225 — REGISTER NEW STICK SHAPED OBJECT CANDIDATE infoStick[n].xstart[0] →X-COORDINATE OF START OF PIXEL SEQUENCE infoStick[n].xend[0] →X-COORDINATE OF END OF PIXEL SEQUENCE infoStick[n].length→1 infoStick[n].status→EXTENDED

227 — LENGTH OF UPDATED STICK SHAPED OBJECT REACHED PRESCRIBED LENGTH? infoStick[n].length≧d

YES

228 — (A)

NO

# FIG.14

 ～229

CALCULATE TH
$$TH=(sum/max)^2 \times max$$
   sum:MEAN OF PIXEL VALUE SUMS PER LINE FOR
   1ST & 2ND LINES FROM TOP OF STICK SHAPED
   OBJECT (TOPMOST IS 0-TH LINE)
   max:MAXIMUM PIXEL VALUE IN 1ST & 2ND LINES    ～230

OBTAIN k & a $(0<a\leqq1)$ THAT SATISFY:
$$TH= \sum_{i=0}^{k-1} xsum[i]+a \cdot xsum[k]$$
WHERE xsum[i] IS PIXEL VALUE SUM OF
PARTIAL PIXEL SEQUENCE FOR i-TH LINE
OF STICK SHAPED OBJECT    ～231

MULTIPLY a WITH EACH PIXEL VALUE OF PARTIAL
PIXEL SEQUENCE FOR k-TH LINE    ～232

OBTAIN CENTER OF GRAVITY (xx, yy)
$$yy=\left[\sum_{i=0}^{k} xsum[i](infoStick[n].ystart+i)\right] \Big/ TH$$

$$xx=\left[\sum_{i=0}^{k} xpsum[i]\right] \Big/ TH$$

$$xpsum[i]= \sum_{j=infoStick[n].xstart[i]}^{infoStick[n],xend[i]} j \cdot P(j,infoStick[n].ystart+i)$$    ～233

FIG.15



AFTER FINDING PARTIAL PIXEL IN y=3 LINE & REGISTERING IT AS NEW STICK SHAPED OBJECT CANDIDATE

236

infoStick[0].ystart=3
infoStick[0].xstart[0]=6
infoStick[0].xend[0]=6
infoStick[0].length=1
infoStick[0].status=EXTENDED

AFTER SCAN IS FINISHED UP TO y=4 LINE

237

infoStick[0].ystart=3
infoStick[0].xstart[0]=6
infoStick[0].xstart[1]=5
infoStick[0].xend[0]=6
infoStick[0].xend[1]=7
infoStick[0].length=2
infoStick[0].status=EXTENDED

AFTER PARTIAL PIXEL IN MIDDLE OF y=5 LINE IS CONNECTED TO STICK SHAPED OBJECT CANDIDATE

235

238

infoStick[0].ystart=3
infoStick[0].xstart[0]=6
infoStick[0].xstart[1]=5
infoStick[0].xstart[2]=5
infoStick[0].xend[0]=6
infoStick[0].xend[1]=7
infoStick[0].xend[2]=7
infoStick[0].length=3
infoStick[0].status=EXTENDED

234

infoStick[n].ystart
Y-COORDINATE (LINE) AT WHICH STICK SHAPED OBJECT START

infoStick[n].xstart[i]
START OF X-COORDINATE IN i-TH LINE FROM TOP OF STICK SHAPED OBJECT

infoStick[n].xend[i]
END OF X-COORDINATE

infoStick[n].length
CURRENT NUMBER OF LINES (LENGTH IN VERTICAL DIRECTION)

infoStick[n].status
STICK:IT IS STICK SHAPED OBJECT CANDIDATE
NOSTICK:IT IS NOT STICK SHAPED OBJECT CANDIDATE
EXTENDED:IT IS UPDATED (EXTENDED) BY NEW LINE



FIG.16

AFTER SCAN OF y=2 LINE IS FINISHED
infoStick[0].ystart=2
infoStick[0].xstart[0]=3
infoStick[0].xend[0]=3
infoStick[0].length=1
infoStick[0].status=EXTENDED

AFTER SCAN OF y=3 LINE IS FINISHED
infoStick[0].ystart=2
infoStick[0].xstart[0]=3
infoStick[0].xend[0]=3
infoStick[0].length=1
infoStick[0].status=NOSTICK

infoStick[1].ystart=3
infoStick[1].xstart[0]=6
infoStick[1].xend[0]=6
infoStick[1].length=1
infoStick[1].status=EXTENDED

# FIG.17



# FIG.18



IPR2021-00920
Apple EX1003 Page 19



FIG.19

IPR2021-00920
Apple EX1003 Page 20



FIG.20



FIG.21



FIG.22



FIG.23

IPR2021-00920
Apple EX1003 Page 24



FIG.24

**U.S. Patent**　　　Nov. 7, 2000　　　Sheet 25 of 101　　　**6,144,366**

# FIG.25



# FIG.26

SHAPE INTERPRETATION RULES FOR POINTING

RULE -1:ONE RECTANGLE→POINTING
RULE -2:TWO RECTANGLES→TWO FINGER OPERATION
RULE -3:OTHERS→MOTION INPUT
$$\vdots$$

POINTING RULE
 VERTICAL & HORIZONTAL CHECK
  VERTICAL/HORIZONTAL≈1→OBJECT SELECT/MOVE FORWARD
  VERTICAL/HORIZONTAL<1→SLOPE CHECK-1
  VERTICAL/HORIZONTAL>1→SLOPE CHECK-2
 SLOPE CHECK-1
  SLOPE≈0 & CENTER OF GRAVITY RIGHT→ROTATION TO RIGHT
  SLOPE≈0 & CENTER OF GRAVITY LEFT→ROTATION TO LEFT
$$\vdots$$

 SLOPE CHECK-2
  SLOPE≈0 & CENTER OF GRAVITY UPPER→TURNING UPWARD
  SLOPE≈0 & CENTER OF GRAVITY LOWER
                              →TURNING DOWNWARD
$$\vdots$$

IPR2021-00920
Apple EX1003 Page 27



FIG.27



FIG.28

# FIG.29

SHAPE INTERPRETATION RULES FOR POWER ON/OFF

RULE -1:ONE RECTANGLE→POINTING
RULE -2:TWO RECTANGLES→TWO FINGERS
RULE -3:FIVE RECTANGLES→FIVE FINGERS
$$\vdots$$

POINTING RULE
   AREA CHECK
     AREA>> $\alpha$ →FIST
     AREA$\leq \alpha$ →NULL
$$\vdots$$

 COMMAND GENERATION
  FIVE FINGERS, FIST, TWO FINGERS→POWER OFF
  TWO FINGERS, FIST, FIVE FINGERS→POWER ON

IPR2021-00920
Apple EX1003 Page 30

# FIG.30





FIG.31

a)VIEWPOINT-1

b)VIEWPOINT-2

c)VIEWPOINT-3



FIG.32

# FIG.33

SHAPE INTERPRETATION RULES FOR
MOVING OBJECT PARALLAX

RULE -1:TWO RECTANGLES→FACE CHECK
RULE -2:OTHERS→NULL

FACE CHECK
  DISTANCE TO LARGER RECTANGLE>DISTANCE TO SMALLER
  RECTANGLE→VIEWPOINT CHECK
  OTHERS→NULL
VIEWPOINT CHECK
  L≠0→VIEWPOINT DIRECTION=arcsin((L-R)/L)
  L=0→VIEWPOINT DIRECTION=-90°

IPR2021-00920
Apple EX1003 Page 34



FIG.34



FIG.35

# FIG.36



# FIG.37

$$v=[(X_n, Y_n)-(X_{n-1}, Y_{n-1})]/M \cdot 30$$



# FIG.38

SWINGING  RANGE$(X_n-X_{n-1})/M \cdot 30$



SPEED$(Y_n-Y_{n-1})/M \cdot 30$

IPR2021-00920
Apple EX1003 Page 38

# FIG.39



FINGER AT TIME t      FINGER AT TIME t+1

IPR2021-00920
Apple EX1003 Page 39

# FIG.40



# FIG.41





FIG.42

IPR2021-00920
Apple EX1003 Page 42



FIG.43



FIG.44



FIG.45



FIG.46



FIG.47

# FIG.48

ORIGINAL
IMAGE

MASK







EXTRACTED
IMAGE

IPR2021-00920
Apple EX1003 Page 48



FIG.49



FIG.50

# FIG.51

BACKGROUND IMAGE          EXTRACTED IMAGE

 



COMPOSED IMAGE

# FIG.52



# FIG.53



# FIG.54





FIG.55

# FIG.56





FIG.57

FIG.58



# FIG.59



## FIG.60



# FIG.61



CORRECTED
RANGE
IMAGE

# FIG.62



# FIG.63



# FIG.64

| INPUT \ COORDINATE | 0 | 1 | 2 | | 4094 | 4095 |
|---|---|---|---|---|---|---|
| 0 | 255 | 255 | 255 | | 255 | 255 |
| 1 | 255 | 255 | 255 | | 255 | 255 |
| 2 | 255 | 255 | 255 | | 255 | 255 |
| 3 | 255 | 255 | 255 | | 255 | 255 |
| 4 | 255 | 255 | 255 | | 255 | 255 |
| 5 | 255 | 255 | 255 | | 255 | 255 |
| 6 | 255 | 255 | 255 | | 255 | 255 |
| 7 | 255 | 255 | 255 | | 255 | 255 |
| 8 | 255 | 255 | 255 | | 255 | 255 |
| | | | | | | |
| 99 | 39 | 37 | 40 | | 38 | 39 |
| 100 | 38 | 36 | 39 | | 37 | 38 |
| 101 | 38 | 36 | 39 | | 37 | 38 |
| 102 | 37 | 35 | 38 | | 36 | 37 |
| 103 | 37 | 35 | 38 | | 36 | 37 |
| 104 | 36 | 34 | 37 | | 35 | 36 |
| 105 | 36 | 34 | 37 | | 35 | 36 |
| 106 | 35 | 33 | 36 | | 34 | 35 |
| 107 | 35 | 33 | 36 | | 34 | 35 |
| 108 | 34 | 32 | 35 | | 34 | 34 |
| 109 | 34 | 32 | 35 | | 33 | 34 |
| | | | | | | |
| 247 | 1 | 0 | 2 | | 1 | 1 |
| 248 | 1 | 0 | 2 | | 1 | 1 |
| 249 | 1 | 0 | 2 | | 1 | 1 |
| 250 | 1 | 0 | 2 | | 1 | 1 |
| 251 | 1 | 0 | 2 | | 0 | 1 |
| 252 | 0 | 0 | 1 | | 0 | 0 |
| 253 | 0 | 0 | 1 | | 0 | 0 |
| 254 | 0 | 0 | 1 | | 0 | 0 |
| 255 | 0 | 0 | 1 | | 0 | 0 |

# FIG.65



# FIG.66

| INPUT / COORDINATE | 0 | 1 | 2 | | 4094 | 4095 |
|---|---|---|---|---|---|---|
| 0 | 255 | 255 | 255 | | 255 | 255 |
| 8 | 296 | 290 | 293 | | 298 | 296 |
| 16 | 191 | 187 | 188 | | 193 | 191 |
| 24 | 144 | 141 | 141 | | 146 | 144 |
| 32 | 116 | 114 | 113 | | 118 | 116 |
| 40 | 97 | 95 | 94 | | 99 | 97 |
| 48 | 83 | 82 | 80 | | 85 | 83 |
| 56 | 72 | 71 | 69 | | 74 | 72 |
| 64 | 64 | 62 | 61 | | 66 | 64 |
| 72 | 56 | 55 | 53 | | 58 | 56 |
| 80 | 50 | 49 | 47 | | 52 | 50 |
| 88 | 45 | 44 | 42 | | 47 | 45 |
| 96 | 40 | 39 | 37 | | 42 | 40 |
| 104 | 36 | 35 | 33 | | 38 | 36 |
| 112 | 32 | 32 | 29 | | 34 | 32 |
| 120 | 29 | 29 | 26 | | 31 | 29 |
| 128 | 26 | 26 | 23 | | 28 | 26 |
| 136 | 24 | 23 | 21 | | 26 | 24 |
| 144 | 21 | 21 | 18 | | 23 | 21 |
| 152 | 19 | 18 | 16 | | 21 | 19 |
| 160 | 17 | 16 | 14 | | 19 | 17 |
| 168 | 15 | 15 | 12 | | 17 | 15 |
| 176 | 13 | 13 | 10 | | 15 | 13 |
| 184 | 11 | 11 | 8 | | 13 | 11 |
| 192 | 10 | 10 | 7 | | 12 | 10 |
| 200 | 8 | 8 | 5 | | 10 | 8 |
| 208 | 7 | 7 | 4 | | 9 | 7 |
| 216 | 6 | 5 | 3 | | 8 | 6 |
| 224 | 4 | 4 | 1 | | 6 | 4 |
| 232 | 3 | 3 | 0 | | 5 | 3 |
| 240 | 2 | 2 | 0 | | 4 | 2 |
| 248 | 1 | 1 | 0 | | 3 | 1 |
| 255 | 0 | 0 | 0 | | 2 | 0 |

# FIG.67



# FIG.68



# FIG.69



# FIG.70



# FIG.71

PLEASE PLACE THE REFERENCE
PLATE AT DISTANCE OF 20cm.

CORRECTION
DATA
PRODUCTION

CANCEL

# FIG.72



# FIG.73



# FIG.74



# FIG.75



# FIG.76





FIG.77

# FIG.78



# FIG.79





FIG.80

Appx735        IPR2021-00920
Apple EX1003 Page 79



FIG.81



FIG.82

# FIG.83





FIG.84



FIG.85



FIG.86

(a)EXTERNAL LIGHT LEVEL

(b)EXTERNAL LIGHT SIGNALS CONVERTED INTO PULSES

(c)LIGHTING PULSE

(d)STORING OPERATION

FIG.87

(a)EXTERNAL LIGHT LEVEL

(b)EXTERNAL LIGHT SIGNALS CONVERTED INTO PULSES

(c)LIGHTING PULSE

(d)STORING OPERATION

IPR2021-00920
Apple EX1003 Page 86



FIG.88

Appx743    IPR2021-00920
Apple EX1003 Page 87



# FIG.90



# FIG.91



# FIG.92A



# FIG.92B



# FIG.93A



# FIG.93B





FIG.94

FIG.95



FIG.96

# FIG.97





FIG.98



FIG.99

(a) "STATE-1"
[a-1]LIGHTING PULSE
[a-2]STORING OPERATION

(b) "STATE-2"
[b-1]LIGHTING PULSE
[b-2]STORING OPERATION

(c) "STATE-3"
[c-1]LIGHTING PULSE
[c-2]STORING OPERATION



FIG.100



FIG.101

LINEAR AMPLIFIER VS. LOGARITHMIC AMPLIFIER

## FIG.102



## FIG.103



# FIG.104



# FIG.105
## PRIOR ART



6,144,366

**1**

# METHOD AND APPARATUS FOR GENERATING INFORMATION INPUT USING REFLECTED LIGHT IMAGE OF TARGET OBJECT

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to a method and an apparatus for generating information input in which information is extracted by obtaining a reflected light image of a target object.

### 2. Description of the Background Art

There are various input devices for computers, and among them, a mouse is widely used as one of the most popular input devices along with a keyboard. However, the mouse can only carry out manipulations such as a moving of a cursor and a selection from a menu, so that the mouse is only capable of playing a role of a two-dimensional pointing device at best. In other words, the mouse can only handle two-dimensional information, and it is difficult to select a thing with a depth aspect such as an object in a three-dimensional space. Also, in a case of producing the animation by using a computer, for example, it is difficult to give a natural motion to a character by means of manipulation information input operations using the input device like mouse.

Also, in the multi-modal field, there is a demand for a scheme that enables to handle a device in a form close to a natural human communication by inputting manipulation information such as a gesture like a hand action or a body motion and a posture, as a complement to the input information given by the input means such as speech input, keyboard, mouse, track ball, etc.

For this reason, in recent years, the three-dimensional pointing device for enabling the recognition of natural human gestures has been developed as one technique for enabling a variety of input operations in the multi-modal field and others by compensating the difficulties associated with the pointing in the three-dimensional space.

For example, there is a proposition of a three-dimensional pointing device as shown in FIG. **105**. This device has a ball shaped operation portion in a middle of its body, and ten keys arranged at a peripheral portion. This device has six degrees of freedom corresponding to six different ways for operating the ball shaped operation portion, that is, pushing a front part of it, pushing a central part of it, pushing a rear part of it, pulling it upward, rotating it to the right, and rotating it to the left.

By assigning appropriate roles to these six degrees of freedom, it is possible to control a position (x, y, z) and an orientation (x-axis, y-axis, z-axis) of a cursor in the three-dimensional space, or a position (x, y, z) and an orientation (x-axis, y-axis, z-axis) of a viewpoint with respect to the three-dimensional space.

However, this three-dimensional pointing device requires a considerable level of skills so that when this device is actually operated it is quite difficult to control a cursor or a viewpoint exactly as desired. For example, when one tries to rotate the ball to the left or right, a front part or a rear part of the ball can be pushed at the same time unintentionally, such that a cursor is moved or a viewpoint is shifted to a totally unexpected direction.

As oppose to such a three-dimensional pointing device, there are also input devices that use a hand action or a body motion, known by the names such as a data glove, a data

**2**

suit, and a cyber-glove. Among them, the data glove is a glove shaped device which has optical fibers on its surface. These optical fibers are provided up to finger joints so as to utilize a change of a light conduction due to a bending of a finger. By measuring an amount of light conduction, it is made possible to determine how much each finger joint is bent. A position of a hand itself in the three-dimensional space is measured by a magnetic sensor provided on the back of the hand.

As a result, when a command corresponding to a specific hand action is determined in advance, such as a pointing by an index finger indicates a forward move, for example, it is possible to realize an operation (called a walk-through) using the data glove that simulates a motion of walking about while variously changing a viewpoint within the three-dimensional space.

However, such a three-dimensional pointing device is associated with the following problems.

First of all, it is very expensive and therefore not suitable for home use.

Secondly, the recognition error is inevitable as an angle of the finger joint is to be measured. For example, suppose that a state of extending only the index finger while the other fingers are turned in is defined as a forward move command. Here, even when the index finger is extended it is rather unlikely for an angle of the second joint of the index finger to become exactly 180°, so that unless a margin is provided, it would be impossible to recognize this state except when the finger is completely extended.

Thirdly, the operator is required to wear the data glove so that a natural movement can be obstructed, and also it is necessary to calibrate the light conduction state in a state of opening the hand and a state of closing the hand every time the data glove is worn, so that it is not very convenient to use. Moreover, because of the use of the optical fibers, a problem like a broken fiber occurs during the continuous use so that it is very much an article of consumption.

In addition, despite of the fact that it is a very expensive and not easily handlable device, unless the size of the glove perfectly fits, it is difficult to recognize sophisticated hand actions because the light conduction state tends to deviate from the calibrated state during the use.

Because of such numerous problems associated with it, the data glove has not become as popular as originally expected despite of the fact that it was a device that triggered the VR (Virtual Reality) technology, and there is no significant reduction of its price so that there are many problems related to its convenience in use.

For this reason, there are some attempts which try to input a hand action or a body motion without requiring the operator to wear a special device such as the data glove. For example, there is a technique for recognizing a shape of the hand by analyzing dynamic images such as video images. However, to this end, there is a need to develop a technique for extracting a target image from the background image. Namely, in a case of recognizing a hand action, it is necessary to extract the hand alone, but this has turned out to be a technically rather difficult thing to do.

For example, consider a case of extracting a hand portion in an image according to the color information. Since the hand is in the flesh color, it is possible to employ a scheme for extracting only those pixel portions that have the flesh color as image information. However, it is impossible to distinguish pixels corresponding to the flesh color of the hand portion alone if beige clothes or walls are present in the background. Also, even if it is made possible to distinguish

IPR2021-00920
Apple EX1003 Page 103

6,144,366

**3**

the beige and the flesh color by some adjustments, the color tone will be changed when the lighting is changed, so that it is still difficult to extract the hand portion stably.

In order to resolve these problems, there is a measure for imposing a limitation on the background image such as the placing of a blue mat on the background so as to make the extraction easy. There is also a measure to paint the finger tips with a color that can be easily extracted from the background, or wear a ring in such a color. However, these limitations are not realistic so that they are utilized for experiments but not for practical use.

On the other hand, as another available technique for recognizing the hand action, it is possible to utilize a device for inputting range images called range finder. Typically, the range finder is based on the principle that a spot light or a slit light is irradiated onto a target object and then a distance is determined by the principle of the triangular survey according to a position at which the reflected light is received. This spot light or slit light is mechanically scanned in order to obtain the two-dimensional distance information.

This range finder is capable of generating the range image in very high precision, but the device requires a very large scale configuration and a high cost. Also, the input is very time-consuming and it is difficult to carry out the real time processing.

There are also devices, some of which are already in practical use, for capturing a shape or a motion of the hand or the body by attaching color markers or light emitting elements to the hand or a part of the body, and detecting these color markers or light emitting elements by using the image.

However, the requirement for mounting some element at every occasion of its operation is a great demerit from a viewpoint of the convenience of the user, and can limit its application range significantly. Moreover, as can be seen in the example of the data glove, a device that requires to mount some element on the movable part such as hand tends to have a problem of the durability.

Now, setting aside the input devices as described above, the conventional art of the camera technique will be described.

In the conventional camera technique, in order to realize the chromakey, that is, a character composition with respect to the background, it has been necessary to take an image of the character with the blue back in advance so as to make it easier to extract the character. For this reason, the location for taking images has been limited to a place like studio where it is possible to take images with the blue back. Else, in order to extract the character from the video image taken without using the blue back, it has been necessary to manually edit the character extraction range scene by scene, which is very time-consuming.

Similarly, in a case of generating the character in the three-dimensional space, the conventional camera technique uses a scheme in which a three-dimensional model is produced in advance and then the texture mapping for attaching a picture of the character thereto is carried out. However, the three-dimensional model production and the texture mapping require considerable time and effort so that this scheme has been almost impractical except for some special case where the great expense is permitted such as the movie production.

As described, conventionally, there has been no input device of a direct command type by which the gesture or the motion can be inputted easily. In particular, there has been no device by which the pointing or the viewpoint change in

**4**

the three-dimensional space can be carried out easily. Also, it has been impossible to give a natural motion to the animation character by using the gesture or the motion of a user directly. In addition, in the conventional camera technique, it has not been possible to extract a specific character alone or input the depth information on the character easily.

## SUMMARY OF THE INVENTION

It is therefore an object of the present invention to provide to provide a method and an apparatus for generating information input which are capable of realizing a direct command type information input scheme by which the gesture or the motion can be inputted easily.

It is another object of the present invention to provide a method and an apparatus for generating information input which are capable of realizing an information input scheme by which the pointing or the viewpoint change in the three-dimensional space can be carried out easily.

It is another object of the present invention to provide a method and an apparatus for generating information input which are capable of realizing an information input scheme by which it is possible to give a natural motion to the animation character by using the gesture or the motion of a user directly.

It is another object of the present invention to provide a method and an apparatus for generating information input which are capable of realizing an information input scheme by which a specific character alone can be extracted and the depth information on the character can be inputted easily.

It is another object of the present invention to provide a method and an apparatus for generating information input which are capable of extracting a specific target object at high precision easily even under an environment incorporating the external light fluctuation.

It is another object of the present invention to provide a method and an apparatus for generating information input which are capable of extracting an image of a target object in an optimum state even when a distance with respect to the target object is changing.

According to one aspect of the present invention there is provided an information input generation apparatus, comprising: a timing signal generation unit for generating a timing signal; a lighting unit for emitting a light whose intensity vary in time, according to the timing signal generated by the timing signal generation unit; and a reflected light extraction unit having a sensor array for detecting a reflected light from a target object resulting from the light emitted by the lighting unit, in synchronization with the timing signal generated by the timing signal generation unit, so as to obtain a spatial intensity distribution of the reflected light in a form of a reflected light image indicative of an information input related to the target object, in separation from an external light that is illuminating the target object.

According to another aspect of the present invention there is provided a method of information input generation, comprising the steps of: (a) generating a timing signal; (b) emitting a light whose intensity vary in time at a lighting unit, according to the timing signal generated by the step (a); and (c) detecting a reflected light from a target object resulting from the light emitted by the step (b), in synchronization with the timing signal generated by the step (a), so as to obtain a spatial intensity distribution of the reflected light in a form of a reflected light image indicative of an information input related to the target object, in separation from an external light that is illuminating the target object, at a reflected light extraction unit.

IPR2021-00920
Apple EX1003 Page 104

6,144,366

**5**

Other features and advantages of the present invention will become apparent from the following description taken in conjunction with the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic block diagram showing an exemplary configuration of an information input generation apparatus according to the first embodiment of the present invention.

FIG. 2 is a detailed block diagram of the information input generation apparatus of FIG. 1.

FIG. 3 is a block diagram showing an exemplary configuration of a reflected light extraction unit in the information input generation apparatus of FIG. 1.

FIG. 4 is a block diagram showing an exemplary configuration of a unit photo-detector cell in the reflected light extraction unit of FIG. 3.

FIG. 5 is a timing chart for control signals used in the information input generation apparatus of FIG. 1.

FIG. 6 is a diagram showing an exemplary reflected light image used in the second embodiment of the present invention.

FIG. 7 is a diagram for explaining a finger tip position extraction operation in the second embodiment of the present invention.

FIG. 8 is another diagram for explaining a finger tip position extraction operation in the second embodiment of the present invention.

FIG. 9 is a block diagram showing one exemplary configuration of a feature data generation unit according to the second embodiment of the present invention.

FIG. 10 is a diagram showing an exemplary reflected light image processed by the feature data generation unit of FIG. 9.

FIGS. 11A and 11B are diagrams for explaining the operation of the feature data generation unit of FIG. 9.

FIG. 12 is another diagram for explaining the operation of the feature data generation unit of FIG. 9.

FIG. 13 is a flow chart for a first half of the operation carried out by the feature data generation unit of FIG. 9.

FIG. 14 is a flow chart for a second half of the operation carried out by the feature data generation unit of FIG. 9.

FIG. 15 is a diagram for explaining the operation of the feature data generation unit of FIG. 9 according to the flow charts of FIG. 13.

FIG. 16 is another diagram for explaining the operation of the feature data generation unit of FIG. 9 according to the flow charts of FIG. 13.

FIG. 17 is a diagram showing another exemplary reflected light image that can be used in the second embodiment of the present invention.

FIG. 18 is a diagram showing another exemplary reflected light image that can be used in the second embodiment of the present invention.

FIG. 19 is a diagram for explaining additional aspect of the operation carried out by the feature data generation unit of FIG. 9.

FIG. 20 is another diagram for explaining additional aspect of the operation carried out by the feature data generation unit of FIG. 9.

FIG. 21 is a block diagram showing another exemplary configuration of a feature data generation unit according to the second embodiment of the present invention.

**6**

FIG. 22 is a block diagram showing another exemplary configuration of a feature data generation unit according to the second embodiment of the present invention.

FIG. 23 is a schematic block diagram showing an exemplary configuration of a feature data generation unit according to the third embodiment of the present invention.

FIG. 24 is a diagram showing exemplary reflected light images and rectangles extracted therefrom used in the feature data generation unit of FIG. 23.

FIG. 25 is a flow chart for the operation carried out by the feature data generation unit of FIG. 23.

FIG. 26 is a diagram showing an exemplary shape interpretation rule used in the feature data generation unit of FIG. 23.

FIG. 27 is a diagram showing another exemplary reflected light images and rectangles extracted therefrom used in the feature data generation unit of FIG. 23.

FIG. 28 is a diagram showing another exemplary reflected light images and rectangles extracted therefrom used in the feature data generation unit of FIG. 23.

FIG. 29 is a diagram showing another exemplary shape interpretation rule used in the feature data generation unit of FIG. 23.

FIG. 30 is a diagram for explaining a viewpoint extraction operation that can be realized by the feature data generation unit of FIG. 23.

FIG. 31 is a diagram showing exemplary views from three viewpoints indicated in FIG. 30.

FIG. 32 is a diagram showing exemplary reflected light images and rectangles extracted therefrom used in the viewpoint extraction operation by the feature data generation unit of FIG. 23.

FIG. 33 is a diagram showing an exemplary shape interpretation rule used in the viewpoint extraction operation by the feature data generation unit of FIG. 23.

FIG. 34 is a diagram for explaining an alternative way of realizing the viewpoint extraction operation by the feature data generation unit of FIG. 23.

FIG. 35 is a schematic block diagram showing one exemplary configuration of a feature data generation unit according to the fourth embodiment of the present invention.

FIG. 36 is a flow chart for the operation carried out by the feature data generation unit of FIG. 35.

FIG. 37 is a diagram showing an exemplary character motion to be handled by the feature data generation unit of FIG. 35.

FIG. 38 is a diagram showing another exemplary character motion to be handled by the feature data generation unit of FIG. 35.

FIG. 39 is a diagram for explaining the operation of the feature data generation unit of FIG. 35.

FIG. 40 is another diagram for explaining the operation of the feature data generation unit of FIG. 35.

FIG. 41 is another diagram for explaining the operation of the feature data generation unit of FIG. 35.

FIG. 42 is a diagram showing exemplary reflected light images used in the feature data generation unit of FIG. 35.

FIG. 43 is a block diagram showing another exemplary configuration of a feature data generation unit according to the fourth embodiment of the present invention.

FIG. 44 is a diagram showing an exemplary screen display by a graphical user interface used in the feature data generation unit of FIG. 43.

6,144,366

**7**

FIG. **45** is a diagram showing another exemplary screen display by a graphical user interface used in the feature data generation unit of FIG. **43**.

FIG. **46** is a block diagram showing one exemplary configuration of an information input generation apparatus according to the fifth embodiment of the present invention.

FIG. **47** is a diagram showing an exemplary configuration of a photo-detection array that can be used in the information input generation apparatus of FIG. **46**.

FIG. **48** is a diagram for explaining the operation carried out by the information input generation apparatus of FIG. **46**.

FIG. **49** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the fifth embodiment of the present invention.

FIG. **50** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the fifth embodiment of the present invention.

FIG. **51** is a diagram for explaining another operation carried out by the information input generation apparatus according to the fifth embodiment of the present invention.

FIG. **52** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the fifth embodiment of the present invention.

FIG. **53** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the fifth embodiment of the present invention.

FIG. **54** is a block diagram showing one exemplary configuration of an information input generation apparatus according to the sixth embodiment of the present invention.

FIG. **55** is a diagram for explaining the operation carried out by the information input generation apparatus of FIG. **54**.

FIG. **56** is another diagram for explaining the operation carried out by the information input generation apparatus of FIG. **54**.

FIG. **57** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the sixth embodiment of the present invention.

FIG. **58** is another diagram for explaining the operation carried out by the information input generation apparatus of FIG. **57**.

FIG. **59** is a block diagram showing one exemplary configuration of an information input generation apparatus according to the seventh embodiment of the present invention.

FIG. **60** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the seventh embodiment of the present invention.

FIG. **61** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the seventh embodiment of the present invention.

FIG. **62** is a graph showing an ideal characteristic of a nonlinear conversion used in an information input generation apparatus according to the seventh embodiment of the present invention.

FIG. **63** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the seventh embodiment of the present invention.

FIG. **64** is a diagram showing an exemplary table data used in a correction table of the information input generation apparatus of FIG. **63**.

**8**

FIG. **65** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the seventh embodiment of the present invention.

FIG. **66** is a diagram showing an exemplary table data used in a correction table of the information input generation apparatus of FIG. **63**.

FIG. **67** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the seventh embodiment of the present invention.

FIG. **68** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the seventh embodiment of the present invention.

FIG. **69** is a diagram for explaining the operation carried out by the information input generation apparatus of FIG. **68**.

FIG. **70** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the seventh embodiment of the present invention.

FIG. **71** is a diagram showing an exemplary dialogue box used in a user commanding unit of the information input generation apparatus of FIG. **70**.

FIG. **72** is a diagram for explaining the operation carried out by the information input generation apparatus of FIG. **70**.

FIG. **73** is a flow chart for the operation carried out by the information input generation apparatus of FIG. **70**.

FIG. **74** is a diagram showing an exemplary system configuration incorporating an information input generation apparatus according to the eighth embodiment of the present invention.

FIG. **75** is a diagram showing another exemplary system configuration incorporating an information input generation apparatus according to the eighth embodiment of the present invention.

FIG. **76** is a diagram showing another exemplary system configuration incorporating an information input generation apparatus according to the eighth embodiment of the present invention.

FIG. **77** is a diagram showing another exemplary system configuration incorporating an information input generation apparatus according to the eighth embodiment of the present invention.

FIG. **78** is a diagram showing another exemplary system configuration incorporating an information input generation apparatus according to the eighth embodiment of the present invention.

FIG. **79** is a diagram showing another exemplary system configuration incorporating an information input generation apparatus according to the eighth embodiment of the present invention.

FIG. **80** is a block diagram showing one exemplary configuration of an information input generation apparatus according to the ninth embodiment of the present invention.

FIG. **81** is a timing chart for explaining the operation carried out by the information input generation apparatus of FIG. **80**.

FIG. **82** is another timing chart for explaining the operation carried out by the information input generation apparatus of FIG. **80**.

FIG. **83** is a flow chart for the operation carried out by a reflected light image acquisition unit of the information input generation apparatus of FIG. **80**.

IPR2021-00920
Apple EX1003 Page 106

6,144,366

**9**

FIG. **84** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the ninth embodiment of the present invention.

FIG. **85** is a block diagram showing an exemplary configuration of an information input generation apparatus according to the tenth embodiment of the present invention.

FIG. **86** is a timing chart for explaining the operation carried out by the information input generation apparatus of FIG. **85** in one exemplary case.

FIG. **87** is a timing chart for explaining the operation carried out by the information input generation apparatus of FIG. **85** in another exemplary case.

FIG. **88** is a block diagram showing an exemplary configuration of an information input generation apparatus according to the eleventh embodiment of the present invention.

FIG. **89** is a timing chart for explaining the operation carried out by the information input generation apparatus of FIG. **88**.

FIG. **90** is a block diagram showing an exemplary configuration of an information input generation apparatus according to the twelfth embodiment of the present invention.

FIG. **91** is a flow chart for the operation carried out by a reflected light image acquisition unit of the information input generation apparatus of FIG. **90**.

FIGS. **92A** and **92B** are diagrams for explaining the operation carried out by the information input generation apparatus of FIG. **90** in one exemplary case.

FIGS. **93A** and **93B** are diagrams for explaining the operation carried out by the information input generation apparatus of FIG. **90** in another exemplary case.

FIG. **94** is a block diagram showing another possible configuration of a photo-detection section in an information input generation apparatus according to the twelfth embodiment of the present invention.

FIG. **95** is a timing chart for explaining the operation carried out by the photo-detection section of FIG. **94**.

FIG. **96** is a graph showing a relationship of a distance and a reflected light amount in an information input generation apparatus according to the thirteenth embodiment of the present invention.

FIG. **97** is a block diagram showing one exemplary configuration of an information input generation apparatus according to the thirteenth embodiment of the present invention.

FIG. **98** is a diagram showing a state transition among three states used in the information input generation apparatus of FIG. **97**.

FIG. **99** is a timing chart for explaining the operation carried out by the information input generation apparatus of FIG. **97** for three states in one exemplary case.

FIG. **100** is a timing chart for explaining the operation carried out by the information input generation apparatus of FIG. **97** for three states in another exemplary case.

FIG. **101** is a graph showing a characteristic of a logarithmic amplifier that can be used in the information input generation apparatus of FIG. **97**.

FIG. **102** is a block diagram showing another exemplary configuration of an information input generation apparatus according to the thirteenth embodiment of the present invention.

FIG. **103** is a block diagram showing an exemplary configuration of an information input generation apparatus according to the fourteenth embodiment of the present invention.

**10**

FIG. **104** is a flow chart for the operation carried out by the information input generation apparatus of FIG. **103**.

FIG. **105** is a perspective view of a conventional three-dimensional pointing device.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present invention is basically directed to an information input scheme in which the light is irradiated onto a target object from a light source, and the reflected light from this target object is captured as an image, so that information on this target object such as its shape, motion, distance, etc., can be obtained from this reflected light image. In addition, in the present invention, a plurality of operation patterns for the lighting and charge storing operation are provided and selectively used according to the external light state so that the reflected light image can be obtained at high precision regardless of the external light state. In the following, various embodiments of this information input scheme will be described in detail.

<First Embodiment>

FIG. **1** shows an exemplary configuration of an information input generation apparatus according to the first embodiment of the present invention, which comprises a lighting unit **101**, a reflected light extraction unit **102**, a feature data generation unit **103**, and a timing signal generation unit **104**.

The lighting unit **101** emits a light whose intensity varies in time according to the timing signal generated by the timing signal generation unit **104**. This light is irradiated onto a target object located in front of the lighting unit **101**.

The reflected light extraction unit **102** extracts the reflected light from the target object resulting from the light emitted by the lighting unit **101**. Preferably, this reflected light extraction unit **102** extracts the spatial intensity distribution of the reflected light. This spatial intensity distribution of the reflected light can be captured as an image which will be referred to as a reflected light image hereafter.

The reflected light extraction unit **102** has a photo-detection section for detecting a receiving light amount in order to extract the reflected light from the target object. In general, the photo-detection section detects not only the reflected light from the target object resulting from the light emitted by the lighting unit **101** but also the external light such as illumination light or sunlight. For this reason, the reflected light extraction unit **102** takes a difference between a received light amount detected when the lighting unit **101** is emitting the light and a received light amount detected when the lighting unit **101** is not emitting the light, so as to obtain only a component for the reflected light from the target object resulting from the light emitted by the lighting unit **101**. In other words, the reflected light extraction unit **102** is also controlled by the timing signal generation unit **104** which generates the signal for controlling the lighting unit **101**.

The feature data generation unit **103** extracts various feature data from the reflected light image. Many different types of the feature data and their extraction methods can be used in the present invention, as will be described in detail in the later embodiments. When the target object is a hand, it becomes possible to obtain the information regarding a gesture or a pointing according to the feature data extracted from the reflected light image of the hand, for example, and it becomes possible to operate a computer by using this obtained information. It is also possible to extract the 3D information on the target object for further utilization. Note

IPR2021-00920
Apple EX1003 Page 107

6,144,366

## 11

that this feature data generation unit **103** is not an indispensable element of the present invention, and it is also possible to directly input or utilize the reflected light image obtained by the reflected light extraction unit **102**.

Now, the technical improvements incorporated in this information input generation apparatus of the first embodiment will be described in further detail with reference to FIG. **2**.

FIG. **2** shows an exemplary detailed configuration of this information input generation apparatus of the first embodiment. In FIG. **2**, the light emitted by the lighting unit **101** is reflected by the target object **106**, and an image is formed on a photo-detection plane of the reflected light extraction unit **102** by a photo-detection optics **107**. The reflection light extraction unit **102** detects the intensity distribution of this reflected light, that is, the reflected light image. Here, the reflected light extraction unit **102** has a first photo-detection unit **109**, a second photo-detection unit **110**, and a difference calculation unit **111**.

Each of the first photo-detection unit **109** and the second photo-detection unit **110** detects the optical image formed on the photo-detection plane and converts it into image signals corresponding to the received light amounts. The first photo-detection unit **109** and the second photo-detection unit **110** carry out this photo-detection operation at different timings. A timing control unit **112** (corresponding to the timing signal generation unit **104** of FIG. **1**) controls their operation timings such that the lighting unit **101** emits the light when the first photo-detection unit **109** is in a photo-detecting state, whereas the lighting unit **101** does not emit the light when the second photo-detection unit **110** is in a photo-detecting state.

By means of this control, the first photo-detection unit **109** detects the received light amounts by receiving the reflected light from the object resulting from the light emitted by the lighting unit **101** as well as the external light such as illumination light or sunlight.

On the other hand, the second photo-detection unit **110** only receives the external light. Here, the timings at which the first and second photo-detection units **109** and **110** receive the lights are set to be different but close to each other, so that the fluctuation of the external light between these timings is ignorable. Consequently, a difference between the image detected by the first photo-detection unit **109** and the image detected by the second photo-detection unit **110** corresponds to a component for the reflected light from the object resulting from the light emitted by the lighting unit **101**, and therefore it is possible to extract the reflected light image corresponding to the component for the reflected light from the object resulting from the light emitted by the lighting unit **101**.

The difference calculation unit **111** calculates this difference between the images detected by the first photo-detection unit **109** and the second photo-detection unit **110**, and outputs the obtained difference.

The further detail of this reflected light extraction unit **102** will be described below.

The reflected light extraction unit **102** sequentially outputs the reflected light amount for each pixel of the reflected light image. The output from the reflected light extraction unit **102** is then amplified by an amplifier **113**, converted from analog signals into digital signals by an A/D converter **114**, and stored at a memory **115**. Then, at an appropriate timing, the data stored in this memory **115** are read out and processed at the feature data generation unit **103**. The timing control unit **112** controls this overall operation.

## 12

When the target object to be detected is a human hand, it is preferable to use a device that can emit the near infrared light which is invisible to the human eyes, as the lighting unit **101**. In this case, the light emitted from the lighting unit **101** cannot be seen by the target human being so that the target human being will not sense the glare of the light. Also, when the lighting unit **101** emits the near infrared light, a near infrared light passing filter should preferably be provided at the photo-detection optics **107**. This filter can pass the near infrared light in the emitted wavelength, while blocking the visible light and the far infrared light, so that the most of the external light can be removed by this filter.

Now, the reflected light from the object decreases considerably when a distance to the object increases. In a case where the object surface scatters the light uniformly, the received light amount per each pixel of the reflected light image as seen by the receiving side becomes smaller in counter-proportion to the square of the distance to the object. Consequently, when the target object **106** is placed in front of this multi-dimensional information input generation apparatus of the present invention, the reflected light from the background becomes ignorably small, and therefore it is possible to obtain the reflected light image only from the object. Thus, when the target object **106** in a form of a hand is placed in front of this multi-dimensional information input generation apparatus, it is possible to obtain the reflected light image of the hand alone.

At this point, a value of each pixel of the reflected light image indicates the reflected light amount received by a unit photo-detector cell corresponding to each pixel. The reflected light amount can be affected by the property of the object (that is, whether or not the object totally reflects the light, scatters the light, absorbs the light, etc.), the orientation of the object surface, the distance to the object, etc., and in a case where the object as a whole scatters the light uniformly, the reflected light amount is closely related to the distance to the object.

The hand has such a property, so that the reflected light image of the hand is dependent on the distance to the hand, the leaning of the hand (that causes the partially different distance), etc. Consequently, by extracting these features as the feature data, it is possible to input and generate various information.

In a case where it is desired to extract a 3D shape, it is desirable to obtain the distance information at high precision. In such a case, it is preferable to use a logarithmic amplifier as the amplifier **113**. The received light amount at the photo-detection section is counter-proportional to the square of the distance, but when the logarithmic amplifier is used, the output of the logarithmic amplifier is counter-proportional to the distance, so that it becomes possible to utilize the dynamic range effectively.

Now, with reference to FIG. **3**, an exemplary configuration of the reflected light extraction unit **102** will be described in further detail.

The reflected light extraction unit **102** of FIG. **3** has the photo-detection section formed by CMOS sensors, which includes a plurality of unit photo-detector cells, each corresponding to each pixel of the reflected light image, so as to be able to capture the intensity distribution of the reflected light. In FIG. **3**, a simplified case of 2×2 pixels is shown for the sake of clarity, where a portion **117** enclosed by a dashed line is a unit photo-detector cell PD for one pixel. Each unit photo-detector cell PD for one pixel has a configuration as shown in FIG. **4**.

In relation to FIG. **2** described above, one pixel part of the first photo-detection **109** and one pixel part of the

IPR2021-00920
Apple EX1003 Page 108

6,144,366

**13**

second photo-detection unit **110** constitutes a single unit photo-detector cell PD in FIG. **3**. As shown in FIG. **4**, each unit photo-detector cell PD has one photo-electric conversion unit **118** formed by a photo-diode and two charge storage units **119** and **120** formed by capacitors. Between the photo-electric conversion unit **118** and the charge storage units **119** and **120**, several gates (**122** and **123** in this example of FIG. **4**) are provided, so that the charges generated at the photo-electric conversion unit **118** can be selectively lead to either one of the two charge storage units **119** and **120** by controlling these gates. Here, the control signal for these gates and the lighting control signal for the lighting unit **101** are synchronized.

FIG. **5** shows time changes of the control signals in the photo-detection section, the lighting control signal, and the lighting power.

A lighting control pulse **128** is a signal for controlling the lighting unit **101**, for a case of realizing the light pulse emission. The lighting unit **101** emits the light when the lighting control pulse **128** is in "HIGH" level, and does not emit the light when the lighting control pulse **128** is in "LOW" level.

In response to this lighting control signal, the light actually emitted from the lighting unit **101** has a waveform that changes in time as indicated by the lighting power **129** in FIG. **5**, which is determined by the time response of the light emitting element used as a light source in the lighting unit **101**. The control signals including RESET **130**, SAMPLE1 **131**, SAMPLE2 **132**, and TRANSFER are also given to the photo-detection section.

The TRANSFER is a signal for controlling the transfer gate **121** that transfers the changes generated at the photo-electric conversion unit **118** to the next stage. When this signal is in "HIGH" level, the charges accumulated at the photo-electric conversion unit **118** are transferred. After the charge storing, at a time of charge transfer to an output gate **125**, this transfer gate **121** is closed so that the changes generated at the photo-electric conversion unit **118** do not flow into the output gate **125** which is formed by an amplifying transistor connected with a transistor for selecting this unit photo-detector cell having a gate connected with an address line **127**, where the photo-diode of the photo-electric conversion unit **118** is connected with a gate of this amplifying transistor, while each of the capacitors of the two charge storage units **119** and **120** has one electrode connected to this amplifying transistor while another electrode is grounded, as shown in FIG. **4**.

The RESET **130** is a reset control signal for controlling a reset gate **124** formed by a reset transistor. While the TRANSFER is "HIGH", when the RESET becomes "HIGH", the reset gate **124** is opened so that the charges accumulated at the photo-electric conversion unit **118** are discharged through the transfer gate **121** and the reset gate **124**.

The SAMPLE1 **131** and SAMPLE2 **132** are control signals for controlling sample gates **122** and **123** in order to lead the changes from the photo-electric conversion unit **118**.

Now, the operation of the unit photo-detector cell according these control signals will be described in detail.

In the unit photo-detection cell, the transfer gate **121** is kept open during the charge storing period. First, by opening the reset gate **124**, the unnecessary charges accumulated between the photo-electric conversion unit **118** and the sample gates **122** and **123** are discharged. Then, by closing the reset gate **124**, the charges obtained by the photo-electric

**14**

conversion are accumulated between the photo-electric conversion unit **118** and the sample gates **122** and **123**.

After a prescribed period of time, the first sample gate **122** is opened so that the accumulated charges are transferred to the first charge storage unit **119**. Consequently, the charges obtained by the photo-electric conversion during the "storing period-1" as indicated in FIG. **5** which extends since the RESET **130** becomes "LOW" until the SAMPLE1 **131** becomes "LOW" will be stored into the first charge storage unit **119**. After the first sample gate **122** is closed, the reset gate **124** is opened again to discharge the unnecessary charges, and then closed. Then, after the prescribed period of time, the second sample gate **123** is opened so that the charges generated by the photo-electric conversion are transferred to the second charge storage unit **120** this time. Consequently, the charges obtained by the photo-electric conversion during the "storing period-2" as indicated in FIG. **5** which extends since the RESET **130** becomes "LOW" until the SAMPLE2 **132** becomes "LOW" will be stored into the second charge storage unit **120**. Here, the "storing period-1" and the "storing period-2" have the same duration.

Here, the lighting unit **101** emits the light during the charge storing period called "storing period-1" whereas the lighting unit **101** does not emit the light during the charge storing period called "storing period-2".

As a result, the first charge storage unit **119** stores the charges generated from both the reflected light from the object resulting from the light emitted by the lighting unit **101** and the external light such as illumination light or the sunlight, whereas the second charge storage unit **120** stores the charges generated from the external light alone.

Here, the charge storing period called "storing period-1" and the charge storing period called "storing period-2" are close in time, so that the size of the fluctuation of the external light between them can be regarded as sufficiently small. Consequently, a difference between the charge amounts in the first charge storage unit **119** and the second charge storage unit **120** can be regarded as the charge amount generated by the reflected light from the target object **106** resulting from the light emitted by the lighting unit **101**.

For the SAMPLE1; SAMPLE2, RESET and TRANSFER as described above, the same signals are given to all the unit photo-detector cells, so that the charge storing is carried out at all the unit photo-detector cells in synchronization. This implies that a single light emission is sufficient in obtaining the one frame of the reflected light image. Consequently, it is possible to reduce the power required for the light emission. Also, a LED can be used as the light source, where the LED has a property that it can emit more intense light instantaneously when the DUTY ratio of the lighting pulse is smaller (that is, when the pulse interval is longer compared with a single pulse width), so that it is possible to utilize the lighting power efficiently.

After the charge storage, the charge extraction is carried out. First, a single line is selected by a vertical selectors **135**. Then, from the unit photo-detector cells of each selected line, the charges stored in the first charge storage unit **119** and the second charge storage unit **120** are sequentially taken out, and their difference is obtained by a difference circuit **133**. The obtained difference is then taken out by selecting a row by a horizontal shift registers **136**.

Note that, in this example, at a time of the charge extraction, the extraction cell addresses are specified by the shift registers so that the output order is fixed (to that of the

IPR2021-00920
Apple EX1003 Page 109

6,144,366

**15**

sequential output) but the random access is possible by generating arbitrary address. In such a case, it is possible to extract charges from only a part of the photo-detection section, so that the sensor operation frequency can be lowered or the frame rate of the reflected light image can be increased. For example, in a case of detecting a small object that only occupies a part of the image and tracing its motion, it suffices to search this object in a vicinity of its location in some frame, so that it suffices to extract charges for only a part of the images.

Also, a case of using the near infrared light as the light source has been described, but the present invention is not necessarily limited to this case, and it is also possible to use the visible light under the condition that prevents the human eyes from sensing the glare of the light (such as the condition that the light amount is not too large, or that the light is directed so that it does not enter into the human eye directly, etc.). In addition, the present invention is not necessarily limited to a case of using the light, and it is also possible to use the electromagnetic waves, ultrasonic waves, etc. It is also possible to omit the near infrared light passing filter under the condition that requires no consideration for the influence of the external light.

Note that it is also possible to realize the photo-detection section by using the CCD image sensors for usual imaging purpose instead of the CMOS sensors, but the use of the CMOS sensors is advantageous in view of both the performance and the cost.

Namely, although it is possible to use the CCD image sensors and a light source, the CCD can only image once in every $\frac{1}{60}$ second (in unit of field). Consequently, even when the lighting unit 101 is controlled to emit the light in the first $\frac{1}{60}$ second and not to emit the light in the next $\frac{1}{60}$ second, the external light can fluctuate largely during this $\frac{1}{60}$ second interval so that the difference will not be equal to the reflected light amount. The fluorescent light has its intensity fluctuating in a period of $\frac{1}{100}$ second, so that this problem can be caused. Even in the usual imaging using the CCD image sensors, it is known that the phenomenon called flickering can occur, where the brightness of the image flickers due to the difference between the imaging period and the fluctuation period of the external light.

In a case of using the CMOS sensors for the photo-detection section as described above, the CMOS sensors have the structural property that it is possible to control the photo-detection (charge storing) and the read out arbitrarily in unit of pixel, and the control time can be as short as about $\frac{1}{10000}$ second or less, but it can also be set to any sufficiently long time, so that it is possible to eliminate the influence of the external light fluctuation by selecting the optimum value according to the fluctuation of the external light.

In the imaging using the CCD image sensors, in order to prevent the flickering, there are cases where the charge storing period is set to be $\frac{1}{100}$ second so that it matches with the fluctuation period of the fluorescent light. Similarly, in a case of synchronizing this operation with the lighting unit, it is possible to suppress the influence of the external light by setting the charge storing period to be $\frac{1}{100}$ second, or by setting one field to be $\frac{1}{100}$ second by changing the CCD driving signals. However, in such cases, there arises another problem. Namely, when the target object in a form of the hand is moving, the position of the hand can be slightly displaced between the imaging at a time of the light emission and the imaging at a time of no light emission. When the difference is taken in this state, the reflected light image is largely disturbed at the edge portion of the object (hand) in particular.

**16**

In addition, there is a significant difference in compactness of the configuration between a case of using the CCD image sensors and a case of using the CMOS sensors. Namely, in a case of using the CCD, it is at least necessary to provide an A/D converter, a memory for storing data for one frame part, and a calculation circuit for obtaining a difference image. Moreover, in a case of using the CCD, it is also necessary to separately provide a driver IC.

In contrast, in a case of using the CMOS sensors in a configuration where a plurality of unit photo-detector cells are arranged two-dimensionally as described above, various circuits can be formed on a base of the CMOS sensors (a substrate on which the CMOS sensors are formed), so that it is possible to contain the driver in the same chip. In addition, the difference between a case of light emission and a case of no light emission can be taken within the sensors so that no difference calculation circuit is necessary. Moreover, it is also possible to contain an A/D converter, a memory, and a control unit in one chip, so that it can be realized at a very low cost.

In the above, the configuration up to the extraction of an image (the reflected light image) of the target object alone has been described. This much of a configuration by itself is sufficiently useful as a commercial product, but in practical use, it is often preferable to use the present invention in a form that matches with the need of a user by applying some processing to the obtained reflected light image.

For example, by inputting the reflected light image of the hand, it is possible to realize the pointing or gesture input. The feature data generation unit 103 extracts the information useful for this purpose from the reflected light image, by extracting the feature quantity, processing the feature quantity, or generating some other information from the feature quantity.

A representative example for the processing of the reflected light image is the distance information extraction and a region extraction. As already described above, when the object has a uniform and homogeneous scattering surface, the reflected light image can be regarded as a range image. Consequently, it is possible to extract a 3D shape of the object. When the object is the hand, it is possible to detect an inclination of the palm of the hand, which appears as a partially different distances. Also, when the hand is moved, the change of the pixel values can be regarded as a change of the distance.

It is also possible to process the reflected light image so as to extract the object property information such as a color information and a material information of the target object.

The extracted distance information and/or the object property information can then be utilized in extracting an object image of at least a part of the target object for the purpose of further processing.

Also, as there is almost no reflected light from remote object such as the background, it is possible to extract the shape of the object easily by the processing for extracting a region with the pixel value over a certain threshold from the reflected light image. For example, when the object is the hand, it is quite easy to extract its silhouette image. Even in a case of using the range image, it is often preferable to extract a region according to a threshold once and then use the distance information within that region.

In this manner, it becomes possible to extract the target object image easily, so that it becomes possible to realize various information input operations or commanding operations using the target object image.

As described, according to this first embodiment, it becomes possible to acquire the reflected light image of the

IPR2021-00920
Apple EX1003 Page 110

6,144,366

## 17

object such as the hand, easily in real time. This eliminates the need of an image processing for extracting a target object image which is a type of image processing that is most difficult to realize conventionally and has been a hindrance to the application of the image processing. Consequently, according to this first embodiment, it becomes possible to provide various types of image processing that have been difficult to realize at the practically usable level conventionally, in a form which is easy to realize and stable, and at a low cost, so that it can be a great innovation to the wide ranging fields such as industry, home, and amusement.

<Second Embodiment>

Referring now to FIG. 6 to FIG. 22, the second embodiment of the present invention will be described in detail.

This second embodiment is directed to one exemplary case of the feature data generation unit in the first embodiment.

When the hand is used as the target object, it is possible to capture the information on a position and a shape of the hand without a contact, so that it is possible to utilize the present invention as a means for inputting information from a human being to a machine. The pointing operation (an operation for inputting a position) has been carried out conventionally by using a device called pointing device such as mouse or track ball, but according to this second embodiment, this pointing operation can be realized by the hand action alone without a contact. In the following, a device for realizing this non-contact pointing will be described in detail.

First, an example of the non-contact pointing will be described. According to the present invention, a shape of the hand can be easily detected, so that it is possible to utilize the present invention as the non-contact pointing device, which can be a suitable pointing means for a portable information device and the like.

In this second embodiment, a user extends his hand in front of the input device in a state of extending all the fingers, and then makes the hand action, which is a very natural operation to do for a user. In this case, the reflected light image appears as shown in a left half of FIG. 6. A finger tip position is detected from this reflected light image by means of the image processing and utilized for the pointing operation. The extended finger portion appears as an upward pointing stick shaped object, so that it is not so difficult to obtain the coordinates of this tip end by the image processing. However, by simply obtaining the coordinates of the stick shaped tip end, it is only possible to obtain the finger tip position at the precision corresponding to the resolution of the reflected light image.

In general, the reflected light extraction unit can be manufactured at lower cost when the required number of pixels is smaller. Consequently, if it is possible to obtain the finger tip position at high precision from the rough reflected light image, it becomes possible to manufacture the non-contact pointing device at low cost. To this end, in this second embodiment, the position of a X mark 208 as indicated in FIG. 7 is obtained by the resolution above the pixels rather than the coordinates of the finger tip, and this position is utilized for the pointing as a feature point. This point is a center of gravity of a part of the finger tip (image). The manner for extracting this center of gravity position from the rough reflected light image will now be described in detail.

Consider the pixel values in this reflected light image. It is already mentioned that the pixel value can be converted into the distance information. However, when the resolution

## 18

of the reflected light image is rough, this idea is not necessarily applicable to the region surrounding the hand. Now suppose that the relationship between the pixels in the reflected light image and a target space is as shown in FIG. 8. Here, the reflected light from one block in FIG. 8 corresponds to the pixel value of one pixel in the reflected light image. From this FIG. 8, it can be seen that the reflected light from a block 211 is about a half of the reflected light from a block 212. The reflected light amount is changed according to a rate by which the target object occupies each block, even if the target object is located at the same distance. In other words, in this case, the decrease of the reflected light amount indicates a position of the edge of the hand.

Now suppose that the finger position has slightly moved. Then, a rate by which the finger occupies each block changes, so that the pixel values will be slightly changed. Even if the reflected light image is rough, when the pixel values can be obtained at certain precision, it is possible to obtained the pointing position by the resolution above the pixels by using the pixel values. It is experimentally confirmed that a good pointing precision can be achieved when the width of the extended finger covers two to three pixels. A method for obtaining the finger tip position at high precision from the rough image will now be described in detail.

FIG. 9 shows an exemplary configuration of the feature data generation unit according to this second embodiment, which comprises a stick shaped object detection unit 213, a stick shaped object tip end extraction unit 214, and a center of gravity detection unit 215.

The stick shaped object detection unit 213 detects a stick shaped object extending in the vertical direction, that is, an upward extended finger (normally an index finger) of the hand of the operator. Then, the stick shaped object tip end extraction unit 214 extracts an upper tip end of the stick shaped object (index finger) extending in the vertical direction, and then the center of gravity detection unit 215 obtains the center of gravity of that extracted portion.

At this point, if the portion is extracted in pixel units, the pixel value sum of the extracted portion largely fluctuates because the pixels are rough, and the precision of the detected center of gravity would become poor (as will be described in detail below). Consequently, the stick shaped object tip end extraction unit 214 extracts the tip end portion while correcting some pixel values such that the pixel value sum of the extracted portion satisfies a certain condition. Then, the center of gravity detection unit 215 calculates the center of gravity of the tip end portion extracted by the stick shaped object tip end extraction unit 214, and set this calculates center of gravity as a finger tip position.

More specifically, this feature data generation unit of FIG. 9 operates as follows.

Here, it is assumed that, when a user extends a finger for the purpose of commanding an operation, a commanding finger (normally an index finger) is extended upwards in the reflected light image. Consequently, when the hand is extended in a shape (such as that of a fist) that does not match this assumption, there is a possibly that a correct detection cannot be made.

First, the reflected light image 201 as shown in FIG. 6 is scanned along the horizontal direction from the top. When the finger tip is not present at an upper end of the reflected light image, in the upper part normally, all the pixels in one line have pixel values nearly equal to 0 as indicated by lines 202 to 203 in FIG. 6. When there is a portion where the pixel

6,144,366

19

value becomes locally large in one line along the horizontal direction as indicated by a line 204 in FIG. 6, this position and this line are memorized. This is repeated for the several lines as indicated in lines 205 to 207 in FIG. 6, and when the portion where the pixel value becomes locally large coincides over several lines, it can be judged that the stick shaped object (index finger, for example) extending in the vertical direction is present there. Then, a region where the extended finger is most likely present is enclosed by a rather large enclosure, and for this partial image, the following processing is carried out by the stick shaped object tip end extraction unit 214.

FIG. 10 shows an original reflected light image 216 in which the finger tip is judged to be present within a partial image 217 by the stick shaped object detection unit 213. In this partial image 217, it is assumed that the upper left corner pixel value is P(1,1), the upper right corner pixel value is P(k,1), the lower left corner pixel value is P(1,n), and the lower right corner pixel value is P(n,n).

Here, a certain threshold TH is set up in advance, and values k and a that satisfy the following equation (1) are obtained.

$$TH = \sum_{x=1}^{n} \sum_{y=1}^{k-1} P(x, y) + a \cdot \sum_{x=1}^{n} P(x, k) \quad (0 < a \leq 1) \tag{1}$$

Then, the pixel values P(1,k) to P(n,k) are corrected by using the obtained value a. Namely, the old pixel values P'(1,k) to P'(n,k) are updated according to the following equation (2).

$$P(x,k) = a \cdot P'(x,k) \ (x=1, 2, \ldots, n) \tag{2}$$

The pixel values P(1,1) to P(n,k) including the corrected pixel values P(1,k) to P(n,k) constitute the extracted portion 218. The upper three lines of the extracted portion 218 are the same as the upper three lines of the partial image 217, while the fourth line of the extracted portion 218 (enclosed by a bold line) is corrected by multiplying the value a to the respective pixel values of the fourth line of the partial image 217, so that it appears paler in FIG. 10.

Next, at the center of gravity detection unit 215, the center of gravity (xx,yy) is determined by using the obtained pixel values P(1,1) to P(n,k) according to the following equations (3) and (4).

$$xx = \sum_{x=1}^{n} \sum_{y=1}^{k} x \cdot P(x, y) \bigg/ \sum_{x=1}^{n} \sum_{y=1}^{k} P(x, y) \tag{3}$$

$$yy = \sum_{x=1}^{n} \sum_{y=1}^{k} y \cdot P(x, y) \bigg/ \sum_{x=1}^{n} \sum_{y=1}^{k} P(x, y) \tag{4}$$

The center of gravity (xx,yy) obtained here nearly coincides with a center of gravity of an image obtained by extracting a certain length from a top (where a length to be extracted is related to the threshold TH) of the extended finger in the image of FIG. 8. Here, the pixels are rougher than the usual TV image so that the above described correction is made in order to achieve the same effect as maintaining the length to be extracted constant. Note that the precision of the center of gravity (xx,yy) becomes better when the pixel value P(x,y) of each pixel is obtained at the better precision.

20

Here, the reason for correcting the pixel values P(1,k) to P(n,k) as described above will be explained. Namely, what might happens if the center of gravity (xx,yy) is calculated without correcting the pixel values P(1,k) to P(n,k) will be considered with references to FIGS. 11A and 11B.

Suppose that the finger tip position is to be determined by calculating the center of gravity using a shaded region indicated in FIGS. 11A and 11B, which starts from the horizontal line where the pixel value becomes locally large up to three pixels part below. In this case, when the finger moves from a state shown in a part (a) of FIG. 11A to a part (b) of FIG. 11A, the change of the position of the center of gravity (xx,yy) becomes larger than the change of the position of the finger tip. On the other hand, when the finger moves from a state shown in a part (c) of FIG. 11B to a part (d) of FIG. 11B, the change of the position of the center of gravity (xx,yy) becomes smaller than the change of the position of the finger tip. In other words, there is no linearity between the actual finger tip position and the calculated center of gravity (xx,yy) in this case.

In contrast, when the center of gravity is calculated by correcting the pixel values so that the pixel value sum of all the pixels remains constant while calculating the center of gravity as described above, the finger tip movement and the center of gravity movement can be smoothly correlated.

Also, it is mentioned above that the sufficient pointing precision can be achieved when the width of the extended finger covers two to three pixels, and on the contrary, when the width of the finger does not even cover one pixel, the sufficient precision cannot be achieved. This is a case shown in FIG. 12, where the calculated x-coordinate of the center of gravity does not change even when the finger tip is moved slightly. In this case, there is also no linearity between the actual finger tip position and the calculated center of gravity (xx,yy).

Now, the operation of the feature data generation unit of this second embodiment in a case of the digital processing will be described with references to FIG. 13 to FIG. 15. Here, some more details of the operation not described above will also be described. By implementing a program according to these flow charts, it is also possible to realize this operation of the feature data generation unit in a form of software. It is obviously possible to realize a hardware configuration for carrying out this operation, and a configuration using both software and hardware is also possible. In a case of using software, the program may be recorded in a recording medium such as FD so that it can be distributed.

FIG. 13 shows the processing of the stick shaped object detection unit 213. As described above, in this stick shaped object detection unit 213, the reflected light image is scanned along the horizontal direction, and a portion where the pixel value becomes locally large is found. When such a portion appears in several lines at close positions, it is judged that the stick shaped object is present. This portion where the pixel value becomes locally large will be referred to as a partial pixel sequence. Also, a set of a plurality of partial pixel sequences which is not yet judged as a stick shaped object but which has a possibility of being judged as a stick shaped object will be referred to as a stick shaped object candidate. During the scanning along the horizontal direction, the stick shaped object candidates can be found, and as the scanning proceeds the stick shaped object can be detected from them.

More specifically, a plurality of structure elements for storing information of the stick shaped object candidates are prepared (step 220). Here, this structure element is denoted as "infoStick[n]" where [n] is a label for distinguishing the

IPR2021-00920
Apple EX1003 Page 112

**21**

plurality of structure elements. Here, a plurality of structure elements are prepared because there may be more than one stick shaped object candidates.

This structure element has five members, of which two are arrays. As indicated by a reference numeral **235** in FIG. **15**, the members include: "ystart" indicating a y-coordinate of a line at which the stick shaped object started; "xstart[i]" indicating an x-coordinate at which the partial pixel sequence starts on the i-th line (where the uppermost line is the **0**-th line) from the top of the stick shaped object candidate; "xend[i]" indicating an x-coordinate at which the partial pixel sequence ends on the i-th line (where the uppermost line is the **0**-th line) from the top of the stick shaped object candidate; "length" indicating a length in the vertical direction of the stick shaped object candidate (that is, a number of partial pixel sequences); and "status" indicating a current status (that takes three values of STICK, NOSTICK, and EXTENDED as will be described below). The starting x-coordinate and the ending x-coordinate are to be indicated for each of a plurality of lines, so that they are given in forms of arrays.

Now, this processing of FIG. **13** will be described with reference also to FIG. **15** for the sake of clarity. In FIG. **15**, a reference numeral **234** indicates the reflected light image, where the density of each pixel indicates the size of the pixel value. The numbers on the upper side and the left side indicate the x-coordinate and the y-coordinate, respectively. A reference numeral **235** indicates the structure element described above in outline. A reference numerals **236** to **238** shown in the right half indicate the contents of the structure element during the processing.

While scanning the horizontal line, when a partial pixel sequence that satisfies a given condition (which is assumed to require the partial pixel sequence to have no more than c consecutive pixels with the pixel values above p) is found (step **221**), it is either integrated with the already found stick shaped object candidate (step **226**) or registered as a new stick shaped object candidate (step **225**). The partial pixel sequence that is found first will always be registered as a new stick shaped object candidate.

For example, in FIG. **15**, while the y=3 line is scanned, the partial pixel sequence is found for the first time, and this is registered as a new stick shaped object candidate (as indicated by **236**). Namely, the y-coordinate value "3" of this line is entered into "infoStick[**0**].ystart". Also, the same value "6" is entered into the "infoStick[**0**].xstart[**0**]" and "infoStick[**0**].xend[**0**]" because the length of this partial pixel sequence is "1". Also, a value "1" is entered into "infoStick[**0**].length" and a value "EXTENDED" is entered into "infoStick[**0**].status" because this is a new stick shaped object candidate. Here, a value "EXTENDED" is also used in a case of registering a new stick shaped objected candidate for the reason explained below.

Next, the partial pixel sequence found by scanning the y=4 line can be connected with the already found stick shaped object candidate. Here, whether it can be connected with the already found stick shaped object candidate or not can be determined from a positional relationship in the x-direction between the partial pixel sequence in the last line of the already found stick shaped object candidate and this new partial pixel sequence. In this case, "infoStick[**0**].xstart[**0**]=6" and "infoStick[**0**].xend[**0**]=6", while the x-coordinates of the new partial pixel sequence are "5" to "7", so that they are judged as being connected.

Then, the information of the stick shaped object candidate that was judged to be connected with this new partial pixel sequence is updated (as indicated by **237**). Namely, the

**22**

positions (in the x-direction) of the new partial pixel sequence are entered as "infoStick[**0**].xstart[1]=5" and "infoStick[**0**].xend[1]=7" and the length of the stick shaped object candidate is increased by 1 as "infoStick[**0**].length= 2".

Next, the partial pixel sequence found by scanning the y=5 line is also connected, as indicated by **238**. Here, assuming that a prescribed length d is equal to "3", the condition of the step **227** in FIG. **13** holds, so that the stick shaped object is determined and the processing proceeds to the next step **238**. The above processing is repeated until this condition is satisfied, and when the scan of one image field is finished before this condition is satisfied, it is judged that no stick shaped object was detected.

Now, the use of "infoStick[n].status" will be described in further detail. This takes three values of STICK, NOSTICK, and EXTENDED. NOSTICK indicates that this structure element is not a stick shaped object candidate (so that the "status" member of all the structure elements are initially set to be NOSTICK). STICK indicates that this structure element is a stick shaped object candidate. EXTENDED is also used for a stick shaped object candidate but its usage is somewhat different. Namely, when the scan of a new horizontal line begins, all the stick shaped object candidates have values STICK. Then, a value of a stick shaped object candidate which is connected with a newly found partial pixel sequence during the scan of one line will be changed to EXTENDED. When the scan of this one line is finished, the stick shaped object candidate that still has a value STICK is not connected with any partial pixel sequence on that line, so that it will be regarded as no longer a stick shaped object candidate.

Consequently, when the scan of one line is finished, a value of the stick shaped object candidate which remains to be STICK will be changed to NOSTICK, and a value of the stick shaped object candidate which has been changed to EXTENDED will be changed to STICK again. By this processing, as indicated by **239** in FIG. **16**, the floating partial pixel sequence (that may possibly be noise) will be registered into "infoStick[**0**]" as the stick shaped object candidate once (as indicated by **241** in FIG. **16**), but when the pixel sequence becomes discontinuous, it is removed from the stick shaped object candidates (actually deleted by the processing of step **222**) (as indicated by **242** in FIG. **16**). The real finger tip portion is registered in "infoStick[1]" as indicated by **243** in FIG. **16**. Here, the "status" is changed to NOSTICK simply for the purpose of removing it from the stick shaped object candidates.

By means of this, at a time of judgement of the step **224** in the next scan, only the structure elements having the value STICK will be referred, and the structure elements having the value NOSTICK will be ignored. Also, in this manner, the once used structure element can be used for a registration of a new stick shaped object candidate again by changing its value to NOSTICK, so that a memory can be saved. By carrying out this processing, it is possible to reduce the influence of the noise.

At the step **224**, the judgement as to whether it can be connected or not is made only for those structure elements which have a value STICK. Also, at a time of registering a new stick shaped object candidate, the structure element having a value NOSTICK is searched and the new information is stored there.

FIG. **14** shows the processing of the stick shaped object tip end extraction unit **214** and the center of gravity detection unit **215**. When the condition of the step **227** of FIG. **13** is satisfied, the processing proceeds to the step **229** of FIG. **14**.

IPR2021-00920
Apple EX1003 Page 113

6,144,366

**23**

At the step 230, a parameter TH for the purpose of extracting the tip end of the stick shaped object is obtained. This threshold may be a fixed one, but it can also be determined according to the size and the pixel values of the tip end portion of the stick shaped object as in the step 230. When the formula shown in the step 230 is used, a difference between the lengths of the extracted tip end portion in the vertical and horizontal directions does not become so large even when the pixel values are changed as a result of different finger thicknesses or different distances. A first ratio of a thickness of a stick (i.e. the pixel value sum in one line, where the 0-th line is excluded from the calculation because it is at the tip end which often has no thickness) and the maximum pixel value for one pixel is obtained, and a second ratio of TH (i.e. the pixel value sum of the extracted portion) and the maximum pixel value is set to be a square of the first ratio. It is also possible to obtain TH by the calculation method other than this.

At the step 231, the value a and k described above are obtained according to the above equation (1) by using TH obtained by the step 230. In the above equation (1), the calculation is made by using a rectangular region, but in the step 231, the calculation is made by using only the partial pixel sequence of each line. In this manner, the influence of the noise at the position unrelated to the stick shaped object within the rectangular region can be reduced. For example, when the finger is pointing to an oblique direction as shown in FIG. 17, the influence of a noise 244 can be avoided.

At the step 232, a value a obtained at the step 231 is multiplied with each pixel value of the k-th line.

These steps 230 to 232 constitute the processing of the stick shaped object tip end extraction unit 214.

Then, at the step 233, the center of gravity is calculated by using the values a and k and the corrected pixel values. In principle, the x-coordinate of the center of gravity is given by a sum of the products of respective pixel values and x-coordinate values in the partial pixel sequences up to the k-th line divided by TH (which is equal to a total sum of the pixel values), and the y-coordinate of the center of gravity is given by a sum of the products of respective pixel values and y-coordinate values in the partial pixel sequences up to the k-th line divided by TH (which is equal to a total sum of the pixel values). Here, xsum[i] is known, so that the y-coordinate of the center of gravity is obtained as a product of this xsum[i] and the y-coordinate (infoStick[n].ystart+i) divided by TH. Here, of course, xsum[k] is re-calculated by the corrected pixel values. xpsum[i] is a sum of products of respective pixel values and x-coordinate values in the partial pixel sequence of the i-th line, and the x-coordinate of the center of gravity is calculated by using this xpsum[i] in the formula shown in FIG. 14.

Up to this point, the processing has been described for a case of dealing with an image in which the finger is extended in the direction perpendicular to the optical axis of the photo-detection sensors. In practice, however, the finger is often also pointed along the direction of the optical axis of the sensors. In the following, the method for obtaining the position of the finger tip which is pointing toward the sensors will be described.

In a case where the finger is extended along the optical axis direction (toward the sensors), the reflected light image appears as shown in FIG. 18, where a portion corresponding to the finger tip has the pixel value that is abruptly increased. In FIG. 18, the blacker pixel indicates the pixel with the larger pixel value. Here, it is possible to merely find the extremum point of the pixel values and use it as the pointing position. The calculation processing in such a case will be

**24**

very simple. However, in such a method, it is impossible to obtain the finger tip position at the precision better than the resolution of the image. Here, similarly as in a case of extending the finger upwards (toward the direction perpendicular to the optical axis direction), a method for obtaining the finger tip position at the precision better than the resolution of the image will be described.

First, a pixel where the pixel value is the maximum is found. This can be done easily by the comparison of the pixel values. Then, for a surrounding small region Γ of this pixel, the coordinate of the finger tip position is determined by the following expression (5).

$$\left( \frac{\sum\limits_{\Gamma} x \cdot P(x, y)}{\sum\limits_{\Gamma} P(x, y)}, \frac{\sum\limits_{\Gamma} y \cdot P(x, y)}{\sum\limits_{\Gamma} P(x, y)} \right) \qquad (5)$$

This can be regarded as the center of gravity of the pixels within the small region Γ. As for the surrounding small region Γ, it is customary to set it to be a rectangular region such as 3x3 or 5x5, but it is not necessarily limited to this, and it can be non-rectangular region. By using this formula, not just the pixel at the maximum point but its surrounding pixels are also taken into account.

For example, consider a case where the finger tip position has slightly changed, as from a state shown in a part (a) of FIG. 19 to a state shown in a part (b) of FIG. 19, where a region enclosed by the bold line is the small region Γ. Here, the change is so small that the coordinates of the maximum point 246 is unchanged. However, the pixel values of the surrounding pixels are changed, in such a manner that the pixel value of the surrounding pixel 247 on one side become slightly larger while the pixel value of the surrounding pixel 248 on the other side becomes slightly smaller, for example. This change can be taken into account by using the above formula, as shown in FIG. 19 where the center of gravity position indicated by the X mark is slightly changed accordingly.

Thus, it is possible to detect the finger tip position at the precision better than the resolution of the reflected light image in this manner. This calculation can also be realized by the formula other than that of the above expression (5). For example, the following expression (6) may be used instead.

$$\left( \frac{\sum\limits_{\Gamma} x(P(x, y) - Pmin)}{\sum\limits_{\Gamma} (P(x, y) - Pmin)}, \frac{\sum\limits_{\Gamma} y \cdot (P(x, y) - Pmin)}{\sum\limits_{\Gamma} (P(x, y) - Pmin)} \right) \qquad (6)$$

where Pmin is the minimum pixel value in the small region Γ. The effect of using this expression (6) is as follows.

For example, consider a case where the finger tip position has moved so that a portion of the reflected light image has changed as in states shown in parts (a) to (c) of FIG. 20, where a region enclosed by the bold line is the small region Γ, and the X mark shown in the small region indicates the center of gravity position calculated by the above expression (5).

In the change from a state (a) to a state (b), the finger tip has slightly moved to the right. Accordingly, the value of the pixel 249 is slightly decreased while the value of the pixel 250 is slightly increased. The center of gravity position (X mark) is also moved slightly to the right. In this case, the center of gravity position also changes according to the movement of the finger.

IPR2021-00920
Apple EX1003 Page 114

6,144,366

25

In the change from a state (b) to a state (c), the coordinates of the maximum pixel is changed, so that the position of the small region Γ is also changed.

Now, consider states immediately before and after the maximum pixel position change. Immediately before the maximum pixel position change, the values of the pixels 249 and 250 in a state (b) are almost the same. Nevertheless, when the above expression (5) is used, the center of gravity position is displaced from a middle point between the pixels 249 and 250, toward the left side, because of the weights of the surrounding pixels. On the other hand, immediately after the maximum pixel position change, the values of the pixels 249 and 250 are also almost the same, but the center of gravity position is displaced toward the right side this time, also because of the weights of the surrounding pixels. This implies that the center of gravity position does not move smoothly between immediately before and after the maximum pixel position change. In other words, it is difficult to point a middle point between the pixels 249 and 250 in a case of using the above expression (5).

In contrast, in a case of using the above expression (6), the minimum pixel value within that small region is subtracted from the pixel value sum within the small region, so that the influence due to the surrounding pixels becomes smaller, and the center of gravity position immediately before and after the maximum pixel position change can be located near the middle point between these two pixels.

Which one of these expressions (5) and (6) is to be used in the pointing position calculation can be determined according to the factors such as a relationship between a size of a region occupied by a single pixel and a size of the finger, the required precision for the pointing position, etc. When a region occupied by a single pixel is small (i.e. when the resolution of the reflected light image is relatively high), or when the required precision is low, the requirement on the center of gravity calculation is not severe.

It is also possible to provide the hysteresis characteristic to the pointing positions, so as to realize the satisfactory pointing operation. For example, in a case of obtaining the pointing position in 0.1 pixel unit (with respect to the pixel of the reflected light image) by rounding it to the one decimal, when the coordinate value near 10.05 is obtained, values 10.0 and 10.1 will appear unstably or alternately so that a cursor will be fluttered if a cursor is displayed. In such a case, it is possible to avoid calculating such an unstable pointing coordinate by giving a hysteresis characteristic in which the increase of the coordinate value over 0.07 is rounded to the increase by 0.1 and the decrease of the coordinate value below 0.03 is rounded to the decrease by 0.1 when the change of the calculated coordinate value is small.

In the above described processing, the maximum pixel value within the small region indicates the distance to the finger tip, so that it is possible to carry out the three-dimensional pointing by using it. Also, when the motion of pushing by the finger can be captured as a motion in the depth direction as in the example described above, it is possible to realize the clicking by using it.

In the above, the method for detecting the finger tip position at the precision better than the resolution of the reflected light image has been described for two cases including a case where the finger is extended upwards (along the direction perpendicular to the optical axis of the photo-detection section) and a case where the finger is extended forward (toward the photo-detection section). In the practical use, it is often difficult to determine the direction of the extended finger as either one of these two, because the

26

direction for extending the finger may be different for different users or may be changed by the same user at different occasions. Consequently, by judging the direction to which the finger is currently extended, and using the detection method suitable for the judged direction, it becomes possible to obtain the finger tip position stably regardless of the direction to which the finger is pointing.

Now, by using the finger tip position obtained in the above, the cursor on the screen can be controlled. When the finger tip position is set in correspondence to the cursor position within the screen, the cursor is displayed at the corresponding position when the finger is extended. Also, when the finger is moved, the cursor is also moved. When the finger is withdrawn, the cursor disappears. However, these functions alone cannot provide an equivalent of the mouse button. To this end, instead of pushing the mouse button (clicking), the cursor is set to be stationary in this embodiment.

FIG. 21 shows a configuration for realizing these functions. In FIG. 21, a finger tip position detection unit 251 obtains the finger tip position at the precision higher than the resolution of the reflected light image as explained above.

A cursor position determination unit 252 determines a position to display the cursor according to the finger tip position. The simplest method for this is to set the finger tip position and the cursor position in one-to-one correspondence. However, the obtained finger tip position may contain noises or minute vibrations of the human hand, so that the cursor would be minutely vibrating if the cursor position is uniquely determined from the finger tip position. It is possible to quantize the cursor positions to such a level that the minute vibrations can be eliminated, but then the precision will be lowered.

These minute vibrations can be suppressed by applying a low pass filter using the finger tip positions over the past several frames. For example, when the latest finger tip position is (x0, y0) and the finger tip position in n frames earlier time is (xn, yn), the cursor position (x, y) can be determined by the following equation (7).

$$(x, y) = \left( \sum_{i=0}^{k} ai \cdot xi, \sum_{i=0}^{k} ai \cdot yi \right) \qquad (7)$$

Here, k indicates the finger tip positions of how many previous frames should be taken into account, and when this is too large, the cursor movement tends to react with delay in response to the finger movement. Also, ai is a weight for each finger tip position in the past.

It is also possible to consider the processing in which, after the cursor position at some point is determined, the original position is retained stationary until the new position is separated from the original position by more than a prescribed distance. In this manner, even when there are minute vibrations, the cursor position will remain unchanged and the cursor only moves when the finger is moved largely.

It is also possible to utilize the fact that the direction of the movement is unstable in a case of the minute vibrations, such that the cursor is kept stationary until the movements into the same direction are made for more than a prescribed number of times, and the cursor position is updated only when the movements into the same direction are made for more than a prescribed number of times.

A cursor display unit 253 displays the cursor on the screen according to the cursor position determined by the cursor position determination unit 252.

IPR2021-00920
Apple EX1003 Page 115

6,144,366

27

A cursor stationary state detection unit **254** monitors a change in time of the cursor position, and when the cursor is detected to be in the stationary state (or moving little) for over a prescribed period of time, a click signal **255** is generated. Using this configuration, it is possible to move the cursor by the finger, and carry out the click operation by setting the cursor stationary.

In a case of using the mouse, the click operation is carried out explicitly by the operator by pushing the mouse button. However, when the click signal is to be generated by setting the cursor stationary, there can be cases where the click is made without being noticed by the operator, and this may cause some inconvenience in some cases. In this regard, the cursor display unit **253** can monitor the click signal generation and changes the shape of the cursor when the click signal is generated, so that it is possible to provide a feedback to the operator indicating the occurrence of the click.

For example, consider a case of carrying out the operation to select one option from the pull down menu. First, the cursor appears as the finger is extended, so that the operator moves the finger in order to move the cursor to a position of the menu item. When the cursor is set stationary for a prescribed time after it has been moved on that menu item, the pull down menu appears. Then, when the finger is further moved downwards, the cursor moves while reversing the menu display. Then, when the cursor is set stationary at a desired menu option, that menu option command is activated.

Note that this method may seem to introduce many erroneous operations, because when the mouse is used the cursor always remain stationary while the mouse is not operated. However, in this method, the cursor disappears when the finger is not extended, and the finger is extended only purposefully (in order to select some menu option, for example), so that it is highly unlikely for the cursor to be set stationary before the cursor reaches to the target position. Consequently, it is quite natural in this embodiment to replace the usual click operation by the operation to set the cursor stationary.

In the above described example, only the tip end portion is extracted from the image of the finger tip and its center of gravity is obtained. By means of this, it is possible to realize the two-dimensional pointing such as the pointing on the computer screen. By capturing the feature quantity indicating the motion in the depth direction (approaching to or moving away from the photo-detection section) in addition, it also becomes possible to input more than just the two-dimensional information, or the three-dimensional information.

For example, when the motion of "approaching a little and then moving back" is detected, it is possible to generate a signal corresponding to the mouse click. By means of this, it becomes possible to move the cursor by the finger and make a selection from the menu by making an action of "pushing".

Also, although it is not possible to input the distance to the finger rigorously, it is still possible to detect "approaching" or "moving away" in the relative sense, so that it is possible to combine this information with the feedback by the display so as to realize the input of the three-dimensional position information. Namely, in a case where the finger is extended upwards, when the finger moves in the depth direction, the received light amount at the photo-detection element which is photo-detecting the reflected light from the finger increases or decreases. Also, apart from the output of each photo-detection element, a number of pixels occupied by the

28

finger also increases or decreases. When the finger approaches, the width of the extended finger becomes larger, from 1.5 pixel part to 2 pixel part, for example.

In the above described example, in a case of detecting, the stick shaped object by scanning the horizontal lines, the stick shaped object is judged to be present when there are consecutive lines in which the partial pixel sequence appear at the same position. Here, the pixel value sum in the partial pixel sequence on one line can be utilized as a quantity corresponding to the distance. When the finger is extended forward, the pixel value sum in the small region $\Gamma$ described above can be used as a quantity corresponding to the distance.

Also, apart from extracting the distance information, it is also possible to utilize it as an information for determining an appropriate size of the small region. For example, when the finger tip is too large with respect to the small region $\Gamma$, all the pixels within the small region $\Gamma$ have equally high values. In such a case, there are too many candidates for the maximum point and the maximum point position cannot be obtained stably, so that the small region is enlarged. Also, in such a case, instead of simply setting the maximum point at the center of the small region, a center of a group of pixels having pixel values above a certain value can be set at a center of the small region $\Gamma$ and the size of the small region $\Gamma$ can be enlarged such that pixels having pixel values smaller than that certain value will be included at the peripheral portion.

It is also effective to utilize various finger tip gestures as commands, in addition to a case of "pushing" described above. FIG. **22** shows a configuration which can recognize the operator's finger action and utilize it as the input information. For example, when the cursor is moved above some icon, and then the finger action in a form of "=" is made, a command related to that icon can be activated. Also, when the finger action drawing a circle is made, an object within the circle is selected. In FIG. **22**, a cursor or finger tip position movement detection unit **256** monitors the movement of the finger tip or the cursor, and when there is a movement matching with the pre-registered one, a corresponding command or the click signal **257** is outputted.

It is also possible to utilize the cursor position in relation to the button state as the input information. For example, the cursor is moved above some menu option by moving the finger, and then a button is depressed to select that menu option. Also, when the finger is moved while the button is depressed on some icon, the icon can be moved. In this manner, the operations such as click and drag of the mouse can be realized by using the button similarly as the mouse button. Here, the button should preferably be provided at such a position where the operator extending one hand for the purpose of controlling the cursor can conveniently depress the button by another hand. In this manner, it is possible to realize a quicker click operation than a case of setting the finger stationary or a case of making the "pushing" action. It is also possible to give the operator a real impression of having done some operation. This is effective when both hands can be freely used.

In contrast, it is preferable to be able to carry out the click operation by one hand when the cursor is to be operated by one hand with respect to a wrist watch like very compact portable information device worn on another hand, or with respect to a compact portable terminal held by another hand.

As described, according to this second embodiment, it becomes possible to realize the pointing without requiring the user to wear anything special, so that the burden on the user can be reduced significantly.

IPR2021-00920
Apple EX1003 Page 116

6,144,366

29

<Third Embodiment>
Referring now to FIG. 23 to FIG. 34, the third embodiment of the present invention will be described in detail.

This third embodiment is directed to another exemplary case of the feature data generation unit of the first embodiment, which realizes a gesture camera for recognizing the hand action easily and its application as a pointing device in the three-dimensional space.

FIG. 23 shows an exemplary configuration of the feature data generation unit according to this third embodiment, which comprises: a range image memory unit 331 for storing the distance information extracted by the reflected light extraction unit in a form of N×N matrix as shown in FIG. 24, for example; a shape memory unit 332 for storing shape interpretation rules; and a shape interpretation unit 333 for interpreting a shape of the distance matrix stored in the range image memory unit 331 according to the shape interpretation rules stored in the shape memory unit 332.

FIG. 25 shows the flow chart for the shape recognition processing carried out by this feature data generation unit of FIG. 23.

First, the range image extracted by the reflected light extraction unit is registered into the range image memory unit 331, in 256 step gradation, for example (step 401). The registered range image is then read out to the shape interpretation unit 333 in a form of N×N matrix (where N is 16, for example) as shown in FIG. 24, for example (step 402). The shape interpretation unit 333 carries out the processing for extracting only those cells which are reaching to a prescribed threshold, from the distance matrix (step 403). In addition, the processing necessary for the matching at the step 404 is also carried out here. There are many matching schemes, and accordingly there are many types of processing that can be carried out here, such as a vectorization for extracting a vector from an image, an extraction of a deformation state of a shape according to a shape model, a spectrum analysis based on the distance value on the scanning line, etc.

Here, for the sake of simplicity, a case of using the matching scheme according to a rectangle extracted from the shape will be described. For example, parts (a), (b) and (c) of FIG. 24 show the range images when the index finger is pointed upwards, towards the right, and obliquely upwards, respectively. With respect to each of these range images, a rectangle is formed by joining midpoints of cells with high intensities (the intensity is higher for a darker cell in FIG. 24). The resulting rectangles for the range images of parts (a), (b) and (c) of FIG. 24 are as shown in parts (d), (e) and (f) of FIG. 24, respectively. As a result, according to the obtained normalized distance matrices, the rectangles as shown in parts (d), (e) and (f) of FIG. 24 are extracted in this example, and the matching, with the shapes stored in the shape memory unit 332 is carried out (step 404).

FIG. 26 shows an example of the shape interpretation rules stored in the shape memory unit 332. For example, for each of the range images of parts (a), (b) and (c) of FIG. 24, there is only one rectangle so that the first RULE-1 of FIG. 26 is matched. The matching result of this RULE-1 is the pointing, so that next the matching with respect to the pointing rule is made. In the pointing rule, the vertical and horizontal check is carried out first. A part (a) of FIG. 24 matches with a rule that vertical/horizontal ratio is greater than 1, for example. As a result, the slope check-2 is carried out next. In the slope check-2, the slope is nearly equal to 0 and parts of closer distances (darker cells) are present at the upper section, i.e., the center of gravity is located in the upper section in this case, so that the first rule is matched,

30

and therefore the matching result is a command for turning upward. When the matching shape is found, a command corresponding to that shape is outputted (step 405). If there is no matching shape, the threshold is changed (step 406), and the matching processing is carried out again.

In a case of utilizing this third embodiment as a pointing device in the three-dimensional space, it is necessary to provide the depth coordinate.

FIG. 27 shows the distance matrices in a case of using the finger as the three-dimensional pointing device. A part (a) of FIG. 27 shows a state in which the index finger is extended and the other fingers are turned in. Parts (a) and (b) of FIG. 27 shows the same hand action but the distance of the closest part is closer in the part (b) than the part (a) of FIG. 27. According to the shape interpretation rules of FIG. 26, both parts (a) and (b) of FIG. 27 match with the RULE-1, and in the vertical and horizontal check, the vertical/horizontal ratio is nearly equal to 1 so that the first rule is matched, so that it is an object select/move forward command.

In the two-dimensional space, it is impossible to move forward toward the screen, so that it is an object select command. In the object select, when the transition time from the part (a) to the part (b) of FIG. 27 is over a prescribed time, it is interpreted that an object on which the cursor is located is selected. In a case of the three-dimensional space, it is possible to move forward into the depth direction, so that it is an object select or move forward command.

In a case of the object select, similarly as in the two-dimensional case, the judgement is made according to the transition time from the part (a) to the part (b) of FIG. 27. On the other hand, in a case of the move forward, the distance becomes closer from the part (a) to the part (b) of FIG. 27, so that an adjustment to make the moving forward speed faster can be made. Else, the actual moving forward is not made in the state of the part (a) of FIG. 27, and the moving forward as much as the distance that becomes closer is made when the hand action of the part (b) of FIG. 27 is made.

In this manner, the viewpoint can be controlled as if the viewpoint is actually located at the finger tip, so that the natural operation can be realized.

In this third embodiment, it becomes possible to easily realize the recognition of the hand action, that has not been possible conventionally unless some special device such as the data glove is worn. Also, in the conventional image processing, the recognition has been difficult as the extraction of the hand image has been difficult, but in this third embodiment, there is no need for the extraction, so that the hand action recognition accuracy can be improved and the processing speed can be increased considerably. It is experimentally confirmed that the processing for 30 times per second is actually possible. This is faster than 0.1 second which is the condition for the human interface with the ideal response speed. Consequently, it is possible to carry out the truly natural operations and its effect is enormous.

Note that the shape interpretation rules of FIG. 26 are just an example, and various modifications are possible. Also, for the sake of simplicity, the matching scheme using the rectangular division is described, but this is also just an example. The shape interpretation rules should be changed according to the matching scheme, and the shape interpretation result should be changed according to the intended application. Also, the 16×16 distance matrix is used in the above description, but the present invention is not limited to this arrangement. If the photo-detector elements can be arranged densely, it is also possible to use the arrangement such as 64×64 or 256×256. The matching scheme and the

IPR2021-00920
Apple EX1003 Page 117

6,144,366

**31**

shape interpretation rules obviously should be changed when the precision of the matrix in increased.

Also, this third embodiment has been described for a case of using the hand gesture recognition as the means for inputting the command in the three-dimensional space and the like into the computer, but the present invention is not necessarily limited to this case. For example, it is also possible to utilize this third embodiment as the means for instructing the power ON/OFF of the TV, the lighting equipment, etc.

In such a case, there is a possibility for erroneously recognizing even those gestures which are not intended as commands. In order to prevent an occurrence of such an erroneous commanding, the command input can be given by a combination of a plurality of shapes. For example, the command input is given by alternating the hand opened state and the hand closed state. Parts (a), (b) and (c) of FIG. 28 show exemplary range images of the hand gestures using two fingers, fist, and five fingers, respectively. It is possible to make a setting such that the power is turned ON when the hand gestures of the parts (a), (b) and (c) of FIG. 28 are made in this order, and the power is turned OFF when these hand gestures are made in the reverse order. In this manner, even when the hand or the person moves in front of this device, it is possible to prevent the power from being turned OFF as a result of the erroneous recognition.

The shape interpretation rules to be used by the shape interpretation unit **333** in such a case of giving a command by a combination of a plurality of gestures is as shown in FIG. 29, for example. Here, the interpretation specialized for a case of the power ON/OFF is considered for the sake of simplicity. It is impossible to judge whether it is a single finger or a fist according to a number of rectangles, so that it is judged as a fist here when the area largely exceeds a threshold $\alpha$.

By combining a plurality of gestures in such a manner, it is possible to realize the natural operations for the power ON/OFF of the lighting equipment and the like, without the erroneous operation and without requiring any special tool. Apart from the switch ON/OFF for the home electronic appliances such as lighting equipment and TV, it is also possible to apply this third embodiment as an input device for the bank cash dispenser (automatic teller machine), the automatic ticket vending machine at the station, etc.

Also, this third embodiment has been described for a case of interpreting the shape of the hand, but the present invention is not necessarily limited to this case. For example, it is also possible to control the viewpoint information by recognizing the orientation of the face.

FIG. 30 shows a screen and the person facing to this screen along with the three-dimensional objects (cylinder, pyramid, sphere) displayed on this screen, which are viewed from the above, for the purpose of explaining a case where the orientation of the face (that is, the direction of the viewpoint) changes. The viewpoint-1, viewpoint-2 and viewpoint-3 indicates the orientations of the person's face with respect to the screen. The viewpoint-1 is a case where the face is oriented straight toward the screen. The viewpoint-2 is a case where the face is oriented toward the right direction with respect to the screen (an orientation in which the left cheek comes closer to the screen). The viewpoint-3 is a case where the face is oriented toward the left direction with respect to the screen (an orientation in which the right cheek comes closer to the screen).

The three-dimensional objects actually seen from these three viewpoints are as shown in parts (a), (b) and (c) of FIG. 31. Namely, in the viewpoint-1, all three objects can be seen

**32**

completely, but in the viewpoint-2, a part of the cylinder along the left edge is out of view, whereas in the viewpoint-3, the sphere along the right edge is completely out of view.

It is possible to make a change of these viewpoints by using a finger. For example, it is possible to set a state of pointing the finger vertically with respect to the screen (as in a part (a) of FIG. 27) as a command for the viewpoint-1, a state of pointing the finger toward the right with respect to the screen (as in a part (b) of FIG. 24) as a command for the viewpoint-2, and so on.

The problem with this scheme of controlling the viewpoint by the hand is that the handling is largely different from the viewpoint control in the real world. In the real world, the viewpoint is controlled by the orientation of the face (normally unconsciously) in such a manner that the objects present on the right side are viewed by turning toward the right, and the objects present on the left side are viewed by turning toward the left, and the finger is used for the purpose of pointing a specific object among the visible objects, not for changing the viewpoint. In this regard, the data glove or the space mouse utilized in the conventional VR technology are also associated with the problem that the natural handling cannot be realized.

In contrast, according to this third embodiment, the natural handling can be realized as follows. FIG. 32 shows exemplary range images of the face orientations as acquired by the information input generation apparatus of the present invention. A part (a) of FIG. 32 shows a state of the viewpoint-1 in which the face is oriented straight toward the screen, a part (b) of FIG. 32 shows a state of the viewpoint-2 in which the face is oriented toward the right direction, and a part (c) of FIG. 32 shows a state of the viewpoint-3 in which the face is oriented toward the left direction.

Parts (d), (e) and (f) of FIG. 32 shows rectangles extracted from the range images of parts (a), (b) and (c) of FIG. 32, respectively. Here, in order to extract a rectangle corresponding to the nose, three types of rectangles are extracted from the farthest cells (the palest cells, corresponding to the contour portion of the entire face) and the closest cells (the darkest cells, corresponding to the nose) and the farther cells right above the farthest cells (the paler cells, corresponding to the eyes).

FIG. 33 shows one example of the shape interpretation rule for the moving object parallax. Here, for the sake of simplicity, an exemplary shape interpretation rule specialized for a case of recognizing the face orientation is shown.

The RULE-1 checks whether two rectangles corresponding to the entire face and the nose are extracted or not. If not, no particular processing is carried out here (NULL) according to the RULE-2. When these two rectangles are present, according to the face check rule, whether there is a relationship of having the larger rectangle farther and the smaller rectangle nearer or not is checked. If not, it is judged that something other than the face is imaged, so that no particular processing is carried out here (NULL). Only when these two rectangles are in the right relationship, the viewpoint direction calculation is carried out according to the following formula (8).

$$L \; 0 \rightarrow \text{Viewpoint Direction} = arcsin((L-R)/L)$$

$$L=0 \rightarrow \text{Viewpoint Direction} = -90° \qquad (8)$$

Here, when L=0, it is interpreted that the face is oriented toward the left direction at 90° so that the nose is present along the left edge, and therefore the viewpoint direction becomes −90°. When the face is oriented straight, L and R

IPR2021-00920
Apple EX1003 Page 118

6,144,366

**33**

are equal so that the numerator becomes 0 and the viewpoint direction becomes 0°. When L is greater than R, the face is oriented toward the right direction as much. When R=0, the viewpoint direction becomes 90° and the nose is present along the right edge so that the face is oriented toward the right direction completely.

In this example, the viewpoint shift between left and right has been described, but the viewpoint control between the viewpoint for looking down from the above and the viewpoint for looking up from the below can also be realized similarly. In such a case, it suffices to recognize whether the position of the nose is upper side or lower side with respect to the face.

By means of the interpretation as described above, it becomes possible to realize the viewpoint change according to the face orientation, and it is possible to realize the natural operations.

When the information input generation apparatus of the present invention is implemented in a compact size, it can be utilized as an input device for the portable information terminal. In such a case, it is possible to change the position of the portable information terminal with respect to the face, as indicated in FIG. 34. Namely, instead of moving the face, the terminal can be moved by the hands. In this manner, the face orientations in the viewpoint-1 to viewpoint-3 become similar to those shown in FIG. 32, and therefore the viewpoint control similar to a case of FIG. 31 can also be realized. The same also applies to the up and down directions.

In this manner, the true moving object parallax can be realized. In other words, it is possible to realize the truly direct handling for the user as if the large three-dimensional space is seen through a window in a form of the screen of the portable information terminal.

<Fourth Embodiment>

Referring now to FIG. 35 to FIG. 45, the fourth embodiment of the present invention will be described in detail.

The third embodiment described above recognizes a shape and converts it into a command for a computer, which is convenient for such operations as the power ON/OFF, but it is regrettably not suitable for such operations as an operation for giving a motion to a character or changing a speed of the motion in the animation. When such operations are to be handled by the shape recognition alone, it is necessarily in a form of operating a slider and the like for the purpose of adjusting the speed, and it is impossible to manipulate the motion directly. In order to resolve this problem, this fourth embodiment is directed to another exemplary case of the feature data generation unit; of the first embodiment, which realizes a motion input.

FIG. 35 shows an exemplary configuration of the feature data generation unit according to this fourth embodiment, which differs from that of FIG. 23 in that an image change extraction unit 343 is provided in place of the shape interpretation unit 333 of FIG. 23, and a comparison position memory unit 342 is provided in place of the shape memory unit 332 of FIG. 23.

The comparison position memory unit 342 stores positions in the past which are to be compared with current position, such as the positions calculated by the image change extraction unit 343 including the center of gravity position or the closest position for M frames previous case, for the purpose of calculating the motion vector.

The image change extraction unit 343 analyzes the distance matrix and extracts the motion vector from the changes of the center of gravity position, the closest position, etc., for example. As for the calculation of the

**34**

center of gravity position, the closest position, etc., the error due to the minute vibration of the hand action is cancelled out by taking an average over M frames. In other words, the center of gravity position (Xn,Yn) in the i-th frame is given by the following equations (9).

$$Xn = \sum_{j=0}^{j=M-1} Xi - j / M \qquad (9)$$

$$Yn = \sum_{j=0}^{j=M-1} Yi - j / M$$

FIG. 36 shows the flow chart for the processing by the feature data generation unit of FIG. 35. First, prior to the processing, the content of the comparison position memory unit 342 is initialized to an empty state at the step 901. Then, the range image is stored into the range image memory unit 331 (step 902). Then, the distance matrix is read out (step 903), and the center of gravity position, for example, is calculated (step 904). The calculation of the center of gravity position is carried out as follows, for example. In the first time, the center of gravity position (Xn−1,Yn−1) is not stored in the comparison position memory unit 342 (step 905 NO) so that it is stored into the comparison position memory unit 342 (step 907).

Next, when the center of gravity position (Xn,Yn) is calculated, (Xn−1,Yn−1) of the M frames previous case is stored in the comparison position memory unit 342, where the time required in changing from (Xn−1,Yn−1) to (Xn,Yn) is M·1/30=M/30 sec. Consequently, the motion vector is given by the changed part ((Xn,Yn)−(Xn−1,Yn−1)) divided by this time. That is, the motion vector v is calculated by the following equation (10) (step 906).

$$v = ((Xn,Yn) - (Xn-1,Yn-1))/M/30 \qquad (10)$$

Now, an exemplary case of giving the motion to the animation by using the extracted motion vector will be described. In a character of a doll as shown in a left side of FIG. 37, when the positions of both hands are moved, this character appears as shown in a right side of FIG. 37. When the value of the motion vector v is large, the motion becomes fast and the movement of the hands of the doll becomes large so that it becomes a violent motion. On the other hand, when the value of the motion vector v is small, the movement becomes slow so that it becomes a gentle motion.

In the above example, a case where the image change extraction unit 343 calculates the motion vector has been described, but the present invention is not necessarily limited to this case, apart from that case, it is also possible to calculate the swinging range alone, or the speed alone, or also the angle, from the motion vector. In these cases, the step 906 in the processing of FIG. 36 should be replaced by the step 908, 909 or 910. For example, it is also possible to extract the change in the X-direction as the swinging range and the motion in the Y-direction as the speed, in such a manner that the position of the doll is controlled by the swinging range while the motion speed of the doll is controlled by the speed as shown in FIG. 38.

Alternatively, it is also possible to control the swinging angle of the head of the doll by the swinging angle of the finger. In this case, the simple calculation of the center of gravity cannot provide an accurate center of gravity. Namely, as shown in a part (a) of FIG. 39, between the finger at time t and the finger at time (t+1) resulting from the swinging of the finger at the time t, the pivotal point of the

IPR2021-00920
Apple EX1003 Page 119

6,144,366

35

finger is displaced so that the angle becomes larger than the actual angle. When it is tolerable to have somewhat exaggerated motion than the actual swing of the finger, there is no problem in using this swinging angle directly. However, when it is desired. to give a sophisticated motion, this is inconvenient.

In order to avoid this problem, it is necessary to calculate the center of gravity after the pivotal points of the finger at the time t and at the time (t+1) are set to coincide with each other. More specifically, denoting the pivotal point of the finger at the time t as (Xst,Yst), the center of gravity of the finger at the time t as (Xbt,Ybt), the pivotal point of the finger at the time (t+1) as (Xst+1,Yst+1), and the center of gravity of the finger at the time (t+1) as (Xbt+1,Ybt+1), the pivotal point (X'st+1,Y'st+1) and the center of gravity (X'bt+1,Y'bt+1) of the finger at the time (t+1) as corrected by the pivotal point of the finger at the time t can be given by the following equations (11).

$$X'st+1=Xst+1-Xst$$

$$Y'st+1=Yst+1-Yst$$

$$X'bt+1=Xbt+1-Xst$$

$$Y'bt+1=Ybt+1-Yst$$

By using them, the swinging angle α can be calculated as the following equations (12).

$$Swinging\ Angle\ \alpha=2arcsin(r/2l)$$

$$r=|(X'bt+1,Y'bt+1)-(Xbt,Ybt)|$$

$$l=|(Xbt,Ybt)-(Xst,Yst)|$$

When the swinging angle so obtained is used, as shown in FIG. 40 for example, it becomes possible to give an arbitrary walking motion by swinging the forearm part and the lower leg part in this swinging angle. Also, as shown in FIG. 41 for example, it becomes possible to give a gasping motion at the mouth of a snake character by moving the mouth of this snake character at this swinging angle. By changing the manner of swinging the finger, it is also easily possible to give a mouth motion in relation to the words so as to make this character looks like talking.

It Is also possible for the user to make the mouth motion by himself and move the mouth of the snake character similarly. For example, parts (a), (b) and (c) of FIG. 42 shows the range images of the mouth motion of the user, where parts (a) and (c) shows states in which the mouth is opened, and a part (b) shows a state in which the mouth is closed. The size m by which the mouth is opened is obtained from the range images of FIG. 42. Using an average value for the size of the mouth (denoted as β), the swinging angle can be obtained by the following equation (13).

$$r=arctan(m/2\beta) \hspace{3cm} (13)$$

Then, using this swinging angle, the mouth of the snake character can be moved. It is also possible to use the size m of the opened mouth directly for controlling the opening and closing of the mouth of the snake character.

Conventionally, this type of operation has been realized by an indirect operation in which a slider for controlling the motion is operated, so that it has been extremely difficult for the inexperienced user to give a motion exactly as intended.

36

In contrast, according to this fourth embodiment, it is possible to realize the completely direct operation in such a manner that, when the user makes the action while watching the animation character, the character moves according to that action, so that its effect is enormous.

In FIG. 36 described above, the processing has been described for an exemplary case of extracting the center of gravity position, but the present invention is not necessarily limited to this case. It is also possible to use various other positions such as the closest position, the position where the distance is less than a certain distance in the range image and which is the highest in the X-direction, the position which is rightmost in the Y-direction, etc.

Also, instead of extracting only one type of change as described above, the image change extraction unit may extract plural types of changes. For example, the center of gravity position and the area can be extracted. In this case, the area can be obtained from the distance matrix by counting a number of cells above a certain threshold. At that point, in order to reduce the error, an average over M frames should be taken. Then, the center of gravity position can be used to give a displacement to the both hands while the area can be used to specify a size of the character as a whole. In this manner, when the user alternately opens and closes the hand while changing the hand position, it is possible to realize the animation in which the character moves both hands while changing its size.

As described, according to this fourth embodiment it is possible to realize the natural handling at high speed and low cost while improving the recognition accuracy by using the information (such as the area) other than the distance information. By means of this, it is also possible to realize the operations to give plural commands to the character without requiring the user to remember any sort of difficult operational procedures.

In the third and fourth embodiments described above, the operations using the finger, hand, or face have been described, but the present invention is not necessarily limited to these operations. For example, it is also possible to carry out the operate the character by using both hands and assigning the left hand motion to the left hand and the left leg of the character while assigning the right hand motion to the right and and the right leg of the character, in the manner by which the puppeteer gives motions to the puppet. It is also possible to give a motion to the character by the action for forming and moving a shape of a dog in the shadow picture.

Also, in the above, an exemplary case of operating the two-dimensional animation character has been described, but the present invention is not necessarily limited to this case. For example, by obtaining the depth coordinate for the center of gravity position as well, it is also possible to operate the three-dimensional animation character.

Also, when the present invention is utilized for teaching the rhythmical sense to the children, the change in the X-direction alone may be extracted and the head of the character may be moved by this, so that the child can easily check his own rhythm by watching the character. Also, the motion of the hand of the child can be used not only to give a motion to the character so as to visualize the child's hand motion, but also as a parameter for the media other than computer graphics by generating sound accordingly, for example.

Also, in the above, an exemplary case of giving a motion by using the user's action alone has been described, but it is also possible to use this fourth embodiment in combination with the other input device. For example, while the target object is rotated in correspondence to the right hand motion,

IPR2021-00920
Apple EX1003 Page 120

6,144,366

37

it may be desired to stop the motion of the target object temporarily at the current position, reset the right hand motion back, and then rotate the target object from the stopped position further. In such a case, the command for stopping or releasing can be given by pushing a menu button for the stopping or releasing command using the left hand. Else, when some motions are given to the target object, it may be desired to memorize a series of motions, and in such a case, an operation to press the menu button for the storing command can be carried out.

In this manner, the operation for giving motions which cannot be easily realized by the simple menu buttons and the operation that can be easily realized by simply pressing the menu buttons can be carried out in parallel without causing any sense of unnaturalness to the user, so that its effect is enormous.

FIG. 43 shows a modified configuration of the feature data generation unit according to the fourth embodiment.

In the configuration of FIG. 35, only the change of the image such as the motion vector is extracted and used to give a motion to the animation character. On the other hand, in the configuration of FIG. 23, the range image is recognized as a still image, the action is interpreted, and the interpretation result is used as a command. In contrast, the configuration of FIG. 43 is for extracting many parameters from the range image, and mapping them to parameters for controlling complicated character motions.

To this end, the configuration of FIG. 43 includes both the image change extraction unit 343 and the shape interpretation unit 333. Here, of course, it is possible to extract a plurality of parameters by the image change extraction unit 343 alone, so that it is not absolutely necessary to include the shape interpretation unit 333. On the contrary, it is also possible for the shape interpretation unit 333 to extract not only the action interpretation result but also values of area, center of gravity, etc., so that it is possible to extract a plurality of parameters by the shape interpretation unit 333 alone and therefore it is not absolutely necessary to include the image change extraction unit 343.

A parameter mapping control unit 344 determines the mapping of a plurality of parameters extracted by the shape interpretation unit 333 or the image change extraction unit 343 to the character motion control parameters.

A character control unit 345 actually calculates the character motions according to the parameters mapped by the parameter mapping control unit 344. A drawing unit 346 depicts the resulting character with motions.

At the parameter mapping control unit 344, it is possible to control the parameter mapping by using various optimization techniques such as the neural network and GA (Genetic Algorithm), for the purpose of making the user training easier. Else, it is also possible for the parameter mapping control unit 344 to determine the mapping of each parameter in advance. For instance, in an example of the snake character of FIG. 41, it is possible to determine the parameter mapping such that an area corresponds to a size of the snake, a speed corresponds to a speed by which the snake wags its tail, a finger position corresponds to a position of the snake, and so on.

In addition, it is also possible to determine the parameter mapping in advance according to the size of the change of the parameter. Namely, some hand actions are made first, and a parameter for which the change is the largest can be mapped to a speed of the snake's tail, a parameter for which the change is the smallest can be mapped to a size of the snake, and so one. Then, when the hand action is made next, the parameters determined by the initial calibration are used.

38

In this case, the user can easily learn the operation to give motions to the character by actually moving the finger or the hand while watching the corresponding change in the character, and it becomes possible to give complicated motions to the character.

Also, in the above, the application to the operation for giving motions to an animation character has been mainly described, but the present invention is not necessarily limited to this case. Apart from the animation, it is also possible to apply the present invention to the operation for playing music or the operation for giving special effects to the image. Namely, it is possible to play music by controlling a rhythm by the swinging of the hand, and notes to be played by the gesture of the hand. It is also possible to control the special display effects in the presentation, by controlling a speed for wiping the image by the swinging of the hand, a rotation of letters by the rotation of the hand, etc. As such, the present invention is applicable to a variety of applications, and not limited to the embodiments described herein.

FIG. 44 shows an exemplary screen display by the GUI (Graphical User Interface) in the configuration of FIG. 43. In this GUI, when it is desired to limit gestures, desired gestures to be limited are to be selected from icons arranged below the screen.

For example, the leftmost icon indicates that a motion in the X-direction can be given by moving the finger tip. Similarly, the second icon from the left indicates that a motion in the Y-direction can be given by moving the finger tip, and the third icon from the left indicates that a motion in the Z-direction can be given by moving the finger tip. On the other hand, the second icon from the right shows shapes of the hand in three states, a state of making a fist, a state of extending two fingers, and a state of extending five fingers. This icon indicates that when this icon is selected the rule stored in the shape memory unit 332 is switched so that these three gestures become recognizable and the corresponding interpretations can be made by the shape interpretation unit 333. Similarly, the rightmost icon shows shapes of the hand in two states, a state of making a fist and a state of extending five fingers, so as to indicate that only these two shapes become recognizable.

In FIG. 44, the icons are displayed in a state where these shaped are shown in overlap, but it is not necessary for these icons to have a static display. For instance, shapes of the hand in three states, a state of making a fist, a state of extending two fingers, and a state of extending five fingers, may be displayed sequentially in a form of animation, so as to indicate that these three shapes are recognizable. Also, a finger may be displayed in motion between left and right so as to indicate that the motion in the X-direction is possible.

It is also possible to select more than one of these icons so as to widen the range of limitation. In this case, when some icon is selected and there is another icon which is not compatible with the selected icon, the incompatible icon may be displayed in the fade-out fashion so that it becomes impossible to select this incompatible icon. In FIG. 45, when the second icon from the right is selected, the rightmost icon is incompatible with the selected icon so that it is displayed in the fade-out fashion. Also, in the GUI configuration of FIG. 44, when a user registers a new action, this new action can also be displayed in a form of an icon. In such a case, the icon can display the simplified view of the range image.

In this manner, any other user can also easily try to use the new icon by imitating the action indicated by the new icon upon looking at this icon display. In other words, by means of the GUI of FIG. 44, it becomes possible for the users to

IPR2021-00920
Apple EX1003 Page 121

6,144,366

**39**

easily learn and easily share the knowledge for giving a motion easily, so that its effect is enormous.

<Fifth Embodiment>

Referring now to FIG. 46 to FIG. 53, the fifth embodiment of the present invention will be described in detail.

The video image compression technique has been progressing rapidly, but it is still difficult to display the video at the portable terminal device in a satisfactory fashion. If it is possible to transmit and display only the useful information, it becomes possible to lower the communication cost, and the power consumption and cost of the portable terminal device can also be lowered. To this end, in the TV telephone, for example, it is desirable to extract and transmit only the faces of both sides. Also, in the electronic conference record, there may be a desire to carry out the retrieval only in terms of close-up views of the face of the speaking person.

In view of these, this fifth embodiment is directed to another exemplary case of the feature data generation unit in the first embodiment, which realizes the chromakey camera for extracting only a specific target from such an image.

FIG. 46 shows an exemplary configuration of the information input generation apparatus according to this fifth embodiment.

Similarly as in the third and fourth embodiments, the feature data generation unit 103 includes a range image memory unit 331 for storing the reflected light image. Here, however, it is not absolutely necessary to store the range image, and it suffices to store a reflection matrix which can be produced by setting a value of each cell to be "1" when the photo-detection is made or "0" when the photo-detection is not made.

In parallel to this, the configuration of FIG. 46 also includes a visible light photo-detection array 351 which is generally used as a CCD camera for taking video images, and an image memory unit 352 for storing the video images.

The configuration of FIG. 46 also includes an extraction unit 353 for extracting an image of only a specific target by comparing the image information stored in the image memory unit 352 and the range image stored in the range image memory unit 331, and an extracted image memory unit 354 for storing the extracted image.

In FIG. 46, the visible light photo-detection array 351 and the reflected light extraction unit 102 are arranged in parallel, but the practical implementation is not necessarily limited to this arrangement. For example, as shown in FIG. 47, it is quite possible to arrange near infrared photo-detectors and visible light photo-detectors mixedly within the same photo-detection array, and share a photo-detection lens so as to reduce the size and the weight.

FIG. 48 shows an outline of the extraction processing carried out by the extraction unit 353. In FIG. 48, the original image is an image photo-detected by the visible light photo-detection array 351, which is stored in the image memory unit 352. On the other hand, the mask is a reflected light image photo-detected by the reflected light extraction unit 102, which is stored as a reflection matrix in the range image memory unit 331. The extraction unit 353 superposes the original image and the mask, and leaves only the overlapping portion. This extracted image is stored in the extracted image memory unit 354.

When the photo-detection operations by the reflected light extraction unit 102 and the visible light photo-detection array 351 are carried out completely in parallel, the photo-detection can be carried out 30 times per second (while the frame rate of the usual video is 30 frames per second). When the extraction speed at the extraction unit 353 is sufficiently fast, it is possible to update the extracted image 30 times per

**40**

second. In such a case, it is possible to update the images stored in the image memory unit 352 and the range image memory unit 331 whenever the photo-detection is made, that is, 30 times per second, so that it is sufficient for each of the image memory unit 352 and the range image memory unit 331 to have a small memory capacity.

On the other hand, when the extraction speed at the extraction unit 353 is not sufficiently fast, it is necessary for each of the image memory unit 352 and the range image memory unit 331 to have a buffer for storing the video image or the range image for an immediately previous frame. However, by carrying out the extraction processing with respect to an average of the previous frame part stored in this buffer and the current frame part, it is possible to compensate for the speed and also improve the S/N ratio.

Next, the manner of utilizing the extracted image will be described. For example, in the conference record system for the electronic conference and the like, the conventional scheme requires to record the video images stored in the image memory unit 352 of FIG. 46 on video tapes, or to record them by using the compression technique such as MPEG2. However, in this conventional scheme, the video image information which is not so important as the conference record such as the image of persons other than the speaking person is going to be recorded so that the wasteful recording is involved and it is impossible to realize the efficient playback such as the playback focused on the uttered contents.

In contrast, according to this fifth embodiment, it is possible to extract only a specific target such as the speaking person (the extracted image shown in FIG. 48 corresponds to the speaking person in this context). By recording the extracted image, it is possible to reduce the recording capacity considerably (in an order of one tenth to one hundredth) and it is also possible to realize the wasteless playback. In this case, the apparatus configuration is as shown in FIG. 49, for example, where an extracted image (compression) recording unit 355 records the extracted image either directly as video signals or by compressing it using the MPEG2 encoder and the like.

It is also possible to transfer the extracted image instead of storing it. In this case, the background image that has conventionally been transferred wastefully can be omitted, so that the amount of transfer data can be reduced considerably. In this case, the apparatus configuration is as shown in FIG. 50, for example, where a (compression) transmission unit 356 transmits the extracted image either directly as video signals or by compressing it using the MPEG2 encoder and the like.

By using the extracted image, it is very easy to realize the chromakey for superposing the extracted image with the other background as shown in FIG. 51. In this case, the apparatus configuration is as shown in FIG. 52, for example, where an image composition unit 357 composes the extracted image with the background image such as that of a map as shown in an upper left side of FIG. 51 which is stored in a background image memory unit 358, at a separately specified position as shown in a lower side of FIG. 51, and outputs the composed image. When the background image is stored in a compressed form, the image composition unit 357 carries out the composition after the decoding is carried out. It is also possible to carry out the composition using the extracted image recorded in advance. It is also possible to carry out the composition using a plurality of extracted images.

Conventionally, in order to extract a specific target from the video image, it has been necessary to carry out the

IPR2021-00920
Apple EX1003 Page 122

6,144,366

**41**                                                           **42**

manual operation for specifying a target to be extracted so that considerable time and effort have been required. In contrast, according to this fifth embodiment, the mask for a target to be extracted can be easily produced from the reflection matrix, so that the conventionally required time and effort can be reduced considerably and therefore its effect is enormous.

On the other hand, by utilizing this fifth embodiment to the conference record system for the electronic conference and the like which uses the face of the speaking person as an index, it is also possible to considerably reduce the operations for inputting the information necessary for the retrieval.

In the above, the reflected light extraction unit **102** and the visible light photo-detection array **351** are supposed to photo-detect simultaneously, but the present invention is not necessarily limited to this case. For example, as shown in FIG. **53**, it is also possible to carry out the photo-detection switchably according to a switch unit **359**. When the switching period is 60 Hz, each of the visible light and the near infrared light can be photo-detected at 30 Hz.

Also, in FIG. **47**, the near infrared photo-detector array is arranged among the visible light photo-detector array, but the present invention is not necessarily limited to this case. For example, it may become possible in future to develop an element which can be controlled to photo-detect either the visible light or the near infrared light by changing the applied voltage. When such an element is used, it is possible to realize the configuration of FIG. **53** by switching the applied voltage for this element at the switch unit **359**.

Also, at a time of composing the extracted image in the configuration of FIG. **53**, a character to be composed is not limited to a single one as shown in FIG. **51**. For example, it is also possible to superpose a plurality of extracted images which are separately extracted in advance onto the background image. At this point, it is also possible to carry out the composition by giving different depth coordinates (Z-coordinate values) to these plurality of extracted images. In this manner, it becomes possible to produce the video image with the depth easily. Here, in conjunction with the given depth coordinates, (X/Z, Y/Z, 1/Z) which is the transparent conversion (for which the extinction point is located at the infinite point) can be applied. In this manner, the image becomes smaller as the depth becomes deeper, so that it is possible to produce the video image with the depth perspective very easily.

&lt;Sixth Embodiment&gt;

Referring now to FIG. **54** to FIG. **58**, the sixth embodiment of the present invention will be described in detail.

There are several methods for producing the three dimensional model of a character. One method is to produce a model of a character by clay and the like, and to trace the major points on the surface by a device called three dimensional digitizer that inputs the three dimensional coordinates. This method can produce an accurate model so that it is often utilized in the fields of movies and commercial messages that use the non-real time high quality video images. When the three dimensional model of a large target object is to be produced, it is quite cumbersome to input all the points on the surface one by one by using the three dimensional digitizer, so that there are cases where a device called range finder that irradiates the laser beam and measures distances according to the reflection is used instead.

Another method is to produce the model by using the three dimensional CAD. This method is suitable for a case of producing the model of a mechanical structure or a building which involves relatively few curved surfaces.

In either method, in order to give the realistic feeling (genuine feeling), the operation called texture mapping for attaching photographs to the produced three dimensional model is required so as to endow the material quality of the character.

The texture mapping is a two-dimensional coordinate conversion for fitting the square pattern (texture) to a (curved) surface of the three-dimensional object. In the often used modeling software, it is required to specify an attaching target surface and the texture to be attached there. This operation is indispensable for providing the realistic sense to the model but it is also quite cumbersome. In particular, this operation required too much burden on an operator and therefore not suitable for such a usage like an entertainment for children to create the animation at home.

In view of these, this sixth embodiment is directed to another exemplary case of the feature data generation unit of the first embodiment which makes it possible to carry out the operation to produce the three dimensional model and attach the textures to the model easily.

FIG. **54** shows an exemplary configuration of the information input generation apparatus according to this sixth embodiment, which differs from that of FIG. **46** in that a Z-value image memory unit **361** for storing the extracted images and the Z-values in correspondence and a drawing unit **362** for carrying out the drawing based on comparison of Z-values are provided instead of the extraction image memory unit **354** of FIG. **46**.

FIG. **55** is for explaining the principle of the drawing based on comparison of Z-values used in this sixth embodiment. In FIG. **55**, parts (a) and (b) show exemplary Z-value images stored in the Z-value image memory unit **361**. This Z-value image is an image obtained by superposing the extracted image as shown in FIG. **48** for example which is stored in the extracted image memory unit **354** in the configuration of FIG. **46** and the range image as shown in a part (a) of FIG. **24** for example which is stored in the range image memory unit **331** in the configuration of FIG. **23**. In other words, the Z-value image has an RGB color information and a depth information given by the Z-value, for each pixel.

The Z-value images shown in FIG. **55** are shown as monochromatic images for the sake of explanation. Also, for the sake of simplicity, it is assumed that the Z-value image shown in a part (a) of FIG. **55** has the uniform Z-value of "1" while the Z-value image shown in a part (b) of FIG. **55** has the uniform Z-value of "2" (FIG. **55** indicates these Z-values by numbers written in the respective image regions for the sake of simplicity). Now, a case of composing the Z-value images of parts (a) and (b) of FIG. **55** will be described, Here, the darker part is assumed to be closer in distance, that is, having a smaller Z-value.

At a time of the composition, the Z-value image of the part (a) is directly drawn first, and then the Z-value image of the part (b) is drawn in superposition. At the pixels (6,6), (6,7), (6,8), (7,6), and (7,7), only the Z-value image of the part (a) exists, so that the Z-value image of the part (a) remains unchanged there. At the pixel (7,8), the Z-value images of the parts (a) and (b) both exist, but the already written Z-value is "1" of the part (a) while the Z-value of the part (b) is "2", which implies that the part (b) is located farther and therefore the part (b) is not drawn there. Hereafter, similarly, the shadowed region is processed by comparing the Z-values and retaining only the image with the smaller Z-value (that is, the image with the smaller distance) at each pixel. By the similar processing, the extracted images can be composed according to the Z-values

IPR2021-00920
Apple EX1003 Page 123

as shown in FIG. **56**, for example, so that the image with the depth perspective can be produced easily.

According to this sixth embodiment, there is no need for the cumbersome operation to input the three dimensional model and specify a surface to which the texture is to be attached as required in the conventional scheme, and it is possible to produce the texture mapped three-dimensional model easily, in a manner similar to that of taking photographs. Consequently, unlike the conventional scheme which allows only the professional operators and the sufficiently skilled users to produce the animation, this sixth embodiment makes it possible for anyone to easily enjoy producing the animation based on the three-dimensional model.

In the above, a case of producing the video image with the depth perspective by drawing images directly according to the Z-values has been described, but the present invention is not necessarily limited to this case. For example, it is also possible to produce the three-dimensional model by generating a polygon with a vertex coordinates (x, y, z), and mapping the extracted images on that model.

In the sixth embodiment as described above, it is rather difficult to extract a plurality of video images. This problem can be resolved by the following modification. In this case, the apparatus configuration is as shown in FIG. **57**, where an extraction range determination unit **363** controls a range of the Z-values at a time of extraction, so that a plurality of targets can be extracted. For example, suppose that the obtained range image has a plurality of targets overlapping as shown in a part 8$a$) of FIG. **58**. In this case, the extraction range determination unit **363** determines a plurality of central Z-values for extraction. Namely, the extraction range determination unit **363** obtains a histogram (frequency distribution) of the distances as shown in a part (b) of FIG. **58**, from the range image of the part (a) of FIG. **58**. Then, according to (peak positions in) this histogram distribution, the central Z-values for extraction are determined. In this case, there are two peaks in the histogram of the part (b) of FIG. **58** so that two central Z-values Zc1 and Zc2 can be determined. Then, the extraction is carried out by providing some width (denoted as $\gamma$) around these central Z-values, that is, in ranges of Zc1±$\gamma$ and Zc2±$\gamma$. The resulting extracted range images in this case are as shown in parts (c) and (d) of FIG. **58**. Then, the video images corresponding to these extracted range images are extracted as the extracted images.

In the part (c) of FIG. **58**, the extracted region is divided into two parts, so that these two parts are connected by a closed curve as indicated in the part (c) of FIG. **58**, to form a single unified target. Here, however, the video image for the connected part (where another target was originally located) is hidden by that another target so that it cannot be extracted. For this reason, the interpolation image is generated according to the already extracted image parts, and the extracted image is compensated by this interpolation image.

With respect to the Z-value images after the extraction, the shadowed region is processed by the drawing according to the respective Z-values similarly as described above, so as to realize the composition with the depth perspective.

In this modified case, it is possible to extract a plurality of targets and produce the video image with the depth perspective easily, so that the children can enjoy producing new video images (arts) at home, and therefore its effect is enormous.

&lt;Seventh Embodiment&gt;

Referring now to FIG. **59** to FIG. **73**, the seventh embodiment of the present invention will be described in detail.

In the information input generation apparatus of the present invention, each pixel of the reflected light image indicates an intensity of the reflected light, but the intensity of the reflected light is inversely proportional to the square of the distance to the object. Consequently, the range image can be generated from the reflected light image by using a nonlinear conversion. However, the range image obtained here contains some errors, because the objects at the same distance do not necessary return the same reflected lights depending on their surface orientations and reflection characteristics. Yet, it is still possible to obtain the rough range image, so that errors in the range image due to the object property will be ignored here.

When the ideal reflected light image is obtained, it is possible to obtain a good range image by the nonlinear conversion. However, in practice, the ideal reflected light image cannot be obtained for various reasons. As a consequence, it becomes necessary to provide means for correcting the reflected light image correctly, or means for carrying out the nonlinear conversion and the correction together (both of which will be collectively referred to as correction means). This seventh embodiment describes such correction means in detail.

Here, the cause of the reflected light image distortion will be described first.

To begin with, there is an influence of an imaging lens. The imaging lens is used for focusing the reflected light from the object onto the sensor plane, and generally has a characteristic that its brightness changes according to the incident direction of the light. In general, the brightness is high in the optical axis direction, and becomes lower towards the periphery. In other words, even when the same amount of reflected lights are returned from the same direction, the central portion of the image becomes brighter than the peripheral portion.

The error in the range image is also caused by the non-uniformity of the light emission by the lighting unit. The illumination is generally not completely uniform and the illuminance on the irradiated surface is not uniform. This implies that even when the reflected light image is obtained from the light irradiated onto a flat scattering surface, the obtained reflected light image may not indicate a flat surface.

There is also a non-uniformity in the imaging by the imaging sensor for imaging the reflected light image. The imaging sensor generally comprises a two-dimensional array of cells, each having means for converting the light into charges, means for storing charges, means for transferring charges, and means for amplifying if necessary. The characteristics of these cells are not necessarily identical, and there are individual variations. The error in the range image can also be caused by these individual variations of the cells of the imaging sensor.

Due to various causes as described above, the distortion can be caused in the obtained reflected light image, and this in turn causes errors in the reconstructed range image. For this reason, the image correction becomes necessary.

FIG. **59** shows an exemplary configuration for converting the reflected light image into the range image by using the nonlinear conversion.

A reflected light image generation unit **721** operates according to a control signal from a timing control unit **720** and outputs signals corresponding to the reflected light image. The lighting unit is assumed to be contained in this reflected light image generation unit **721**. The output signals of this reflected light image generation unit **721** are analog signals.

A nonlinear conversion unit **722** is a nonlinear amplifier whose amplification rate is changed according to the input

6,144,366

**45**

voltage. Ideally speaking, it is preferable to have the following relationship between the input voltage Vi and the output voltage Vo.

$$V_O = \frac{k}{\sqrt{Vi}} \tag{14}$$

where k is a constant. In practice, it is difficult to manufacture a nonlinear amplifier having such a characteristic, so that a nonlinear amplifier or a logarithmic amplifier having approximately similar characteristic may be used. A digital range image can be obtained by A/D conversing the signals outputted from the nonlinear amplifier unit **722**.

The nonlinear conversion unit **722** may not necessarily apply the analog conversion, and may apply the nonlinear conversion on digital signals after the A/D conversion. FIG. **60** shows an exemplary configuration in such a case.

The signals outputted from the reflected light image generation unit **721** are converted into digital data by an A/D converter **724**, and this digital reflected light image is converted into the range image by a correction unit **725**.

The correction unit **725** uses different correction parameters according to the coordinates in the image so that the coordinate information is obtained by a coordinate signal supplied from the timing control unit **723**. In this case, an arbitrary characteristic can be realized by giving the input to an address signal of a ROM and taking the output as the converted value, so that the characteristic of the above equation (14) can be satisfied. However, the conversion of the above equation (14) ha a poor conversion precision when the input signal is large, so that it is preferable to apply the A/D conversion with a number of bits greater than that of the final output. In a case of applying the nonlinear conversion after the A/D conversion, it is possible to combine the nonlinear conversion unit with a unit for correcting the reflected light image as will be described below.

It is also possible to modify this configuration of FIG. **60** such that the image data after the A/D conversion are stored into a memory once and then the correction unit **725** accesses this memory to carry out the correction operation.

FIG. **61** shows an exemplary configuration for converting the reflected light image into the range image while correcting the distortion of the reflected light image, using two step conversion.

First, the output of the reflected light image generation unit **721** is converted into distance information by a nonlinear conversion unit **726**. Then, this range image is A/D converted by an A/D converter **724**, and this digital range image is further converted into an accurate range image by a correction unit **727**. In order to correct the distortion of the reflected light image, it is necessary to make a correction for a two-dimensional image so that it is preferable to make a correction after the conversion into the digital image.

The use of such a two step conversion has the following advantages.

When the conversion from the reflected light data to the distance data is carried out after the A/D conversion as in a case of FIG. **60**, it becomes necessary for an A/D converter to have many number of bits. The ideal characteristic of the nonlinear conversion for converting the reflected light data into the distance data is a curve as shown in FIG. **62**. It can be seen that, when such a nonlinear conversion is applied to the A/D converted image, the conversion precision becomes poor when the input signal is large. In order to avoid this problem, it becomes necessary to apply the A/D conversion with a number of bits greater than the eventually necessary number of bits. When this nonlinear conversion to convert

**46**

the reflected light data into the distance data is applied before the A/D conversion, a required number of bits of the A/D converter can be less.

Also, the nonlinear conversion before the A/D conversion can have only a rough characteristic. In other words, there is no need to satisfy the characteristic of the above equation (14) completely. This is because, at a time of correcting the distortion of the reflected light image after the conversion, it is possible to make such a correction that the errors left out by the nonlinear conversion can be absorbed. No difficulty or cost increase ill be incurred by correcting the errors of the nonlinear conversion simultaneously at a time of correcting the distortion. In fact, it is possible to reduce the cost because a high precision will not be required to the nonlinear conversion at the analog signal level.

Note that this nonlinear conversion can also be realized by modifying the reflected light image generation unit **721** to output the nonlinear output signals in correspondence to the reflected light intensities.

Next, the details of the correction unit in this seventh embodiment will be described. FIG. **63** and FIG. **65** show two exemplary configurations incorporating the correction unit in two specific forms.

FIG. **63** is a case of using a correction table **728** indicating one-to-one correspondences between the input and the output. When the number of pixels used is 64×64=4096 pixels, their coordinates can be expressed by 12 bits. Then, when the output data is 8 bits, the output value corresponding to arbitrary value of arbitrary pixel can be determined by using a memory having **20** bits address input. When the output value is 8 bits, this memory can be realized in form of a 1 MByte memory. FIG. **64** shows exemplary table data in this correction table **728**. The coordinates expressed by 12 bits are allocated to rows, and the input values expressed by 8 bits are allocated to columns. An intersection point in this matrix indicates the output value corresponding to particular coordinate and input value.

FIG. **65** is a case of using a correction table **730** for only selected points. FIG. **66** shows exemplary table data in this correction table **730**. The input values in the 256 gradation steps are partitioned at every 8 gradation steps, and the output value is indicated only for the partitioning input value in the table form. When an input value not registered in this table is entered, the output value is calculated by the linear interpolation from the two table values for two registered input values close to that input value.

For example, this table of FIG. **66** is defined as follows.

$$f(LOC,IN)=OUT$$

LOC=0, 1, . . . , 4095
IN=8n (n: 0, 1, . . . , 32)
OUT=0, 1, . . . , 255

Then, the input value not registered in this table can be expressed as follows.

$$IN=\{8a+b|a=0, 1, . . . , 31, b=1, 2, . . . , 7\}$$

In this case, the corresponding output value can be calculated as follows.

$$f(LOC,IN)=\frac{1}{8}((8-b)f(LOC,8a)+b \cdot f(LOC,8(a+1)))$$

When this scheme is adopted, the memory capacity required for storing the correction table can be reduced to ⅛ of that required in the configuration of FIG. **63**.

IPR2021-00920
Apple EX1003 Page 125

6,144,366

47

Note that the correction data for points which are spatially close to each other on the image have close values. Consequently, instead of proving correction data for all coordinates, it is also possible to adopt a scheme in which the correction data are provided only for the selected coordinates and the correction data for the other coordinates are obtained by the calculation based on the correction data for nearby points. In this manner, the memory capacity for storing the correction data can be reduced further.

When this correction unit is realized in a form of software, the configuration may be modified slightly. FIG. 67 shows an exemplary configuration in such a case.

An image data storage unit 731 temporarily stores the reflected light image A/D converted by an A/D converter (not shown) without correction.

An image data transfer unit 732 then transfers the image data stored in the image data storage unit 731 to a computer for executing the correction processing. More specifically, this image data transfer unit 732 is an interface circuit provided on a hardware configuration including the reflected light image generation unit 721, or a device driver that functions to receive data on a computer.

A correction calculation unit 729 is realized by a software executed on the computer. The correction data are stored in the correction table 730 which is also provided on that computer. In this case, the correction calculation unit 729 receives the image data, but these image data also contains coordinate information, so that it is logically equivalent to receiving the output data along with the coordinate information as in a case of FIG. 65.

Next, the method for producing the correction data in this seventh embodiment will be described.

FIG. 68 shows an exemplary configuration of an apparatus for automatically producing the correction data. Here, the reflected light image generation unit 721 is the same as already described above. A control unit 735 has the function of the timing control unit 723 already described above, as well as a function for controlling a reference object activation unit 733.

The reference object activation unit 733 moves a reference object 734 according to the control signal from the control unit 735. The reference object 734 is in a form of a flat plate which is perpendicular to the optical axis of the imaging lens, and moved to change its distance with respect to the imaging section. In a case of producing the correction data for capturing a shape of the hand, it is preferable for this reference object 734 to have a reflection characteristic similar to that of the hand surface as much as possible.

The control unit 735 also provides the information on the current distance of the reference object 734 to a correction data calculation unit 737, and the coordinate signal to a correction data storage unit 736.

The correction data calculation unit 737 calculates the correction data from the reflected light image and the information on the current distance of the reference object 734. The calculated correction data are stored in the correction data storage unit 736, in correspondence to the coordinate information given from the control unit 735. Else, it is also possible to modify this configuration of FIG. 68 such that the coordinate information is supplied from the control unit 735 to the correction data calculation unit 737, and the correction data calculation unit 737 stores the correction data and the coordinate information in correspondence into the correction data storage unit 736.

Now, the processing in this configuration of FIG. 68 is carried out as follows.

First, the distance range to be inputted is divided into 256 equal parts, and the distance between the reference object

48

734 and the reflected light image generation unit 721 is sequentially changed in these 256 steps.

At each step, several reflected light images are captured, and one reflected light image is produced by averaging them. This operation is repeated at each distance, so as to obtain total 256 sets of the reflected light images. In this way, the relationship between the output and the distance at 256 points for each pixel is obtained.

Then, the correction data are produced according to this relationship. In a case of having the correction values with respect to all the output values (inputs of the correction unit), a table is formed from these data. In a case of having correction values discretely, each partition of the obtained relationship between the output and the distance is approximated by a line segment, and the intersections of the line segments are stored as the correction data.

For example, a curve shown in a part (b) of FIG. 69 is the relationship between the output and the distance as obtained by sequentially moving the reference object 734, and lines shown in a part (a) of FIG. 69 are the approximating line segments, where joints of these lines are the correction data. In such a case of having the correction data discretely, the correction data may be provided at regular intervals or the correction data may be provided at irregular intervals for an ease of the approximation. For example, a narrower interval can be used at sharply curving section and a wider interval can be used at nearly straight section. Note that, in graphs shown in FIG. 69, the output value has a ceiling because the output is assumed to be in 8 bits (0 to 255) so that any farther distance cannot be expressed.

The correction data as described above are preferably produced in advance and offered in a form of being included in a product, but there can be cases where it becomes necessary to produce the correction data again after the product is purchased by the user. For example, it is possible for the correction data to become inappropriate because of the change of the environment under which they are used, the malfunction of LED, the secular change or LED and sensor characteristic, or some other causes. It is also possible to require the user to produce the correction data from the beginning.

In such cases, there is a need to provide a mechanism for producing the correction data by the user operations. FIG. 70 shows an exemplary configuration for realizing this mechanism. Here, the constituent elements other than a user commanding unit 738 are basically similar to those of FIG. 68.

The user commanding unit 738 sequentially commands the user to place a reference object at specified distances. The user only need to carry out the commanded operations according to this command, and the rest of the reference data production processing is carried out automatically. Here the method for producing the correction data is basically the same as described above. Here, however, it is not very appropriate to require the repetitive manual operations to the user too many times at excessively minute intervals. Also, the position and the orientation of the reference object placed by the manual operation are not necessarily very accurate, so that it is important to carry out the calculation by anticipating reasonable errors.

FIG. 71 shows an exemplary dialogue box to be displayed on the screen by the user commanding unit 738.

When the correction data are produced by the user operations, the reliability of the correction data is inevitably lower, because the user places the reference plate at the specified position but the position and the orientation of the placed reference plate are not necessarily accurate. In view

IPR2021-00920
Apple EX1003 Page 126

6,144,366

**49**

of this fact, it is also possible to absorb the inaccuracy by limiting the correction targets to only those factors which can be easily modelled.

One of the major causes of the distortion in the range image reconstructed from the reflected light image is the lowering of the peripheral light amount in the imaging lens which causes the lower brightness at positions farther away from the optical axis. In other words, even when a flat plate is placed, the reflected light amount at the peripheral portion is smaller than that at the central portion. In practice, the further light amount lowering due to the larger distance for the peripheral portion is also added to this effect.

When the non-uniformity of the sensor sensitivity and the non-uniformity of the light emission are within the tolerable range, it suffices to correct only this light amount lowering (including the lowering due to distance difference) of the lens. Since the specification of the lens is known in advance, the characteristic regarding the extent of this peripheral light amount lowering is also known in advance. Consequently, under the assumption that the optical axis passes through the center of the image sensor, the correction data can be easily obtained by the calculation based on this known characteristic. However, the optical axis may not necessarily pass through the center of the image sensor, mainly because of an error in a mounting position of the image sensor introduced at a time of mounting a sensor chip on a sensor package. Yet, the correct correction is still possible by shifting the correction data obtained under the assumption that the optical axis passes through the center of the image sensor, as much as the displacement of the image sensor.

FIG. 72 shows an exemplary case of such a shift of the correction data, where bar graph indicates the raw data before correction, a curve graph indicates correction data which are assumed to be values to be multiplied to the raw data, and a line graph with markers indicate corrected data. The image data is actually two-dimensional, but only one dimension part (x-direction or y-direction part) is shown in FIG. 72 for the sake of simplicity.

A part (a) of FIG. 72 shows the reflected light image obtained from a flat surface when the optical axis of the lens passes through the center of the sensor, in which the power decreases smoothly from a peak at the center toward the periphery. In this state, when the correction data as indicated by a curve graph are multiplied, the data values becomes uniform as indicated by a line graph with markers, so that the flat surface can be expressed.

A part (b) of FIG. 72 shows a case where the optical axis of the lens is displaced from the center of the sensor. It can be seen that the corrected data obtained by multiplying the correction data do not indicate a flat surface.

A part (c) of FIG. 72 shows a case where the correction data is shifted from a state shown in the part (b) such that the corrected data obtained by multiplying the shifted correction data now correctly indicate a flat surface.

In this manner, when the peripheral light amount lowering of the lens is dominant, it suffices to provide the correction model for a case where the optical axis of the lens passes through the center of the sensor, and sequentially shift these correction data to find out a position where the correction result is closest to the flat.

FIG. 73 shows a flow chart for this operation to produce correct correction data by shifting the correction data. In this operation of FIG. 73, the user is commanded to place the reference plate at the specified distance (step 751) and the reflected light image is acquired (step 752). Then, the correction model is applied so that the position of the correction data is shifted horizontally so that the values after

**50**

the correction indicate a flat surface as in a part (c) of FIG. 72 (step 753), and after the correction data are produced, the user is commanded to move the reference plate parallel (step 754). By moving the reference plate, the reflected light images of the reference plate at many distances are acquired and the corrected images are produced for these reflected light images, and then whether the correction data are correct or not is judged (step 755). Here, whether the correction data are appropriate or not may be judged automatically, or the corrected range image may be shown to the user and the user may be asked to judge whether it is correctly corrected or not.

Note that a case of requiring the user to produce the correction data has been described here, but it is also effective to use this correction model even in a case of automatically producing the correction data by using the reference object moving means.

<Eighth Embodiment>

Referring now to FIG. 74 to FIG. 79, the eighth embodiment of the present invention will be described in detail.

This eighth embodiment is directed to a system configuration incorporating the information input generation apparatus of the present invention as described in the above embodiments.

FIG. 74 shows a computer equipped with the information input generation apparatus of the present invention. This computer of FIG. 74 is a portable computer generally called note PC in which a keyboard and a display are integrally provided with the computer body. In this computer of FIG. 74, a lighting unit 701 and a photo-detection sensor unit 702 of the information input generation apparatus are provided at positions beyond the keyboard when viewed from an operator side, and arranged to have the optical axis of the photo-detection sections pointing obliquely upward towards the operator side. In FIG. 74, the entire hand of the operator is illuminated, as can be seen from a dashed line circle indicating a range of illumination.

In this configuration, the operator operating the keyboard can make the pointing or gesture input by slightly raising and moving the index finger. The user's convenience is remarkably improved here because the keyboard input and the pointing or gesture input can be made without hardly any shift of the hand position. It is also possible to provide a button for use in conjunction with the pointing or gesture input. The operations such as click and drag for selecting and moving icons on the screen can be carried out by using this button. It is also convenient to use a button in a case of inputting a timing trigger in the gesture input.

It is also possible to make this information input generation apparatus operable only when the button is depressed. Namely, when it is desired to make the pointing or gesture input, the input is made by moving hand while depressing the button. In this manner, it is possible to prevent an erroneous operation due to an accidental entry of the finger into the operation region without an intention for making the pointing or gesture input. This is particularly effective in a case of pointing, because there is no possibility for making an erroneous pointing operation while using the keyboard. The operation region can be set very close the home position of the keyboard so that the pointing operation can be made with the minimum movement of the hand (such as the slight upward pointing of the index finger of the right hand). In addition, the lighting unit emits the light only when the button is depressed so that the power consumption can be saved.

In a case of the note PC, this button can be replaced by a key of the keyboard. For example, in a case of using a space

6,144,366

**51**

bar, normally this space bar is set to have a function for inputting a space, and when this space bar is depressed while the cursor is displayed by the finger pointing, this space bar is set to have a function for inputting operations such as click and drag.

In a case of using a separate keyboard, a positional relationship between the keyboard and this information input generation apparatus can be an important factor. FIG. 75 shows a keyboard device equipped with the information input generation apparatus of the present invention. Similarly as in a case of the note PC described above, a lighting unit 703 and a photo-detection sensor unit 704 are provided at positions in such a positional relationship with the keyboard that the light is irradiated onto the hand when the hand is raised from the home position of the keyboard. Here, again, a dashed line circle indicates a range of illumination.

Although not always necessary, a key 705 that can be used in conjunction with the pointing or gesture input is also provided in the keyboard device of FIG. 75. By replacing the existing keyboard with this keyboard device of FIG. 75, it is possible to use the keyboard input and the pointing or gesture input together under the comfortable environment. Two keys like the key 705 may be provided at left and side sides of the keyboard in order to make it equally convenient for the left-handed user and the right-handed user.

FIG. 76 shows a display device equipped with the information input generation apparatus of the present invention. This device is convenient when a positional relationship between the operating hand and the screen is important. A lighting unit 706 and a photo-detection sensor unit 707 are provided above the display screen. The orientation of the light and the photo-detection section is set to be slightly downward so that a range indicated by a dashed line circle can be illuminated. This arrangement is adopted because it is easier for a user to make the operations by positioning the hand at roughly the same or slightly lower height as the screen.

In FIG. 76, the information input generation apparatus is arranged at an upper part of the display device, but it is also possible to arrange the information input generation apparatus at a lower part or a side part of the display device. By arranging one information input generation apparatus on the left side and another information input generation apparatus of the right side, it is also possible to create an environment where the input can be made by both hands simultaneously.

FIG. 77 shows a display device embedded on the wall which is equipped with the information input generation apparatus of the present invention. Here, an information input generation apparatus is either attached to or placed nearby an embedding type display 709. The information input generation apparatus may be formed integrally with the embedding type display 709. At least the lighting unit and the photo-detection sensor unit of the information input generation apparatus are provided within a box shaped casing 708 placed above the display 709. The feature data generation unit of the information input generation apparatus may be also provided within this casing 708, or contained inside the display body, or else provided separately. It is preferable for this casing 708 containing the lighting unit and the photo-detection sensor unit to have its orientation adjustable. In FIG. 77, a range indicated by a dashed line circle is illuminated, and an object 711 displayed on the display 709 is operated as an operator moves his hand 710 within this range.

This display device of FIG. 77 is suitable for an information presentation or input terminal at a public location such as a museum or a station. It is also possible to create

**52**

a preferable environment by using a combination of a compact display embedded on the wall and the information input generation apparatus as an operation unit for the home automation and the like.

FIG. 78 shows a compact portable information device equipped with the information input generation apparatus of the present invention, which is in a size that can be held by one hand. The information input generation apparatus of the present invention only requires to have a window capable of lighting and photo-detecting on an external body, so that a limited space available in this compact portable information device can be utilized efficiently. In FIG. 78, a window 712 is provided for the lighting unit and the photo-detection sensor unit. A position of a cursor 714 on the screen can be controlled by moving a finger 713 in front of this window 712. Here, the window 712 is so small that the remaining space can be used as a relatively large display unit 715 despite of an overall compact size of this compact portable information device.

FIG. 79 shows a wrist watch like very compact portable information device equipped with the information input generation apparatus of the present invention. Here, again, a cursor 717 can be controlled by moving a finger 716. Windows 718 and 719 are provided for the lighting unit and the photo-detection sensor unit. When the device body is as small as this one, there is not even a space for installing a pen, so that the convenience of the input operations realized by the information input generation apparatus is evident. Also, by placing the operation space at a position displaced from a line between the eyes and a display device, it is possible to prevent the operating finger from obstructing the view of the display.

In a case of installing the information input generation apparatus of the present invention on a portable device like this, it is necessary to make the device less power consuming. The information input generation apparatus requires to emit a considerable amount of lights, so that the control of the lighting currents can contribute to the lower power consumption.

To this end, the light emission timing and the emitted light amount can be controlled to realize the lower power consumption. For example, when there is no object in front of the device, this fact can be detected as all the pixel values of the reflected light image become nearly zero. When this absence of an object is detected, or after a prescribed time elapsed since this absence of an object is detected, the light emission interval can be set longer. For instance, the light emission rate of once in every $\frac{1}{30}$ sec. can be lowered to once in every $\frac{1}{10}$ sec. In this manner, the lighting power can be lowered to $\frac{1}{3}$.

When an object appears in front of the device again, this fact can be detected from a change appearing in the reflected light image, so that the light emission rate can be set back to once in every $\frac{1}{30}$ sec. While actually moving the cursor, there would be an apparent difference in the smoothness of the cursor motion between a case of photo-detecting 30 times per second and a case of photo-detecting 10 times per second. In contrast, a slight delay in an appearance of a cursor since the hand is extended is not so frustrating.

It is also possible to realize the lower power consumption by controlling the emitted light amount rather than the light emission timing. In comparison to a light amount required for detecting the position of the finger tip at high precision, a light amount required for judging whether there is an object in front of the device or not is much smaller. Consequently, when an absence of an object in front is detected, the emitted light amount can be controlled to be

IPR2021-00920
Apple EX1003 Page 128

6,144,366

**53**

smaller, and only whether an object appears again or not Is checked. When the reappearance of an object is detected, the emitted light amount can be set back to the original amount.

The above described light emission timing control and the emitted light amount control may be carried out simultaneously. In such a case, even greater power consumption saving effect can be expected.

Now, in the information input generation apparatus of the present invention as described above, the CMOS sensors are used as the photo-detection means, and as described above, the CMOS sensors have the structural property that it is possible to control the photo-detection (charge storing) and the read out arbitrarily in unit of pixel, and the control time can be as short as about ¹⁄₁₀₀₀ second or less, but it can also be set to any sufficiently long time, so that it is possible to eliminate the influence of the external light fluctuation by selecting the optimum value according to the fluctuation of the external light. However, there still remains the problem as to how to realize the optimal setting according to the fluctuation state of the external light. In the following, the embodiments directed to this aspect will be described in detail.

The above described information input generation apparatus has the lighting unit and the photo-detection section, and outputs an image formed by the reflected light from an object resulting from the light emitted by the lighting unit, so as to enable the gesture recognition and so on. In this apparatus, the photo-detection section stores the charges generated by the photo-electric conversion element upon photo-detecting images of the object at a time of light emission by the lighting unit and at a time of no light emission by the lighting unit, and cancels the image due to the external light components by taking difference between them, so as to obtain the reflected light image which is the image solely due to the reflected light of the object resulting from the light emitted by the lighting unit, as already described in detail above.

Here, the external lights include not just the sunlight but also the fluorescent light which regularly (periodically) fluctuates even under the stable operation state, and moreover there are various types of fluorescent light such as an ordinary fluorescent light, an inverter fluorescent light, etc., and their fluctuation periods vary.

Also, there is a case where the image acquisition (charge storing) operation is assigned at a time of light emission by the lighting unit and the image acquisition (charge storing) operation at a time of no light emission by the lighting unit, but when the external light fluctuates between these cases, the lowering of the quality of the difference image, that is, the degradation of the obtained reflected light image, may be caused depending on a size of a difference in the external light between these cases.

There are a case where the external light fluctuates irregularly and a case where the external light fluctuates regularly, and how to handle the external light is different in these two cases.

In the case of the irregular fluctuation, the level of degradation cannot be ascertained until the reflected light image is obtained, whereas in the case of the regular fluctuation, the relationship of the timings for the above described two image acquisition operations with respect to the fluctuation period is related to the image quality of the reflected light image.

In particular, when the time difference between a case of light emission and a case of no light emission is close to the fluctuation period of the external light, a difference between the stored charges in these two cases may include the contribution from the fluctuation of the external light.

**54**

When the influence due to the fluctuation of the external light remains in the reflected light image, it may not be possible to extracts only the reflected light of the target object under the light irradiation by the lighting unit at high precision, depending on a size of this influence due to the external light fluctuation.

Consequently, it is necessary to deal with the external light fluctuation, and the following embodiments are directed to this aspect.

<Ninth Embodiment>

Referring now to FIG. **80** to FIG. **84**, the ninth embodiment of the present invention will be described in detail.

This ninth embodiment is directed to a case of dealing with the irregular external light fluctuation. In this ninth embodiment, a level of the external light alone is detected and the state of the external light is judged from the detected external light level, and then the acceptance or rejection of the reflected light image is determined according to the judged external light state.

FIG. **80** shows an exemplary configuration of the information input generation apparatus in this ninth embodiment, which comprises a lighting unit **1101** (corresponding to the lighting unit **101** of FIG. **1**), a reflected light image acquisition unit **1102** (corresponding to the reflected light extraction unit **102** of FIG. **1**), an optical filter **1202**, an external light detection unit **1203**, an external light state judgement unit **1204**, and a lighting and photo-detection operation control unit **1205** (corresponding to the timing signal generation unit **104** of FIG. **1**). In FIG. **80**, a target object **106** placed in front of this information input generation apparatus is constantly illuminated by the external light from an external light source **1201**.

The lighting unit **1101** is a light source for illuminating the target object **106**, which is the light source of the reflected light image. For this lighting unit **1101**, a LED for emitting lights with the wavelength in the infrared range can be used. This lighting unit **1101** is controlled by the lighting and photo-detection operation control unit **1205**.

The external light source **1201** is a light source of an indoor or outdoor environment under which the target object **106** is placed. The target object **106** always receives lights from this external light source **1201**.

The optical filter **1202** is a filter for blocking illumination lights in the infrared range from the lighting unit **1201**, for the purpose of extracting only the external light components.

The external light detection unit **1203** detects a level of the external light received through the optical filter **1202**, and outputs a detection output corresponding to the intensity of the entered external light.

The external light state judgement unit **1204** receives the detection output of the external light detection unit **1203**, and monitors the level and the fluctuation in time of the external light, so as to detect an external light state that has a possibility of largely affecting the reflected light image and generate an external light state intolerable signal when this state is detected.

The lighting and photo-detection operation control unit **1205** carries out control of various timing signals so as to realize the operations according to the output result of the external light state judgement unit **1204**. In this embodiment, when the external light state judgement unit **1204** judges that there is an external light fluctuation that has a possibility for largely affecting the reflected light image, the lighting and photo-detection operation control unit **1205** generates necessary timing signals for controlling the apparatus so that the acquisition of the image by the external light alone and the acquisition of the image in a case of light

IPR2021-00920
Apple EX1003 Page 129

6,144,366

55

emission by the lighting unit **1101** are carried out and the reflected light image is extracted as a difference between these images, once again, but after a prescribed time has elapsed, this control is not carried out and instead a signal indicating the poor reflected light image quality is generated and given to the reflected light image acquisition unit **1102**.

The reflected light image acquisition unit **1102** acquires the image in a case of light emission by the lighting unit **1101** and the image in a case of no light emission by the lighting unit **1101**, obtains a difference component between these images, and outputs it as the reflected light image, in response to the timing signal from the lighting and photo-detection operation control unit **1205**. When an external light state intolerable signal indicating the external light state that has a possibility of largely affecting the reflected light image is generated by the external light state judgement unit **1204**, the reflected light image acquisition unit **1102** is reset so that the processing for obtaining the reflected light image by carrying out the image acquisition and the difference extraction once again.

In this configuration of FIG. **80**, the reflected light image acquisition unit **1102** acquires the image of the target object **106** illuminated by the light emitted by the lighting unit **1101** and the image of the target object **106** illuminated only by the external light without the light from the lighting unit **1101** according to the control of the lighting and photo-detection operation control unit **1205**, and obtains the reflected light image as the difference component between these two images.

On the other hand, at the image acquisition timing of the reflected light image acquisition unit **1102**, the external light detection unit **1203** detects the level of the light under the environment. In front of this external light detection unit **1203**, the optical filter **1202** is provided for blocking the reflected light from the target object **106** resulting from the light emitted by the lighting unit **1101**, so that only the external light is detected by the external light detection unit **1203**. The detection output of this external light detection unit **1203** is then given to the external light state judgement unit **1204**.

The external light state judgement unit **1204** is monitoring the level and the fluctuation in time of the external light according to this detection output, and detects a state which has a possibility of largely affecting the reflected light image. Then, an intolerable signal is generated when the state which has a possibility of largely affecting the reflected light image is detected, whereas this intolerable signal is not generated in cases of the other states.

The reflected light image acquisition unit **1102** acquires the target object images and the reflected light image as a difference component between the acquired target object images, according to the timing signals from the lighting and photo-detection operation control unit **1205** that may include the intolerable signal generated by the external light state judgement unit **1204**, and when the output result (intolerable signal) from the external light state judgement unit **1204** is present, the reflected light image acquisition unit **1102** once again repeats the operation to acquire the image of the target object **106** illuminated by the light emitted by the lighting unit **1101** and the image of the target object **106** illuminated only by the external light without the light from the lighting unit **1101** and obtain the reflected light image as the difference component between these two images.

Note that, although not shown in FIG. **80**, it is also possible to provide a reflected light image processing unit at a next stage of the reflected light image acquisition unit **1102** so as to determine how to handle the reflected light image according to the output of the external light state judgement unit **1204**.

56

In the present invention, the CMOS sensors are used for the photo-detection section in the reflected light image acquisition unit **1102** to acquire the images of the target object **106** in real time, and the difference component of the acquired images is outputted as the reflected light image in forms of image signals for video image. The operation of the CMOS sensors for one frame is basically repetitions of the photo-detection and charge storing and the charge output.

FIG. **81** shows a timing chart for this operation, where a part (a) indicates the lighting pulse (the light emission by the lighting unit **1101**, that is, the irradiation of the illumination light) and a part (b) indicates the operation of the CMOS sensors. In FIG. **81**, "R", "1" and "2" indicates the "reset of the stored charge", "storing into the first charge storage unit (corresponding to **109** of FIG. **2** or **119** of FIG. **4**)" and "storing into the second charge storage unit (corresponding to **110** of FIG. **2** or **120** of FIG. **4**)", respectively.

More specifically, this operation at the reflected light image acquisition unit **1102** is carried out according to the flow chart of FIG. **83** as follows.

Within one frame period, the charges in the first and second charge storage units in the photo-detection section are reset at the timing of "R" (step **831**), and then charges are stored for a prescribed period of time into the first charge storage unit at the timing of "1" (step **832**) so as to realize the photo-detection of the target object image. At the same time, the lighting unit **1101** emits the light for the same period of time.

Next, the charges of the photo-detection section are reset at the timing of next "R" that appears again (step **833**), and then charges are stored for a prescribed period of time into the second charge storage unit at the timing of "2" (step **834**) so as to realize the photo-detection of the target object image. At this point, the lighting unit **1101** does not emit any light.

The difference component of the two images so obtained is obtained as a reflected light image, and this reflected light image is outputted to the subsequent stage in the second half of one frame period (step **836**). In a case of using the CMOS sensors as in this ninth embodiment, at a time of the reflected light image output, the difference of the stored charges in two charge storage units for each unit pixel is outputted so as to output only the reflected light component from the object resulting from the light emitted by the lighting unit **1101**.

While operating according to the timings as indicated in FIG. **81** in which case the reflected light image can be successfully acquired by storing charges into the first and second charge storage units once, the time used for the charge storing is quite short, and there is a time margin before the data output. However, this is not the case in a situation where there is a problem regarding the reliability as many noise components are contained in the reflected light image, that is, in a state where the external light fluctuation is large.

Namely, in this ninth embodiment, in parallel to the reflected light image acquisition operation by the reflected light image acquisition unit **1102**, the external light level as indicated in a part (a) of FIG. **82** is detected by the external light detection unit **1203**. At this point, when the near infrared LED is used as the light source of the lighting unit **1101**, for example, the near infrared light blocking optical filter **1202** is provided in front of (i.e. the input side of) the external light detection unit **1203**, so that the reflected light resulting from the light of this light source does not enter into the external light detection unit **1203**.

Then, the external light state judgement unit **1204** monitors the external light level according to the detection output

IPR2021-00920
Apple EX1003 Page 130

6,144,366

57

of the external light detection unit **1203**, and detects a state in which the external light level fluctuation is large so that there is a possibility for largely affecting the reflected light image. When this state is detected, the external light state judgement unit **1204** outputs the external light state intolerable signal as indicated in a part (b) of FIG. **82** to notify this detection result. In this external light state intolerable signal, when the logical level of this is "H (HIGH)", it is indicated that a corresponding region is judged as having a poor external light state (that has a possibility of largely affecting the reflected light image).

This judgement is made, for example, when the external light fluctuation is abrupt (a case of first "H" state in the part (b) of FIG. **82**) or when the external light level is very high (a case of second "H" state in the part (b) of FIG. **82**).

When the external light fluctuation is abrupt, there is a large difference between the light amounts due to the external light as stored in the first charge storage unit and the second charge storage unit that constitute the reflected light image acquisition unit **1102**, so that the difference component between them will contain not just the reflected light component but also a large external light fluctuation part as well.

When it is under the environment where the external light level is very large, the rate of the reflected light with respect to the external light becomes very small, so that S/N (Signal to Noise ratio) becomes poor.

Consequently, when these types of the external light fluctuation is present, the noise components become large and it becomes impossible to extract the target object **106** at high precision.

In an example shown in FIG. **82**, the first lighting and storing operation is carried out within one frame period as described above, but by the time this operation is finished, it is ascertained that the external light state was poor during this storing operation (t1 in the part (b) of FIG. **82**), so that this operation is cancelled once and retried (step **835** YES).

In other words, the stored charges are reset again ("R"), and the storing into the first charge storage unit ("1") and the storing into the second charge storing unit ("2") are repeated again. During this second storing operation, the external light state was normal (the external light state intolerable signal was in "L" state), so that the obtained difference component (reflected light image) is outputted as it is (step **835** NO).

The extraction of the reflected light image and the output of this extracted reflected light image are to be carried out within a prescribed period of time (one frame period), so that the storing operation would overlap with the data output timing if the storing operation is retried too many times. For this reason, a prescribed number of times for which the retry is permitted at most is determined in advance, and the retry is not repeated beyond this prescribed number of times (step **837**).

When the normal reflected light image could not be obtained at the end, that is, when the normal reflected light image could not be obtained before the data output timing comes, the last obtained low reliability data are outputted, and at the same time, a signal indicating that this reflected light image has a lower reliability is also outputted by the separate line.

In the configuration of FIG. **80** described above, the image acquisition and difference (reflected light image) acquisition operation is retried according to the external light fluctuation state by directly controlling the lighting and photo-detection operation control unit **1205** according to the output of the external light state judgement unit **1204**.

58

However, instead of carrying out such a retry, it is also possible to determine the acceptance or rejection of the reflected light image outputted from the reflected light image acquisition unit **1102** according to the output of the external light state judgement unit **1204** at the subsequent stage so that the low reliability reflected light image will not be utilized.

FIG. **84** shows an exemplary configuration of the information input generation apparatus in this ninth embodiment for such a modified case.

In the configuration of FIG. **84**, the processing for acquiring the image illuminated by the light emitted by the lighting unit **1101**, acquiring the image due to the external light alone, and obtaining the reflected light image by obtaining the difference component between these images is carried out only once by the reflected light image acquisition unit **1102** within one frame period, and the obtained reflected light image is outputted within an output period.

The reflected light image obtained by the reflected light image acquisition unit **1102** is received at a reflected light image processing unit **1103**, which has a function for determining whether this received reflected light image is to be used or to be discarded according to the output of the external light state judgement unit **1204**. The reflected light image processing unit **1103** may also have the other functions similar to those of the feature data generation unit **103** of FIG. **1**.

Thus, in this configuration of FIG. **84**, instead of controlling the reflected light image acquisition unit **1102** and the lighting unit **1101** according to the output of the external light state judgement unit **1204**, the reflected light image processing unit **1103** is provided to determine the acceptance or rejection of the reflected light image according to the output of the external light state judgement unit **1204**.

This reflected light image processing unit **1103** is basically a unit for further processing the outputted reflected light image, and changes the manner of processing the reflected light image according to the output (which is not necessarily binary) of the external light state judgement unit **1204** supplied thereto.

When the external light state is very poor, the reflected light image is discarded and not utilized, or the current frame is predicted by utilizing the previous frame, for example. In a case of using the prediction, it is preferable to control the procedure for making prediction by using how poor the external light state is as a parameter for indicating how low the reliability of the current frame is.

According to the ninth embodiment as described above, at a time of obtaining the reflected light image of the target object, when the adverse influence of the external light fluctuation is large, the reflected light image acquired in this state will not be used, so that only the high quality image of the target object alone can be easily acquired, and therefore it becomes possible to realize the acquisition of information on gesture or three-dimensional operation made by the target object at high precision.

<Tenth Embodiment>

The ninth embodiment described above is directed to a technique for monitoring the external light level and not utilizing the reflected light image obtained at a timing where the influence of the external light fluctuation is present.

However, in that case, the utilizable reflected light image cannot be obtained under the unstable environment where the external light fluctuation continues indefinitely. Also, under the environment where the light amount is constantly fluctuating in short period as in a case of using the inverter type fluorescent light, there may be cases in which the

IPR2021-00920
Apple EX1003 Page 131

6,144,366

**59**

utilizable reflected light image cannot be obtained forever. Also, in a case where it is necessary to extract the reflected light image at the rate as fast as 30 frames per second as in a case of the TV images, or in a case where it is necessary to extract the reflected light image at the rate even faster than that, there may be cases where the reflected light image cannot be obtained as the flickering of the fluorescent light has a directly influence as the external light fluctuation.

In view of these problems, this tenth embodiment is directed to a technique suitable for use under the environment involving the external light that is fluctuating constantly and periodically, and capable of obtaining the reflected light image in real time.

Referring now to FIG. 85 to FIG. 87, the tenth embodiment of the present invention will be described in detail.

In this tenth embodiment, a unit for monitoring the fluctuation of only the external light is provided to detect the fluctuation period of the external light, and the lighting and photo-detection operation control is carried out according to the detected external light fluctuation period.

FIG. 85 shows an exemplary configuration of the information input generation apparatus in this tenth embodiment, which comprises a lighting unit **1101** (corresponding to the lighting unit **101** of FIG. 1), a reflected light image acquisition unit **1102** (corresponding to the reflected light extraction unit **102** of FIG. 1), an optical filter **1202**, an external light detection unit **1203**, an external light fluctuation period detection unit **1301**, and a lighting and photo-detection operation control unit **1205** (corresponding to the timing signal generation unit **104** of FIG. 1). In FIG. 85, the target object **106** placed in front of this information input generation apparatus is constantly illuminated by the external light from the external light source **1201**.

The lighting unit **1101** is a light source for illuminating the target object **106**, which is the light source of the reflected light image. For this lighting unit **1101**, a LED for emitting lights with the wavelength in the infrared range can be used. This lighting unit **1101** is controlled by the lighting and photo-detection operation control unit **1205**.

The external light source **1201** is a light source of an indoor or outdoor environment under which the target object **106** is placed. The target object **106** always receives lights from this external light source **1201**.

The optical filter **1202** is a filter for blocking illumination lights in the infrared range from the lighting unit **1201**, for the purpose of extracting only the external light components.

The external light detection unit **1203** detects a level of the external light received through the optical filter **1202**, and outputs a detection output corresponding to the intensity of the entered external light.

The external light fluctuation period detection unit **1301** receives the detection output of the external light detection unit **1203**, and monitors the level and the fluctuation in time of the external light, so as to detect an external light fluctuation period.

The lighting and photo-detection operation control unit **1205** carries out control of various timing signals so as to realize the operations in synchronization with the external light fluctuation period, according to the fluctuation period information detected by the external light fluctuation period detection unit **1301**. In this embodiment, the lighting and photo-detection operation control unit **1205** generates timing signals for controlling the apparatus so that the light emission by the lighting unit **1101** and the first charge storing operation by the reflected light image acquisition unit **1102** are carried out in synchronization with one external light fluctuation period, and the second charge storing

**60**

operation by the reflected light image acquisition unit **1102** in a state of no light emission by the lighting unit **1101** is carried out in synchronization with a next external light fluctuation period so as to obtain the image due to the external light alone.

The reflected light image acquisition unit **1102** acquires the image in a case of light emission by the lighting unit **1101** (given by charges stored by the first charge storing operation) and the image in a case of no light emission by the lighting unit **1101** (given by changes stored by the second charge storing operation), obtains a difference component between these images, and outputs it as the reflected light image, in response to the timing signal from the lighting and photo-detection operation control unit **1205**.

In this configuration of FIG. 85, the reflected light image acquisition unit **1102** acquires the image of the target object **106** illuminated by the light emitted by the lighting unit **1101** and the image of the target object **106** illuminated only by the external light without the light from the lighting unit **1101** according to the control of the lighting and photo-detection operation control unit **1205**, and obtains the reflected light image as the difference component between these two images.

On the other hand, the state of the external light is monitored by the external light detection unit **1203**. In front of this external light detection unit **1203**, the optical filter **1202** is provided for blocking the reflected light from the target object **106** resulting from the light emitted by the lighting unit **1101**, so that only the external light is detected by the external light detection unit **1203**. When the lighting unit **1101** emits the infrared light, this optical filter **1202** is realized in a form of an infrared light blocking filter.

The detection output of this external light detection unit **1203** is then given to the external light fluctuation period detection unit **1301**. In response, the external light fluctuation period detection unit **1301** detects the fluctuation period of the external light according to the supplied detection output. Then, this detected fluctuation period information is given to the lighting and photo-detection operation control unit **1205**.

The lighting and photo-detection operation control unit **1205** generates the control signals for the lighting and photo-detection operations so as to carry out these operations in synchronization with the external light fluctuation period detected by the external light fluctuation period detection unit **1301**.

FIG. 86 shows an exemplary case where the external light fluctuation occurs regularly. A part (a) of FIG. 86 shows the external light level (the output of the external light detection unit **1203**) in this case, while a part (b) of FIG. 86 shows the external light signals converted into pulses (output of the external light fluctuation period detection unit **1301**). Also, a part (c) of FIG. 86 shows a lighting pulse signal for the lighting unit **1101**, according to which the lighting unit **1101** emits the light, and a part (d) of FIG. 86 shows a signal for controlling the storing operation similar to that shown in FIG. 81.

The pulse signal of the part (c) of FIG. 86 and the storing operation control signal of the part (d) of the FIG. 86 are generated according to the signal of the part (b) of FIG. 86. Namely, the timing at which charges are stored into the first charge storage unit (**109** of FIG. 2 or **119** of FIG. 4) and the timing at which charges are stored into the second charge storage unit (**110** of FIG. 2 or **120** of FIG. 4) have the same phase with respect to the external light fluctuation period. Consequently, the light amounts due to the external light contained in the charges stored by these two storing opera-

IPR2021-00920
Apple EX1003 Page 132

6,144,366

**61**

tions are going to be equal. Thus, the difference between the stored charges in the first charge storage unit and the second charge storage unit contains hardly any part due to the external light fluctuation, and therefore it is possible to extract the reflected light image at high precision under the regularly fluctuating external light.

FIG. **87** shows an exemplary case where the external light fluctuation period is regular but short with respect to the charge storing time.

In this case, the processing for obtaining the the difference image from the images obtained by the first and second charge storing operations is carried out in synchronization with the external light fluctuation period, and in addition, the storing time of each charge storing operation is set to be n times a single period part of the external light fluctuation. Namely, in an example shown in FIG. **87**, the storing operation is always carried out in the storing time which is twice the external light fluctuation period (n=2), when the external light fluctuation period is short with respect to the storing time.

For this reason, similarly as in the previous example, the light amounts due to the external light contained in the charges stored by these two storing operations are going to be equal. Note that the example of FIG. **87** shows a case of setting the storing time as an integer multiple of the external light fluctuation period, but the present invention is not necessarily limited to this case. For example, it is also possible to set the storing time to be 1.5 times, 2.7 times, or 3.3 times the external light fluctuation period, if desired. It is however necessary to have a correct matching of the phases.

Thus, in this tenth embodiment, the external light fluctuation period is detected and the image acquisition is carried out in unit of a prescribed time interval in synchronization with the external light fluctuation period, so that even under the environment in which the external light fluctuations constantly and periodically, it is possible to obtain the reflected light image in real time by eliminating the influence of the external light.

<Eleventh Embodiment>

The tenth embodiment described above is directed to a technique for controlling the acquisition timing of the images from which the reflected light image is to be obtained, with respect to the external light fluctuation. However, there are many cases where the external lights are artificially controllable, as in a case of using the room light.

In view of this fact, this eleventh embodiment is directed to a technique suitable for such a case, in which the light source of the external light is controlled so as to prevent the external light from affecting the reflected light image.

Referring now to FIG. **88** to FIG. **89**, the eleventh embodiment of the present invention will be described in detail.

FIG. **88** shows an exemplary configuration of the information input generation apparatus in this eleventh embodiment, which comprises a lighting unit **1101** (corresponding to the lighting unit **101** of FIG. **1**), a reflected light image acquisition unit **1102** (corresponding to the reflected light extraction unit **102** of FIG. **1**), a light control signal generation unit **1401**, and a lighting and photo-detection operation control unit **1205** (corresponding to the timing signal generation unit **104** of FIG. **1**). In FIG. **88**, the target object **106** placed in front of this information input generation apparatus is constantly illuminated by the external light from the external light source **1201** such as the room illumination light which is driven by a light driving device **1402**.

**62**

The lighting unit **1101** is a light source for illuminating the target object **106**, which is the light source of the reflected light image.

The external light source **1201** is a light source of an environment under which the target object **106** is placed. The target object **106** always receives lights from this external light source **1201**.

The light driving device **1402** drives this external light source **1201** to emit the external light, and has a function for controlling the light amount of the external light source **1201** according to a light control signal supplied thereto.

The lighting and photo-detection operation control unit **1205** generates signals for controlling the lighting unit **1101** and the reflected light image acquisition unit **1102**.

The light control signal generation unit **1401** generates the light control signal according to which the external light source **1201** is to be driven, such that the received light amounts due to the external light in two charge storing operations (the acquisition of the image under the lighting by the lighting unit **1101** and the acquisition of the image due to the external light alone) by the reflected light image acquisition unit **1102** are going to be equal.

The reflected light image acquisition unit **1102** acquires the image in a case of light emission by the lighting unit **1101** and the image in a case of no light emission by the lighting unit **1101**, obtains a difference component between these images, and outputs it as the reflected light image, in response to the timing signal from the lighting and photo-detection operation control unit **1205**.

In this configuration of FIG. **88**, the lighting unit **1101**, the reflected light image acquisition unit **1102**, and the light control signal generation unit **1401** are controlled under the lighting and photo-detection operation control unit **1205**, in such a manner that the lighting by the lighting unit **1101**, and the image acquisition (the first charge storing and the second charge storing) and the reflected light image extraction by the reflected light image acquisition unit **1102** are carried out at specified timings.

On the other hand, the light control signal generation unit **1401** generates the light control signal in such a manner that the received light amounts due to the external light in two charge storing operations (the acquisition of the image under the lighting by the lighting unit **1101** and the acquisition of the image due to the external light alone) by the reflected light image acquisition unit **1102** are going to be equal. According to this light control signal, the light driving device **1402** controls the lighting by the external light source **1201** so that the external light source **1201** is controlled to emit the external light in such a manner that the external light amounts during the above described two charge storing operations become equal.

Consequently, when the reflected light image acquisition unit **1102** acquires the image in a case of light emission by the lighting unit **1101** and the image in a case of no light emission by the lighting unit **1101** according to the timing signal from the lighting and photo-detection operation control unit **1205**, the light amounts given to the environment by the external light source **1201** are equal in these cases, so that when the difference component of these images is obtained, the obtained reflected light image is in a high precision.

FIG. **89** shows a timing chart for the operation in this eleventh embodiment, where a part (a) indicates the light control signal for controlling the external light source **1201**, a part (b) indicates the control signal (lighting pulse) for the lighting unit **1101**, and a part (c) shows an exemplary operation pattern (the charge storing operations) of the reflected light image acquisition unit **1102** in this eleventh embodiment.

6,144,366

**63**

The lighting and photo-detection operation control unit **1205** generates the control signals so that the reflected light image acquisition unit **1102** operates according to the operation pattern shown in the part (c) of FIG. **89**, while giving the lighting pulse of the part (b) of FIG. **89** to the lighting unit **1101**. On the other hand, at the same time, the light control signal generation unit **1401** generates the light control signal of the part (a) of FIG. **89**, so that the external light source **1201** is driven according to this light control signal.

For example, the external light source **1201** repeats the external light emission and no external light emission in such a pattern that the external light is emitted when the light control signal has a level "H", and no external light is emitted when the light control signal has a level "L". This operation is obviously repeated at high speed, so that the external light source **1201** appears to be lighting at the constant brightness to the human eyes.

However, the external light fluctuates in such a manner that is brightness is instantaneously lowered while the charge storing operation is carried out, so that at a time of obtaining the reflected light image, it is possible to obtain the reflected light image at high precision without receiving any influence from the external light,

The above described example is directed to a case of directly controlling the external light source (such as fluorescent light) whose emitted light amount periodically changes, so as to prevent the external light source from affecting the reflected light image.

On the contrary, there is also a scheme which utilizes the external light source as the light source for the reflected light image. Namely, the external light source itself is used as the light source of the lighting unit, and the reflected light from the target object resulting from the light emitted by the external light source is photo-detected by the photo-detection section. In this case, depending on the positional relationship between the external light source and the photo-detection section, the relationship of the reflected light amount being inversely proportional to the square of the distance may not hold, so that it becomes difficult to obtain the distance information, but there is no problem for the extraction of a shape of the target object. Such a modified scheme will be effective in a case where the entire room can be formed as a communication space as in a case of the amusement park.

<Twelfth Embodiment>

Referring now to FIG. **90** to FIG. **95**, the twelfth embodiment of the present invention will be described in detail.

In this twelfth embodiment, a plurality of lighting and charge storing operation patterns are provided in advance and selectively used according to the external light state, so as to make it possible to obtain the reflected light image at high precision regardless of the external light state.

This twelfth embodiment is based on the following principle. Namely, suppose that the photo-detection charge storing operation is carried out twice in a state of having no light emission by the lighting unit **101**, and a difference between the stored charges is outputted. In this case, if there was hardly any external light fluctuation between these two photo-detection charge storing operations, the output would be nearly equal to **0**, and the resulting reflected light image would be completely dark. Namely, the light source is not emitting the light in this case, so that there is obviously no reflected light image component and therefore the reflected light image (output image) becomes completely dark. However, if there was some external light fluctuation between these two photo-detection charge storing operations, and if that fluctuation was a large one, then a

**64**

difference between the stored charges for these two photo-detection charge storing operations would not be zero, and therefore the output image would not be completely dark.

For this reason, in this twelfth embodiment, the respective reflected light images are acquired by using a plurality of charge storing operation patterns provided in advance, in a state of having no light emission by the lighting unit **101**, and the operation pattern from which the darkest image can be obtained is selected. Then, the lighting operation pattern having a lighting period corresponding to the selected charge storing operation pattern is selected, and the lighting by the lighting unit **101** is controlled by this selected lighting operation pattern.

To this end, the information input generation apparatus of this twelfth embodiment has an exemplary configuration as shown in FIG. **90**, which comprises the lighting unit **101**, the feature data generation unit **103**, the reflected light image acquisition unit **1102** (corresponding to the reflected light extraction unit **102** of FIG. 1), a lighting and photo-detection control signal generation unit **2104** (corresponding to the timing signal generation unit **104** of FIG. 1), an external light influence evaluation unit **2201**, and a lighting and photo-detection pattern selection and determination unit **2202**.

The lighting unit **101** is a light source for illuminating the target object, which is the light source of the reflected light image.

In this twelfth embodiment, two operation modes including an optimal operation pattern selection mode and a normal operation mode are provided in order to make it possible to obtain the optimal photo-detection operation pattern according to the external light fluctuation state. In a case of finding the photo-detection operation pattern which is optimal for the external light, that is, in a case of the optimal operation pattern selection mode, the lighting unit **101** is controlled to stop the light emission, whereas in a case of the normal operation mode, this control is cancelled and the lighting unit **101** is controlled to emit the light at prescribed timing specified from the lighting and photo-detection control signal generation unit **2104** so as to illuminate the target object.

The lighting and photo-detection control signal generation unit **2104** is provided for carrying out the timing control. This lighting and photo-detection control signal generation unit **2104** generates signals for controlling the reflected light image acquisition unit **1102** and the lighting unit **101** according to the setting information supplied from the lighting and photo-detection pattern selection and determination unit **2202**.

The lighting and photo-detection pattern selection and determination unit **2202** has two modes including the optimal operation pattern selection mode and the normal operation mode as well as a plurality of photo-detection charge storing operation patterns provided in advance. In a case of the optimal operation pattern selection mode, the lighting and photo-detection pattern selection and determination unit **2202** carries out the setting control with respect to the lighting and photo-detection control signal generation unit **2104** while sequentially using these various operation patterns so as to have the photo-detection carried out in the plurality of operation patterns. Then, the lighting and photo-detection pattern selection and determination unit **2202** receives the evaluation results for the reflected light images obtained by the respective operation patterns from the external light influence evaluation unit **2201**, and determines the operation pattern for which the evaluation result is best among these evaluation results, as the optimal operation pattern.

6,144,366

65

The external light influence evaluation unit **2201** evaluates the reflected light images obtained by the respective operation patterns according to the output images of the reflected light image acquisition unit **1102**, and gives the obtained evaluation values to the lighting and photo-detection pattern selection and determination unit **2202**, so that the optimal operation pattern is determined according to the evaluation values. While the optimal operation pattern is determined, the lighting and photo-detection pattern selection and determination unit **2202** controls the lighting unit **101** to emit no light. After the optimal operation pattern is determined, it becomes the normal operation mode, and the reflected light image acquisition unit **1102** and the lighting and photo-detection control signal generation unit **2104** are controlled to realize a photo-detection charge storing period in accordance with the determined operation pattern.

The external light influence evaluation unit **2201** evaluates how much influence of the external light fluctuation is contained in each reflected light image, where the reflected light image is acquired from the reflected light image acquisition unit **1102**.

The reflected light image acquisition unit **1102** outputs a difference between an image photo-detected by the first photo-detection unit **109** and an image photo-detected by the second photo-detection unit **110**. The first photo-detection unit **109** outputs the image photo-detected in a state of having the light emission by the lighting unit **101**, and the second photo-detection unit **110** outputs the image photo-detected in a state of having no light emission by the lighting unit **101**, and in a case of the optimal operation pattern selection mode, the lighting and photo-detection pattern selection and determination unit **2202** sets the lighting unit **101** not to emit any light. Note that it is also alternatively possible to control the lighting and photo-detection control signal generation unit **2104** not to generate any signal for making the lighting unit **101** to carry out the lighting operation.

In this manner, by controlling the lighting unit **101** not to emit any light in a case of the optimal operation pattern selection mode, the reflected light image obtained by the reflected light image acquisition unit **1102**, that is, the difference output between the stored charges for the image photo-detected by the first photo-detection unit **109** and the stored charges for the image photo-detected by the second photo-detection unit **110**, indicates only the external light fluctuation, so that the brighter reflected light image implies the more influence received from the external light. In order to secure the reliability, the evaluation value is given by an average value obtained by repeating the operation of each operation pattern several times in a case of the optimal operation pattern selection mode. In other words, for each operation pattern, the average brightness over several frames of the reflected light image is obtained and outputted as the evaluation value.

Next, the operation of this information input generation apparatus of FIG. **90** will be described with reference to the flow chart of FIG. **91**.

Initially, this apparatus is set in the optimal operation pattern selection mode. In this mode, the lighting unit **101** is controlled not to emit any light first (step **1001**). Namely, the lighting and photo-detection pattern selection and determination unit **2202** sets the lighting unit **101** such that the lighting unit **101** does not carry out the lighting operation even during the second charge storing period, so as to make the acquired reflected light image completely dark.

Then, the lighting and photo-detection pattern selection and determination unit **2202** selects one photo-detection

66

operation pattern from a plurality of operation patterns provided in advance (step **1002**), and controls the lighting and photo-detection control signal generation unit **2104** such that the difference component is obtained by carrying out the charge storing operations in the selected photo-detection operation pattern. In response, the lighting and photo-detection control signal generation unit **2104** controls the reflected light image acquisition unit **1102** to carry out the first charge storing operation and the second charge storing operation for the image of the target object in the operation period corresponding to the selected photo-detection operation pattern and obtain the difference component between the stored charges.

Then, according to that, the external light influence evaluation unit **2201** evaluates the external light in this operation pattern (step **1003**). Here, the average brightness over several frames of the reflected light image is used as the evaluation value for the external light influence (which is of course smaller when it is darker). In other words, In other words, the above operation for obtaining the difference component is repeated for a plurality of times in one and the same operation pattern, and an average value of the respectively obtained difference component values is obtained as the evaluation value in that operation pattern. This evaluation result is then given to the lighting and photo-detection pattern selection and determination unit **2202**.

Next, the lighting and photo-detection pattern selection and determination unit **2202** checks whether all the patterns are tried or not (step **1004**), and if there is any pattern that is not tried yet, selects one of the untried patterns as the next photo-detection operation pattern (step **1005**). Then, the lighting and photo-detection pattern selection and determination unit **2202** controls the lighting and photo-detection control signal generation unit **2104** such that the difference component is obtained by carrying out the charge storing operations in the selected photo-detection operation pattern. In response, the lighting and photo-detection control signal generation unit **2104** controls the reflected light image acquisition unit **1102** to carry out the first charge storing operation and the second charge storing operation for the image of the target object in the operation period corresponding to the selected photo-detection operation pattern and obtain the difference component between the stored charges. Then, according to that, the external light influence evaluation unit **2201** evaluates the external light in this operation pattern (step **1003**). This evaluation result is then given to the lighting and photo-detection pattern selection and determination unit **2202**.

Next, the lighting and photo-detection pattern selection and determination unit **2202** checks whether all the patterns are tried or not (step **1004**), and if there is any pattern that is not tried yet, selects one of the untried patterns as the next photo-detection operation pattern (step **1005**) and the above described operation is repeated in the selected photo-detection operation pattern and the evaluation is made, but when the step **1004** judges that all the patterns are tried, the lighting and photo-detection pattern selection and determination unit **2202** compares the respective evaluation values of all the patterns, and selects one pattern with the best evaluation value as the optimal pattern (step **1006**).

Next, the lighting and photo-detection pattern selection and determination unit **2202** gives commands to the lighting unit **101** and the lighting and photo-detection control signal generation unit **2104** such that the lighting operation and the photo-detection operation are carried out in pattern and timing for realizing the charge storing period of that selected photo-detection operation pattern. As a result, the lighting

IPR2021-00920
Apple EX1003 Page 135

6,144,366

67                                                                68

and photo-detection control signal generation unit **2104** is set to generate the lighting command and the photo-detection command in accordance with that selected operation pattern, while the lighting unit **101** is relieved from its lighting stop state (step **1007**).

In conjunction with this cancellation, the mode is changed from the optimal operation pattern selection mode to the normal operation mode.

In the normal operation mode, the photo-detection by the first photo-detection unit **109** in a state of having light emission by the lighting unit **101** is carried out for the charge storing period of the selected operation pattern, then the photo-detection by the second photo-detection unit **110** in a state of having node no light emission by the lighting unit **101** is carried out for the same charge storing period, and then the difference between the stored charges is obtained as the reflected light image without the influence of the external light.

In this manner, in this twelfth embodiment, a plurality of operation patterns with mutually different charge storing periods are provided in advance, and the optimal operation pattern selection mode is provided to carry out the photo-detection by the first photo-detection unit and the second photo-detection unit in a state of having no light emission by the lighting unit and obtain the difference output between the photo-detection outputs (image outputs) of these photo-detection units for each operation pattern, and then the operation pattern for which the difference image (reflected light image) is the darkest image is selected as the optimal operation pattern without the influence of the external light and the normal operation mode is carried out in that pattern.

In other words, the difference image is obtained without using the lighting unit for each of a plurality of operation patterns provided in advance and the influence of the external light is evaluated, and then the pattern indicating the best evaluation value is selected. After that, the image due to the external light alone and the image with the illumination by the lighting unit are acquired and the difference between them is obtained as the reflected light image in that selected pattern. As the evaluation value of the influence of the external light, the average brightness over several frames of the reflected light image is used, and this evaluation is tried for all the operation patterns provided in advance and then the operation pattern with the smallest average brightness (which received the least influence from the external light) is selected, so as to select the photo-detection period for the first photo-detection unit and the second photo-detection unit which is least influenced by the external light fluctuation under the current external light fluctuation state.

Consequently, it becomes possible to obtain the reflected light image in the operation pattern for which the influence of the external light fluctuation becomes minimum under the environment in which this apparatus is placed.

Now, the effect of this twelfth embodiment will be described more specifically.

FIGS. **92A** and **92B** show an exemplary case of the external light (indicated by a solid line) with a long fluctuation period, and FIGS. **93A** and **93B** show an exemplary case of the external light with a short fluctuation period. In these figures, the horizontal axis represents a time and the vertical axis represents an intensity of the light at the photo-detection plane. When the light is emitted, the output curve increases in proportion to the emitted light amount (that is, a level is increased).

The light intensity integrated over a prescribed period of time (indicated as $L1$, $L2$, $L11$ and $L12$ in the figures) corresponding to the stored charges. In FIGS. **92A** and **93A**,

$L1$ is the stored charges of the first photo-detection unit **109** at a time of the light emission by the lighting unit **101**, and $L2$ is the stored charges of the second photo-detection unit **110** at a time of no light emission by the lighting unit **101**, for an exemplary case of using the charge storing period $t1$.

Also, in FIGS. **92B** and **93B**, $L11$ is the stored charges of the first photo-detection unit **109** at a time of the light emission by the lighting unit **101**, and $L12$ is the stored charges of the second photo-detection unit **110** at a time of no light emission by the lighting unit **101**, for an exemplary case of using the charge storing period $t2$, where ti is assumed to be sufficiently smaller than $t2$.

The difference between $L1$ and $L2$ and the difference between $L11$ and $L12$ can be regarded as the reflected light images. For the light source of the lighting unit **101**, an incandescent lamp or LED can be used, but it is more usual to use the LED in recent years. Then, the LED that is usually used for the lighting unit **101** can emit the higher power instantaneously for the shorter light emission time, so that the light intensity goes up higher for the shorter storing time cases in FIGS. **92A** and **92B**.

Here, when the external light fluctuation is gradual and large as shown in FIGS. **92A** and **92B**, it is possible to reduce the influence of the external light fluctuation in the difference between the stored charges for a time of light emission and a time of no light emission, by shortening the light emission time of the lighting unit **101**, and therefore the reflected light amount can be detected at high precision (FIG. **92A**). On the other hand, when the light emission time of the lighting unit **101** is made longer, the external light largely fluctuates during that period and therefore the large influence of the external light fluctuation will be contained in the difference between the stored charges for a time of light emission and a time of no light emission, so that the reflected light amount cannot be detected at high precision (FIG. **92B**).

Next, when the external light fluctuation period is short as shown in FIGS. **93A** and **93B** (for example, when the inverter fluorescent light is used for the indoor lighting, where the light amount of this fluorescent light that functions as the external light fluctuates at the period of about several tens of kHz), suppose that the light emission time of the lighting unit **101** is set as short as the external light fluctuation period and the charges are stored for the duration of this light emission period (ti) as shown in FIG. **93A**. In this case, if there is a displacement in phase between the external light fluctuation period and the lighting pulse of the lighting unit **101**, the influence of the external light is largely changed and the errors becomes noticeable so that the reflected light image component cannot be detected at high precision.

For this reason, in this case, the light emission time of the lighting unit **101** is made longer instead. In other words, the light emission time is set to be a long time $L2$ which can contain several external light fluctuation periods as shown in FIG. **93B**, and the charges are stored for the duration of this light emission period (t2). In this manner, the influence of the external light fluctuation can be reduced.

In a case where the external light fluctuation period is short, there is also a scheme for controlling the lighting unit **101** to emit the light in the light emission time which is even shorter than the external light fluctuation period. However, in general, when the light emission in an excessively short time is attempted, the driving frequency of the circuit increases, and the cost and the power consumption also increase.

As described, in this twelfth embodiment, the optimal operation pattern selection mode is provided, and a plurality

IPR2021-00920
Apple EX1003 Page 136

6,144,366

**69**

of patterns are tried automatically and the optimal one is determined automatically while operating in this mode. However, the present invention is not necessarily limited to this particular case, and it is also possible to provide a switching button such that the operator can select the operation pattern by depressing this button. In such a case, a complicated processing is not involved so that the low cost realization becomes possible. In this case, it is preferable to display the reflected light image on the screen so that the operator can select the operation pattern with least noises while watching the reflected light image on the screen. Thus, the present invention should be construed as encompassing such a case of not selecting the operation pattern automatically.

By means of this, even when the light fluctuation is present, it becomes possible to obtain the reflected light image at high precision and therefore it becomes possible to extract only the image of the target object at high precision.

When it becomes possible to extract the image of the target object from the image signals, it becomes possible to acquire information on its shape, motion, distance, etc., from the extracted image. For example, the reflected light from a position where the object is existing has some value, while there is hardly any reflected light from the remote background, so that it becomes possible to extract the shape of the object by thresholding the reflected light image at appropriate threshold. It also becomes possible to extract various feature data from that shape. By analyzing the time sequence of the shape, it also becomes possible to capture the motion or the deformation of the object. Since the concavity and convexity of the object can be captures as the difference in the reflected light amount, it also becomes possible to obtain the 3D structure of the target object.

Consequently, it also becomes possible to easily realize the three dimensional operation input or the three dimensional command operation according to such information, and this twelfth embodiment can be the significant contribution to the practical implementation of the present invention.

Note that, in the above description, the phrase like a difference between two images is used frequently, but this is more of a conceptual description, and it does not necessarily imply the two images actually exist. In the general configuration, the first and second charge storage units are provided in the unit photo-detector cell, and one image can be formed by using the stored charges of the first charge storage units of all the cells, while another image can be formed by using the stored charges of the second charge storage units of all the cells. In this sense, the references to "two images" are made, but in practice, each cell outputs the difference of the two charge storage units at a time of output from the photo-detection section, and it is not that these two images are to be extracted as such to the external. Consequently, a phrase "two images" used in the above description does not necessarily imply the output of two images that can be actually seen separately.

Also, a number of times for carrying out the lighting operation per one frame is not necessarily limited to just once. For example, the charge storing into the first charge storage unit **119** with the light emission and the charge storing into the second charge storage unit **120** with no light emission can be repeated for ten times, for example.

Also, as shown in FIG. **94**, it is possible to further provide a difference circuit **2121** and the third charge storage unit **2122**. In this case, the charge storing into the first charge storage unit **119** with the light emission by the lighting unit and the charge storing into the second charge storage unit

**70**

with no light emission by the lighting unit are carried out, a difference between the stored charges in the first and second charge storage units **119** and **120** is obtained by the difference circuit **2121**, and the charges for this difference is transferred to the third charge storage unit **2122**, while the first and second charge storage units **119** and **120** are reset only after that, as indicated in FIG. **95**. In this case, only a difference is present even within each cell, and it is not quite appropriate to speak of two images.

Including those cases mentioned above, this twelfth embodiment is effective for all the reflected light image acquisition apparatus and method which have the same effect as obtaining the difference between two images.

<Thirteenth Embodiment>

In the above, various techniques for suppressing the degradation of the reflected light image due to the light amount fluctuation under the environment has been described. However, even when the light amount under the environment is stable, if the reflected light amount from the target object is not very large compared with the light amount under the environment, the S/N becomes poor so that the quality of the obtained reflected light image is going to be low.

Such a situation arises, for example, when the dynamic range of the CMOS sensor in the reflected light image acquisition unit **1102** is set to be an optimum state for detecting the reflected light amount from the target object within a prescribed distance range of the photo-detection optics. This is because the intensity of the light is inversely proportional to the square of the distance. Consequently, in a case where the information input generation apparatus of the present invention is to be implemented on a computer such as PC and utilized for the operation input, and when the target object is the hand of a user, it is normal for the user to try to make the operation input according to his own convenience so that the operation input may be made with the position of the hand outside the range intended by a designer.

In view of this problem, this thirteenth embodiment is directed to a technique capable of dealing with such a situation, for suppressing the degradation of the reflected light image by adjusting the emission light amount according to the distance to the target object.

In a case of detecting the reflected light from the target object by the sensor, the reflected light amount that can be detected by the sensor is inversely proportional to the sqaure of the distance to the target object. Consequently, when the target object moves away from the sensor, the reflected light amount from the target object decreases abruptly. For example, compared to a case where the target object is located at the distance of 10 cm from the sensor, the reflected light amount that can be detected in a case where the target object is located at the distance of 30 cm will be decreased to ⅑.

In other words, when the measurement range is set to be an optimum state for the measurement of the object in a range of the distance up to 10 cm, the measurement precision of the object located at the distance of about 30 cm will be lowered abruptly as the received light amount itself will be decreased to ⅑.

In order to measure the target object located at the distance of about 30 cm at high precision without changing the measurement range, it is possible to raise the lighting power of the lighting unit so as to increase the reflected light amount from that target object. However, in this case, on the contrary, the reflected light amount from the object at the distance of about 10 cm would be excessively large and

IPR2021-00920
Apple EX1003 Page 137

6,144,366

**71**

could exceed the measurement range, and this can largely affect the image quality degradation in the image to be acquired.

In the information input generation apparatus of the present invention as described above, it is often difficult to take an image of the target object at the optimum position with respect to the sensor position in accordance with its measurement range. This is because, when the target object the hand, the hand will be set in various hand actions with various hand shapes, and when the user's attention is pre-occupied by the hand actions, the user tends to forget to keep the distance between the hand and the sensor position (the position of the photo-detection section of the reflected light image acquisition unit) within the intended range.

For this reason, this thirteenth embodiment is directed to a case of dealing with such a situation and making it possible to extract the reflected light image of the target object at high precision even when the located distance of the target object changes.

In this thirteenth embodiment, it is made possible to obtain the reflected light image of the target object at high precision by controlling the emission light amount of the lighting unit according to the distance between the sensor (the photo-detection section of the reflected light image acquisition unit) and the target object.

Namely, it is made possible to measure the distance at sufficient precision regardless of the distance at which the object is located, by means of the control that realizes an appropriate reflected light amount according to the distance at which the object is located.

Now, the basic configuration of the information input generation apparatus in this thirteenth embodiment and its variations will be described.

In the basic configuration, the apparatus includes the following three elements.

(1) A detection unit for detecting information regarding the distance of the object.

(2) A determination unit for determining a level of increase or decrease of the reflected light amount according to the detection result of the detection unit.

(3) A control unit for carrying out the control (the control of the emission light amount, the control of the amplifier, the control of the A/D conversion) for increasing or decreasing the reflected light amount according to the determination made by the determination unit.

In the practical implementation, each of these three elements can be realized in several different forms, including the following.

(1) The detection unit for detecting the distance of the object (or information related to it):

(1-1) The distance of the object is detected from an output (analog signals) of the cell array. The maximum value is then obtained by a maximum value detection circuit.

(1-2) The average signal amount is obtained by entering the signals through a low pass filter.

(1-3) The information is detected from digital data after the A/D conversion. The maximum value is then detected.

(1-4) The maximum value is calculated from the mean and variance.

(2) The determination unit for determining a level of increase or decrease of the reflected light amount according to the result obtained by the detection unit (1), so as to control the emission light amount of the lighting unit according to the determined content (either linearly or by stages).

(2-1) In case of controlling by stages, the control is made such that the reflected light amount changes in stages

**72**

such as twice, three times, four times, and so on of the reference state.

(2-2) In a case of controlling linearly, the reflected light amount is controlled to be arbitrary x times the current amount.

(3) The control unit for carrying out the control (the control of the emission light amount, the control of the amplifier, the control of the A/D conversion) for increasing or decreasing the reflected light amount according to the determination of the determination unit (2).

(3-1) The lighting by an LED that constitutes the lighting unit is controlled.

(3-2) The lighting power (lighting current) of an LED that constitutes the lighting unit is controlled.

(3-3) A number of lighting pulses for an LED that constitutes the lighting unit is controlled.

(3-4) A pulse length of the lighting driving pulses for an LED that constitutes the lighting unit is controlled.

(3-5) A gain of an amplifier is controlled.

(3-6) An input voltage range of an A/D converter is controlled.

Now, an exemplary specific configuration of the information input generation apparatus in this thirteenth embodiment will be described in detail. This specific example corresponds to a case of using (1-3), (2-1) and (3-3) noted above, in which the detected values of the reflected light amount from the target object are classified into several levels, and the emission light amount is adjusted by changing the number of pulses for driving the lighting unit according to the classified level.

More specifically, assuming that the hand as the target object is placed at the distance of 20 cm in front of the photo-detection section, for example, a state in which the CMOS sensor in this setting outputs the photo-detection output voltage (the stored charge voltage) of 1 [V], ½ [V], or ¼ [V] will be called "state-1", "state-2", or "state-3", respectively.

Then, the emission light amount of the lighting unit is switched according to the state, by changing the number of lighting pulses for driving the lighting unit. For the "state-1", four pulses are used. For the "state-2", two pulses are used. For the "state-3", one pulse is used.

The fine adjustment control is carried out as follows. The image signals (reflected light image) from the CMOS sensor are A/D converted and the maximum value among the pixel values (a position where the reflected light amount is largest, that is, a position which is closest) is obtained from the digital reflected light image. The digital output is given by 8 bits to realize the 256 step gradation, for example.

The digital output is monitored and when the maximum value exceeds "250", the state is lowered to one grade lower one ("state-1" to "state-2", for example). Also, when the maximum value becomes lower than "100", the state is raised to one grade higher one ("state-3" to "state-2", for example). Note however that, when there is nothing that can be identified as the object, the state transition does not occur.

In this specific example, the setting is made so that the reflected light amount are exactly doubled from "state-3" to "state-2" and from "state-2" to "state-1", so that the conversion to the distance can be made easily.

At this point, the property of the reflected light amount and the necessity of the emission light amount control will be explained.

In this apparatus, the light is emitted from the lighting unit to the target object and the reflected light amount from that target object is measured (detected). Then, the distribution of

IPR2021-00920
Apple EX1003 Page 138

6,144,366

**73**

the obtained reflected light amount is obtained in a form of an image, that is, the reflected light image of the target object. When the object surface is a uniform scattering surface, the reflected light amount (a value of each pixel in the reflected light image) indicates the distance. The value of each pixel (reflected light amount) is inversely proportional to the square of the distance to the object. This relationship between the distance to the object and the reflected light amount can be depicted in a form of a graph as shown in FIG. 96.

From this FIG. 96, it can be seen that, when the distance increases, the reflected light amount decreases and the distance resolution is lowered.

In order to make it possible to measure the sufficiently far distance, it suffices to increase the emission light amount of the lighting unit. However, when the emission light amount is increased, the reflected light amount is going to be excessively large when the object is located near on the contrary, so that there arises a problem that the reflected light amount may exceed the measurable range. Consequently, the solution for enabling the measurement of the distance at high precision over wide distance range is to suppress the change of the reflected light amount by controlling the emission light amount of the lighting unit according to the distance of the object.

With this in mind, the information input generation apparatus in this thirteenth embodiment has a configuration as shown in FIG. 97, which comprises the lighting unit 101, the reflected light image acquisition unit 1102, the reflected light image processing unit 1103, a maximum pixel value detection unit 1500, and a lighting state determination unit 1501.

The lighting unit 101 is a device for emitting the light to illuminate the target object placed under the external light.

The reflected light image acquisition unit 1102 detects the reflected light from the target object in a state of having the light emission by the lighting unit 101 by using the CMOS sensor and storing charges into the first charge storage unit, and detects the reflected light from the target object in a state of having no light emission by the lighting unit 101 by using the CMOS sensor and storing charges into the second charge storage unit, and then obtains and outputs the difference between the stored charges as the reflected light image.

The maximum pixel value detection unit 1500 detects the maximum pixel value from data of the reflected light image.

The lighting state determination unit 1501 sets the light-ing state of the lighting unit 101 appropriately, which also has a function for determining whether or not to change the lighting state of the lighting unit 101 according to the maximum pixel value obtained by the maximum pixel value detection unit 1500. The lighting state of the lighting unit 101 takes any one of "state-1", "state-2", and "state-3". The lighting state determination unit 1501 selects one of these states according to the maximum pixel value, and controls the lighting unit 101 to carry out the lighting operation by using the number of pulses specified for the selected state.

The reflected light image processing unit 1103 obtains the three-dimensional operation information by analyzing the action or state of the target object according to the reflected light image obtained by the reflected light image acquisition unit 1102, which corresponds to the feature data generation unit 103 of FIG. 1.

In this configuration of FIG. 97, the lighting unit 101 emits the light to illuminate the target object placed under the external light. The reflected light image acquisition unit 1102 detects the reflected light from the target object in a state of having the light emission by the lighting unit 101 by using the CMOS sensor and storing charges into the first

**74**

charge storage unit, and detects the reflected light from the target object in a state of having no light emission by the lighting unit 101 by using the CMOS sensor and storing charges into the second charge storage unit, and then obtains and outputs the difference between the stored charges as the reflected light image.

The reflected light image acquisition unit 1102 is operated in synchronization with the lighting unit 101, so as to acquire a distribution of the light amount returned by the reflection of the object placed in front of the apparatus resulting from the light emitted by the lighting unit 101, that is, the reflected light image.

The reflected light image acquisition unit 1102 has the photo-detection cells arranged in an array structure. Each photo-detection cell carries out the photo-detection for the same time in a case of the light emission by the lighting unit 101 and in a case of no light emission by the lighting unit 101, stores respective charges, and detects the reflected light amount as the difference between the stored charges. Also, the reflected light image acquisition unit 1102 has an A/D converter for converting the detected reflected light amount into digital data and outputting the obtained digital data.

This A/D converter converts the input voltage in a range of 0 to 1 [V] into 8 bit digital data ranging from "0" to "255". Consequently, the distribution of the reflected light amount, that is, the pixel values of the reflected light image, will be outputted as the digital data from the reflected light image acquisition unit 1102.

The maximum pixel value detection unit 1500 detects the maximum pixel value from a series of reflected light image data, and then gives the detected value to the lighting state determination unit 1501.

Upon receiving this detected value, the lighting state determination unit 1501 determines the optimum state among the three states of "state-1", "state-2" and "state-3", by judging which one of these three lighting states is optimum according to the detected value.

Here, the optimum state is determined as follows. Namely, the lighting state determination unit 1501 deter-mines whether or not to change the lighting state according to the obtained maximum pixel value. Now, there are three states of "state-1", "state-2" and "state-3" that can be the lighting state of the lighting unit 101. Among them, the "state-1" is a mode by which the largest reflected light amount can be obtained, which is set such that the input voltage of the A/D converter becomes approximately 1 [V] when the hand as the target object is located at the distance of 20 cm.

Note however that the absolute distance value cannot be determined from the reflected light amount size alone, so that the above definition is only a standard one. For example, the reflected light amount may vary depending on the color or the surface state (dry or wet) of the hand.

The "state-2" is a mode by which the reflected light amount as much as about a half of that obtained by the "state-1" can be obtained.

The "state-3" is a mode by which the reflected light amount as much as about a quarter of that obtained by the "state-1" can be obtained.

In the following, the change of the state for increasing the reflected light amount to a double of the current value will be referred to as "raising the state by one grade" and the change of the state for decreasing the reflected light amount to a half of the current value will be referred to as "lowering the state by one grade". In other words, the state change is expressed in such a manner as "lowering from "state-1" to "state-2"", "raising from "state-3" to "state-2"", etc.

IPR2021-00920
Apple EX1003 Page 139

6,144,366

75

The lighting state determination unit **1501** controls the lighting state as follows. When the maximum pixel value is "250", the light state is lowered by one grade. In other words, when the hand comes too close for the current state, the reflected light amount is lowered by lowering the emission light amount, so that the input signals of the A/D converter will not be saturated.

On the other hand, when the maximum pixel value becomes lower than "100", the lighting state is raised by one grade. In other words, when the hand position is too far for the current state so that the reflected light amount is insufficient, the reflected light amount is increased by raising the emission light amount. Here, however, the "state-1" cannot be raised any higher, and the "state-3" cannot be lowered any lower. The state transition among these three states is summarized in a state transition diagram shown in FIG. **98**.

Here, a case of lowering the state when the maximum pixel value is greater than "250" and raising the state when the maximum pixel value is less than "100" has been described, but this thirteenth embodiment is not necessarily limited to these values.

The simplest case is to lower the state when the maximum pixel value is "255" (which is the maximum possible value) and raise the state when the maximum pixel value is "127" (a half of the maximum possible value). In this case, however, the input signals of the A/D converter will be saturated once before the state is lowered (that is, the state is lowered after the input signals are saturated). Also, by lowering the state by one grade when the maximum pixel value is "255", the output becomes "128" (or "127"), but if the reflected light amount becomes slightly less by then, the maximum pixel value immediately becomes lower than "127" and the state is immediately raised again.

As such, when the threshold for raising the state is set to be about a half of the threshold for lowering the state, the state is going to be changed frequently in a case where the reflected light amount remains around that threshold for raising the state.

For this reason, by setting the threshold for raising the state to be somewhat less than a half of the threshold for lowering the state so as to provide the hysteresis characteristic to the state transition, it is possible to prevent the frequent changes of the state. In this thirteenth embodiment, the threshold for lowering the state is set to be "250", so that the state is lowered immediately before the input signals of the A/D converter are saturated. Also, when the state is lowered by the threshold of "250", the value is lowered to about "125", and the threshold for raising the state is set to be "100" which is lower than that.

In this thirteenth embodiment, a number of states is set to be three. Then, by changing the state, the reflected light amount is controlled to be doubled or reduced in half. However, it is also possible to realize a somewhat finer controller by increasing a number of states.

The difference in the lighting states is controlled by the number of lighting pulses. In this thirteenth embodiment the lighting unit is driven by four lighting pulses in the "state-1" as shown in a part (a) of FIG. **99**, by two lighting pulses in the "state-2" as shown in a part (b) of FIG. **99**, or by one lighting pulse in the "state-3" as shown in a part (c) of FIG. **99**.

As shown in FIG. **99**, the length of each lighting pulse a-**1**, b-**1**, c-**1** is the same, so that the "state-2" can obtain twice as much reflected light amount as the "state-3", and the "state-1" can obtain twice as much reflected light amount as the "state-2". In response to this lighting pulse, the charge storing control is carried out as follows.

76

In FIG. **99**, charts a-**2**, b-**2**, c-**2** shown directly below the lighting pulses a-**1**, b-**1**, c-**1** show the respective charge storing operations. In FIG. **99**, "1" indicates the charge storing into the first charge storage unit of the CMOS sensor in the reflected light image acquisition unit **1102** utilizing the CMOS sensor in a configuration of FIG. **3** and FIG. **4**, "2" indicates the charge storing into the second charge storage unit, and "R" indicates the reset for releasing the generated charges to the power source.

Namely, as described in relation to FIG. **3** and FIG. **4**, the CMOS sensor has a configuration in which the unit photo-detector cells PD are arranged in n×n pixel array, where each unit photo-detector cell PD has one photo-electric conversion unit **118** and two charge storage units **119** and **120**. Between the photo-electric conversion unit **118** and the charge storage units **119** and **120**, several gates (**122** and **123** in this example) are provided, so that the charges generated at the photo-electric conversion unit **118** can be selectively lead to either one of the two charge storage units **119** and **120** by controlling these gates. Here, the control signal for these gates and the lighting control signal for the lighting unit **101** are synchronized. Then, the difference between the stored charges of the two charge storage units is obtained as a component of the reflected light image at the corresponding pixel.

In the charge storing operation in the "state-3" shown in a part (c) of FIG. **99**, after the reset is made first, the generated changes of the photo-electric conversion unit **118** are stored into the first charge storage unit of the CMOS sensor in synchronization with the lighting pulse.

Next, after the reset is made once again, the generated charges of the photo-electric conversion unit **118** are stored into the second charge storage unit of the CMOS sensor, in a state of no light emission by the lighting unit **101** this time. The second charge storage unit stores the generated charges due to the external light such as the illumination light and the sunlight, while the first charge storage unit stores the generated charges due to the reflected light including the external light and the light returned by the reflection of the object resulting from the light emitted by the lighting unit **101**. Consequently, the reflected light amount can be obtained by taking a difference between the stored charges of the first charge storage unit and the second charge storage unit.

In the "state-2", the charge storing is carried out twice, so that the reflected light amount is doubled. In the "state-1", the charge storing is repeated for four times.

Note that, in this thirteenth embodiment, the emission light amount is controlled by the number of pulses, but this thirteenth embodiment is not necessarily limited to this case. For example, as shown in FIG. **100**, it is also possible to provide three states by setting the pulse length of the lighting pulse in three sizes, i.e., a unit length, twice the unit length, and four times the unit length. In this case, in any of "state-1", "state-2" and "state-3", the charge storing operation stores charges into each of the first and second charge storage units once, and only the storing period is different in three cases.

The total lighting time of the lighting unit **101** for each state is the same as in a case of FIG. **99**, so that the reflected light amount is also approximately the same as in a case of FIG. **99**. Note however that, when the external light is fluctuating, it is less likely to receive the influence of the external light by emitting a plurality of short light pulses, rather than emitting one long light pulse.

Besides those described above, there are still some other methods for controlling the reflected light amount. For example, there is a method for changing the emission light

IPR2021-00920
Apple EX1003 Page 140

6,144,366

**77**

intensity of the lighting unit **101**. Namely, in this case, the lighting current is to be changed. Also, when a plurality of light sources are used for the lighting unit **101**, there is a method for changing a number of light sources for emitting lights.

In addition, apart from these methods for controlling the reflected light amount, there are several methods for suppressing the variation of the digital data size after the A/D conversion. For example, there is a method for dynamically changing the amplification rate at an amplifier provided at a front stage of the A/D converter. When the A/D converter is to be given with input voltages corresponding to the 0 level output and the full scale output as references, and by changing these reference voltages, it is also possible realize the control such that the digital data will be contained within an appropriate range.

By inserting a logarithmic amplifier at a front stage of the A/D converter, the signal change with respect to the distance change can be suppressed as indicated in FIG. **101**, so that the measurable range for one mode can be widened. For this reason, there may be cases where the above described processing can be omitted. However, even in a case of using the logarithmic amplifier, the use of the above described processing can enable the measurement even when the hand as the target object is located at far distance, at the same S/N level as in a case where the target object is located near.

In the above, the lighting state is determined solely according to the maximum value among the pixel values of the reflected light image, but there are other methods as well. For example, it is also possible to determine the state according a number of pixels that satisfy the threshold condition, in such a manner that the state is lowered when there are ten or more pixels that have the pixel values above "250", the state is raised when there are ten or more pixels that have the pixel values below "100", etc. In this case, there is an advantage in that the state will not be changed even when there is a pixel with the pixel value above "250" that appears locally due to the noise.

There is also a method which utilizes the mean value of the pixel values in addition. In this method, the mean pixel value of the pixels with the pixel values above a certain value (that is the pixels not belonging to the background) is obtained, and the state is lowered when the maximum pixel value is above "250" and the mean pixel value is above "150" and so on, for example. According to this method, there is an advantage in that it is possible to avoid the problematic situation in which only the maximum pixel value is prominent but the other pixel values are relatively small so that the resolution would be lowered for the most part if the state is lowered.

It is also possible to determine the state at the analog signal level before the reflected light amount is A/D converted. When the analog signals before the A/D conversion are entered through the low pass filter, the average signal amount can be obtained. This average signal amount is entered into a comparator and the lighting state is determined according to the comparator output. Else, when the analog signals are entered into the maximum value holding circuit instead of the low pass filter, the maximum value of the input signals can be obtained, so that it is also possible to determine the lighting state according to this maximum value of the input signals.

In the examples described above, the lighting state is changed by stages, using the number of lighting pulses or the pulse width. In other words, the emission light amount of the lighting unit **101** is changed by changing the number of lighting pulses or the pulse width in the light amount control.

**78**

In such a case, there is a drawback in that the fine light amount control is rather difficult. In order to realize the fine light amount control, it is necessary to control the light amount linearly.

In view of this, an exemplary case of changing the lighting state linearly will now be described.

In this case, an analog feedback circuit is from the analog signals before the A/D conversion by the A/D converter so as to control the lighting current, that is, the lighting power itself.

FIG. **102** shows an exemplary configuration for this case. In this configuration of FIG. **102**, the reflected light image acquisition unit **1102** outputs analog signals. These analog signals are entered through a low pass filter (LPF) **1602** so as to extract the DC (direct current) component of the frame. The apparatus also includes a lighting power determination unit **1603** having a feedback loop by which the emission light amount is lowered when the DC component is above a certain value or the emission light amount is raised when the DC component is below that certain amount.

With this configuration, the emission light amount of the lighting unit **101** can be automatically adjusted such that the average of the reflected light image always remains constant.

In the configuration of FIG. **102**, the low pass filter is used in order to extract the DC component of the frame from the analog signals, but this thirteen embodiment is not necessarily limited to this case. For example, it is also possible to realize the control such that the maximum value of the reflected light image always remains constant, by using the maximum value detection circuit instead. It is also possible to control the lighting pulse length linearly, instead of controlling the lighting current.

In these methods, the emission light amount is automatically controlled such that the average (or the maximum value) of the reflected light image always remains constant, so that when the distance of the hand as a whole is changed, it is impossible to detect this change. Consequently, these methods are effective when the automatic emission light amount control has a higher priority and the absolute distance value is required. Also, although the absolute distance value cannot be obtained, it is still possible to obtain the relative distance information, so that these methods are also suitable in a case of detecting the shape alone. Also, by supplying the emission light amount to the reflected light image processing unit **1103** somehow, it becomes possible to restore the range image from the obtained reflected light image and the emission light amount.

<Fourteenth Embodiment>

The thirteenth embodiment is directed to various cases for suppressing the influence of the distance (far or near) of the target object position on the image quality of the reflected light image, by controlling the emission light amount of the lighting unit.

In contrast, it is also possible to generate and acquire the reflected light image with a wide dynamic range by obtaining several reflected light images while changing the emission light intensity of the lighting unit, and composing these reflected light images. By means of this, the reflected light image in good quality can be obtained and the distance can be detected at high precision for a wide range of distances ranging from the near distance to the far distance. The fourteenth embodiment is directed to this case.

FIG. **103** shows an exemplary configuration of the information input generation apparatus in this fourteenth embodiment, which comprises the lighting unit **101**, the reflected light image acquisition unit **1102**, a frame buffer **1701**, a reflected light image composition unit **1702**, a control unit **1703**, and a lighting state control unit **1704**.

IPR2021-00920
Apple EX1003 Page 141

6,144,366

**79**

The lighting state control unit **1704** controls the lighting unit **101** to carry out the lighting operation in one of several lighting modes provided in advance. More specifically, for example, the lighting state control unit **1704** functions to generate the lighting pulse according to which the lighting unit **101** emits the light, and in this case, the lighting state control unit **1704** generates several patterns of the lighting pulse sequentially. At the same time, the lighting state control unit **1704** gives a storage control signal to the reflected light image acquisition unit **1102**. The charge storing operation at the reflected light image acquisition unit **1102** needs to be synchronized with the lighting operation, so that the lighting state control unit **1704** controls both of them simultaneously.

The reflected light image data outputted from the reflected light image acquisition unit **1102** are stored in the frame buffer **1701**. When data for a prescribed number of frames are stored in the frame buffer **1701**, the reflected light image composition unit **1702** reads out these data and carries out the composition processing. The control unit **1703** carries out the timing control for the apparatus as a whole.

Now, the composition processing by the reflected light image composition unit **1702** will be described in further detail.

Here, it is assumed that the lighting state control unit **1704** sequentially carries out the operations of "state-1", "state-2" and "state-3" as described in the thirteenth embodiment. In other words, the lighting unit **101** emits the light first at a prescribed lighting power, next a half of that prescribed lighting power next, and finally a quarter of that prescribed lighting power.

In synchronization with this lighting operation, the reflected light image acquisition processing by the reflected light image acquisition unit **1102** is carried out, and three frames of the reflected light images are stored in the frame buffer **1701**. The reflected light image composition unit **1702** carries out the composition processing by using these three frames of the reflected light images.

In the following, the reflected light images corresponding to "state-1", "state-2" and "state-3" will be referred to as "reflected light image-1", "reflected light image-2" and "reflected light image-3", respectively.

The "reflected light image-2" has the pixel values twice as high as those of the "reflected light image-3", and the "reflected light image-1" has the pixel values four times as high as those of the "reflected light image-3". Note however that the pixel value is "255" at most.

Now, the reflected light images are composed by the following algorithm according to the flow chart of FIG. **104**. Here, for each coordinate (x, y), the pixel value for the coordinate (x, y) in "reflected light image-1", "reflected light image-2" and "reflected light image-3" will be denoted as P1(x, y), P2(x, y) and P3(x, y), respectively, while the pixel value for this coordinate in the composed image will be denoted as P(x, y).

In this algorithm of FIG. **104**, one pixel (x, y) is selected (step 982) and for this one pixel (x, y), if P1(x, y)<255 (step 983 YES), then P(x, y) is set to be P(x, y)=P1(x, y) (step 984). Otherwise (step 983 NO), if P1(x, y)=255 and P2(x, y)<255 (step 985 YES), then P(x, y) is set to be P(x, y)=P2(x, y)×2 (step 986). Otherwise (step 985 NO), P1(x, y)=P2(x, y)=255, so that P(x, y) is set to be P(x, y)=P3(x, y)×4 (step 987). This operation is repeated for all the pixels of the reflected light image (step 981).

The above algorithm presupposes the fact that the pixel values are exactly doubled from "reflected light image-3" to "reflected light image-2" and from "reflected light image-2"

**80**

to "reflected light image-1", but in practice, there may be some errors due to the nonlinearity or the charge storage capacity characteristic of the circuit. These errors can be corrected as follows.

Namely, here, the "reflected light image-2" is how many times (ideally twice) of the "reflected light image-3" and the "reflected light image-1" is how many times (ideally twice) of the "reflected light image-2" are exactly determined.

First, all the pixels which have the pixel values less than "255" are taken out from the "reflected light image-2", and ratios with respect to the corresponding pixel values in the "reflected light image-3" are obtained. Then an average α23 of these ratios can be regarded as the multiplication factor of the "reflected light image-2" with respect to the "reflected light image-3".

Then, in the algorithm of FIG. **104**, this α23 is used instead of "2" appearing in the formula "P(x, y) P2(x, y)×2" of the step **986**.

Also, the ratio α12 of the "reflected light image-1" with respect to the "reflected light image-2" is similarly obtained, and α12×α23 is used instead of "4" appearing in the formula "P(x, y)=P3(x, y)×4" of the step **987**.

Note here that, in the above, the ratio with respect to the "reflected light image-3" is obtained for all the pixels with the pixel values less than "255" in the "reflected light image-2", but when this ratio is too small, the ratio calculation error may be large, so that the processing target may be limited by selecting only those pixels which have sufficiently large pixel values, such as the pixel values less than "255" and greater than "100", for example.

It is to be noted that, besides those already mentioned above, many modifications and variations of the above embodiments may be made without departing from the novel and advantageous features of the present invention. Accordingly, all such modifications and variations are intended to be included within the scope of the appended claims.

What is claimed is:

1. An information input generation apparatus, comprising:
   a timing signal generation unit for generating a timing signal;
   a lighting unit for emitting a light whose intensity vary in time, according to the timing signal generated by the timing signal generation unit; and
   a reflected light extraction unit having a sensor array for detecting a reflected light from a target object resulting from the light emitted by the lighting unit, in synchronization with the timing signal generated by the timing signal generation unit, so as to obtain a spatial intensity distribution of the reflected light in a form of a reflected light image indicative of an information input related to the target object, in separation from an external light that is illuminating the target object.

2. The apparatus of claim **1**, wherein the reflected light extraction unit obtains the reflected light image in separation from the external light by detecting a plurality of image data in a state of having a light emission by the lighting unit and in a state of having no light emission by the lighting unit.

3. The apparatus of claim **2**, wherein the reflected light extraction unit obtains the reflected light image as a difference between the image data detected in a state of having a light emission by the lighting unit and the image data detected in a state of having no light emission by the lighting unit.

4. The apparatus of claim **1**, wherein the lighting unit emits the light which is invisible to human eyes.

5. The apparatus of claim **1**, wherein the reflected light extraction unit includes:

6,144,366

**81**

at least one photo-electric conversion unit for generating charges corresponding to input lights of the reflected light extraction unit;

at least two charge storage units for storing the charges generated by the photo-electric conversion unit under different lighting states of the lighting unit; and

gates operated in synchronization with the timing signal generated by the timing signal generation unit, for selectively leading the charges generated by the photo-electric conversion unit to one of the charge storage units.

**6.** The apparatus of claim **1,** wherein the reflected light extraction unit includes:

an optical filter for receiving input lights of the reflected light extraction unit, and passing those input lights which have wavelengths within a specified range and blocking those input lights which have wavelengths outside the specified range.

**7.** The apparatus of claim **1,** wherein the target object is at least a part of a body of an operator, and the reflected light image is indicative of the information input for controlling a device to be operated by the operator.

**8.** The apparatus of claim **1,** further comprising:

a feature data generation unit for generating feature data related to the target object from the reflected light image.

**9.** The apparatus of claim **8,** wherein the feature data generation unit generates the feature data by extracting a distance information including a depth information of the target object.

**10.** The apparatus of claim **8,** wherein the feature data generation unit generates the feature data by extracting an object property information including a color information or a material information of the target object.

**11.** The apparatus of claim **8,** wherein the feature data generation unit includes:

an image extraction unit for extracting an object image of at least a part of the target object, from the reflected light image.

**12.** The apparatus of claim **11,** wherein the image extraction unit extracts the object image according to one or both of a distance information including a depth information of the target object and an object property information including a color information or a material information of the target object.

**13.** The apparatus of claim **11,** wherein the target object is at least a part of a body of an operator, and the object image extracted by the image extraction unit indicates the information input for a pointing operation by the operator.

**14.** The apparatus of claim **11,** wherein the feature data generation unit also includes:

a shape interpretation unit for interpreting a shape of said at least a part of the target object in the object image extracted by the image extraction unit.

**15.** The apparatus of claim **14,** wherein the target object is at least a part of a body of an operator, and the shape interpreted by the shape interpretation unit indicates the information input for a gesture input by the operator.

**16.** The apparatus of claim **14,** wherein the target object is at least a part of a body of an operator, and the shape interpreted by the shape interpretation unit indicates the information input for a pointing operation by the operator.

**17.** The apparatus of claim **14,** wherein the shape interpretation unit interprets the shape as a command to be used as the information input.

**18.** The apparatus of claim **14,** wherein the shape interpretation unit interprets the shape as a viewpoint information

**82**

to be used as the information input, the viewpoint information indicating a viewpoint from which three-dimensional objects are to be displayed on a display device.

**19.** The apparatus of claim **11,** wherein the feature data generation unit also includes:

a motion extraction unit for extracting a change of said at least a part of the target object in the object image extracted by the image extraction unit.

**20.** The apparatus of claim **19,** wherein the motion extraction unit extracts the change as a command to be used as the information input.

**21.** The apparatus of claim **19,** wherein the target object is at least a part of a body of an operator, and the change extracted by the motion extraction unit indicates the information input for a motion input by the operator.

**22.** The apparatus of claim **11,** wherein the feature data generation unit also includes:

a shape interpretation unit for interpreting a shape of said at least a part of the target object in the object image extracted by the image extraction unit;

a motion extraction unit for extracting a change of said at least a part of the target object in the object image extracted by the image extraction unit; and

a command generation unit for generating at least one command to be used as the information input from the shape interpreted by the shape interpretation unit and the change extracted by the motion extraction unit.

**23.** The apparatus of claim **1,** further comprising:

an imaging unit for imaging a visible light image of the target object.

**24.** The apparatus of claim **23,** further comprising:

an image extraction unit for extracting at least one specific image region from the visible light image imaged by the imaging unit, according to one or both of the reflected light image and an information extracted from the reflected light image.

**25.** The apparatus of claim **24,** further comprising:

an image memory unit for storing an extracted image data for said at least one specific image region extracted by the image extraction unit; and

an image composition unit for composing the extracted image data stored by the image memory unit with another image data in a specified manner.

**26.** The apparatus of claim **23,** further comprising:

a Z-value image generation unit for generating a Z-value image by setting the visible light image imaged by the imaging unit in correspondence to a distance information of the target object which Is extracted from the reflected light image.

**27.** The apparatus of claim **26,** further comprising:

an image extraction unit for extracting image data for a specific image region from the the Z-value image generated by the Z-value image generation unit, according to the distance information contained in the Z-value image, the specific image region being a region for which the distance information is within a specified range.

**28.** The apparatus of claim **26,** wherein the Z-value image generation unit generates the Z-value image as the information input for texture information to be mapped onto a three-dimensional model.

**29.** The apparatus of claim **1,** further comprising:

a conversion unit for converting intensities of the reflected light defining pixel values of the reflected light image into distance values with respect to the target object so as to obtain a range image of the target object.

IPR2021-00920
Apple EX1003 Page 143

6,144,366

## 83

**30**. The apparatus of claim **29**, wherein the conversion unit is a logarithmic amplifier.

**31**. The apparatus of claim **1**, further comprising:

a correction unit for correcting a distortion of the reflected light image obtained by the reflected light extraction unit.

**32**. The apparatus of claim **1**, further comprising:

a correction and conversion unit for correcting a distortion of the reflected light image obtained by the reflected light extraction unit while converting intensities of the reflected light defining pixel values of the reflected light image into distance values with respect to the target object so as to obtain a range image of the target object.

**33**. The apparatus of claim **1**, further comprising:

a nonlinear conversion unit for converting intensities of the reflected light defining pixel values of the reflected light image into rough distance values with respect to the target object; and

a correction unit for converting the rough distance values obtained by the nonlinear conversion unit into accurate distance values with respect to the target object so as to obtain a range image of the target object.

**34**. The apparatus of claim **1**, further comprising:

a reference object activation unit for moving a reference object with respect to the reflected light extraction unit so that the reflected light extraction unit obtains the reflected light image of the reference object; and

a correction data generation unit for generating correction data to be used in correcting a distortion of the reflected light image and/or generating a range image from the reflected light image, according to a position of the reference object moved by the reference object activation unit and the reflected light image of the reference object obtained by the reflected light extraction unit.

**35**. The apparatus of claim **1**, further comprising:

a user commanding unit for commanding a user to place a reference object at a specified position with respect to the reflected light extraction unit so that the reflected light extraction unit obtains the reflected light image of the reference object; and

a correction data generation unit for generating correction data to be used in correcting a distortion of the reflected light image and/or generating a range image from the reflected light image, according to a position of the reference object placed by the user in response to the user commanding unit and the reflected light image of the reference object obtained by the reflected light extraction unit.

**36**. The apparatus of claim **35**, further comprising:

a verification unit for checking whether the correction data generated by the correction data generation unit are correct or not by obtaining the reflected light image of the reference object within a prescribed distance range by using the correction data.

**37**. The apparatus of claim **1**, further comprising:

a filter for receiving the external light and the reflected light, and blocking the reflected light while passing the external light;

an external light detection unit for detecting a light amount of the external light received through the filter; and

an external light state judgement unit for judging whether the external light is in an intolerable state that has a possibility of largely affecting the reflected light image

## 84

or not according to the light amount detected by the external light detection unit, and generating an intolerable signal indicating the intolerable state when the external light is judged to be in the intolerable state.

**38**. The apparatus of claim **37**, wherein the timing signal generation unit controls the lighting unit and the reflected light extraction unit according to the intolerable signal generated by the external light state judgement unit, so as to obtain the reflected light image while the external light is not in the intolerable state.

**39**. The apparatus of claim **37**, further comprising:

a reflected light image processing unit for determining whether to accept or reject the reflected light image obtained by the reflected light extraction unit under the external light in the intolerable state, according to the intolerable signal generated by the external light state judgement unit.

**40**. The apparatus of claim **1**, further comprising:

a filter for receiving the external light and the reflected light, and blocking the reflected light while passing the external light;

an external light detection unit for detecting a light amount of the external light received through the filter; and

an external light fluctuation period detection unit for detecting a fluctuation period of the external light according to the light amount detected by the external light detection unit;

wherein the timing signal generation unit controls the lighting unit and the reflected light extraction unit in synchronization with the fluctuation period detected by the external light fluctuation period detection unit.

**41**. The apparatus of claim **1**, further comprising:

an external light control unit for controlling the external light in relation to the timing signal for controlling the lighting unit and the reflected light extraction unit.

**42**. The apparatus of claim **1**, wherein the timing signal generation unit controls the lighting unit and the reflected light extraction unit by using a plurality of operation patterns provided in advance, according to a change of the external light.

**43**. The apparatus of claim **42**, wherein the timing signal generation unit in an optimal operation pattern selection mode controls the lighting unit to stop emitting the light while controlling the reflected light extraction unit to obtain the reflected light images by executing each of said plurality of operation patterns sequentially, and the apparatus further comprises:

an evaluation unit for generating evaluation values for the reflected light images obtained by the reflected light extraction unit in the optimal operation pattern selection mode; and

an operation pattern selection unit for selecting an optimal operation pattern among said plurality of operation patterns according to the evaluation values generated by the evaluation unit, so that the timing signal generation unit in a normal operation mode controls the lighting unit and the reflected light extraction unit according to the optimal operation pattern selected by the operation pattern selection unit.

**44**. The apparatus of claim **43**, wherein the operation pattern selection unit selects the optimal operation pattern by which a darkest reflected light image is obtained in the optimal operation pattern selection mode.

**45**. The apparatus of claim **1**, further comprising:

a distance information detection unit for detecting a distance information indicating a distance of the target

IPR2021-00920
Apple EX1003 Page 144

6,144,366

**85**

object with respect to the reflected light extraction unit according to the reflected light image obtained by the reflected light extraction unit;

a determination unit for determining a reflected light amount to be increased or decreased according to the distance information detected by the distance information detection unit; and

a control unit for controlling the lighting unit or the reflected light extraction unit so that the reflected light amount received at the reflected light extraction unit is increased or decreased to the reflected light amount determined by the determination unit.

**46.** The apparatus of claim **45**, wherein the lighting unit has a plurality of lighting modes with different emission light amounts, and the control unit controls the lighting unit to be operated in one of said plurality of lighting modes according to the reflected light amount determined by the determination unit.

**47.** The apparatus of claim **1**, wherein the lighting unit has a plurality of lighting modes with different emission light amounts, and the apparatus further comprises:

a lighting state control unit for controlling the lighting unit to sequentially carry out lighting operations in said plurality of lighting modes so that the reflected light extraction unit obtains a plurality of reflected light images under the light emitted by the lighting unit in said plurality of lighting modes; and

a reflected light image composition unit for composing said plurality of reflected light images obtained by the reflected light extraction unit.

**48.** A method of information input generation, comprising the steps of:

(a) generating a timing signal;

(b) emitting a light whose intensity vary in time at a lighting unit, according to the timing signal generated by the step (a); and

(c) detecting a reflected light from a target object resulting from the light emitted by the step (b), in synchronization with the timing signal generated by the step (a), so as to obtain a spatial intensity distribution of the reflected light in a form of a reflected light image indicative of an information input related to the target object, in separation from an external light that is illuminating the target object, at a reflected light extraction unit.

**49.** The method of claim **48**, wherein the step (c) obtains the reflected light image in separation from the external light by detecting a plurality of image data in a state of having a light emission by the step (b) and in a state of having no light emission by the step (b).

**50.** The method of claim **49**, wherein the step (a) obtains the reflected light image as a difference between the image data detected in a state of having a light emission by the step (b) and the image data detected in a state of having no light emission by the step (b).

**51.** The method of claim **48**, wherein the step (b) emits the light which is invisible to human eyes.

**52.** The method of claim **48**, wherein the step (c) includes steps of:

(c1) generating charges corresponding to input lights of the reflected light extraction unit;

(c2) storing the charges generated by the step (c1) under different lighting states of the step (b), in at least two charge storage units; and

(c3) operating gates in synchronization with the timing signal generated by the step (a), for selectively leading

**86**

the charges generated by the step (c1) to one of the charge storage units.

**53.** The method of claim **48**, wherein the step (c) includes the step of receiving input lights of the reflected light extraction unit by an optical filter for passing those input lights which have wavelengths within a specified range and blocking those input lights which have wavelengths outside the specified range.

**54.** The method of claim **48**, wherein the target object is at least a part of a body of an operator, and the reflected light image is indicative of the information input for controlling a device to be operated by the operator.

**55.** The method of claim **48**, further comprising the steps of:

(d) generating feature data related to the target object from the reflected light image.

**56.** The method of claim **55**, wherein the step (d) generates the feature data by extracting a distance information including a depth information of the target object.

**57.** The method of claim **55**, wherein the step (d) generates the feature data by extracting an object property information including a color information or a material information of the target object.

**58.** The method of claim **55**, wherein the step (d) includes the step of:

(d1) extracting an object image of at least a part of the target object, from the reflected light image.

**59.** The method of claim **58**, wherein the step (d1) extracts the object image according to one or both of a distance information including a depth information of the target object and an object property information including a color information or a material information of the target object.

**60.** The method of claim **58**, wherein the target object is at least a part of a body of an operator, and the object image extracted by the step (d1) indicates the information input for a pointing operation by the operator.

**61.** The method of claim **58**, wherein the step (d) also includes the step of:

(d2) interpreting a shape of said at least a part of the target object in the object image extracted by the step (d1).

**62.** The method of claim **61**, wherein the target object is at least a part of a body of an operator, and the shape interpreted by the step (d2) indicates the information input for a gesture input by the operator.

**63.** The method of claim **61**, wherein the target object is at least a part of a body of an operator, and the shape interpreted by the step (d2) indicates the information input for a pointing operation by the operator.

**64.** The method of claim **61**, wherein the step (d2) interprets the shape as a command to be used as the information input.

**65.** The method of claim **61**, wherein the step (d2) interprets the shape as a viewpoint information to be used as the information input, the viewpoint information indicating a viewpoint from which three-dimensional objects are to be displayed on a display device.

**66.** The method of claim **58**, wherein the step (d) also includes the step of:

(d3) extracting a change of said at least a part of the target object in the object image extracted by the step (d1).

**67.** The method of claim **66**, wherein the step (d3) extracts the change as a command to be used as the information input.

**68.** The method of claim **66**, wherein the target object is at least a part of a body of an operator, and the change extracted by the step (d3) indicates the information input for a motion input by the operator.

IPR2021-00920
Apple EX1003 Page 145

6,144,366

87

**69**. The method of claim **58**, wherein the step (d) also includes:

(d4) interpreting a shape of said at least a part of the target object in the object image extracted by the step (d1);

(d5) extracting a change of said at least a part of the target object in the object image extracted by the step (d1); and

(d6) generating at least one command to be used as the information input from the shape interpreted by the step (d4) and the change extracted by the step (d5).

**70**. The method of claim **48**, further comprising the step of:

(e) imaging a visible light image of the target object.

**71**. The method of claim **70**, further comprising the step of:

(f) extracting at least one specific image region from the visible light image imaged by the step (e), according to one or both of the reflected light image and an information extracted from the reflected light image.

**72**. The method of claim **71**, further comprising the steps of:

(g) storing an extracted image data for said at least one specific image region extracted by the step (f); and

(h) composing the extracted image data stored by the step (g) with another image data in a specified manner.

**73**. The method of claim **70**, further comprising the step of:

(i) generating a Z-value image by setting the visible light image imaged by the step (e) in correspondence to a distance information of the target object which is extracted from the reflected light image.

**74**. The method of claim **73**, further comprising the step of:

(j) extracting image data for a specific image region from the the Z-value image generated by the step (i), according to the distance information contained in the Z-value image, the specific image region being a region for which the distance information is within a specified range.

**75**. The method of claim **73**, wherein the step (i) generates the Z-value image as the information input for texture information to be mapped onto a three-dimensional model.

**76**. The method of claim **48**, further comprising the steps of:

(k) converting intensities of the reflected light defining pixel values of the reflected light image into distance values with respect to the target object so as to obtain a range image of the target object.

**77**. The method of claim **76**, wherein the step (k) converts the intensities by using a logarithmic amplifier.

**78**. The method of claim **48**, further comprising the step of:

(l) correcting a distortion of the reflected light image obtained by the reflected light extraction unit.

**79**. The method of claim **48**, further comprising the step of:

(m) correcting a distortion of the reflected light image obtained by the reflected light extraction unit while converting intensities of the reflected light defining pixel values of the reflected light image into distance values with respect to the target object so as to obtain a range image of the target object.

**80**. The method of claim **48**, further comprising the steps of:

(n) nonlinearly converting intensities of the reflected light defining pixel values of the reflected light image into rough distance values with respect to the target object; and

88

(o) converting the rough distance values obtained by the step (n) into accurate distance values with respect to the target object so as to obtain a range image of the target object.

**81**. The method of claim **48**, further comprising the steps of:

(p) moving a reference object with respect to the reflected light extraction unit so that the reflected light extraction unit obtains the reflected light image of the reference object; and

(q) generating correction data to be used in correcting a distortion of the reflected light image and/or generating a range image from the reflected light image, according to a position of the reference object moved by the step (p) and the reflected light image of the reference object obtained by the reflected light extraction unit.

**82**. The method of claim **48**, further comprising the steps of:

(r) commanding a user to place a reference object at a specified position with respect to the reflected light extraction unit so that the reflected light extraction unit obtains the reflected light image of the reference object; and

(s) generating correction data to be used in correcting a distortion of the reflected light image and generating a range image from the reflected light image, according to a position of the reference object placed by the user in response to the step (r) and the reflected light image of the reference object obtained by the reflected light extraction unit.

**83**. The method of claim **82**, further comprising the step of:

(t) checking whether the correction data generated by the step (s) are correct or not by obtaining the reflected light image of the reference object within a prescribed distance range by using the correction data.

**84**. The method of claim **48**, further comprising the steps of:

(u) receiving the external light and the reflected light, and blocking the reflected light while passing the external light, at a filter;

(v) detecting a light amount of the external light received through the filter; and

(w) judging whether the external light is in an intolerable state that has a possibility of largely affecting the reflected light image or not according to the light amount detected by the step (v), and generating an intolerable signal indicating the intolerable state when the external light is judged to be in the intolerable state.

**85**. The method of claim **84**, wherein the timing signal generated by the step (a) controls the lighting unit and the reflected light extraction unit according to the intolerable signal generated by the step (w), so as to obtain the reflected light image while the external light is not in the intolerable state.

**86**. The method of claim **84**, further comprising the step of:

(x) determining whether to accept or reject the reflected light image obtained by the reflected light extraction unit under the external light in the intolerable state, according to the intolerable signal generated by the step (w).

**87**. The method of claim **48**, further comprising the steps of:

(y) receiving the external light and the reflected light, and blocking the reflected light while passing the external light, at a filter;

IPR2021-00920
Apple EX1003 Page 146

6,144,366

**89**

(z) detecting a light amount of the external light received through the filter; and

(aa) detecting a fluctuation period of the external light according to the light amount detected by the step (z);

wherein the timing signal generated by the step (a) controls the lighting unit and the reflected light extraction unit in synchronization with the fluctuation period detected by the step (aa).

**88**. The method of claim **48**, further comprising the steps of:

(bb) controlling the external light in relation to the timing signal for controlling the lighting unit and the reflected light extraction unit.

**89**. The method of claim **48**, wherein the timing signal generated by the step (a) controls the lighting unit and the reflected light extraction unit by using a plurality of operation patterns provided in advance, according to a change of the external light.

**90**. The method of claim **89**, wherein the timing signal generated by the step (a) in an optimal operation pattern selection mode controls the lighting unit to stop emitting the light while controlling the reflected light extraction unit to obtain the reflected light images by executing each of said plurality of operation patterns sequentially, and the method further comprises the steps of:

(cc) generating evaluation values for the reflected light images obtained by the reflected light extraction unit in the optimal operation pattern selection mode; and

(dd) selecting an optimal operation pattern among said plurality of operation patterns according to the evaluation values generated by the step (cc), so that the timing signal generated by the step (a) in a normal operation mode controls the lighting unit and the reflected light extraction unit according to the optimal operation pattern selected by the step (dd).

**91**. The method of claim **90**, wherein the step (dd) selects the optimal operation pattern by which a darkest reflected light image is obtained in the optimal operation pattern selection mode.

**92**. The method of claim **48**, further comprising the steps of:

(ee) detecting a distance information indicating a distance of the target object with respect to the reflected light extraction unit according to the reflected light image obtained by the reflected light extraction unit;

(ff) determining a reflected light amount to be increased or decreased according to the distance information detected by the step (ee); and

(gg) controlling the lighting unit or the reflected light extraction unit so that the reflected light amount

**90**

received at the reflected light extraction unit is increased or decreased to the reflected light amount determined by the step (ff).

**93**. The method of claim **92**, wherein the lighting unit has a plurality of lighting modes with different emission light amounts, and the step (gg) controls the lighting unit to be operated in one of said plurality of lighting modes according to the reflected light amount determined by the step (ff).

**94**. The method of claim **48**, wherein the lighting unit has a plurality of lighting modes with different emission light amounts, and the method further comprises the steps of:

(hh) controlling the lighting unit to sequentially carry out lighting operations in said plurality of lighting modes so that the reflected light extraction unit obtains a plurality of reflected light images under the light emitted by the lighting unit in said plurality of lighting modes; and

(ii) composing said plurality of reflected light images obtained by the reflected light extraction unit.

**95**. An imaging apparatus, comprising:

a plurality of unit photo-detector cells arranged in a two-dimensional array on a semiconductor substrate, each unit photo-detector cell having:

a photo-detection unit for receiving an input light and outputting signals corresponding to a light amount of the input light;

an amplification unit for amplifying the signals outputted by the photo-detection unit;

a selection unit for selecting said each unit photo-detector cell;

a reset unit for resetting the photo-detection unit; and

at least two storage units for respectively storing the signals outputted by the photo-detection unit under different states and amplified by the amplification unit; and

a difference circuit, provided on the semiconductor substrate, for detecting a difference between the signals stored in said at least two storage units of each unit photo-detector cell.

**96**. The apparatus of claim **95**, wherein the photo-detection unit is formed by a photo-diode, the amplification unit is formed by an amplifying transistor, the resent unit is formed by a reset transistor, said at least two storage units are formed by capacitors, said photo-diode is connected with a gate of said amplifying transistor, and each of said capacitors has one electrode which is connected with the amplifying transistor and another electrode which is grounded.

\* \* \* \* \*

IPR2021-00920
Apple EX1003 Page 147

US006088018A

# United States Patent [19]

## DeLeeuw et al.

[11] **Patent Number:** **6,088,018**

[45] **Date of Patent:** **Jul. 11, 2000**

[54] **METHOD OF USING VIDEO REFLECTION IN PROVIDING INPUT DATA TO A COMPUTER SYSTEM**

[75] Inventors: **William C. DeLeeuw**, Hillsboro; **Kenneth L. Knowlson**, Portland; **Bradford H. Needham**, Hillsboro, all of Oreg.

[73] Assignee: **Intel Corporation**, Santa Clara, Calif.

[21] Appl. No.: **09/096,282**

[22] Filed: **Jun. 11, 1998**

[51] Int. Cl.[7] ................................................. **G09G 5/00**
[52] U.S. Cl. ............................. **345/156**; 345/113; 345/158
[58] Field of Search .................................. 345/156, 157, 345/158, 145, 146, 113, 114, 115, 343, 344, 345

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,686,521 | 8/1987 | Beaven et al. . | |
| 4,833,462 | 5/1989 | Gover et al. . | |
| 4,988,981 | 1/1991 | Zimmerman et al. . | |
| 5,270,688 | 12/1993 | Dawson et al. | 345/145 |
| 5,283,560 | 2/1994 | Bartlett | 345/113 |
| 5,436,639 | 7/1995 | Arai et al. | 345/156 |
| 5,463,728 | 10/1995 | Blahut et al. . | |
| 5,528,263 | 6/1996 | Flatzker et al. | 345/156 |
| 5,594,469 | 1/1997 | Freeman et al. | 345/158 |
| 5,616,078 | 4/1997 | Oh | 345/156 |

### FOREIGN PATENT DOCUMENTS

8-139994   5/1996   Japan .

### OTHER PUBLICATIONS

"Headlines—Feb. 1998", Reality Fusion, Inc.; http://www.realityfusion.com/; 1997, 2 pages.
"Technology", Reality Fusion, Inc.; http://www.realityfusion.com/technology.htm; 1997, 3 pages.

"Human–Object Reactor Technology", Reality Fusion, Inc.; http://www.realityfusion.com/tech1.htm; 1997, 1 page.

"Known–Object Reactor Technology", Reality Fusion, Inc.; http://www.realityfusion.com/tech2.htm; 1997, 1 page.

"Dynamic Layer Transformer Technology", Reality Fusion, Inc.; http://www.realityfusion.com/tech3.htm; 1997, 1 page.

"RFI Press Release—Feb. 3, 1998", Reality Fusion, Inc.; http://www.realityfusion.com/release__020398.htm; 1997, 2 pages.

"Products", Reality Fusion, Inc.; http://www.realityfusion.com/products.htm; 1997, 2 pages.

"Corporate Profile", Reality Fusion, Inc.; http://www.realityfusion.com/corprofile.htm; 1997, 1 page.

"Developers", "Products", Reality Fusion, Inc.; http://www.realityfusion.com/developers.htm; 1997, 1 page.

Krueger, Myron W., "Artificial Reality", 2nd ed., c. 1991, 14 pages.

Foley, James D., "Computer Graphics: Principles and Practice", 2nd ed. in C., c. 1997, 2 pages.

*Primary Examiner*—Regina Liang
*Attorney, Agent, or Firm*—Steven P. Skabrat

[57] **ABSTRACT**

Providing input signals to a computer system having a display, the computer system being coupled to a video camera or other video source, is accomplished by capturing video data signals generated by the video camera, the video data signals representing a scene, rendering the scene on the display such that the scene is reflected and transparently visible on the display, analyzing the video data signals to detect an object in the scene, and generating an input signal for the computer system in response to the detected object.

**27 Claims, 16 Drawing Sheets**





**FIG. 1**



FIG. 2



**FIG. 3**



**FIG. 4**



FIG. 5

| T + OS MIX | OS | T + OS MIX | OS | T + OS MIX | OS | • • • |
|---|---|---|---|---|---|---|
| OS | T + OS MIX | OS | T + OS MIX | OS | T + OS MIX | |
| T + OS MIX | OS | T + OS MIX | OS | T + OS MIX | OS | |
| OS | T + OS MIX | OS | T + OS MIX | OS | T + OS MIX | • • • |

• • •

**FIG. 6**



```
                                        400
┌─────────────────────────────────┐
│   DETERMINE OPERATING SYSTEM     │
│   DISPLAY OUTPUT INFORMATION     │
└─────────────────────────────────┘
                │
                ▼                       402
┌─────────────────────────────────┐
│   ALLOCATE TWO WORKING FRAME     │
│   BUFFERS IN VIDEO MEMORY        │
└─────────────────────────────────┘
                │
                ▼                       404
┌─────────────────────────────────┐
│  COPY DATA FROM VISIBLE OPERATING│
│  SYSTEM OUTPUT FRAME BUFFER TO   │
│  ONE OF THE ALLOCATED WORKING    │
│  FRAME BUFFERS                   │
└─────────────────────────────────┘
                │
                ▼                       406
┌─────────────────────────────────┐
│   MAKE OPERATING SYSTEM          │
│   OUTPUT FRAME BUFFER            │
│   NON-VISIBLE                    │
└─────────────────────────────────┘
                │
                ▼                       408
┌─────────────────────────────────┐
│   MAKE SELECTED WORKING          │
│   FRAME BUFFER VISIBLE           │
└─────────────────────────────────┘
```

**FIG. 7**



**FIG. 8**



FIG. 9



**FIG. 10**



FIG. 11

**U.S. Patent**    Jul. 11, 2000    Sheet 12 of 16    **6,088,018**



CREATE A FILTER GRAPH — 540

LOCATE VIDEO RENDERER WITH TRANSPARENCY FILTER IN THE FILTER GRAPH — 542

SET DESIRED LEVEL OF OPACITY INTO THE VIDEO RENDERER WITH TRANSPARENCY FILTER — 544

LOCATE COLOR ANALYZER FILTER IN THE FILTER GRAPH — 546

SET COLOR RANGES TO BE TRACKED AND CORRESPONDING ALPHA VALUES INTO THE COLOR ANALYZER FILTER — 548

LOCATE BLOB DETECTOR FILTER IN THE FILTER GRAPH — 550

SET CONTROL WINDOW ID, ALPHA VALUES AND CORRESPONDING CONTROL MESSAGES INTO THE BLOB DETECTOR FILTER — 552

START DATA FLOW THROUGH THE FILTER GRAPH — 554

**FIG. 12**

IPR2021-00920
Apple EX1004 Page 13



**FIG. 13**



**FIG. 14**



**FIG. 15**

**U.S. Patent**          Jul. 11, 2000          Sheet 16 of 16          **6,088,018**



FIG. 16

6,088,018

1

# METHOD OF USING VIDEO REFLECTION IN PROVIDING INPUT DATA TO A COMPUTER SYSTEM

A portion of the disclosure of this patent document contains material which is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the patent document or the patent disclosure, as it appears in the Patent and Trademark Office patent file or records, but otherwise reserves all copyright rights whatsoever.

## BACKGROUND

### 1. Field

The present invention relates generally to computer systems and more specifically to a method for providing input data to a computer system.

### 2. Description

Many techniques and devices for communicating input data from a user to a computer system have been developed. Keyboards, cursor movement devices (such as a mouse, trackball, and joystick, for example), pens and tablets, bar code scanners, and other devices have all been used to direct a computer to perform selected tasks. With the growing use of video cameras coupled to computer systems such as personal computers (PCs), for example, opportunities for using real-time video data in new and interesting ways have arisen. However, many recent applications for video data in PCs have been focused on various display features, without regard for the possibilities of new input paradigms. What may be valuable are input techniques that take advantage of the capabilities of video cameras to enrich the PC user's experience and make PCs easier to use.

## SUMMARY

An embodiment of the present invention is a method of providing input signals to a system having a display, the system being coupled to a source of video data signals. The method includes capturing video data signals generated by the video source, the video data signals representing a scene, rendering the scene on the display such that the scene is transparently visible on the display, analyzing the video data signals to detect an object in the scene, and generating an input signal for the system in response to the detected object.

## BRIEF DESCRIPTION OF THE DRAWINGS

The features and advantages of the present invention will become apparent from the following detailed description of the present invention in which:

FIG. 1 is a diagram of a sample display portion illustrating video reflection according to an embodiment of the present invention;

FIG. 2 is a diagram illustrating an example of transparent graphics data displayed with operating system output graphics data according to an embodiment of the present invention;

FIG. 3 is a diagram illustrating a sample computer system suitable to be programmed with a transparency method according to an embodiment of the present invention;

FIG. 4 is a diagram of a software and hardware stack for implementing transparent graphics according to an embodiment of the present invention;

FIG. 5 is a diagram illustrating multiple frame buffers used for providing transparent graphics according to an embodiment of the present invention;

2

FIG. 6 is a diagram illustrating an alternating pixel technique mixing between the transparent graphics frame buffer and the operating system output frame buffer according to an embodiment of the present invention;

FIG. 7 is a flow diagram for initializing a system to provide transparent graphics according to an embodiment of the present invention;

FIG. 8 is a flow diagram showing double buffering control processing according to an embodiment of the present invention; and

FIG. 9 is a flow diagram of color mixing and interleaving processing according to an embodiment of the present invention.

FIG. 10 is a diagram illustrating components of an application program providing a video reflection input technique according to an embodiment of the present invention;

FIG. 11 is a diagram of a filter graph according to an embodiment of the present invention;

FIG. 12 is a flow diagram of filter initialization processing according to an embodiment of the present invention;

FIG. 13 is a flow diagram of handle input events processing according to an embodiment of the present invention;

FIG. 14 is a flow diagram of processing for detecting valid input events according to an embodiment of the present invention;

FIG. 15 is a flow diagram describing a processing thread of a video renderer with transparency according to an embodiment of the present invention; and

FIG. 16 is a flow diagram describing a processing thread of a transparency mixer core according to an embodiment of the present invention.

## DETAILED DESCRIPTION

In the following description, various aspects of the present invention will be described. For purposes of explanation, specific numbers, systems and configurations are set forth in order to provide a thorough understanding of the present invention. However, it will also be apparent to one skilled in the art that the present invention may be practiced without the specific details. In other instances, well known features are omitted or simplified in order not to obscure the present invention.

An embodiment of the present invention is a method for providing user input data signals to a computer system such as a PC, for example. Real-time video images may be captured by a video camera coupled to a PC or received from any other source of video data signals and rendered to the entire screen of the PC's display such that the captured video images may be made transparent and shown on the display. The video data signals may be mixed with the normal application program and operating system software display output data signals so as not to obscure the normal foreground display images. The resulting effect is that when the video camera is pointed toward the user, the user may see a reflected image of himself or herself on the computer screen while the user may also be able to see and interact with other display elements such as desktop icons or application program displays. Because the reflected image is displayed transparently, it does not interfere with the display of the other display elements.

Although some embodiments of the present invention are described herein with reference to a video camera, the invention is not so limited in this respect. In alternate embodiments, the source of the video data signals may be any video source, such as a video cassette recorder (VCR),

IPR2021-00920
Apple EX1004 Page 18

6,088,018

**3**

broadcast television signals, or previously stored video data signals, for example.

One of the features of some embodiments of the present invention is that the user may see his or her reflection or image on the computer screen after it is captured by the video camera. Using this video reflection, the user may interact with application program and operating system display elements of the computer system's graphical user interface (GUI) by physically moving real objects (such as the user's hands and fingers, for example) that are in the field of view of the video camera. The input capability of some embodiments of the present invention may be provided without any modification to existing application programs. In embodiments of the present invention, these movements may be used to direct actions within the computer system such as grasping or selecting icons and other application program elements, much as the user now does with a mouse or other selection device. This physical movement activity to create a desired result while observing the user's reflected image is very natural and intuitive for users. For example, users frequently look at reflected images of themselves in a mirror, for example, while manipulating objects with their hands without thinking very much about it. Additionally, it is typically easy for users to use either a dominant or non-dominant hand or both hands to perform operations while viewing their reflected image. In alternate embodiments, specific predetermined props may be used as the objects to direct actions within the computer. These props may be active or inactive. Active props contain mechanical or electrical mechanisms such as light emitting diode (LED) lights. Inactive props are items such as colored sticks or paddles, fabric swatches, and colored gloves, for example, although the present invention is clearly not limited in this respect.

While some embodiments of the present invention may not replace the use of a computer mouse entirely, it is a powerful new paradigm for user input in a computer system. In particular, it presents a natural and direct method for manipulating computer display objects by moving real objects. Various types of application programs may be extended to make beneficial use of this input paradigm. Computer games, for example, may employ user input through video reflection for increased user interaction. Video presentation systems wherein a user points to selected areas of video display data may be made easier to use. Video-conferencing applications may be extended to provide additional input features. A combination PC/television (TV) may make use of this input capability, especially where the distance between the user and display is relatively large. For many users, such as children, for example, the manipulation of real objects (such as their hands) to send input to a computer system is more intuitive than other typical input devices.

In one embodiment, the colors of pixels in the video data signals sent to the PC for processing and display may be analyzed to track the movement of real objects such as a user's hands. This may be assisted through the use of colored dots attached to the user's hands or fingers or through other computer vision methods. Optionally, distinctive colors may be placed on specific objects (like fingers and thumbs, for example, or other props), to help the computer vision components of embodiments of the present invention isolate and identify objects to be recognized as input event generators.

In one embodiment, the cursor of the PC's mouse may be moved in accordance with the movement of a user's index finger and thumb. When the user "pinches" his or her index

**4**

finger and thumb and the images of the index finger and thumb are detected in the captured video images, a mouse down event may be introduced to the operating system software. When the user releases the pinched hand position and these images of the index finger and thumb are detected in the captured video images, a mouse up event may be introduced. Other movements signifying specific input signals and events may also be defined in alternate embodiments.

FIG. **1** is a diagram of a sample display portion illustrating video reflection according to an embodiment of the present invention. In this example, the image of the user is captured by the video camera and rendered in a transparent manner to the display. The user then interacts with display objects, such as application program icons, for example, to provide input signals and events to the system.

An underlying capability of some embodiments of the present invention is a method of providing a transparent layer of display data signals (such as video data signals communicated by a video camera, for example) over the top of another layer of display data signals on a computer display so that the user may see both layers clearly and substantially simultaneously. This capability will be described first for general use and further below for use with an input detection method of some embodiments of the present invention. The capability to display transparent windows doubles, in essence, the maximum screen area available on a display for use by application programs. One embodiment is a method for producing transparent computer graphics layers by interleaving (or alternating in a pattern) the pixels from one video frame buffer with the pixels from another video frame buffer. In this embodiment, selected pixels from a first frame buffer are mixed by color averaging with corresponding pixels from a second frame buffer to reduce the "checkerboard" effect created by the use of spatial multiplexing alone. Additionally, because the degree of interleaving is adjustable and the color averaging may be weighted, the degree of transparency of the displayed images may be controlled.

In this embodiment, an output frame buffer used by operating system software is not affected by provision of the transparency feature and the operating system is unaware of the transparency operations. Hence, the transparency effect provided by embodiments of the present invention does not require modifications to application programs for transparency to work over them. Furthermore, input operations to application program and operating system windows are not affected by transparent foreground effects.

An embodiment of the present invention operates by combining at least two frame buffers of computer graphics output data or video data in the form of electrical signals. The pixels of the output, or visible, frame buffer are created by spatially interleaving the contents of two input frame buffers. The interleaving in this embodiment is accomplished by combining pixels of one frame buffer with those of the other frame buffer. This results in the visual illusion of two displays of images layered one on another. As the pixels are being interleaved, the pixels of the first frame buffer are color averaged with the pixels of the second frame buffer that they are about to replace. Color averaging is performed on the pixels of one frame buffer by averaging them with the corresponding pixels of the other frame buffer prior to, or during, interleaving them into the output frame buffer. The result comprises multiple overlapping images being substantially simultaneously visible on a display such as a computer monitor, for example.

FIG. **2** is a diagram illustrating an example of transparent graphics data displayed with operating system output graph-

IPR2021-00920
Apple EX1004 Page 19

6,088,018

5

ics data according to an embodiment of the present invention. Operating system output frame buffer **10** is an area of memory used to store the current display data of the computer system shown below in FIG. **3**. The operating system output frame buffer may be allocated in any memory available to the operating system. A frame buffer is a set of storage locations to store a two-dimensional array of pixel data. The operating system output frame buffer may be associated with operating system software of the computer system, which controls the generation and display of the data signals on a computer monitor (not shown). In one embodiment, the operating system software comprises the Windows 95® or Windows NT® operating system software available from Microsoft Corporation, although other operating system software supporting graphical user interfaces may also be employed. In this example, the operating system output frame buffer **10** contains application program display data signals for three overlapping windows shown pictorially in FIG. **2** and labeled **12**, **14**, and **16**, respectively.

Transparent graphics frame buffer **18** is an area of memory used to store the display data of transparent graphics for substantially simultaneous display with the display data signals of the operating system output frame buffer. This area of memory may be allocated in any memory available in the system. Transparent graphics frame buffer **18** may be used to store frames of video data received from a video camera or other source of video data signals. In the example shown in FIG. **2**, display components such as a clock **20** and stock ticker **22** are shown as sample application program display features which illustrate the use of transparency, although generally any display components may be made transparent through the use of embodiments of the present invention. More specifically, in embodiments of the present invention, captured video frames may be shown as a sequence of transparent images on the display.

The display components of the operating system output frame buffer and the transparent graphics frame buffer may be combined in block **24** by color mixing selected corresponding pixels of each buffer while interleaving the resulting pixels of the color mixing operation with the operating system output frame buffer's pixels to form the display components of visible display buffer **28**. The visible display buffer shows in pictorial form the three overlapping windows **12**, **14**, and **16** with the clock **20** and stock ticker **22** displays appearing as transparent display components overlaying portions of the windows. In this example, the transparent display components are partially overlaying the other display components. However, it should be understood that the transparent display components may be entirely within the boundaries of one or more non-transparent windows or display components on the display. Of course, in certain application programs and with certain display components, the display of data from two display components with one substantially or even completely on top of the other may present image quality problems for the user. Nonetheless, in other application programs the ability to overlay transparent display components in a well designed manner is advantageous and desirable.

In addition, some embodiments of the present invention allow transparent display components overlaying background windows to have little or no effect on input operations to a selected background window. For example, a user may interact with an input window of an application program being displayed in a background window while a transparent display component is partially or completely overlaying the background window. Generally, the operating system software may accept the user input events or key

6

strikes to the input window (such as a mouse entry or text entry) without substantial interference with the display of the transparent display components.

In accordance with some embodiments of the present invention, a method for producing transparency effects employs minimal mixing of display contents. Instead, it relies on the human eye's inability to distinguish between the color of adjacent pixels on a computer monitor (in essence, the human eye averages each pixel with its neighbor). Some mixing is employed, because large computer monitors and low display resolutions may result in a "checkerboard" effect when pixels are interleaved in this manner. In one embodiment, one half of the pixels from a first frame buffer (such as the operating system output frame buffer) are averaged with the corresponding one half of the pixels from a second frame buffer (such as the transparent graphics frame buffer) as the pixels of the two frame buffers are interleaved into a third display buffer. By averaging a fraction of the pixels, there may be a decrease in the processing power used when providing the transparency effect. In alternate embodiments, different percentages of pixels may be averaged (e.g., one fourth of the pixels, one eighth of the pixels, one sixteenth of the pixels, one thirty-second of the pixels, or any one Nth of the pixels where N is a positive integer), and the percentages may be changed dynamically

FIG. **3** is a diagram illustrating a sample computer system suitable to be programmed according to an embodiment of a method for producing transparency displays in conjunction with video reflection to obtain user input signals in accordance with the present invention. Sample system **100** may be used, for example, to execute the processing for the methods described herein. Sample system **100** is representative of computer systems based on the PENTIUM®, PENTIUM® Pro, and PENTIUM® II microprocessors available from Intel Corporation, although other systems (including personal computers (PCs) having other microprocessors, engineering workstations, set-top boxes and the like) may also be used. Sample system **100** includes microprocessor **102** and cache memory **104** coupled to each other through processor bus **105**. Sample system **100** also includes high performance I/O bus **108** and standard I/O bus **118**. Processor bus **105** and high performance I/O bus **108** are bridged by host bridge **106**, whereas high performance I/O bus **108** and standard I/O bus **118** are bridged by I/O bus bridge **110**. Coupled to high performance I/O bus **108** are main memory **112** and video memory **114**. Coupled to video memory **114** is video display **116**. Coupled to standard I/O bus **118** are mass storage **120**, and keyboard and pointing devices **122**. In one embodiment, a video camera **501** may also be coupled to standard I/O bus **118**.

These elements perform their conventional functions well-known in the art. In particular, mass storage **120** may be used to provide long-term storage for the executable instructions for embodiments of methods for obtaining user input signals through the use of video reflection in accordance with the present invention, whereas main memory **112** is used to store on a shorter term basis the executable instructions of embodiments of the methods for obtaining user input signals through the use of video reflection in accordance with the present invention during execution by microprocessor **102**.

FIG. **4** is a diagram of a software and hardware stack for implementing transparent graphics according to an embodiment of the present invention. Application programs **200** designed to use transparent display objects call functions provided by transparency support software **202** to define and

IPR2021-00920
Apple EX1004 Page 20

6,088,018

7

update the transparent display objects. In response, transparency support 202 calls the operating system graphics rendering programming interface (graphics API) 204 in this embodiment. In the Windows95® operating system, this may be the Graphics Device Interface (GDI). The transparency support software 202 also calls the operating system's video hardware control abstraction programming interface (video control API) 206 in this embodiment. In the Windows95® operating system, this may be the DirectDraw™ API, available from Microsoft Corporation. In some operating systems, the graphics API 202 and video control API 206 may not be distinguishable from each other as they may exist within the same application programming interface. The graphics API 204 may be used to render requested graphics to the transparent graphics frame buffer 18 shown in FIG. 2. The video control API 206 may be used to control frame buffer visibility and to access the contents of all frame buffers. In this embodiment, the graphics API 204 and video control API 206 interact with display driver software 208 to communicate with video card 210. The video card 210 controls the video display 116 in the system of FIG. 3. Video card accesses video memory 114 to obtain display data. Other application programs 212, which do not employ transparency, interact with the graphics API 204 to create and update display objects.

Generally, images may be displayed on a display such as a computer monitor, for example, by creating a frame buffer of pixel data in video memory 114. This frame buffer may be designated as a visible portion of video memory by video control API 206. If there is a sufficient amount of video memory available, multiple frame buffers may be defined, only one of which may be used at a time (by the video card 210) to obtain the data signals for building the current visible display. In a well-known double buffering technique, a first frame buffer is considered to be the "visible" buffer and the video card 210 reads data signals from it to obtain the current display data signals, while a second frame buffer (or "non-visible" buffer) is written to with new display data. In this embodiment, the video control API is then called upon to "flip" the frame buffers by designating the second frame buffer to be the visible buffer and designating the first frame buffer to be the non-visible buffer. Use of this technique provides for the smooth update of display data, resulting in aesthetically pleasing displays for the user. Embodiments of the present invention may extend this concept to employ extra frame buffers to provide the transparent display data signals in conjunction with normal display data.

FIG. 5 is a diagram illustrating an embodiment of multiple frame buffers used for providing transparent graphics. At least one designated portion of the video memory may be assigned to be displayed as visible on the computer monitor at a time. This is called the "visible display." That is, the visible display comprises the display data from an area of video memory that is currently displayed on the computer monitor for viewing by a user. Generally, in this embodiment the graphics API 204 of the operating system software writes data signals into the operating system output frame buffer 10. In most current systems, the operating system output frame buffer, resident in video memory 114, is used for the visible display. However, in embodiments of the present invention, other frame buffers may be used as the visible display. A first working frame buffer 300 and a second working frame buffer 302, both resident in video memory 114 or other accessible memory, store display data according to embodiments of the present invention. In this embodiment, each frame buffer stores an array of pixel data signals. The size of the array in this embodiment is depen-

8

dent on the current display characteristics of the system. Frame buffer array sizes may, for example, be 640 pixels by 480 pixels, 800 pixels by 600 pixels, or 1280 pixels by 1024 pixels, or other appropriate sizes dependent on the computer monitor and operating system software settings. Each pixel includes red (R), green (G), blue (B), and optionally, opacity (A) components. Alternatively, other color coding schemes such as YUV or YUVA may also be used. Multiple transparent graphics frame buffers 18, 19, resident in main memory 112 or in video memory 114, in this embodiment store transparent display data signals created by transparency support software 202, video control API 206, and graphics API 204. The transparent graphics frame buffers 18, 19 are "double-buffered" similar to the working frame buffers to provide rapid updates to the transparently displayed images.

In one embodiment, data signals from one of the transparent graphics frame buffers 18, 19 may be color mixed and interleaved with data signals from operating system output frame buffer 10, and then stored in one of the working frame buffers. In an alternate embodiment, the mixing may be accomplished with the assistance of dedicated circuitry for alpha blending. This mixed and interleaved data may be stored into a working frame buffer when the working frame buffer is in a "non-visible" state (that is, in this embodiment the data stored in the frame buffer is not currently displayed on the computer monitor). While one of the working frame buffers is being written to in a non-visible state, the other working frame buffer may be in a "visible" state and used as the source of current display data. When the color mixing and interleaving operations are complete for a working frame buffer, the non-visible working frame buffer may be designated the visible working frame buffer and vice versa. This double buffering of the working frame buffers process may be repeated at a rate of at least 8–15 times per second in this embodiment to provide a visually appealing display to a user. Additionally, in this embodiment use of the transparent graphics frame buffers is also double buffered. In this embodiment, double buffering of the transparent graphics frame buffers is employed because color mixing may not be performed on a frame buffer that is currently being modified, and a frame buffer that is being mixed from may not be updated at the same time. Without double buffering, errors may result in the displayed images or unnecessary processing delays may be incurred.

In some embodiments of the present invention, interleaving of the pixels of one of the transparent graphics frame buffers and the operating system output frame buffer may be accomplished as follows. In one embodiment, alternating pixels in the selected working frame buffer may be written by a mix of a transparent graphics frame buffer pixel value and a spatially corresponding operating system output frame buffer pixel value. The other pixels in the selected working frame buffer may be written with pixels from the operating system output frame buffer. In another embodiment, pixels from the operating system output frame buffer may be block transferred to the selected working frame buffer and pixels from the transparent graphics frame buffer may be subsequently spatially multiplexed and color averaged with the pixels of the selected working frame buffer. In another embodiment, the mixing may be accomplished with the assistance of circuitry on the video card for performing alpha blending. Note that interleaving may not be necessary when using dedicated circuitry for alpha blending.

FIG. 6 is a diagram illustrating an embodiment of one method of alternating pixel mixing between one of the transparent graphics frame buffers and the operating system

6,088,018

9

output frame buffer. A "T+OS Mix" pixel in the selected working frame buffer comprises a color averaged mix of a pixel from the selected transparent graphics frame buffer (the T value) and a pixel from the operating system output frame buffer (the OS value). An "OS" pixel in the selected working frame buffer contains a spatially corresponding pixel copied from the operating system output frame buffer. In this embodiment, color averaging may be performed through a weighted averaging scheme on each color component of each pixel from corresponding positions within the two frame buffers, although in other embodiments, different color mixing techniques may also be employed. In one embodiment, weighted averaging may be accomplished by multiplying a component value of a first pixel by a weight value and multiplying the same component value of a second pixel by a different weight value. The two weighted color components may then be added together and the resulting sum may be divided by the sum of the two weight values. This method is also known as alpha blending. By using this alternating pattern, the processing employed to create the transparent effect may be cut in half, for example, in comparison to a mixing of all pixels of the frame buffers. The pixel data movement within the video memory may be performed by a block transfer operation provided by the drawing API or video control API in this embodiment.

In other embodiments, the mixed pixels may comprise only one quarter of the pixels in the selected working frame buffer, one eighth of the pixels in the selected working frame buffer, or other percentages such as any one Nth of the pixels, where N is a positive integer, depending on the specific interleaving pattern used. Furthermore, in other embodiments the interleaving pattern may be modified. For example, the interleaving pattern may comprise horizontally alternating lines from the transparent graphics frame buffer and the operating system software frame buffer. Alternatively, the interleaving pattern may comprise vertically alternating lines from the transparent graphics frame buffer and the operating system software frame buffer. A combination of a checkerboard pattern and horizontally or vertically alternating lines may also be used. One skilled in the art will realize that various interleaving patterns may be used in embodiments of the present invention with varying degrees of transparent effect, and the invention is not limited in scope to any particular pattern.

In another embodiment of the present invention, the interleaving pattern may be changed over time at a periodic or non-periodic rate or in a predetermined manner. For example, use of any two of the different interleaving patterns described above may be alternated, such that a first interleaving pattern is used for a first generation of the transparent graphics frame buffer and a second interleaving pattern is used for a second, succeeding generation of the transparent graphics frame buffer. This process may be repeated, thereby implementing a hybrid spatial, color-mixed, and temporal transparency method.

In another embodiment, special purpose circuitry may be used to eliminate the need to mix the pixels in software.

It should be noted that each pixel in the transparent frame buffer may be used more than once, or not at all, to achieve a stretching or shrinking effect in the resulting transparency output. The frequency and location of pixel re-use or omission depends at least in part on the desired amount of stretching or shrinking.

FIG. 7 is a flow diagram illustrating an embodiment for initializing a system to provide transparent graphics. At block 400, the operating system display output control

10

information may be determined. This control information comprises the size of the display, color resolution, and other data. Next, at block 402, two working frame buffers may be allocated in video memory in this embodiment. These operations may be performed by calls to the video control API in this embodiment. At block 404, a block transfer operation may be performed to copy data from the normally visible operating system output frame buffer to a selected one of the two working frame buffers. Assume for this example that the second working frame buffer is selected first, although the first working frame buffer may also be used as the initial working frame buffer. The block transfer may be performed by a call to the video control API in this embodiment. At block 406, the operating system output frame buffer may be set to a "non-visible" state by a call to the video control API. At block 408, the selected working frame buffer (for example, the second working frame buffer) may be made visible by a call to the video control API in this embodiment. In some embodiments, block 406 and block 408 may be accomplished by a single call to the video control API. At this point, the video card's current display output data may be obtained from the selected working frame buffer, not the operating system output frame buffer. In alternate embodiments, other APIs may also be used to effect the same results.

FIG. 8 is a flow diagram showing an embodiment of double buffering control processing. After starting block 410, a block transfer operation may be performed at block 412 to copy the operating system output frame buffer to the non-visible first working frame buffer by a call to the video control API in this embodiment. At block 414, an operation may be performed to write the mixed and interleaved contents of the first working frame buffer and a selected one of the transparent graphics frame buffers to the first working frame buffer. At block 416, the first working frame buffer may be made visible and the second working frame buffer may be made non-visible, in effect, flipping the two frame buffers as the current display output data source. At block 418, a block transfer operation may be performed to copy the operating system output frame buffer to the non-visible second working frame buffer by a call to the video control API in this embodiment. At block 420, an operation may be performed to write the color mixed and interleaved contents of the second working frame buffer and a selected one of the transparent graphics frame buffers to the second working frame buffer. The selected transparent graphics frame buffer may be the transparent graphics frame buffer previously selected at block 414 or the other transparent graphics frame buffer. At block 422, the second working frame buffer may be made visible and the first working frame buffer may be made non-visible, in effect, flipping the two frame buffers as the current display output data source. This process may be repeated by returning to block 412. During each of the previous blocks, the operating system software may be concurrently writing additional display data into the operating system output frame buffer.

an embodiment of the color mixing and interleaving operation of blocks 414 and 420 is further described with reference to FIG. 9. At block 426, a memory location in the currently non-visible (either the first or the second) working frame buffer may be determined for a reference point (e.g., point M 304) of the currently selected transparent graphics frame buffer. At block 428, a data signal value for a pixel from the currently non-visible working frame buffer may be read and the spatially corresponding pixel(s) from the currently selected transparent graphics frame buffer may be determined. This correspondence may not necessarily be a

IPR2021-00920
Apple EX1004 Page 22

6,088,018

11

1:1 ratio since the transparent graphics frame buffer image may be stretched or reduced to fit a portion of the working frame buffer. This pixel correspondence determination is well-known in the art and is commonly used in stretch block transfers in operating system software (e.g., the StretchBlt function in the Windows95® operation system). Next, at block **430**, in this embodiment the weighted average of the pixel from the working frame buffer and the pixel from the currently selected transparent graphics frame buffer may be computed. The weighted averages of the individual pixel components may be determined on a color component by color component basis. That is, red components may be averaged, blue components may be averaged, and green components may be averaged. The weight that is given to each of the components determines the resulting transparency of the pixel, however the same weight value may be used for all components of a given pixel. It is the weight associated with a pixel that affects at least in part the level of transparency. These weights may be manipulated by the application program employing transparency to achieve various mixing ratios. Furthermore, the application program employing transparency may provide user interface elements that allow the user to control the mixing ratios directly or indirectly.

The result of the weighted averaging computation may be placed into the same location in the working frame buffer at block **432** as the current pixel being processed. At block **434**, the next location in the working frame buffer to be processed may be determined, taking into account the current interleaving pattern (e. g., using every second pixel, every fourth pixel, horizontally or vertically alternating lines, etc.). At block **436**, if more pixels of the working frame buffer and the currently selected transparent graphics frame buffer are to be processed, processing continues with block **428** with the next pixel. Otherwise, color mixing and interleaving processing ends at block **438**.

In an alternate embodiment, mixing of pixels may be performed through a video control API block transfer using dedicated alpha blending circuitry.

FIG. **10** is a diagram illustrating components of an application program providing a video reflection input technique according to an embodiment of the present invention. Video data signals **500** may be generated by a video camera **501** coupled to a computer system such as is shown in FIG. **3**. Or by any other video source The video camera may be coupled to the standard I/O bus **118** and provides the video data signals **500** for storage in mass storage **120** or main memory **112**. Once the video data signals are within the computer system **100**, they may be processed by programs being executed by microprocessor **102**, such as application program **502** and filter graph manager **504** of FIG. **10**, for example. Referring back to FIG. **10**, application program **502** may be designed to provide any desired functionality for a user. At a minimum, in this embodiment the application program is designed to provide the capability of user input through the use of video reflection. The application program may interact with other application programs (not shown) and the operating system software (not shown) being executed by the processor of the computer system. When application program **502** is designed to provide the capability of user input selections through the use of video reflection in accordance with some embodiments of the present invention, the application program comprises filter graph manager **504**, filter initialization **506**, handle input events **508**, filter graph **510**, and COM interfaces **512**.

In one embodiment, a filter graph **510** may be created as part of a filter graph architecture of the ActiveMovie™

12

application programming interface (API) (also known as the DirectShow™ or DirectMedia™ API) available from Microsoft Corporation, although in other embodiments, other APIs may be used and the invention is not limited in scope in this respect. ActiveMovie™ is a software architecture that controls and processes streams of multimedia data signals, as well as run-time environment software that uses the architecture to allow users to play digital video and sound encoded in various well-known data formats on a PC. The playback capability makes use of video and audio hardware cards that support the DirectX™ set of APIs, available from Microsoft Corporation, although other APIs may also be used and the invention is not limited in scope in this respect. The ActiveMovie™ architecture defines how to control and process streams of time-stamped multimedia data signals by using modular software components called filters connected in a configuration called a filter graph **510**.

A software object called a filter graph manager **504** may be accessed by the application program **502** to control how the filter graph **510** may be assembled and how data may be moved through the filter graph. The instantiated filter graph manager generates and manages the filter graph. The filter graph comprises at least one custom filter for processing video data signals. The filter graph manager **504** provides a set of Component Object Model (COM) interfaces **512** to allow communication between the filter graph and application program **502**. Application program **502** may call the filter graph manager COM interfaces to control processing of the multimedia data stream or retrieve filter events. Since application program **502** processes the incoming video data stream from the coupled video camera **501**, in this embodiment the filter graph manager and filter graph are incorporated into the application program. In other embodiments, the filter graph manager may be a separate program independent of the application program.

In one embodiment, all components of the filter graph architecture may be implemented as COM objects. This includes the filters through which data signals may be passed, and filter components that serve as connections between filters or that allocate memory. Each object implements one or more interfaces, each of which comprises a predefined set of functions called methods. Generally, application program **502** calls a method to communicate with the object exposing the interface. For example, the application program may call methods on an IMediaControl interface on the object of filter graph manager **504**, such as a Run method, which starts a multimedia data stream. Filter graph manager, in turn, calls a Run method on the IFilter interface exposed by each of the filters of the filter graph **510**.

A filter graph **510** may comprise a collection of filters of different types. Most filters may be categorized as one of three types. A source filter takes data signals from some source, such as a file on disk, a satellite feed, an Internet server, or a video camera **501**, and introduces the data signals into the filter graph. A transform filter takes the data signals, processes them, and passes them along to another filter. A rendering filter renders the data signals. Typically, the processed data signals may be rendered to a hardware device such as a computer display, but the data may also be rendered to any location that accepts media input (such as a memory or a disk file, for example).

Generally, filter graphs may be used to stream multimedia data, such as video data, for example, through filters. In a multimedia data stream, one filter passes the multimedia data downstream to the next filter in the filter graph. To make a filter graph operate, filters may be connected in a predetermined order, and the multimedia data stream may be

IPR2021-00920
Apple EX1004 Page 23

6,088,018

13 14

started and stopped in the predetermined order. The filter graph manager connects filters and controls the multimedia data stream. Controlling the multimedia data stream comprises starting, pausing, or stopping the multimedia data stream, playing the data stream for a particular duration, or seeking a particular point in the data stream. The filter graph manager **504** allows the application program **502** to specify these activities, and then calls the appropriate methods on the filters to invoke them. The filter graph manager also allows filters to post event notifications that the application program may retrieve. In this way, the application program may retrieve the status of a filter that the application program has installed in the filter graph, once multimedia data is flowing through the filter graph.

During processing initialization, application program **502** instructs the filter graph manager **504** to load a graph file (not shown) which describes the filter graph. The filter graph manager creates the filter graph **510** based on the graph file and filter behavior commands received from filter initialization **506**. The filter behavior commands refer to specific filters by name and specify input and control parameters for the filters. When video data **500** is streaming through the filter graph and being processed according to specified filters, event notifications (also known as window messages) may be sent from the filter graph through COM interfaces **512** to handle input events **508**. In one embodiment, the input event may be determined to be a mouse down event or a mouse up event. In other embodiments, the input event may be any user input selection detected during the filter graph's processing of the video data stream. Handle input events **508** receives the event notification and handles it for application program **502**. In some embodiments, the handle input events **508** may comprise calls to other components within the application program to perform desired functions.

FIG. **11** is a diagram of a filter graph according to an embodiment of the present invention. In this embodiment, the filter graph comprises seven filters: video capture filter **520**, tee filter **522**, optional first and second color space converter filters **524**, **526**, video renderer with transparency filter **528**, color analyzer filter **530**, and blob detector filter **532**, although the invention is not limited in this respect. Video capture filter **520** captures individual frames of video data signals received by the PC from a coupled video camera or other video source. Each frame of video data signals may be passed to tee filter **522**. The tee filter splits the video data signals into two substantially similar data streams. One of the data streams may be forwarded to first color space converter filter **524**, and the other data stream may be forwarded to second color space converter filter **526**. The first color space converter converts the first data stream such that the color space of the video data signals is similar to the system display color space. In one embodiment, the pixel format of the video data signals must match the video card pixel format (e.g., 16 bit RGB color or 24 bit RGB color, for example). Converted data signals from the first color space converter filter may be forwarded to the video renderer with transparency filter **528**. The video renderer with transparency filter **528** renders the first data stream on a display in a transparent manner as described above with respect to FIGS. **4** through **9**. Video data signals may also be converted or "flipped" about a vertical center line of each frame to make objects on one side of the scene appear on the same side of the display (in effect, the scene appears like a mirror on the display).

In this embodiment, the second color space converter filter **526** converts the second data stream into a red, green, blue, alpha (RGBA) color format for each pixel of the second data stream, wherein the alpha values may be used to hold extra pixel information. Converted data signals from the second color space converter filter may be forwarded to the color analyzer filter **530**. The color analyzer filter analyzes the pixels of the second data stream and tags color values of pixels within specified color ranges with specific alpha "A" values. The second data stream with added tag information may be forwarded to blob detector filter **532**.

The blob detector filter analyzes the data stream and finds blocks of pixels with specific alpha values and posts event notifications (e.g., messages) to a control window of the application program **502**. The application program forwards these event notifications to the handle input events function **508**. In one embodiment, the blob detector filter may be set to look for substantially contiguous blocks of a predetermined color that have been tagged by the color analyzer filter. A block is also known as a blob of color. Herein, a blob may have predetermined physical attributes with a distinctive color and may be represented digitally as a group of pixels. The blob detector filter may be informed of a specified window handle to which detected blobs may be reported. In one embodiment, a blob of a predetermined pattern is determined to be an input event when the blob is detected in the video data stream by the blob detector filter and the handle input events function verifies that the blob meets a set or predetermined criteria. The location of the blobs in the video data stream (that is, in the current video frame) may also be communicated to handle input events **508**.

In the embodiment shown in FIG. **11**, the blob detector filter and the color analyzer filter are shown as separate filters, although in alternate embodiments the functions of these filters may be combined into a single filter, or may be combined with the video renderer filter. One skilled in the art will recognize that various combinations of such filters may be used, and the present invention is not limited in this respect.

FIG. **12** is a flow diagram of filter initialization processing according to an embodiment of the present invention. Generally, filter initialization **506** instructs the filter graph manager **504** to create and initialize the filter graph **510** and begin the flow of video data signals into the filter graph. At block **540**, filter initialization directs the filter graph manager to create a filter graph. At block **542**, the video renderer with transparency filter may be located in the filter graph. Locating a filter means that an IFilter COM interface is retrieved based on the filter name and a configuration interface is then obtained through the filter. Next, at block **544**, initialization parameters for the video renderer with transparency filter may be set. For example, the desired level of opacity may be set for future video data signal processing. Other initialization parameters include mirroring settings and interleaving patterns. At block **546**, the color analyzer filter may be located in the filter graph. At block **548**, the color ranges and corresponding alpha values of pixels in the video data stream to be tracked by the color analyzer filter may be set. For example, in the embodiment tracking the finger and thumb input events, the color ranges and alpha values of the finger and thumb may be set so that the color analyzer tags pixels in the video data stream having color values in the specified ranges. At block **550**, the blob detector filter may be located in the filter graph. At block **552**, a control window identifier, alpha values, and corresponding control messages may be set in the blob detector filter. At block **554**, video data signal flow through the filter graph may be started.

Once the video data signals are flowing through the filter graph, an event notification called a window message may

IPR2021-00920
Apple EX1004 Page 24

15

be received by handle input events **508** from the blob detector filter **532**. FIG. **13** is a flow diagram of handle input events processing according to an embodiment of the present invention. Processing begins by waiting for a window message ready indication at block **560**. If no window message ready event is received, then handle input events continues to wait until a potential input event is received. When a window message is received, further processing may be performed to determine if it is a potential input event. At block **562**, the window message may be examined to determine if a blob type **1** event has been detected by the blob detector filter. In one embodiment, a blob type 1 may be associated with a predetermined physical artifact occurring in a video frame such as an index finger, for example, and a blob type 2 may be associated with a another physical artifact occurring in a video frame such as a thumb, for example, although one skilled in the art will recognize that various physical artifacts and objects and their accompanying colors may be used in various embodiments as input indicators. In this embodiment, two distinct colors may be used as indicators, however in other embodiments any number of colors may be employed. In this embodiment, if blob type 1 is detected, then the size and location of the blob type 1 in the current video frame of the video data stream may be recorded in a data structure denoted the type 1 list at block **564**. Processing then continues by waiting for another potential input event.

If blob type 1 was not detected at block **562**, then processing continues at block **566**, wherein the window message may be examined to determine if a blob type 2 event has been detected by the blob detector filter **532**. If blob type 2 was detected, then the size and location of the blob type 2 in the current video frame of the video data stream may be recorded in a data structure denoted the type 2 list at block **568**. Processing then continues by waiting for another potential input event. If blob type 2 was not detected, processing continues at block **570**, wherein the window message may be examined to determine if an end of frame indicator has been detected by the blob detector filter. If an end of frame indicator was detected, then block **572** is processed to determine if a valid input event was detected in the current video frame. After block **572**, processing continues by waiting for another window message at block **560**. When the end of frame indicator is detected, the blobs detected during processing of the frame are stored in the blob lists. In one embodiment, the type 1 and type 2 lists store possible occurrences of two different physical objects represented in the video data stream. In other embodiments, any number of lists may be used to track a corresponding number of physical objects represented in the video data stream.

If an end of frame indicator was not detected, the window message may be examined at block **574** to determine if an application close message was received. If an application close message was received, the filter graph may be stopped at block **576**, the filter graph may be deleted at block **578**, and the application program **502** may be exited at block **580**. Otherwise, an application close message was not received and processing continues by waiting for a window message at block **560**.

FIG. **14** is a flow diagram of processing for detecting valid input events. At the beginning of detecting valid input events processing, a complete video frame may be processed by the filter graph and application program **502** may have at least two lists of blobs occurring in the video frame. In one embodiment, the two lists are the blob type 1 and blob type 2 lists, each list representing a blob color region space. Valid

16

input event detection processing then comprises searching the blob lists to find the closest pair of blobs. Each pair is tested to determine if it is closer together than a selected threshold distance. If such a blob pair exists, then detection of this blob pair is considered to be a valid input event. If more than one pair is detected, then the closest pair is used for further processing. At block **600**, detect valid input processing determines if the end of the blob type 1 list has been reached. If the end of the blob type 1 list has not been reached, then block **602** is performed to find a blob in the blob type 2 list that is closest in the video frame to the current blob type 1 and to record the index within the blob type 2 list of this closest blob type 2 into the current entry of the blob type 1 list. In this embodiment, closeness may be defined as the spatial distance between the centers of two blob locations in the two dimensional plane of the video frame. At block **604**, the next entry in the blob type 1 list is selected for processing. Processing continues with this next blob type 1 at block **600**. If there is no pair available at **605**, then an appropriate flag or other indicator is set in the current entry of the blob type 1 list.

When the end of the blob type 1 list is reached, block **606** may be performed to find the closest blob type 1/blob type 2 pair in the blob type 1 list. If the closest pair is less than a threshold distance apart at block **608**, then block **610** may be performed to submit the detected input event to the operating system software of the computer system. The operating system software may then pass the input event to other application programs as needed. In one embodiment, the location of the blobs in the current video frame may be mapped or otherwise converted to screen coordinates (e.g., normalized mouse coordinates) prior to reporting the input event. At block **610**, if the closest pair is not less than the threshold distance apart, then block **611** may be performed to submit a different input event to the operating system software. Next, at block **612** the type 1 blob list and the type 2 blob list may be reset. Detect valid input event processing ends at block **614**.

While the example of handling input events by detecting the movement of a user's finger and thumb has been described, one skilled in the art will recognize that the capture and analysis of a video data stream including a number of different physical objects of different colors and movements may be used to signify an input event, and that the invention is not limited in scope by way of the specific example shown herein. Additionally, in this embodiment, lists are used to store the blob information. In other embodiments, other data structures may be used and other techniques for searching the data structures to determine blob pairs may be also be used.

FIG. **15** is a flow diagram describing a processing thread of a video renderer with transparency according to an embodiment of the present invention. Video renderer with transparency processing begins at block **700**. Video renderer with transparency processing begins at block **700**. In one embodiment, a video control API object (such as a DirectDraw™ object, for example), three video frame buffers and a secondary thread may be created. At block **704**, if the transparent graphics frame buffers do not exist or one or more of their sizes have changed, then new transparent graphics frame buffers may be created and a first one of the transparent graphics frame buffers may be marked as the currently active frame buffer. At block **706**, a graphics display interface (GDI) display context (DC) for the currently active transparent graphics frame buffer may be created. At block **708**, the GDI may be used by the video renderer to draw video data signals on the transparent DC created in block **706**. Next, at block **710** the currently inactive transparent graph-

IPR2021-00920
Apple EX1004 Page 25

6,088,018

**17**

ics frame buffer may be marked as active and the active transparent graphics frame buffer may be marked as inactive. At block **712**, the transparent DC is deleted. At block **714**, a system event may be set to indicate that the newly inactive transparent graphics frame buffer is ready for color mixing and interleaving operations. At block **716**, the video renderer determines if there are more video frames in the video data stream to process. If there are more video frames, then frame processing continues with block **704**. If there are no more video frames to process, then the frame buffers may be destroyed at block **718**. At block **720**, the video renderer waits for the secondary thread (created above at block **702**) to terminate. Video renderer processing then ends at block **722**.

FIG. **16** is a flow diagram describing a processing thread of a transparency mixer core according to an embodiment of the present invention. This thread is the secondary thread created in block **702** of FIG. **15**. The secondary thread may be a process or task independent of the main video renderer process. After the secondary thread is created (block **740**), the transparency mixer core waits for a transparent graphics frame buffer to be completed. In one embodiment, a transparent graphics frame buffer is completed when it is ready to be color mixed and interleaved with other data signals. The event being waited for by the secondary thread may be the system event of block **714** of FIG. **15**. At block **744**, the contents of the operating system output frame buffer are block transferred to both of the working frame buffers. At block **746**, the operating system output frame buffer may be set to a non-visible or inactive state and one of the working frame buffers may be set to a visible state. These two operations effectively "flip" the frame buffer used for displaying data signals on the display. At this point, the operating system output frame buffer is not directly visible

**18**

been completed (that is, loaded with video data signals), the secondary thread mixes the contents of the inactive transparent graphics frame buffer with the non-visible working frame buffer at block **750**. This mixing may be accomplished according to the method describing above in FIG. **8**, for example, although the mixing operation may also be accomplished by dedicated mixing hardware. At block **752**, the secondary thread flips the two working frame buffers so that the visible working frame buffer becomes the non-visible working frame buffer and the non-visible working frame buffer becomes the visible working frame buffer. If all frame buffers still exist at block **754**, then further color mixing and interleaving processing may be performed on the transparent graphics frame buffers, and processing continues with block **748**. Otherwise, if any of the frame buffers do not exist, block **756** may be performed to terminate the transparent display context thread.

A process of one embodiment of a color analyzer filter **530** of the filter graph is shown below in Table I. The process accepts two inputs: a frame of video in RGBA format (which is subsequently converted to Hue, Saturation and Value (HSV) format) and a range of color values for matching color values of individual pixels of the frame. A pixel may be considered a match if the pixel's Hue, Saturation and Value are in the specific range of colors. Since Hue is a circle rather than a line, the range of hue to match can be either a non-wrapping range (e.g., 20–53) or a wrapping range (e.g., 240– 255, 0–20). The range of colors to match may be a constant, or may be determined empirically based on the color characteristics of the video camera, the video capture hardware, and the object to be detected (although one skilled in the art may also envision an automatic calibration method where color ranges may be determined automatically).

TABLE 1

● **1998** Intel Corporation
Color Analyzer

Inputs:     a frame of video data signals in RGBA format; a minimum match pixel in HSV format, RangeMin; a maximum match pixel in HSV format, RangeMax. P(H) represents the Hue, as does RangeMin(H); P(S) represents Saturation, and P(V) represents Value.
Outputs:     a frame of video in HSVA format
Begin
For each pixel P in the video frame loop
    Convert RGBA pixel to HSVA pixel
    If RangeMin(H) <= RangeMax(H) then
    // normal range (for example, 20 through 53)
        If (RangeMin(H) <= P(H)) AND (P(H) <= RangeMax(H)) AND
        (RangeMin(S) <= P(S)) AND (P(S) <= RangeMax(S)) AND
        (RangeMin(V) <= P(V)) AND (P(V) <= RangeMax(V)) then
        Pixel P matches the key color
        End If
    Else // Hue wraps from RangeMin(H) through RangeMax(H)
    // Inverted range. For example, 240 through 255 and 0 through 20
        If ((P(H) <= RangeMax(H)) OR (RangeMin(H) <= P(H))) AND
        (RangeMin(S) <= P(S)) AND (P(S) <= RangeMax(S)) AND
        (RangeMin (V) <= P(V)) AND (P(V) <= RangeMax (V)) then
        Pixel P matches the key color
    End if
End Loop
End

on the display. At block **748**, the secondary thread waits a predetermined period of time (such as 75 milliseconds, for example) or for a transparent graphics frame buffer to be completed.

When the secondary thread has waited the predetermined period of time or the transparent graphics frame buffer has

A process of one embodiment of a blob detector filter is shown below in Table II. The process examines pixels in the video frame vertically, examining each scan line in turn, to find horizontally contiguous pixels called "runs" that match a desired key color. As these operations may be performed, the process looks for runs on another scan line (such as the

IPR2021-00920
Apple EX1004 Page 26

6,088,018

**19**

previous scan line, for example) that connect to runs on the current scan line and joins them. Whenever a set of runs are found that do not significantly connect to the current scan line, the process considers that set of runs to be a blob of contiguous pixels that matched the desired key color. The process returns all blobs that are within desired minimum and maximum dimensions.

TABLE II

● 1998 Intel Corporation
Blob Detector

```
Begin
For each scan line of the video frame loop
    For each horizontal set of contiguous pixels that match the key color
loop
        Create a run object to represent these pixels on this scan line
        Create a blob object that contains this run
        For each run of the previous line that overlaps this run
        horizontally loop
            if that run's blob does not yet extend to the current scan
            line then
                Incorporate that run and its blob to the current blob
            Else
                If the current run has not been added to a blob yet
                then
                    incorporate the run into the other run's blob
                Else
                    Ignore the other run
                    // its already part of another blob on the current
                    // scan line
                End if
            End if
        End loop
    End loop
End loop
// current scan line is done
// Completed cataloging runs on this scan line
// and adds them to appropriate blobs.
// Now see if any blobs have ended
For each run on the previous scan line that didn't get incorporated into the
current scan line's blob set loop
    If that run is not part of another blob on its scan line then
        If the run is marked as "tentatively terminated" OR
        the current scan line is the last scan line of the image then
            Mark this run as a completed blob
            If this blob is within the dimension requirements then
                Post a message indicating the characteristics
                of the blob
            End If
        Else
            Mark this run as "tentatively terminated"
            Add this run to the current scan line's run list
        End If
    End If
End Loop
Process final line of the video frame
Post a frame complete message to the target window
End
```

While this invention has been described with reference to illustrative embodiments, this description is not intended to be construed in a limiting sense. Various modifications of the illustrative embodiments, as well as other embodiments of the invention, which are apparent to persons skilled in the art to which the inventions pertains are deemed to lie within the spirit and scope of the invention.

What is claimed is:

1. A method of providing input signals to a system having a display, the system being coupled to a source of video data signals, comprising:

capturing video data signals generated by the video source, the video data signals representing a scene;

rendering the scene on the display such that the scene is transparently visible on the display;

analyzing the video data signals to detect an object in the scene; and

**20**

automatically generating an input event for a program of the system when the object is detected in the scene.

2. The method of claim 1, wherein the scene comprises a user of the system and the rendered scene comprises a reflected image of the user.

3. The method of claim 1, wherein the detected object comprises at least one body part of a user of the system.

4. The method of claim 1, wherein the detected object comprises at least one predetermined prop.

5. The method of claim 1, further comprising displaying at least one display object on the display in addition to the transparently rendered scene.

6. The method of claim 5, further comprising interpreting movement of the detected object in the scene as selecting the at least one display object.

7. The method of claim 6, wherein the at least one display object is an icon.

8. The method of claim 1, wherein analyzing the video data signals comprises analyzing color values of pixels of the video data signals and tagging pixels having selected color values.

9. The method of claim 8, further comprising identifying a block of tagged pixels as the detected object and generating corresponding input signals when the detected object matches predetermined criteria of objects signifying input events.

10. The method of claim 1, wherein the input signal is at least one of a mouse-down event, a mouse-up event, and a cursor position movement.

11. In a system having a source of video data and a display, an apparatus comprising:

means for capturing video data signals generated by the video source, the video data signals representing a scene;

means for rendering the scene on the display such that the scene is transparently visible on the display;

means for analyzing the video data signals to detect an object in the scene; and

means for automatically generating an input event for a program of the system when the object is detected in the scene.

12. The apparatus of claim 11, further comprising means for displaying at least one display object on the display in addition to the rendered scene.

13. The apparatus of claim 12, wherein the generating means comprises means for interpreting movement of the detected object in the scene as selecting the at least one display object.

14. The apparatus of claim 13, wherein the analyzing means comprises means for analyzing color values of pixels of the video data signals and means for tagging pixels having selected color values.

15. The apparatus of claim 14, further comprising means for identifying a block of tagged pixels as the detected object and means for generating corresponding input signals when the detected object matches predetermined criteria of objects signifying input events.

16. In a system having a source of video data and a display, an apparatus comprising:

video capture circuitry to capture video data signals generated by the video source, the video data signals representing a scene;

video render circuitry to render the scene on the display such that the scene is transparently visible on the display;

color analyzer circuitry to analyze the video data signals to detect an object in the scene; and

IPR2021-00920
Apple EX1004 Page 27

6,088,018

**21**

input handler circuitry to automatically generate an input event for a program of the system when the object is detected in the scene.

**17**. An article comprising a machine readable medium having a plurality of machine readable instructions, wherein when the instructions are executed by a processor the instructions cause a system to capture video data signals generated by a video source, the video data signals representing a scene, to render the scene on a display such that the scene is transparently visible on the display, to analyze the video data signals to detect an object in the scene, and to automatically generate an input event for a program of the system when the object is detected in the scene.

**18**. The article of claim **17**, wherein the machine readable medium further comprises instructions to render an image of the scene on the display such that the rendered scene comprises a reflected image of the scene.

**19**. The article of claim **17**, wherein the machine readable medium further comprises instructions to display at least one display object on the display in addition to the transparently rendered scene.

**20**. The article of claim **19**, wherein the machine readable medium further comprises instructions to interpret movement of the detected object in the scene as selecting the at least one display object.

**21**. The article of claim **17**, wherein the machine readable medium further comprises instructions to analyze color values of pixels of the video data signals and to tag pixels having selected color values.

**22**. The article of claim **21**, wherein the machine readable medium further comprises instructions to identify a block of tagged pixels as the detected object and to generate corresponding input signals when the detected object matches predetermined criteria of objects signifying input events.

**23**. In a computer system coupled to a source of video data signals and a display, an apparatus for providing input signals to the computer system, the apparatus comprising:

**22**

a filter graph for processing video data signals received from the video source, the video data signals representing a scene captured by the video source, the filter graph comprising:

a video renderer filter to render the scene on the display such that the scene is transparently visible on the display;

a color analyzer filter to analyze color values of pixels of the video data signals and to tag color values of pixels within specified ranges; and

a block detector filter coupled to the color analyzer filter to analyze the tagged color values of pixels of the video data signals, to identify blocks of pixels with selected color values as detected objects of the scene, and to provide a notification of potential input events; and

an input event handler to analyze the notification and to determine if the detected objects signify input signals for the computer system.

**24**. The apparatus of claim **23**, wherein the filter graph further comprises a video capture filter to capture individual frames of video data signals from the video source.

**25**. The apparatus of claim **24**, wherein the filter graph further comprises a tee filter coupled to the video capture filter to split the video data signals into at least two substantially similar data streams, a first one of the data streams being communicated to the video renderer filter and a second one of the data streams being communicated to the color analyzer filter.

**26**. The apparatus of claim **23**, wherein the rendered scene comprises a reflected image of the scene.

**27**. The apparatus of claim **23**, further comprising message-based interfaces for communication between the filter graph and the input event handler.

\* \* \* \* \*

IPR2021-00920
Apple EX1004 Page 28

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.
Petitioner

v.

GESTURE TECHNOLOGY PARTNERS LLC
Patent Owner

———————

*Inter Partes* Review Case No. IPR2021-00920
U.S. Patent No. 7,933,431

**DECLARATION OF DR. BENJAMIN B. BEDERSON**

IPR2021-00920
U.S. Patent No. 7,933,431



*Id*. at Fig. 2. A timing control unit is used to turn lighting unit 101 on (i.e., illuminating the target object) when the first camera unit is active and off when the second camera unit is active. *Id*. at 11:20-32. The result of this light control is the first camera unit captures an image of the target object illuminated by both natural light and the lighting unit 101 and the second camera unit captures an image of the target object illuminated by only natural light. *Id*. at 11:33-39. The difference between the two images—obtained by difference calculation unit 111—represents the "reflected light from the object resulting from the light emitted by the lighting unit 101." *Id*. at 11:43-51. This information is then used by feature data generation unit 103 to determine gestures, pointing, etc. of the target object that may be converted into commands executed by a computer. *Id*. at 10:57-66.

40.    The "photo-detection units" depicted in Fig. 2 and described in *Numazaki* are "camera units." Each performs the basic function of a "camera," which

is to capture image information based on light captured by the sensors' pixels. Further, *Numazaki* notes that these units can be "CMOS sensors" or "CCD image sensors." *Id*. at 15:24-16:19. These were two widely recognized technologies used to implement imaging sensors for cameras. *See, e.g.*, "CCD and CMOS Imaging Array Technologies," Stuart Taylor, Xerox Research Centre Europe, 1998 (Ex. 1012) (discussing the history of CCD and CMOS imaging technologies, concluding that CMOS is likely to overtake CCD devices for future imaging).

*Numazaki's Second Embodiment—Hand-Based Gesture Detection*

41.    *Numazaki's* second embodiment focuses on a user's hand as the target object such that a user can control the computing device using gestures. *Id*. at 17:18-22 ("When the hand is used as the target object, it is possible to capture the information on a position and a shape of the hand without a contact, so that it is possible to utilize the present invention as a means for inputting information from a human being to a machine."). In one example, Numazaki describes a process by which a user's fingertip position is identified and tracked such that "the cursor on the screen can be controlled" by the user's gestures. *Id*. at 26:8-67. *Numazaki* describes many implementation details in this section, some of which I discuss below where relevant to my specific opinions.

*Numazaki's Third Embodiment—Converting Gestures into Commands*

power. *Id*. at 39:12-20. To accomplish this improvement, *Numazaki* uses the same two-camera structure described with respect to the first embodiment, using the reflected light sensor to identify an outline of the subject and subtracting from the other sensor's image everything that falls outside the subject's outline. *Id*. at 39:24-60.

*Numazaki's Eighth Embodiment—Portable Devices Implementing the Earlier Described Functionalities*

44.    *Numazaki's* eighth embodiment describes various portable computers such as laptops and handheld devices on which the earlier-described hardware and functionalities may be implemented. *Id*. at 50:19-24 ("This eighth embodiment is directed to a system configuration incorporating the information input generation apparatus of the present invention as described in the above embodiments."). For example, Fig. 74 depicts a laptop computer with a lighting unit 701 and camera unit 702:



*Id*. at Fig. 74, 50:25-37 (describing the same). "In this configuration, the operator operating the keyboard can make the pointing or gesture input by slightly raising and moving the index finger. The user's convenience is remarkably improved here because the keyboard input and the pointing or gesture input can be made without hardly any shift of the hand position. It is also possible to provide a button for use in conjunction with the pointing or gesture input. The operations such as click and drag for selecting and moving icons on the screen can be carried out by using this button."

*Id*. at 50:38-48. Similar implementations in which a user can control a cursor by moving a finger are depicted in Figs. 78-79 below:

IPR2021-00920
Apple EX1008 Page 30

IPR2021-00920
U.S. Patent No. 7,933,431



*Id.* at Figs. 78-79, 52:5-23 (describing the same). As noted above, *Numazaki* contemplates these portable devices implementing the information input generation apparatus described in the preceding embodiments. *Id.* at 50:19-24 ("This eighth embodiment is directed to a system configuration incorporating the information input generation apparatus of the present invention as described in the above embodiments."). Where relevant to my opinions below, I explain why a PHOSITA would also have been motivated to implement in the eighth embodiment devices hardware and functionalities described with respect to *Numazaki's* earlier described embodiments.

45.     Because *Numazaki*, like the '431 Patent, discloses a camera system that may be controlled by human gesture input, *Numazaki* is in the same field of endeavor

gesture camera is to accurately capture a user's gestures and convert them into commands. *Id*. at 29:1-30:5. Accordingly, a PHOSITA would have recognized that the third embodiment's gesture camera is well-suited to the gesture recognition and device control contemplated by the eighth embodiment. *Id*. at 29:4-8 (noting the camera is capable of "recognizing the hand action easily and its application as a pointing device in [a] three-dimensional space.").

> ### 3.  *Claim 3: A method according to claim 1, including the further step of acquiring an image of at least a portion of the user of the device.*

50.    *Numazaki* explains that an image of the object is acquired as part of the gesture recognition process:

> The present invention is basically directed to an information input scheme in which the light is irradiated onto a target object from a light source, and **the reflected light from this target object is captured as an image**, so that information on this target object such as its shape, motion, distance, etc., can be obtained from this reflected light image.

*Numazaki* at 10:8-13 (emphasis added); *see also id*. at 10:33-39 (explaining that the first embodiment's information input generation apparatus "extracts the reflected light from the target object . . . as an image").

51.    Additionally, *Numazaki's* fifth embodiment is directed to lowering the communication costs for videoconference applications on a portable device. *Id*. at 39:6-16 (noting a goal of "lower[ing] the power consumption and cost of the portable terminal device"). To accomplish these goals, *Numazaki* teaches that all image

information other than the subject should be deleted from the image information before transmitting. *Id*. at 39:17-60 (describing a mask process through which an "extracted image" containing only the subject is "stored in the extracted image memory unit 354"). A PHOSITA would have been motivated to include such image capture functionality in the portable eighth embodiment's portable device because *Numazaki* expressly suggests its fifth embodiment image capture technology should be incorporated into a portable device. As I discussed above, *Numazaki* discloses the goal to overcome difficulties involved with videoconference applications using a portable device, including communication costs and power consumption. *Id*. at 39:6-16. To combat these difficulties, *Numazaki* teaches a "TV telephone" that extracts and transmits only the faces of the participating users, removing extraneous background information that would otherwise consume bandwidth and battery power. *Id*. at 39:12-20. To accomplish this improvement, *Numazaki* uses the same two-camera structure described with respect to the first embodiment, using the reflected light sensor to identify an outline of the subject and subtracting from the other sensor's image everything that falls outside the subject's outline. *Id*. at 39:24-60. A PHOSITA would recognize these same benefits would apply to the portable device in *Numazaki's* eighth embodiment, which also relies on the first embodiment's two-camera structure and battery power for operation.

52.    Additionally, a PHOSITA would have recognized the portable device in *Numazaki's* eighth embodiment could easily support the image capture solution described with respect to the fifth embodiment. With respect to Fig. 46, the fifth embodiment image capture technology uses two separate cameras—one for reflected light and one for natural light—to identify and extract only the subject from the image information. *Id*. at 39:21-60. As I discussed above, the eighth embodiment already includes this two-camera structure described with respect to the first embodiment within its eighth embodiment portable device. *Id*. at 50:19-24. *Numazaki* even makes express reference to the same two-camera image difference calculation step taught with respect to the first embodiment in its eighth embodiment. *Numazaki* at 11:39-56 and 53:22-36. Accordingly, a PHOSITA would recognize that minimal modifications would be required to implement the fifth embodiment image capture functionality in the eighth embodiment's handheld device as *Numazaki* intends.

> 4.    ***Claim 4: A method according to claim 1, wherein said movement is sensed in 3 dimensions.***

53.    *Numazaki* teaches that finger movement in three dimensions can be detected and used in the context of controlling a computer:

> The feature data generation unit 103 extracts various feature data from the reflected light image. Many different types of the feature data and their extraction methods can be used in the present invention, as will be described in detail in the later embodiments. **When the target object is a hand**, it becomes possible to obtain the information regarding

5.      *Claim 7(c): computer means within said housing for analyzing said image to determine information concerning a position or movement of said object; and*

55.    I understand the corresponding structure for "computer means within said housing for analyzing said image to determine information concerning a position or movement of said object" includes a computer/processor programmed to identify natural features on an object to determine the object's position. *See, e.g., '431 Patent* (Ex. 1001), 3:39-41(noting features such as a finger tip can be used as a "target"), 13:46-67 (describing a user pointing and using the motion of her fingers to control objects within an application). *Numazaki* teaches the same (or an equivalent) structure for detecting the position of a user's finger to permit the user to control a device using gestures. Namely, *Numazaki's* "compact portable information device" allows the "position of a cursor 714 on the screen [to] be controlled by moving a finger 713 in front of [] window 712." *Id*. at 52:5-16. This eighth embodiment functionality uses the process expressly described in the second embodiment through which the system identifies a user's finger based on its characteristics and tracks lateral finger movements by "detecting the center of gravity" of a finger, where "finger tip movement and the center of gravity movement can be smoothly correlated" using pixel values. *Id*. at 19:43-20:25. To detect a finger, *Numazaki* teaches a "stick shaped object detection unit 213 detects a stick shaped object extending in the vertical direction, that is, an upward extended

finger (normally an index finger) of the hand of the operator." *Id*. at 18:32-35. Once the finger is detected, *Numazaki* calculates the center of gravity and tracks this center of gravity as the finger moves. *Id*. at 19:43-20:25. Using this technique, *Numazaki* teaches "the cursor on [a] screen can be controlled" so that "when the finger is moved, the cursor is also moved" and a cursor position depends on a fingertip position. *Id*. at 26:8-14, 26:23-25. A PHOSITA would have recognized this cursor control is similar to the "click and drag" functionality described with reference to the eighth embodiment and would have be useful to implement the "click and drag" functionality. Indeed, detecting the position of a user's fingertip and tracking its movement is precisely the functionality necessary to implement such a "click and drag" feature. Accordingly, a PHOSITA would have been motivated to implement the fingertip detection and tracking technique within the eighth embodiment.

### 6. Claim 7(d): means for controlling a function of said apparatus using said information.

56.    As discussed above, the corresponding structure for this limitation includes at least the disclosure with reference to Fig. 9 by which a user can control a cursor on a display by moving her fingers (captured by a camera). *Numazaki* teaches the same (or an equivalent) structure for controlling cursor 714 on the screen based on a user's finger movements. Namely, *Numazaki's* "compact portable information device" allows the "position of a cursor 714 on the screen [to] be controlled by moving a finger 713 in front of [] window 712." *Numazaki* (Ex. 1003),

A PHOSITA would have understood that the user moving the cursor is reflected on the device's display, providing feedback to the user as the user manipulates the cursor. Accordingly, a PHOSITA would recognize *Numazaki's* cursor control as a display function.

### 8. *Claim 11: Apparatus according to claim 7, further including means for transmitting information.*

58.    As I discussed above with respect to Claim 3, a PHOSITA would have been motivated to include the fifth embodiment image capture functionality in *Numazaki's* eighth embodiment portable device. The fifth embodiment not only captures images, but also transmits those images to other devices. *Numazaki* refers to this functionality as a "TV telephone" that allows the system to extract image information of only the speaker and transmit that extracted information to another device in support of a "conference record system." *Numazaki* at 39:6-16, 40:16-49. A PHOSITA would have understood this "conference record system" is more commonly referred to as a videoconference system in which videoconference telephones send video and audio to each other. Such videoconference telephones were also known as cellular videophones. *See, e.g.*, "Next Stage of the Cellular Tour: Forced to Compete, Japan Become a Global Power," Sheryl WuDunn, New York Times, 1999 (Ex. 1013) (discussing the global efforts preceding the launch of a market leading cellular videophone—the Visual Phone VP-210—by Japan's Kyocera Corporation).

9.    ***Claim 13: Apparatus according to claim 7, wherein said apparatus is a cellular phone.***

59.    As I discussed with respect to Claim 11, a PHOSITA would have been motivated to implement *Numazaki's* fifth embodiment functionality into the eighth embodiment's handheld device, including the video conference functionality in which a handheld device extracts image information of only the speaker and transmits it to a further device for the same reasons as discussed previously.

60.    *Numazaki* refers to this videoconference embodiment as a "TV telephone" and stresses that its goals are to "lower communication cost[s] . . . [and] power consumption." *Numazaki* at 39:6-16. Although *Numazaki* does not expressly state that its TV telephone is a cellular phone, a PHOSITA would have understood that *Numazaki's* focus on lower communications costs is a concern applicable to cellular phones. Indeed, wireless cellular data connections at the time were expensive, and *Numazaki's* image extract method would alleviate otherwise high data transfer costs. Notably, *Numazaki's* subject extraction process would be less valuable to other wireless connections such as WiFi or wired connections, which do not share the same data transfer cost concerns. Although cellular videophones were not prevalent in the marketplace as of the '431 Patent's alleged invention date of July 8, 1999, a PHOSITA would have known that researchers were working on the technology and that products were being introduced to customers. *See, e.g.*, "Next Stage of the Cellular Tour: Forced to Compete, Japan Become a Global Power,"

Sheryl WuDunn, New York Times, 1999 (Ex. 1013), 2 (a July 1999 article discussing a new "cellular videophone" introduced by Kyocera). Further, a PHOSITA would have understood that *Numazaki's* fifth embodiment is directed to improvements to make such cellular videophones commercially viable.

> 10.   ***Claim 14[a]: providing a computer within said device;***

61.   "Computer," as used in this limitation, mean a processor-based system able to execute functionality through software (i.e., by executing instructions defined by the software). *Numazaki's* eighth embodiment handheld device, including that depicted in Fig. 78, performs its function using an internal processor. A PHOSITA would have understood that such processor-based systems are "computer" systems and would have considered *Numazaki's* handheld device to include a computer within the meaning of this limitation.

> 11.   ***Claim 18: A method according to claim 14, wherein said information includes the velocity or path of the portion or object.***

62.   As depicted in Fig. 20 below, *Numazaki* uses a center of gravity calculation to track the path of a finger as it moves:



3

# Next Stage of the Cellular Tour: Forced to Compete, Japan Becomes a Global Power

Tokyo, July 26

ONE OF the nicest things the United States ever did for Japan, it seems, was to force it, kicking and screaming, to open its market for cellular phones.

That was five years ago. At the time, Japan was aghast at the idea of freeing up a market that was a groggy backwater. Japanese citizens were not even allowed to own cellular phones—just rent them—and Japanese companies were afraid that they were going to lose business to American rivals like Motorola.

Yet Japan buckled, and now, under the pressure of competi-

*By Sheryl WuDunn*
Copyright 1999 The New York Times Company. Reprinted by permission.
*The New York Times*, July 27, 1999.

33

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

tion, it has leapfrogged to the front of the global pack. The country now has a higher concentration of cellular telephones —including ones colored pink, pale blue or tea green—than does the United States.

More astonishing, Japan has caught up with Europe, the early pacesetter, and plans to move ahead in 2001 by introducing the "third generation" of cellular-phone technology, which promises much greater clarity and ability to transmit data and video.

Already, Japanese cell phones, which used to be second-rate and expensive, have been transformed into devices to buy and sell stocks, reserve tickets for trains and airplanes, transfer funds between bank accounts and send and receive text messages and simple drawings.

Moreover, as in Europe, they have leaped into the digital era under the umbrella of compatibility—unlike in the United States, where competing technologies have actually stifled the advance of seamless and ubiquitous communication.

The latest mobile phone to draw oohs and aahs here has a tiny camera that sends a shaky TV-style color image to a small screen on the other party's telephone—assuming that it too is a videophone.

That cellular videophone, made by the Kyocera Corporation, will be introduced this month, for about $335, and it is as tiny as any other mobile phone, easily fitting into a shirt pocket. Meanwhile, Epson has merged phones with functions of a personal digital assistant like the Palm Pilot, creating a unit that is both phone and diary, and that can also send color images.

So, as Japan's economy still staggers along, one of the brightest opportunities in this country of 126 million people is a shimmering milky way of 50 million twinkling and tinkling portable phones.

Trials have already begun on an advanced wideband wireless-transmission technology, and some say that Japan may drive the global standard and become a leader in the next generation of mobile phones.

"In Japan, we are at a turning point," said Jun Murai, a pro-

34

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.



A promotion assistant demonstrates Kyocera Corporation's new communication gadget, the Visual Phone VP-210, which can transmit and receive color images. Kyocera, a leading shareholder of Japan's long-distance telephone carrier DDI, claims VP-210 is the world's first video personal handyphone system. It can transmit about two frames a second.

AP/Wide World Photos

fessor at Keio University and the leading cheerleader here for the Internet. Japan lags behind the United States significantly in information technology, he said, but with regard to potential technical power, "Japanese companies are not behind."

In many ways, at stake is Japan's pride at being a leader in a pivotal technology—enormously important in a nation that has been economically wounded for the entire decade.

Japan is betting that mobile phones will enjoy explosive growth as they become a key accessory, as common as wrist-watches, that people take when they leave home. Japanese companies are betting that mobile phones, rather than computers, will connect people here to E-commerce on the Internet.

35

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

Indeed, Japanese researchers are collaborating with American companies, like Sun Microsystems, so that they may also become a major link in controlling home appliances. Their goal, ultimately, is to transform mobile phones into the crucial digital device of the future.

They see a big market not just in the industrialized world but also in nations like China, where many consumers' first phone is cellular.

Japan's gamble, though, is by no means a sure bet.

"The next question is whether they take it from a cell phone to a full PC or whether it makes sense to browse the Net on the phone, for simple point-and-clicking," said Vinton G. Cerf, senior vice president for Internet architecture and technology at MCI Worldcom. "Japan is good at size, power and bringing the cost down. There's no better country to do it than Japan."

One big problem, though, is that few Japanese are plugged into the computing world. As recently as a few years ago, Japan was in the personal-computing dark ages, a nation where corporate offices were big rooms filled with paper-laden desks and where desktop computers were rare.

Even now, on average, only one person in four here uses a personal computer. And so far, only about 14 percent of Japan's population is plugged into the Internet, compared with 40 percent in the United States.

Personal computers have not been a bigger hit in Japan for several reasons. For one thing, keyboards intimidate many middle-aged Japanese, and tapping in the Japanese language—with two alphabets and several thousand Chinese characters—requires combinations of strokes that are far more complex than in English.

Another is that many homes are cramped, and PCs take up a fair amount of space. But that aversion to bulky computers and keyboards may actually serve to spur the development of mobile phones as a more compatible alternative.

At the same time, the high cost of traditional phone services may help advance cell-phone technology even more. Hefty

36

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

IPR2021-00920
Apple EX1013 Page 4

telephone costs, including a mandatory $580 start-up fee for a telephone and charges that add up by the minute, currently make Internet surfing very expensive.

Initial costs for cell phones are so much cheaper than for a regular phone line that young Japanese, especially students, often have only a cell phone in their apartments. And the prospect of a transformation in mobile-phone technology, along with the hope of a new kind of gateway to the Web, is beginning to create a sense of optimism that Japan may be able to catch up in the Internet revolution.

"There's a huge penetration of mobile telephones in Japan," said Junichi Saeki, director of systems solutions at the International Data Corporation in Tokyo. "This will lead to the next generation of information technology."



Consumers pack the famed Akihabara electric/electronic shopping district in downtown Tokyo in January 1999. In spite of the severe recession, computers, games and cellular phones sell briskly in the district.

AP/Wide World Photos

37

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

The push has been driven by NTT's Mobile Communications Network, known as NTT DoCoMo, a cellular operator that commands more than 50 percent of the market in Japan. NTT DoCoMo is now working with American and Japanese companies to develop a new wireless transmission technology, called wideband CDMA—short for code division multiple access — that is supposed to ultimately enable people around the world to transmit data and video rapidly through a cell phone.

Many mobile-phone operators here now use a fairly narrow band, which can send data at speeds as fast as 32 kilobits a second, faster than Europe's first-generation digital phones but slower than the interim standard expected next year. True wide band offers much more space and speed—a potential of as fast as 2 megabits a second, 65 times the capability of existing phones.

Negotiators from around the world have settled on a format to move toward a wideband CDMA for the next generation of telephones, so that the same cellular phone could be used in almost any country. But carriers in the United States are still fighting over standards.

For now, the latest craze in Japan is a cell phone called the I-mode, which NTT DoCoMo started selling in February. As many as 10,000 of the phones are sold every day; already 779,000 owners use them to send E-mail, check news headlines, buy stocks, make bank transfers or plane reservations. They can gain access to specially formatted World Wide Web sites and even see simple graphics.

NTT DoCoMo is betting that Japanese consumers will get hooked on electronic commerce through I-mode phones, which rely on current technology. Once they get used to E-commerce, then the new wide band CDMA should begin, scheduled to commence in Japan in March 2001, probably several years before it will arrive in the United States and at least a few months ahead of Europe.

"I-mode is like black-and-white TV," said Keiichi Enoki, a director at DoCoMo who spearheaded the I-mode project. "CDMA is like color TV."

38

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

Kyocera is working on a competing product that would let users gain access to the Internet through a different Web protocol. In the meantime, Kyocera is promoting the notion that telephone partners will want to see each other.

Videophones have flopped in the past, and Kyocera officials admit they have not yet figured out how to market the new model. Still, when they introduced the product in May, they got some unexpected responses.

A professional matchmaker inquired about using the phones for clients on first-time dates, and a security company asked how the phones could be used to keep tabs on where its guards were patrolling.

The idea of a mobile "spy phone," though, is precisely what may scare off customers, even those directly involved in the business. The videophone is one of the pet projects of Kazuo Inamori, Kyocera's iconoclastic chairman.

But at a marketing strategy session this winter, not one in a crowd of 60 employees raised his hand when asked who would buy one. The reason? No one wanted to talk to the boss on a videophone. Kyocera went ahead anyway with the product, mainly to keep up with the competition.

Masahiro Inoue, Kyocera's director of product development for the phone, is crossing his fingers that the public will respond.

"If it is inside the home, a lady might not want to use it because she might not have her makeup on yet and she wouldn't want to reveal her naked face," Mr. Inoue said. "But if she's outside, she's well prepared to be seen. So such an application is right for the market."

39

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

APPLE INC.
Petitioner

v.

GESTURE TECHNOLOGY PARTNERS LLC
Patent Owner
_____

*Inter Partes* Review Case No. IPR2021-00920
U.S. Patent No. 7,933,431

**SUPPLEMENTAL DECLARATION OF DR. BENJAMIN B. BEDERSON**

I, Benjamin B. Bederson, hereby declare the following:

1.     My name is Benjamin B. Bederson, Ph.D and I am over 21 years of age and otherwise competent to make this Declaration. I make this Declaration based on facts and matters within my own knowledge and on information provided to me by others.

2.     I submitted an initial declaration in support of Apple's petition for *Inter Partes* Review of U.S. Patent No. 7,933,431 ("the *'431 Patent*"). I understand the PTAB instituted the requested review and that the proceeding involves the full scope of the proposed grounds addressed in my initial declaration. I have been asked to address a few additional issues in response to Patent Owner's Response (Paper 15) and Patent Owner's expert's declaration (Ex. 2002).

## I.     Numazaki's eighth embodiment's "photo-detection *sensor* unit" implements the first embodiment's photo-detection *sensors*

3.     As set forth in my initial declaration (Ex. 1008) at ¶ 39, Numazaki describes a unique image differencing structure configured with two photo-detection units 109, 110 and a lighting unit 101:

IPR2021-00920
U.S. Patent No. 7,933,431



Ex. 1003, Fig. 2, 11:9-23. I also explained at ¶ 40 that Numazaki's photo-detection units 109, 110 are imaging sensors. More specifically, they are electro-optical sensors that convert captured light into electrical signals. At ¶ 44 I explained that Numazaki's eighth embodiment (directed to allowing users to control portable devices through gestures) incorporates "the controlled light and two-camera configuration described in its first embodiment." Namely, the eighth embodiment's "window" 712 includes a lighting unit and photo-detection sensor unit implemented using the components depicted in Fig. 2 and described with respect to the first embodiment.

4.     I understand that Patent Owner and its expert, Mr. Occhiogrosso, have suggested that a POSITA would not have agreed that Numazaki's eighth embodiment implements the structure depicted in Fig. 2 based on an alleged terminology discrepancy. Namely, Patent Owner and its expert take issue with the

6.     Given the above, rather than a terminology conflict or discrepancy as Patent Owner suggests, Numazaki uses the phrase "photo-detection *sensor* unit" to describe a photo-detection unit that includes *sensors*—an entirely consistent and easy to understand designation. Accordingly, not only is Numazaki internally consistent, referring to a sensor-containing unit as a "sensor unit," but it also fully supports my conclusion that a POSITA would have understood Numazaki's Fig. 78 photo-detection sensor unit includes the photo-detecting sensors depicted in Fig. 2.

## II.     Numazaki's multi-camera gesture detection accomplishes the same goals as a single camera system with improved accuracy

7.     I understand Patent Owner and its expert argue that Numazaki's gesture detection system falls outside the scope of the '431 Patent claims because it employs multiple cameras/imaging sensors. Paper 15, 12-13; Ex. 2002, ¶¶ 57-58. I disagree. Numazaki teaches a system that captures images of an illuminated object in order to detect gestures performed by that object. This is precisely what is described in the '431 Patent and evidences that the prior art was more sophisticated than the Challenged Patent.

8.     As I stated in my initial declaration at ¶ 39, Numazaki uses its controlled lighting and two-camera arrangement to illuminate the target object (e.g., the user's hand) in a controlled manner such that a precise image of the user's hand and hand movement can be ascertained. Ex. 1003, 11:9-23. A timing control unit turns lighting unit 101 on to illuminate a target object while Numazaki's first camera

unit 109 is active, then off when the second camera unit 110 is active. *Id.* at 11:20-32. Using this lighting control, the first camera captures an image of a target object illuminated by both natural light and directed light from lighting unit 101, while the second camera captures an image of the target object illuminated by only natural light. *Id.* at 11:33-39. The difference calculation unit 111 extracts and outputs a "reflected light image" created by subtracting the first camera's captured aggregate of natural and reflected light image information from the second camera's captured natural light-only image information. *Id.* at 11:43-55. Numazaki's two-sensor structure thus improves upon a single sensor structure by ensuring that resulting image reflects only the illuminated gesture, excluding extraneous image information.

## III.  Numazaki's feature data generation unit would have been efficiently implemented as software

9.    I understand Patent Owner and its expert do not deny that Numazaki's "feature generation unit" is a programmed computer or processor, but rather argue "Numazaki does not *state* that the 'feature data generation unit' is or can be implemented as a 'programmed' computer or processor." Paper 15, 18; Ex. 2002, ¶ 73 (emphasis added). I disagree. Numazaki expressly teaches "it is [] possible to realize th[e] operation of the feature data generation unit in a form of software." Ex. 1003, 20:41-47 (further noting that "[i]t is obviously possible to realize a hardware configuration for carrying out this operation, and a configuration using both software

and hardware is also possible"). In my initial declaration, I confirmed that a POSITA would have understood the gesture detection features in Numazaki are "the same (or an equivalent)" to the programmed computer/processor disclosed in the '431 Patent. Ex. 1008, ¶ 55. Indeed, while Numazaki expressly acknowledges that implementations in hardware or a combination of software and hardware are possible, a POSITA would have recognized Numazaki's feature data generation unit would have been most efficiently implemented as software. Indeed, the functionality provided by the feature data generation unit is particularly well suited to a software implementation. Numazaki even teaches that the flowcharts in Figs. 13-15 are provided to guide the software implementation. Ex 1003, 20:36-43. No similar instruction is provided as to how a POSITA might implement the feature data generation unit in hardware. Further, Numazaki identifies an additional benefit unique to the software implementation—the feature data generation unit can be "recorded in a recording medium such as [floppy disk]" and "distributed" amongst other laptops to likewise run Numazaki's gesture-recognition technology. *Id.* at 20:45-47.

## IV. Numazaki's fifth embodiment would have necessarily transmitted information using a cellular transceiver

10. The petition construed "means for transmitting information" as "at least a cellular transceiver." Paper 1, 32-33. In my initial declaration, I described how a POSITA would have understood the "TV telephone" Numazaki describes in his fifth

embodiment as a videoconference telephone because it extracts images of "only the speaker" for transmission to another conference device out of respect to the power and communication costs involved with transmitting video and audio data. Ex. 1008, ¶ 58 (citing Ex. 1003, 39:6-16, 40:16-19). Citing an article describing the Kyocera VP-210 "Visual Phone" cellular videophone, I further explained such "videoconference telephones were also known as cellular videophones." Ex. 1008, ¶ 58. I understand that neither Patent Owner nor its expert refute these points.

11.     I also understand that Mr. Occhiogrosso admits cellular telephones do in fact communicate using cellular transceivers. Ex. 1018, 30:8-25 (stating the use of the world "cellular" implies using a cellular network), 33:19-34:2 (stating a cellular transceiver is required for use in a cellular network). I agree. It is well understood that cellular telephones use cellular transceivers to transmit information. Accordingly, a POSITA would have recognized Numazaki's TV telephone transmits information using a cellular transceiver.

## V.     Numazaki's fifth embodiment reduces the amount of information transmitted to support sending a 30 frame per second video

12.     I understand that Patent Owner argues Numazaki does not disclose a cellular telephone because its transmission rate of 30 frames per second is much higher than the two frames per second transmission rate of Japan's Kyocera VP-210 cellular videophone I referenced in my original declaration. Paper 15, 22-23 (citing Ex. 1003, 39:61-66; Ex. 1013, p. 3). I understand Patent Owner's expert argues that

the VP-210 cellular videophone's bandwidth was restricted to a two frames per second transmission rate and that Numazaki contemplates 30 frames per second. From this, he concludes that Numazaki's higher transmission rate is incompatible with cellular networks at the time, which would have led a POSITA to conclude that Numazaki's TV telephone is not a cellular videophone. Ex. 2002, ¶¶ 88-89. I disagree.

13.    Even accepting Mr. Occhiogrosso's premise that cellular networks at the time were bandwidth limited to two frames per second for full-resolution imagery, Mr. Occhiogrosso critically ignores that the entire premise of Numazaki's fifth embodiment is that it "reduce[s] considerably" the bandwidth required for video transmission. Ex. 1003, 40:41-45. In the fifth embodiment, Numazaki describes extracting only the subject from captured video, thereby reducing the video by "an order of one tenth to one hundredth." Ex. 1003, 40:29-36. Were Numazaki's original 30 frame per second video feed reduced by one hundredth, as contemplated, it requires a bandwidth sufficient to communicate 0.3 frames per second of video that has not been reduced by Numazaki's method. Because the Japanese commercial deployment supports 3 frames per second of normal video, Numazaki's bandwidth reducing method is capable of taking a 30 frames per second video feed and reducing it to occupy a mere 15% (i.e., 0.3/2) of the bandwidth used by the Kyocera VP-210 cellular phone. In fact, I implemented a video phone myself over standard telephone

lines (often called "Plain Old Telephone Service") with about 3KHz bandwidth in 1992. This was part of my dissertation work I described in my first declaration and was described in more detail in U.S. Patent 5,175,617 that I am a named inventor on. That patent described a similar technique of reducing resolution of images to achieve a "video telephone" that transmitted 4 frames per second, a speed up of about 40x in comparison to existing video over telephone systems of the time that transmitted one frame every "9 to 12 seconds" that I described in that patent (1:39). Accordingly, contrary to Mr. Occhiogrosso's argument, Numazaki's videoconference functionality would in fact have worked even with the bandwidth limited commercial Japanese network.

## VI.    Conclusion

14.    I declare that all statements made herein of my knowledge are true, and that all statements made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.


Date: _____


By: _____
    Dr. Benjamin B. Bederson

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

APPLE INC.,

Petitioner,

v.

GESTURE TECHNOLOGY PARTNERS, LLC,

Patent Owner

————————————

IPR2021-00920
U.S. Patent No. 7,933,431

————————————

**DECLARATION OF BENEDICT OCCHIOGROSSO, IN SUPPORT OF
GESTURE TECHNOLOGY PARTNERS, LLC's PATENT OWNER
RESPONSE**

### B.    "camera means"

43.    Claim element [7(b)][1] recites "a camera means . . . for obtaining an image . . . of at least one object."  It is my opinion that a camera is a well-known device to a POSITA.  Placing "means" after the word "camera" does not change its meaning to a POSITA.  Accordingly, a POSITA would interpret "a camera means" to be "a camera."

### C.    "a light source for illuminating said object

44.    Dependent claim 12 recites "Apparatus according to claim 7, further including a light source for illuminating said object."  Claim 12 depends from claim 7, which recites "a camera means . . . for obtaining an image using reflected light of at least one object." It is my opinion that a POSITA would understand claim 12, when read in light of the specification, as meaning the light source of the handheld computer apparatus illuminates the object while the "camera means" obtains an image of the object.  Indeed, the object reflects light from the light source and it is this "reflected light" that is used by the "camera means" to obtain the image of the object.

---

[1] For convenience of reference only, this Declaration adopts the claim element numbering presented in the Petition.

45.     Specifically, this understanding is based on the specification of the '431 Patent, which discloses "cameras and their associated light sources" and operating the camera "at the same time a . . . light is on." Ex. 1001, 3:31-32, 7:5-7. *See also* Ex. 1001, 8:4-8 ("object 360 [] illuminated by a light source 365 provides a time variant intensity change in the camera image 368 obtained by camera."), 9:2-6 ("reflective grating 440 on object 445 . . . [w]hen illuminated by white light for example from lamp 450, it reflects the spectrum such that when the object has moved . . . [the light] returning to camera 460 is changed.").

46.     Accordingly, a POSITA would understand claim 12 to mean the light source of the handheld computer apparatus illuminates the object while the "camera means" obtains an image of the object.

## V.    OPINIONS

47.     Petitioner challenges independent claims 1, 7, and 14, and dependent claims 2-6, 8-13, and 15-31 of the '431 Patent (the "Challenged Claims").

48.     In my opinion, as described below, Petitioner has not established by a preponderance of the evidence that the challenged claims are unpatentable.

### A.    Ground 1 – Numazaki Does Not Render Obvious Claims 1-4, 7-9, 11-22, 25, 26, and 28

49.     In my opinion, Numazaki (the "Ground 1 Reference") does not render obvious any of claims 1-4, 7-9, 11-22, 25, 26, and 28.

involves two images. Second, the analysis must be done "to determine information concerning position or movement of said object." The subtraction process makes no such determination. Accordingly, Numazaki fails to teach a computer means that performs the "analyzing" portion of claim element [7(c)].

72.     It is my understanding that claim element [7(c)] is a means-plus-function element. I also understand that the Petition construes "computer means" to "include[] a computer/processor programmed to identify natural features on an object so as to determine the object's position." Pet., p. 29. It is my opinion that Numazaki fails to teach or suggest "a computer/processor programmed to identify natural features on an object so as to determine the object's position," and thus fails to teach or suggest claim element [7(c)].

73.     To meet claim element [7(c)], the Petition cites to various algorithms performed by Numazaki's "feature data generation unit." Pet., pp. 29-30. Ex. 1003, 17:13-17 ("Referring now to FIG. 6 to FIG. 22, the second embodiment of the present invention will be described in detail. The second embodiment is directed to . . . the *feature data generation unit*.") (emphasis added). Numazaki discloses various implementations of the "feature data generation unit." *E.g.*, Ex. 1003, Fig. 21, Fig. 22, Fig. 23, and Fig, 35. Each of these "feature data generation unit" implementations consists of numerous specialized units. Petitioner has not provided any explanation as to how these specialized units correspond to a computer or

processor that has been "programmed," as required by Petitioner's construction. Pet., pp. 29-30. Further, Numazaki does not state that the "feature data generation unit" is or can be implemented as a "programmed" computer or processor.

74.     The Bederson Declaration (Ex. 1008) cites to Numazaki's "compact portable information device" to meet the corresponding structure for "computer means" in claim element [7(c)]. Ex. 1008, ¶ 55. But Numazaki does not disclose the internal hardware/circuitry of the "compact portable information device," Ex. 1003, 52:5-19, and thus Numazaki fails to disclose the "computer means" as construed by Petitioner.

75.     For at least these reasons, it is my opinion that Numazaki fails to teach or suggest claim element [7(c)], and thus Numazaki fails to render independent claim 7 unpatentable.

### 4.    Dependent Claims 8 and 9

76.     Claims 8 and 9 depend, either directly or indirectly, from and add limitations to claim 7. Numazaki fails to render claim 7 unpatentable, therefore, Numazaki fails to render dependent claims 8 and 9 unpatentable for at least the same reasons.

IPR2021-00920 Apple v. GTP
GTP EX 2002 Page 29

communication costs" and the knowledge of a POSITA, as teaching or suggesting a cellular phone.  Pet., p. 34; Ex. 1008, ¶ 60.  I disagree.

88.    Numazaki's fifth embodiment, which includes the "TV telephone," discloses a video frame rate of 30 frames per second.  Ex. 1003, 39:61-66.   In discussing the knowledge of a POSITA, the Bederson Declaration (Ex. 1008) cites to a July 1999 New York Times article ("NYT article") (Ex. 1013) describing cellphone technology.  Ex. 1008, ¶ 60.  The NYT article, which is dated _after_ the effective filing date of the '431 Patent, states that an _upcoming_ cellular videophone (Kyocera's VP-210) will be able to transmit video at "about two frames a second." Ex. 1013, p. 3.  In my opinion, if cellphones scheduled for release after the effective filing date of the '431 Patent can only transmit video at "about two frames a second," a POSITA would not have understood Numazaki's "TV telephone," which is associated with rates of 30 frames per second (fps), which is characteristic of full motion TV, as being a cellphone.  In fact, the NYT article's stated capability of 2 fps is far below even Slow – scan video (10 fps), which was typically used at the time to monitor scenes of interest with little or no anticipated action.

89.    In short, the cell phones of the time completely lacked the bandwidth required to transmit the video rate specified in Numazaki.  Ex. 1003, 39:61-66.

90.    Numazaki also does not teach that any of its devices can transmit or receive voice signal via a cellular network.  At a minimum, to be a cellular phone,

such a device must be able to make cellular phone calls. This means that the device

must be able to transmit voice and receive voice over a cellular radio network.

Numazaki teaches no such devices.

91.     For at least these reasons, it is my opinion that Numazaki fails to teach

or suggest claim 13.

### 8.     Independent Claim 14

92.     In my opinion, the Ground 1 Reference does not render obvious

independent claim 14 at least because it does not teach or suggest the following

elements of independent claim 14.

### a.  Claim element [14(b)]

93.     Claim element [14(b)] recites "associating a camera with said device,

said camera viewing at least a portion of the body of a user operating said device or

an object held by said user, in order [to] provide image data concerning said portion

or object." It is my understanding that the Petition argues that Numazaki's "photo-

detection sensor unit" is "a camera" that "provide[s] image data" and thus Numazaki

teaches or suggests this limitation. *See* Pet., p. 35 (citing the Petition's arguments

for claim elements [1(b)] and [1(c)]). In my opinion Numazaki's "photo-detection

sensor unit" does not teach or suggest "a camera" that "provide[s] image data."

94.     As I discuss above in reference to claim element [7(b)], Numazaki is

silent regarding the "photo-detection sensor unit" in Fig. 78 as being or including a

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

LG ELECTRONICS, INC. and LG ELECTRONICS U.S.A., INC.

Petitioner,

v.

GESTURE TECHNOLOGY PARTNERS, LLC

Patent Owner

_____

*Inter Partes* Review No. IPR2022-00091

**Patent No. 7,933,431**

**PATENT OWNER'S PRELIMINARY RESPONSE TO THE PETITION
FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 7,933,431
PURSUANT TO 37 C.F.R. § 42.120**

Filed on behalf of Patent Owner by:

Todd E. Landis (Reg. No. 44,200)
2633 McKinney Ave., Suite 130
Dallas, TX 75204

John Wittenzellner (Reg. No. 61,662)
1735 Market Street, Suite A #453
Philadelphia, PA 19103

Adam B. Livingston (Reg. No. 79,173)
601 Congress Avenue, Suite 600
Austin, TX 78701

**WILLIAMS SIMONS & LANDIS PLLC**

IPR2022-00091
Patent 7,933,431

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................1

II.    STATEMENT OF THE PRECISE RELIEF REQUESTED ........................3

III.   THE PETITION SHOULD BE DENIED BECAUSE IT DOES NOT ESTABLISH A REASONABLE LIKELIHOOD OF SUCCESS ON ANY CHALLENEGED CLAIM ................................................3

   A.   The '431 Patent ..........................................................3

   B.   Level of Ordinary Skill in the Art ................................5

   C.   Claim Construction......................................................5

       1.   The preambles of independent claims 1, 7, and 14 should be construed as limitations.........................5

   D.   Ground 1 – Numazaki Does Not Render Obvious Claims 1-4, 7-9, 11-22, 25, 26, and 28 ...........................................9

       1.   Independent Claim 1 ............................................9

           i.   [1(c)] electro-optically sensing light reflected from said at least one finger using a sensing means associated with said device; determining from said sensed light the movement of said finger .......................9

       2.   Dependent Claim 2........................................12

       3.   Dependent Claim 3........................................12

       4.   Dependent Claim 4........................................12

       5.   Independent Claim 7 .....................................13

           i.   [7(b)] a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object.................................................13

           ii.  [7(c)] computer means within said housing for analyzing said image to determine information concerning a position or movement of said object.........14

6.    Dependent Claim 8..................................................15

7.    Dependent Claim 9..................................................15

8.    Dependent Claim 11 ..............................................16

9.    Dependent Claim 12 ..............................................17

10.   Dependent Claim 13 ..............................................17

11.   Independent Claim 14 ............................................17

      i.    [14(b)] associating a camera with said device, said
            camera viewing at least a portion of the body of a
            user operating said device or an object held by said
            user, in order provide image data concerning said
            portion or object..............................................17

      ii.   [14(c)] using said computer, analyzing said image
            data to determine information concerning a user
            input command ..............................................18

12.   Dependent Claim 15 ..............................................20

13.   Dependent Claim 16 ..............................................20

14.   Dependent Claim 17 ..............................................20

15.   Dependent Claim 18 ..............................................21

16.   Dependent Claim 19 ..............................................21

17.   Dependent Claim 20 ..............................................21

18.   Dependent Claim 21 ..............................................22

19.   Dependent Claim 22 ..............................................22

20.   Dependent Claim 25 ..............................................22

21.   Dependent Claim 26 ..............................................22

22.   Dependent Claim 28 ..............................................23

E.      Ground 2 – The Combination of Numazaki and DeLeeuw Does Not Render Obvious Claims 5, 6, and 29 ....................................................23

F.      Ground 3 – The Combination of Numazaki and DeLuca Does Not Render Obvious Claims 10, 23, 24, and 27 .........................................23

G.      Ground 4 – The Combination of Numazaki and Peters Does Not Render Obvious Claims 30 and 31 .......................................................24

IV.     THE PETITION SHOULD BE DENIED FOR FAILURE TO COMPLY WITH 37 C.F.R. § 42.104(b)(3)-(4) ...............................................................24

V.      BOTH THE PETITION AND PETITITIONER's JOINDER MOTION SHOULD BE DENIED UNDER 35 U.S.C § 314(a) ....................................25

A.      *General Plastic* Factors ........................................................................26

B.      *General Plastic* Factor One ................................................................28

C.      *General Plastic* Factor Two ................................................................30

D.      *General Plastic* Factor Three ..............................................................31

E.      *General Plastic* Factors Four and Five................................................32

F.      *General Plastic* Factor Six .................................................................33

VI.     THE PETITION AND PETITIONER'S JOINDER MOTION SHOULD BE DENIED UNDER 35 U.S.C. § 315(d) .....................................................34

VII.    THE PETITION SHOULD BE DENIED BECAUSE THE BOARD DOES NOT HAVE JURISDICTION OVER EXPIRED PATENTS ...........35

VIII.   CONCLUSION..............................................................................................36

# TABLE OF AUTHORITIES

## Cases

*Acceleration Bay, LLC v. Activision Blizzard, Inc.*,
908 F.3d 765 (Fed. Cir. Nov. 6, 2018) ....................................................6

*Apple Inc. v. Gesture Technology Partners, LLC*,
IPR2021-00920, Paper 1 (P.T.A.B. May 21, 2021).............................28

*Apple Inc. v. Gesture Technology Partners, LLC*,
IPR2021-00920, Paper 12 (P.T.A.B. Dec. 6, 2021)............................33

*Apple Inc. v. Uniloc 2017 LLC*,
IPR2020-00854, Paper 9 (P.T.A.B. Oct. 28, 2020) .............. 25, 27, 31

*Catalina Mktg.Int'l, Inc. v. Coolsavings.com, Inc.*,
289 F.3d 801 (Fed. Cir. 2002) ................................................................6

*Cuozzo Speed Techs., LLC v. Lee*,
136 S. Ct. 2131 (2016) .........................................................................25

*General Plastic Indus. Co. v. Canon Kabushiki Kaisha*,
IPR2016-01357, Paper 19 (P.T.A.B. Sept. 6, 2017) .................. passim

*Gesture Technology Partners, LLC v. Apple Inc.*,
No. 6:21-cv-00121 (W.D. Tex. Feb 4, 2021).......................................29

*Gesture Technology Partners, LLC v. LG Electronics, Inc.*,
No. 6:21-cv-00123 (W.D. Tex. Feb 4, 2021).......................................29

*NetApp Inc. v. Realtime Data LLC*,
IPR2017-01195, Paper 9 (P.T.A.B. Oct. 12, 2017).............................28

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
138 S. Ct. 1365 (2018) .........................................................................35

*Unified Patents, LLC v. Gesture Technology Partners, LLC*,
IPR2021-00917, Paper 1 (P.T.A.B. May 14, 2021)................. 29, 30, 31

*Valve Corp. v. Electronic Scripting Products, Inc.*,
  IPR2019-00064, Paper 10 (P.T.A.B. May 1, 2019) (precedential)......................32

*Valve Corporation v. Electronic Scripting Products, Inc*.,
  IPR2019-00062, Paper 11  (P.T.A.B. April 2, 2019).........................................28

**Statutes**

35 U.S.C. § 112(f)...................................................................................25
35 U.S.C. § 314(a) ...................................................................... 25, 26, 27, 36
35 U.S.C. § 315(c) ...................................................................................25
35 U.S.C. § 315(d) ............................................................................... 34, 36
35 U.S.C. § 315(e)(1)................................................................................34
35 U.S.C. § 316(a)(11)..............................................................................27
37 C.F.R. § 42.104(b) ...............................................................................24
37 C.F.R. § 42.104(b)(3)............................................................................24
37 C.F.R. § 42.104(b)(3)-(4).......................................................................24

## I.   INTRODUCTION

Gesture Technology Partners, LLC ("GTP" or "Patent Owner") respectfully submits this Preliminary Response (the "Response") to LG Electronics, Inc. and LG Electronics U.S.A., Inc. (collectively, "LG" or "Petitioner") Petition for *Inter Partes* Review ("IPR") No. IPR2022-00091 (the "Petition" or "Pet.") of U.S. Patent No. 7,933,431 (the "'431 Patent"). Patent Owner notes that LG has filed a motion to join IPR2021-00920 ("J.Mot."). Paper 3.

Institution should be denied because the Petition fails to demonstrate a reasonable likelihood that any challenged claim of the '431 Patent is unpatentable. As detailed herein, the reference (*Numazaki*) applied by the Petition against all independent claims of the '431 Patent has numerous glaring deficiencies, including failing to teach to suggest at least the following limitations:

- [1(c)][1] electro-optically sensing light reflected from said at least one finger using a sensing means associated with said device; determining from said sensed light the movement of said finger;

---

[1] For convenience of reference only, this Preliminary Response adopts the claim element numbering presented in the Petition.

- [7(b)] a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object;

- [7(c)] computer means within said housing for analyzing said image to determine information concerning a position or movement of said object;

- [14(b)] associating a camera with said device, said camera viewing at least a portion of the body of a user operating said device or an object held by said user, in order provide image data concerning said portion or object; and

- [14(c)] using said computer, analyzing said image data to determine information concerning a user input command.

Further, the Board should also deny institution because the Petition fails to comply with 37 C.F.R. § 42.104(b)(3)-(4).

Further still, institution should be denied for the additional reason that the Board should exercise its discretionary power to deny institution under 35 U.S.C. §§ 314(a) and/or 315(d).

Finally, the Petition should be denied because the Board does not have jurisdiction over expired patents.

For these reasons, institution should be denied.

## II.    STATEMENT OF THE PRECISE RELIEF REQUESTED

Patent Owner requests that the Board deny institution of the Petition with respect to all challenged claims and all asserted grounds.  A full statement of the reasons for the relief requested is set forth in Sections III-VII of this Response.

## III.    THE PETITION SHOULD BE DENIED BECAUSE IT DOES NOT ESTABLISH A REASONABLE LIKELIHOOD OF SUCCESS ON ANY CHALLENEGED CLAIM

As shown below, the Petition fails to demonstrate a reasonable likelihood that Petitioner would prevail with respect to any claim of the '431 Patent.  The Petition challenges claims 1-31 of the '431 Patent (the "Challenged Claims").  Pet., p. 1.  As detailed herein, each proposed Ground fails to disclose key limitations of each Challenged Claim.  Trial should not be instituted.

### A.    The '431 Patent

The '431 Patent, which is entitled "Camera Based Sensing in Handheld, Mobile, Gaming or Other Devices," claims priority to U.S. Provisional Application No. 60/142,777 filed on July 8, 1999.  *See* Ex. 1001.  The '431 Patent is directed towards methods and apparatuses "to enable rapid TV camera and computer-based sensing in many practical applications, including, but not limited to, handheld devices, cars, and video games."  *Id.*, Abstract.  In some embodiments, the patent describes the use of computer devices and one or more cameras that "optically

sens[e] human input" with applications in a "variety of fields such as computing,

gaming, medicine, and education." *Id.*, 2:7-17.

In some embodiments, the '431 Patent discloses a handheld device, such as a

cell phone, that processes imaging from a person or object to control functions on

the handheld device. *Id.*, 11:62:-67. Figure 8A, which is reproduced below, depicts

some embodiments in which a handheld device includes the functionality of the

invention.



*FIG. 8A*

Ex. 1001, Fig. 8A.

The '431 Patent describes that the handheld device can "perform a control

function by determining [] position, orientation, pointing direction or other variable

with respect to one or more external objects, using an optical sensing apparatus . . . or with a camera located in the handheld device, to sense datums or other information external for example to the device." *Id.*, 12:1-9. The '431 Patent describes that the device is able to "acquire features of an object and use it to determine something" such as object recognition. *Id.* at 13:5-21. The '431 Patent states that the purpose of some handheld embodiments is "to add functionality to the device, without complicating its base function, and/or alternatively [to] add a method to interact with the device to achieve other purposes." *Id.* at 11:64-67.

## B.    Level of Ordinary Skill in the Art

For the purposes of this Response only, Patent Owner does not dispute the level of skill of a person of ordinary skill in the art ("POSITA") identified in the Petition. Pet., p. 3.

## C.    Claim Construction

Except for the claim term discussed below, Patent Owner does not contest the constructions proposed in the Petition for the purpose of this response. *See* Pet., pp. 5-11. Patent Owner reserves the right to address claim construction of any term in the Challenged Claims if the Board institutes *inter partes* proceedings.

### 1.    The preambles of independent claims 1, 7, and 14 should be construed as limitations.

The preambles of claims 1, 7, and 14 should be construed as limitations. "A preamble limits the invention if it recites essential structure or steps, or is 'necessary

to give life, meaning, and vitality' to the claim." *Acceleration Bay, LLC v. Activision Blizzard, Inc.*, 908 F.3d 765, 770 (Fed. Cir. Nov. 6, 2018) (quoting *Catalina Mktg.Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002)). The preambles of claims 1, 7, and 14 do both. Independent claims 1, 7, and 14 are reproduced below.

> 1. A method for controlling a <u>handheld computing device</u> comprising the steps of:
>
> holding said <u>device</u> in one hand;
>
> moving at least one finger in space in order to signal a command to said <u>device</u>;
>
> electro-optically sensing light reflected from said at least one finger using a sensing means associated with said <u>device</u>;
>
> determining from said sensed light the movement of said finger, and
>
> using said sensed finger movement information, controlling said <u>device</u> in accordance with said command.

Ex. 1001, 25:40-50 (emphasis added).

> 7. <u>Handheld computer apparatus</u> comprising:
>
> a housing;

a camera means associated with said housing for obtaining an image

using reflected light of at least one object positioned by a user

operating said object;

computer means within said housing for analyzing said image to

determine information concerning a position or movement of

said object; and

means for controlling a function of said <u>apparatus</u> using said

information.

Ex. 1001, 25:61-26:5 (emphasis added).

14. A method for controlling a <u>handheld computing device</u> comprising the

steps of:

providing a computer within said <u>device</u>;

associating a camera with said <u>device</u>, said camera viewing at least a

portion of the body of a user operating said <u>device</u> or an object

held by said user, in order provide image data concerning said

portion or object;

using said computer, analyzing said image data to determine

information concerning a user input command; and

from said determined information, controlling a function of said <u>device</u>.

Ex. 1001, 26:18-28 (emphasis added).

The preamble of claim 1 recites: "a handheld computing device." As shown, multiple limitations within claim 1 refer back to the same handheld computing device for antecedent basis. Moreover, claim 1 explicitly requires "holding said device in one hand," which only reinforces that "the device" must be the "handheld computing device," as set forth in the preamble of claim 1. Similarly, the preamble of claim 7 recites "handheld computer apparatus." The final limitation of claim 7 refers back to the same handheld computer apparatus for antecedent basis. And, finally, the preamble of claim 14 recites: "handheld computing device." As shown, multiple limitations within claim 14 refer back to the same handheld computing device for antecedent basis. So the preambles recite essential structure for claims 1, 7, and 14.

The preambles are also necessary to give life, meaning, and vitality to claims 1, 7, and 14. The '431 Patent discloses different embodiments of Dr. Pryor's inventions. In some embodiments, the invention is provided in the form of a computer. *See, e.g.,* Ex. 1001, Fig. 1A. In some other embodiments, the invention is provided in a handheld device, such as a cell phone. *See id.*, 12:59-13:7. Claims 1, 7, and 14 purposely recite a "handheld computing device" or "handheld computing apparatus" to claim the handheld-device embodiments disclosed in the specification. Thus, the preamble is necessary to give life, meaning, and vitality to claims 1, 7, and 14, consistent with the embodiments that the inventor chose to claim.

### D.  Ground 1 – Numazaki Does Not Render Obvious Claims 1-4, 7-9, 11-22, 25, 26, and 28

Numazaki does not render obvious claims 1-4, 7-9, 11-22, 25, 26, and 28.

#### 1.  Independent Claim 1

Numazaki does not render independent claim 1 obvious because it does not teach or suggest at least the following elements of independent claim 1.

> #### i.  [1(c)] electro-optically sensing light reflected from said at least one finger using a sensing means associated with said device; determining from said sensed light the movement of said finger

Claim element [1(c)] recites "electro-optically sensing light reflected from said at least one finger using a sensing means associated with said device; determining from said sensed light the movement of said finger."  Claim element [1(c)] requires "determining" finger movement from reflected light that is "electro-optically" sensed using one "sensor means."  The Petition contends that Numazaki teaches or suggests claim element [1(c)].  Pet., pp. 17-18.  It does not.

The Petition fails to provide any construction for the term "sensing means." *See id.*  The Petition also fails to expressly identify which components in Numazaki correspond to the claimed "sensing means." *See id.*  For purposes of this response, Patent Owner assumes that Petitioner has identified the "camera units" as corresponding to the "sensing means" term.

It is worth noting, however, that Numzaki does not use the term "camera unit." Instead, the Petition uses the term "camera units" to refer to what Numazaki describes as "photo-detection units." *Compare* Pet., p. 18 ("when the first camera unit is active and off when the second camera unit is active.") (citing Ex. 1003, 11:20-32) *with* Ex. 1003, 11:28-32 ("such that the lighting unit 101 emits the light when the first photo-detection unit 109 is in a photo-detecting state, whereas the lighting unit 101 does not emit the light when the second photo-detection unit 110 is in a photodetecting state."). This response will use the term "photo-detection unit" (i.e., the term used in Numazaki) to refer to what the Petition identifies as "camera units" to be consistent with the disclosure of Numazaki.

Numazaki requires <u>two</u> photo-detection units to perform an analysis of a target object and control a computer. Numazaki discloses a "reflected light extraction unit 102" with a "first photo-detection unit 109," a "second photo-detection unit 110," and a "difference calculation unit 111." Ex. 1003, 10:57-66; 11:20-51; Fig. 2. The first photo-detection unit 109 requires that a lighting unit 101 emit light during detection. *Id*. at 11:26-30, Fig. 2. Later, at a different time, when first photo-detection unit 109 is not active, the second photo-detection unit 110 detects while lighting unit 101 is not active. *Id*., 11:30-32, Fig. 2. Those two images—the image from first photo-detection unit 109 and the image from the second photo-detection unit 110—are then subtracted from each other before the information is used in the

remainder of the system to analyze the target object and control a computer.  *See id.*, 10:57-66; 11:43-56.  Thus, Numazaki's first embodiment requires: (1) two, not one, photo-detection units; (2) a lighting unit for illumination; (3) timing circuitry that selectively activates the lighting unit based on which photo-detection unit is active; and (4) circuitry for subtracting one image from another.  Petitioner agrees that Numazaki requires two photo-detection units to perform an analysis of a target object and control a computer.  *See* Pet., pp. 12-15 and 18.

Numazaki requires two photo-detection units to perform an analysis of a target object and control the computer, so it does not teach or suggest "determining" finger movement from reflected light that is "electro-optically" sensed using one "sensor means," as set forth in claim element [1(c)].  Similarly, Numazaki does not teach or suggest "determining" finger movement absent the other hardware that Numazaki identifies as necessary, such as the lighting unit, the image-subtraction circuitry, and the associated timing circuitry.  The Petition does not recognize this deficiency in Numazaki.  *See* Pet., pp. 12-15 and 18.  Nor does it argue that it would have been obvious to modify Numazaki to meet this claim element.  *See id.*

For at least these reasons, Numazaki fails to teach or suggest claim element [1(c)].  Accordingly, Numazaki fails to render independent claim 1 unpatentable.

### 2.    Dependent Claim 2

Dependent claim 2 recites "A method according to claim 1, wherein at least one camera is utilized to effect said electro-optical sensing." Claim 2 depends from and adds limitations to claim 1. Numazaki fails to render claim 1 unpatentable, therefore, Numazaki fails to render dependent claim 2 unpatentable for at least the same reasons.

### 3.    Dependent Claim 3

Dependent claim 3 recites "A method according to claim 1, including the further step of acquiring an image of at least a portion of the user of the device." Claim 3 depends from and adds limitations to claim 1. Numazaki fails to render claim 1 unpatentable, therefore, Numazaki fails to render dependent claim 3 unpatentable for at least the same reasons.

### 4.    Dependent Claim 4

Dependent claim 4 recites "A method according to claim 1, wherein said movement is sensed in 3 dimensions." Claim 4 depends from and adds limitations to claim 1. Numazaki fails to render claim 1 unpatentable, therefore, Numazaki fails to render dependent claim 4 unpatentable for at least the same reasons.

### 5.     Independent Claim 7

Numazaki does not render independent claim 7 obvious because it does not teach or suggest the following elements of independent claim 7:

> **i.     [7(b)] a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object**

Claim element [7(b)] recites "a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object."  The Petition contends that Numazaki teaches or suggests this limitation.  Pet., pp. 25-27.  It does not.

Under Petitioner's proposed construction, the "camera means" term is an "optical image sensor."  Pet., pp. 5-6.  Numazaki does not teach or suggest one optical image sensor (i.e., one camera means) to obtain an image.  As discussed above, Numazaki requires two photo-detection units.  *See* claim 1, *supra*.  The Petition even concedes that Numazaki requires two photo-detection units.  Pet., pp. 12, 13, 18, and 26.  The Petition does not address this deficiency in Numazaki, nor does it assert that it would have been obvious to a skilled artisan to modify Numazaki such that it meets this claim element.  *See* Pet., pp. 25-27.  For at least these reasons, Numzaki fails to teach or suggest claim element [7(b)].

### ii.    [7(c)] computer means within said housing for analyzing said image to determine information concerning a position or movement of said object

Claim element [7(c)] recites "computer means within said housing for analyzing said image to determine information concerning a position or movement of said object." Claim element [7(c)] requires, in part, that the "computer means" be capable of analyzing an image from one camera means to determine position or movement information of the object. *Compare* claim element [7(c)] *with* claim element [7(b)]. The Petition contends that Numazaki teaches or suggests this limitation. Pet., 27-28. It does not.

As discussed above, to perform an analysis (e.g., tracking) of a target object, Numazaki requires: (1) two, not one, images from different photo-detection units; (2) a lighting unit for illumination; (3) timing circuitry that selectively activates the lighting unit based on which photo-detection unit is active; and (4) circuitry for subtracting one image from another. *See* claim 1, *supra*. *See also* Ex. 1003, 10:57-66; 11:20-56; Fig. 2.

Under Petitioner's proposed construction, the "camera means" term is an "optical image sensor." Pet., p. 6. Claim element 7 requires that the optical image sensor obtain an image. Ex. 1001, 25:63-65. Under Petitioner's proposed construction of the "computer means . . ." term, the corresponding structure must be capable of analyzing a target object captured by one camera means (i.e., one "optical

image sensor"). The alleged "computer means" taught by Numazaki cannot analyze a target object captured by one optical image sensor. Similarly, alleged "computer means" taught by Numazaki cannot analyze a target object absent the other hardware that Numazaki identifies as necessary, such as the lighting unit, the image-subtraction circuitry, and the associated timing circuitry. The Petition does not recognize this deficiency in Numazaki. *See* Pet., pp. 12-15 and 25-27. Nor does it argue that it would have been obvious to modify Numazaki to meet this claim element. *See id.* Accordingly, Numazaki does not teach or suggest the corresponding structure for performing the recited function of claim element [7(c)].

For at least these reasons, Numazaki fails to render independent claim 7 unpatentable.

### 6.    Dependent Claim 8

Dependent claim 8 recites "Apparatus according to claim 7, wherein said object is a finger." Claim 8 depends from and adds limitations to claim 7. Numazaki fails to render claim 7 unpatentable, therefore, Numazaki fails to render dependent claim 8 unpatentable for at least the same reasons.

### 7.    Dependent Claim 9

Dependent claim 9 recites "Apparatus according to claim 7, further including a display function which is controlled." Claim 9 depends from and adds limitations

to claim 7.  Numazaki fails to render claim 7 unpatentable, therefore, Numazaki fails to render dependent claim 9 unpatentable for at least the same reasons.

### 8.    Dependent Claim 11

Dependent claim 11 recites "Apparatus according to claim 7, further including means for transmitting information."  Claim 11 depends from and adds limitations to claim 7.  Numazaki fails to render claim 7 unpatentable, therefore, Numazaki fails to render dependent claim 11 unpatentable for at least the same reasons.

Moreover, the Petition fails to provide any analysis regarding whether Numazaki discloses this limitation under Petitioner's proposed construction of the term "means for transmitting information."  *See* Pet., p. 30.  The Petition asserts that the corresponding structure for this limitation is "at least a cellular transceiver."  *See id.*, pp. 10-11.

The Petition fails to identify any cellular transceiver in Numazaki.  *See* Pet., p. 30.  Instead, the Petition relies on the so-called fifth embodiment of Numazaki, which is part of a "conference record system."  *See id.*  The Petition fails to identify the transmitter in that embodiment, let alone provide any analysis regarding whether the transmitter allegedly disclosed in Numazaki is an equivalent of the "cellular transceiver" proposed by Petitioner.  *See id.*

### 9.    Dependent Claim 12

Dependent claim 12 recites "Apparatus according to claim 7, further including a light source for illuminating said object."  Claim 12 depends from and adds limitations to claim 7.  Numazaki fails to render claim 7 unpatentable, therefore, Numazaki fails to render dependent claim 12 unpatentable for at least the same reasons.

### 10.    Dependent Claim 13

Dependent claim 13 recites "Apparatus according to claim 7, wherein said apparatus is a cellular phone."  Claim 13 depends from and adds limitations to claim 7.  Numazaki fails to render claim 7 unpatentable, therefore, Numazaki fails to render dependent claim 13 unpatentable for at least the same reasons.

### 11.    Independent Claim 14

Numazaki does not render independent claim 14 obvious because it does not teach or suggest the following elements of independent claim 14:

**i.    [14(b)] associating a camera with said device, said camera viewing at least a portion of the body of a user operating said device or an object held by said user, in order provide image data concerning said portion or object**

Claim element [14(b)] recites "associating a camera with said device, said camera viewing at least a portion of the body of a user operating said device or an object held by said user, in order provide image data concerning said portion or

object." Claim element [14(b)] requires, in part, one camera viewing a body portion or an object to provide image data. The Petition contends that Numazaki teaches or suggests this limitation. Pet., p. 33. It does not.

As discussed above, Numazaki requires two photo-detection units. *See* claim 1, *supra*. The Petition even concedes that Numazaki requires two photo-detection units. Pet., pp. 12, 13, 18, and 26. Accordingly, Numazaki does not teach or suggest one camera viewing a body portion or an object to provide image data. The Petition does not address this deficiency in Numazaki, nor does it assert that it would have been obvious to a skilled artisan to modify Numazaki such that it meets this claim element. *See* Pet., pp. 25-27 and 33. For at least these reasons, Numzaki fails to teach or suggest claim element [14(b)].

> ### ii.   [14(c)] using said computer, analyzing said image data to determine information concerning a user input command

Claim element [14(c)] recites "using said computer, analyzing said image data to determine information concerning a user input command." Claim element [14(c)] requires, in part, "analyzing" the "image data" from the one camera to "determine information concerning a user input command." *Compare* claim element [14(c)] *with* claim element [14(b)]. The Petition contends that Numazaki teaches or suggests this limitation. Pet., 33. It does not.

As discussed above, to perform an analysis (e.g., tracking) of a target object and control a computer, Numazaki requires: (1) two, not one, images from different photo-detection units; (2) a lighting unit for illumination; (3) timing circuitry that selectively activates the lighting unit based on which photo-detection unit is active; and (4) circuitry for subtracting one image from another. *See* claim 1, *supra*. *See also* Ex. 1003, 10:57-66; 11:20-56; Fig. 2.

Numazaki requires <u>two</u> images from different photo-detection units to perform an analysis of a target object and control the computer, so it does not teach or suggest "analyzing" the "image data" from the one camera to "determine information concerning a user input command," as set forth in claim element [14(c)]. Similarly, Numazaki does not teach or suggest "analyzing" image data absent the other hardware that Numazaki identifies as necessary, such as the lighting unit, the image-subtraction circuitry, and the associated timing circuitry. The Petition does not recognize this deficiency in Numazaki. *See* Pet., pp. 12, 13, 18, and 26. Nor does it argue that it would have been obvious to modify Numazaki to meet this claim element. *See id.* Accordingly, Numazaki does not teach or suggest the corresponding structure for performing the recited function of claim element [14(c)].

For at least these reasons, Numazaki fails to render independent claim 14 unpatentable.

IPR2022-00091
Patent 7,933,431

### 12. Dependent Claim 15

Dependent claim 15 recites "A method according to claim 14, wherein reflected light from said body portion or object is imaged by said camera." Claim 15 depends from and adds limitations to claim 14. Numazaki fails to render claim 14 unpatentable, therefore, Numazaki fails to render dependent claim 15 unpatentable for at least the same reasons.

### 13. Dependent Claim 16

Dependent claim 16 recites "A method according to claim 14, wherein said information includes the position of the portion or object." Claim 16 depends from and adds limitations to claim 14. Numazaki fails to render claim 14 unpatentable, therefore, Numazaki fails to render dependent claim 16 unpatentable for at least the same reasons.

### 14. Dependent Claim 17

Dependent claim 17 recites "A method according to claim 14, wherein said information includes the change in position of the portion or object." Claim 17 depends from and adds limitations to claim 14. Numazaki fails to render claim 14 unpatentable, therefore, Numazaki fails to render dependent claim 17 unpatentable for at least the same reasons.

### 15.    Dependent Claim 18

Dependent claim 18 recites "A method according to claim 14, wherein said information includes the velocity or path of the portion or object." Claim 18 depends from and adds limitations to claim 14. Numazaki fails to render claim 14 unpatentable, therefore, Numazaki fails to render dependent claim 18 unpatentable for at least the same reasons.

### 16.    Dependent Claim 19

Dependent claim 19 recites "A method according to claim 14, wherein said information is obtained in 3 dimensions." Claim 19 depends from and adds limitations to claim 14. Numazaki fails to render claim 14 unpatentable, therefore, Numazaki fails to render dependent claim 19 unpatentable for at least the same reasons.

### 17.    Dependent Claim 20

Dependent claim 20 recites "A method according to claim 14, wherein said information includes the pointing direction of the portion or object." Claim 20 depends from and adds limitations to claim 14. Numazaki fails to render claim 14 unpatentable, therefore, Numazaki fails to render dependent claim 20 unpatentable for at least the same reasons.

### 18.    Dependent Claim 21

Dependent claim 21 recites "A method according to claim 14, wherein a display is controlled."  Claim 21 depends from and adds limitations to claim 14. Numazaki fails to render claim 14 unpatentable, therefore, Numazaki fails to render dependent claim 21 unpatentable for at least the same reasons.

### 19.    Dependent Claim 22

Dependent claim 22 recites "A method according to claim 21, wherein a virtual image on said display is moved or changed."  Claim 22 depends from and adds limitations to claim 21.  Numazaki fails to render claim 21 unpatentable, therefore, Numazaki fails to render dependent claim 22 unpatentable for at least the same reasons.

### 20.    Dependent Claim 25

Dependent claim 25 recites "A method according to claim 14, including the further step of transmitting data to a further device."  Claim 25 depends from and adds limitations to claim 14.  Numazaki fails to render claim 14 unpatentable, therefore, Numazaki fails to render dependent claim 25 unpatentable for at least the same reasons.

### 21.    Dependent Claim 26

Dependent claim 26 recites "A method according to claim 14, wherein said camera operates at 30 frames per second or greater."  Claim 26 depends from and

adds limitations to claim 14. Numazaki fails to render claim 14 unpatentable, therefore, Numazaki fails to render dependent claim 26 unpatentable for at least the same reasons.

### 22.    Dependent Claim 28

Dependent claim 28 recites "A method according to claim 14, including the further step of acquiring a picture of the user of the handheld device." Claim 28 depends from and adds limitations to claim 14. Numazaki fails to render claim 14 unpatentable, therefore, Numazaki fails to render dependent claim 28 unpatentable for at least the same reasons.

### E.    Ground 2 – The Combination of Numazaki and DeLeeuw Does Not Render Obvious Claims 5, 6, and 29

Dependent claims 5, 6, and 29 depend from and add limitations to claim 1 or claim 14. For at least the reasons discussed above with respect to Ground 1, Numazaki does not teach or suggest one or more limitations of claim 1 and claim 14. DeLeeuw does not remedy those deficiencies, and the Petition does not so assert. *See* Pet., pp. 45-48. Therefore, the combination of Numazaki and DeLeeuw fails to render dependent claims 5, 6, and 29 unpatentable.

### F.    Ground 3 – The Combination of Numazaki and DeLuca Does Not Render Obvious Claims 10, 23, 24, and 27

Dependent claims 10, 23, 24, and 27 depend indirectly from and add limitations to claim 7 or claim 14. For at least the reasons discussed above with

respect to Ground 1, Numazaki does not teach or suggest one or more limitations of claim 7 and claim 14. DeLuca does not remedy those deficiencies, and the Petition does not so assert. *See* Pet., pp. 48-57. Therefore, the combination of Numazaki and DeLuca fails to render dependent claims 10, 23, 24, and 27 unpatentable.

### G. Ground 4 – The Combination of Numazaki and Peters Does Not Render Obvious Claims 30 and 31

Dependent claims 30 and 31 depend from and add limitations to claim 14. For at least the reasons discussed above with respect to Ground 1, Numazaki does not teach or suggest one or more limitations of claim 14. Peters does not remedy those deficiencies, and the Petition does not so assert. *See* Pet., pp. 57-61. Therefore, the combination of Numazaki and Peters fails to render dependent claims 30 and 31 unpatentable.

## IV. THE PETITION SHOULD BE DENIED FOR FAILURE TO COMPLY WITH 37 C.F.R. § 42.104(b)(3)-(4)

The Petition must identify how each challenged claim is to be construed. *See* 37 C.F.R. § 42.104(b). For means-plus-function terms, the Petition "must identify the specific portions of the specification that describe the structure, material, or acts corresponding to each claimed function." *See* 37 C.F.R. § 42.104(b)(3). The Petition fails to construe the term "sensing means," which is recited in independent claim 1. *See* Ex. 1001, 25:44-46. The term includes the word "means," but Petitioner fails to identify whether the term requires construction under 35 U.S.C. §

112(f).[2]  By contrast, the Petition provides a construction for the "camera means" limitation recited in claim 7, even though Petitioner contends that the term does not require construction pursuant to 35 U.S.C. § 112(f).  *See* Pet., pp. 6-7.  By failing to show how independent claim 1 (and dependent claims 2-6) is to be construed in accordance with 37 C.F.R. § 42.104(b)(3), Petitioner also fails to show how, as so construed, challenged claim 1 is unpatentable under the statutory grounds identified in the Petition, and thus trial should not be instituted.  *See* 37 C.F.R. § 42.104(b)(4).

## V.    BOTH THE PETITION AND PETITITIONER's JOINDER MOTION SHOULD BE DENIED UNDER 35 U.S.C § 314(a)

The Board has discretion as to whether to institute *inter partes* review.  *See* 35 U.S.C. § 314(a); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2140 (2016) ("[T]he agency's decision to deny a petition is a matter committed to the Patent Office's discretion.").  Even when Petitioner files a motion to join, the Board first decides whether to institute the IPR before reaching the joinder decision.  *Apple Inc. v. Uniloc 2017 LLC*, IPR2020-00854, Paper 9 at 5 (P.T.A.B. Oct. 28, 2020) (precedential) ("Under 35 U.S.C. § 315(c), the discretion of the Director to join a party to an ongoing IPR is premised on the Director's determination that the petition

---

[2] Patent Owner does not contend that the term "sensing means" requires construction under 35 U.S.C. § 112(f).

warrants institution.).  The Petition should be denied, and thus Petitioner's joinder motion should also be denied, under 35 U.S.C. § 314(a) in view of the *General Plastic* factors.

### A.    *General Plastic* Factors

In *General Plastic*, the Board recognized "the potential for abuse of the review process by repeated attacks on patents." *General Plastic Indus. Co. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19 at 17 (P.T.A.B. Sept. 6, 2017) (precedential).  To mitigate such abuse, the Board identified seven factors that it considers in determining whether to institute decision of a subsequent petition:

1. whether the same petitioner previously filed a petition directed to the same claims of the same patent;

2. whether at the time of filing of the first petition the petitioner knew of the prior art asserted in the second petition or should have known of it;

3. whether at the time of filing of the second petition the petitioner already received the patent owner's preliminary response to the first petition or received the Board's decision on whether to institute review in the first petition;

4. the length of time that elapsed between the time the petitioner learned of the prior art asserted in the second petition and the filing of the second petition;

5. whether the petitioner provides adequate explanation for the time elapsed between the filings of multiple petitions directed to the same claims of the same patent;

6. the finite resources of the Board; and

7. the requirement under 35 U.S.C. § 316(a)(11) to issue a final determination not later than 1 year after the date on which the Director notices institution of review.

*Id.*, Paper 19 at 16.   Petitioner contends that the *General Plastic* factors are inapplicable here because the Petition "does not present any new grounds" and "Petitioner would [only] be taking an understudy role" following the joinder with IPR2021-00920.  Paper 3, p. 9.  Patent Owner disagrees.  The *General Plastic* factors remain applicable even when, like the present case, a joinder motion has been filed and the later filed IPR petition is substantially identical to the earlier filed IPR petition.  *Apple Inc. v. Uniloc 2017 LLC*, IPR2020-00854, Paper 9 at 5 (P.T.A.B. Oct. 28, 2020) (precedential) ("[E]ven though the Petition is a 'me-too petition,' we first determine whether application of the *General Plastic* factors warrants the exercise of discretion to deny the Petition under § 314(a)."), 8 ("[T]he General Plastic factors are relevant to our determination whether denial is warranted under § 314(a), even when the petition filed is a follow-on petition and Petitioner is not

seeking an active role in the ongoing IPR.").  In the present case, the *General Plastic* factors overwhelmingly favor denying institution.

## B.    *General Plastic* Factor One

Under the first *General Plastic* factor, the Board considers "whether the same petitioner filed a petition directed to the same claims of the same patent."  *General Plastic*, Paper 19 at 16.  In *Valve Corporation*, the Board clarified that the "application of the *General Plastic* factors is not limited solely to instances when multiple petitions are filed by the same petitioner.  Rather, when different petitioners challenge the same patent, [the Board considers] any relationship between those petitioners when weighing the *General Plastic* factors."  *Valve Corporation v. Electronic Scripting Products, Inc.*, IPR2019-00062, Paper 11 at 9 (P.T.A.B. April 2, 2019) (precedential).  *See also NetApp Inc. v. Realtime Data LLC*, IPR2017-01195, Paper 9 at 10 (P.T.A.B. Oct. 12, 2017) ("[T]he General Plastic factors provide a useful framework for analyzing the facts and circumstances present in this case, in which a different petitioner filed a petition challenging a patent that had been challenged already by previous petitions.").

Apple Inc. ("Apple") previously filed a petition for *inter partes* review of the '431 patent.  *Apple Inc. v. Gesture Technology Partners, LLC*, IPR2021-00920, Paper 1 (P.T.A.B. May 21, 2021).  This Petition and Apple's petition in IPR2021-00920 challenge the exact same claims.  *Compare* Pet., p. 1 *with Apple Inc. v.*

*Gesture Technology Partners*, Paper 1 at 1. Both Petitioner and Apple were sued for infringement of the '431 Patent on the same day in the same district court. *Compare Gesture Technology Partners, LLC v. Apple Inc.*, No. 6:21-cv-00121 (W.D. Tex. Feb 4, 2021) *with Gesture Technology Partners, LLC v. LG Electronics, Inc.*, No. 6:21-cv-00123 (W.D. Tex. Feb 4, 2021). Petitioner even admits that the patent infringement lawsuit against Apple is a related case. Pet., 72. Accordingly, there is a significant relationship between Apple and Petitioner with respect to Patent Owner's assertion of the '431 Patent. The complete overlap in the challenged claims and the significant relationship between Apple and Petitioner favor denying institution.

Moreover, Unified Patents, LLC previously filed a petition for *inter partes* review of the '431 patent. *Unified Patents, LLC v. Gesture Technology Partners, LLC*, IPR2021-00917 ("*Unified IPR*"), Paper 1 (P.T.A.B. May 14, 2021). This Petition and the petition in the *Unified IPR* both challenge at least claims 7-13 of the '431 patent. *Compare* Pet., p. 1 *with Unified IPR*, Paper 1 at 4. LG is a Unified Patents Member. *Unified IPR*, Paper 7, p. 1, n. 2 (P.T.A.B. Sept. 22, 2021). Unified Members, such as LG, pay a yearly subscription fee. *Unified IPR*, Ex. 1020, ¶2. In return for those fees, Unified Patents performs various services for LG, including filing petitions for *inter partes* review. *See id.*, ¶3. Accordingly, there is a significant relationship between Unified Patents and Petitioner with respect to dealings with the

USPTO. The overlap in the challenged claims and the significant relationship between Unified Patents and Petitioner favor denying institution.

### C.    *General Plastic* Factor Two

Under the second *General Plastic* factor, the Board considers "whether at the time of filing of the first petition the petitioner knew of the prior art asserted in the second petition or should have known of it." *General Plastic*, Paper 19 at 16. As acknowledged by Petitioner, this Petition and Apple's petition in IPR2021-00920 rely on the same prior art references. Pet., p. 1 ("This petition is substantively the same as IPR2021-00920."); J.Mot., p. 11 ("[T]he present Petition is essentially a copy of the prior Apple Petition."). As discussed above, both Petitioner and Apple were sued for infringement of the '431 Patent on the same day in the same district court. Petitioner even admits it was aware of the infringement lawsuit against Apple. Pet., p. 72. Accordingly, Petitioner and Apple are similarly situated. Petitioner knew or should have known of the prior art references in the Petition around the time Apple filed its petition in IPR2021-00920 because they are the same references relied upon by Apple. This favors denying institution.

Further, by virtue of its membership with United Patents, Petitioner knew or should have known of at least the primary prior art reference (Numazaki) in the Petition around the time the *Unified IPR* was filed because the *Unified IPR* also relies on Numazaki. *Unified IPR*, Paper 1 at 5.

Further still, in *Apple Inc. v. Uniloc 2017 LLC*, the Board found that this factor favored denying institution because Apple failed to "set forth facts or offer an explanation concerning its knowledge, at the time it filed the first petition, of the prior art asserted in the [later petition]." *Apple Inc. v. Uniloc 2017 LLC*, IPR2020-00854, Paper 9 at 9 (P.T.A.B. Oct. 28, 2020) (precedential). In the present case, like in *Apple Inc. v. Uniloc 2017 LLC*, Petitioner provides no explanation as to when it knew about the prior art references asserted in the later petition. This too favors denying institution.

**D.    *General Plastic* Factor Three**

Under the third *General Plastic* factor, the Board considers "whether at the time of filing of the second petition the petitioner already received the patent owner's preliminary response to the first petition or received the Board's decision on whether to institute review in the first petition." *General Plastic*, Paper 19 at 16.

The patent owner's preliminary response in IPR2021-00920 filed on September 7, 2021. The patent owner's preliminary response in *Unified IPR* filed on August 26, 2021. In contrast, the Petition filed on November 5, 2021. Accordingly, Petitioner had access to patent owner's preliminary responses for approximately 2 months before filing the Petition and thus would have been aware of Patent Owner's arguments and positions. This favors denying institution.

### E.    *General Plastic* Factors Four and Five

Under the fourth and fifth *General Plastic* factors, the Board considers "the length of time that elapsed between the time the petitioner learned of the prior art asserted in the second petition and the filing of the second petition" and "whether the petitioner provides adequate explanation for the time elapsed between the filings of multiple petitions directed to the same claims of the same patent," respectively. *General Plastic*, Paper 19 at 16.  As discussed above, Petitioner knew or should have known about the prior art asserted in the Petition when Apple filed its earlier petition in IPR2021-00920 (i.e., May 21, 2021).  Petitioner knew or should have known about the primary prior art reference (Numazuki) when the *United IPR* filed (i.e., May 14, 2021).  The Petition filed on November 5, 2021.  Accordingly, Petitioner waited more than 5 months to file the Petition after learning about the prior art. Further, the Petition provides no explanation for this 5-month delay.  In *Valve Corp. v. Electronic Scripting Products, Inc.*, the Board found that a five-month delay was sufficient to favor denying institution. *Valve Corp. v. Electronic Scripting Products, Inc.*, IPR2019-00064, Paper 10 at 15 (P.T.A.B. May 1, 2019) (precedential) ("The fact that Valve waited five months after HTC's petition to file the Petition in this case favors denying institution.").  This favors denying institution.

### F. *General Plastic* Factor Six

Under the sixth *General Plastic* factors, the Board considers "the finite resources of the Board." *General Plastic*, Paper 19 at 16. The sixth factor is an efficiency consideration. *Id.* at 16-17.

As a threshold matter, Petitioner admits the Petition is a replica of the petition filed in IPR2021-00920. Pet., p. 1 ("This petition is substantively the same as IPR2021-00920."); J.Mot., p. 11 ("[T]he present Petition is essentially a copy of the prior Apple Petition."). IPR2021-00920 has been instituted. *Apple Inc. v. Gesture Technology Partners, LLC*, IPR2021-00920, Paper 12 (P.T.A.B. Dec. 6, 2021). Accordingly, instituting this identical Petition would be redundant and a waste of the Board's finite resources. This favors denying institution.

In *Apple Inc. v. Uniloc 2017 LLC*, Apple filed both: (a) a petition replicating a petition filed by Microsoft Corporation in an instituted IPR; and (b) a motion to join the instituted IPR. While assessing the sixth factor, the Board noted that should Microsoft settle, Apple would stand in to continue a proceeding that would otherwise be terminated and this favored denial of institution. *Apple Inc. v. Uniloc 2017 LLC*, Paper 9 at 11-12. Petitioner is similarly situated to Apple in *Apple Inc. v. Uniloc 2017*. Should the existing parties in IPR2021-00920 settle, Petitioner would be able to continue the otherwise terminated proceeding and thus continue consuming the Board's finite resources. In fact, Petitioner even concedes it intends to continue

IPR2021-00920 should the existing parties settle.  J.Mot., p. 2 ("Petitioner will []

assume the lead role in the proceedings if [Petitioner in IPR2021-00920] is no longer

a party to the proceedings or unable to advance arguments for one or more claims,

or grounds, for example, because of § 315(e)(1)."). This favors denying institution.

In view of the above, the *General Plastic* factors overwhelmingly favor

denying institution.  Accordingly, the Petition, and thus the joinder motion, should

be denied.

## VI.    THE PETITION AND PETITIONER'S JOINDER MOTION SHOULD BE DENIED UNDER 35 U.S.C. § 315(d)

"[I]f another proceeding or matter involving the patent is before the Office,

the Director may determine the manner in which the *inter partes* review or other

proceeding or matter may proceed, including providing for stay, transfer,

consolidation, or termination of any such matter or proceeding." 35 U.S.C. § 315(d).

The Director ordered an *ex parte* reexamination of the '431 Patent in January

2022.  *Ex parte* reexamination of U.S. Patent No. 7933431, Control No. 90/014,901,

Reexam Order (USPTO Jan. 11, 2022).  In view of the finite resources of the Board

and this co-pending reexamination, the Director should deny the Petition under 35

U.S.C. § 315(d) and thus also deny the joinder motion.

## VII.  THE PETITION SHOULD BE DENIED BECAUSE THE BOARD DOES NOT HAVE JURISDICTION OVER EXPIRED PATENTS

In *Oil States*, the Supreme Court explained that the "decision to *grant* a patent is a matter involving public rights—specifically, the grant of a public franchise." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018).  "Specifically, patents are public franchises that the Government grants to the inventors of new and useful improvements."  *Id.* (internal quotation marks omitted).  The Court explained that "Congress [has] significant latitude to assign [the] adjudication of public rights to entities other than Article III courts."  *Id.* at 1368.  In exercising its "significant latitude," Congress grants public franchises "subject to the qualification that the PTO has the authority to reexamine—and perhaps cancel—a patent claim in an inter partes review."  *Id.* at 1368, 1374 (internal quotation marks omitted).  Accordingly, so long as the public franchise exists, the PTO may have jurisdiction to amend and cancel the claims of the patent (e.g., via *inter partes* review).

When a patent expires, however, the public franchise ceases to exist and the franchisee (e.g., the patent owner) no longer has the right to exclude others.  At most, the franchisee may be entitled to collect damages from the public franchise that formerly existed through an infringement action in district court.  But because the public franchise no longer exists, the PTO has nothing in its authority to cancel or

amend.  Expiration removes the patent from the PTO's jurisdiction and returns it to

the sole jurisdiction of the Article III courts, which have exclusive authority to

govern claims for damages.  If this were not so, the PTO would purport to have

authority to retroactively modify a public franchise that no longer exists, in a setting

where the expired public franchise does not enjoy any presumption of validity and

in which amendment of claims is no longer permitted.

The '431 Patent issued in April 2011 and expired in July 2020, long before

the Petition was filed on November 5, 2021.[3]  With the expiration of the patent in

July 2020, the Board ceased to have jurisdiction over the '431 Patent, and this IPR

Petition should be dismissed as a result.

## VIII.  CONCLUSION

The Petition should be denied.  Petitioner has not established that the cited

references render unpatentable any claim of the '431 Patent.  Alternatively, the

Board should exercise its discretion under 35 U.S.C. §§ 314(a) or 315(d) to deny

institution, or the Board should dismiss because it does not have jurisdiction over

expired patents.

---

[3] Petitioner seeks joinder with IPR2021-00920.  *See* Paper 3.  The petition in

IPR2021-00920, was filed on May 21, 2021, well after the '431 Patent expired.

## CERTIFICATE OF COMPLIANCE

Pursuant to 37 C.F.R. § 42.24(d), I hereby certify that the foregoing Patent Owner's Preliminary Response contains 7,537 words as measured by the word processing software used to prepare the document, excluding the cover page, signature block, and portions exempted under 37 C.F.R. § 42.24(a) or (b).

DATED:  February 18, 2022                    Respectfully submitted,

By: /Todd E. Landis/
Todd E. Landis
Registration No. 44,200
Counsel for Patent Owner

IPR2022-00091
Patent 7,933,431

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. § 42.6, the undersigned certifies that on February 18, 2022, the foregoing document was served on counsel of record for Petitioner by filing this document through the End-to-End System, as well as via electronic mail to counsel of record for Petitioner at the following address:

Matthew D. Satchwell (Matthew.satchwell@dlapiper.com)
Gianni Minutoli (gianni.minutoli@us.dlapiper.com)
Paul R. Steadman (Paul.steadman@dlapiper.com)

Respectfully submitted,

By: /Todd E. Landis/
Todd E. Landis
Registration No. 44,200
Counsel for Patent Owner

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.
Petitioner

v.

GESTURE TECHNOLOGY PARTNERS LLC
Patent Owner

———————

*Inter Partes* Review Case No. IPR2021-00920
U.S. Patent No. 7,933,431

**DECLARATION OF DR. BENJAMIN B. BEDERSON**

focused communication systems and subsystems. In reaching my opinions in this

matter, I have also reviewed the following references and materials:

- The '431 Patent (Ex. 1001)
- The '431 Patent File History (Ex. 1002)
- U.S. Patent No. 6,144,366 ("Numazaki") (Ex. 1003)
- U.S. Patent No. 6,008,018 ("DeLeeuw") (Ex. 1004)
- U.S. Patent No. 6,064,354 ("DeLuca") (Ex. 1005)
- U.S. Patent No. 6,243,683 ("Peters") (Ex. 1006)
- "CCD and CMOS Imaging Array Technologies," Stuart Taylor, Xerox Research Centre Europe, 1998 (Ex. 1012)
- Sheryl WuDunn's article on cellular videophone technology (Ex. 1013)
- A Brief History of Handheld Video Games (Ex. 1014)
- Any additional background materials cited below

### A.    Educational Background

5.    I received a Bachelor of Science degree in Computer Science with a

minor in Electrical Engineering from Rensselaer Polytechnic Institute ("RPI") in

1986. I received a Master of Science degree and a Ph.D. in Computer Science from

New York University ("NYU") in 1989 and 1992, respectively.

### B.    Professional Experience

6.    Since 1998, I have been a Professor of Computer Science at the

University of Maryland ("UMD"), where I have joint appointments at the Institute

for Advanced Computer Studies and the College of Information Studies (Maryland's

"iSchool"), and am currently Professor Emeritus. I was also Associate Provost of

Learning Initiatives and Executive Director of the Teaching and Learning

Transformation Center from 2014 to 2018. I am a member and previous director of

the Human-Computer Interaction Lab ("HCIL"), the oldest and one of the best known Human-Computer Interaction research groups in the country. I was also co-founder and Chief Scientist of Zumobi, Inc. from 2006 to 2014, a Seattle-based startup that is a publisher of content applications and advertising platforms for smartphones. I am also co-founder and co-director of the International Children's Digital Library ("ICDL"), a web site launched in 2002 that provides the world's largest collection of freely available online children's books from around the world with an interface aimed to make it easy for children and adults to search and read children's books online. I am also co-founder and prior Chief Technology Officer of Hazel Analytics, a data analytics company whose product sends alerts in warranted circumstances. In addition, I have for more than 25 years consulted for numerous companies in the area of user interfaces, including Logitech, Microsoft, the Palo Alto Research Center, Sony, Lockheed Martin, Hillcrest Labs, and NASA Goddard Space Flight Center.

7.    For more than 30 years, I have studied, designed, and worked in the field of computer science and human-computer interaction. My experience includes 30 years of teaching and research, with research interests in human-computer interaction and the software and technology underlying today's interactive computing systems. This includes the design and implementation of image sensing and image processing systems as well as software applications on mobile devices,

including smart phones and PDAs, such as my work on DateLens, LaunchTile, and StoryKit described below. My consulting included helping companies apply my work on "zoomable user interfaces" to their consumer-facing audio/video access software.

8.      In 1992, I completed my Ph.D. dissertation at New York University titled "A Miniature Space-Variant Active Vision System: Cortex-I" (Ex. 1015)[1] in which I worked with both CMOS and CCD image sensors and wrote image processing software using those sensors. As depicted in the VLSI circuit layout image below, I designed a custom CMOS image sensor with a radial pixel layout. Figure 2.1 from my dissertation show the result of images taken with a camera I built using that image sensor. I then built a custom CCD-based camera by manufacturing a lens that I attached directly to a commercially available CCD sensor that is shown in Figure 2.2.

---

[1] Ex. 1015 is a pre-publication version of my thesis, which does not include the final chapter.



IPR2022-00091 - LGE
Ex. 1008 - Page 6



Figure 2.1: Images from our custom logmap sensor chip. They are the logmap images from the chip, and have not been mapped back to scene coordinates. They are scenes of **a)** an all black scene, **b)** a horizontal edge with the top half black and the bottom half white, and **c)** an all white scene. The circle in the center of the images is an artifact of the chip geometry.



Figure 2.2: The fixed field of view camera. It consists of a four element lens assembly attached directly to a CCD sensor.

9.    In 1995, I built an "audio augmented reality" system[2] that identified which piece of art a person was standing in front of. This worked by installing infrared transmitters in the ceiling above each piece of art which was identified by an infrared receiver controlled by a microcontroller. As depicted in Figure 1 below,

---

[2] Benjamin B. Bederson. 1995. Audio augmented reality: a prototype automated tour guide. In Conference Companion on Human Factors in Computing Systems (CHI '95), I. Katz, R. Mack, and L. Marks (Eds.). ACM, New York, NY, USA, 210-211. DOI=http://dx.doi.org/10.1145/223355.223526 (Ex. 1016).

a person wearing the receiver walked around, the microcontroller they were carrying

would identify the code from the transmitter they were standing under.



Figure 1: Schematic of automated tour guide proto-
type.

10.    At UMD, my research is in the area of Human-Computer Interaction

("HCI"), a field that relates to the development and understanding of computing

systems to serve users' needs. Researchers in this field are focused on making

universally usable, useful, efficient and appealing systems to support people in their

wide range of activities. My approach is to balance the development of innovative

technology that serves people's practical needs. Example systems following this

approach that I have built include PhotoMesa (software for end users to browse

personal photos), DateLens (2002 software for end users to use their mobile devices

to efficiently access their calendar information), LaunchTile (2005 "home screen"

software for mobile devices to allow users to navigate apps in a zoomable

IPR2021-00920
U.S. Patent No. 7,933,431

environment), SpaceTree (2001 software for end users to efficiently browse very large hierarchies), ICDL (as described above), and StoryKit (a 2009 iPhone app for children to create stories).

11.     LaunchTile led to my creation of Zumobi in 2006, where I was responsible for investigating new software platforms and developing new user interface designs that provide efficient and engaging interfaces to permit end users to access a wide range of content on mobile platforms (including the iPhone and Android-based devices). For example, I designed and implemented software called "Ziibii," a "river" of news for iPhone, software called "ZoomCanvas," a zoomable user interface for several iPhone apps, and iPhone apps including "Inside Xbox" for Microsoft and Snow Report for REI. At the International Children's Digital Library (ICDL), I have since 2002 been the technical director responsible for the design and implementation of the web site, www.childrenslibrary.org (originally at www.icdlbooks.org). In particular, I have been closely involved in designing the user interfaces as well as the software architecture for the web site since its inception in 2002.

12.     Beginning in the mid-1990s, I have been responsible for the design and implementation of numerous other web sites in addition to the ICDL. For example, I designed and built my own professional web site when I was an Assistant Professor of Computer Science at the University of New Mexico in 1995 and have continued

to design, write the code for, and update both that site (which I moved to the University of Maryland in 1998, currently at http://www.cs.umd.edu/~bederson/) as well as numerous project web sites, such as Pad++, http://www.cs.umd.edu/hcil/pad++/. I received the Janet Fabri Memorial Award for Outstanding Doctoral Dissertation for my Ph.D. work in robotics and computer vision. I have combined my hardware and software skills throughout my career in Human-Computer Interaction research, building various interactive electrical and mechanical systems that couple with software to provide an innovative user experience.

13.     My work has been published extensively in more than 160 technical publications, and I have given about 100 invited talks, including 9 keynote lectures. I have won a number of awards including the Brian Shackel Award for "outstanding contribution with international impact in the field of HCI" in 2007, and the Social Impact Award in 2010 from Association for Computing Machinery's ("ACM") Special Interest Group on Computer Human Interaction ("SIGCHI"). ACM is the primary international professional community of computer scientists, and SIGCHI is the primary international professional HCI community. I have been honored by both professional organizations. I am an "ACM Distinguished Scientist," which "recognizes those ACM members with at least 15 years of professional experience and 5 years of continuous Professional Membership who have achieved significant

accomplishments or have made a significant impact on the computing field." I am a member of the "CHI Academy," which is described as follows: "The CHI Academy is an honorary group of individuals who have made substantial contributions to the field of human-computer interaction. These are the principal leaders of the field, whose efforts have shaped the disciplines and/or industry, and led the research and/or innovation in human-computer interaction." The criteria for election to the CHI Academy are: cumulative contributions to the field; impact on the field through development of new research directions and/or innovations; and (3) influence on the work of others.

14.     I have appeared on radio shows numerous times to discuss issues relating to user interface design and people's use and frustration with common technologies, web sites, and mobile devices. My work has been discussed and I have been quoted by mainstream media around the world over 120 times, including by the New York Times, the Wall Street Journal, the Washington Post, Newsweek, the Seattle Post-Intelligencer, the Independent, Le Monde, NPR's All Things Considered, New Scientist Magazine, and MIT's Technology Review.

15.     I have designed, programmed, and publicly deployed dozens of user-facing software products that have cumulatively been used by millions of users. My work is cited in patents by several major companies, including Amazon, Apple, Facebook, Google, and Microsoft. I am the co-inventor of 12 U.S. patents and 18

U.S. patent applications. The patents are generally directed to user interfaces/experience with some directed to mobile devices, including U.S. Patent No. 9,778,810 (issued 2017), entitled "Techniques to modify content and view content on mobile devices."

16.     My curriculum vitae, which includes a more detailed summary of my background, experience, and publications, is attached as Appendix A.

## II.     LEGAL FRAMEWORK

### A.     Obviousness

17.     I am a technical expert and do not offer any legal opinions. However, counsel has informed me as to certain legal principles regarding patentability and related matters under United States patent law, which I have applied in performing my analysis and arriving at my technical opinions in this matter.

18.     I have been informed that the Patent Trial and Appeal Board ("PTAB") now applies the claim construction standard applied by Article III courts (i.e., the *Phillips* standard) regardless of whether a patent has expired. I have been informed that under the *Phillips* standard, claim terms are to be given the meaning they would have to a person having ordinary skill in the art at the time of the invention, taking into consideration the patent, its file history, and, secondarily, any applicable extrinsic evidence (e.g., dictionary definitions). In my analyses below, I have applied the plain and ordinary meaning pursuant to the *Phillips* standard.

invention by others skilled in the art; (g) lack of independent simultaneous invention within a comparatively short space of time; (h) teaching away from the invention in the prior art.

29. I am further informed that secondary considerations evidence is only relevant if the offering party establishes a connection, or nexus, between the evidence and the claimed invention. The nexus cannot be based on prior art features. The establishment of a nexus is a question of fact. While I understand that the Patent Owner here has not offered any secondary considerations at this time, I will supplement my opinions in the event that the Patent Owner raises secondary considerations during the course of this proceeding.

## III. OPINION

### A. Level of a Person of Ordinary Skill in the Art

30. I was asked to provide my opinion as to the level of skill of a person having ordinary skill in the art ("PHOSITA") of the '431 Patent at the time of the claimed invention, which counsel has told me to assume is July 8, 1999. In determining the characteristics of a hypothetical person of ordinary skill in the art of the '431 Patent, I considered several factors, including the type of problems encountered in the art, the solutions to those problems, the rapidity with which innovations are made in the field, the sophistication of the technology, and the education level of active workers in the field. I also placed myself back in the time

frame of the claimed invention and considered the colleagues with whom I had worked at that time.

31.    In my opinion, a PHOSITA at the time of the claimed invention of the '431 Patent would have had at least a bachelor's degree in electrical engineering or equivalent with at least one year of experience in the field of human computer interaction. Additional education or experience might substitute for the above requirements. Such a PHOSITA would have been capable of understanding the '431 patent and the prior art references discussed herein.

32.    Based on my education, training, and professional experience in the field of the claimed invention, I am familiar with the level and abilities of a person of ordinary skill in the art at the time of the claimed invention. Additionally, I met at least these minimum qualifications to be a person having ordinary skill in the art as of the time of the claimed invention of the '431 Patent.

**B.    Description of the Alleged Invention of the '431 Patent**

33.    The '431 Patent describes computer devices that "optically sens[e] human input" using one or more cameras, contemplating applications in a "variety of fields such as computing, gaming, medicine, and education." *'431 Patent* (Ex. 1001), 2:7–17. A number of scenarios are described in which a user and or object held by a user are imaged in order to control a computer function, including multiple cameras mounted in a fixed display as depicted in Fig. 1A below:

something." *Id*. at 13:5-7. For example, the device can be used for object recognition or to automatically read text printed on the object. *Id*. at 13:8-21.

### C.    Claim Construction

35.    I have been asked to opine certain claim construction issues related to 35 U.S.C. § 112(f) ("112(f)"), which I have been informed is a special rule applied to limitations drafted in what is referred to as "means-plus-function" format. I have been informed that, pursuant to 112(f), limitations "may be expressed as a means . . . for performing a specified function *without the recital of structure, material, or acts in support thereof,* and such [limitation] shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." I have further been informed that the essential inquiry is not merely the presence or absence of the word "means" but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure.

36.    Claim 7 recites a "camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object." Here, a PHOSITA would understand the phrase "camera means" to have a sufficiently definite meaning as the name for structure. Specifically, camera means in the context of this claim conveys the class of digital image sensors, which is the component in a digital camera that obtains an image of

an object by converting light into electrical signals. While traditional analog cameras operated using light alone, directing captured light onto photo-sensitive film, the image sensors contemplated by the '431 Patent are digital image sensors. Also referred to as electro-optical sensors, these digital image sensors detect light in a scene and convert the light into electrical signals that are used to represent/describe the scene, i.e., the electrical signals are stored as digital data in a pre-determined format that is used to recreate the scene as an image (or video). Indeed, all optical sensors obtain images by capturing light. In the context of the '431 Patent, the light captured is reflected from objects in the camera's field of view—either ambient light reflected from the object or artificial light that has been emitted specifically to illuminate the object. Accordingly, the claimed function—obtaining an image using reflected light of at least one object positioned by a user operating said object—is simply describing the general process that digital image sensors employ to obtain images of objects. In other words, the claimed function is describing the generic process common to all imaging and performed by all digital image sensors when capturing an image of an object. Supporting my conclusion that "camera means" in the '431 Patent describes this class of digital image sensors, Claim 1 from the '431 Patent expressly describes the imaging step as "electro-optically sensing light," and Claim 2 further specifies that a "camera is utilized to effect said electro-optical sensing." A PHOSITA would have been familiar with the class of digital image

"optically sensing a human input" such that the output of a "single or multiple TV cameras [is] analyzed and used as input to a computer"). Accordingly, a PHOSITA would consider *Numazaki* analogous art to the '431 Patent.

**E.    Opinions Supporting Obviousness over *Numazaki* in View of the Knowledge of a PHOSITA**

> *1.    Claim [1(b)] moving at least one finger in space in order to signal a command to said device;*

46.    As noted above, *Numazaki* contemplates portable devices implementing an information generation apparatus described in the preceding embodiments. In particular, *Numazaki* discloses a "compact portable information device" with "a window 712 [that] is provided for the lighting unit and the photo-detection sensor unit," which enables the "position of a cursor 714 on the screen [to] be controlled by moving a finger 713 in front of this window 712." *Numazaki* at 52:5-16. A PHOSITA would have understood that controlling a cursor on the handheld device is signaling a command to the device. Notably, the '431 Patent does not precisely define a "command." It does, however, provide some disclosures that inform the meaning of signaling a command. For example, the embodiment described with reference to Fig. 9 allows a user to "point at the object using ones fingers" such that the system may "sense the motions of ones fingers with respect to the virtually displayed images on the screen." *'431 Patent* at 13:46-66. Specifically, a user can

9.      **Claim 13: Apparatus according to claim 7, wherein said apparatus is a cellular phone.**

59.    As I discussed with respect to Claim 11, a PHOSITA would have been motivated to implement *Numazaki's* fifth embodiment functionality into the eighth embodiment's handheld device, including the video conference functionality in which a handheld device extracts image information of only the speaker and transmits it to a further device for the same reasons as discussed previously.

60.    *Numazaki* refers to this videoconference embodiment as a "TV telephone" and stresses that its goals are to "lower communication cost[s] . . . [and] power consumption." *Numazaki* at 39:6-16. Although *Numazaki* does not expressly state that its TV telephone is a cellular phone, a PHOSITA would have understood that *Numazaki's* focus on lower communications costs is a concern applicable to cellular phones. Indeed, wireless cellular data connections at the time were expensive, and *Numazaki's* image extract method would alleviate otherwise high data transfer costs. Notably, *Numazaki's* subject extraction process would be less valuable to other wireless connections such as WiFi or wired connections, which do not share the same data transfer cost concerns. Although cellular videophones were not prevalent in the marketplace as of the '431 Patent's alleged invention date of July 8, 1999, a PHOSITA would have known that researchers were working on the technology and that products were being introduced to customers. *See, e.g.*, "Next Stage of the Cellular Tour: Forced to Compete, Japan Become a Global Power,"

Sheryl WuDunn, New York Times, 1999 (Ex. 1013), 2 (a July 1999 article discussing a new "cellular videophone" introduced by Kyocera). Further, a PHOSITA would have understood that *Numazaki's* fifth embodiment is directed to improvements to make such cellular videophones commercially viable.

> ### 10.    *Claim 14[a]: providing a computer within said device;*

61.    "Computer," as used in this limitation, mean a processor-based system able to execute functionality through software (i.e., by executing instructions defined by the software). *Numazaki's* eighth embodiment handheld device, including that depicted in Fig. 78, performs its function using an internal processor. A PHOSITA would have understood that such processor-based systems are "computer" systems and would have considered *Numazaki's* handheld device to include a computer within the meaning of this limitation.

> ### 11.    *Claim 18: A method according to claim 14, wherein said information includes the velocity or path of the portion or object.*

62.    As depicted in Fig. 20 below, *Numazaki* uses a center of gravity calculation to track the path of a finger as it moves: