VOLUME II of II (PAGES APPX1696-2401)
Nos. 23-1475, -1533

IN THE
# United States Court of Appeals for the Federal Circuit

APPLE INC.,

*Appellant,*

LG ELECTRONICS INC., LG ELECTRONICS USA, INC.,
GOOGLE LLC,

*Appellees,*

*v.*

GESTURE TECHNOLOGY PARTNERS, LLC

*Cross-Appellant.*

On Appeal from the United States Patent & Trademark
Office, Patent Trial & Appeal Board, Nos. IPR2021-00920,
IPR2022-00091, IPR2022-00359

## JOINT APPENDIX

Fred I. Williams
WILLIAMS SIMONS & LANDIS PLLC
601 Congress Avenue, Suite 600
Austin, TX 78701
(512) 543-1354

*Counsel for Cross-Appellant
Gesture Technology Partners, LLC*

Daniel Cooley
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
Suite 800
1875 Explorer Street
Reston, VA 20190

*Counsel for Appellee Google
LLC*

Melanie L. Bostwick
Abigail Colella
Jonas Q. Wang
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street NW
Washington, DC 20005
(202) 339-8400

*Counsel for Appellant Apple Inc.*

Stanley J. Panikowski
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, CA 92121

*Counsel for Appellees LG
Electronics Inc. and LG Electronics
USA Inc.*

*Additional Counsel on Inside Cover*

John Wittenzellner
WILLIAMS SIMONS &
  LANDIS PLLC
1735 Market Street
Suite 125 No. 453
Philadelphia, PA 19103

*Counsel for Cross-Appellant Gesture Technology Partners, LLC*

Elizabeth R. Moulton
Orrick, Herrington &
  Sutcliffe LLP
405 Howard Street
San Francisco, CA 94105

Paul R. Hart
ERISE IP, P.A.
5299 DTC Blvd.
Suite 1340
Greenwood Village, CO 80111

Adam P. Seitz
Clifford T. Brazen
ERISE IP, P.A.
7015 College Blvd.
Suite 700
Overland Park, KS 66211

*Counsel for Appellant Apple Inc.*

Matthew D. Satchwell
DLA PIPER LLP (US)
Suite 900
444 West Lake Street
Chicago, IL  60606

*Counsel for Appellees LG Electronics Inc. and LG Electronics USA Inc.*

Erika Arner
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001

*Counsel for Appellee Google LLC*

# TABLE OF CONTENTS

## VOLUME I

### IPR2021-00920

Final Written Decision,
Paper No. 28, filed November 30, 2022.................................... Appx1-38

Ex. 1001, U.S. Patent No. 7,933,431, filed April 26, 2011........ Appx39-74

Certified List of the Prosecution History of IPR2021-00920,
IPR2022-00091 and IPR2022-00359.......................................... Appx78-82

Petition for Inter Partes Review,
Paper No. 1, filed May 21, 2021 ........................................ Appx132-213

Patent Owner's Preliminary Response,
Paper No. 8, filed September 7, 2021................................ Appx235-269

Patent Owner's Sur-Reply,
Paper No. 10, filed October 1, 2021.................................... Appx275-280

Decision Granting Institution of Inter Partes Review,
Paper No. 12, filed December 6, 2021 .............................. Appx 282-312

Patent Owner's Response,
Paper No. 15, filed February 28, 2022 .............................. Appx328-363

Petitioner's Reply,
Paper No. 19, filed May 23, 2022 ...................................... Appx389-417

Patent Owner's Sur-Reply to Petitioner's Reply,
Paper No. 19, filed July 6, 2022 ........................................ Appx418-438

Oral Hearing Transcript,
Paper No. 27, September 13, 2022 .................................... Appx469-529

EX1002, Prosecution History for the 7,933,431 Patent
(excerpts) ............................................................. Appx609-613, 629-634

EX1003, U.S. Patent No. 6,144,366 to Numazaki et al.,
filed November 7, 2000 ........................................................... Appx657-803

EX1004, U.S. Patent No. 6,088,018 to DeLeeuw et al.,
    filed July 11, 2000 .............................................................. Appx804-831

EX1008, Declaration of Dr. Benjamin B. Bederson,
    dated May 20, 2021
    (excerpts) ........ Appx863, 888-889, 891-893, 899-901, 903-904, 906-908

EX1013, Sheryl WuDunn, *Next Stage of the Cellular Tour:*
    *Forced to Compete, Japan Becomes a Global Power*,
    N.Y. Times, July 27, 1999 .............................................. Appx1026-1032

EX1017, Supplemental Declaration of Dr. Benjamin B. Bederson,
    dated May 23, 2022
    (excerpts) ..................................................... Appx1128-1130, 1133-1138

EX2002, Declaration of Benedict Occhiogrosso, in Support of
    Gesture Technology Partners, LLC's Patent Owner Response,
    dated February 28, 2022
    (excerpts) ......................... Appx1324, 1340-1341, 1351-1352, 1356-1357

**IPR2022-00091**

Patent Owner's Preliminary Response to the Petition
    for Inter Partes Review of U.S. Patent No. 7,933,431
    Pursuant to 37 C.F.R. § 42.120, Paper 7,
    dated February 18, 2022 ................................................. Appx1528-1571

EX1008, Declaration of Dr. Benjamin B. Bederson,
    dated May 21, 2021
    (excerpts) .............. Appx1586, 1588-1597, 1604-1605, 1607-1608, 1618,
                                                                                1630-1631

# VOLUME II

## IPR2022-00359

Petition for Inter Partes Review of U.S. Patent No. 7,933,431,
    Paper 1, dated January 6, 2022
    (excerpts) .......................................... Appx1696, 1704-1705, 1714, 1741

EX1008, Declaration of Dr. Benjamin B. Bederson,
    dated May 21, 2021
    (excerpts) ...................................Appx1818-1821, 1855-1856, 1858-1863

Petition for Inter Partes Review of U.S. Patent 7,933,431,
    IPR2021-00917, Paper 1, dated May 14, 2021 .............. Appx2026-2088

Petitioner's Authorized Reply to Patent Owner's Preliminary
    Response, IPR2021-00917, Paper 7,
    dated September 22, 2021 ............................................. Appx2089-2090

Final Written Decision, IPR2021-00917,
    Paper 31, dated November 21, 2022
    (excerpt)....................................................................... Appx2101, 2145

Original Complaint for Patent Infringement filed in W.D. Tex.
    Case No. 6:21-cv-00121, filed February 4, 2021 ............ Appx2147-2166

Unified Patents, LLC FAQ................................................ Appx2167-2171

Unified Patents, LLC Success at Challenging Bad Patents
    (excerpt)....................................................................... Appx2172-2176

Exhibit 1020, Declaration of Kevin Jakel, IPR2021-00917,
    dated May 11, 2021....................................................... Appx2178-2184

Final Decision on Remand Terminating Institution,
    IPR2015-01751, -1752, filed October 2, 2020
    (excerpts) .................................................. Appx2185, 2210, 2217, 2221

Patent Trial and Appeal Board Consolidated Trial Practice
    Guide, dated November 2019 (excerpts).............. Appx2226, 2243-2244

iii

Order Identifying Real Party in Interest, IPR2021-01413,
    Paper 56, filed March 8, 2023 (excerpt) ........................ Appx2362, 2395

Decision Granting Director Review, Vacating-in-part the Final Written
    Decision and Vacating Board Order, IPR2021-01413,
    Paper 76, filed May 22,2023 (excerpt) ................. Appx2397, 2400-2401

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

GOOGLE LLC,
Petitioner

v.

GESTURE TECHNOLOGY PARTNERS LLC
Patent Owner

———————

Case No. IPR2022-00359
U.S. Patent No. 7,933,431

———————

**PETITION FOR *INTER PARTES* REVIEW
OF U.S. PATENT NO. 7,933,431**

*Id*. at Fig. 1A, 3:23–52 (describing cameras 100, 101, and 144).

The Challenged Claims, however, are limited to handheld devices that process imaging of a person (or an object held by a person) to control a function of the handheld device. *Id*. at 25:40-26:62. Fig. 8B below is the sole figure from the '431 Patent that depicts such a handheld device:



*Id*. at Fig. 8B, 12:59-13:25 (describing a handheld device with a camera that captures images of objects, including people). With this handheld device, the '431 Patent explains that "it is [] possible to acquire features of an object and use it to determine something." *Id*. at 13:5-7. For example, the device can be used for object recognition or to automatically read text printed on the object. *Id*. at 13:8-21.

### B.    The '431 Patent's Prosecution

The Application that resulted in the '431 Patent was filed on July 12, 2010. The Application claims priority to provisional patent application No. 60/142,777, filed July 8, 1999. *Id*. at (22), (60). For purposes of this petition and without waiving

2

its right to challenge priority in this or any other proceeding, Petitioner adopts July 8, 1999 as the invention date for the Challenged Claims.

The Challenged Claims were not subject to any prior art-based office actions. *'431 File History* (Ex. 1002), 80-83.

### C.    A Person Having Ordinary Skill in the Art

A person having ordinary skill in the art ("PHOSITA") at the time of the '431 Patent would have had at least a bachelor's degree in electrical engineering or equivalent with at least one year of experience in the field of human computer interaction. Additional education or experience might substitute for the above requirements. *Bederson Dec.* (Ex. 1008), ¶¶ 30-32.

## III.    REQUIREMENTS FOR IPR UNDER 37 C.F.R. § 42.104

### A.    Standing Under 37 C.F.R. § 42.104(A)

Petitioner certifies that the '431 Patent is available for IPR and that Petitioner is not barred or estopped from requesting an IPR challenging the claims of the '431 Patent. Specifically, (1) Petitioner is <u>not</u> the owner of the '431 Patent, and (2) Petitioner has <u>not</u> filed a civil action challenging the validity of any claim of the '431 Patent, and (3) Petitioner has not been served with a complaint more than one year ago alleging infringement of the '079 patent.

## IV.    THE CHALLENGED CLAIMS ARE UNPATENTABLE

### A.    Ground 1: Claims 1-4, 7-9, 11-22, 25, 26, and 28 are obvious under pre-AIA 35 U.S.C. § 103 over *Numazaki* in view of the knowledge of a PHOSITA

*Overview of Numazaki*

U.S. Patent No. 6,144,366 to Numazaki et al. (*"Numazaki"*) (Ex. 1003) was filed on October 17, 1997 and is prior art to the '431 Patent under at least 35 U.S.C. § 102(e) (pre-AIA). *Numazaki* was not cited or considered during prosecution of the '431 Patent. *'431 Patent* (Ex. 1001).

*Numazaki* is generally directed to a method for detecting a gesture or the movement of a user's hand. *Numazaki* (Ex. 1003), Abstract, 4:9-40. *Numazaki* purports to have improved upon prior methods by using a controlled light source to illuminate the target object (e.g., the user's hand), a first camera unit (referred to by *Numazaki* as a "photo-detection unit"),[1] and a second camera unit. *Id*. at 11:9-23. This arrangement is illustrated in Fig. 2 below:

---

[1] A PHOSITA would have considered *Numazaki's* photo-detection units to be camera units. *Bederson Dec*. (Ex. 1008), ¶ 40 (explaining that *Numazaki* describes using CMOS or CCD sensor units at 15:24-16:19, which were two of the more common optical sensors used in camera units at the time).

12

frames per second. *Numazaki* (Ex. 1003), 39:61-6 (noting the "frame rate of the usual video is 30 frames per second" and concluding "it is possible to update the extracted image 30 times per second").

### *xxii.* *Claim 28*

***A method according to claim 14, including the further step of acquiring a picture of the user of the handheld device.***

See Claim 3, supra.

### B. Ground 2: Claims 5-6 and 29 are obvious under pre-AIA 35 U.S.C. § 103 over *Numazaki* in view of *DeLeeuw*

### *Overview of DeLeeuw*

U.S. Patent No. 6,088,018 to DeLeeuw, et al. (*"DeLeeuw"*) (Ex. 1004) was filed on June 11, 1998 and is prior art to the '431 Patent under at least 35 U.S.C. § 102(e) (pre-AIA). *DeLeeuw* was not cited or considered during prosecution of the '431 Patent. *'431 Patent* (Ex. 1001).

*DeLeeuw* discloses a "method of providing input signals to a system having a display" by capturing an object via video. *Id.* at 1:37-45. In a typical setup, the "video camera is pointed toward the user," whom "may see a reflected image of himself or herself on the computer screen" yet still "see and interact with other display elements such as desktop icons or application program displays" because the reflected image is displayed transparently. *Id.* at 2:55-60. The result appears in Figure 1:

39

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.
Petitioner

v.

GESTURE TECHNOLOGY PARTNERS LLC
Patent Owner

_____

*Inter Partes* Review Case No. IPR2021-00920
U.S. Patent No. 7,933,431

**DECLARATION OF DR. BENJAMIN B. BEDERSON**

I, Benjamin B. Bederson, hereby declare the following:

## I.      BACKGROUND AND QUALIFICATIONS

1.      My name is Benjamin B. Bederson, Ph.D and I am over 21 years of age and otherwise competent to make this Declaration. I make this Declaration based on facts and matters within my own knowledge and on information provided to me by others.

2.      I have been retained by counsel for Petitioner as a technical expert in the above-captioned case. Specifically, I have been asked to render certain opinions in regard to the IPR petition with respect to U.S. Patent No. 7,933,431 (the "'431 Patent"). I understand that the Challenged Claims are claims 1-31. My opinions are limited to those Challenged Claims.

3.      My compensation in this matter is not based on the substance of my opinions or the outcome of this matter. I have no financial interest in Petitioner. I am being compensated at an hourly rate of $600 for my analysis and testimony in this case.

4.      In writing this declaration, I have considered my own knowledge and experience, including my work experience in the field of electrical and computer engineering; my experience in teaching in this area; and my experience working with others involved in this field, including in both the design and analysis of multimedia-

focused communication systems and subsystems. In reaching my opinions in this

matter, I have also reviewed the following references and materials:

- The '431 Patent (Ex. 1001)
- The '431 Patent File History (Ex. 1002)
- U.S. Patent No. 6,144,366 ("Numazaki") (Ex. 1003)
- U.S. Patent No. 6,008,018 ("DeLeeuw") (Ex. 1004)
- U.S. Patent No. 6,064,354 ("DeLuca") (Ex. 1005)
- U.S. Patent No. 6,243,683 ("Peters") (Ex. 1006)
- "CCD and CMOS Imaging Array Technologies," Stuart Taylor, Xerox Research Centre Europe, 1998 (Ex. 1012)
- Sheryl WuDunn's article on cellular videophone technology (Ex. 1013)
- A Brief History of Handheld Video Games (Ex. 1014)
- Any additional background materials cited below

### A.    Educational Background

5.    I received a Bachelor of Science degree in Computer Science with a

minor in Electrical Engineering from Rensselaer Polytechnic Institute ("RPI") in

1986. I received a Master of Science degree and a Ph.D. in Computer Science from

New York University ("NYU") in 1989 and 1992, respectively.

### B.    Professional Experience

6.    Since 1998, I have been a Professor of Computer Science at the

University of Maryland ("UMD"), where I have joint appointments at the Institute

for Advanced Computer Studies and the College of Information Studies (Maryland's

"iSchool"), and am currently Professor Emeritus. I was also Associate Provost of

Learning Initiatives and Executive Director of the Teaching and Learning

Transformation Center from 2014 to 2018. I am a member and previous director of

the Human-Computer Interaction Lab ("HCIL"), the oldest and one of the best known Human-Computer Interaction research groups in the country. I was also co-founder and Chief Scientist of Zumobi, Inc. from 2006 to 2014, a Seattle-based startup that is a publisher of content applications and advertising platforms for smartphones. I am also co-founder and co-director of the International Children's Digital Library ("ICDL"), a web site launched in 2002 that provides the world's largest collection of freely available online children's books from around the world with an interface aimed to make it easy for children and adults to search and read children's books online. I am also co-founder and prior Chief Technology Officer of Hazel Analytics, a data analytics company whose product sends alerts in warranted circumstances. In addition, I have for more than 25 years consulted for numerous companies in the area of user interfaces, including Logitech, Microsoft, the Palo Alto Research Center, Sony, Lockheed Martin, Hillcrest Labs, and NASA Goddard Space Flight Center.

7.      For more than 30 years, I have studied, designed, and worked in the field of computer science and human-computer interaction. My experience includes 30 years of teaching and research, with research interests in human-computer interaction and the software and technology underlying today's interactive computing systems. This includes the design and implementation of image sensing and image processing systems as well as software applications on mobile devices,

information other than the subject should be deleted from the image information before transmitting. *Id*. at 39:17-60 (describing a mask process through which an "extracted image" containing only the subject is "stored in the extracted image memory unit 354"). A PHOSITA would have been motivated to include such image capture functionality in the portable eighth embodiment's portable device because *Numazaki* expressly suggests its fifth embodiment image capture technology should be incorporated into a portable device. As I discussed above, *Numazaki* discloses the goal to overcome difficulties involved with videoconference applications using a portable device, including communication costs and power consumption. *Id*. at 39:6-16. To combat these difficulties, *Numazaki* teaches a "TV telephone" that extracts and transmits only the faces of the participating users, removing extraneous background information that would otherwise consume bandwidth and battery power. *Id*. at 39:12-20. To accomplish this improvement, *Numazaki* uses the same two-camera structure described with respect to the first embodiment, using the reflected light sensor to identify an outline of the subject and subtracting from the other sensor's image everything that falls outside the subject's outline. *Id*. at 39:24-60. A PHOSITA would recognize these same benefits would apply to the portable device in *Numazaki's* eighth embodiment, which also relies on the first embodiment's two-camera structure and battery power for operation.

52.    Additionally, a PHOSITA would have recognized the portable device in *Numazaki's* eighth embodiment could easily support the image capture solution described with respect to the fifth embodiment. With respect to Fig. 46, the fifth embodiment image capture technology uses two separate cameras—one for reflected light and one for natural light—to identify and extract only the subject from the image information. *Id*. at 39:21-60. As I discussed above, the eighth embodiment already includes this two-camera structure described with respect to the first embodiment within its eighth embodiment portable device. *Id*. at 50:19-24. *Numazaki* even makes express reference to the same two-camera image difference calculation step taught with respect to the first embodiment in its eighth embodiment. *Numazaki* at 11:39-56 and 53:22-36. Accordingly, a PHOSITA would recognize that minimal modifications would be required to implement the fifth embodiment image capture functionality in the eighth embodiment's handheld device as *Numazaki* intends.

> 4.    ***Claim 4: A method according to claim 1, wherein said movement is sensed in 3 dimensions.***

53.    *Numazaki* teaches that finger movement in three dimensions can be detected and used in the context of controlling a computer:

> The feature data generation unit 103 extracts various feature data from the reflected light image. Many different types of the feature data and their extraction methods can be used in the present invention, as will be described in detail in the later embodiments. **When the target object is a hand**, it becomes possible to obtain the information regarding

5.      *Claim 7(c): computer means within said housing for analyzing said image to determine information concerning a position or movement of said object; and*

55.    I understand the corresponding structure for "computer means within said housing for analyzing said image to determine information concerning a position or movement of said object" includes a computer/processor programmed to identify natural features on an object to determine the object's position. *See, e.g., '431 Patent* (Ex. 1001), 3:39-41(noting features such as a finger tip can be used as a "target"), 13:46-67 (describing a user pointing and using the motion of her fingers to control objects within an application). *Numazaki* teaches the same (or an equivalent) structure for detecting the position of a user's finger to permit the user to control a device using gestures. Namely, *Numazaki's* "compact portable information device" allows the "position of a cursor 714 on the screen [to] be controlled by moving a finger 713 in front of [] window 712." *Numazaki* at 52:5-16. This eighth embodiment functionality uses the process expressly described in the second embodiment through which the system identifies a user's finger based on its characteristics and tracks lateral finger movements by "detecting the center of gravity" of a finger, where "finger tip movement and the center of gravity movement can be smoothly correlated" using pixel values. *Id.* at 19:43-20:25. To detect a finger, *Numazaki* teaches a "stick shaped object detection unit 213[, which] detects a stick shaped object extending in the vertical direction, that is, an upward extended finger

(normally an index finger) of the hand of the operator." *Id*. at 18:32-35. Once the finger is detected, *Numazaki* calculates the center of gravity and tracks this center of gravity as the finger moves. *Id*. at 19:43-20:25. Using this technique, *Numazaki* teaches "the cursor on [a] screen can be controlled" so that "when the finger is moved, the cursor is also moved" and a cursor position depends on a fingertip position. *Id*. at 26:8-14, 26:23-25. A PHOSITA would have recognized this cursor control is similar to the "click and drag" functionality described with reference to the eighth embodiment and would have be useful to implement the "click and drag" functionality. Indeed, detecting the position of a user's fingertip and tracking its movement is precisely the functionality necessary to implement such a "click and drag" feature. Accordingly, a PHOSITA would have been motivated to implement the fingertip detection and tracking technique within the eighth embodiment.

> 6.    ***Claim 7(d): means for controlling a function of said apparatus using said information.***

56.    As discussed above, the corresponding structure for this limitation includes at least the disclosure with reference to Fig. 9 by which a user can control a cursor on a display by moving her fingers (captured by a camera). *Numazaki* teaches the same (or an equivalent) structure for controlling cursor 714 on the screen based on a user's finger movements. Namely, *Numazaki's* "compact portable information device" allows the "position of a cursor 714 on the screen [to] be controlled by moving a finger 713 in front of [] window 712." *Numazaki* (Ex. 1003),

52:5-16. A PHOSITA would have understood that converting a user's finger movements into cursor control is a function performed by a processor and would have considered the processes performed by *Numazaki's* processor at least equivalent to the graphical user interface control algorithm disclosed in the '431 Patent. Indeed, in both the '431 Patent and *Numazaki*, a user's hand movements are captured by an image sensor and those movements are converted into commands that instruct the movement of graphical user interface virtual controls.

> *7.*    ***Claim 9: Apparatus according to claim 7, further including a display function which is controlled.***

57.    *Numazaki* teaches controlling a cursor 714 on the display of the handheld device depicted in Figs. 78-79:




A PHOSITA would have understood that the user moving the cursor is reflected on the device's display, providing feedback to the user as the user manipulates the cursor. Accordingly, a PHOSITA would recognize *Numazaki's* cursor control as a display function.

### 8.    *Claim 11: Apparatus according to claim 7, further including means for transmitting information.*

58.    As I discussed above with respect to Claim 3, a PHOSITA would have been motivated to include the fifth embodiment image capture functionality in *Numazaki's* eighth embodiment portable device. The fifth embodiment not only captures images, but also transmits those images to other devices. *Numazaki* refers to this functionality as a "TV telephone" that allows the system to extract image information of only the speaker and transmit that extracted information to another device in support of a "conference record system." *Numazaki* at 39:6-16, 40:16-49. A PHOSITA would have understood this "conference record system" is more commonly referred to as a videoconference system in which videoconference telephones send video and audio to each other. Such videoconference telephones were also known as cellular videophones. *See, e.g.,* "Next Stage of the Cellular Tour: Forced to Compete, Japan Become a Global Power," Sheryl WuDunn, New York Times, 1999 (Ex. 1013) (discussing the global efforts preceding the launch of a market leading cellular videophone—the Visual Phone VP-210—by Japan's Kyocera Corporation).

9.     ***Claim 13: Apparatus according to claim 7, wherein said apparatus is a cellular phone.***

59.    As I discussed with respect to Claim 11, a PHOSITA would have been motivated to implement *Numazaki's* fifth embodiment functionality into the eighth embodiment's handheld device, including the video conference functionality in which a handheld device extracts image information of only the speaker and transmits it to a further device for the same reasons as discussed previously.

60.    *Numazaki* refers to this videoconference embodiment as a "TV telephone" and stresses that its goals are to "lower communication cost[s] . . . [and] power consumption." *Numazaki* at 39:6-16. Although *Numazaki* does not expressly state that its TV telephone is a cellular phone, a PHOSITA would have understood that *Numazaki's* focus on lower communications costs is a concern applicable to cellular phones. Indeed, wireless cellular data connections at the time were expensive, and *Numazaki's* image extract method would alleviate otherwise high data transfer costs. Notably, *Numazaki's* subject extraction process would be less valuable to other wireless connections such as WiFi or wired connections, which do not share the same data transfer cost concerns. Although cellular videophones were not prevalent in the marketplace as of the '431 Patent's alleged invention date of July 8, 1999, a PHOSITA would have known that researchers were working on the technology and that products were being introduced to customers. *See, e.g.*, "Next Stage of the Cellular Tour: Forced to Compete, Japan Become a Global Power,"

Sheryl WuDunn, New York Times, 1999 (Ex. 1013), 2 (a July 1999 article discussing a new "cellular videophone" introduced by Kyocera). Further, a PHOSITA would have understood that *Numazaki's* fifth embodiment is directed to improvements to make such cellular videophones commercially viable.

> 10.    **Claim 14[a]: providing a computer within said device;**

61.    "Computer," as used in this limitation, mean a processor-based system able to execute functionality through software (i.e., by executing instructions defined by the software). *Numazaki's* eighth embodiment handheld device, including that depicted in Fig. 78, performs its function using an internal processor. A PHOSITA would have understood that such processor-based systems are "computer" systems and would have considered *Numazaki's* handheld device to include a computer within the meaning of this limitation.

> 11.    **Claim 18: A method according to claim 14, wherein said information includes the velocity or path of the portion or object.**

62.    As depicted in Fig. 20 below, *Numazaki* uses a center of gravity calculation to track the path of a finger as it moves:

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

UNIFIED PATENTS, LLC

Petitioner

v.

GESTURE TECHNOLOGY PARTNERS, LLC

Patent Owner

————————

IPR2021-00917

U.S. Patent 7,933,431

PETITION FOR *INTER PARTES* REVIEW OF
U.S. PATENT 7,933,431
CHALLENGING CLAIMS 7–13

I.   MANDATORY NOTICES UNDER 37 C.F.R. § 42.8 ......................................1

     A.   Real Party-in-Interest................................................................................1

     B.   Related Matters..........................................................................................1

     C.   Lead and Back-up Counsel and Service Information .............................2

II.  CERTIFICATION OF GROUNDS FOR STANDING....................................2

III. OVERVIEW OF CHALLENGE AND RELIEF REQUESTED .......................4

     A.   Prior Art Patents ......................................................................................4

     B.   Statutory Grounds for Challenges ...........................................................5

IV. U.S. PATENT 7,933,431 ..................................................................................6

     A.   Summary....................................................................................................6

     B.   Level of Ordinary Skill in the Art ...........................................................9

     C.   Prosecution History .................................................................................9

          1.   Priority Application Prosecution History........................................10

     D.   Priority Date ..........................................................................................12

V.  CLAIM CONSTRUCTION ..............................................................................13

     A.   "camera means associated with said housing" (claim 7) .......................13

     B.   "camera means associated with said housing for obtaining an image
          using reflected light of at least one object positioned by a user
          operating said object" (claim 7) .............................................................14

     C.   "computer means within said housing for analyzing said image to
          determine information concerning a position or movement of said
          object" (claim 7) ....................................................................................15

     D.   "means for controlling a function of said apparatus using said
          information" (claim 7)..............................................................................15

E.    "means for transmitting information" (claim 11)...................................17

VI. CLAIMS 7–13 ARE UNPATENTABLE .........................................................17

A.    Ground 1: Claims 7–12 are rendered obvious by *Doi* in view of
*Cousins* .......................................................................................................17

1.    Prior Art Overview and Reasons to Combine..................................17

a.    Overview of *Doi*.................................................................................17

b.    Overview of *Cousins* ........................................................................18

c.    Reasons to Combine Teachings of *Doi* and *Cousins* .......................18

2.    Analysis of Claims 7–12 ..................................................................21

B.    Ground 2: Claim 13 is rendered obvious by *Doi* in view of *Cousins*
further in view of *Parulski* ........................................................................33

1.    Overview of *Parulski* and Reasons to Combine ............................33

C.    Ground 3: Claims 7–9 and 11–12 are anticipated by *Numazaki* .............35

1.    Overview of *Numazaki* ...................................................................35

2.    Analysis of Claims 7–9 and 11–12 ..................................................36

D.    Ground 4: *Rhoads* renders claims 7, 9, and 11 obvious ..........................42

1.    Overview of *Rhoads* ........................................................................42

2.    Analysis....................................................................................43

VII. THE BOARD SHOULD NOT EXERCISE ITS DISCRETION TO
DENY THE PETITION .................................................................................52

A.    The Board Should Not Exercise Discretion to Deny Under § 325(d)
Based on Prior Art Previously Cited ..........................................................52

B.    The Board Should Not Exercise Discretion to Deny Under § 314(a)
Based on Previous Petitions .......................................................................52

C.    The Board Should Not Exercise Discretion to Deny Under § 314(a) Based on Parallel Litigations ....................................................53

D.    Discretionary Factors Summary ............................................55

VIII. CONCLUSION ................................................................56

IX. CERTIFICATE OF WORD COUNT ................................................57

## PETITIONER'S EXHIBIT LIST

| EX1001 | U.S. Patent 7,933,431 to Timothy R. Pryor |
|--------|-------------------------------------------|
| EX1002 | Prosecution File History of U.S. Patent 7,933,431 ("'431 PH") |
| EX1003 | Declaration of Mr. Christopher Schmandt |
| EX1004 | U.S. Patent Application Publication 2005/0013462 to Geoffrey B. Rhoads ("*Rhoads*") |
| EX1005 | U.S. Patent 6,266,061 to Doi et al. ("*Doi*") |
| EX1006 | U.S. Patent 6,417,797 to Cousins et al. ("*Cousins*") |
| EX1007 | U.S. Patent 6,144,366 to Numazaki et al. ("*Numazaki*") |
| EX1008 | U.S. Patent 5,666,159 to Parulski et al. ("*Parulski*") |
| EX1009 | U.S. Patent 5,768,163 to Smith |
| EX1010 | Eric R. Fossum, "Digital Camera System on a Chip," IEEE, 1998 |
| EX1011 | Microsoft Computer Dictionary (excerpts) |
| EX1012 | Prosecution File History of U.S. Application No. 11/980,710 |
| EX1013 | CNN.com, "First mobile videophone introduced," May 18, 1999 |
| EX1014 | PCMag, "The Golden Age of HP Palmtop PCs," August 18, 2016 |
| EX1015 | U.S. Patent 6,118,653 to Jung-Ho Kim |
| EX1016 | U.S. Patent 5,719,799 to Yasuo Isashi |
| EX1017 | Webster's Unabridged Dictionary of the English Language (excerpts) |
| EX1018 | Prosecution File History of U.S. Patent 6,417,797 |
| EX1019 | Starner et al., "Wearable Computing and Augmented Reality," MIT Media Lab, Nov. 1995 |
| EX1020 | Declaration of Kevin Jakel |
| EX1021 | Prosecution File History of U.S. Application No. 10/893,534 |
| EX1022 | Prosecution File History of U.S. Provisional Application No. 60/092,798 |

## I.    MANDATORY NOTICES UNDER 37 C.F.R. § 42.8

### A. Real Party-in-Interest

Pursuant to 37 C.F.R. § 42.8(b)(1), Unified Patents, LLC ("Unified" or "Petitioner") certifies that Unified is the real party-in-interest, and further certifies that no other party exercised control or could exercise control over Unified's participation in this proceeding, the filing of this petition, or the conduct of any ensuing trial.  In view of *Worlds Inc. v. Bungie, Inc.*, 903 F.3d 1237, 1242–44 (Fed. Cir. 2018), Unified has submitted voluntary discovery in support of its certification. *See* EX1020 (Declaration of Kevin Jakel).

### B. Related Matters

As of the filing date of this Petition, and to the best knowledge of Petitioner, the '431 Patent is or has been involved in the following matters:

| Case Caption | Number |
|---|---|
| *Gesture Technology Partners, LLC v. Huawei Device Co., Ltd.,* (E.D. Tex.) (complaint filed Feb. 4, 2021) | 2:21-cv-00040 |
| *Gesture Technology Partners, LLC v. Samsung Electronics Co., Ltd.,* (E.D. Tex.) (complaint filed Feb. 4, 2021) | 2:21-cv-00041 |
| *Gesture Technology Partners, LLC v. Apple Inc.,* (W.D. Tex.) (complaint filed Feb. 4, 2021) | 6:21-cv-00121 |
| *Gesture Technology Partners, LLC v. Lenovo Group Ltd.,* (W.D. Tex.) (complaint filed Feb. 4, 2021) | 6:21-cv-00122 |
| *Gesture Technology Partners, LLC v. LG Electronics, Inc.,* (W.D. Tex.) (complaint filed Feb. 4, 2021) | 6:21-cv-00123 |

### C. Lead and Back-up Counsel and Service Information

| Lead Counsel<br>Raghav Bajaj<br>HAYNES AND BOONE, LLP<br>2323 Victory Ave. Suite 700<br>Dallas, TX 75219 | Phone:       512-867-8520<br>Fax:          214-200-0853<br>raghav.bajaj.ipr@haynesboone.com<br>USPTO Reg. No. 66,630 |
|---|---|
| Back-up Counsel<br>Ashraf Fawzy<br>Unified Patents, LLC<br>PO Box 53345<br>Washington, DC 20009 | Phone:       202-871-0110<br><br>afawzy@unifiedpatents.com<br>USPTO Reg. No. 67,914 |
| Alyssa Holtslander<br>Unified Patents, LLC<br>PO Box 53345<br>Washington, DC 20009 | Phone:       202-750-3605<br><br>alyssa@unifiedpatents.com<br>USPTO Reg. No. 64,026 |
| David L. McCombs<br>HAYNES AND BOONE, LLP<br>2323 Victory Ave. Suite 700<br>Dallas, TX 75219 | Phone:       214-651-5533<br><br>david.mccombs.ipr@haynesboone.com<br>USPTO Reg. No. 32,271 |
| Angela Oliver<br>HAYNES AND BOONE, LLP<br>2323 Victory Ave. Suite 700<br>Dallas, TX 75219 | Phone:       202-654-4552<br><br>angela.oliver.ipr@haynesboone.com<br>USPTO Reg. No. 73,271 |

Please address all correspondence to lead and back-up counsel. Petitioner consents to electronic service.

## II.    CERTIFICATION OF GROUNDS FOR STANDING

Petitioner certifies pursuant to Rule 42.104(a) that the patent for which review is sought is available for *inter partes* review and that Petitioner is not barred or estopped from requesting an *inter partes* review challenging the patent claims on the

grounds identified in this Petition.

## III.   OVERVIEW OF CHALLENGE AND RELIEF REQUESTED

Pursuant to Rules 42.22(a)(1) and 42.104(b)(1)–(2), Petitioner challenges claims 7–13 ("Challenged Claims") of the '431 Patent.

### A. Prior Art Patents

The '431 Patent claims priority through a chain of applications to U.S. Provisional Application 60/142,777 filed July 8, 1999.  The following references are pertinent to the grounds of unpatentability explained below:

1. U.S. Patent 6,266,061 to Doi et al. (filed January 20, 1998, issued July 24, 2001) ("*Doi*" (EX1005)), which is prior art under at least 35 U.S.C. § 102(e).[1]

2. U.S. Patent 6,417,797 to Cousins et al. (filed June 1, 1999, claiming priority to a provisional application filed July 14, 1998 (*see* EX1022), issued July 9, 2002) ("*Cousins*" (EX1006)), which is prior art under at least 35 U.S.C. § 102(e).

3. U.S. Patent 5,666,159 to Parulski et al. (filed April 24, 1995, issued September 9, 1997) ("*Parulski*" (EX1008)), which is prior art under at least 35 U.S.C. § 102(b).

---

[1] The '431 Patent issued from an application filed prior to the enactment of the America Invents Act ("AIA").  Thus, the pre-AIA statutory framework applies.

4. U.S. Patent 6,144,366 to Numazaki et al. (filed October 17, 1997, issued November 7, 2000) ("*Numazaki*" (EX1007)), which is prior art under at least 35 U.S.C. § 102(e).

5. U.S. Patent Publication 2005/0013462 to Geoffrey B. Rhoads (filed January 23, 2004, claiming priority to U.S. Patent Application 09/343,104 filed June 29, 1999, published January 20, 2005) ("*Rhoads*" (EX1004)), which is prior art under at least 35 U.S.C. § 102(e).

None of the above references were cited during prosecution of the '431 Patent.

### B. Statutory Grounds for Challenges

This Petition, supported by the declaration of Mr. Christopher Schmandt ("Schmandt Declaration" or "Schmandt" (EX1003)), requests cancellation of claims 7–13 under the Grounds listed below:

**Ground #1**: Claims 7–12 of the '431 Patent are obvious under 35 U.S.C. § 103(a) over *Doi* in view of *Cousins*.

**Ground #2**: Claim 13 of the '431 Patent is obvious under 35 U.S.C. § 103(a) over *Doi* in view of *Cousins* further in view of *Parulski*.

**Ground #3**: Claims 7–9 and 11–12 of the '431 Patent are anticipated under 35 U.S.C. § 102(e) by *Numazaki*.

**Ground #4**: Claims 7, 9, and 11 of the '431 Patent are obvious under 35 U.S.C. § 103(a) over *Rhoads*.

## IV.  U.S. PATENT 7,933,431

### A. Summary

The '431 Patent is directed to "rapid TV camera and computer based sensing in many practical applications, including, but not limited to, handheld devices, cars, and video games." '431 Patent (EX1001), Abstract.  The '431 Patent states that its invention "relates to simple input devices for computers, particularly, but not necessarily…operating by optically sensing a human input to a display screen or other object and/or the sensing of human positions or orientations." *Id.* at 2:6–13.

In one example relevant to the instant Petition, and with reference to Figures 8A and 8B, the '431 Patent describes "a combination of one or more TV cameras (or other suitable electro-optical sensors) and a computer to provide various position and orientation related functions of use." *Id.* at 11:54–58.

IPR2021-00917 Petition
U.S. Patent 7,933,431



**'431 Patent (EX1001), Figs. 8a-8b**

More specifically, the '431 Patent depicts "control of functions with the invention, using a handheld device which itself has functions" and its purpose "is to add functionality to the device…and/or alternatively add a method to interact with the device." *Id.* at 11:62–67. Explaining further, the '431 Patent's "basic idea here is that a device which one holds in ones hand for use in its own right, can also be used with the invention herein to perform a control function by determining its

position, orientation, pointing direction or other variable with respect to one or more external objects, using an optical sensing apparatus such as a TV camera located externally to sense the handheld device, or with a camera located in the handheld device, to sense datums or other information external for example to the device." *Id.* at 12:1–9.

Independent claim 7 reads:

> 7. Handheld computer apparatus comprising:
>
> a housing;
>
> a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object;
>
> computer means within said housing for analyzing said image to determine information concerning a position or movement of said object; and
>
> means for controlling a function of said apparatus using said information.

However, prior to the '431 Patent's priority date, there was an abundance of research in the field of human-computer interaction and numerous prior art references related to alternative input modalities for computing devices. As demonstrated by the prior art presented herein, and as supported by the declaration of Mr. Schmandt, a recognized expert in the field of human-computer interaction, the '431 Patent's challenged claims simply restate technologies that were well-

known to persons of skill in the art prior to the alleged priority date. Thus, the prior art presented in this Petition (as supported by the testimony of Mr. Schmandt) renders obvious or discloses all elements of the challenged claims, as discussed below.

### B. Level of Ordinary Skill in the Art

A person of ordinary skill in the art at and before the priority date for the '431 Patent ("POSITA") would have had a bachelor's degree in computer science, computer engineering, electrical engineering, or a related subject, and one to two years of work experience with human-computer interaction. Less experience may be necessary with additional education (*e.g.*, a Master's degree); likewise, less education may be necessary with additional work experience (*e.g.*, 4–5 years). Schmandt (EX1003), ¶¶ 36–40.

### C. Prosecution History

The '431 Patent issued from U.S. Patent Application Number 12/834,281 ("the '281 Application"), which was filed July 12, 2010. The '281 Application is a continuation of U.S. Patent Application Number 11/980,710 ("the '710 Application"), filed October 31, 2007, which itself is a continuation of U.S. Patent Application Number 10/893,534, filed July 19, 2004, which itself is a continuation of U.S. Patent Application Number 09/612,225, filed July 7, 2000. The '281 Application also claims priority to U.S. Provisional Application No. 60/142,777,

filed July 8, 1999.

The claims filed with the '281 Application closely match the issued claims of the '431 Patent. *See* '431 PH (EX1002), pp. 43–44. In the only Office Action, claim 7 was rejected under § 112 for failing to recite sufficient antecedent basis. *Id.* at 82. No prior art rejections were made. *Id.* In response to the rejection, the applicant made an amendment to correct the antecedent basis error (*id.* at 92), and the examiner in turn issued a Notice of Allowance (*id.* at 100). The reasons for allowance did not provide insight into the allowable features of the claims; the examiner simply stated that the "[p]rior art of record, taken alone or in combination, fails to teach all the features in independent claims 1, 7 and 14." *Id.* at 104.

Although the examiner did not apply any prior art during prosecution, there were multiple references describing gesture-based input prior to the '431 Patent's priority date. The prior art cited herein demonstrates that every limitation of the challenged claims was known, and thus the challenged claims are unpatentable.

### 1. Priority Application Prosecution History

The prosecution history of one of the priority applications is also relevant to the '431 Patent's challenged claims.[2] The immediate parent '710 Application was

---

[2] The prosecution history of the grandparent non-provisional application, U.S. Application No. 10/893,534, is not pertinent to the challenged claims. The claims

filed with claims reciting similar subject matter; for example, prosecution claim 1 of the '710 Application recited "processing said camera image to determine location of points in said image; and using said determined locations determining the orientation of said handheld device" and claim 3 recited "control[ling] a display in response to said orientation." '710 PH (EX1012), p. 42. The examiner rejected these claims under § 112 for failing to comply with the written description requirement. *Id.* at 95. In response, the applicant substantially amended the claims. These amended claims recited, *inter alia*, "providing a TV camera within said handheld device to acquire an image of a plurality of discrete points…" *Id.* at 105. In arguing for written description support, the applicant conceded that the technology was well-known, stating: "It is believed that the first patent disclosing the principles behind the above noted steps was USP 4219847 issued August <u>1980</u> to Pinkney et al." *Id.* at 109 (emphasis in original). The applicant also pointed to other patents by the same inventor in attempting to establish written description support. Subsequently, in the next Office Action (a final Office Action), the examiner maintained the § 112 rejection, alleging that "providing a TV camera within said handheld device…" was "nowhere to be found in the specification." *Id.* at 124.

---

of the '534 Application are directed to a "method for board game play" and do not recite limitations analogous to those in claim 7. *See* EX1021, p. 190.

In response to the final Office Action, the applicant pointed to Figure 8B of the specification as containing support for the rejected limitation, which shows "cell phone 851 with a camera 850 as a part thereof acquiring an image of object 849." *Id.* at 137. The applicant also pointed to related matters; for example, U.S. Application No. 09/433,297, which allegedly taught a device incorporating a camera in Figure 9. *Id.* at 138. The examiner then withdrew the § 112 rejection and issued a notice of allowance. *Id.* at 147.

### D. Priority Date

For purposes of this proceeding, Petitioner assumes a priority date of July 8, 1999 (*i.e.,* the filing of the provisional application).

## V.   CLAIM CONSTRUCTION

The challenged claims of the '431 Patent are construed herein "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b)."  37 C.F.R. § 42.100(b) (Nov. 13, 2018).  Petitioner respectfully submits that, aside from the terms construed below, all other claim terms should have their ordinary and customary meaning as understood by one of ordinary skill in the art.

### A.  "camera means associated with said housing" (claim 7)

The phrase "associated with" in the claim term "camera means associated with said housing" should not be interpreted to require the camera means to be within the recited housing.  This is consistent with the '431 Patent and precedent.

First, claim 7 uses the phrase "associated with" to describe the relationship between the "camera means" and the "housing," while the claim uses the different adjective "within" to describe the relationship between the "computer means" and the "housing."  According to precedent, "[d]ifferent claim terms are presumed to have different meanings" and thus "associated with" cannot mean the same thing as "within."  *Board of Regents Univ. of Texas v. BenQ America*, 533 F.3d 1362, 1371 (Fed. Cir. 2008).  This is consistent with dictionary definitions of the two phrases, where "associate" is defined as "connected, joined, or related" whereas "within" is defined more narrowly as "in or into the interior or inner part; inside."  *See* EX1017,

pp. 126 (associate), 2183 (within).

Second, rewriting claim 7 to require the camera means to be "within" the housing would exclude a disclosed embodiment. The '431 Patent contemplates at least two physical locations for the camera: "a TV camera located externally to sense the handheld device" and "a camera located in the handheld device." '431 Patent (EX1001), 12:1–9. Narrowing the claim and interpreting "associated with" as "within" would read out the first embodiment, which is "rarely, if ever, correct." *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004).

Accordingly, the phrase "associated with" should not be narrowed to require the camera means to be "within" the recited housing. Schmandt (EX1003), ¶¶ 45–48.

## B. "camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object" (claim 7)

This is a means-plus-function limitation subject to § 112 ¶ 6.

The function of this limitation is obtaining an image using reflected light of at least one object positioned by a user operating said object. The structure corresponding to this function is one or more TV cameras (e.g., TV camera 815) or other suitable electro-optical sensors, and equivalents thereof. *See* '431 Patent (EX1001), 3:15–19; Schmandt (EX1003), ¶¶ 50–51.

### C. "computer means within said housing for analyzing said image to determine information concerning a position or movement of said object" (claim 7)

This is a means-plus-function limitation subject to § 112 ¶ 6.

The function of this limitation is analyzing an image to determine information concerning a position or movement of an object. The structure corresponding to this function is a general purpose computer programmed with an algorithm to cause the general purpose computer to: (1) analyze target image(s) of an object captured by the camera means; and (2) determine position(s) of the object. *See* '431 Patent (EX1001), 12:46–52 ("computer 830 connected to the camera analyzes the target images (including successive images if motion in a direction for example is used as an indicator, rather than pointing angle for example) [and] determines the cell phone position…"); *see also id.* at 6:9–18, 17:34–50; 7:22–29 ("a human 301 moves his finger 302 in a rapid up and down motion, creating different image positions sequentially…as seen by camera 325….If the camera can read quickly enough each of these positions such as 326 and 327 in image field 328 can be resolved…"); 11:54–58 ("computer to provide various position and orientation related functions of use"), 12:1–9; Schmandt (EX1003), ¶¶ 53–56.

### D. "means for controlling a function of said apparatus using said information" (claim 7)

This is a means-plus-function limitation subject to § 112 ¶ 6.

The function of this limitation is controlling a function of said apparatus using

said information.[3]  The structure corresponding to this function is a general purpose computer programmed with an algorithm to cause the general purpose computer to:

(1) receive position information;

(2) correlate the position information with a function of the apparatus; and

(3) cause the apparatus to perform the function, wherein the function includes one or more of:

> (a) a display function (*see* '431 Patent (EX1001), 26:8–9 (claim 9); 13:63–67);

> (b) a command to print (*see id.* at 12:46–52);

> (c) an image transmission function (*see id.* at 12:65–66); or

> (d) an e-mail transmission function (*see id.* at 13:36–40).

Schmandt (EX1003), ¶¶ 58–59.

---

[3] The '431 Patent explains that the purpose of its control of function invention is to "add functionality to the device, without complicating its base function, and/or alternatively add a method to interact with the device to achieve other purposes." '431 Patent (EX1001), 11:62–67; *see also* 12:1–9 ("perform a control function"); 12:29–35 ("multitude of added functions"); 12:59–64 ("perform the function desired").

### E. "means for transmitting information" (claim 11)

This is a means-plus-function limitation subject to § 112 ¶ 6.

The function of this limitation is transmitting information. The structure corresponding to this function is a mobile phone link and equivalents thereof. *See* '431 Patent (EX1001), 12:65–13:3 ("One function is just to acquire an image for transmission via for example the cell phones own connection. This is illustrated in FIG. 8B, where an image of object 849 acquired by camera 850 of cell phone 851 held by user 852 is transmitted over mobile phone link 853 to a remote location and displayed, for example."); Schmandt (EX1003), ¶¶ 61–62.

## VI.    CLAIMS 7–13 ARE UNPATENTABLE

### A. Ground 1: Claims 7–12 are rendered obvious by *Doi* in view of *Cousins*

#### 1.  Prior Art Overview and Reasons to Combine

##### a.  Overview of *Doi*

*Doi* describes a "user interface apparatus for performing input by image processing of an input image." *Doi* (EX1005), Abstract. *Doi* describes as background that a "user can easily perform input by gesture" (*id.* at 1:45–46) and, as relevant to the analysis below, describes a "first device for inputting a reflected image, and a second device for performing input by image processing of an input image." *Id.* at 2:38–49. In more detail, *Doi's* apparatus "receives reflected light

from an object such as the hand of a user as an image…detects information of the

shape, motion, or distance of the object, and performs predetermined control (e.g.,

control relating to I/O devices or start of application software) in accordance with

the shape or the like.  That is, this embodiment provides a function by which a user

can perform an intended input operation by, e.g., moving his or her hand." *Id.* at

7:23–36.

### b.  Overview of *Cousins*

*Cousins* describes a "multi-purpose portable imaging device" that is "small

enough to be hand-held or wearable."  *Cousins* (EX1006), Abstract.  *Cousins*

describes that the "portable multi-purpose imaging device" includes a "camera 140."

*Id.* at 5:6–8, 7:1–40.

### c.  Reasons to Combine Teachings of *Doi* and *Cousins*

In the analysis below, *Doi* is cited as teaching most of the subject matter of

claim 7.  While *Doi* generally states that its "user interface apparatus is suitably

applicable to, e.g., a computer having a graphical user interface" (*Doi* (EX1005),

7:13–14) it does not explicitly disclose that such a computer is *handheld* as recited

in the preamble of claim 7.  However, applying *Doi's* teachings to a *handheld*

computer apparatus would have been obvious at the time of the '431 Patent, as

confirmed by, for example, *Cousins.*  As noted above, *Cousins* describes a "hand-

held" device, and, like *Doi*, describes a "graphical user interface."  *Cousins*

(EX1006), Abstract, 6:1–3.

A POSITA would have recognized several reasons to combine the teachings of *Doi* and *Cousins*. First, *Cousins* provides an explicit teaching, suggestion, or motivation to use its hand-held device in a manner consistent with the teachings of *Doi*; for example, *Cousins* states that its imaging device can be used with hand gestures for input to a computer. *See id.* at 13:33–47.[4] Thus, consistent with the pre-*KSR* test for combining prior art teachings, there is an explicit teaching, suggestion, or motivation to combine the elements of *Doi* and *Cousins* to show that claim 7 is obvious, as *Cousins* explicitly would have motivated a POSITA to consider the teachings of gesture-based input references like *Doi*. Schmandt (EX1003), ¶¶ 76–78.

Second, combining the teachings of *Doi* and *Cousins* would have been obvious based on an implicit motivation to combine, when considering the general knowledge of a POSITA, consistent with the pre-*KSR* teaching, suggestion, or motivation test. As the Federal Circuit acknowledged (and as the Supreme Court cited with approval in *KSR*), "we have repeatedly held that an implicit motivation to

---

[4] *Doi* and *Cousins* are in the same field as the '431 Patent, input devices for computers including handheld devices, and are thus analogous art. Schmandt (EX1003), ¶ 77.

combine exists not only when a suggestion may be gleaned from the prior art as a whole, but when the 'improvement' is technology-independent and the combination of references results in a product…that is more desirable, for example because it is…smaller….we have held that there exists in these situations a motivation to combine prior art references even absent any hint of suggestion in the references themselves." *DyStar Textilfarben GmbH & Co. v. CH Patrick Co.,* 464 F. 3d 1356, 1368 (Fed. Cir. 2006). Here, applying *Cousins'* teachings to *Doi* results in a product that is smaller – a *handheld* computing device instead of, for example, a desktop computing device. Schmandt (EX1003), ¶ 79. Thus, there is an implicit motivation to combine the teachings of *Doi* and *Cousins*.

Third, combining the teachings of *Doi* and applying them to the *handheld* apparatus of *Cousins* would have been no more than the simple substitution of one known element for another, and would have been obvious at the time of the '431 Patent. Schmandt (EX1003), ¶ 80. The only difference between *Doi* and the claimed device is the substitution of a *handheld* computing device for a general disclosure of a computing device. Such a device was known in the art, as shown by *Cousins*, and a POSITA could have, and would have found it obvious to, substitute the handheld computing device of *Cousins* for that of *Doi*, and the results of such a substitution would have been predictable. Schmandt (EX1003), ¶ 81. Further, as noted above, *Cousins* explicitly teaches and suggests the combination, as it suggests that "another

application consists of using imaging device 100 along with an expert system to read sign language or the like" and that "[h]and gestures can be used to issue commands…." *Cousins* (EX1006), 13:33–47. Thus, a POSITA would have been motivated to, and would have found it obvious to, combine the teachings of *Doi* and *Cousins*. Schmandt (EX1003), ¶¶ 80–81.

There would have been a reasonable expectation of success in combining these teachings, as Mr. Schmandt testifies, as POSITAs would have been aware of devices combining gesture recognition technologies in smaller form factor devices. Schmandt (EX1003), ¶ 82. Based on the combined teachings of *Doi* and *Cousins*, claims 7–12 are rendered obvious, as set forth below.

## 2.   Analysis of Claims 7–12

### <u>Claim 7</u>

#### *[7.0] Handheld computer apparatus comprising:*

To the extent the preamble is limiting, the combined teachings of *Doi* and *Cousins* render it obvious. *Doi* teaches a "user interface apparatus…applicable to, e.g., a computer having a graphical user interface" and thus teaches a *computer apparatus* as recited. *Doi* (EX1005), 7:10–22. *Cousins* supplements the teachings of *Doi* and discloses that such an apparatus may be *handheld*, as it describes a

"**hand-held**"[5] imaging device.  *Cousins* (EX1006), Abstract.  A POSITA would have combined these teachings of *Cousins* and *Doi* as summarized above. *See supra* § VI.A.1.c.  Thus, the combined teachings of *Doi* and *Cousins* render obvious a *handheld computer apparatus* as recited.  Schmandt (EX1003), ¶¶ 83–87.

### [7.1] a housing;

*Doi* in view of *Cousins* renders obvious this claim limitation.

*Cousins* discloses that its "[i]maging device 100 comprises a compact, hard case 101 designed for hand-held use."  *Cousins* (EX1006), 5:11–13.  A POSITA would have recognized a case to correspond to a *housing* as recited, and thus, *Doi* in view of *Cousins* renders obvious this limitation.  Schmandt (EX1003), ¶¶ 88–92; *see also* § VI.A.1.c (motivations to combine *Doi* and *Cousins*).

### [7.2] a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object;

*Doi* discloses, or at least renders obvious, this limitation.  Alternatively, the combined teachings of *Doi* and *Cousins* render obvious this limitation.

The function of this limitation is obtaining an image using reflected light of at

---

[5] Emphasis is added unless otherwise specified.  **Bold** emphasis is used within quoted material; *italics* are used to signify the challenged claims' language.

least one object positioned by a user operating said object, and the structure corresponding to this function is a TV camera or other suitable electro-optical sensors. *See* § V.B., *supra*.

*Doi* teaches that its apparatus includes an "image input unit 10" that includes a "a **reflected light** extracting unit 102" which "**receives the reflected light from the object** by using light-receiving elements arranged in the form of a two-dimensional array." *Doi* (EX1005), 7:41–51. *Doi* further explains that an example of the "light-receiving unit" is "a CCD **camera**." *Id.* at 7:60–62. Thus, *Doi* discloses the corresponding structure and function of the recited *camera means ... for obtaining an image using reflected light of at least one object*. Schmandt (EX1003), ¶¶ 94–95.

*Doi* also discloses that the object is *positioned by a user operating said object* as it describes that the apparatus "receives reflected light from an object such as the hand of a user" and describes the user "moving his or her hand." *Doi* (EX1005), 7:23–36. Figure 3 of *Doi* depicts the "housing 8 of the image input unit 10" coupled to a "display device 20" and thus *Doi* teaches that its *camera means* is *associated with* a housing of a computing device. Schmandt (EX1003), ¶ 96.

However, to the extent this not considered an explicit teaching of this limitation, and to the extent the phrase *camera means associated with said housing* is more narrowly interpreted to require that the *camera means* be **within** *said*

*housing*, Cousins explicitly discloses such a *camera means associated with said housing*. *See* Schmandt (EX1003), ¶¶ 97–98. In Figure 2, *Cousins* depicts imaging device 100 with camera means 140 integrated into the case of imaging device 100.



**Figure 2**

100

***Cousins* (EX1006), Fig. 2**

Thus, *Doi*, or the combined teachings of *Doi* and *Cousins*, teach *a camera means associated with said housing for obtaining an image using reflected light of*

*at least one object positioned by a user operating said object* as recited.  Schmandt (EX1003), ¶¶ 93–99.

### *[7.3] computer means within said housing for analyzing said image to determine information concerning a position or movement of said object; and*

*Doi* discloses, or at least renders obvious, this limitation.

The function of this limitation is analyzing an image to determine information concerning a position or movement of an object.  The structure corresponding to this function is a general purpose computer programmed with an algorithm to cause the general purpose computer to: (1) analyze target image(s) of an object captured by the camera means; and (2) determine position(s) of the object.  *See* § V.C., *supra*.

First, *Doi* discloses the general purpose computer portion of the structure of the recited *computer means* in its user interface unit applied to a "computer having a graphical user interface."  *Doi* (EX1005), 7:10–14.  *Doi* also discloses that its "functions can be realized by software" and "practiced as mechanically readable media recording programs for allowing a computer to execute the procedures or the means described above."  *Id.* at 20:15–19.  A POSITA would have recognized *Doi's* computer means to be *within* the housing depicted as element 20 in Figure 3, or alternatively, *within* the housing depicted as element 8.  Schmandt (EX1003), ¶ 102.

IPR2021-00917 Petition
U.S. Patent 7,933,431



***Doi* (EX1005), Fig. 3**

To the extent this is not an explicit teaching of a *computer means within said housing*, again, *Cousins* provides such teachings. *Cousins* describes with respect to Figure 4 "the major components of a system for a multi-purpose portable imaging device" which includes within the device a "processor array 400." *Cousins* (EX1006), 9:1–11; *see also* 1:55–61 ("compact devices typically comprise sensors for collecting data, a processor for manipulating data"); 14:17–24 (claim 1 reciting "compact imaging device comprising…one or a plurality of processors, coupled to array of sensors…"); 14:57–59 (claim 6 reciting "processors…within the portable case"); EX1018, 75:5–12 (original *Cousins* disclosure corresponding to claim 1); 75:1–12 (original *Cousins* disclosure corresponding to claim 6); Schmandt (EX1003), ¶ 103.

IPR2021-00917 Petition
U.S. Patent 7,933,431



**Figure 4**

*Cousins* **(EX1006), Fig. 4**

*Doi* also describes that its computer means is *for analyzing said image to determine information concerning a position or movement of said object* and thus, *Doi's* computer means performs the algorithm portion of the corresponding structure. *Doi's* computer includes an "interpretation rule storage unit 13" which "stores interpretation rules for shape interpretation." *Doi* (EX1005), 8:35–36. As one example, this data can include "predetermined contents such as feature amounts, e.g., the shape, area, **uppermost point**, and the center of gravity of an object such as the hand of a user in a dot matrix and designation contents corresponding to these predetermined contents are stored as interpretation rules." *Id.* at 8:36–41.

Additionally, "[t]he designation contents include, e.g., selection of an icon, start of an application, and movement of a cursor. When cursor movement is to be performed, the moving amount of a cursor corresponding to the direction and the distance of the movement of the hand is also designated. For example, the following rules are possible. That is, a state in which the thumb and the index finger are open and raised is used to indicate cursor movement (in this case, **the distance and the direction of the movement of the tip of the index finger** correspond to the distance and the direction of the movement of the cursor)." *Id.* at 8:35–59. Thus, *Doi* describes that its computer means analyzes target images of the object and determines positions of the object. Schmandt (EX1003), ¶ 104.

Thus, because *Doi* describes a user interface apparatus that interprets movement of a finger, *Doi* discloses, or at least renders obvious (whether alone or with *Cousins*), *computer means within said housing for analyzing said image to determine information concerning a position or movement of said object* as recited. Schmandt (EX1003), ¶¶ 100–105.

### [7.4] means for controlling a function of said apparatus using said information.

*Doi* discloses, or at least renders obvious, this limitation.

The function of this limitation is controlling a function of said apparatus using said information. The structure corresponding to this function is a general purpose

computer programmed with an algorithm to cause the general purpose computer to receive position information, correlate the position information with a function of the apparatus, and cause the apparatus to perform one of four functions. *See* § V.D., *supra*.

As described above in the analysis of limitation [7.3], *Doi* describes an "interpretation rule storage unit" which "stores interpretation rules for shape interpretation." *Doi* (EX1005), 8:35–36. As one example, based on "the distance and the direction of the movement of the tip of the finger", *Doi* discloses that "cursor movement" can occur, where the distance and direction of the finger tip "correspond to the distance and direction of the movement of the cursor." *Id.* at 8:43–59. Thus, *Doi* teaches that its system receives position information (e.g., the direction of the movement of the tip of the finger), correlates the position information with a function of the apparatus (e.g., cursor movement in a specified distance and direction), and causes the apparatus to perform the function (move the cursor). Schmandt (EX1003), ¶ 108. *Doi* provides other functions that are controlled in Figures 5 through 18; for example, one such function is to start an application: "An action of turning the palm of the hand while only the index finger is raised is used to indicate start of an application corresponding to an icon in a position where the cursor exists." *Doi* (EX1005), 17:24–27; Schmandt (EX1003), ¶ 109.

Accordingly, *Doi* teaches *means for controlling a function of said apparatus*

*using said information* as recited.  Schmandt (EX1003), ¶¶ 107–110.  Thus, the

combined teachings of *Doi* and *Cousins* render claim 7 obvious.

## Claim 8

*[8.1] Apparatus according to claim 7, wherein said object is a finger.*

 *Doi* discloses, or at least renders obvious, this limitation.  As detailed in the

analysis of limitation [7.3], *Doi* analyzes movement of a thumb and index finger in

one example.



## FIG. 5

*Doi* **(EX1005), Fig. 5**

 Thus, *Doi* teaches *wherein said object is a finger* and renders obvious claim

8.  Schmandt (EX1003), ¶¶ 111–113.

## Claim 9

***[9.1] Apparatus according to claim 7, further including a display function which is controlled.***

*Doi* discloses, or at least renders obvious, this limitation. As detailed in the analysis of limitation [7.4], *Doi* describes moving a cursor on a display. *Doi* also contemplates "changing a display state of a cursor" in some instances. *Doi* (EX1005), 5:2–6.



**FIG. 6B**

***Doi* (EX1005), Fig. 6B**

Accordingly, *Doi* teaches *a display function which is controlled* and renders obvious claim 9. Schmandt (EX1003), ¶¶ 114–117.

## Claim 10

### [10.1] Apparatus according to claim 7, wherein said display is 3D display.

*Cousins* renders obvious this limitation. *Cousins* describes that "[d]isplay 105 may comprise an active or passive matrix flat panel display" and that the "display may also be a holographic display." *Cousins* (EX1006), 5:16–21. *Cousins* further describes this display as a "holographic autostereoscopic display" and that the "user of this type of display can see a stereoscopic 3Dimage in front and behind the plane of the screen." *Id.* at 5:39–46. Thus, *Cousins* teaches *said display is 3D display* as recited and renders obvious claim 10. Schmandt (EX1003), ¶¶ 118–120.

## Claim 11

### [11.1] Apparatus according to claim 7, further including means for transmitting information.

*Cousins* renders obvious this limitation. *Cousins* contemplates that "interfaces to other imaging devices may also be provided to provide sharing of imaging data among other imaging devices or to **transmit imaging data to remote locations using ground-base wireless or satellite technology**." *Cousins* (EX1006), 5:26–29. Thus, *Cousins* teaches *means for transmitting information* as recited and renders obvious claim 11. Schmandt (EX1003), ¶¶ 121–124.

**Claim 12**

*[12.1] Apparatus according to claim 7, further including a light source for illuminating said object.*

*Doi* teaches this limitation. *Doi* teaches that its "image input unit 10 includes a **light-emitting unit**" and that the light-emitting unit "irradiates light such as near infrared rays onto an object by using light-emitting elements such as LEDs." *Doi* (EX1005), 7:44–51. Thus, *Doi* teaches *a light source for illuminating said object* as recited and renders obvious claim 12. Schmandt (EX1003), ¶¶ 125–127.

### B. Ground 2: Claim 13 is rendered obvious by *Doi* in view of *Cousins* further in view of *Parulski*

#### 1. Overview of *Parulski* and Reasons to Combine

*Parulski* describes an embodiment of its invention in which "a cellular telephone is provided with the components of an electronic image camera to form a combined telephone/camera unit 48." *Parulski* (EX1008), 4:26–29.



***Parulski* (EX1008), Figs. 7–8**

A POSITA would have been motivated to implement the teachings of the *Doi-Cousins* combination in a cellular telephone as taught by *Parulski*, because this would have been no more than the simple substitution of one known element (a hand-held computing apparatus as taught by *Cousins*) for another (a cellular telephone as disclosed by *Parulski*) with predictable results.  Schmandt (EX1003), ¶¶ 130–132.[6]

**Claim 13**

*[13.1] Apparatus according to claim 7, wherein said apparatus is a cellular phone.*

As noted above, *Parulski* teaches "a cellular telephone … provided with the components of an electronic image camera to form a combined telephone/camera unit 48." *Parulski* (EX1008), 4:26–29, Figs. 7–8.  Accordingly, in combination with the teachings of *Doi* and *Cousins*, *Parulski* renders obvious *said apparatus is a cellular phone* as recited in claim 13.  Schmandt (EX1003), ¶¶ 133–135.

---

[6] *Parulski* is analogous art to the '431 Patent, as it is reasonably pertinent to at least one problem addressed by the '431 Patent of using a handheld device with camera and computer functionality.  *See Parulski* (EX1008), Fig. 9; Schmandt (EX1003), ¶ 130.

### C. Ground 3: Claims 7–9 and 11–12 are anticipated by *Numazaki*

### 1.  Overview of *Numazaki*

*Numazaki* discloses an "apparatus for generating information input" using "gesture or [] motion."  *Numazaki* (EX1007), Abstract.  With reference to the analysis below, *Numazaki* discloses a "compact portable information device equipped with the information input generation apparatus of the present invention, which is in a size that can be held by one hand." *Id.* at 52:5–8.

FIG.78



***Numazaki* (EX1007), FIG. 78**

## 2. Analysis of Claims 7–9 and 11–12

### Claim 7

***[7.0] Handheld computer apparatus comprising:***

To the extent the preamble is limiting, *Numazaki* discloses it. As detailed above, *Numazaki* discloses and depicts a "compact portable information device…which is in a size that can be held by one hand." *Numazaki* (EX1007), 52:5–8. Thus, *Numazaki* discloses a *handheld computer apparatus* as recited. Schmandt (EX1003), ¶¶ 139–141.

***[7.1] a housing;***

*Numazaki* discloses this claim limitation. Specifically, *Numazaki* discloses that its portable information device has an "external body," which a POSITA would have recognized as disclosing the recited *housing*. *Numazaki* (EX1007), 52:8–12. Thus, *Numazaki* discloses this limitation. Schmandt (EX1003), ¶¶ 142–143.

***[7.2] a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object;***

*Numazaki* discloses this limitation.

The function of this limitation is obtaining an image using reflected light of at least one object positioned by a user operating said object, and the structure corresponding to this function is a TV camera or other suitable electro-optical

sensors. *See* § V.B., *supra*.

*Numazaki* discloses that its portable information device includes a "photo-detection sensor unit." *Numazaki* (EX1007), 52:8–14. Details of the "photo-detection sensor unit" are described with respect to the "information input generation apparatus of the present invention as described in the above embodiments," i.e., the first through seventh embodiments of the "information input generation apparatus," where the portable information device corresponds to the eighth embodiment and where the disclosure of the first through seventh embodiments applies to the eighth embodiment. *Id.* at 50:21–24; Schmandt (EX1003), ¶¶ 146–147.

In describing the first embodiment of the information input generation apparatus, *Numazaki* discloses that the apparatus comprises a "reflected light extraction unit 102" which "extracts the reflected light from the target object." *Id.* at 10:33–35. *Numazaki* further discloses that this is accomplished using "photo-detection optics 107." *Id.* at 11:11–15. Thus, *Numazaki* discloses the function and corresponding structure of the recited *camera means…for obtaining an image using reflected light of at least one object*, as the structure corresponding to the *camera means* limitation includes at least electro-optical sensors, such as those disclosed in *Numazaki*. Schmandt (EX1003), ¶¶ 148–150.

*Numazaki* further discloses that this *camera means* is *associated with said housing*, because the "photo-detection sensor unit" is described as being within the

"portable information device." *Numazaki* (EX1007), Fig. 78, 52:12–14; Schmandt (EX1003), ¶ 151.

*Numazaki* further discloses that it obtains images of objects *positioned by a user operating said object* as it describes and depicts the user "moving a finger 713." *Numazaki* (EX1007), 52:14–16; Schmandt (EX1003), ¶ 152.

Thus, *Numazaki* discloses *a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object* as recited. Schmandt (EX1003), ¶¶ 144–153.

### [7.3] computer means within said housing for analyzing said image to determine information concerning a position or movement of said object; and

*Numazaki* discloses this limitation.

The function of this limitation is analyzing an image to determine information concerning a position or movement of an object. The structure corresponding to this function is a general purpose computer programmed with an algorithm to cause the general purpose computer to: (1) analyze target image(s) of an object captured by the camera means; and (2) determine position(s) of the object. *See* § V.C., *supra*.

*Numazaki* discloses that its portable information device also includes "feature data generation unit 103" which "extracts [] information … from the reflected light image." *Numazaki* (EX1007), 10:57–61. A POSITA would have recognized *Numazaki's* "feature data generation unit 103" as *computer means within said*

*housing*, at least because it is depicted as coupled to a digital memory, timing control, and other control components, and is depicted within a computing device; thus, it would be recognized as corresponding to part of a general purpose computing device, consistent with the structure of the recited *computer means*. Schmandt (EX1003), ¶¶ 156–157.

*Numazaki* further discloses that the feature data generation unit performs the functions of analyzing target images of an object and determining a position of the object. *Numazaki* describes that "by inputting the reflected light image of the hand, it is possible to realize the pointing or gesture input." *Id.* at 16:27–28. *Numazaki* further describes that "[w]hen the hand is used as the target object, it is possible to capture the **information on a position** and a shape of the hand without a contact, so that it is possible to utilize the present invention as a means for inputting information." *Id.* at 17:19–23. *Numazaki* likewise provides an example of "obtain[ing] the finger tip position at high precision." *Id.* at 17:51–56. Thus, *Numazaki* discloses the function and corresponding structure for the *computer means within said housing for analyzing said image to determine information concerning a position or movement of said object* as recited. Schmandt (EX1003), ¶¶ 156–160.

**[7.4] means for controlling a function of said apparatus using said information.**

    *Numazaki* discloses this limitation.

The function of this limitation is controlling a function of said apparatus using said information.  The structure corresponding to this function is a general purpose computer programmed with an algorithm to cause the general purpose computer to receive position information, correlate the position information with a function of the apparatus, and cause the apparatus to perform one of four functions.  *See* § V.D., *supra*.

*Numazaki* discloses that "by using the finger tip position obtained in the above, the cursor on the screen can be controlled. When the finger tip position is set in correspondence to the cursor position within the screen, the cursor is displayed at the corresponding position when the finger is extended. Also, when the finger is moved, the cursor is also moved."  *Numazaki* (EX1007), 26:8–18; *see also* 52:14–16 ("position of a cursor 714 can be controlled by moving a finger 713 in front of this window 712.").  Thus, *Numazaki* discloses the algorithm portion of the corresponding structure, as it describes receiving position information (the finger tip position), correlating it with a function of the apparatus (setting the finger tip position in correspondence to the cursor position) and causing the apparatus to move the cursor (the cursor is displayed at the corresponding position).  *Numazaki* also discloses that this is performed by equivalents of the structure in "cursor position determination unit 252."  *Id.* at 26:23–25.

Thus, *Numazaki* discloses *means for controlling a function of said apparatus*

*using said information.*  Schmandt (EX1003), ¶¶ 161–165.

Thus, *Numazaki* discloses each and every limitation of claim 7, arranged as in the claim, and therefore anticipates claim 7.

## Claim 8

*[8.1] Apparatus according to claim 7, wherein said object is a finger.*

*Numazaki* discloses this limitation.  As shown in Figure 78, and as detailed throughout the reference, *Numazaki* uses "the finger tip position" to control a displayed cursor.  Thus, *Numazaki* discloses *wherein said object is a finger* and anticipates claim 8.  Schmandt (EX1003), ¶¶ 166–167.

## Claim 9

*[9.1] Apparatus according to claim 7, further including a display function which is controlled.*

*Numazaki* discloses this limitation.  As detailed in the analysis of limitation [7.4], *Numazaki* describes moving a cursor on a display.  Accordingly, *Numazaki* discloses *a display function which is controlled* and anticipates claim 9.  Schmandt (EX1003), ¶¶ 168–170.

## Claim 11

*[11.1] Apparatus according to claim 7, further including means for transmitting*

*information.*

*Numazaki* discloses this limitation.  In describing the fifth embodiment, *Numazaki* describes a "transmission unit 356" which "transmits the extracted image." *Numazaki* (EX1007), 40:45–49.  Thus, *Numazaki* discloses *means for transmitting information* as recited and anticipates claim 11.  Schmandt (EX1003), ¶¶ 171–174.

## Claim 12

*[12.1] Apparatus according to claim 7, further including a light source for illuminating said object.*

*Numazaki* discloses this limitation.  *Numazaki* describes that its information input generation apparatus "comprises a lighting unit 101" which "emits a light…irradiated onto a target object located in front of the lighting unit." *Numazaki* (EX1007), 10:29–31.  Thus, *Numazaki* discloses *a light source for illuminating said object* as recited and anticipates claim 12.  Schmandt (EX1003), ¶¶ 175–177.

### D. Ground 4: *Rhoads* renders claims 7, 9, and 11 obvious

#### 1.  Overview of *Rhoads*

*Rhoads* relates to "optical user interfaces that sense digitally-encoded objects" and "systems using such optical interfaces to control computers." *Rhoads* (EX1004), ¶ 2.  *Rhoads* further describes that its invention is "about powerful new

user interfaces to computers involving optical input" and the technology "may be regarded as enhanced systems by which users can interact with computer-based devices." *Id.* at ¶¶ 9, 13. *Rhoads* coins the name "Bedoop" as a sound made in response to an object placed in front of a camera, and uses this term to describe its system. *See id.* at ¶ 3. As relevant to the analysis below, *Rhoads* describes "Gestural Input" using the Bedoop system, and in one example, describes "gestural interfaces…for simplifying user-computer interaction." *Id.* at ¶¶ 143–172. *Rhoads* is thus analogous art to the '431 Patent, as it is within the same field. Schmandt (EX1003), ¶ 180.

## 2. Analysis

**<u>Claim 7</u>**

***[7.0] Handheld computer apparatus comprising:***

To the extent the preamble is limiting, *Pacing Techs., LLC v. Garmin Intern., Inc.*, 778 F. 3d 1021, 1023–1024 (Fed. Cir. 2015) (preambles are not normally limiting), *Rhoads* discloses or at least renders it obvious.

*Rhoads* states that the disclosed Bedoop systems "can be portable. Some such systems, for example, employ **palmtop computers** equipped with optical sensor arrays." *Rhoads* (EX1004), ¶ 288. A POSITA would have recognized a "palmtop computer" to teach a *handheld computer apparatus* as a computing dictionary

defines "palmtop" as a "portable personal computer whose size enables it to be **held in one hand** while it is operated with the other hand."  Schmandt (EX1003), ¶¶ 182–184 (citing Microsoft Computer Dictionary (EX1011), p. 330).   Thus, *Rhoads* discloses, or at least renders obvious, a *handheld computer apparatus* as recited.

### [7.1] a housing;

*Rhoads* discloses, or at least renders obvious, this claim limitation.

As described above in limitation [7.0], *Rhoads* contemplates "palmtop computers" as one implementation.  *Rhoads* (EX1004), ¶ 288.  A POSITA would have recognized such palmtop computers to include a *housing* as recited.  For example, the Hewlett-Packard 95X was an early palmtop computer (released in 1991), and a POSITA would have recognized that the outer case of the device corresponded to the recited *housing*.  Schmandt (EX1003), ¶¶ 186–188.



Thus, *Rhoads* discloses, or at least renders obvious, *a housing* as recited.  Schmandt (EX1003), ¶¶ 185–189.

***[7.2] a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object;***

*Rhoads* discloses, or at least renders obvious, this limitation.

The function of this limitation is obtaining an image using reflected light of at least one object positioned by a user operating said object, and the structure corresponding to this function is a TV camera or other suitable electro-optical sensors. *See* § V.B., *supra*.

As detailed above, *Rhoads* describes that its palmtop computer is "equipped with **optical sensor arrays**." *Rhoads* (EX1004), ¶ 288. *Rhoads* explains that in a "basic embodiment" the "illustrated optical sensor 12 is a **digital camera** having a resolution of 320 by 200 pixels." *Id.* at ¶ 16. *Rhoads* also describes that a user may be "equipped with a portable appliance that merges the functions of palmtop computer and **digital camera**." *Id.* at ¶ 404. Thus, *Rhoads* discloses the structure of the recited *camera means associated with said housing*. *See also* Schmandt (EX1003), ¶¶ 192–196 (citing, e.g., Isashi (EX1016) and Smith (EX1009) as describing palmtop computers with attached cameras).

*Rhoads* further discloses the function of this limitation; specifically, *Rhoads* describes that the digital camera is *for obtaining an image*, as it describes that the digital camera "stares out, grabbing **frames of image data** five times per second…." *Rhoads* (EX1004), ¶ 16.

*Rhoads* further discloses, or at least renders obvious, that the digital camera obtains an image *using reflected light*. A POSITA would have recognized that digital cameras at the time of *Rhoads* used charge-coupled devices for image capture: "digital camera *n*….A digital camera uses a CCD (charge-coupled device) element to capture the image through the lens…" Microsoft Computer Dictionary (EX1011), p. 138 (digital camera). Charge-coupled devices, in turn, use the reflection of light to capture images: "The light-detecting component of digital cameras and many video cameras is a charge-coupled device." *Id.* at 83 (charge-coupled device); *see also* Fossum (EX1010), p. 8 ("[o]ptics collect and focus **photons reflected off an object**…"). Thus, because *Rhoads* discloses a digital camera, it teaches that an image is obtained *using reflected light* as recited. Schmandt (EX1003), ¶¶ 197–200.

*Rhoads* also discloses that the digital camera obtains images of *at least one object positioned by a user operating said object*. For example, *Rhoads* discloses that the "Bedoop system can determine the scale state, rotation state, X-Y offset, and differential scale state, **of an object**" and it provides an example of "**moving an object** to the left or right in front of the Bedoop scanner" and an additional example of "tilting the object so that one part is moved towards or away from **the camera**." *Rhoads* (EX1004), ¶¶ 144–145. *Rhoads* also describes that "[a]ny object (talisman) that can be distinguished in the **image data** can be **manipulated by a user** in the

manners described above, and an appropriate system can recognize the movement of the object and respond accordingly." *Id.* at ¶ 151. Thus, *Rhoads* discloses obtaining *an image…of at least one object positioned by a user operating said object*. Schmandt (EX1003), ¶¶ 201–202.

Accordingly, by describing optical sensor arrays, including digital cameras, that obtain image data of an object manipulated by a user, *Rhoads* discloses, or at least renders obvious, the function and corresponding structure of *a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object* as recited. Schmandt (EX1003), ¶¶ 190–203.

### [7.3] computer means within said housing for analyzing said image to determine information concerning a position or movement of said object; and

*Rhoads* discloses, or at least renders obvious, this limitation.

The function of this limitation is analyzing an image to determine information concerning a position or movement of an object. The structure corresponding to this function is a general purpose computer programmed with an algorithm to cause the general purpose computer to: (1) analyze target image(s) of an object captured by the camera means; and (2) determine position(s) of the object. *See* § V.C., *supra*.

First, *Rhoads* discloses the corresponding structure for this function in in "computer 14." *Rhoads* (EX1004), ¶ 16; Fig. 1. As described above, *Rhoads* teaches

that its computer can take the form of a palmtop computer, or a "portable appliance that merges the functions of a palmtop computer and digital camera" with a "processor". *Id.* at ¶ 404. A POSITA would have recognized that the processor is *within said housing* of the palmtop computer's housing. Schmandt (EX1003), ¶ 206.

Second, *Rhoads* discloses that the computer is *for analyzing said image to determine information concerning a position or movement of said object* and performs the functions of analyzing target images of an object captured by the camera means and determines position(s) of the object. For example, as detailed above, *Rhoads* discloses that "an appropriate system can **recognize the movement of the object** and **respond accordingly**." *Id.* at ¶ 151. By describing that the system recognizes movement and responds accordingly, *Rhoads* teaches that its system is analyzing the image data and determining the position of the object in the image to provide an appropriate response, and thus, *Rhoads* discloses analyzing target images and determining multiple positions of the object. Similarly, *Rhoads* discloses that a "Bedoop system can determine the **scale state, rotation state, X-Y offset, and differential scale state**, of an object" and it provides an example of "**moving an object** to the left or right in front of the Bedoop scanner." *Id.* at ¶¶ 144–145, *see also* ¶ 149 ("changes in two of these four positioning variables can be used to provide one of four different inputs to the computer"). Here too, *Rhoads* indicates that it analyzes the image data to detect changes in positioning variables. Schmandt

(EX1003), ¶ 207.

Thus, because *Rhoads* describes a palmtop computer with a processor that recognizes the movement of an object and responds accordingly, *Rhoads* discloses, or at least renders obvious, *camera means within said housing for analyzing said image to determine information concerning a position or movement of said object* as recited.  Schmandt (EX1003), ¶¶ 205–208.

### [7.4] means for controlling a function of said apparatus using said information.

*Rhoads* discloses, or at least renders obvious, this limitation.

The function of this limitation is controlling a function of said apparatus using said information.  The structure corresponding to this function is a general purpose computer programmed with an algorithm to cause the general purpose computer to receive position information, correlate the position information with a function of the apparatus, and cause the apparatus to perform one of four functions.  *See* § V.D., *supra*.

As described above in the analysis of limitation [7.4], *Rhoads* describes that the Bedoop system, which includes the computer portion of the corresponding structure, responds accordingly to the movement of an object.  For example, *Rhoads* provides a scenario in which a "card is twisted to the left" and in response, "the computer opens a web browser to a web page address corresponding to Bedoop data

on the card." *Rhoads* (EX1004), ¶ 147.  By contrast, "[i]f the card is twisted to the right, the computer opens an e-mail template, pre-addressed to an e-mail address indicated by the card." *Id.*; Schmandt (EX1003), ¶¶ 211–212.

Thus, *Rhoads* teaches that its system receives position information (e.g., corresponding to the movement of the card to the left or right), correlates the position information with a function of the apparatus (e.g., right twist correlated with e-mail function), and causes the apparatus to perform the function (open an e-mail template).  Schmandt (EX1003), ¶ 213.

*Rhoads* provides other uses of the Bedoop system; for example, the system "responds to gestures in different manners…for example, the gestural interface active in the internet browser software may **display the stored list of Favorite web addresses** in response to tipping the left edge of the talisman towards the optical sensor." *Rhoads* (EX1004), ¶ 173.  This function corresponds to a display function. *Rhoads* also describes that "simple X-Y movement of the talisman" may cause movement of "an on-screen cursor." *Id.* at ¶ 174.  *Rhoads'* description of causing the internet browser software to display certain information and causing a cursor to be moved on-screen also corresponds to a *function of said apparatus* consistent with the construction of this claim phrase.  *See* § V.D., *supra*; Schmandt (EX1003), ¶¶ 214–215.

Accordingly, *Rhoads* teaches *means for controlling a function of said*

*apparatus using said information* as recited.  Schmandt (EX1003), ¶¶ 209–216.

Thus, *Rhoads* teaches all limitations of claim 7, and renders the claim obvious.

## Claim 9

**[9.1] Apparatus according to claim 7, further including a display function which is controlled.**

*Rhoads* discloses, or at least renders obvious, this limitation.  As detailed in the analysis of limitation [7.4], responsive to movement of a talisman, *Rhoads* teaches displaying a stored list of favorite web addresses or moving a cursor on a screen.  Thus, *Rhoads* teaches *a display function which is controlled* and renders obvious claim 9.  Schmandt (EX1003), ¶ 217.

## Claim 11

**[11.1] Apparatus according to claim 7, further including means for transmitting information.**

*Rhoads* discloses, or at least renders obvious, this limitation.  *Rhoads* describes that a "basic embodiment 10 of the present invention includes … a network connection 16 to the internet 18."  *Rhoads* (EX1004), ¶ 16.  Thus, *Rhoads* discloses *means for transmitting information*[7] as recited and renders obvious claim 11.

---

[7] The *information* recited in this claim that is transmitted is not required to be the

Schmandt (EX1003), ¶¶ 218–221.

## VII. THE BOARD SHOULD NOT EXERCISE ITS DISCRETION TO DENY THE PETITION

Petitioner respectfully submits that the Board should not exercise its discretion under 35 U.S.C. §§ 325(d) or 314(a) to deny this Petition.

### A. The Board Should Not Exercise Discretion to Deny Under § 325(d) Based on Prior Art Previously Cited

*Doi*, *Cousins*, *Parulski*, *Numazaki*, and *Rhoads* were not presented to the Office in an Information Disclosure Statement or otherwise, and were not cited by the examiner during prosecution of the '431 Patent or its priority applications. Thus, these references were not previously considered, and discretionary denial under § 325(d) would not be appropriate.

### B. The Board Should Not Exercise Discretion to Deny Under § 314(a) Based on Previous Petitions

The '431 Patent has not been challenged in any prior IPR petition. As such, none of discretionary institution factors 1–5 set forth in *General Plastic* apply to this Petition. *See General Plastic Indus. Co., Ltd. v. Canon Kabushiki Kaisha*, IPR2016-

---

*information concerning a position or movement of said object* recited in claim 7. In any event, *Rhoads* equivalent *means for transmitting information* is capable of transmitting the information recited in claim 7.

01357, Paper 19 at 16 (PTAB Sept. 6, 2016) (Section II.B.4.i. precedential).

### C. The Board Should Not Exercise Discretion to Deny Under § 314(a) Based on Parallel Litigations

Patent Owner has asserted the '431 Patent in multiple litigations ("the Parallel Litigations"), as noted above in § I.B. Those litigations were filed in February 2021. Petitioner is not a defendant, real party-in-interest, or privy of any district court defendant, and Petitioner is not involved in any district court litigation. *See* Jakel Declaration (EX1020). Petitioner has not communicated with any district court litigant regarding this Petition, the Parallel Litigations, or the '431 Patent. *Id.*

In *Apple Inc. v. Fintiv, Inc.*, the Board set forth six factors guiding discretion under § 314(a) by considering efficiency, fairness, and the merits in view of an earlier trial date. IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020) (precedential). These factors favor institution.

As to *Fintiv* factor 1, the complaints in the Parallel Litigations were recently filed; as of the filing of this Petition, only one party in one litigation has filed its answer. According to public information, there is no indication in any Parallel Litigation whether the district court will grant or deny a stay motion if this proceeding is instituted. No district court litigant knew of this Petition before it was filed. Jakel Decl. (EX1020). Petitioner is not in communication with any district court litigant and is not aware of its plans regarding a stay. Thus, this factor is speculative at best, neither weighing for nor against discretionary denial.

*Fintiv* factor 2 favors institution. The Board would issue a final written decision in this proceeding by approximately December 2022. No Parallel Litigation is at an advanced stage; indeed, there is no schedule set for any case. Therefore, it is likely the Board will likely issue a final written decision before the Parallel Litigations proceed to trial, even if a trial date were set. *Cf. In re Apple Inc.*, 979 F.3d 1332, 1344 n.5 (Fed. Cir. 2020) (anticipating district court trial dates "frequently calls for speculation" because "scheduled trial dates are often subject to change"). The interests of efficiency, fairness, and patent quality favor institution, even if a speculative district court trial were accelerated to occur before the Board would issue a final written decision. Thus, *Fintiv* factor 2 weighs against discretionary denial.

*Fintiv* factor 3 favors institution. It is unclear whether Patent Owner, the district court litigants, and the district court will have made investment in the Parallel Litigations by the Board's institution decision, given that only one answer has been filed and no schedule is of record. Thus, most of the investment and effort in the Parallel Litigations will occur *after* the Board's institution decision.

*Fintiv* factor 4 also favors institution and weighs against discretionary denial. There is minimal overlap because the Petition challenges claims 7–13. According to public records, only claim 7 is at issue in the Parallel Litigations. Further, Petitioner is not a party to any of the Parallel Litigations, or in communication with

any district court litigant, and therefore has no knowledge about any potential overlap between the grounds in this Petition and what the district court litigants may include in their invalidity contentions. Should Patent Owner argue in favor of discretionary denial based on any overlap between the asserted grounds and any district court invalidity contentions, Patent Owner should make such invalidity contentions of record to allow Petitioner and the Board to evaluate the degree of overlap.

*Fintiv* factor 5 weighs heavily against discretionary denial. Petitioner is not a defendant in any Parallel Litigation, and is not a real party-in-interest, or in privity with any district court litigant.

Finally, *Fintiv* factor 6 strongly weighs against discretionary denial. The merits of the Petition are extremely strong. *Fintiv*, Paper 11 at 14–15 ("[I]f the merits of a ground raised in the petition seem particularly strong on the preliminary record, this fact has favored institution."). The Petition demonstrates that the prior art discloses the very limitations that the examiner found to be allowable over the art considered during prosecution.

Thus, the *Fintiv* factors weigh heavily against discretionary denial.

### D. Discretionary Factors Summary

As detailed above, none of the discretionary bases under either §§ 325(d) or 314(a) support denial of the instant Petition.

## VIII.  CONCLUSION

For the reasons above, Petitioner asks that the Patent Office order an *inter partes* review trial for claims 7–13 and then cancel these claims as unpatentable.

Respectfully submitted,

May 14, 2021                    /Raghav Bajaj/
Raghav Bajaj
Counsel for Petitioner
Registration No. 66,630

## IX. CERTIFICATE OF WORD COUNT

Pursuant to 37 C.F.R. § 42.24, the undersigned attorney for the Petitioner,

Unified Patents, LLC, declares that the argument section of this Petition (Sections

II-VIII) has 10,121 words, according to the word count tool in Microsoft Word™.


/Raghav Bajaj/
Raghav Bajaj
Counsel for Petitioner
Registration No. 66,630

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Unified Patents, LLC | § | Petition for *Inter Partes* Review |
| Petitioner | § | |
| | § | U.S. Patent 7,933,431 |
| | § | |
| | § | |

## **CERTIFICATE OF SERVICE**

The undersigned certifies, in accordance with 37 C.F.R. §§ 42.105 and 42.6, that service was made on the Patent Owner as detailed below.

*Date of service*  May 14, 2021

*Manner of service*  FEDERAL EXPRESS

*Documents served*  Petition for *Inter Partes* Review, including Exhibit List; Exhibits 1001 through 1022

*Persons served*  Warner Norcross + Judd LLP
Intellectual Property Group
150 Ottawa Ave NW Suite 1500
Grand Rapids, MI 49503


/Raghav Bajaj/
Raghav Bajaj
Counsel for Petitioner
Registration No. 66,630

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

UNIFIED PATENTS, LLC

Petitioner

v.

GESTURE TECHNOLOGY PARTNERS, LLC

Patent Owner

————————

IPR2021-00917

U.S. Patent 7,933,431

PETITIONER'S AUTHORIZED REPLY
TO PATENT OWNER'S PRELIMINARY RESPONSE

Petitioner Unified Patents, LLC ("Unified") submits this authorized reply in response to Patent Owner Gesture Technology Partners, LLC's ("GTP") Preliminary Response ("POPR", Paper 6).  GTP asks the Board to use its discretion to deny institution based on its speculation that "several of the *Fintiv* factors **might** weigh in favor of the Board denying institution" if certain defendants were Unified members, or that the identification of Unified's members "is material to several of the *General Plastic* factors."  POPR, 33 (emphasis added).  Neither contention has merit.  Unified is the sole petitioner and properly certified itself as the sole real party-in-interest (*see* Petition, 1).  Moreover, as demonstrated below, the *Fintiv* and *General Plastic* analyses do not compel denial under § 314(a), irrespective of Unified's membership.  The Board should continue to institute trial.

## I.    THE *FINTIV* FACTORS WEIGH TOWARDS INSTITUTION

As a preliminary matter, only one *Fintiv*[1] factor (factor 5) considers an overlap between the petitioner in *inter partes* review and the defendants in litigation.[2]  The

---

[1] *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (Mar. 20, 2020) (precedential).

[2] Apple, Inc. and Samsung Electronics Co., Ltd. are members of Unified Patents. Huawei and LG Electronics are not direct members of Unified Patents; however, Huawei and LG are members because they are Licensees of Unified member Open Invention Network ("OIN") (*see* EX1032).  Had GTP asked Unified, Unified would

Trials@uspto.gov                                          Paper 31
571-272-7822                              Entered: November 21, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

UNIFIED PATENTS, LLC,
Petitioner,

v.

GESTURE TECHNOLOGY PARTNERS, LLC,
Patent Owner.

_____

IPR2021-00917
Patent 7,933,431 B2

_____

Before KEVIN F. TURNER, BRENT M. DOUGAL, and
SCOTT RAEVSKY, *Administrative Patent Judges.*

DOUGAL, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
Denying Petitioner's Motion to Strike
*35 U.S.C. § 318(a)*

IPR2021-00917
Patent 7,933,431 B2

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| Overall Outcome | | | 7–9, 12 | 10, 11, 13 |

## IV.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 7–9, 12 of U.S. Patent 7,933,431 B2 have been shown to be unpatentable;

FURTHERED ORDERED that claims 11 and 13 of U.S. Patent 7,933,431 B2 have not been shown to be unpatentable;

FURTHERED ORDERED that the portions of Petitioner's Motion to Strike that are not moot are denied; and

FURTHERED ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| GESTURE TECHNOLOGY PARTNERS, LLC, | CIVIL ACTION NO. 6:21-cv-00121 |
| Plaintiff, | ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT |
| v. | **JURY TRIAL DEMANDED** |
| APPLE INC., | |
| Defendant. | |

**ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Gesture Technology Partners, LLC ("GTP" or "Plaintiff") files this original complaint against Apple Inc. ("Apple") alleging, based on its own knowledge as to itself and its own actions, and based on information and belief as to all other matters, as follows:

**PARTIES**

1.      Gesture Technology Partners, LLC is a limited liability company filed under the laws of the State of Ohio, with its principal place of business at 2815 Joelle Drive, Toledo, Ohio 43617.

2.      Defendant Apple is a company incorporated in California.  Apple designs, manufactures, makes, uses, imports into the United States, sells, and/or offers for sale in the United States Apple smartphones and tablets.  Apple's smartphones and tablets are marketed, used, offered for sale, and/or sold throughout the United States, including within this district.

## JURISDICTION AND VENUE

3.      GTP repeats and re-alleges the allegations in Paragraphs 1-2 as though fully set forth in their entirety.

4.      This is an action for infringement of United States patents arising under 35 U.S.C. §§ 271, 281, and 284–85, among others.  This Court has subject matter jurisdiction of the action under 28 U.S.C. § 1331 and § 1338(a).

5.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1400(b) and 1391(c).

6.      Apple is subject to this Court's specific and general personal jurisdiction due at least to Apple's substantial business in this forum, including (i) at least a portion of the infringements alleged herein; or (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct, or deriving substantial revenue from goods and services provided to individuals in Texas and in this district.

7.      Specifically, Apple intends to and does business in Texas, directly or through intermediaries and offers its products or services, including those accused herein of infringement, to customers and potential customers located in Texas, including in the Western District of Texas.

8.      Apple maintains a regular and established place of business in this District, including at 2901 S. Capital of Texas Highway, Austin, Texas 78746.  Apple may be served with process through its registered agent for service in Texas: CT Corporation System, 1999 Bryant Street, Suite 900, Dallas, Texas 75201.

9.      Since 2010, Apple has maintained an engineering team in Austin that designs chips that "go into all the devices [Apple] sell[s]."  *See* The Statesman, *Apple dives deeper into Austin's talent pool*, Sept. 7, 2016, available at https://www.statesman.com/news/20160907/apple-dives-deeper-into-austins-talent-pool (last accessed Dec. 29, 2020).

2

10.      In 2018, Apple had 6,200 employees in Austin, which was the largest population of Apple employees outside of its headquarters in Cupertino, California.  *See* Apple, Inc., *Apple to build new campus in Austin and add jobs across the US*, Dec. 13, 2018, available at https://www.apple.com/newsroom/2018/12/apple-to-build-new-campus-in-austin-and-add-jobs-across-the-us/ (last accessed Dec. 29, 2020).

11.      As of 2019, Apple had approximately 7,000 employees in Austin.  It has also broken ground on its new $1 billion, 3-million square-foot campus, which will have the capacity to house up to 15,000 employees.  *See* Apple, Inc., *Apple expands in Austin*, Nov. 20, 2019, available at https://www.apple.com/newsroom/2019/11/apple-expands-in-austin/ (last accessed Dec. 29, 2020).

## THE TECHNOLOGY

12.      GTP repeats and re-alleges the allegations in Paragraphs 1-11 as though fully set forth in their entirety.

13.      GTP was founded in 2013 by Dr. Timothy Pryor, the sole inventor of the five Asserted Patents.  He currently resides in Toledo, Ohio.  Dr. Pryor received a B.S. in Engineering Physics from Johns Hopkins University in 1962, where he was also a member of the Army Reserve Officer in Training (ROTC) program.  Upon graduation, he was commissioned as a Second Lieutenant in the United States Army.  Dr. Pryor continued his education, obtaining an M.S. in Physics from the University of Illinois (1964) and a Ph.D. in Mechanical Engineering from the University of Windsor (1972).

14.      Dr. Pryor rose to the rank of Captain in the U.S. Army before his honorable discharge in 1967.  Dr. Pryor served at the U.S. Army Aberdeen Proving Ground and in Italy,

3

commanding missile teams supporting the Italian armed forces on a NATO anti-aircraft missile site, charged with guarding nuclear warheads and providing technical assistance to NATO.

15.     Dr. Pryor is a named inventor on over 200 patents and patent applications.  For the past four decades, he has been a pioneer in laser sensing technology, motion sensing technology, machine vision technology and camera-based interactive technology.

16.     Since the 1970's, Dr. Pryor has founded and led three other operating companies: two small operating companies in the automotive parts inspection and robotics businesses, one company that developed new forms of vehicle instrument panel controls, and co-founded another company that utilized camera-based sensors for physical therapy.  Dr. Pryor is responsible for a significant amount of the research and development for the technologies at these companies.

17.     The patents-in-suit, U.S. Patent Nos. 8,194,924 (the "'924 patent"), 7,933,431 (the "'431 patent"), 8,878,949 (the "'949 patent"), and 8,553,079 (the "'079 patent") (collectively, the "Asserted Patents"), are generally directed to innovations in using mobile phone cameras to assist a user to interact with their smartphone, including, for example, but not limited to unlocking their phone, taking and using photos or videos, and providing other functions.

18.     Dr. Pryor conceived of the inventions embodied in the Asserted Patents in the mid- to late-1990s, when he was working on a variety of different projects related to imaging and computer control.  Dr. Pryor describes the process as a brainstorm that led to several breakthrough moments, ultimately resulting in the Asserted Patents.

### DISCUSSIONS WITH APPLE

19.     Dr. Pryor and his patents are well-known to Apple.

4

20.     Indeed, Apple has purchased patents and technologies from Dr. Pryor in the past including his "multi-touch" patent portfolio in 2010.  Dr. Pryor later assisted Apple in asserting the multi-touch portfolio against HTC.

21.     After Dr. Pryor developed the technology embodied in the Asserted Patents, Dr. Pryor again approached Apple about acquiring or licensing rights to Asserted Patents.

22.     GTP initiated a licensing discussion with Apple in June 2016 providing Apple with the Asserted Patents and describing the patented technology.

23.     Apple responded to GTP in writing by letter dated December 5, 2016 and negotiations continued through March 27, 2017.

24.     As a result of the correspondence described above and other negotiations, Apple was aware of the details of the Asserted Patents and was aware that Apple needed a license to practice the inventions in the Asserted Patents.

25.     On information and belief, Apple did not take any steps to change their products or to inform its engineers and design team of the Asserted Patents to avoid infringing them.

## THE ACCUSED PRODUCTS

26.     GTP repeats and re-alleges the allegations in Paragraphs 1-25 as though fully set forth in their entirety.

27.     Apple infringed the asserted patents by making, using, selling, offering to sell, and importing its smartphones and tablets including, but not limited to, Apple's iPhone models 5C, 5S, 6, 6 Plus, 6S, 6S Plus, SE (1st), 7, 7 Plus, 8, 8 Plus, X, XS, XS Max, XR, 11, 11 Pro, 11 Pro Max, SE (2nd), 12, 12 Mini, 12 Pro, and 12 Pro Max and Apple's iPad models iPad Mini 3, Air 2, Mini 4, Pro (1st, 12.9 in.), iPad Pro (1st, 9.7 in.), iPad (5th generation), iPad Pro (2nd, 10.5/12.9 in.), iPad (6th generation), iPad Pro (3rd, 11/12.9 in.), iPad Air (3rd generation), iPad Mini (5th generation),

5

iPad (7th generation), iPad Pro (4th, 11/12.9 in.), iPad (8th generation), and iPad Air (4th generation), (collectively the "Accused Products").

**EXAMPLES OF APPLE'S MARKETING OF THE ACCUSED FEATURES**

28.     The Accused Products have features including, but not limited to, at least the following:  Face ID, QR Scanner, Smart HDR, tracking autofocus, picture face recognition, selfie focus, autofocus area, optical image stabilization, portrait mode, switch control, and Animojis (the "Features").

29.     The Features drive the popularity and sales of the Accused Products.

30.     For example, Apple has marketed the Accused Products using Face ID to unlock the phone as a superior security feature, as described in the following screenshot from Apple's website:[1]



---

[1] Apple Inc., *About Face ID advanced technology*, available at https://support.apple.com/en-us/HT208108 (last accessed November 12, 2020).

6

31. Apple has marketed its Accused Products using Face ID to make payments through Apple Pay, as described in the following screenshot from Apple's website:[2]

## Use Face ID to make purchases

You can use Face ID to authenticate purchases with Apple Pay and in the iTunes Store, App Store, and Book Store in Apple Books.

### With Apple Pay

To use Face ID with Apple Pay, make sure that Apple Pay is set up on your iPhone or iPad and turned on in Settings > Face ID & Passcode. Then follow these steps.

To make a purchase in a store:

1. Make sure that you're using an iPhone.
2. To use your default card, double-click the side button. To use a different card, double-click the side button, tap your default card, then choose another card.
3. Glance at your iPhone to authenticate with Face ID. If you're wearing a face mask that covers your mouth and nose, tap Pay with Passcode and enter your passcode instead.
4. Hold the top of your iPhone near the contactless reader.
5. Wait for Done and a checkmark to display.

To make a purchase within an app or on a website in Safari:

1. When you're ready to check out, tap the Buy with Apple Pay button or choose Apple Pay as the payment method. Confirm your payment information. To choose a different card to pay with, tap > next to your card.

[2] Apple Inc., *Use Face ID to make purchases*, available at https://support.apple.com/en-us/HT208109#purchases (last accessed November 12, 2020).

32.     Apple has marketed its Accused Products using functions in taking photos and videos, such as the Smart HDR feature in its front-facing camera, as described in the following screenshot from Apple's website:[3]



―――――――――――――――――
[3] Apple, *Apple 11*, available at https://web.archive.org/web/20200101215146/www.apple.com/iphone-11/ (last accessed November 12, 2020).

8

33.     Apple has marketed the Accused Products using convenience features, such as Attention Aware features, as described in the following screenshot from Apple's website[4]:



**COUNT I**

**INFRINGEMENT OF U.S. PATENT NO. 8,194,924**

34.     GTP repeats and re-alleges the allegations in Paragraphs 1-34 as though fully set forth in their entirety.

35.     GTP owns all substantial rights, interest, and title in and to the '924 patent, including the sole and exclusive right to prosecute this action and enforce the '924 patent against

---

[4] Apple, *About Attention Aware features on your iPhone X or iPad Pro*, available at https://support.apple.com/en-us/HT208245 (last accessed November 12, 2020).

9

infringers, and to collect damages for all relevant times. The United States Patent and Trademark Office duly issued the '924 patent on June 5, 2012. A copy of the '924 patent is attached as Exhibit A.

36. The '924 patent is titled "Camera Based Sensing in Handheld, Mobile, Gaming or Other Devices." The '924 patent describes using a camera output such that the handheld device's computer performs a control function on the device, such as acquiring or taking images, reading things, determining data, transmitting data, printing data, and actuating a vehicle or function.

37. The claims of the '924 patent are not directed to an abstract idea.

38. Apple has directly infringed (literally or under the doctrine of equivalents) at least Claim 1 of the '924 patent.

39. Apple has infringed the '924 patent by making, using, selling, offering for sale, and importing the Accused Products.

40. The Accused Products are handheld devices with a housing and a computer, including but not limited to one or more System-on-Chips.

41. The Accused Products have at least one first camera oriented to view a user of the Accused Product. The first camera has an output when used.

42. The Accused Products have at least one second camera oriented to view an object other than the user. The second camera has an output when used.

43. The first and second cameras of the Accused Products have non-overlapping fields of view.

44. The computer of the Accused Products is adapted to perform a control function, such as the control functions associated with the Features, based on an output of either the first camera or the second camera.

10

45.     Plaintiff has been damaged as a result of the infringing conduct by Apple alleged above.  Thus, Apple is liable to Plaintiff in an amount that compensates it for such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

46.     Plaintiff has satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the '924 patent.

47.     Plaintiff has not offered for sale nor sold any product implicated by 35 U.S.C. § 287 with respect to the '924 patent.

48.     Apple had knowledge of the '924 patent at least as early as June 2016, when GTP contacted Apple in an attempt to license the Asserted Patents.

49.     Apple has also indirectly infringed one or more claims of the '924 patent by inducing others to directly infringe the '924 patent.  Apple has induced end-users and other third-parties to directly infringe (literally or under the doctrine of equivalents) the '924 patent by using the Accused Products.  Apple took active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the Accused Products in a manner that infringes one or more claims of the '924 patent, including, for example, Claim 1 of the '924 patent.  Such steps by Apple included, among other things, advising or directing end-users and other third-parties to use the Accused Features in the Accused Products in an infringing manner; advertising and promoting the use of the Accused Products in an infringing manner; or distributing instructions that guide end-users and other third-parties to use the Accused Products in an infringing manner.  Apple performed these steps, which constitute induced infringement with the knowledge of the '924 patent and with the knowledge that the induced acts constitute infringement.  Apple was aware that the normal and customary use of the Accused Products by others would infringe the

11

'924 patent.  Apple's direct infringement of the '924 patent was willful, intentional, deliberate, or in conscious disregard of Plaintiff's rights under the patent.

## COUNT II

## INFRINGEMENT OF U.S. PATENT NO. 7,933,431

50.     GTP repeats and re-alleges the allegations in Paragraphs 1-49 as though fully set forth in their entirety.

51.     GTP owns all substantial rights, interest, and title in and to the '431 patent, including the sole and exclusive right to prosecute this action and enforce the '431 patent against infringers, and to collect damages for all relevant times.  The United States Patent and Trademark Office duly issued the '431 patent on April 26, 2011.  A copy of the '431 patent is attached as Exhibit B.

52.     The '431 patent is titled "Camera Based Sensing in Handheld, Mobile, Gaming, or Other Devices."  The '431 patent describes a method for a user to control a handheld device using gestures that are observed by a sensor on the handheld device.

53.     Apple has directly infringed (literally or under the doctrine of equivalents) at least Claim 7 of the '431 patent.  Apple has infringed the '431 patent by making, using, selling, offering to sell, and importing the Accused Products.

54.     The claims of the '431 patent are not directed to an abstract idea.

55.     The Accused Products are handheld computers.

56.     The Accused Products have a housing.

57.     The Accused Products have one or more cameras associated with their housing. The one or more cameras obtain images of objects using reflected light from the objects.

12

58.     A computer, including but not limited to at least one System on Chip, resides within the housing of the Accused Products.  The computer analyzes images obtained by the one or more images to determine information about a position or movement of the object.

59.     The Accused Products use information about the object to control a function of the Accused Products, such as the functions associated with the Features.

60.     Plaintiff has been damaged as a result of the infringing conduct by Apple alleged above.  Thus, Apple is liable to Plaintiff in an amount that adequately compensates it for such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

61.     Plaintiff has satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the '431 Patent.

62.     Plaintiff has not offered for sale nor sold any product implicated by 35 U.S.C. § 287 with respect to the '431 patent.

63.     Apple had knowledge of the '431 patent at least as early as June 2016.

64.     Apple has also indirectly infringed one or more claims of the '431 patent by inducing others to directly infringe the '431 patent.  Apple has induced end-users and other third-parties to directly infringe (literally or under the doctrine of equivalents) the '431 patent by using the Accused Products.  Apple took active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the Accused Products in a manner that infringes one or more claims of the '431 patent, including, for example, Claim 7 of the '431 patent.  Such steps by Apple included, among other things, advising or directing end-users and other third-parties to use the Accused Products in an infringing manner; advertising and promoting the use of the Accused Products in an infringing manner; or distributing instructions that guide end-users and

13

other third-parties to use the Accused Products in an infringing manner. Apple performed these steps, which constitute induced infringement with the knowledge of the '431 patent and with the knowledge that the induced acts constitute infringement. Apple was aware that the normal and customary use of the Accused Products by others would infringe the '431 patent. Apple's direct and indirect infringement of the '431 patent was willful, intentional, deliberate, or in conscious disregard of Plaintiff's rights under the patent.

## COUNT III

## INFRINGEMENT OF U.S. PATENT NO. 8,878,949

65.     GTP repeats and re-alleges the allegations in Paragraphs 1-64 as though fully set forth in their entirety.

66.     GTP owns all substantial rights, interest, and title in and to the '949 patent, including the sole and exclusive right to prosecute this action and enforce the '949 patent against infringers, and to collect damages for all relevant times. The United States Patent and Trademark Office duly issued the '949 patent on November 4, 2014. A copy of the '949 patent is attached as Exhibit C.

67.     The '949 Patent is titled "Camera Based Interaction and Instruction." The '949 patent describes a device that allows a user to control the device using gestures registered by the front-facing camera and an electro-optical sensor.

68.     The claims of the '949 patent are not directed to an abstract idea.

69.      Apple has directly infringed (literally or under the doctrine of equivalents) at least Claim 1 of the '949 patent. Apple infringed the '949 patent by making, using, selling, offering for sale, and importing the Accused Products.

70.     The Accused Products are portable devices.

14

71.     The Accused Products have a housing.  The housing has a forward-facing portion that includes an electro-optical sensor that has a field of view and a digital camera.

72.     Within the housing is a processing unit including, but not limited to, at least one System on Chip.  The processing unit is coupled to the electro-optical sensor.

73.     The processing unit in the Accused Products has been programmed to determine if a gesture has been performed in the electro-optical sensors field of view based on an output from the electro-optical sensor.

74.     The processing unit of the Accused Products controls the digital camera in response to the gesture performed.  Such gestures are used by the Features.

75.     Plaintiff has been damaged as a result of the infringing conduct by Apple alleged above.  Thus, Apple is liable to Plaintiff in an amount that adequately compensates it for such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

76.     Plaintiff has satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the '949 Patent.

77.     Plaintiff has not offered for sale nor sold any product implicated by 35 U.S.C. § 287 with respect to the '949 patent.

78.     Apple had knowledge of the '949 patent at least as early of June 2016.

79.     Apple has also indirectly infringed one or more claims of the '949 patent by inducing others to directly infringe the '949 patent.  Apple has induced end-users and other third-parties to directly infringe (literally or under the doctrine of equivalents) the '949 patent by using the Accused Products.  Apple took active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the Accused Products in a manner that infringes

15

one or more claims of the '949 patent, including, for example, Claim 1 of the '949 patent. Such steps by Apple included, among other things, advising or directing end-users and other third-parties to use the Accused Products in an infringing manner; advertising and promoting the use of the Accused Products in an infringing manner; or distributing instructions that guide end-users and other third-parties to use the Accused Products in an infringing manner. Apple performed these steps, which constitute induced infringement with the knowledge of the '949 patent and with the knowledge that the induced acts constitute infringement. Apple was aware that the normal and customary use of the Accused Products by others would infringe the '949 patent. Apple's direct and indirect infringement of the '949 patent was willful, intentional, deliberate, or in conscious disregard of Plaintiff's rights under the patent.

<div align="center">

**COUNT IV**

**INFRINGEMENT OF U.S. PATENT NO. 8,553,079**

</div>

80.     GTP repeats and re-alleges the allegations in Paragraphs 1-79 as though fully set forth in their entirety.

81.     GTP owns all substantial rights, interest, and title in and to the '079 patent, including the sole and exclusive right to prosecute this action and enforce the '079 patent against infringers, and to collect damages for all relevant times. The United States Patent and Trademark Office duly issued the '079 patent on October 8, 2013. A copy of the '079 patent is attached as Exhibit D.

82.     The '079 patent is titled "More Useful Man Machine Interfaces and Applications." The '079 patent describes methods and apparatuses related to determining gestures illuminated by a light source of a computer by using a camera housed in the computer.

83.     The claims of the '079 patent are not directed to an abstract idea.

<div align="center">

16

</div>

84.     Apple has directly infringed (literally or under the doctrine of equivalents) at least Claim 11 of the '079 patent.  Apple has infringed the '079 patent by making, using, selling, offering for sale, and importing the Accused Products.

85.     The Accused Products are computer apparatuses.

86.     The Accused Products contain a light source that will illuminate a human body part within a work volume.

87.     The Accused Products have one or more cameras.  The one or more cameras have a fixed relation to the light source.  The one or more cameras of the Accused Products are oriented to observe gestures performed by a human body part.

88.     The Accused Products have one or more processors including, but not limited to, one or more System on Chips, that have been programmed to determine a gesture performed based on output from the one or more cameras.

89.     Plaintiff has been damaged as a result of the infringing conduct by Apple alleged above.  Thus, Apple is liable to Plaintiff in an amount that adequately compensates it for such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

90.     Plaintiff has satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the '079 patent.

91.     Plaintiff has not offered for sale nor sold any product implicated by 35 U.S.C. § 287 with respect to the '079 patent.

92.     Apple had knowledge of the '079 patent at least as early as June 2016.

93.     Apple has also indirectly infringed one or more claims of the '079 patent by inducing others to directly infringe the '079 patent.  Apple has induced end-users and other third-

17

parties to directly infringe (literally or under the doctrine of equivalents) the '079 patent by using the Accused Products. Apple took active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the Accused Products in a manner that infringes one or more claims of the '079 patent, including, for example, Claim 11 of the '079 patent. Such steps by Apple included, among other things, advising or directing end-users and other third-parties to use the Accused Products in an infringing manner; advertising and promoting the use of the Accused Products in an infringing manner; or distributing instructions that guide end-users and other third-parties to use the Accused Products in an infringing manner. Apple performed these steps, which constitute induced infringement with the knowledge of the '079 patent and with the knowledge that the induced acts constitute infringement. Apple was aware that the normal and customary use of the Accused Products by others would infringe the '079 patent. Apple's inducement is ongoing.

94.        Apple's direct and indirect infringement of the '079 patent was willful, intentional, deliberate, or in conscious disregard of Plaintiff's rights under the patent.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable by right.

## PRAYER FOR RELIEF

GTP requests that the Court find in its favor and against Apple, and that the Court grant GTP the following relief:

a.        Judgment that one or more claims of the Asserted Patents have been infringed, either literally or under the doctrine of equivalents, by Apple or all others acting in concert therewith;

b.        Judgment that Apple accounts for and pays to GTP all damages to and costs incurred by GTP because of Apple's infringing activities and other conduct complained of herein;

18

c.     Judgment that Apple's infringements be found willful, and that the Court award treble damages for the period of such willful infringement pursuant to 35 U.S.C. § 284;

d.     Pre-judgment and post-judgment interest on the damages caused by Apple's infringing activities and other conduct complained of herein;

e.     That this Court declare this an exceptional case and award GTP its reasonable attorneys' fees and costs in accordance with 35 U.S.C. § 285; and

f.     All other and further relief as the Court may deem just and proper under the circumstances.

Dated: February 4, 2021                  Respectfully submitted,


By: /s/ Fred I. Williams
Fred I. Williams
Texas State Bar No. 00794855
Michael Simons
Texas State Bar No. 24008042
Jonathan L. Hardt
Texas State Bar No. 24039906
Chad Ennis
Texas State Bar No. 24045834
WILLIAMS SIMONS & LANDIS PLLC
327 Congress Ave., Suite 490
Austin, TX 78701
Tel: 512-543-1354
fwilliams@wsltrial.com
msimons@wsltrial.com
jhardt@wsltrial.com
cennis@wsltrial.com

Todd E. Landis
State Bar No. 24030226
WILLIAMS SIMONS & LANDIS PLLC
2633 McKinney Ave., Suite 130 #366
Dallas, TX 75204
Tel: 512-543-1357
tlandis@wsltrial.com

John Wittenzellner

19

Pennsylvania State Bar No. 308996
WILLIAMS SIMONS & LANDIS PLLC
1735 Market Street, Suite A #453
Philadelphia, PA 19103
Tel: 512-543-1373
johnw@wsltrial.com

*Attorneys for Plaintiff Gesture Technology
Partners, LLC*

20

(http://eepurl.com/cSVHYP)

Sign up today to receive FREE daily patent litigation alerts!     ×



FAQ (/FAQ)     SUCCESS (/SUCCESS)     EVENTS (/EVENTS)

OFFICES (/OFFICES)     MEMBERS (/MEMBERS)     TEAM (/TEAM)

JOBS (/JOBS)



# What is Unified?

Unified is a 200+ international membership organization that seeks to improve patent quality and deter unsubstantiated or invalid patent assertions in defined technology sectors (Zones) through its activities. Its actions are focused broadly in Zones with substantial assertions by Standards Essential Patents (SEP) (https://www.unifiedpatents.com/sep) holders and/or Non-Practicing Entities (NPEs) (/npe). These actions may include analytics (https://portal.unifiedpatents.com/), prior art, invalidity contests (https://patroll.unifiedpatents.com/), patentability analysis, administrative patent review (PTAB) (https://portal.unifiedpatents.com /ptab/caselist?petitioners=Unified+Patents&sort=-filing_date), amicus briefs, economic surveys, and essentiality studies. Unified works independently of its members to achieve its deterrence goals. Small members join for free while larger ones pay modest annual fees (https://www.unifiedpatents.com/join/).

# Is Unified a law firm representing its members?

No. Unified is a deterrence entity that seeks to deter the assertion of poor quality patents in certain technology zones. Unified acts independent of its members or any other company. Unified is not a law firm, and does not have an attorney-client relationship with members. Unified's activities are not based on the interests of any particular member or members.

# Does Unified ever settle with NPEs?

Yes. Should Unified determine that its goals can be better served by settling a post-grant challenge (or agreeing to never file any challenges), Unified will consider settling in exchange for a license, though never for money. As with all aspects of its challenges, Unified acts independently when settling, and never provides members with advance notice of negotiations, draft settlement agreements, or actual settlement. For this reason, Unified will not negotiate unless a nondisclosure agreement is in place. Unified's practice of settling disputes springs from its long term Zone deterrence goals, as it saves legal

Appx2168

of settling disputes. Saving from litigation or prior art research saves legal fees, which can be reallocated for other future deterrence activities. In order to have discussions we require executing an NDA which can be obtained here: LINK (/s/Mutual-NDA_UP_COMPANY_Template.docx)

# What are the primary differences between AST, RPX, and Unified Patents, LLC?

Unified is the only solution designed to deter NPE activity and, therefore, Unified never pays any money to NPEs, whether to purchase licenses or otherwise. This ensures that Unified never incentivizes further NPE activity. Additionally, by focusing on deterrence, Unified is never put into the conflicted position of negotiating a licensing deal between NPEs and defendants in litigation.

# How can members of particular zones be sure they aren't subsidizing other zones?

Subscription fees paid by a member with respect to one zone are not used by Unified for activities for other zones (excluding administrative overhead). If a patent or portfolio involves more than one zone, any activities and/or costs related to that patent or portfolio are allocated amongst the affected zones.

# Is Unified interested in receiving demand letters and hearing about patents that are for sale in a particular zone?

Yes. For members and non-members alike, Unified invites and welcomes any and all non-confidential information regarding demand letters, threats of assertion, or patent

licensing and sales.

# Do members receive advance notice of Unified's actions?

No. Unified (including its employees, agents and representatives) does not discuss details with its members concerning the preparation and prosecution of any patentability or validity challenge before the USPTO, including whether Unified will (or will not) file. To be specific, members receive no prior notice that Unified is preparing or filing any post-grant patent challenge.

# Do members have any control over Unified's use of post-grant proceedings at the USPTO?

No. Unified retains sole and absolute discretion regarding all aspects of any challenge.

This includes, but is not limited to:

1. Identifying any relevant prior art,
2. Conducting an invalidity/patentability analysis,
3. Deciding whether to file or what procedure to file,
4. Preparing a petition or request,
5. Prosecuting a post-grant challenge once filed, and
6. Terminating that challenge (including settlement).

# How does Unified successfully deter?

Unified uses the subscription fees collected for each Zone to provide a wide range of services. Unified conducts patent analytics and provides those analytics to subscribed

members. Unified also monitors document and patentary track of these sales, demand letters, post-grant procedures, and litigation to track activity and risks in each Zone. Unified also files post-grant procedures against patents it believes are unpatentable or invalid.

HOME (/HOME)      SOLUTION (/NPE)      NEWS (/NEWS)      ABOUT (/ABOUT)      JOIN (/JOIN)

(650) 999-0889   INFO@UNIFIEDPATENTS.COM (MAILTO:INFO@UNIFIEDPATENTS.COM)

*Copyright © 2021 Unified Patents, LLC.  All rights reserved.*

Legal (/term-of-services) | Privacy Policy (/privacy-policy) | DMCA
(http://unifiedpatents.com/dmca)

(http://eepurl.com/cSWHYP)

Sign up today to receive FREE daily patent litigation alerts!    ✕



# SUCCESS AT CHALLENGING BAD PATENTS

More NPEs (aka Patent Trolls) have been challenged by us than anyone else

FAQ (/FAQ)

SUCCESS (/SUCCESS)

EVENTS (/EVENTS)

OFFICES (/OFFICES)

MEMBERS (/MEMBERS)

TEAM (/TEAM)

JOBS (/JOBS)



Case: 23-1475     Document: 37-2     Page: 117     Filed: 02/16/2024

Challenging invalid patents instead of paying for expensive licenses has proved to be the most cost-effective and successful way to stop unreasonable assertions.  Unlike other third-party solutions, we don't monetize transactions by paying.  In fact, we never pay. Ever.

Unified has filed more patent challenges than all other third-party petitioners combined. Unified was the #6 most prolific all time PTAB petitioner and #3 for 2019.  Moreover, we have successfully neutralized more patents than any other third-party.

# OVERALL SUCCESS RATE



"Success" is defined as a positive institution decision, invalidation, or no money settlement by Unified. The outcome of each case was determined as of the latest available status such that no case is counted more than once. Visit Unified's Portal (https://portal.unifiedpatents.com/ptab/caselist?petitioners=Unified+Patents&sort=-filing_date) for more information.

# UNIFIED IS THE MOST SUCCESSFUL THIRD-PARTY SOLUTION

Unified has developed a reputation for challenging anyone and the only third-party to have challenged the largest and most notorious NPEs, including General Patent Corporation (http://www.generalpatent.com/), Intellectual Ventures (http://www.intellectualventures.com/), IP Edge (http://www.ip-edge.com/), Uniloc (http://www.uniloc.com/), Marathon (http://www.marathonpg.com/), Acacia (http://acaciaresearch.com/), and others. In contrast, other third-parties have developed a close and symbiotic working relationship with the NPEs they purportedly seek to deter, resulting in more frivolous litigation.



For transparency we have included a link to all PTAB cases brought by each entity listed above:

RPX  (https://portal.unifiedpatents.com/ptab/caselist?petitioners=Rpx+Corp&sort=-filing_date)| Unified  (https://portal.unifiedpatents.com/ptab/caselist?petitioners=Unified+Patents&sort=-filing_date)| CFAD (https://portal.unifiedpatents.com/ptab/caselist?petitioners=Coalition+For+Affordable+Drugs&sort=-filing_date)| Askelladden (https://portal.unifiedpatents.com/ptab/caselist?petitioners=Askelladden&sort=-filing_date)

Appx2174

# WORLDWIDE NPE & SEP CHALLENGES SINCE 2020



Unified has expanded its efforts with over a dozen re-examinations and several foreign opposition filings.

# WHAT SETS UNIFIED APART

- **Challenge Early** - To disrupt monetization campaigns before valuable resources are wasted

- **Challenge Anyone** - Regardless of an entity's size and unconflicted by commercial relationships

- **Refuse to Pay** - To ensure that we never encourage future assertions

- **Refuse to Incentivize** - Unlike some third-parties, our settlements never include provisions which encourage going after others

- **Act Independently** - As the sole real-party and never as a proxy

- **Educate Licensors** - To ensure they know that low quality patents will be challenged

Buying licenses to invalid patents should be, at best, an absolute last resort. While paying may be expedient in the short term, it rewards the assertion of low quality patents and, thus, encourages more predatory activity in the future. Further, it is impossible to purchase all of the low quality patents. The unfortunate fact is that with millions of granted U.S. patents, there is an abundant supply of low quality assets available for assertion.

Unified exists to break the cycle of patent assertion. We never have, and never will, pay because we aim to stop, not promote, frivolous patent litigation.

When Unified settles, we do so only in exchange for royalty-free licenses. This is an unqualified success and it deters future litigation. The same isn't true when our competitors pay for licenses or purchase patents. These payments perpetuate the cycle of litigation and, moreover, create an inherent conflict of interest because entities that participate in the patent marketplace may be tempted to fan the flames they are paid to extinguish. Unified faces no such conflict because we have no financial relationships with asserters.

Appx2176

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

UNIFIED PATENTS, LLC

Petitioner

v.

GESTURE TECHNOLOGY PARTNERS, LLC

Patent Owner

————————

IPR2021-00917
U.S. Patent 7,933,431

————————

**DECLARATION OF KEVIN JAKEL**

          Unified Patents Exhibit 1020

I, Kevin Jakel, hereby declare as follows:

## I. INTRODUCTION

1.    I am a founder and the current CEO of Unified Patents, LLC ("Unified").  I am over 21 years and otherwise competent to make this Declaration. I make this Declaration based on facts and matters within my own knowledge and on information provided to me by others, and, if called as a witness, I could and would competently testify to the matters set forth herein.

2.    Unified was founded by intellectual property professionals over concerns with the increasing risk of non-practicing entities ("NPEs") asserting patents of poor quality against strategic technologies and industries. The founders thus created a first-of-its-kind company whose purpose is to protect technology sectors, also referred to as zones, by deterring the assertion of invalid or low-quality patents. Some companies in a technology sector, referred to herein as "Members," subscribe to one or more of Unified's technology-specific NPE zones. Members pay a yearly subscription fee to a specific NPE technology zone based generally on when each Member subscribes.

3.    Unified performs many deterrent activities, including data analytics, analyzing the technology sector and monitoring patent activity (including patent ownership and sales, demand letters and litigation, and industry companies), prior art searching, prior art contests, validity and patentability analyses, reissue protests,

amicus briefing, and post-grant review requests.  Unified's deterrent activities allow it to identify patents, perform prior art research, analyze invalidity, and to sometimes file reexaminations or post-grant proceedings against some patents, such as *inter partes* reviews ("IPRs"), post grant reviews ("PGRs"), and *ex parte* reexaminations ("EPRs") before the United States Patent and Trademark Office ("USPTO"), or proceedings overseas, such as European Patent Oppositions ("EPOs").

4.    Unified exercises sole and absolute discretion over its decision to contest patents through the USPTO's post-grant proceedings.  Based on its own analysis, Unified determines which patents are worth pursuing in terms of searching for prior art or taking action, including filing a PGR, IPR, or EPR.  Unified's decisions to file a PGR, IPR, or EPR are made independently without the input, assistance, or approval of any of Unified's Members.  Should Unified decide to challenge a patent in a post-grant proceeding, Unified controls every aspect of such a challenge, including controlling which patent and claims to challenge, which prior art to apply and the grounds raised in the challenge, when to bring any challenge, and whether to settle or otherwise end any challenge.

5.    Unified does not discuss the preparation of any patentability challenge with Members or potential Members, including whether Unified will or will not file a petition or whether a Member desires that Unified file a petition.  Unified does not send to, or solicit or consider from, Members or potential Members any

- 2 -

communications directing which patent or group of patents are to be considered for a PGR, IPR, or EPR. Further, Unified does not send to, or solicit or consider from, any company's preferences, suggestions, or desires as to the selection of a patent or group of patents for a PGR, IPR, or EPR. Unified identifies potential patents to challenge based on publicly available information obtained solely through Unified's own independent search of publicly available legal databases and information.

6.      Unified does not communicate with Members about their litigation strategies in district court, before the USPTO and/or before other forums, including whether Members may pursue or have pursued their own patent challenges. Unified does not communicate with Members about any settlement strategies or settlement negotiations Members may have with patent owners, nor does Unified inform Members about any settlement strategies or settlement negotiations Unified may have with patent owners in pursuit of settling Unified's patent challenge.

7.      Members receive no prior notice of Unified's patent challenges. Unified does not give Members an opportunity to participate in or an opportunity to even know that Unified is contemplating filing a PGR, IPR, or EPR before the petition is filed.

8.      After filing a post-grant proceeding, Unified retains sole and absolute discretion and control over all strategy decisions (including any decision to continue or terminate Unified's participation). Unified is also solely responsible for paying

for the preparation, filing, and prosecution of any PGR, IPR, or EPR, including any expenses associated with the proceeding.

9.     Unified's Members do not pay any fees designated for post-grant proceedings (e.g., IPRs, PGRs, or EPRs), let alone for post-grant proceedings against specific patents.  It is Unified and Unified alone that determines how to spend its money.  Unified independently selects which patents to target based on the perceived deterrent value to a technology zone and not on behalf of any specific Member(s) to resolve their litigation. Based on its own analysis, Unified determines which patents are worth pursuing in terms of filing a post-grant proceeding, such as a PGR or IPR, or performing some other activity.   Unified's decisions to file a post-grant proceeding, such as a PGR, IPR, or EPR, are made independently without the input, assistance, or approval of its Members.

10.     Unified has no explicit or implicit agreements with its Members about Unified performing any particular deterrent strategy, including the instant IPR (*see* Sec. II, below).

11.     No other entity or individual outside of Unified controls Unified.  There are no board Members of Unified that participate on any boards of directors for any of Unified's Members.

12.     As     stated     on     Unified's     website     for     many     years (https://www.unifiedpatents.com/faq/), Unified acts independent of its Members or

- 4 -

any other company. Unified is not a law firm and does not have an attorney-client relationship with Members.

## II. THE INSTANT IPR

13.    Unified exercised its sole discretion and control in deciding to file a petition in the instant IPR, IPR2021-00917, against U.S. Patent 7,933,431 (the "Patent-at-Issue"), including paying for all fees and expenses.  No individuals other than Unified's employees, counsel, and consultants acting under the direction of counsel had any prior knowledge of the filing of the instant IPR. And no Member had any involvement in the preparation of, payment for, or decision to file this Petition.   And none of Unified's Members had any prior knowledge of, or involvement in, the preparation and filing of the petition for the instant IPR. Unified also had no discussions with any Member regarding whether any Member desired Unified to challenge the Patent-at-Issue. Further, Unified did not send to, or solicit or consider from, a Member any directions identifying (a) a patent or group of patents to be considered for the instant IPR or (b) any Member's requests, instructions, preferences, suggestions, or desires regarding the selection of a patent or group of patents for the instant IPR.

14.    Unified shall exercise sole and absolute control and discretion of the continued prosecution of the instant IPR (including any decision to terminate Unified's participation) and shall bear all costs related to the instant IPR.

## III.    VERIFICATION

15.    I declare that all statements made herein of my knowledge are true, and that all statements made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Date:  05/11/2021

By:    *Kevin Jakel*
        Kevin Jakel




Trials@uspto.gov
Tel: 571-272-7822

IPR2015-01750, Paper 128
IPR2015-01751, Paper 128
IPR2015-01752, Paper 126
Entered: October 2, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

RPX CORPORATION,
Petitioner,

v.

APPLICATIONS IN INTERNET TIME, LLC,
Patent Owner.

Case IPR2015-01750
Patent 8,484,111 B2

Case IPR2015-01751
Case IPR2015-01752
Patent 7,356,482 B2

Before SCOTT R. BOALICK, *Chief Administrative Patent Judge*,
JACQUELINE WRIGHT BONILLA, *Deputy Chief Administrative Patent Judge*, and SCOTT C. WEIDENFELLER, *Vice Chief Administrative Patent Judge*.

BOALICK, *Chief Administrative Patent Judge*.

JUDGMENT
Final Decision on Remand
Terminating Institution
*35 U.S.C. §§ 314, 315*

IPR2015-01750 (Patent 8,484,111 B2)
IPR2015-01751, IPR2015-01752 (Patent 7,356,482 B2)

infringement of the patents at issue, or its other clients. *Id.* at 37. Evidence shows that RPX became such a "threat" in relation to the relevant patents by filing the current IPR petitions to Salesforce's benefit. *Id.* (citing, for example, Ex. 1019 ¶¶ 9, 43).

The Federal Circuit in *AIT* pointed to a statement on RPX's website that RPX "help[s] paying members 'extricate themselves from NPE lawsuits,'" indicating that this fact, along with others, could "imply that RPX can and does file IPRs to serve its clients' financial interests." *AIT*, 897 F.3d at 1351 (citing Ex. 2007) (brackets omitted). We agree. RPX contends that "[i]f RPX's goal had been to extricate Salesforce from litigation, RPX would have attempted to acquire rights under the AIT Patents for RPX's membership, as RPX has done in **over 1,200 other cases**." Pet. Remand Br. 42 (citing Ex. 1073 ¶ 38; Ex. 1090 ¶ 24). But that is not the only way in which RPX can extricate Salesforce from litigation. It can, as it did here, file IPR petitions and challenge the patents being asserted. That a member organization exists in part to file IPR petitions against patents being asserted or threatened to be asserted against its members is indicative of an RPI relationship between the organization and its members. That is the case here, as between RPX and Salesforce.

G.    *Whether Salesforce actually "desire[d] review of the patent[s]"*

The Federal Circuit points out that "the Trial Practice Guide, on which the Board relied, suggests that the agency understands the 'fact-dependent' nature of this inquiry, explaining that the two questions lying at its heart are

26

IPR2015-01750 (Patent 8,484,111 B2)
IPR2015-01751, IPR2015-01752 (Patent 7,356,482 B2)

record evidence shows that Salesforce directly exercised control over this proceeding.

As the Federal Circuit instructs, however, the RPI inquiry sweeps more broadly than requiring explicit evidence of request, funding, or control, instead requiring consideration of the factors discussed above. *AIT*, 897 F.3d at 1351 ("Depending on the nature of the parties' relationship, an entity can serve as an agent to a principal and file an IPR on the principal's behalf without the two formally agreeing that the agent will do so. *See* Restatement (Third) of Agency, § 1.01 cmt. c (Am. Law Inst. 2006) ('Thus, a person may be an agent although the principal lacks the right to control the full range of the agent's activities, how the agent uses time, or the agent's exercise of professional judgment.').").  Even if Salesforce did not directly fund, control, or expressly request these IPR proceedings, the evidence regarding RPX's relationship with Salesforce indicates that RPX represented Salesforce's interests to Salesforce's benefit and, consequently, that RPX effectively acted as if Salesforce had requested action by RPX, when filing the IPR petitions.  Pet. Remand Br. 1, 6–7, 28–31, 43.  Evidence regarding the relationship and communications between Salesforce and RPX from January 2014 through May 2015, as well as RPX's "Best Practices" document, carry weight under the circumstances here.  *Id.* at 15, 27–31 (citing, for example, Ex. 1019 ¶¶ 22–29, Ex. 1090 ¶¶ 32–34); Ex. 2018.  Consistent with RPX's Best Practices Guide (Ex. 2018), for example, RPX, and presumably Salesforce, would have known that Salesforce could not directly fund, control, or expressly request the IPRs without immediately necessitating the listing of Salesforce as an RPI in the IPR cases, triggering

IPR2015-01750 (Patent 8,484,111 B2)
IPR2015-01751, IPR2015-01752 (Patent 7,356,482 B2)

is adequate representation by the named party; (4) where the non-party had control of the prior litigation; (5) where the non-party acts as a proxy for the named party to relitigate the same issues; and (6) where special statutory schemes foreclose successive litigation by the non-party (e.g., bankruptcy and probate). *See Taylor*, 553 U.S. at 894–95; *AIT*, 897 F.3d at 1360 (Reyna, J., concurring). The Board explains in its Consolidated Trial Practice Guide that "privity" is even more expansive than RPI, "encompassing parties that do not necessarily need to be identified in the petition as a 'real party-in-interest.'" Consolidated Trial Practice Guide 14.

As with our RPI analysis above, the Board "evaluate[s] what parties constitute 'privies' in a manner consistent with the flexible and equitable considerations established under federal caselaw." *Id.* "This approach is consistent with the legislative history of the AIA, which indicates that Congress included 'privies' within the parties subject to the statutory estoppel provisions in an effort to capture 'the doctrine's practical and equitable nature,' in a manner akin to collateral estoppel." *Id.* at 15 (quoting 154 Cong. Rec. S9987 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl)).[18] Thus, if Salesforce is an RPI, it typically will qualify as being in privity with RPX. And here, in particular, Judge Reyna writes that, "[w]hen viewed through the lens of the more expansive notion of privity, the record clearly

---

[18] As explained by the Federal Circuit, "the related concept of privity 'is an equitable rule that takes into account the "*practical situation*," and should extend to parties to transactions and other activities relating to the property in question.'" *AIT*, 897 F.3d at 1350 (emphasis added and omitted) (quoting Trial Practice Guide, 77 Fed. Reg. at 48,759 (citing 157 Cong. Rec. S1376 (Mar. 8, 2011) (statement of Sen. Kyl)).



# Patent Trial and Appeal Board
# Consolidated Trial Practice Guide
# November 2019

Paper filing may be used where appropriate, but must be accompanied by a motion explaining the need for non-electronic filing. 37 C.F.R. § 42.6(b). Based upon experience, the Board does not expect to receive many requests to file paper submissions. Circumstances where a paper filing may be warranted include those occasions where the Office's electronic filing system is unable to accept filings. Alternatively, if a problem with electronic filing arises during normal business hours, a party may contact the Board and request a one-day extension of time for due dates that are set by rule or orders of the Board. 37 C.F.R. § 42.5. In the unlikely event that an administrative patent judge is not available to rule on the extension, the Board may grant an extension the day after the paper is due, which includes situations where electronic filing problems are shown to have occurred.

**D. Mandatory Notices**

The rules require that parties to a proceeding provide certain mandatory notices, including identification of the real parties-in-interest, related matters, lead and back-up counsel, and service information. 37 C.F.R. § 42.8. Where there is a change of information, a party must file a revised notice within 21 days of the change. 37 C.F.R. § 42.8(a)(3).

1. <u>Real Party-in-Interest or Privy</u>: The core functions of the "real party-in-interest" and "privies" requirements are to assist members of the Board in identifying potential conflicts, and to assure proper application of the statutory estoppel provisions. The latter, in turn, seeks to protect patent owners from harassment via successive petitions by the same or related parties, to prevent parties from having a "second bite at the apple," and to protect the

integrity of both the USPTO and federal courts by assuring that all issues are promptly raised and vetted. *Cf.* Fed. R. Civ. P. 17(a) (Advisory Committee Note to 1966 Amendment to Rule 17(a)) ("[T]he modern function of the rule in its negative aspect is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata."). The USPTO will apply traditional common-law principles with these goals in mind and parties will be well-served to factor in these considerations when determining whom to identify.

Whether a party who is not a named participant in a given proceeding nonetheless constitutes a "real party-in-interest" or "privy" to that proceeding is a highly fact-dependent question. *See generally Taylor v. Sturgell*, 553 U.S. 880 (2008); 18A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE §§ 4449, 4451 (2d ed. 2011) (hereinafter "WRIGHT & MILLER"). Such questions will be handled by the Office on a case-by-case basis taking into consideration how courts have viewed the terms "real party-in-interest" and "privy." *See, e.g.*, *Taylor*, 553 U.S. at 893–895 and 893 n.6 (noting that "[t]he list that follows is meant only to provide a framework [for the decision], not to establish a definitive taxonomy"). Courts invoke the terms "real party-in-interest" and "privy" to describe relationships and considerations sufficient to justify applying conventional principles of estoppel and preclusion. Accordingly, courts have avoided rigid definitions or recitation of necessary factors. Similarly, multiple Federal Rules invoke the terms without attempting to define them or what factors trigger their application. *See, e.g.*, Fed. R. Civ. P. 17; Fed. Cir. R. 47.4.

Trials@uspto.gov                                                    Paper 56
571-272-7822                                          Entered: March 8, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

UNIFIED PATENTS, LLC,
Petitioner,

v.

MEMORYWEB, LLC,
Patent Owner.

———————————

IPR2021-01413
Patent 10,621,228 B2

———————————

Before LYNNE H. BROWNE, NORMAN H. BEAMER, and
KEVIN C. TROCK, *Administrative Patent Judges.*

TROCK, *Administrative Patent Judge.*

ORDER
Identifying Real Party in Interest
*37 C.F.R. §§ 42.5, 42.8*

IPR2021-01413
Patent 10,621,228 B2

ORDER

Accordingly, it is

ORDERED that Apple, Inc. and Samsung Electronics Co., Ltd. are Real Parties in Interest to this Proceeding;

FURTHER ORDERED that Petitioner shall update its Mandatory Notices by March 10, 2023, identifying all Real Parties in Interest consistent with this Order pursuant to its obligations under 37 C.F.R. § 42.8(b)(1); and

FURTHER ORDERED that the parties shall, no later than 14 days from the entry of this Decision, jointly email a proposed redacted version of this Order, which identifies proposed redactions with red highlighting, to trials@uspto.gov.

Director_PTABDecision_Review@uspto.gov
571.272.7822

Paper 76
Date: May 22, 2023

*PUBLIC VERSION*

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE
FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE
UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

UNIFIED PATENTS, LLC,
Petitioner,

v.

MEMORYWEB, LLC,
Patent Owner.

———————————

IPR2021-01413
Patent 10,621,228 B2

———————————

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for
Intellectual Property and Director of the United States Patent and
Trademark Office.*

DECISION
Granting Director Review,
Vacating-in-part the Final Written Decision and Vacating Board Order

IPR2021-01413
Patent 10,621,228 B2

Apple and Samsung as RPIs.  *See* Decision 5 (incorporating RPI Order). The Board determined that it was appropriate to decide whether Apple and Samsung are RPIs in this proceeding "[b]ecause the issue of Section 315(e) estoppel has been put before us [as relevant to the subsequent IPR challenges filed by Apple and Samsung], and we now have a complete factual record available to fully address the RPI question, and to avoid unnecessary prejudice to Patent Owner."  RPI Order 6.

### III.    DISCUSSION

In the RPI Order, the Board held "if we do not decide the RPI issue now, as Patent Owner urges, then the underlying purpose of Section 315(e) would potentially be frustrated.  Determining whether Apple or Samsung are RPIs in this case is a necessary precursor to determining whether they would be estopped in [] subsequent proceeding[s]."  RPI Order 6.  Absent an RPI determination, "Patent Owner may have to continue to unnecessarily defend against two subsequent IPR challenges filed by Apple and Samsung should they have been named as RPIs in this case."  *Id.*

The precedential *SharkNinja* decision held that it best serves the Office's interests in cost and efficiency to not resolve an RPI issue when "it would not create a time bar or estoppel under 35 U.S.C. § 315" in that proceeding.  *SharkNinja*, Paper 11, 18.  *SharkNinja* further acknowledged that patent owners "should not be forced to defend against later judicial or administrative attacks on the same or related grounds by a party that is so closely related to the original petitioner as to qualify as a real party in interest," but held that was not the case before the Board.  *Id.* at 20 (quoting *Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1350 (Fed. Cir. 2018)).

IPR2021-01413
Patent 10,621,228 B2

Petitioner contends that *SharkNinja*'s reasoning should apply here, where neither a time bar nor estoppel applies in this proceeding. *See* Paper 70, 3. Accordingly, Petitioner contends "the panel erred by issuing a non-binding advisory opinion" on RPI, which prejudices Apple and Samsung by "prejudg[ing] the RPI issue without their participation," where that determination could bind Apple and Samsung in their subsequently-filed proceedings. *See id.*

The Board can and should make a determination of the real parties in interest or privity in any proceeding in which that determination may impact the underlying proceeding, for example, but not limited to, a time bar under 35 U.S.C. § 315(b) or an estoppel under 35 U.S.C. § 315(e) that might apply. That is not the situation here. The Board should not have determined whether Apple and Samsung are RPIs in this proceeding given that determination was not necessary to resolve the proceeding.

Accordingly, I vacate the Board's RPI determination in the Final Written Decision (pages 3–5, Section I.B.) and the Board's RPI Order, Paper 56, on which the Final Written Decision's RPI determination is based.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that the Board's real party in interest determination in the Final Written Decision (Section I.B.) is vacated; and

FURTHER ORDERED that the Board's Order Identifying Real Party in Interest (Paper 56) is vacated.